OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515

SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004

ARNOLD & PORTER
601 Massachusetts Ave, NW
Washington, D.C. 20001

Counsel for the Congressional Defendants

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| JOHN C. EASTMAN<br><br>          Plaintiff,<br><br>vs.<br><br>BENNIE G. THOMPSON, *et al.*,<br><br>          Defendants. | Case No. 8:22-cv-00099-DOC-DFM<br><br>**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**<br><br>Date:       January 24, 2022<br>Time:       2:00 p.m.<br>Location: Courtroom 9D |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...........................................................................ii

INTRODUCTION ........................................................................................1

BACKGROUND ..........................................................................................2

I.   APPLICABLE LEGAL STANDARD ...................................................6

II.  PLAINTIFF CANNOT DEMONSTRATE A SUBSTANTIAL LIKELIHOOD
     OF SUCCESS ON THE MERITS .........................................................6

     A.   Plaintiff's Challenges to the Select Committee's Authority to Issue the
          Subpoena Fail .........................................................................7

          1.   The Select Committee Is Validly Constituted Under House Rules .....8

          2.   The Select Committee Has a Valid Legislative Purpose .................12

     B.   The Documents the Subpoena Seeks Are Not Protected by the Attorney-
          Client Privilege .......................................................................16

     C.   The Documents Sought from Chapman Are Not Protected by the Attorney
          Work Product Privilege............................................................21

     D.   Plaintiff Is Unlikely to Succeed on His Constitutional Claims.................24

III. PLAINTIFF HAS FAILED TO DEMONSTRATE A LIKELIHOOD OF
     IRREPARABLE HARM ....................................................................25

IV.  THE BALANCE OF EQUITIES WEIGHS HEAVILY IN FAVOR OF THE
     SELECT COMMITTEE ....................................................................26

V.   THE PUBLIC INTEREST SUPPORTS ALLOWING THE SELECT
     COMMITTEE TO CONDUCT ITS URGENT INVESTIGATION ..................27

CONCLUSION ...........................................................................................29

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*All. for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011).............................................................6

*Almar Ranch, LLC v. Cty. of Boise*,
  No. CV-09-004-S-BLW, 2009 WL 3669741 (D. Idaho Nov. 2, 2009) ...............18

*Arizona Recovery Hous. Ass'n v. Arizona Dep't of Health Servs.*,
  462 F. Supp. 3d 990 (D. Ariz. 2020)....................................................26

*Barenblatt v. United States*,
  360 U.S. 109 (1959).......................................................................24

*Barker v. Conroy*,
  921 F.3d 1118 (D.C. Cir. 2019)............................................................9

*Brock v. Loc. 375, Plumbers Int'l Union of Am., AFL-CIO*,
  860 F.2d 346 (9th Cir. 1988)..............................................................24

*Buckley v. Valeo*,
  424 U.S. 1 (1976)...........................................................................24

*Clarke v. Am. Commerce Nat'l Bank*,
  974 F.2d 127 (9th Cir. 1992)..............................................................17

*Comm. on Ways & Means, U.S. House of Reps. v. U.S. Dep't of Treasury*,
  No. 1:19-CV-01974 (TNM), 2021 WL 5906031 (D.D.C. Dec. 14, 2021)...........12

*Convertino v. U.S. Dep't of Justice*,
  674 F. Supp. 2d 97 (D.D.C. 2009).......................................................17

*Doe v. San Diego Unified Sch. Dist.*,
  19 F.4th 1173 (9th Cir. 2021)..............................................................6

*Doe 1 v. George Washington Univ.*,
  480 F. Supp. 3d 224 (D.D.C. 2020)..................................................18, 19

*Eastland v. United States Servicemen's Fund*,
  421 U.S. 491 (1975)..............................................................7, 12, 25

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

*Exxon Corp. v. F.T.C.*,
    589 F.2d 582 (D.C. Cir. 1978) ............................................................... 12, 28

*F.T.C. v. TRW, Inc.*,
    628 F.2d 207 (D.C. Cir. 1980) ......................................................................28

*Franklin v. Scribner*,
    No. CIV. 07-0438BTMLSP, 2007 WL 1491100 (S.D. Cal. May 21, 2007)...........6

*Hollins v. Powell*,
    773 F.2d 191 (8th Cir. 1985) ........................................................................16

*In re California Pub. Utils. Comm'n*,
    892 F.2d 778 (9th Cir. 1989) ........................................................................21

*In re Chapman*,
    166 U.S. 661 (1897) .....................................................................................12

*In re Excel Innovations*,
    502 F.3d 1086 (9th Cir. 2007)......................................................................26

*In re Grand Jury Investigation*,
    810 F.3d 1110 (9th Cir. 2016)......................................................................17

*In re Horowitz*,
    482 F.2d 72 (2d Cir. 1973)...........................................................................16

*In re Lindsey*,
    158 F.3d 1263 (D.C. Cir. 1998).....................................................................17

*Judicial Watch, Inc. v. Schiff*,
    998 F.3d 989 (D.C. Cir. 2021) ........................................................................7

*Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp.*,
    5 F.3d 1508 (D.C. Cir. 1993) ................................................................. 27, 28

*McGrain v. Daugherty*,
    273 U.S. 135 (1927).......................................................................... 7, 12, 14

*McPhaul v. United States*,
    364 U.S. 372 (1960)............................................................................. 15, 25

*Metzenbaum v. FERC*,
    675 F.2d 1282 (D.C. Cir. 1982)......................................................................9

iii

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

*Munaf v. Geren*,
   553 U.S. 674 (2008) ................................................................... 1

*N.Y. State Club Ass'n, Inc. v. City of New York*,
   487 U.S. 1 (1988) ..................................................................... 24

*Randolph v. Willis*,
   220 F. Supp. 355 (S.D. Cal. 1963) ............................................. 9

*Rockwell Int'l Corp. v. U.S. Dep't of Justice*,
   235 F.3d 598 (D.C. Cir. 2001) ................................................. 22

*Saxholm AS v. Dynal, Inc.*,
   164 F.R.D. 331 (E.D.N.Y. 1996) .............................................. 16

*Senate Permanent Subcomm. on Investigations v. Ferrer*,
   856 F.3d 1080 (D.C. Cir. 2017) ................................................. 7

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
   240 F.3d 832 (9th Cir. 2001) ..................................................... 6

*Tenney v. Brandhove*,
   341 U.S. 367 (1951) .................................................................. 14

*Trump v. Mazars USA, LLP*,
   140 S. Ct. 2019 (2020) .................................................. 1, 7, 12, 13

*Trump v. Thompson*,
   20 F.4th 10 (D.C. Cir. 2021) ................................................. 2, 13

*United Keetoowah Band of Cherokee Indians in Okla. v. FCC*,
   933 F.3d 728 (D.C. Cir. 2019) ................................................. 10

*United States v. Ballin*,
   144 U.S. 1 (1892) ....................................................................... 8

*United States v. Deloitte LLP*,
   610 F.3d 129 (D.C. Cir. 2010) ................................................. 21

*United States v. Durenberger*,
   48 F.3d 1239 (D.C. Cir. 1995) ................................................... 9

*United States v. Harrelson*,
   754 F.2d 1153 (5th Cir. 1985) ................................................. 16

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

*United States v. Legal Servs. for N.Y.C.*,
    249 F.3d 1077 (D.C. Cir. 2001)............................................................17

*United States v. Martin*,
    278 F.3d 988 (9th Cir. 2002)..............................................................17

*United States v. Munoz*,
    233 F.3d 1117 (9th Cir. 2000)............................................................17

*United States v. R. Enters., Inc.*,
    498 U.S. 292 (1991)............................................................................15

*United States v. Rostenkowski*,
    59 F.3d 1291 (D.C. Cir. 1995) ........................................................8, 9

*United States v. Ruehle*,
    583 F.3d 600 (9th Cir. 2009)..............................................................16

*United States v. Sanmina Corp.*,
    968 F.3d 1107 (9th Cir. 2020).................................................... *passim*

*Verizon Cal. Inc. v. Ronald A. Katz Tech. Licensing, L.P.*,
    266 F. Supp. 2d 1144 (C.D. Cal. 2003)............................................16

*Watkins v. United States*,
    354 U.S. 178 (1957)............................................................................12

*Weil v. Inv./Indicators, Rsch. & Mgmt., Inc.*,
    647 F.2d 18 (9th Cir. 1981)................................................................23

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)..........................................................................6, 26

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ..........................................................26

**Statutes**

18 U.S.C. § 1341 ............................................................................................17

26 U.S.C. §§ 8001-8005................................................................................8

Pub. L. No. 107-306, § 602(1), 116 Stat. 2383 (2002)..................................14

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

**Constitutional Provisions**

U.S. Const. art. I, § 5, cl. 2.................................................................8

**Rules**

Fed. R. Civ. P. 26(b)(3)....................................................................21

**Legislative Authorities**

167 Cong. Rec., 117th Cong. (Oct. 27, 2021).............................................13

167 Cong. Rec. H37, 117th Cong. (daily ed. Jan. 4, 2021)................................. 8, 9, 11

H. Rep. No. 109-377, 109th Cong. (2006)..................................................10

H. Rep. No. 114-848, 114th Cong. (2016)..................................................10

H. Res. 6, 116th Cong. (2019) ............................................................10

H. Res. 24, 110th Cong. (2007) ...........................................................10

H. Res. 437, 109th Cong. (2005)..........................................................10

H. Res. 503, 117th Cong. (2021)....................................................... *passim*

H. Res. 567, 113th Cong. (2014)..........................................................10

**Other Authorities**

28 Annals of Congress 310 (1814)........................................................14

*Another Way,* 710 KNUS News/Talk (Sept. 27, 2021) (available at
     https://equalcitizens.us/discussing-the-john-eastman-memo-with-john-eastman/.20

Chapman University, *President Struppa's Message on Supreme Court Case*, Dec. 10,
     2020, https://news.chapman.edu/2020/12/10/president-struppas-message-on-
     supreme-court-case/.................................................... 19, 20

Eastman Letter to the Honorable Bennie G. Thompson, Chair
     https://www.politico.com/f/?id=0000017d-811e-dac5-abff-a11f4c830000............5

Federalist Society, *Dr. John C. Eastman*, https://fedsoc.org/contributors/john-eastman.19

John C. Eastman, *John Eastman: Here's the Advice I Actually Gave Vice President Pence
     on the 2020 Election,* Sacramento Bee, Oct. 7, 2021 .................................... 20, 21

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

John McCormack, *John Eastman v. the Eastman Memo,* Nat'l Rev., Oct. 22, 2021.......20

*Joint Committee on the Investigation of the Pearl Harbor Attack, Pearl Harbor Attack:
    Hearings before the Joint Committee on the Investigation of the Pearl Harbor
    Attack*, 79th Cong. 4 (1945) ..................................................................................14

Luke Broadwater, *Trump Lawyer Blamed Pence for Violence as Rioters Stormed the
    Capitol*, N.Y. Times, Oct. 30, 2021 .....................................................................15

Michael Greene, Cong. Rsch. Serv., R46786, *Rules Governing House Committee and
    Subcommittee Assignment Procedures* (2021) .....................................................11

Michael S. Schmidt and Maggie Haberman, *The Lawyer Behind the Memo on How
    Trump Could Stay in Office,* N.Y. Times, Oct. 2, 2021 .......................................20

Nov. 8, 2021 Select Committee Cover Letter to Eastman................................................4

*Peter Boyles Show,* 710KNUS News/Talk, May 5, 2021..............................................20

*Policies and Procedures: Computer and Network Acceptable Use Policy*, Chapman
    University, https://www.chapman.edu/campus-services/information-
    systems/policies-and-procedures/acceptable-use-policy.aspx..................18, 19, 23

Press Release, Kevin McCarthy, House of Representatives, McCarthy Statement about
    Pelosi's Abuse of Power on January 6th Select Committee, July 21, 2021 ...........3

Press Release, Nancy Pelosi, Speaker, House of Representatives, Pelosi Statement on
    Republican Recommendations to Serve on the Select Comm. To Investigate the
    Jan. 6 Attack on the U.S. Capitol, July 21, 2021 ..................................................3

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

## **INTRODUCTION**

Defendants the House Select Committee to Investigate the January 6th Attack on the U.S. Capitol and Bennie Thompson, in his official capacity as Chairman of the Select Committee, (collectively, "Congressional Defendants") submit this memorandum of law in opposition to Plaintiff's Application for Temporary Restraining Order ("Motion").

Plaintiff asks the Court to enjoin Chapman University from disclosing documents and communications ***on its own email system***.  Plaintiff seeks this injunction even though Chapman made clear that the University reserves the right to review what is placed on that system, that users have no expectation of privacy regarding the system, and that the contents of that system may be disclosed to third parties.  Moreover, the records at issue here are being sought by the Select Committee because they are highly relevant to its investigation of the January 6, 2021 attack on the U.S. Capitol.  For multiple independent reasons, Plaintiff's motion is flawed under governing principles of law.  Therefore, Plaintiff's complaint should also now be dismissed.[1]

*First*, Plaintiff's contention that the Select Committee is invalidly constituted fails because the Rulemaking Clause protects the House's right to make and interpret its own rules.  And Plaintiff's specific contentions—that "consultation" with the Minority Leader requires his approval, and that the Republican Steering Committee and Republican House Conference were entitled to select Members of the Select Committee—are both belied by the text of the House's governing resolution, the applicable House Rules, and the indisputable facts surrounding the appointments.

*Second*, Plaintiff's argument that the Select Committee lacks a valid legislative purpose is likewise fatally flawed.  The Supreme Court has instructed that Congressional committees are not required to identify a specific piece of legislation in advance of conducting an investigation of the pertinent facts.  It is sufficient that a committee's investigation concerns a subject on which legislation "could be had." *Trump v. Mazars*

---

[1]    In considering an application for injunctive relief, if a court determines that the "injunction rests on a question of law and it is plain that the plaintiff cannot prevail … the defendant is entitled to judgment." *Munaf v. Geren*, 553 U.S. 674, 691 (2008).

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

*USA, LLP*, 140 S. Ct. 2019, 2031-32 (2020).  The D.C. Circuit has recently held that the Select Committee has such a valid purpose.  *Trump v. Thompson*, 20 F.4th 10, 41-42 (D.C. Cir. 2021).  The Supreme Court recently denied a request for an injunction pending review of that decision, leaving in place the D.C. Circuit's determination of a valid legislative purpose.  In any event, Plaintiff cannot show that the subpoena issued to him lacks a legislative purpose, given the legitimate scope of the Select Committee's inquiry and his admitted role in the events leading up to and on January 6.

*Third*, Plaintiff's claim that the records sought are protected by the attorney-client privilege is unavailing.  Plaintiff has failed to identify any particular communication that could be privileged, or even who the clients are with whom he had privileged communications, and has instead simply made a blanket assertion of the privilege, which is inadequate under governing law.  Moreover, to the extent any communication is privileged, such privilege has been waived by Plaintiff's use of Chapman University's email system and by Plaintiff's various public statements that former President Trump authorized him to discuss their confidential communications.  The records sought similarly have no protection under the work product doctrine.

*Finally*, Plaintiff has failed to demonstrate he is likely to suffer irreparable harm in the absence of a temporary restraining order.  His claim of harm is speculative and falls far short of outweighing the Select Committee and the public's immense interest in the investigation of the events of January 6.

For these and the other reasons set forth below, Plaintiff's motion for emergency relief must be denied, and this case should be dismissed.

## BACKGROUND

### A.    The January 6 Attack

On January 6, 2021, rioters seeking to stop the peaceful transfer of power from President Trump to President Joseph Biden following the Presidential election of November 2020 launched an assault on the United States Capitol.  H. Res. 503, 117th Cong. (2021), Preamble.  As Plaintiff describes the event, a large group "entered the

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

Capitol building. Some of the individuals who entered the Capitol committed criminal acts, including assault and property damage." Compl. ¶ 3. This attack resulted in multiple deaths, physical harm to over 140 members of law enforcement, and terror and trauma among government employees, press, and Members of Congress. *See* H. Res. 503, Preamble.

**B.    The Formation of the Select Committee**

In response to the attack, the House of Representatives adopted House Resolution 503, "Establish[ing] the Select Committee to Investigate the January 6th Attack on the United States Capitol." This resolution authorizes the Speaker of the House to appoint up to thirteen Members to the Select Committee, five of whom "shall be appointed after consultation with the minority leader." H. Res. 503, § 2(a). Speaker Pelosi appointed seven Democrats and two Republicans to the Select Committee. Compl. ¶ 4. Pursuant to the requirements of House Resolution 503, the Speaker consulted with House Minority Leader Kevin McCarthy, who recommended five Republicans for appointment to the Select Committee. *Id.* ¶ 40. The Speaker "spoke[]" with Minority Leader McCarthy and stated her intention to appoint three of the Members he had recommended. Press Release, Nancy Pelosi, Speaker, House of Representatives, Pelosi Statement on Republican Recommendations to Serve on the Select Comm. to Investigate the Jan. 6 Attack on the U.S. Capitol (July 21, 2021), https://www.speaker.gov/newsroom/72121-2. However, the Speaker asked that Minority Leader McCarthy recommend two other Republicans to serve on the Select Committee in place of Reps. Jordan and Banks. *Id.* Minority Leader McCarthy declined and instead withdrew all five recommendations. Press Release, Kevin McCarthy, House of Representatives, McCarthy Statement about Pelosi's Abuse of Power on January 6th Select Committee (July 21, 2021), https://republicanleader.house.gov/mccarthy-statement-about-pelosis-abuse-of-power-on-january-6th-select-committee/. House Resolution 503 authorizes the Select Committee to: (1) "investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol"; (2) "identify, review, and evaluate the causes of and the lessons

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

learned from the domestic terrorist attack on the Capitol"; and (3) "issue a final report to the House containing such findings, conclusions, and recommendations for corrective measures described in subsection (c) as it may deem necessary." H. Res. 503, § 4(a)(1)-(3).[2]

## C.     The Select Committee's Subpoenas to Plaintiff and Chapman University

In furtherance of its duty to "investigate the facts, circumstances, and causes" of the attack on January 6, the Select Committee issued subpoenas to certain government agencies, companies, and individuals, including Plaintiff and his former employer, Defendant Chapman University.  On November 8, 2021, the Select Committee issued a subpoena to Plaintiff.  In an accompanying cover letter, Chairman Thompson explained that the Select Committee had "credible evidence" that he knew about and "may have participated in, attempts to encourage the Vice President of the United States to reject the electors from several states, or, at the very least, to delay the electoral college results to give states more time to submit different slates of electors."  Nov. 8, 2021 Select Committee Cover Letter to Eastman at 1.[3]  Specifically, Chairman Thompson reported that Plaintiff wrote "two memoranda offering several scenarios for the Vice President to potentially change the outcome of the 2020 Presidential election."  *Id.*  Chairman Thompson also noted that Plaintiff had "participated in a briefing for nearly 300 state legislators from several states regarding purported election fraud," "testified to Georgia

---

[2]     Subsection 4(c) describes three categories of corrective measures: "changes in law, policy, procedure, rules or regulations that could be taken" (1) "to prevent future acts of violence, domestic terrorism, and domestic violent extremism, including acts targeted at American democratic institutions"; (2) "to improve the security posture of the United States Capitol Complex while preserving accessibility of the Capitol Complex for all Americans"; and (3) "to strengthen the security and resilience of the United States and American democratic institutions against violence, domestic terrorism, and domestic violent extremism."  H. Res. 503, § 4(c).

[3]     *Available at* https://january6th.house.gov/sites/democrats.january6th.house.gov/files/20211108%20Eastman.pdf.

4

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

state senators regarding alleged voter fraud and reportedly sharing a paper that argued that that the state legislature could reject election results and directly appoint electors," was "at the Willard Hotel 'war room' with Steve Bannon and others on the days leading up to January 6 where the focus was on delaying or blocking the certification of the election," and "on January 6, [he] spoke at the rally at the White House Ellipse." *Id.* at 2.

In the ensuing weeks, the Select Committee sent emails to Eastman's counsel, attempting to reach an accommodation with Eastman regarding emails from his Chapman account, including an offer to connect Eastman with the General Counsel of Chapman so that Eastman could review and produce responsive emails along with a privilege log. Counsel for Eastman did not respond to those efforts at accommodation. On December 1, Plaintiff sent a letter to the Select Committee declining to produce any documents responsive to the subpoena. The letter asserted that the act of production itself—and even the provision of a log explaining his basis for withholding documents—was protected by his Fifth Amendment right against self-incrimination. *See* Dec. 1, 2021 Eastman Letter to the Honorable Bennie G. Thompson, Chair at 1.[4]   Likewise, at his deposition on December 9, Eastman declined to answer any questions except those regarding biographical information, again invoking the Fifth Amendment 146 separate times.

On January 18, 2022, the Select Committee issued a subpoena to Chapman for certain documents in its possession "attributable to Dr. John Eastman, that are related in any way to the 2020 election or the January 6, 2021 Joint Session of Congress." Pl.'s Mem. Ex. B at 4.  The subpoena requests documents during the period of November 3, 2020 to January 20, 2021. *Id.*  The Select Committee provided to Chapman a list of suggested search terms to assist in the identification of relevant documents.  The deadline to produce the subpoenaed documents was January 21, 2022. *Id.* at 3.

---

[4]     *Available at* https://www.politico.com/f/?id=0000017d-811e-dac5-abff-a11f4c830000.

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

**D.      Procedural History**

On January 20, Plaintiff filed this action and sought a temporary restraining order ("TRO") to enjoin Chapman from producing the records in response to the subpoena. Plaintiff did not include an affidavit or declaration with his submission.  On the same day, the Court granted Plaintiff's request for an *ex parte* TRO until the parties appear for a hearing scheduled for January 24.  *See* Jan. 20, 2022 Civil Minutes, ECF 12.

## ARGUMENT

**I.      APPLICABLE LEGAL STANDARD**

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  A party seeking a TRO must satisfy the same test required for the issuance of a preliminary injunction.  *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001); *Franklin v. Scribner*, No. CIV. 07-0438BTMLSP, 2007 WL 1491100, at *3 (S.D. Cal. May 21, 2007).  Plaintiff must show that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest.  *See Winter*, 555 U.S. at 20.  "The Ninth Circuit applies a 'sliding scale' approach to preliminary injunctions such that a preliminary injunction can issue 'where the likelihood of success is such that serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor.'"  *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1176-77 (9th Cir. 2021), *reh'g en banc denied,* No. 21-56259, 2022 WL 130808 (9th Cir. Jan. 14, 2022) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)).

**II.      PLAINTIFF CANNOT DEMONSTRATE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS**

Plaintiff is exceedingly unlikely to succeed on the merits of his challenge to the Select Committee's subpoena.  Notably, just yesterday a district court denied from the bench a similar motion for a temporary restraining order challenging a subpoena issued

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

by the Select Committee, rejecting many of the very same arguments raised by Plaintiff here.  Minute Entry, *Budowich, et al. v. Pelosi, et al.*, No. 1:22-cv-00005-CJN (D.D.C. Jan. 20, 2022).[5]  As an initial matter, and as the D.C. Circuit recently reaffirmed, the "[i]ssuance of subpoenas … has long been held to be a legitimate use of Congress of its power to investigate." *Judicial Watch, Inc. v. Schiff*, 998 F.3d 989, 992 (D.C. Cir. 2021) (citations omitted).  The Supreme Court has long recognized that Congress's "power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function." *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927).

Indeed, investigations and subpoenas are "indispensable ingredient[s] of lawmaking."  *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 505 (1975).  "Without information, Congress would be shooting in the dark, unable to legislate 'wisely or effectively.'" *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020) (quoting *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927)).  The authority of a court to interfere with Congress's critical investigative function is thus extremely limited.  The Constitution's Speech or Debate Clause reflects an understanding that "that the legislative function" must be "performed independently" of a potentially "hostile judiciary," and it "reinforc[es] the separation of powers so deliberately established by the Founders." *Eastland*, 421 U.S. 502; *see also Senate Permanent Subcomm. on Investigations v. Ferrer*, 856 F.3d 1080, 1086-88 (D.C. Cir. 2017.  Plaintiff has provided no valid reason for this Court to interfere with the Select Committee's ongoing investigation here.

### A.    Plaintiff's Challenges to the Select Committee's Authority to Issue the Subpoena Fail

Plaintiff's challenges to the validity of the Select Committee and its authority to issue the subpoena to Chapman University also fail on the merits.  Plaintiff argues (1)

---

[5]    The transcript of the hearing at which the district court issued its ruling was requested but was not available at the time of this filing.  The transcript will be provided to this court as soon as it is received.

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

1   that the Committee is not properly constituted pursuant to House Resolution 503 and (2)

2   that it lacks a valid legislative purpose.  Both arguments are badly flawed.

3         **1.**     **The Select Committee Is Validly Constituted Under House Rules**

4        By way of background, the House utilizes four distinct kinds of Committees, each

5   of which are established and governed by various House Rules, statutes, House

6   resolutions, or on an *ad hoc* basis.  *See, e.g.*, Rules of the House of Representatives, Rule

7   X, 117th Cong. (2021) (rules governing standing Committees); 26 U.S.C. §§ 8001-8005

8   (establishing the Joint Committee on Taxation); H. Res. 503 (establishing the Select

9   Committee).  Apart from standing Committees, the House Rules state that "[t]he Speaker

10   shall appoint all select, joint, and conference committees ordered by the House."  House

11   Rule I.11.  Further, by unanimous consent, on January 4, 2021, the House expressly

12   authorized the Speaker to "make appointments authorized by law or by the House."  *See*

13   167 Cong. Rec. H37, 117th Cong. (daily ed. Jan. 4, 2021).

14        The Rulemaking Clause provides that "Each House may determine the Rules of its

15   Proceedings."  U.S. Const. art. I, § 5, cl. 2.  The Clause has long been construed to give

16   broad discretion to Congress to establish—and interpret—its own rules, so long as those

17   rules do not "ignore constitutional restraints or violate fundamental rights."  *United*

18   *States v. Ballin*, 144 U.S. 1, 5 (1892).  For example, in *Ballin*, faced with the question of

19   how to interpret the Quorum Clause of Article I, section 5, the Supreme Court held that,

20   because the Constitution does not specify how to determine when a majority is present to

21   constitute a quorum, "it is therefore within the competency of the house to prescribe any

22   method which shall be reasonably certain to ascertain the fact."  *Id.* at 6.

23        Numerous courts have likewise emphasized the deference owed to Congress in

24   determining its own rules.  While "the Rulemaking Clause is not an absolute bar to

25   judicial interpretation of the House Rules," *United States v. Rostenkowski*, 59 F.3d 1291,

26   1305 (D.C. Cir. 1995), "judicial interpretation of an ambiguous House Rule runs the risk

27   of the court intruding into the sphere of influence reserved to the legislative branch under

28   the Constitution."  *Id.* at 1306.  Thus, a court may interpret internal rules of a House of

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

Congress *only* where such interpretation "requires no resolution of ambiguities." *United States v. Durenberger*, 48 F.3d 1239, 1244 (D.C. Cir. 1995). "Where, however, a court cannot be confident that its interpretation is correct, there is too great a chance that it will interpret the Rule differently than would the Congress itself; in that circumstance, the court would effectively be making the Rules—a power that the Rulemaking Clause reserves to each House alone." *Rostenkowski*, 59 F.3d at 1306-07; *accord Metzenbaum v. FERC*, 675 F.2d 1282, 1287 (D.C. Cir. 1982) ("To decide otherwise would subject Congressional enactments to the threat of judicial invalidation on each occasion of dispute over the content or effect of a House or Senate rule."); *Randolph v. Willis*, 220 F. Supp. 355, 358 (S.D. Cal. 1963) (stating that in analyzing a House rule "all matters of method are open to the determination of the house, and it is no impeachment of the rule to say that some other way would be better, more accurate or even more just").

Plaintiff advances several arguments for his view that the composition of the Select Committee does not comport with House Resolution 503. As discussed below, they read the Resolution incorrectly and misapply the applicable House rules. But to the extent there is any ambiguity, the reasonable interpretation by the House of its own rules and procedures governs. *See Barker v. Conroy*, 921 F.3d 1118, 1130 (D.C. Cir. 2019).

In light of the foregoing principles, Plaintiff's arguments that the Select Committee is not validly constituted under House Resolution 503 are incorrect.

*First*, Plaintiff complains that "the committee was not formed with "5 [of the 13 members who] must be appointed after consultation with the minority leader." Pl.'s Mem. at 7. But as explained above, the power to appoint Members to select Committees rests exclusively with the Speaker. *See* House Rule I.11 ("The Speaker shall appoint all select, joint, and conference committees ordered by the House."); 167 Cong. Rec. H37, 117th Cong. (daily ed. Jan. 4, 2021) (authorizing Speaker to "accept resignations and to make appointments authorized by law or by the House"). House Resolution 503 is not to the contrary. Had the House intended a binding role for the Minority Leader, it could have provided for such a requirement. For instance, in the 116th Congress, the House

9

created two Select Committees, both of which required that a portion of the Members be appointed by the Speaker "on the recommendation of the Minority Leader." *See* H. Res. 6, § 104(f)(1)(B), 116th Cong. (2019) (Select Committee on the Climate Crisis); *id.* at § 201(b)(3) (Select Committee on the Modernization of Congress).  Similarly, had the House wanted to delegate appointment power directly to the Minority Leader, it knew how to do so.  *See*, *e.g.*, H. Res. 24, § 2(a), 110th Cong. (2007) (creating the House Democracy Assistance Commission and allowing nine Members to "be appointed by the Minority Leader of the House of Representatives").

In contrast, when creating the Select Committee, the House did neither, instead deliberately selecting the phrase "after *consultation* with the Minority Leader," H. Res. 503, § 2(a) (emphasis added), which plainly allows the Speaker greater authority and opportunity regarding the appointment of minority party Members.  "Consultation" means to "seek[] advice or information of.'" *United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 750 (D.C. Cir. 2019) (internal quotation marks omitted).  The term itself does not explain how and to what extent such advice or information need be considered, nor whether it must be accepted.  And this language is entirely consistent with House practice and precedent: the same language was used in the resolutions that created both the Hurricane Katrina select committee, *see* H. Res. 437, § 2(a), 109th Cong. (2005), as well as the Select Committee on the Events Surrounding the 2012 Terrorist Attack in Benghazi, *see* H. Res. 567, § 2(a), 113th Cong. (2014).  No points of order or other procedural objections were raised as to the filing of either select committee's final report. *See* H. Rep. No. 109-377, 109th Cong. (2006); H. Rep. No. 114-848, 114th Cong. (2016).

Here, there can be no serious contention that House Resolution 503 was not followed: the Minority Leader *was* consulted.  The Minority Leader made several suggestions to the Speaker regarding minority party Members to serve on the Select Committee, and the Speaker even announced her intention to appoint three of the five minority party Members that the Minority Leader recommended.  That the Speaker—

10

using the authority provided to her by the House Rules, the January 4, 2021 Order of the House, and House Resolution 503—made different selections as to two of the Members, and that the Minority Leader subsequently withdrew his recommendations, does not make the Select Committee improperly constituted, nor does it invalidate any of its actions.

*Second*, Plaintiff complains that the minority party members on the Select Committee were not nominated by the Republican Steering Committee or voted on by the full Republican House Conference. *See* Pl.'s Mem. at 3 (citing House GOP Rule 14(a)(1)). As discussed above, membership on House committees varies by the type of committee. Plaintiff wrongly attempts to apply the rules and practices for standing committees of the House to a select committee. For standing committees, Members must be formally elected by the full House within seven calendar days of the start of a new Congress. *See* House Rule XI.5(a)(1). Assignments to the House's standing committees are also governed by rules established by political parties' respective conferences—the Democratic Caucus and the Republican Conference—which each impose additional restrictions on standing committee service. *See* Michael Greene, Cong. Rsch. Serv., R46786, *Rules Governing House Committee and Subcommittee Assignment Procedures*, 3 (2021).[6]

Contrary to Plaintiff's claim, membership on all other types of House committees, including the Select Committee here, is not obtained by election and, thus, does not require participation of the political party conferences. Rather, the appointment mechanism is expressly established by the House Rules, which states that "[t]he Speaker shall appoint all select, joint, and conference committees ordered by the House." House Rule I.11; *see also* 167 Cong. Rec. H37, 117th Cong. (daily ed. Jan. 4, 2021) (providing the Speaker authority to "accept resignations and to make appointments authorized by law or by the House.").

---

[6]   *Available at* https://crsreports.congress.gov/product/pdf/R/R46786.

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

1  Accordingly, because all the Members were appointed by the Speaker, in
2  accordance with the applicable House Rules and precedents, the Select Committee is
3  validly constituted.[7]

### 2. The Select Committee Has a Valid Legislative Purpose

5  Contrary to Plaintiff's argument, the Select Committee's subpoena is supported by
6  a valid legislative purpose.  A Congressional request for information must "concern a
7  subject on which legislation could be had." *Mazars*, 140 S. Ct. at 2031-32 (quoting
8  *Eastland*, 421 U.S. at 506).  It is "certainly not necessary," however, that the applicable
9  resolution "declare in advance" what a committee "meditate[s] doing when the
10 investigation conclude[s]." *In re Chapman*, 166 U.S. 661, 670 (1897).  Even if a
11 resolution does not expressly state its legislative purpose, such a purpose is presumed to
12 exist so long as Congress has jurisdiction over the subject matter of the resolution.
13 *McGrain*, 273 U.S. at 177; *see also Comm. on Ways & Means, U.S. House of Reps. v.*
14 *U.S. Dep't of Treasury*, No. 1:19-CV-01974 (TNM), 2021 WL 5906031, at *5 (D.D.C.
15 Dec. 14, 2021) (summarizing relevant Supreme Court precedent and concluding that "the
16 legitimate legislative purpose bar is a low one, and the purpose need not be clearly
17 articulated").

18 Courts must "presume that the committees of Congress will exercise their powers
19 responsibly and with due regard for the rights of affected parties." *Exxon Corp. v.*
20 *F.T.C.*, 589 F.2d 582, 589 (D.C. Cir. 1978).  Accordingly, when Congress is investigating
21 a subject matter "on which legislation could be had," *Mazars*, 140 S. Ct. at 2031 (internal
22 quotation marks omitted), "the presumption should be indulged" that the legislation is
23 "the real object" of the investigation, *McGrain*, 273 U.S. at 178; *see also Watkins v.*
24 *United States*, 354 U.S. 178, 200 (1957) (stating that the motives of committee Members

26 _____
27 [7]   Plaintiff's arguments in his Complaint regarding the House Rules regarding
   depositions, *see, e.g.*, Compl. ¶¶ 48-55, fail for the same reasons. In any event, those
28 arguments are entirely misplaced for the additional reason that this case is about a
   subpoena for records, not a deposition.

12

in conducting their investigation "would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served").

Here, the Select Committee plainly has a valid legislative purpose.  The Select Committee is operating pursuant to a House Resolution that expressly authorizes the Select Committee to investigate specified topics and to propose legislative measures.  *See* H. Res. 503, § 4(a), (c).  Indeed, as noted above, the D.C. Circuit recently rejected a similar challenge to the Select Committee's legislative purpose, and the Supreme Court then denied Mr. Trump's application for an injunction pending further review, thereby leaving in place the D.C. Circuit's determination on this point.  *See Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021), *application for stay of mandate and injunction pending review denied*, No. 21A272 (U.S. Jan. 19, 2022).  There, the D.C. Circuit held that the Select Committee "plainly has a 'valid legislative purpose' and its inquiry 'concern[s] a subject on which legislation could be had.'"  *Id.* at 41 (quoting *Mazars*, 140 S. Ct. at 2031-32).

As the D.C. Circuit recognized, the Select Committee's investigation could lead Congress to, for example: (1) "pass laws imposing more serious criminal penalties on those who engage in violence to prevent the work of governmental institutions;" (2) "amend the Electoral Count Act to shore up the procedures for counting electoral votes and certifying the results of a presidential election;" (3) "allocate greater resources to the Capitol Police and enact legislation to 'elevat[e] the security posture of the United States Capitol Complex,'"; or (4) "revise the federal government's 'operational plans, policies, and procedures' for 'responding to targeted violence and domestic terrorism[.]'"  *Thompson,* 20 F.4th at 42 (quoting H. Res. 503 § 4(a)(2)(B), (D)).  To name but a few more examples, Congress could pass laws that mandate better cooperation between Congressional security offices and the Federal Bureau of Investigation and the Department of Defense, impose structural reforms on Executive Branch agencies to prevent their abuse for antidemocratic ends, or prevent campaign fundraising based on knowing misrepresentations regarding election fraud.  *See also* 167

13

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

Cong. Rec. E1151, 117th Cong. (Oct. 27, 2021) (remarks by Vice Chair Cheney adopted by Chairman Thompson identifying other potential legislation).[8]

Plaintiff nonetheless argues that the Select Committee is using the Chapman subpoena to pursue an invalid law enforcement purpose. Pl.'s Mem. at 6. This is incorrect. The fact that the Select Committee has acknowledged the potential for criminal referrals to the Department of Justice as it engages in its investigate work does not demonstrate that the Committee is, pursuing an invalid law enforcement purpose. As the Supreme Court instructed, it is not "a valid objection to the investigation that it might possibly disclose crime or wrongdoing." *McGrain v. Daugherty*, 273 U.S. 135, 180 (1927). Rather, "[t]o find that a committee's investigation has exceeded the bounds of legislative power it must be *obvious* that there was a usurpation of functions exclusively vested in the Judiciary or the Executive." *Tenney v. Brandhove*, 341 U.S. 367, 378 (1951) (emphasis added). No such usurpation exists here, let alone an obvious one.

Plaintiff also argues that, although the Select Committee has a valid legislative purpose, the subpoena issued to Chapman is not relevant to that purpose. Pl.'s Mem. at 7-8. Again, Plaintiff is incorrect. "In determining the proper scope of a legislative subpoena, this Court may only inquire as to whether the documents sought by the subpoena are not plainly incompetent or irrelevant to any lawful purpose [of the Select

---

[8]   Congressional investigations into attacks against the United States are solidly grounded in historical precedent. In 1814, the House initiated an investigation "into the causes of the success of the enemy"— the British—"in his late enterprises," including burning the Capitol, 28 Annals of Congress 310 (1814). Similarly, after the attack on Pearl Harbor, Congress authorized a ten-member joint committee to investigate "the facts relating to the events and circumstances leading up to or following the attack made by Japanese armed forces upon Pearl Harbor." *Joint Committee on the Investigation of the Pearl Harbor Attack, Pearl Harbor Attack: Hearings before the Joint Committee on the Investigation of the Pearl Harbor Attack*, 79th Cong. 4 (1945) (text of authorizing resolution). And in recent times, Congress established the National Commission on Terrorist Attacks Upon the United States in the wake of Sept. 11 to "examine and report upon the facts and causes relating to the terrorist attacks of Sept. 11, 2001." Intelligence Authorization Act for Fiscal Year 2003, Pub. L. No. 107-306, § 602(1), 116 Stat. 2383, 2408 (2002).

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

Committee] in the discharge of [its] duties." *McPhaul v. United States*, 364 U.S. 372, 381 (1960) (internal quotation marks omitted).

The relevance of the records sought from Chapman is clear.  House Resolution 503 explicitly authorizes the Select Committee to investigate "influencing factors that contributed to the domestic terrorist attack on the Capitol."  H. Res. 503, § 4(a)(1)(B).  It has been publicly reported that in advance of January 6, Plaintiff wrote two memoranda describing ways in which Vice President Pence could overturn the results of the election by throwing out electors from several states.  Plaintiff does not deny writing these memos and has called Vice President Pence "spineless" for refusing to go along with his plan.  Luke Broadwater, *Trump Lawyer Blamed Pence for Violence as Rioters Stormed the Capitol*, N.Y. Times, Oct. 30, 2021.[9]  The Select Committee's subpoena to Chapman is the next logical step for the investigation.  It will allow the Committee to determine what role Plaintiff and his writings played in the events that occurred leading up to and on January 6.  Understanding Plaintiff's role will help it make informed decisions about whether and how Congress should legislate to prevent such events from recurring and to ensure a peaceful transfer of power after future presidential elections.  As the Supreme Court has stated, a subpoena must be enforced "unless the district court determines that there is *no reasonable possibility* that the category of materials the Government seeks will produce information relevant to the general subject of the … investigation." *United States v. R. Enters., Inc.*, 498 U.S. 292, 301 (1991) (emphasis added).  Here, it is reasonable and likely that the records from Chapman will produce information relevant to the investigation given that Plaintiff was the legal architect of the plan by former President Trump and his supporters to challenge the election results through the Congressional certification process on January 6, which, of course, set the stage for the violence that occurred in the Capitol.

---

[9]     *Available at* https://www.nytimes.com/2021/10/30/us/politics/eastman-pence-capitol-riot.html.

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

Accordingly, in light of the valid legislative purpose of the Select Committee's investigation, Plaintiff cannot succeed on the merits of any argument that the Chapman subpoena was outside the scope of the Select Committee's authority.

## B. The Documents the Subpoena Seeks Are Not Protected by the Attorney-Client Privilege

Plaintiff next claims that the documents responsive to the Chapman subpoena are protected by the attorney-client privilege. Pl.'s Mem. at 11-12. He is wrong. "[A] party asserting the attorney-client privilege has the burden of establishing the relationship *and* the privileged nature of the communication." *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009) (internal quotation omitted). "The fact that a person is a lawyer does not make all communications with that person privileged." *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002). "Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed." *Id.* (internal quotation omitted); *see also In re Horowitz*, 482 F.2d 72, 81 (2d Cir. 1973) ("[T]he privilege stands in derogation of the public's right to every man's evidence and as an obstacle to the investigation of the truth, [and] thus, ... [i]t ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle." (cleaned up)).

Here, Plaintiff has failed to provide ***any*** factual support or evidence to demonstrate that that the communications sought by the Chapman subpoena are between an attorney and his client or that the communications were made for the purpose of seeking legal advice. *See Verizon Cal. Inc. v. Ronald A. Katz Tech. Licensing, L.P.*, 266 F. Supp. 2d 1144, 1147 (C.D. Cal. 2003) ("Moreover, an assertion of privilege without evidence to support it will not prevail.") (citing, *inter alia*, *Hollins v. Powell*, 773 F.2d 191, 196 (8th Cir. 1985) and *United States v. Harrelson*, 754 F.2d 1153, 1167 (5th Cir. 1985); *see also Saxholm AS v. Dynal, Inc.*, 164 F.R.D. 331, 333 (E.D.N.Y. 1996) (meeting the burden of establishing the applicability of the attorney-client privilege "requires the submission of affidavits or other competent evidence to establish sufficient facts to prove the applicability of the privilege. Conclusory or ipse dixit assertions are not enough.").

16

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

The "party asserting attorney-client privilege has the burden of establishing all of the elements of the privilege." *United States v. Munoz*, 233 F.3d 1117, 1128 (9th Cir. 2000), *superseded on other grounds by* 18 U.S.C. § 1341; *see also United States v. Legal Servs. for N.Y.C.*, 249 F.3d 1077, 1081 (D.C. Cir. 2001) (citing *In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998)). That burden attaches to *each* communication for which the privilege is asserted; "blanket assertions of the privilege are *extremely disfavored*." *Clarke v. Am. Commerce Nat'l Bank*, 974 F.2d 127, 129 (9th Cir. 1992) (emphasis added) (internal quotation marks omitted). Instead, "[a] party claiming the privilege must identify specific communications and the grounds supporting the privilege as to each piece of evidence over which privilege is asserted." *Martin*, 278 F.3d at 1000. Plaintiff's claim of privilege is such an unparticularized, blanket assertion, and therefore is insufficient to assert the privilege. The Complaint does not contain a single allegation of any particular communication that may be privileged. It simply says that Plaintiff "is a practicing attorney." Compl. ¶ 77. His Motion similarly does not identify any client or clients, or any communication that is privileged. *See* Pl.'s Mem. at 8-9.

Moreover, to the extent there is any valid invocation of the privilege, the privilege has been waived. The attorney-client privilege is not absolute, *see In re Grand Jury Investigation*, 810 F.3d 1110, 1113 (9th Cir. 2016), and can be waived by disclosing confidential information to a third-party. *United States v. Sanmina Corp.*, 968 F.3d 1107, 1116–17 (9th Cir. 2020). In order for communications sent through email to be protected by the attorney-client privilege, then, there must be a subjective expectation of confidentiality that is found to be objectively reasonable. *See, e.g.*, *Doe 1 v. George Washington Univ.*, 480 F. Supp. 3d 224, 226 (D.D.C. 2020); *Convertino v. U.S. Dep't of Justice*, 674 F. Supp. 2d 97, 110 (D.D.C. 2009).

To determine whether the subjective expectation of confidentiality in email communications in a company email account is objectively reasonable, courts generally look to four factors: (1) "does the corporation maintain a policy banning personal or other objectionable use," (2) "does the company monitor the use of the employee's computer

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

or e-mail," (3) "do third parties have a right of access to the computer or e-mails," and (4) "did the corporation notify the employee, or was the employee aware, of the use and monitoring policies?" *Doe 1*, 480 F. Supp. 3d at 226.[10]  In *Doe 1*, the court applied these factors to George Washington University's email policy.  *Id.*  GW's policy stated that "individuals have no right of personal privacy with respect to e-mail messages or attachments they send or receive using the GW e-mail system." *Id.* at 227 (internal quotation marks and alterations omitted).  GW also reserved the right to "search, review, monitor, or copy any e-mail sent to or from a GW e-mail account for approved purposes only." *Id.* (internal quotation marks and alterations omitted).  The GW policy was silent as to the right of access of third parties, and as to the fourth factor, all students had accepted the terms and conditions of GW's email policy to use its service.  *Id.*  Accordingly, the court held that GW students had no reasonable expectation of privacy in email communications with attorneys sent from their GW email accounts.  *Id.*

Here, Chapman's Computer and Network Acceptable Use Policy is materially indistinguishable from GW's policy.  The policy states that Chapman reserves "the right to retrieve the contents of University-owned computers and e-mail messages for legitimate reasons." *Policies and Procedures: Computer and Network Acceptable Use Policy*, Chapman University, https://www.chapman.edu/campus-services/information-systems/policies-and-procedures/acceptable-use-policy.aspx (last visited Jan. 20, 2022).  "As such," it goes on to say, "*Users should not expect privacy in the contents of University-owned computers or e-mail messages.*" *Id.* (emphasis added).  Further, the privacy policy states that the university may disclose information in accounts if "required to do so to comply with the law or legal process," including in response to subpoenas. *Policies and Procedures: Privacy Policy*, Chapman University,

---

[10]    Although the Ninth Circuit has not expressly adopted this four-factor test, courts within the Circuit have done so, citing the use of the test by courts around the country. *See Almar Ranch, LLC v. Cty. of Boise*, No. CV-09-004-S-BLW, 2009 WL 3669741, at *3 (D. Idaho Nov. 2, 2009).

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

1  https://www.chapman.edu/campus-services/information-systems/policies-and-
2  procedures/privacy-policy.aspx (last visited Jan. 20, 2022).

3       Indeed, Chapman's policy goes beyond GW's—which did not prohibit the use of
4  school email addresses for personal use, *see Doe 1*, 480 F. Supp. 3d at 227—by stating
5  that all university computing and network systems and services are a "University-owned
6  resource and business tool to be used only by authorized persons for educational
7  purposes or to carry out the legitimate business of the University." *Policies and*
8  *Procedures: Computer and Network Acceptable Use Policy*, Chapman University.  As to
9  the fourth factor—whether Plaintiff was aware of the policy—he served on the faculty
10  for over twenty years and was previously the *Dean* of Chapman's law school, *see*
11  Federalist Society, *Dr. John C. Eastman*, https://fedsoc.org/contributors/john-eastman
12  (last visited Jan. 19, 2022), and thus was almost certainly aware of its email policy.

13       And furthermore, during the time period November 3, 2020 to the end of
14  Plaintiff's employment at Chapman, whenever Plaintiff logged on to Chapman's
15  network, he received a "splash screen" message stating: "Use of this computer system
16  constitutes your consent that your activities on, or information you store in, any part of
17  the system is subject to monitoring and recording by Chapman University or its agents,
18  consistent with the Computer and Acceptable Use Policy without further notice."  ECF
19  17-1, Decl. of Janine P. DuMontelle.

20       Accordingly, to the extent there are any privileged communications at issue here—
21  and Plaintiff does not identify them with requisite particularity—any claim of privilege
22  was waived by transmittal of the communication via Plaintiff's Chapman email account.

23       In addition, with specific reference to Plaintiff's representation of former President
24  Trump in Supreme Court litigation during the period covered by the Chapman subpoena,
25  the Chapman president has stated that the University "has clear policies in place
26  regarding outside activity.…  In fact, when acting privately, Chapman faculty and staff
27  are not free to use Chapman University's email address, physical address or telephone
28  number in connection with the support of a political candidate."  Chapman University,

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

*President Struppa's Message on Supreme Court Case*, Dec. 10, 2020, https://news.chapman.edu/2020/12/10/president-struppas-message-on-supreme-court-case/. Plaintiff indisputably violated that policy in conjunction with any emails related to the events leading up to January 6.

Moreover, Plaintiff has stated publicly that former President Trump authorized Plaintiff's discussion of advice relating to the election and the events leading up to January 6. Two memos that Plaintiff wrote outlining how Vice President Pence could overturn the results of the Presidential election are already in the public domain. Plaintiff has himself stated that his client has given permission for him to discuss matters related to January 6, 2021 publicly. For example, on May 5, 2021, Plaintiff appeared on the Peter Boyles Show and stated that "I would normally not talk about a private conversation I have with a client, but I have express authorization from my client, the president of the United States at the time, to describe what occurred—to truthfully describe what occurred in that conversation."[11] Likewise, Plaintiff appeared on a podcast in which he discussed the advice in his legal memo at length, noting that Plaintiff himself provided the memo to author Bob Woodward, and saying at the outset that the former President had "authorized" him "to talk about these things."[12] And Plaintiff has made extensive public remarks regarding the events of January 6 and his advice to then-President Trump on numerous other occasions.[13] Accordingly, even if Plaintiff had

---

[11]    *Peter Boyles Show,* 710KNUS News/Talk (May 5, 2021) (available at https://omny.fm/shows/peter-boyles-show/peter-boyles-may-5-8am-1).

[12]    *Available at* https://equalcitizens.us/discussing-the-john-eastman-memo-with-john-eastman/.

[13]    *See, e.g.,* Michael S. Schmidt and Maggie Haberman, *The Lawyer Behind the Memo on How Trump Could Stay in Office,* N.Y. Times, Oct. 2, 2021, *available at* https://www.nytimes.com/2021/10/02/us/politics/johneastman-trump-memo.html; John McCormack, *John Eastman v. the Eastman Memo,* Nat'l Rev., Oct. 22, 2021, *available at* https://www.nationalreview.com/2021/10/john-eastman-vs-the-eastman-memo/; John C. Eastman, *John Eastman: Here's the Advice I Actually Gave Vice President Pence on*

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

properly invoked the privilege, the privilege would nonetheless be waived and therefore
not a basis upon which to quash the Chapman subpoena.

### C.   The Documents Sought from Chapman Are Not Protected by the Attorney Work Product Privilege

For similar reasons, Plaintiff's Chapman emails are not protected by the work
product privilege. As with his claim of attorney-client privilege, Plaintiff has failed to
make anything more than an unparticularized, blanket assertion that work product
protection applies.   Under Rule 26, the party asserting work-product protection has the
burden of first showing that document in question was prepared "in anticipation of
litigation." Fed. R. Civ. P. 26(b)(3).   As Plaintiff has identified no such documents, his
assertion of the privilege is inadequate.

Even if Plaintiff had correctly asserted the privilege, any such protection has been
waived.   In the Ninth Circuit, for work product protection to attach, documents must have
two characteristics: (1) they must be 'prepared in anticipation of litigation or for trial,'
and (2) they must be prepared 'by or for another party or by or for that other party's
representative.'" *In re California Pub. Utils. Comm'n*, 892 F.2d 778, 780–81 (9th Cir.
1989) (quoting Fed. R. Civ. P. 26(b)(3)).   Although, unlike the attorney-client privilege,
the work product privilege is not automatically waived by any disclosure to a third party,
the Ninth Circuit has held that disclosing work product to a third party can waive
protection if "such disclosure, under the circumstances, is inconsistent with the
maintenance of secrecy from the disclosing party's adversary" or "conduit to an
adversary." *Sanmina Corp.*, 968 F.3d at 1121 (citing *United States v. Deloitte LLP*, 610
F.3d 129, 139 (D.C. Cir. 2010); *Rockwell Int'l Corp. v. U.S. Dep't of Justice*, 235 F.3d
598, 605 (D.C. Cir. 2001)).

In determining whether waiver has occurred through disclosure to a conduit of an
adversary, courts perform a "fact-intensive analysis." *Id.*   The "focal point" of the waiver

*the 2020 Election,* Sacramento Bee, Oct. 7, 2021, *available at*
https://www.sacbee.com/opinion/op-ed/ai1icle254812552.html.

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

inquiry is "whether, under the totality of the circumstances, [claimant] acted in such a way that is inconsistent with the maintenance of secrecy against its adversary." *Id.* at 1124.  Two factors courts consider when performing this analysis are: (1) whether the disclosing party has engaged in self-interested selective disclosure by revealing its work product to some adversaries but not to others, and (2) whether the disclosing party had a reasonable basis for believing that the recipient would keep the disclosed material confidential.  *Id.* at 1121.  But while these two factors are "highly relevant" they are "not the only considerations at play in assessing whether disclosure is inconsistent with the maintenance of secrecy." *Id.*  Rather, courts consider "the same principle of fundamental fairness that underlies much of our common law doctrine on waiver by implication." *Id.* at 1122.  Thus, a court may find the work-product doctrine waived where the disclosing party's conduct has reached a certain point of disclosure such that fairness requires that the "work-product privilege shall cease, whether [claimant] intended that result or not." *Id.*

Plaintiff acted with complete disregard to the maintenance of secrecy against an adversary.  As a preliminary matter, Congress is no theoretical future adversary to Plaintiff, but in fact, "could be [an] adversary in the sort of litigation the [work-product documents] address." *Sanmina Corp.*, 968 F.3d at 1121.  Plaintiff wrote memos detailing a plan to use the mechanisms of Congress to subvert the outcome of the 2020 election.  It is no surprise that Congress would want to investigate such activities, and accordingly Plaintiff undoubtedly foresaw the potential of litigation with Congress.

Regarding the totality of the circumstances analysis, Plaintiff has "engaged in self-interested disclosure," of the kind described in *Sanmina Corp.*, by speaking about his legal advice to the press.  *See id.* at 1123.  In order to avoid waiver of the work product protection, the disclosing party must have had a reasonable basis for believing that the recipient would keep the disclosed material confidential.  *Sanmina Corp.*, 968 F.3d at 1121.  Plaintiff had no such basis for belief.  By communicating through his Chapman email account, Plaintiff was aware—under the clear and detailed policies of the

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

University—that his communications would not be kept confidential.   And in choosing to store work product in his Chapman email account, he disclosed that material to a third party who substantially increased the likelihood that his communications would be obtained by a subpoenaing party.  The increase in likelihood was not just a scant possibility, but was rather foreseeable to Plaintiff, as Chapman's policy to disclose emails in response to subpoenas was broadcast to all faculty, students, and staff on the University's website.[14]  Thus, in communicating with clients and providing attorney work product through his Chapman account—knowing full well that such communications were not confidential—Plaintiff emailed at his own risk.

Further, whether Plaintiff "intended the result or not," work-product protection should cease because fairness requires it. *Id.* at 1121.  When assessing the fairness principle underlying waivers, "the overriding concern in the work-product context is not the confidentiality of a communication, but the protection of the adversary process." *Id.* at 1124.  But Plaintiff "cannot be allowed, after disclosing as much as he pleases, to withhold the remainder." *Weil v. Inv./Indicators, Rsch. & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981).  Here, Plaintiff's selective disclosure of information he now contends is work product weighs heavily against applying the protection.

Considering the totality of the circumstances, it is clear that Plaintiff disclosed communications to a conduit to an adversary. The documents sought by the Chapman Subpoena are therefore beyond the reach of the protections afforded by the work product doctrine. *See Sanmina Corp.*, 968 F.3d at 1122.

---

[14]    *See Policies and Procedures: Privacy Policy*, Chapman University ("Third Party Requests include, but may not be limited to, a search warrant, court order, subpoena, litigation discovery or legal preservation hold request, other valid legal order, or a written consent from the student permitting disclosure. If the University receives a Third Party Request, it may interface with Microsoft or Google to obtain or preserve the requested records or direct the requestor to contact the Provider or the student directly."); *see also id.* ("The University reserves the right to retrieve the contents of University-owned computers or e-mail messages for legitimate reasons, such as to find lost messages, to comply with investigations of wrongful acts, to respond to subpoenas, or to recover from system failure.").

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

### D.   Plaintiff Is Unlikely to Succeed on His Constitutional Claims

Although not mentioned in his Memorandum in support of his TRO request, Plaintiff asserts in his complaint that the Chapman Subpoena also violates his First and Fourth Amendment Rights.  Neither of these claims supports a TRO.

First, "[t]he protections of the First Amendment … do not afford a witness the right to resist inquiry in all circumstances." *Barenblatt v. United States*, 360 U.S. 109, 126 (1959).  Rather, "[t]o determine whether the First Amendment bars the Committee's access to information it seeks through a duly-authorized subpoena depends on a balancing of "the competing private and public interests at stake in the particular circumstances shown." *Id*.  Here, the Select Committee's interest, supported by valid legislative purpose as described above, is substantial because its investigation is focused on ensuring "the free functioning of our national institutions." *See Buckley v. United States*, 424 U.S. 1, 66 (1976) (internal quotation omitted).  Plaintiff, by contrast, fails to assert any significant First Amendment interest that could outweigh the Government's substantial interest, alleging only that the Chapman subpoena "intrude[s] on" his "rights to freedom of association." Compl. ¶ 30.  Plaintiff has not only failed to identify what specific associational interests the Chapman subpoena threatens, *see N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 13 (1988) ("This is not to say, however, that in every setting in which individuals exercise some discrimination in choosing associates, their selective process of inclusion and exclusion is protected by the Constitution."), he fails to allege what harm threatens these amorphous associational interests, *see Brock v. Loc. 375, Plumbers Int'l Union of Am., AFL-CIO*, 860 F.2d 346, 350 (9th Cir. 1988) (stating that courts have "emphasized in each of those decisions … the need for objective and articulable facts, which go beyond broad allegations or subjective fears. …a merely subjective fear of future reprisals is an insufficient showing of infringement of associational rights").  These allegations are insufficient to state a First Amendment claim.

The same is true of Plaintiff's Fourth Amendment claim.  Plaintiff asserts that the Chapman subpoena is "so broad and indefinite as to exceed the lawfully authorized purpose" of the Select Committee.  Compl. ¶ 98.  A subpoena is not impermissibly overbroad so as to violate the Fourth Amendment as long as its call for documents or testimony are within the scope of the Congressional inquiry at issue.  *See McPhaul*, 364 U.S. at 382.  Here, as described above, the Select Committee's legislative purpose is broad and includes both examining the events of January 6, 2021 as well as the "circumstances" and "causes" of the attack.  H. Res. § 503(3)(1).  In light of that broad legislative purpose, the documents sought in the subpoenas, though extensive, are not impermissibly broad.  *See Eastland*, 421 U.S. at 509 ("Nor is the legitimacy of a congressional inquiry to be defined by what it produces.  The very nature of the investigative function—like any research—is that it takes the searchers up some 'blind alleys' and into nonproductive enterprises.  To be a valid legislative inquiry there need be no predictable end result.").

## III.   PLAINTIFF HAS FAILED TO DEMONSTRATE A LIKELIHOOD OF IRREPARABLE HARM

Plaintiff argues that he will suffer irreparable harm in the absence of an injunction based on the same meritless arguments concerning the attorney-client privilege, a claim that denial of his motion will somehow hurt the ability of law schools to employ practitioners, and that the separation of powers will be irrevocably harmed if this Court does not intervene in the affairs of Congress.  Pl.'s Mem. at 8-10, 11-12.  None of these arguments has merit.  As the Supreme Court has emphasized, the irreparable injury required for preliminary relief must be "both certain and great; it must be actual and not theoretical.'"  *Winter*, 555 U.S. at 22 (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)).  "Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur."  *Wis. Gas*, 758 F.2d at 674.  Rather, "[t]he movant must provide proof that the harm has occurred in the

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future." *Id.*

Plaintiff first argues that will "undoubtedly" face irreparable harm because once his privileged communications and attorney work product are disclosed, the status quo cannot be restored. Pl.'s Mem. 8-9. But the Ninth Circuit has held where the "only relevant evidence" is a party's statement that privileged communications will be revealed, "[s]uch conclusory allegations are insufficient to establish irreparable harm." *In re Excel Innovations*, 502 F.3d 1086, 1098-99 (9th Cir. 2007). For the same reasons that Plaintiff fails to adequately assert the privilege as to particular communications, he fails to demonstrate any harm that will occur—let alone irreparable harm—beyond conclusory allegations. Thus, at most, Plaintiff has identified the mere *possibility* of harm to the attorney-client privilege, a showing far from adequate to meet the demanding standard for preliminary relief. *See Arizona Recovery Hous. Ass'n v. Arizona Dep't of Health Servs.*, 462 F. Supp. 3d 990, 997 (D. Ariz. 2020) ("Plaintiffs seeking preliminary relief cannot rely on the mere possibility that irreparable harm will occur but must instead show such harm is 'likely in the absence of an injunction.'" (quoting *Winter*, 555 U.S. at 22)).

## IV.   THE BALANCE OF EQUITIES WEIGHS HEAVILY IN FAVOR OF THE SELECT COMMITTEE

For the same reasons, the public interest strongly supports denial of relief. Plaintiff's contrary arguments are specious and ignore the clear and compelling public interest in the speedy and efficient conduct of the Select Committee's investigation. Even in the less pressing context of administrative investigations, which derive from statutory authority (whereas Congress's power of investigation is derived from the Constitution itself), courts have "recognized a strong public interest in having" such "investigations proceed 'expeditiously and without impediment.'" *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp.*, 5 F.3d 1508, 1514 (D.C. Cir. 1993) (quoting *F.T.C. v. TRW, Inc.,* 628 F.2d 207, 210 (D.C. Cir. 1980)). *A fortiori*,

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

the public interest in expeditious and unimpeded Congressional investigations is compelling. *Exxon Corp.*, 589 F.2d at 593 (there is a "clear public interest in maximizing the effectiveness of the investigatory powers of Congress.  The welfare of the public is a factor to be weighed in determining whether or not to issue an injunction, and the investigatory power is one that the courts have long perceived as essential to the successful discharge of the legislative responsibilities of Congress.") (internal citations omitted).

Plaintiff argues in opposition that the practice of law professors and legal clinics representing clients would be "throw[n] . . . into doubt" in the absence of an injunction. Pl.'s Mem. 11.  This is speculative and assumes that the court determining that under these specific circumstances, and given Plaintiff's pleading deficiencies and waiver, the privilege is not adequately asserted would impact practitioners at law schools across the country.  There is no evidence that any such decision would adversely affect lawyers and law professors who, unlike Plaintiff, invoke a *valid* attorney-client privilege.  Plaintiff's claim that an injunction from this Court will advance, rather than intrude upon, the separation of powers, is similarly misplaced.  For all the reasons discussed above, proper respect for the separation of powers requires denial of the injunction and dismissal of Plaintiff's complaint.

## V.   THE PUBLIC INTEREST SUPPORTS ALLOWING THE SELECT COMMITTEE TO CONDUCT ITS URGENT INVESTIGATION

For the same reasons, the public interest strongly supports denial of relief. Plaintiff's contrary arguments are specious and ignore the clear and compelling public interest in the speedy and efficient conduct of the Select Committee's investigation. Even in the less pressing context of administrative investigations, which derive from statutory authority (whereas Congress's power of investigation is derived from the Constitution itself), courts have "recognized a strong public interest in having" such "investigations proceed 'expeditiously and without impediment.'" *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp.*, 5 F.3d 1508, 1514 (D.C.

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

Cir. 1993) (quoting *F.T.C. v. TRW, Inc.,* 628 F.2d 207, 210 (D.C. Cir. 1980)).  *A fortiori*,
the public interest in expeditious and unimpeded Congressional investigations is
compelling.  *Exxon Corp.*, 589 F.2d at 593 (there is a "clear public interest in maximizing
the effectiveness of the investigatory powers of Congress.  The welfare of the public is a
factor to be weighed in determining whether or not to issue an injunction, and the
investigatory power is one that the courts have long perceived as essential to the
successful discharge of the legislative responsibilities of Congress.") (internal citations
omitted).

Plaintiff argues in opposition that the practice of law professors and legal clinics
representing clients would be "throw[n] . . . into doubt" in the absence of an injunction.
Pl.'s Mem. 11.  This is speculative and assumes that the court determining that under
these specific circumstances, and given Plaintiff's pleading deficiencies and waiver, the
privilege is not adequately asserted would impact practitioners at law schools across the
country.  There is no evidence that any such decision would adversely affect lawyers and
law professors who, unlike Plaintiff, invoke a *valid* attorney-client privilege.  Plaintiff's
claim that an injunction from this Court will advance, rather than intrude upon, the
separation of powers, is similarly misplaced.  For all the reasons discussed above, proper
respect for the separation of powers requires denial of the injunction and dismissal of
Plaintiff's complaint.

It is difficult to imagine a Congressional investigation of greater national
significance than this one.  The public interest in permitting the Select Committee to
proceed with its investigation is self-evident and compels rejection of Plaintiff's Motion.

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

## **CONCLUSION**

For the reasons set forth above, Plaintiff's Motion should be denied.

Respectfully submitted,

/s/  *Douglas N. Letter*
DOUGLAS N. LETTER
 *General Counsel*
TODD B. TATELMAN
 *Principal Deputy General Counsel*
ERIC R. COLUMBUS
 *Special Litigation Counsel*
STACIE M. FAHSEL
 *Associate General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF
REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C.  20515
(202) 225-9700
Douglas.Letter@mail.house.gov

-and-

SHER TREMONTE LLP
Justin M. Sher
Michael Tremonte
Noam Biale
Maya Brodziak
Kathryn E. Ghotbi
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600
JSher@shertremonte.com
MTremonte@shertremonte.com
NBiale@shertremonte.com
MBrodziak@shertremonte.com
KGhotbi@shertremonte.com

29

1

2

-and-

3        ARNOLD & PORTER
         John A. Freedman
4        Paul Fishman
         Amy Jeffress
5        601 Massachusetts Ave, NW
         Washington, D.C. 20001
6        (202) 942-5000
         John.Freedman@arnoldporter.com
7        Paul.Fishman@arnoldporter.com
8        Amy.Jeffress@arnoldporter.com

9

10

11  Dated:  January 21, 2022

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

30

## <u>CERTIFICATE OF SERVICE</u>

### <u>WASHINGTON, DISTRICT OF COLUMBIA</u>

I am employed in the aforesaid county, District of Columbia; I am over the age of 18 years and not a party to the within action; my business address is:

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515

On January 21, 2022, I served the **DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER** on the interested parties in this action:

Anthony T. Caso
Constitutional Counsel Group
174 W Lincoln Ave #620
Anaheim, CA 92805-2901
atcaso@ccg1776.com

Charles Burnham
Burnham & Gorokhov PLLC
1424 K Street NW, Suite 500
Washington, DC 20005
charles@burnhamgorokhov.com

*Attorneys for Plaintiff John C. Eastman*

☒ **(BY E-MAIL OR ELECTRONIC TRANSMISSION)**
   The document was served on the following via The United States District Court – Central District's CM/ECF electronic transfer system which generates a Notice of Electronic Filing upon the parties, the assigned judge, and any registered user in the case:

☒ **(FEDERAL)**   I declare under penalty of perjury that the foregoing is true and correct, and that I am employed at the office of a member of the bar of this Court at whose direction the service was made.

Executed on January 21, 2022 here, at Bethesda, Maryland.

_/s/_ Douglas N. Letter

CERTIFICATE OF SERVICE