Anthony T. Caso (Cal. Bar #88561)
Email: atcaso@ccg1776.com
CONSTITUTIONAL COUNSEL GROUP
174 W Lincoln Ave # 620
Anaheim, CA 92805-2901
Phone: 916-601-1916
Fax: 916-307-5164

Charles Burnham (D.C. Bar# 1003464)*
Email: charles@burnhamgorokhov.com
BURNHAM & GOROKHOV PLLC
1424 K Street NW, Suite 500
Washington, D.C. 20005
Telephone: (202) 386-6920
* admitted pro hac vice

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| JOHN C. EASTMAN,<br><br>        *Plaintiff*,<br><br>vs.<br><br>BENNIE G. THOMPSON, *et al.*<br><br>        *Defendants* | Case No.: 8:22-cv-00099-DOC-DFM<br><br>**CORRECTED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Date: January 24, 2022<br>Time: 2:00 p.m.<br>Judge: Hon. David O. Carter<br><br>Magistrate Judge: Hon. Douglas F. McCormick<br>Crtrm.: 9D<br>Trial Date: not set |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................3

INTRODUCTION ...........................................................................................6

BACKGROUND .............................................................................................7

ARGUMENT .................................................................................................9

I.   *Because the Committee's subpoena is ultra vires* and fails to protect privileged communications, *Dr. Eastman is likely to succeed on the merits.* ..................................................................................................10

II.  Because a violation of attorney client privilege cannot be undone, the subpoena will cause irreparable harm ...........................................15

III. In contrast, the only harm to defendants will be slight delay ......................17

IV.  If Chapman returns the subpoena the public interest will be gravely harmed by the loss of public confidence in the sanctity of attorney-client privilege when engaging law professors and law school clinics and by violation of the separation of powers. ..........................................18

     *A. Attorney-client privilege* ...............................................................18

     *B. Separation of powers* ...................................................................19

CONCLUSION ...............................................................................................20

CERTIFICATE OF SERVICE .........................................................................21

# TABLE OF AUTHORITIES

## Cases

*Alexander v. Pelosi*,
   No. 1:21-cv-03308 (D.D.C.) ...................................................................15

*22nd Avenue Station, Inc. v. City of Minneapolis*,
   429 F.Supp.2d 1144 (D. Minn. 2006).....................................................18

*Ass'n of Community Organizations For Reform Now (ACORN) v. FEMA*,
   463 F. Supp. 2d 26 (D.D.C. 2006) ..........................................................20

*Caporale v. Cellco Partnership*,
   No. 3:21-cv-20484 (D.N.J.) .....................................................................15

*Contra Animal Legal Def. Fund v. Olympic Game Farm, Inc.*,
   335 F.R.D. 404 (N.D. Cal. 2020)............................................................20

*Donald J. Trump for President, Inc. v. Boockvar*,
   141 S. Ct. 1044 (2021) ...............................................................................8

*Eastland v. U. S. Servicemen's Fund*,
   421 U.S. 491 (1975) ......................................................................... 11, 12

*Eastman v. Thompson*,
   No. 1:21-cv-03273 (D.D.C.) ...................................................................15

*Exxon Corp. v. FTC*,
   589 F.2d 582 (D.C. Cir. 1978) ...............................................................14

*Fund For Animals v. Norton*,
   281 F. Supp. 2d 209 (D.D.C. 2003) ......................................................18

*Harris v. U.S. House Select Comm. To Investigate the Jan. 6th Attack on the U.S. Capitol*,
   No. 1:21-cv-03290 (D.D.C.) ...................................................................15

*Hawai'i v. Trump*,
   233 F. Supp. 3d 850 (D. Haw. 2017) .....................................................16

*John Doe Agency v. John Doe Corp.*,
   488 U.S. 1306 (1989) ........................................................................ 17, 18

*John Doe Co. v. CFPB*,
   235 F.Supp.3d 194 (D.D.C. 2017) ...................................................................17

*Kilbourn v. Thompson*,
   103 U.S. 168 (1880) ................................................................... 12, 13, 20

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
   752 F.3d 755 (9th Cir. 2014).......................................................................10

*McGrain v. Daugherty*,
   273 U.S. 135 (1927) ...................................................................................12

*Meadows v. Pelosi*,
   No. 1:21-cv-03217 (D.D.C.) ......................................................................15

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop*,
   839 F. Supp. 68 (D. Me. 1993) ..................................................................17

*Metro. Life Ins. Co. v. Usery*,
   426 F. Supp. 150 (D.D.C. 1976) ................................................................17

*O'Donnell Const. Co. v. District of Columbia*,
   963 F.2d 420 (D.C. Cir. 1992) ...................................................................20

*PepsiCo, Inc. v. Redmond*,
   1996 WL 3965 (N.D. Ill. 1996) .................................................................17

*Providence Journal Co. v. FBI*,
   595 F.2d 889 (1st Cir. 1979) .....................................................................17

*Quinn v.United States*,
   349 U.S. 155 (1955) ............................................................................ 12, 13

*Shapiro v. U.S. Dep't of Justice*,
   2016 WL 3023980 (D.D.C. May 25, 2016) ...............................................18

*Texas v. Pennsylvania*,
   141 S. Ct. 1230 (2020) .................................................................................8

*Tobin v. United States*,
   306 F.2d 270 (D.C. Cir. 1962) ...................................................................14

*Trump v. Mazars USA, LLP*,
   140 S. Ct. 2019 (2020) ................................................................ 11, 12, 15

*Trump v. Thompson*,
  20 F.4th 10 (D.C. Cir. 2021) ........................................................................ 15, 17

*U.S. Servicemen's Fund v. Eastland*,
  488 F.2d 1252 (D.C. Cir. 1973), *rev'd on merits*, 421 U.S. 491 ........................... 11

*Upjohn Co. v. United States*,
  449 U.S. 383 (1981) ...................................................................................... 20

*Watkins v. United States*,
  354 U.S. 178 (1957) ................................................................. 12, 13, 14, 21

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ......................................................................................... 10

*Yellin v. United States*,
  374 U.S. 109 (1963) ...................................................................................... 11

## Statutes

Cal. Evid. Code § 917 ...................................................................................... 19

## Other Authorities

Cheney, Rep. Elizabeth, Statement, "The Law Enforcement Experience on January
  6th: Hearing Before the H. Select Committee to Investigate the January 6th
  Attack on the United States Capitol, 117th Cong. (2021) .................................... 13

H.Res. 503 ................................................................................................. 9, 15

House GOP Rule 14 ....................................................................................... 9

Press Release, Thompson Statement on Cooperation of Witnesses
  (Oct. 14, 2021) ............................................................................................ 13

Sisk, Gregory C. & Halbur, Nicholas, *A Ticking Time Bomb? University Data
  Privacy Policies and Attorney-Client Confidentiality in Law School Settings*,
  2010 Utah L. Rev. 1277 ................................................................................. 19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## INTRODUCTION

In June, the House of Representatives established by resolution the Select Committee to Investigate the January 6 Attack on the United States Capitol ("J6 Committee"). In an acknowledged "unprecedented" move, the Speaker of the House declined to seat committee members proposed by the minority party in violation of House Rules. Committee Chairman Bennie G. Thompson issued several subpoenas targeting lawyers, including Plaintiff Dr. John Eastman, who were involved in 2020 election litigation and who provided legal advice to former President Trump.

All four temporary restraining order factors favor interim relief. First, Dr. Eastman's argument that the subpoena is *ultra vires* due to the J6 Committee's procedurally unsound foundations and his argument that the subpoena violates attorney client privilege is likely to succeed on the merits. Second, a violation of attorney client privilege is a harm that can never be undone. Third, the only harm from interim relief is a minor delay. And fourth, denying interim relief would undercut public faith in attorney-client privilege and the public interest in preserving the separation of powers.

The TRO would be for a limited duration, would ensure that the status quo is preserved while a request for more fulsome interim relief is considered, and would cause no appreciable harm to Defendants or to the public. Plaintiff thus respectfully requests that the Court grant a TRO before 10:00 AM (EST), January 21, 2022.

**BACKGROUND**

The November 3, 2020, presidential election was one of the most controversial in American history. Rapid and procedurally questionable changes to voting procedures in many states (ostensibly meant to combat the COVID-19 pandemic) caused many to lose confidence in the integrity of the election. In the months after the election, challenges based on these issues were brought in several federal courts across the country, which in most cases did not consider them on the merits. Dr. Eastman represented Donald J. Trump, the 45th President of the United States, serving as counsel of record in *Texas v. Pennsylvania*, 141 S. Ct. 1230 (2020), and *Donald J. Trump for President, Inc. v. Boockvar*, 141 S. Ct. 1044 (2021).

On January 6, 2021, tens of thousands of people gathered for a "Save America" rally outside the White House to exercise their First Amendment freedoms of speech and assembly and the right to petition their government for redress of grievances. Unfortunately, two miles away at the United States Capitol, several hundred protestors broke into the Capitol building, some allegedly with the intent to disrupt the joint session of Congress that was meeting to consider the vote of the electoral college. The executive branch, constitutionally charged with law enforcement authority, is currently addressing those who allegedly disrupted those official proceedings and who physically confronted Capitol police, through ordinary criminal process.

To investigate the capitol incident, the House of Representatives adopted House Resolution 503 on June 30, 2021, creating the Select Committee to

Investigate the January 6 Attack on the United States Capitol ("J6 Committee").

Ex. A.

H.Res. 503 specifically requires that "5 [of the 13 members] must be appointed after consultation with the minority leader." *Id.*, p. 3. On July 19, 2021, Minority Leader Kevin McCarthy recommended five representatives to serve as the Republican members of the J6 Committee.

Speaker of the House of Representatives Nancy Pelosi refused to accept two of Minority Leader McCarthy's appointments. Speaker Pelosi acknowledged that her refusal to seat the Republican members recommended by the Minority Leader was "unprecedented." Minority Leader McCarthy thereafter declined to appoint any Republican members to the J6 Committee. Speaker Pelosi instead appointed Representatives Liz Cheney and Adam Kinzinger without consultation with the minority leader.

House GOP Rule 14(a)(1) provides that the Republican Steering Committee nominates ranking minority members to committees of the House, who are then voted on by the full Republican House Conference. Neither Representative Cheney nor Representative Kinzinger were nominated by the Republican Steering Committee, nor voted upon by the Republican House Conference, to serve as ranking minority member on the J6 Committee. There is therefore no ranking minority member on the J6 Committee.

Two days ago, on January 18, 2022, the J6 Committee served a subpoena on Dr. Eastman's former employer, Chapman University, seeking "all documents and communications in [the university's] possession, custody, or control attributable to Dr. John Eastman, that are related in any way to the 2020 election or the January 6,

2021 Joint Session of Congress, including any such documents stored or located on the servers of Chapman University (e.g. email account(s), contact lists, calendar entries), on any electronic device used by Dr. John Eastman during his employment by Chapman University (e.g., computer, mobile phone, tablet, etc.) , or in any other document database or hard copy document storage, during the time period November 3, 2020 to January 20, 2021." Ex. B, at 4. There is no exception for privileged communications.

Chapman was given three days, until 10:00 AM on Friday, January 21, 2022, to return the subpoena. Counsel for Chapman informed counsel for Dr. Eastman of the subpoena on the afternoon of January 18. Attempts to work with the university stalemated because Dr. Eastman was not permitted to examine the documents for privileged materials.

## ARGUMENT

To receive a temporary restraining order, a movant must show (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm without preliminary relief, (3) that the balance of equities favors relief, and (4) that relief is in the public interest. *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 760 (9th Cir. 2014) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).

The four factors for a TRO all favor Dr. Eastman. He is likely to prevail on the merits of his constitutional and privilege claims; he will suffer irreparable harm if the status quo is not preserved; and the balance of harms and public interest favor interim relief.

**I.  *Because the Committee's subpoena is ultra vires* and fails to protect privileged communications, *Dr. Eastman is likely to succeed on the merits*.**

Not infrequently, federal courts adjudicate the legality of congressional subpoenas. Most such cases follow a familiar fact pattern: Congress issues a subpoena, the target does not comply, Congress tries to force compliance in federal court, and the target raises the illegality of the subpoena as a defense in litigation.

But this is not the only way to challenge a congressional subpoena. When Congress "seeks information directly from a party," that party "can resist and thereby test the subpoena." *Eastland v. U. S. Servicemen's Fund*, 421 U.S. 491, 501 n.14 (1975). But when Congress "seeks that same information from a third person," this option is not available; the third party might not have an interest in protecting the information or resisting the subpoena, and its "compliance" with the subpoena "could frustrate any judicial inquiry." *Id*. For that reason, the law allows the person whose information will be exposed to sue in federal court for an "injunction or declaratory judgment." *U.S. Servicemen's Fund v. Eastland*, 488 F.2d 1252, 1259 (D.C. Cir. 1973), *rev'd on merits*, 421 U.S. 491. The key questions in such a case are "whether a legitimate legislative purpose is present," *Eastland*, 421 U.S. at 501; whether the Committee issuing the subpoena has acted in conformity with House Rules and its authorizing resolution, *Yellin v. United States*, 374 U.S. 109, 114 (1963); and whether it seeks privileged information, *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2032 (2020) (explaining that "recipients have long been understood to retain common law and constitutional privileges with respect to certain materials, such as attorney-client communications").

Congress has no "'general' power to inquire into private affairs and compel disclosures," *McGrain v. Daugherty*, 273 U.S. 135, 173-74 (1927), and "there is no congressional power to expose for the sake of exposure," *Watkins*, 354 U.S. at 200. "Investigations conducted solely for the personal aggrandizement of the investigators or to 'punish' those investigated are indefensible." *Id.* at 187.

The "legitimate legislative purpose" requirement stems directly from the Constitution. "The powers of Congress … are dependent solely on the Constitution," and "no express power in that instrument" allows Congress to investigate individuals or to issue compulsory process. *Kilbourn v. Thompson*, 103 U.S. 168, 182–89 (1880). The Constitution instead permits Congress to enact certain kinds of legislation. *See*, *e.g.*, Art. I, § 8. Thus, Congress' power to investigate "is justified solely as an adjunct to the legislative process." *Watkins*, 354 U.S. at 197. "Congress is not invested with a general power to inquire into private affairs. The subject of any inquiry always must be one on which legislation could be had." *Eastland*, 421 U.S. at 504 n.15 (cleaned up); *see also Quinn v.United States*, 349 U.S. 155, 161 (1955) ("[T]he power to investigate" does not "extend to an area in which Congress is forbidden to legislate."). The legislative purpose inquiry analyzes whether a particular subpoena serves a valid purpose, not whether an investigation as a whole serves a valid purpose. *See Mazars USA*, 140 S. Ct. at 2031.

Conducting an investigation to ensure that "those responsible [for the violence on January 6] are held accountable," to "tell[] the complete story of the unprecedented and extraordinary events of January 6th," and to "get answers for the American people about what happened on January 6th," as Chairman

Thompson and Vice Chair Cheney have announced, *see* The Law Enforcement Experience on January 6th: Hearing Before the H. Select Committee to Investigate the January 6th Attack on the United States Capitol, 117th Cong. (2021) Statement of Elizabeth Cheney, Vice Chair); Press Release, Thompson & Cheney Statement on Pentagon Officials' Reported Actions After January 6th (Sept. 16, 2021); Press Release, Thompson Statement on Cooperation of Witnesses (Oct. 14, 2021), are not legitimate legislative purposes that can justify subpoenaing a private citizen. For more than a century, in fact, the Supreme Court has been quite "sure" that neither the House nor Senate "possesses the general power of making inquiry into the private affairs of the citizen." *Kilbourn*, 103 U.S. at 190.

Additionally, because Congress must have a legitimate legislative purpose, it cannot use subpoenas to exercise "any of the powers of law enforcement." *Quinn*, 349 U.S. at 161. Those powers "are assigned under our Constitution to the Executive and the Judiciary." *Id*. Put simply, Congress is not "a law enforcement or trial agency," and congressional investigations conducted "for the personal aggrandizement of the investigators" or "to 'punish' those investigated" are "indefensible." *Watkins*, 354 U.S. at 187. Our tripartite system of separated powers requires that "any one of the[] branches shall not be permitted to encroach upon the powers confided to the others, but that each shall by the law of its creation be limited to the exercise of the powers appropriate to its own department and no other." *Kilbourn*, 103 U.S. at 190-91.

Finally, when a subpoena is issued by a single committee, any legislative purpose is not legitimate unless it falls within that committee's jurisdiction. "The theory of a committee inquiry is that the committee members are serving as the

representatives of the parent assembly in collecting information for a legislative purpose." *Watkins*, 354 U.S. at 200. Congress therefore must "spell out that group's jurisdiction and purpose with sufficient particularity . . . in the authorizing resolution," which "is the committee's charter." *Id.* at 201. The committee "must conform strictly to the resolution." *Exxon Corp. v. FTC*, 589 F.2d 582, 592 (D.C. Cir. 1978). And when an investigation is "novel" or "expansive," courts will construe the committee's jurisdiction "narrowly." *Tobin v. United States*, 306 F.2d 270, 275 (D.C. Cir. 1962).

Plaintiff will likely prove that the J6 Committee is constituted in violation of its authorizing resolution and that its actions are therefore *ultra vires*. In general, the committee was not formed with "5 [of the 13 members] must be appointed after consultation with the minority leader." Ex. A at 3. From its inception the committee has failed to comply with house rules rendering it a legal nullity.

Plaintiff will also likely prove that Chairman Thompson's subpoena at issue here (as distinct, perhaps, from the broader investigation) is not supported by a legitimate legislative purpose. In their various letters and public statements, Chairman Thompson and the other members of the J6 Committee have never identified *any* valid legislative purpose for the subpoena at issue here. The justification for the Committee's work, as specified in the authorizing resolution, is instead far removed from the kind of information being sought by the subpoenas. As the D.C. Circuit recently recognized, the legislative purposes spelled out in the authorizing resolutions are:

(1) pass laws imposing more serious criminal penalties on those who engage in violence to prevent the work of governmental institutions;

(2) amend the Electoral Count Act to shore up the procedures for counting electoral votes and certifying the results of a presidential election; (3) allocate greater resources to the Capitol Police and enact legislation to "elevat[e] the security posture of the United States Capitol Complex," H.R. Res. 503 § 4(a)(2)(D); or (4) revise the federal government's "operational plans, policies, and procedures" for "responding to targeted violence and domestic terrorism[,]" *id.* § 4(a)(2)(B).

*Trump v. Thompson*, 20 F.4th 10, 42 (D.C. Cir. 2021). None of those *legislative* purposes are related to the communications sought by Chairman Thompson's subpoenas. Rather, the subpoenas encompass privileged communications between Dr. Eastman and his clients and/or Dr. Eastman's attorney work product—common law and constitutional privileges which the target of a congressional investigation retains. *See Mazars USA*, 140 S. Ct. at 2032.

* * *

To the extent the court is unsure of the likelihood of Dr. Eastman's success on the merit, the other factors should play a larger role. Currently, the committee's procedural foundation is being challenged by several cases in the District Court for the District of Columbia. *See*, *e.g.*, *Meadows v. Pelosi*, No. 1:21-cv-03217 (D.D.C.); *Eastman v. Thompson*, No. 1:21-cv-03273 (D.D.C.); *Alexander v. Pelosi*, No. 1:21-cv-03308 (D.D.C.); *Harris v. U.S. House Select Comm. To Investigate the Jan. 6th Attack on the U.S. Capitol*, No. 1:21-cv-03290 (D.D.C.). At least one other district is considering a challenge to the committee's constitution. *See Caporale v. Cellco Partnership*, No. 3:21-cv-20484 (D.N.J.). Given the potential

for inconsistent rulings, caution dictates that this court grant Plaintiff's requested TRO in light of the foregoing factors. *Cf. Hawai'i v. Trump*, 233 F. Supp. 3d 850, 854 (D. Haw. 2017) (staying litigation where defendants challenged TRO issued in another district).

## II. Because a violation of attorney client privilege cannot be undone, the subpoena will cause irreparable harm

Plaintiff undoubtedly faces "irreparable harm" if the Court does not issue an order preserving the status quo by the tomorrow morning. If the Court does not intervene, Chapman will give the J6 Committee the records containing attorney client communications and attorney work product. Once communications are disclosed, the *status quo* can never be restored.

As one court has recognized:

Once confidentiality is breached, the harm is done and cannot be undone. Plaintiff cannot subsequently perform its commitment to its clients to protect the confidentiality of the documents and the information which they contain. There is no way to recapture and remove from the knowledge of others information improperly disclosed by Defendant. No court order or specific performance can be framed to accomplish that end, and no award of money damages will change the fact that information which Plaintiff was entitled to have kept from the knowledge of third parties is no longer shielded from their gaze. Confidentiality, like pregnancy, is an all or nothing proposition; either it exists or it does not exist.

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop*, 839 F. Supp. 68, 72 (D. Me. 1993) (finding irreparable harm). "Once the documents are surrendered," in other words, "confidentiality will be lost for all time. The status quo could never be restored." *Providence Journal Co. v. FBI*, 595 F.2d 889, 890 (1st Cir. 1979); *see PepsiCo, Inc. v. Redmond*, 1996 WL 3965, at *30 (N.D. Ill. 1996) ("[J]ust as it is impossible to unring a bell, once disclosed, . . . confidential information lose their secrecy forever"); *Metro. Life Ins. Co. v. Usery*, 426 F. Supp. 150, 172 (D.D.C. 1976) ("Once disclosed, such information would lose its confidentiality forever."). This is why, as the D.C. Circuit recently acknowledged, "irreparable injury is frequently found when a movant seeks to prevent the disclosure of privileged documents pending litigation. That is generally because the holders of the privileges will, themselves, be irreparably harmed by release, and time is not of the essence." *Trump v. Thompson*, 20 F.4th at 47. More urgently, Dr. Eastman had less than three days' notice of the subpoena, immediate intervention is needed to preserve the opportunity for Plaintiff to secure judicial review of his claims. "Courts routinely issue injunctions to stay the status quo when" events might otherwise "moot the losing party's right to appeal." *John Doe Co. v. CFPB*, 235 F.Supp.3d 194, 206 (D.D.C. 2017); *John Doe Agency v. John Doe Corp.*, 488 U.S. 1306, 1309, (1989) (Marshall, J., in chambers) ("The fact that disclosure would moot that part of the Court of Appeals' decision requiring disclosure . . . create[s] an irreparable injury."). Denying interim relief may "entirely destroy [Dr. Eastman's] right[] to secure meaningful review." *Providence Journal Co.*, 595 F.2d at 890. That is classic irreparable harm.

### III.  In contrast, the only harm to defendants will be slight delay

Unlike the irreparable harm that Dr. Eastman and his clients will suffer absent interim relief, there is no harm to Defendants by delaying production while the parties litigate the subpoenas' validity. For its part, Chapman will actually benefit from preserving the status quo. To the extent, Chapman is liable for preserving the attorney-client privilege of its clinic clients, this litigation will ensure that Chapman's responsibility is settled before disclosure. Moreover, Chapman has only had three days to respond to the subpoena; a delay could only aid in complete compliance.

As for the committee, its harm would be merely a delay in its receipt of documents. In the analogous FOIA context, an "interest in receiving the records immediately" thus "poses no threat of irreparable harm to them"—at least not a cognizable one. *Cf. Shapiro v. U.S. Dep't of Justice*, 2016 WL 3023980, at *7 (D.D.C. May 25, 2016) (quoting *John Doe Agency*, 488 U.S. at 1309 (Marshall, J., in chambers)). This is true even when resolution of the merits delays government action. *Fund For Animals v. Norton*, 281 F. Supp. 2d 209, 222 (D.D.C. 2003) (rejecting government's claim of harm in having its action "delayed for a short period of time pending resolution of this case on the merits"); *22nd Avenue Station, Inc. v. City of Minneapolis*, 429 F.Supp.2d 1144, 1152 (D. Minn. 2006) (delaying implementation of ordinance). In any event, a delay is an entirely different class of harm than the permanent disclosure of privileged information.

**IV.  If Chapman returns the subpoena the public interest will be gravely harmed by the loss of public confidence in the sanctity of attorney-client privilege when engaging law professors and law school clinics and by violation of the separation of powers.**

*A. Attorney-client privilege*

Dr. Eastman was far from the only law professor in the country that practiced law, occasionally using his university email, network, and technology.

> The modern American law school is not only an institution of professional education and scholarly research. It is a law firm. To be more specific and much more accurate, the typical law school hosts multiple law firms, including both associated and independent legal practices, all operating under the same roof.

Gregory C. Sisk & Nicholas Halbur, *A Ticking Time Bomb? University Data Privacy Policies and Attorney-Client Confidentiality in Law School Settings*, 2010 Utah L. Rev. 1277, 1277. Denying interim relief would throw this whole area of representation into doubt. Clients in California are entitled to the presumption that electronic communications with their attorneys are confidential. West's Ann. Cal. Evid. Code § 917(a). Such communication "does not lose its privileged character for the sole reason that it is communicated by electronic means or because persons involved in the delivery, facilitation, or storage of electronic communication may have access to the content of the communication." *Id.* § 917(b).

But if universities are allowed to turn over attorney-client privileged communications and work product created by law professors—employed at least in part for their legal abilities—then clients and the broader public are denied the benefits of the privilege. The privilege's "purpose is to encourage full and frank

communication between attorneys and their clients and thereby promote broader

public interests in the observance of law and administration of justice. The

privilege recognizes that sound legal advice or advocacy serves public ends and

that such advice or advocacy depends upon the lawyer's being fully informed by

the client." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Its preservation

is therefore tied to the public interest. As discussed above, denying interim relief

could moot Dr. Eastman's claim and effectively rule that the privilege no longer

exists as long any communication takes place on a university email account.

*Contra Animal Legal Def. Fund v. Olympic Game Farm, Inc.*, 335 F.R.D. 404, 406

(N.D. Cal. 2020) (explaining that attorneys do not forfeit confidentiality by

contacting expert witnesses who use university email accounts).

### B. Separation of powers

Last, the public interest weighs strongly in favor of preserving the status

quo. As one court has put it, "the public has an interest in the government

maintaining procedures that comply with constitutional requirements." *Ass'n of*

*Community Organizations For Reform Now (ACORN) v. FEMA*, 463 F. Supp. 2d

26, 36 (D.D.C. 2006) (citing *O'Donnell Const. Co. v. District of Columbia*, 963

F.2d 420, 429 (D.C. Cir. 1992)). The Constitution entrusts this Court to determine

whether Congress has "assumed a power which could only be properly exercised

by another branch of the government." *Kilbourn*, 103 U.S. at 192. Denying the

interim relief that Plaintiff seeks, in short, would "abdicate the responsibility

placed by the Constitution upon the judiciary to ensure that the Congress" has not

acted illegitimately in issuing this sweeping subpoena for Dr. Eastman's privileged

communications records. *Watkins* 354 U.S. at 198-99. Allowing the J6 Committee to evade judicial review is not in the public interest.

## CONCLUSION

Plaintiff respectfully asks this Court to enter a TRO prohibiting Defendants from enforcing or complying with Chairman Thompson's subpoenas so that the Court can decide Plaintiff's motion for a preliminary injunction. The Court should then hear argument on Plaintiff's motion and enter a preliminary injunction prohibiting Defendants from enforcing or complying with the subpoena until the Court can issue a final judgment.

Respectfully submitted,

/s/Anthony T. Caso
Anthony T. Caso (Cal. Bar #88561)
CONSTITUTIONAL COUNSEL GROUP
174 W Lincoln Ave # 620
Anaheim, CA 92805-2901
Phone: 916-601-1916
Fax: 916-307-5164
Email:  atcaso@ccg1776.com

/s/ Charles Burnham
Charles Burnham (D.C. Bar # 1003464)
BURNHAM & GOROKHOV PLLC
1424 K Street NW, Suite 500
Washington, D.C. 20005
Email: charles@burnhamgorokhov.com
Telephone: (202) 386-6920

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I have served this filing on all counsel through the Court's ECF system.

Respectfully submitted,

/s/Anthony T. Caso
Anthony T. Caso (Cal. Bar #88561)
CONSTITUTIONAL COUNSEL GROUP
174 W Lincoln Ave # 620
Anaheim, CA 92805-2901
Phone: 916-601-1916
Fax: 916-307-5164
Email:  atcaso@ccg1776.com