Anthony T. Caso (Cal. Bar #88561)
Email: atcaso@ccg1776.com
CONSTITUTIONAL COUNSEL GROUP
174 W Lincoln Ave # 620
Anaheim, CA 92805-2901
Phone: 916-601-1916
Fax: 916-307-5164

Charles Burnham (D.C. Bar# 1003464)*
Email: charles@burnhamgorokhov.com
BURNHAM & GOROKHOV PLLC
1424 K Street NW, Suite 500
Washington, D.C. 20005
Telephone: (202) 386-6920
* admitted pro hac vice

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| JOHN C. EASTMAN,<br><br>          *Plaintiff*,<br><br>vs.<br><br>BENNIE G. THOMPSON, *et al.*<br><br>          *Defendants* | Case No.: 8:22-cv-00099-DOC-DFM<br><br>**PLAINTIFF'S CORRECTED REPLY IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER**<br><br>Date: January 24, 2022<br>Time: 2:00 p.m.<br>Judge: Hon. David O. Carter<br><br>Magistrate Judge: Hon. Douglas F. McCormick<br>Crtrm.: 9D<br>Trial Date: not set |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................2

INTRODUCTION.............................................................................6

ARGUMENT ...................................................................................8

I.   Attorney Client Privilege..........................................................8

    a.  The Congressional Defendants Themselves Have Deprived Dr. Eastman of the Ability to Advance Specific Privilege Claims in Response to the Subpoena ...................................................8

II.  Dr. Eastman's Privilege Claims Have Not Been Waived .............11

    a.  Chapman University's Email policies ...................................11

    b.  Dr. Eastman's Public Statements About his Representation of President Trump Do Not Even Waive Privilege as to President Trump, Let Alone His Other Clients ........................................16

III. The Subpoena is Likely to Reach Documents Covered by Attorney Work Product Privilege ...........................................................19

IV.  The Select Committee is Organized Contrary to its Authorizing Resolution, and Although It Has Some Valid Legislative Purposes, the Supoena At Issue Here Is Not in Furtherance of Them..........24

    a.  The Committee's membership is contrary to its authorizing resolution..24

    b.  The Committee's Law Enforcement Purpose .........................25

V.   Plaintiff and His Clients Will Suffer Irreparable Harm Absent Court Action.................................................................................26

VI.  Balance of Equities and Public Interest....................................27

VII. Other Arguments ...................................................................28

VIII. Conclusion ..........................................................................29

CERTIFICATE OF SERVICE...........................................................30

# TABLE OF AUTHORITIES

## Cases

*American Trucking Associations v. City of Los Angeles*,
   660 F.3d 384 (9th Cir. 2011)................................................................10

*Arizona v. The Inter Tribal Council of Arizona*,
   570 U.S. 1 (2013)..............................................................................10

*Coito v. Superior Ct.*,
   278 P.3d 860 (Cal. 2012) ...................................................................22

*Convertino v. U.S. Dep't of Just.*,
   674 F. Supp. 2d 97 (D.D.C. 2009) ......................................................11

*Doe I v. George Washington Univ.*,
   480 F. Supp. 3d 224 (D.D.C. 2020) ....................................................11

*Espinoza v. Montana Department of Revenue*,
   140 S.Ct. 2246 (2020) .......................................................................10

*Hickman v. Taylor*,
   329 U.S. 495 (1947)..........................................................................19

*Hunt v. Blackburn*,
   128 U.S. 464 (1888)..........................................................................16

*In re California Pub. Utils. Comm'n*,
   892 F.2d 778 (9th Cir. 1989)..............................................................19

*In re Excel Innovations, Inc.*,
   502 F.3d 1086 (9th Cir. 2007)............................................................26

*In re Search Warrant Issued June 13, 2019*,
   942 F.3d 159 (4th Cir. 2019), *as amended* (Oct. 31, 2019) ..............9, 27

*Klitzman, Klitzman & Gallagher v. Krut*,
   744 F.2d 955 (3d Cir. 1984)...............................................................27

*Sanmina Corp.*,
   968 F.3d 1107 (9th Cir. 2020)........................................................ 20, 23

*Tucker Ellis LLP v. Superior Ct. (Nelson)*,
   220 Cal. Rptr. 3d 382 (Cal. Ct. App. 2017) ........................................23

*United States v. Deloitte LLP*,
   610 F.3d 129 (D.C. Cir. 2010) ...................................................................... 20, 21

*United States v. Durenberger*,
   48 F.3d 1239 (D.C. Cir. 1995) ...........................................................................25

*United States v. Long*,
   64 M.J. 57 (C.A.A.F. 2006) ...................................................................... 13, 14

*United States v. Rostenkowski*,
   59 F.3d 1291 (D.C. Cir. 1995) ...........................................................................24

*United States v. Rumely*,
   345 U.S. 41 (1953) .............................................................................................26

*Watkins v. United States*,
   354 U.S. 178 (1957) ...........................................................................................26

*Weil v. Investment/Indicators, Research and Management, Inc.*,
   647 F.2d 18 (9th Cir. 1981) ...............................................................................18

*Whole Woman's Health v. Paxton*,
   2017 WL 4855392 (D. Hawai'i) .........................................................................9

**Statutes**

Cal. Civ. Proc. Code § 2016.020 .........................................................................22

Cal. Evid. Code § 250 .........................................................................................22

Cal. Evid. Code § 953 .........................................................................................16

**Other Authorities**

Brief of Respondent Albert Gore, Jr., *Bush v. Gore*, No. 00-949 (S.Ct. 2000).......15

Florida Legislature Select Joint Committee on the 2000 Presidential Election,
   Hearing on the Matter of the Appointment of Presidential Electors (Nov. 29,
   2000), available at https://www.c-span.org/video/?160847-1/manner-
   appointment-presidential-electors (last visited Jan. 22, 2022). ...........................15

GOP Caucus Rule 11 ...........................................................................................25

GOP Caucus Rule 14 ...........................................................................................25

H.Res. 503 ...........................................................................................................24

*Peter Boyles Show,* 710KNUS News/Talk (May 5, 2021) (available https://omny.fm/shows/peter-boyles-show/peter-boyles-may-5-8am-1).............18

Sisk, Gregory C. & Halbur, Nicholas, *A Ticking Time Bomb? University Data Privacy Policies and Attorney-Client Confidentiality in Law School Settings,* 2010 Utah L. Rev. 1277 (2010) ............................................................. 12, 22, 28

### Rules

California Rule of Professional Conduct Rule 1.6 ...................................................17

Fed. R. Civ. Pro. 45......................................................................................9

**INTRODUCTION**

The Committee seems to be of the view that Dr. Eastman was a scholar for hire – and that all of the personal and professional "papers and effects" he produced while a law professor are actually owned by the University and not him. See opp. At 1 ("on its own email system").  But the University is not a scholar-for-hire corporate entity like the Rand Corporation. It is an academic institution, and it expressly adheres to AAUP (American Association of University Professors) principles of academic freedom.  The University's servers, by custom and reasonable expectation, are therefore more like the servers of an Internet Service Provider than the servers of an ordinary business.

Moreover, to treat the mere use of those servers, as the Committee appears to do, as affecting a waiver of client privileges would place every clinical professor (law, medical, psychiatric, etc.) in violation of their ethical duties of confidentiality to clients.  The same would be true for law professors such as Dr. Eastman who, in addition to his duties as a supervising attorney of a law school clinic, undertakes – with the full blessing and encouragement of the University – to meet his contractual obligations for scholarship and service by taking on outside clients, utilizing his professional email for the purpose.

These issues raise extremely complicated legal questions that warrant more thorough briefing and hearing that could be managed on the short time fuse afforded by the Committee's subpoena.[1]   Those issues include:

---

[1] If the Committee were to argue that Dr. Eastman has known for months that it might seek his records held in archives by the University, he should nevertheless not be faulted for declining to incur tens of thousands of dollars in legal fees based on speculation of what the Committee *might* do.  Nor did he know the full scope of

- Who owns the private and professional email and documents generated by law school professors using University computers and email;

- Whether the mere use of University equipment and email systems constitutes a waiver of attorney-client privilege;

- Whether the Committee's subpoena, which seeks all of Dr. Eastman communications "relating to the election"—an area of core First Amendment concern—threatens to chill the political speech and association of Dr. Eastman and those communicating with him;[2]

- Whether the Committee's expansive, dragnet-like subpoena for all records "related to the election" is effectively a general warrant, barred by the Fourth Amendment;

- Whether the Committee's subpoena, which seeks information far removed from the events of January 6 that it has been tasked with assessing, is for prohibited law enforcement purposes even while other inquiries undertaken by the Committee might validly qualify for legislative purposes, under basic separation-of-powers principles.

---

the intrusion on his personal and professional papers and effects until he was provided with a copy of the subpoena at 2:31 pm on Wednesday, January 19—just over 40 hours from the return date specified in the subpoena.

[2] The Committee notes that although Dr. Eastman has alleged constitutional claims under the First and Fourth Amendments in his complaint, he did not assert such claims in his TRO papers. But the focus of the TRO was to provide a temporary halt so that the more extensive issues raised by the complaint could be adjudicated on a proper timeline. For that, Dr. Eastman's TRO papers focus on the allegations in his complaint where the irreparable injury caused by disclosure was most obvious, namely, the confidences of his clients and his own attorney work product.

Given the constitutional significance of these issues, the TRO should remain in effect and a briefing schedule set that would allow the parties to brief them, and for the court to consider them, on a timetable more suitable to the issues presented by the Committee's subpoena.

## ARGUMENT

I.   **Attorney Client Privilege**

a.   **The Congressional Defendants Themselves Have Deprived Dr. Eastman of the Ability to Advance Specific Privilege Claims in Response to the Subpoena**

The defendants first argue that Dr. Eastman has not made a proper privilege claim because he has failed to provide a detailed list of specific privileged materials.  Resp. at 19-20.  In support of this argument, the defendants cite inapposite cases while ignoring the fact that the defendants themselves have deprived Dr. Eastman of any opportunity to make such claims.

In early December, after serving Dr. Eastman with a subpoena to appear before the select committee, counsel for the committee requested that Dr. Eastman cooperate in a voluntary surrender of the Chapman materials.  Dr. Eastman declined to surrender the Chapman materials voluntarily, as was his right. Declining to surrender the Chapman materials does not deprive Dr. Eastman's clients of their privilege rights.

Some six weeks after these discussions, the committee served a subpoena on Chapman University on January 18 with a return date of January 21 at 10a.m. Counsel for Chapman notified undersigned counsel of the subpoena.  At undersigned counsel's urging, counsel for Chapman requested permission from the

committee to deliver the materials to Dr. Eastman for a privilege review.  The committee declined this request.[3]

Having declined to afford Dr. Eastman a reasonable opportunity to do a proper privilege review of the requested materials, the defendants now accuse Dr. Eastman of making an improper "blanket waiver," citing a collection of cases bearing no relation to the current factual scenario.  Understandably, the defendants do not address how Dr. Eastman could possibly have constructed a detailed privilege claim in roughly 48 hours for 18,925 responsive documents which the defendants refused to let him see.  Chapman Resp. Ex. 1 ¶ 8; *cf*. Fed. R. Civ. Pro. 45 (district court may quash subpoena that "fails to allow a reasonable time to comply"); *Whole Woman's Health v. Paxton*, 2017 WL 4855392 (D. Hawai'i) (quashing deposition subpoena which allowed 6 days to comply).

The congressional defendants' own statements implicitly concede the seemingly obvious facts that Dr. Eastman represented clients while employed at Chapman and that those representations generated privileged material which remains in Chapman's possession.  With respect to former President Trump, the defendants make a waiver argument explicitly relying on a Chapman press release which states, "John Eastman is representing President Trump in an action before

---

[3] Congress's conduct in this case can be usefully compared with other examples of investigative intrusions into the attorney client relationship.  In, *In re Search Warrant*, the government searched a law firm pursuant to warrant.  942 F.3d 159 (4th Cir. 2019).  The warrant contained fairly substantial "taint team" provisions whereby prosecutors not involved in the case would review for privilege.  *Id*. at 165-66.  The court reversed, finding that the government's procedures gave inadequate protection to privilege.  *Id*. at 183.  Here, Congress has made no provision for protecting privileged materials, let alone one which rises to the standard demanded by *In re Search Warrant*.

the Supreme Court.  In that filing, the Chapman physical address, a Chapman email and phone number were used."  Resp. at 23.  As the response also states, the select committee emailed undersigned counsel regarding Chapman emails, "so that Eastman could review and produce responsive emails along with a privilege log."  Resp. at 6.  These and other statements by the defendants concede that privileged materials continue to exist in Chapman's files.

Moreover, as the congressional defendants are presumably aware, Chapman University to this day advertises legal work done by Dr. Eastman under Chapman's auspices and using Chapman resources.  In a description of a legal clinic which Dr. Eastman ran until 2021, Chapman's website states:

> Most significantly, clinic briefs have been cited by appellate judges and Supreme Court Justices in their opinions. Justice Alito cited the clinic's brief in his concurring opinion in *Espinoza v. Montana Department of Revenue*, 140 S.Ct. 2246, 2268 (2020) (Alito, J., concurring), and Justice Thomas cited the clinic's brief in his dissenting opinion in *Arizona v. The Inter Tribal Council of Arizona*, 570 U.S. 1, 30 (2013) (Thomas, J. dissenting). The clinic's brief in another case was cited by Ninth Circuit Judge N. R. Smith in his dissent in *American Trucking Associations v. City of Los Angeles*, 660 F.3d 384, 412 (9th Cir. 2011) (N.R. Smith, dissenting).[4]

All of these representations (and others) were undertaken by Dr. Eastman while a professor at Chapman and the publicly available filings bear Chapman

---

[4] https://www.chapman.edu/law/legal-clinics/jurisprudence.aspx.

phone numbers, addresses, and emails.  The government's protestations to the contrary notwithstanding, there can be no reasonable dispute that the subpoenaed materials contain privileged materials.[5]

## II.    Dr. Eastman's Privilege Claims Have Not Been Waived

### a.  Chapman University's Email policies

The congressional defendants' first contention that Dr. Eastman's privilege claims have been waived is the fact that the communications were made using Chapman's email system.  They rely primarily on *Doe I v. George Washington Univ.*, 480 F. Supp. 3d 224 (D.D.C. 2020), which unlike the present case, involved use by *students* of the University's email system, not use by law professors whose contractual duties include client representations. That distinction is of great significance, as it supports Dr. Eastman's claim that he had a subjective expectation of confidentiality in his communications with or related to clients and prospective clients, and that his expectation of confidentiality is objectively reasonable. *Id*. at 226.  The more relevant case is therefore the other case relied upon (somewhat inexplicably) by the congressional defendants, *Convertino v. U.S. Dep't of Just.*, 674 F. Supp. 2d 97 (D.D.C. 2009). In that case, the same court that decided *Doe I* held that a Department of Justice employee's emails to his outside private attorney, using the Department's email system, retained their attorney-client privilege. "Although DOJ does have access to personal e-mails sent through

---

[5] In drafting his TRO, Dr. Eastman relied on the select committee's repeated assertions that the Chapman materials would be the proper subject of a privilege log.  However, the congressional defendants have now essentially taken the position that no such privileged materials exist.  To respond to that abrupt reversal of position, and out of an abundance of causation, Dr. Eastman offers the attached declaration.

his account, Mr. Turkel was unaware that they would be regularly accessing and saving emails sent from his account," the Court noted.  *Id*. at 110.  As Chapman itself acknowledges, and just like the DOJ in *Convertino*, "Chapman does not make a practice of monitoring email" even though it reserves the right the right to retrieve the contents of emails "for legitimate reasons, such as to find lost messages, to comply with investigations of wrongful acts, to respond to subpoenas, or to recover from system failure."  DuMontelle Decl. ¶ 5.  It is Dr. Eastman's contention, and his subjective expectation, that such "legitimate reasons" would not include the University accessing emails protected by attorney-client and work product privileges without his authorization.  Were the rule otherwise, then every single clinical professor—whether in the law school or in other departments with clients or patients—would be in breach of their ethical duties to protect client and patient confidences.  *See*, *e.g.*, California Rules of Professional Conduct 3-100(A) ("A member shall not reveal information protected from disclosure by Business and Professions Code section 6068, subdivision (e)(1) without the informed consent of the client, …"); Cal. Evid. Code § 995 (describing physician's obligation to assert privilege on behalf of his patient's confidential communications); Cal. Evid. Code § 1015 (same re psychotherapist obligation). *See also*, *generally*, Gregory C. Sisk & Nicholas Halbur, *A Ticking Time Bomb? University Data Privacy Policies and Attorney-Client Confidentiality in Law School Settings*, 2010 Utah L. Rev. 1277, 1293-94 (2010) (concluding that "attorneys practicing in the university law school environment may well be able to distinguish [cases in corporate settings] and successfully overcome a challenge to the privilege, even if the university does maintain a formal data privacy policy

reciting that users have no expectation of privacy in data on university computers or messages sent through university networks.)

That Chapman has a policy—and perhaps even a banner warning[6] — announcing that emails sent across its system are subject to monitoring for certain specified purposes does not defeat Dr. Eastman's reasonable expectation of confidentiality.  Other cases involving similar banner warnings in circumstances where the expectation of privacy would be even lower than in a University setting with its strong commitment to academic freedom, have held that such a warning does not necessarily give rise to a waiver of confidentiality.  *United States v. Long*, 64 M.J. 57 (C.A.A.F. 2006), is particularly salient.  There, the Court of Appeals for the Armed Forces held that a member of the military had a reasonable expectation of privacy in emails she sent and received using the Department of Defense's email system, and which were stored on that system.  There, like Chapman claims to be the case here, a banner appeared anytime a user logged on to the system notifying the user that the system was "provided only for authorized U.S. Government use" and that it "may be monitored for all lawful purposes, including to ensure that their use is authorized, for management of the system, to facilitate protection against unauthorized access, and to verify security procedures, survivability and operational security."  *Id*. at 60.  Yet the Court nevertheless upheld the service member's expectation of privacy in the personal emails she sent using the

---

[6] Dr. Eastman disputes Chapman's claim that a "splash screen" message appeared "every time Eastman logged on to Chapman's network."  During his employment at Chapman, Dr. Eastman used a laptop computer, connecting through the University's VPN. To his recollection, no such message ever appeared when he logged on to the network in that fashion, or when he accessed his Chapman email account via Outlook.

government system.  There, as here, each individual user "had his or her own unique password known only to them."  *Id*.  There, as here, users were told to change passwords frequently.  *Id*.  There, as here, network administrators did not have access to individual users' passwords, *id*., but could access the entire network, including personal email.  If that was good enough for the expectation of confidentiality to be deemed reasonable in the context of the military and highly-secure Department of Defense computers, surely it is sufficient for Dr. Eastman's expectation of confidentiality to be deemed reasonable in the context of a private University in which his duties included representation of clinic and other clients.

Defendant Chapman also intimates that Dr. Eastman's use of the University's email system was "unauthorized."  Chapman Opp. at 4.  The congressional defendants take that intimation as an "indisputably" proven fact.  Cong. Opp. at 22.  It is not.  Dr. Eastman's duties specifically included representation of clients, both through the law school clinic and outside clients through the Center for Constitutional Jurisprudence, a public interest law firm he operated in affiliation with a separate non-profit organization, the Claremont Institute.  Eastman Decl. ¶ 5 and Ex. 1. (employment contract in which Chapman expressly "acknowledges that, separate and apart from his employment as a Faculty Member, Faculty Member may also direct a Center for Constitutional Litigation …." (emphasis added)).  Like other law faculty, Dr. Eastman's promotion and tenure decisions, and his annual performance reviews and merit pay increases, were based in part on scholarship and service that expressly included representation of outside clients in matters related to his scholarship or that served the public interest.  That Dr. Eastman's election integrity work at issue here easily

qualified under established University practice is not speculative, but fully supported by nearly identical outside work Dr. Eastman performed early in his career at Chapman in the aftermath of the 2000 presidential election.  Then, as now, he provided pro bono legal work in election challenges,[7] gave expert testimony to a state legislature,[8]  and was even retained by the state legislature to help craft legislation to protect its electoral votes.  Eastman Decl. ¶ 6.  For that "outside" work, Dr. Eastman utilized his Chapman address and Chapman email. He even utilized the research services of Chapman's library and Chapman students.  Far from being chastised for engaging in "unauthorized" work using Chapman's resources, Chapman praised Dr. Eastman's work, the national

---

[7] Chapman's General Counsel intimates that such work may run afoul of IRS prohibitions on electioneering activity.  DuMontelle Decl. ¶ 3; *see also* Chapman Br. at 3.  But the IRS prohibits non-profit organizations like Chapman "from directly or indirectly participating in, or intervening in, any political campaign on behalf of (or in opposition to) any candidate for elective public office."  It identifies "[c]ontributions to political campaign funds or public statements of position (verbal or written) made on behalf of the organization in favor of or in opposition to any candidate for public office" as things that "clearly violate the prohibition against political campaign activity."  It does not mention post-election legal disputes over election integrity, and we are aware of no instance where the IRS has challenged a University's non-profit status because its law faculty have participated as counsel in post-election litigation despite that having occurred in some rather high-profile matters.  *See, e.g.*, Brief of Respondent Albert Gore, Jr., *Bush v. Gore*, No. 00-949 (S.Ct. 2000) (listing Harvard Law Professor Laurence Tribe as "counsel of record" and depicting his official Harvard University office address).

[8] *See* Florida Legislature Select Joint Committee on the 2000 Presidential Election, Hearing on the Matter of the Appointment of Presidential Electors (Nov. 29, 2000), available at https://www.c-span.org/video/?160847-1/manner-appointment-presidential-electors (last visited Jan. 22, 2022).

recognition of his expertise that it reflected, and the phenomenal opportunity it provided to his students.

Even if Dr. Eastman's work here was somehow "unauthorized" under Chapman's post-hoc interpretation of its rules, however, such would be irrelevant to the issue of whether Dr. Eastman and, as importantly, his clients, had a reasonable expectation of confidentiality in his email communications sent and received using Chapman's email system.  The privilege is held by the client, after all.  Cal. Evid. Code § 953; *Hunt v. Blackburn*, 128 U.S. 464, 470 (1888) ("the privilege is that of the client alone").

### b.  Dr. Eastman's Public Statements About his Representation of President Trump Do Not Even Waive Privilege as to President Trump, Let Alone His Other Clients

The congressional defendants also argue that because Dr. Eastman has spoken publicly about his representation of former President Trump, "the [attorney client] privilege would nonetheless be waived."  Resp. at 29.  As an initial matter, these arguments apply only to Dr. Eastman's representation of the former President and have no application to his other representations or potential representations during the subpoena period, such as the clinic representations mentioned above. However, even with respect to President Trump, the statements provide no basis to authorize a wholesale invasion of the attorney client relationship by the congressional defendants.

As an initial matter, it is by no means clear that any statements by Dr. Eastman about President Trump revealed any privileged material, let alone a complete waiver of such material, as the defendants contend.  A lawyer's duty to

protect a client's information is broader than the duty to protect privileged information.  As California Rule of Professional Conduct Rule 1.6 states:

> The principle of lawyer-client confidentiality applies to information a lawyer acquires by virtue of the representation, whatever its source, and encompasses matters communicated in confidence by the client, and therefore protected by the lawyer-client privilege, matters protected by the work product doctrine, and matters protected under ethical standards of confidentiality, as established in law, rule and policy.

*Id*. at n. 2 (and cases cited therein, *e.g. Goldstein v. Lees*, 46 Cal.App. 3d 614, 621 (1975) (italics added).

The statements about President Trump attributed to Dr. Eastman by the defendants make no reference to privilege.  *See*, *e.g.*, Resp. at 28 (Dr. Eastman's statement to Bob Woodward that the President had authorized him to "talk about these things.").  In fact, the defendants are only able to give Dr. Eastman's public statements the superficial appearance of privilege waivers by omitting highly relevant facts.  For example, the defendants attempt to characterize Dr. Eastman's statement on the Peter Boyles Show that he had authority from the President to discuss a "private conversation" as some kind of waiver.  Resp. at 20.  Conveniently omitted by defendants are Dr. Eastman's statements in the very same interview that the conversation in question occurred in the presence of three non-clients in addition the President.[9]   The "private conversation" of which Dr.

---

[9] To hear Dr. Eastman's description of this conversation, the reader is referred to minutes 12:00 – 15:00 of the podcast cited in the defendants' brief.  *Peter Boyles*

Eastman spoke was therefore obviously unprivileged.  The defendants attempt to characterize Dr. Eastman's discussion of a non-privileged conversation as somehow a waiver of attorney client privilege is misleading in the extreme.

At most, the statements show that President had authorized Dr. Eastman to disclose a limited amount of confidential information.  They provide this Court no basis to hold that Dr. Eastman has made any sort of privilege waiver with respect to former President Trump.

Even if Dr. Eastman had disclosed some sort of privileged information about the former President, it would be at most a limited waiver.  Courts have long recognized that disclosure of privileged information on a particular subject does not necessarily imply a complete waiver of the privilege.  *See*, *e.g.*, *Weil v. Investment/Indicators, Research and Management, Inc.*, 647 F.2d 18, 25 (9th Cir. 1981) ("We conclude, therefore, that the fund has waived its attorney-client privilege...only as to communications about the matter actually disclosed.").  It is publicly known that Dr. Eastman represented President Trump in several matters during the subpoena period.  The government has merely quoted statements from Dr. Eastman relating to a legal memorandum and an unspecified "private conversation."  No reasonable interpretation of these statements could construe them as a total waiver of privilege between Dr. Eastman and the former president.

---

*Show*, 710KNUS News/Talk (May 5, 2021) (available https://omny.fm/shows/peter-boyles-show/peter-boyles-may-5-8am-1)

### III.    The Subpoena is Likely to Reach Documents Covered by Attorney Work Product Privilege

In addition to confidential attorney client communications, the challenged subpoena encompasses attorney work product information. Seventy years of precedent make clear that the work product privilege allows lawyers to "work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." *Hickman v. Taylor*, 329 U.S. 495, 510 (1947). "Proper preparation of a client's case demands that [a lawyer] assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference." *Id*. at 511. The Supreme Court warned that undermining this protection may lead to "[i]nefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial," all to the detriment of clients and "the cause of justice." *Id*.

"As with [Dr. Eastman's] claim of attorney-client privilege," the inability to "make anything more than an unparticularized, blanket assertion that work product protection applies," Opp. at 23, is due Dr. Eastman's inability to access, much less examine, approximately 19,000 documents in 44 hours. Indeed, extending the TRO is necessary if only to show that the government may not overcome attorney client and work product privileges simply by giving attorneys no time to offer a particularized response. Identification of documents "prepared in anticipation of litigation," *In re California Pub. Utils. Comm'n*, 892 F.2d 778, 780–81 (9th Cir. 1989), cannot be done under this timeframe, demonstrating that an extension of the TRO is at least necessary to review the documents.

Implicitly acknowledging that such particularized identification is impossible, defendants' make a generalized waiver argument when law professors use of university email servers is inherently a waiver. Defendants argue that use of Chapman's email system is a banket waiver of the privilege.

This waiver argument fails for two reasons. First, third party "disclosure" only waives work product protections where, as Defendants acknowledge, "such disclosure, under the circumstances, is inconsistent with the maintenance of secrecy from the disclosing party's adversary" or "conduit to an adversary." Opp. at 24 (quoting *Sanmina Corp.*, 968 F.3d 1107, 1121 (9th Cir. 2020)). Chapman was not a conduit to an adversary and Dr. Eastman retained a "reasonable expectation of confidentiality" in his work product regardless of his use of Chapman servers. Second, the "fact-intensive analysis," *id.*, required to determine waiver actually supports extending the restraining order.

The "conduit of an adversary" analysis is divided into two parts:

The first inquiry is "whether the disclosing party has engaged in self-interested selective disclosure by revealing its work product to some adversaries but not to others." If so, "[s]uch conduct militates in favor of waiver" based on fairness concerns. The second inquiry is "whether the disclosing party had a reasonable basis for believing that the recipient would keep the disclosed material confidential."

*Sanmina Corp.*, 968 F.3d at 1121 (citations omitted) (quoting *United States v. Deloitte LLP*, 610 F.3d 129, 141 (D.C. Cir. 2010)).

Chapman is not a conduit to an adversary. As an initial matter, Defendant's contention that Dr. Eastman's work for then-President Trump necessarily predicted

an adversarial confrontation with Congress would not apply to Dr. Eastman's other clients.[10]  Second, even if this one client controls the analysis, the conduit analysis relies on revelation to some adversaries but not others. While Congressional defendants suggest that they were a foreseeable adversary, Chapman was not a foreseeable at the time of disclosure. In fact, Chapman is only an adversary now because Congress subpoenaed it. It turns the analysis on its head to suggest that work product may be shared with some entity that becomes an adversary by the mere fact of receiving a subpoena from the real adversary. Chapman's access to the work product materials, even excepting Dr. Eastman's reasonable expectation of privacy in those materials, is therefore, not a "self-interested selective disclosure." *Id*.[11]  This is particularly true where, as here, Dr. Eastman had every reason to suspect Chapman "would keep the disclosed material confidential." *Id*.

If anything, Chapman and Dr. Eastman's interests align with respect to at least some of the effected clients. "A reasonable expectation of confidentiality may derive from common litigation interests between the disclosing party and the recipient." *Deloitte LLP*, 610 F.3d at 141. Dr. Eastman's clinic work was run with the blessing and imprimatur of Chapman University. As previously explained, Chapman continues to advertise Dr. Eastman's successes. Chapman also encouraged scholarly pursuits which, in legal academia, could include

---

[10] This exclusive focus on representation of then-President Trump suggests that the Chapman subpoena is designed to defeat the former President's right to attorney client privilege and that the committee is not interested in other clients.

[11] Defendant's fairness argument, Opp. at 26, similarly fails because Dr. Eastman did not disclose to some parties while leaving others at an unfair advantage. Chapman is not a party. Nor have defendant's alleged that Dr. Eastman selectively disclosed part of his work product while withholding the rest.

representation of outside clients. *See generally* Gregory C. Sisk & Nicholas Halbur, *A Ticking Time Bomb? University Data Privacy Policies and Attorney-Client Confidentiality in Law School Settings*, 2010 Utah L. Rev. 1277.

Moreover, California privilege law gives Dr. Eastman a basis reasonably to assume work product will remain confidential regardless of electronic storage. Interpreting Chapman's email policy in the manner defendants suggest would assume that Chapman is eager to violate California state privilege law — an assumption that has no basis. In California, work product protections remain regardless of how a document is stored. As Justice Liu explained:

California's civil work product privilege is codified in section 2018.030. Subdivision (a) provides absolute protection to any "writing that reflects an attorney's impressions, conclusions, opinions, or legal research or theories." (§ 2018.030, subd. (a).) Such a writing "is not discoverable under any circumstances." (Ibid.) The term "writing" includes any form of recorded information . . .. (§ 2016.020, subd. (c) [adopting the definition set forth in Evidence Code section 250].)

*Coito v. Superior Ct.*, 278 P.3d 860, 864 (Cal. 2012). Under California law:

"Writing" means handwriting, typewriting, printing, photostating, photographing, photocopying, transmitting by electronic mail or facsimile, and every other means of recording upon any tangible thing, any form of communication or representation, including letters, words, pictures, sounds, or symbols, or combinations thereof, and any record thereby created, regardless of the manner in which the record has been stored.

Cal. Evid. Code § 250 (West) (emphasis added); *see also Tucker Ellis LLP v. Superior Ct. (Nelson)*, 220 Cal. Rptr. 3d 382, 388 (Cal. Ct. App. 2017). Therefore, privilege is retained regardless of individual policies of storage providers.

This is not to suggest that this Court is bound by state law on the final determination, but to show that Dr. Eastman (a California attorney) would not expect use of his Chapman University (a California institution) email to be "under the circumstances" of California law "inconsistent with the maintenance of secrecy." *Sanmina Corp.*, 968 F.3d at 1121. Instead, Dr. Eastman retained a "reasonable expectation of confidentiality." *Id*.

Dr. Eastman, therefore, exercised due care in maintaining the secrecy of his attorney work product.

Second, as defendants note, finding waiver requires "fact-intensive analysis" considering "the totality of the circumstances" that is "ultimately guided by the same principle of fundamental fairness that underlies much of our common law doctrine on waiver by implication." *Sanmina Corp.*, 968 F.3d at 1122; Opp. at 24. No such "fact-intensive analysis" has taken or can take place under this procedural posture. As yet, only the university is in a position to do any analysis of individual documents. Discovery is necessary to determine at the least, which documents were created in the course of work for the university, e.g., law clinics. And assuming arguendo that the university privacy policy controls, it contains exceptions for outside work "authorized, in writing or by e-mail, by the University" or work "in connection with scholarly, creative or community service activities" that benefits "organizations not related to the University." Decl. of

Janine P. DuMontelle ¶ 5. More time is needed to conduct a proper fact inquiry
into the uses of such work.

**IV.    The Select Committee is Organized Contrary to its Authorizing
        Resolution, and Although It Has Some Valid Legislative Purposes,
        the Supoena At Issue Here Is Not in Furtherance of Them.**

**a.  The Committee's membership is contrary to its authorizing
     resolution**

The congressional defendants claim that H.Res. 503 authorized Speaker
Pelosi to appoint "up to 13 members" to the Select Committee.  That is not what
the Resolution says, however.  Section 2 unambiguously provides that "The
Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be
appointed after consultation with the minority leader."  H.Res. 503 (emphasis
added).  Shall is mandatory an unambiguous, and the text nowhere authorizes a
lesser number, or "up to 13," as the congressional defendants claim.

The cases on which the congressional defendants rely for judicial deference
to the House's interpretation of its own rules involve circumstances where the rule
was "ambiguous."  In *United States v. Rostenkowski*, for example, the D.C. Circuit
noted (as the congressional defendants themselves acknowledge) that the
Constitution's "Rulemaking Clause is not an absolute bar to judicial interpretation
of the House Rules," even though "judicial interpretation of an *ambiguous* rule
runs the risk of the court intruding into the sphere of influence reserved to the
legislative branch."  59 F.3d 1291, 1305 (D.C. Cir. 1995) (emphasis added).
Similarly, and again as the congressional defendants noted, "a court may interpret
internal rules of a House of Congress only where such interpretation 'requires no
resolution of *ambiguities*.'"  Cong. Opp. at 8-9 (quoting *United States v.*

*Durenberger*, 48 F.3d 1239, 1244 (D.C. Cir. 1995) (second emphasis added). Because there is nothing ambiguous about "shall appoint 13 members," those cases actually acknowledge the judiciary's role in enforcing unambiguous rules, as are at issue here.  And there is no dispute that 13 members of the Committee were not appointed; this is not a case, therefore, of vacancies arising after the appointment.

Whether the Resolution's use of "consultation" rather than "recommendation" in the second requirement that "5 of whom shall be appointed after consultation with the minority leader" concededly presents a closer call, but the use of the mandatory "shall be appointed" suggests more than a perfunctory consultation that was then ignored by the Speaker who instead chose, on her own, two Members who were neither recommended by the minority leader nor consulted about.

This is not a mere procedural quirk.  The longstanding historical practice of bipartisanship on controversial committees is designed to ensure fairness in the legislative process and prevent it from being hijacked for hyper-partisan ends, to the extent possible.  It is also why the GOP's own caucus rules mandate a role for the caucus in the choosing of its own ranking minority members.  Although the GOP Caucus's Rule 11 addresses GOP steering committee recommendations for committee chairs and ranking members of *standing* committees, Rule 14, on which Plaintiff relied in his opening brief, is not textually so limited.

### b.  The Committee's Law Enforcement Purpose

The congressional defendants highlight portions of the resolution that identify potential legislation that might be proposed as a result of the Select Committee's investigations.  With that, Dr. Eastman has no dispute.  But as the

congressional defendants appear to concede, the issue is whether the particular subpoena at issue serves the stated legislative purposes.  See Cong. Opp. at 14 (""In determining the proper scope of a legislative subpoena, this Court may only inquire as to *whether the documents sought by the subpoena* are not plainly incompetent or irrelevant to any lawful purpose …" (emphasis added)).  It is hard to fathom how the subpoena's demand for "all documents…attributable to Dr. John Eastman, that are related in any way to the 2020 election" has even a remote connection to the stated legislative purposes to prevent future acts of violence, to improve security at the Capitol, and to strengthen security and resilience of the United States and its democratic institutions against violence.  The congressional defendants have offered no evidence, much less evidence that would amount to probable cause, tying Dr. Eastman to anyone who engaged in violence on January 6, 2021.  As the Supreme Court noted in *Watkins*, its decision in "*United States v. Rumely* makes it plain that the mere semblance of legislative purpose would not justify an inquiry in the face of the Bill of Rights."  *Watkins v. United States*, 354 U.S. 178, 198 (1957) (citing *United States v. Rumely*, 345 U.S. 41 (1953)).

## V.   Plaintiff and His Clients Will Suffer Irreparable Harm Absent Court Action

Dr. Eastman and his clients will suffer irreparable harm if the TRO is not extended. Defendants, relying on *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007), suggest that Dr. Eastman has not made a specific showing that harm will result. Resp. at 28. This case is inapposite. In Excel Innovations, the party seeking an injunction submitted an affidavit from a former CEO suggesting that privileged information would come up in an arbitration proceeding. 502 F.3d

at 1091–92. While this was speculative, Dr. Eastman's claim is on solid ground. Defendants acknowledge that the subpoena is targeting Dr. Eastman because of his role representing Donald Trump. All acknowledge that Dr. Eastman is an attorney and represented clients. See Resp. at 16 (citing article referring to Dr. Eastman as "Trump Lawyer").[12]  As previously mentioned Chapman publicized Dr. Eastman's clinic work. And, unlike in *Excel Innovations*, where the client information in question was likely unprivileged, the subpoena here seeks clearly privileged information. See Mem. Ex. 2, at 4. The harm to attorney client privilege is not a plausibility but a certainty.

In cases where lawyers' documents specifically are at issue, courts routinely recognize that breach of privilege is an irreparable harm. *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 175 (4th Cir. 2019), *as amended* (Oct. 31, 2019); *Klitzman, Klitzman & Gallagher v. Krut*, 744 F.2d 955, 960–61 (3d Cir. 1984) (ruling that law firm had demonstrated likelihood of irreparable harm where government seized thousands of files containing privileged information).

Breaching a privilege is a bell that cannot be unrung. It should not be done lightly and definitely should not be done without thorough review of the facts.

## VI.    Balance of Equities and Public Interest

Simply put, the only harm to defendants is delay. Delay, even in actions as important as criminal investigations, "does not outweigh the harm to [a lawyer] and [his] clients caused by" an unfiltered seizure of all electronic materials. *In re Search Warrant*, 942 F.3d at 182 (enjoining that the government's decision to use

---

[12] To the extent these facts are now in issue, Dr. Eastman includes an affidavit confirming them.

filter team of AUSA's on privileged communications). All documents will still be available once proper discovery and resolution of complex legal questions has occurred.

The harm to the public is, in contrast, imminent. Representation of clients by law professors using university resources is common practice.[13]  See generally Sisk and Halbur, supra.  Granting the Defendants' access to Dr. Eastman's privileged materials would throw this important area of representation into doubt.

## VII.   Other Arguments

Dr. Eastman maintains all the claims in the complaint including the claims that that the subpoena was issued in violation of House Rules; that subpoena constitutes an unconstitutional "general warrant" under the Fourth Amendment; and the subpoena infringes on protected First Amendment activity.

These issues are novel and complex and warrant thorough briefing in their own right.  Because of the timeline of this case, Dr. Eastman focuses largely on the attorney client privilege issues presented by the government's subpoena to provide this Court with the most thorough treatment possible.  Those issues are most clear cut, most obviously favor the plaintiff, and are the most logical basis to extend this Court's TRO to allow for proper briefing of the remaining issues preparatory to a permanent and/or preliminary injunction hearing.

---

[13] Indeed, Committee member Rep. Jamie Raskin represented clients under the auspices of American University while a professor at that institution, accordingly to publicly available PACER records.

## VIII.  Conclusion

For the foregoing reasons, this Court should extend the TRO for a reasonable time to allow for thorough briefing and factual development of the issues in preparation for a preliminary and/or permanent injunction hearing.

Respectfully submitted,


/s/Anthony T. Caso
Anthony T. Caso (Cal. Bar #88561)
CONSTITUTIONAL COUNSEL GROUP
174 W Lincoln Ave # 620
Anaheim, CA 92805-2901
Phone: 916-601-1916
Fax: 916-307-5164
Email:  atcaso@ccg1776.com

/s/ Charles Burnham
Charles Burnham (D.C. Bar # 1003464)
BURNHAM & GOROKHOV PLLC
1424 K Street NW, Suite 500
Washington, D.C. 20005
Email: charles@burnhamgorokhov.com
Telephone: (202) 386-6920

*Counsel for Plaintiff*

# CERTIFICATE OF SERVICE

I have served this filing on all counsel through the Court's ECF system.

Respectfully submitted,

/s/Anthony T. Caso
Anthony T. Caso (Cal. Bar #88561)
CONSTITUTIONAL COUNSEL GROUP
174 W Lincoln Ave # 620
Anaheim, CA 92805-2901
Phone: 916-601-1916
Fax: 916-307-5164
Email:  atcaso@ccg1776.com