# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| | |
|---|---|
| **JOHN C. EASTMAN,** | Case No. 8:22-cv-00099-DOC-DFM |
| Plaintiff, | |
| vs. | |
| **BENNIE G. THOMPSON, SELECT COMMITTEE TO INVESTIGATE THE JANUARY 6 ATTACK ON THE US CAPITOL, AND CHAPMAN UNIVERSITY,** | **ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION [2]** |
| Defendants. | |

Before the Court is Plaintiff John Eastman's ("Plaintiff" or "Dr. Eastman") Application for a Temporary Restraining Order and Motion for a Preliminary Injunction ("Application" or "App.") (Dkt. 2). The Court has reviewed the Application filed by Plaintiff, the Opposition filed by Defendants Select Committee to Investigate the January 6 Attack on the US Capitol ("Select Committee") and Representative Bennie Thompson (collectively "Select Committee"), and the Response filed by Defendant Chapman University ("Chapman"). The Court heard oral argument on January 24, 2022. The Court appreciates counsel working nights and through the weekend on this important matter and appreciates the parties' efforts toward a speedy resolution. Having reviewed the parties' papers and arguments, the Court **DENIES** Plaintiff's Application with respect to his First Amendment, Fourth Amendment, and congressional authority claims. The Court **DENIES** Plaintiff's attorney-client privilege and attorney work product claims at this point, but Plaintiff may raise these claims as to specific documents during production.

## I. BACKGROUND

### A. Facts

Dr. Eastman is a former law school dean at Chapman University, a "political conservative who supported former President Trump," and a self-described "activist law professor." Complaint ("Compl.") (Dkt. 1) ¶¶ 5–6. Dr. Eastman sues Defendants Chapman University and the Select Committee to block a subpoena to Chapman seeking Dr. Eastman's documents relating to the 2020 election and the January 6th Capitol attacks. *Id.* ¶¶ 10, 16–19.

#### 1. Dr. Eastman's Actions Following the 2020 Presidential Election

Dr. Eastman claims that the November 3, 2020 presidential election was "one of the most controversial in American history." *Id.* ¶ 1. Despite the lack of any evidence of voter fraud or election tampering, "a significant portion of the population came to believe the election was tainted by fraud, disregard of state election law, misconduct by election officials and other factors." *Id.*

Dr. Eastman was on a leave of absence from Chapman at the time of the election, but was still representing clients through Chapman's Constitutional Jurisprudence Clinic and receiving a stipend from the law school. Dr. Eastman explained at argument that he was representing three clients related to the 2020 election through the Chapman clinic: the Pasadena Republican Club; the Claremont Institute's Center for Constitutional Jurisprudence; and Professor Lawrence Hamermesh in the case *Trump v. Citizens for Responsibility and Ethics in Washington*, 953 F.3d 178 (2d Cir. 2019), *vacated as moot*, 141 S. Ct. 1262 (2021).

Outside of the clinic, Dr. Eastman represented former President Donald Trump in several cases attempting to challenge the results of the election. App. at 2; *see Texas v. Pennsylvania*, 141 S. Ct. 1230 (2020); *Donald J. Trump for President, Inc. v. Boockvar*, 141 S. Ct. 1044 (2021).

Dr. Eastman had other clients related to the 2020 election in addition to those four named clients, but declined to identify them at argument and claimed that their identities were privileged.

In addition to his formal representation of these clients, Dr. Eastman also engaged in a number of activities challenging the results of the 2020 election. The following facts about Dr. Eastman's actions are taken from the Select Committee's letter to Dr. Eastman in November 2021. Nov. 8, 2021 Select Committee Cover Letter to Eastman ("Cover Letter") at 1[1] (cited in Opp'n at 4). Dr. Eastman confirmed at argument that he took these actions and that the majority were part of his representation of President Trump.

Shortly after the election, Dr. Eastman "wrote two memoranda offering several scenarios for the Vice President to potentially change the outcome of the 2020 Presidential election." *Id.* (citing a CNN article[2]).

On December 3, 2020, Dr. Eastman testified to "Georgia state senators regarding alleged voter fraud and reportedly shared a paper arguing that the state legislature could reject election

---

[1] January6th.house.gov/sites/democrats.january6th.house.gov/files/20211108%20Eastman.pdf.
[2] *Trump lawyer's memo on six-step plan for Pence to overturn the election*, CNN (Sept. 21, 2021), www.cnn.com/2021/09/20/politics/trump-pence-election-memo/index.html.

results and directly appoint electors." *Id.* at 2 (citing a Washington Post article[3]).

On January 2, 2021, Dr. Eastman participated in "a briefing for nearly 300 state legislators from several states regarding purported election fraud, during which [Dr. Eastman] told the group that it was 'the duty of the legislatures to fix this, this egregious conduct, and make sure that we're not putting in the White House some guy that didn't get elected.'" *Id.* (citing a PR Newswire article[4]).

On January 3, Dr. Eastman met with President Trump and Vice President Michael Pence to explain his theory that the Vice President had the authority to decide the results of the election regardless of the votes in each state. *Id.* (citing a New York Times article[5]).

On January 5, Dr. Eastman was in "the Willard Hotel 'war room' with Steve Bannon and others . . . where the focus was on delaying or blocking the certification of the election." *Id.* (citing a Washington Post article[6]).

## 2.  January 6th Attack on the Capitol

On January 6, 2021, tens of thousands of people gathered outside the White House to protest the lawful transition of power from President Trump to President Joseph Biden. Dr. Eastman spoke at this rally along with President Trump. *Id.* (citing a National Review article[7]).

After the rally, several hundred protesters, many armed, stormed the Capitol building. As the D.C. Circuit described it:

> On January 6, 2021, a mob professing support for then-President Trump violently attacked the United States Capitol in an effort to prevent a Joint Session of Congress from certifying the electoral college votes designating Joseph R. Biden the 46th President of the United States. The rampage left multiple people dead, injured more than 140 people, and inflicted millions of dollars in damage to the Capitol. Then-Vice President Pence, Senators, and Representatives were all forced to halt their constitutional duties and flee the House and Senate chambers for safety.

---

[3] Josh Dawsey et al., *During Jan. 6 riot, Trump attorney told Pence team the vice president's inaction caused attack on Capitol*, WASH. POST (Oct. 29, 2021), www.washingtonpost.com/investigations/eastman-pence-email-riot-trump/2021/10/29/59373016-38c1-11ec-91dc-551d44733e2d_story.html.

[4] *Election integrity group meets with legislators from contested states*, PR NEWSWIRE (Jan. 2, 2021), www.prnewswire.com/news-releases/election-integrity-group-meets-with-legislators-from-contested-states-301199902.html.

[5] Michael S. Schmidt and Maggie Haberman, *The Lawyer Behind the Memo on How Trump Could Stay in Office*, N.Y. TIMES (Oct. 2, 2021), www.nytimes.com/2021/10/02/us/politics/john-eastman-trump-memo.html.

[6] Jacqueline Alemany et al., *Ahead of Jan. 6, Willard hotel in downtown D.C. was a Trump team 'command center' for effort to deny Biden the presidency*, WASH. POST (Oct. 23, 2021) (www.washingtonpost.com/investigations/willard-trump-eastman-giuliani-bannon/2021/10/23/c45bd2d4-3281-11ec-9241-aad8e48f01ff_story.html).

[7] John McCormack, *John Eastman v. the Eastman Memo*, NAT'L REVIEW (Oct. 22, 2021), www.nationalreview.com/2021/10/john-eastman-vs-the-eastman-memo/.

*Trump v. Thompson*, 20 F.4th 10, 15–16 (D.C. Cir. 2021). The House of Representatives characterized January 6, 2021 as "one of the darkest days of our democracy." Compl., Ex. A (H.R. Res. 503, 117th Cong. (2021), Preamble).

Shortly after the attack on the Capitol, Dr. Eastman emailed the Vice President's counsel that "the 'siege' is because YOU and your boss did not do what was necessary." Cover Letter at 2 (citing a Washington Post article[8]). Dr. Eastman subsequently told the Vice President's counsel that "Pence should still not certify the results." *Id.*

### 3. House of Representatives Resolution 503

In response to the attack, the House of Representatives passed Resolution 503, which created the Select Committee to Investigate the January 6 Attack on the United States Capitol. The Committee was empowered to "investigate and report upon the facts, circumstances, and causes relating to the January 6, 2021, domestic terrorist attack upon the United States Capitol Complex . . . and relating to the interference with the peaceful transfer of power." H.R. Res. 503 § 3(2). The Committee was instructed to "identify, review, and evaluate the causes and the lessons learned from the domestic terrorist attack" and issue a final report to the House with its findings and recommendations. *Id.* §§ 4(2), (3).

Under the Resolution, the Speaker of the House was authorized to appoint thirteen Members to the Select Committee, including appointing five Members after "consultation with the minority leader." *Id.* § 2(a). The Speaker of the House "spoke[]" with the Minority Leader regarding his recommended five Members and conveyed her objections to two candidates and intention to appoint the remaining three. Opp'n at 3 (citing Speaker Press Release[9]). The Minority Leader declined to recommend two other Republicans and instead withdrew all five recommendations. Opp'n at 3 (citing Minority Leader Press Release[10]). The Speaker ultimately

---

[8] Josh Dawsey et al., *During Jan. 6 riot, Trump attorney told Pence team the vice president's inaction caused attack on Capitol*, WASH. POST (Oct. 29, 2021), www.washingtonpost.com/investigations/eastman-pence-email-riot-trump/2021/10/29/59373016-38c1-11ec-91dc-551d44733e2d_story.html.

[9] Press Release, Nancy Pelosi, Speaker, House of Representatives, Pelosi Statement on Republican Recommendations to Serve on the Select Comm. to Investigate the Jan. 6 Attack on the U.S. Capitol (July 21, 2021), www.speaker.gov/newsroom/72121-2.

[10] Press Release, Kevin McCarthy, House of Representatives, McCarthy Statement about Pelosi's Abuse of Power on January 6th Select Committee (July 21, 2021), republicanleader.house.gov/mccarthy-statement-about-pelosis-abuse-of-power-on-january-6th-select-committee/.

appointed seven Democrat and two Republican Representatives to the Select Committee. Compl. ¶ 4.

### 4. The Select Committee's Subpoenas for Dr. Eastman's Documents

On November 8, 2021, the Select Committee issued a subpoena to Dr. Eastman with an accompanying cover letter from Chairman Thompson. Cover Letter at 1. In the letter, Chairman Thompson stated that Dr. Eastman's

> documents and testimony are directly relevant to the Select Committee's investigation, as you appear to have been instrumental in advising President Trump that Vice President Pence could determine which electors were recognized on January 6, a view that many of those who attacked the Capitol apparently also shared.

*Id.* at 3.

Chairman Thompson's letter detailed "credible evidence" of Dr. Eastman's knowledge of and participation in attempts to encourage the Vice President to reject electors from several states or delay the election results. *Id.* at 1.

Dr. Eastman declined to produce any documents or communications to the Select Committee and asserted his Fifth Amendment privilege against production. Opp'n at 5. During his deposition by the Select Committee, Dr. Eastman asserted his Fifth Amendment privilege 146 times. *Id.*

The Select Committee subsequently attempted to obtain the information from Dr. Eastman's former employer, Chapman University. After Chapman represented that it would take three days to produce the documents, the Select Committee issued a subpoena to Chapman on Tuesday, January 18, 2022 with a return date on Friday, January 21, 2022 of 10:00 am EST. Compl., Ex. B (Subpoena) (Dkt. 1-2) at 3–4.

"Pursuant to the authorities set forth in House Resolution 503 and the rules of the House of Representatives," the Select Committee ordered Chapman to produce the following:

> [A]ll documents and communications in [Chapman's] possession, custody, or control attributable to Dr. John Eastman, that are related in any way to the 2020 election or the January 6, 2021 Joint Session of Congress, including any such documents stored or located on the servers of Chapman University (e.g., email account(s), contact lists, calendar entries), on any electronic device used by Dr. John Eastman during his employment by Chapman University (e.g., computer, mobile phone, tablet, etc.), or in any

    other document database or hard copy document storage, during the time period November 3, 2020 to January 20, 2021.

*Id.* The Select Committee explained at argument that Chapman initially collected over 30,000 responsive emails and documents. The Select Committee then worked with Chapman's General Counsel to tailor search terms, resulting in just under 19,000 responsive documents and communications.

  **B.  Procedural History**

  Dr. Eastman filed his Complaint on Thursday, January 20, 2022 (Dkt. 1), and immediately filed his Application for TRO to prevent Chapman complying with the subpoena. That day, the Court decided that "[c]onsidering the short window for compliance with the subpoena, a delay of a few days over the weekend is reasonable to allow thoughtful decision-making on the merits." Order at 4 (Dkt. 12). The Court granted the TRO until the parties could appear for a hearing the following Monday and ordered an expedited briefing schedule over the weekend. *Id.*

  On Friday, January 21, 2022, Defendant Chapman University filed its Response ("Resp.") (Dkt. 17), neither supporting nor opposing the Application. The Select Committee also filed its Opposition ("Opp'n") (Dkt. 23) on Friday, January 21. Dr. Eastman filed his Reply on Saturday, January 22 (Dkt. 35). The Court heard argument on Monday, January 24, 2022.

  **II. LEGAL STANDARD**

  A preliminary injunction is an "extraordinary remedy" that requires courts to balance competing claims on a case-by-case basis, with "particular regard for the public consequences" of issuing an injunction. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A plaintiff seeking preliminary injunctive relief "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am.*

*Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20).

Alternatively, "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) (internal quotation omitted). A "serious question" is one on which the movant "has a fair chance of success on the merits." *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984).

### III. DISCUSSION

If a plaintiff cannot show likelihood of success on the merits of any claim, the Court need not reach any of the other preliminary injunction factors. *See Winter*, 555 U.S. at 20. Dr. Eastman argues that he is likely to succeed on two of his claims: that the Select Committee's actions were beyond its authority, and that the requested information includes privileged attorney-client communications and attorney work product. App. at 4. Dr. Eastman's Complaint includes two other claims: that the subpoena violates Dr. Eastman's First Amendment rights, and that its broad scope violates the Fourth Amendment. *See* Compl. ¶¶ 81, 98. The Court finds that Dr. Eastman has no likelihood of success on the merits of his claims, so his claims do not warrant injunctive relief.

#### A. The Select Committee's Authority to Issue the Subpoena

Dr. Eastman argues that the subpoena to Chapman is invalid because the Select Committee is improperly constituted and seeks information without a legitimate legislative purpose. The Court finds that the Select Committee is acting within its authority.

##### 1. Formation of the Select Committee

The House of Representatives uses four types of committee, including Select Committees. The House Rules state that "[t]he Speaker shall appoint all select, joint, and conference committees ordered by the House." H.R. Rule I.11. The House created this Select Committee in Resolution 503 and required the following appointment process: "The Speaker

shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader." H.R. Res. 503 § 2(a).

The Speaker of the House "spoke[]" with the Minority Leader regarding appointments to the Select Committee. Opp'n at 3 (citing Speaker Press Release[11]). In particular, the Speaker consulted the Minority Leader about his recommended five minority party Members to serve on the Select Committee. Opp'n at 10. When the Speaker announced her intention to appoint only three of those five Members, the Minority Leader withdrew all of his recommendations. *Id.* at 10–11. The Speaker subsequently appointed two other minority party Members to the Select Committee. *Id.* at 11. The appointment process unquestionably included "consultation" with the Minority Leader in line with the plain language of the organizing Resolution.

Dr. Eastman argues that the Resolution requires a ranking minority member to be appointed after nomination by the Republican Steering Committee and a vote by the Republican House Conference. App. at 3 (citing House GOP Rule 14(a)(1)).[12] But that requirement does not appear in the text of the Resolution creating this Select Committee. Moreover, the party election requirement exists only for members of Standing Committees, not Select Committees. Opp'n at 11 (citing Congressional Research Service report[13]).

Because the Speaker followed the requirements of H.R. 503 in appointing Members, the Select Committee is properly constituted.

### 2. Legitimate legislative purpose

"[T]he power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function." *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927). Without the ability to seek information, "Congress would be shooting in the dark, unable to legislate 'wisely or effectively.'" *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020)

---

[11] Nancy Pelosi, Speaker, House of Representatives, Pelosi Statement on Republican Recommendations to Serve on the Select Comm. to Investigate the Jan. 6 Attack on the U.S. Capitol (July 21, 2021), www.speaker.gov/newsroom/72121-2.

[12] Plaintiff also argues in his Reply that the Committee is improperly constituted because it only has nine Members when the text of the Resolution stated that Committee "shall" have thirteen. A court may interpret internal congressional rules only when such interpretation "requires no resolution of ambiguities." *United States v. Durenberger*, 48 F.3d 1239, 1244 (D.C. Cir. 1995). *See* Transcript of Hearing on Application for Temporary Restraining Order 33-34, *Taylor Budowich Conservative Strategies, Inc. v. Nancy Pelosi*, No. 21-cv-3366-JEB (D.D.C. Jan. 20, 2022) (rejecting claim that Select Committee was invalidly constituted for having fewer than thirteen members).

[13] MICHAEL GREENE, CONG. RSCH. SERV., R46786, RULES GOVERNING HOUSE COMMITTEE AND SUBCOMMITTEE ASSIGNMENT PROCEDURES 3 (2021), crsreports.congress.gov/product/pdf/R/R46786.

(quoting *McGrain*, 272 U.S. at 175). Because Congress's ability to obtain information is "justified solely as an adjunct to the legislative process," its subpoenas are "invalid if unrelated to any legislative purpose." *Watkins v. United States*, 354 U.S. 178, 197–98 (1957). Congress has a legislative purpose when the subpoena "concern[s] a subject on which 'legislation could be had.'" *Eastland v. U. S. Servicemen's Fund*, 421 U.S. 491, 506 (1975) (quoting *McGrain*, 272 U.S. at 177). When reviewing the legislative authority of a congressional committee, the Supreme Court has reiterated the importance of protecting Congress from interference from "a possibly hostile judiciary." *Id.* at 502 (1975) (internal quotations omitted).

Resolution 503 outlines three overarching purposes of the Select Committee:

> (1) To investigate and report upon the facts, circumstances, and causes relating to the January 6, 2021, domestic terrorist attack upon the United States Capitol . . . and relating to the interference with the peaceful transfer of power . . . as well as the influencing factors that fomented such an attack on American representative democracy . . . ;
> (2) To examine and evaluate evidence developed by relevant Federal, State, and local governmental agencies regarding the facts and circumstances surrounding the domestic terrorist attack . . . ;
> (3) To build upon the investigations of other entities and avoid unnecessary duplication of efforts by reviewing the investigations, findings, conclusions, and recommendations of other . . . investigations . . . .

H.R. Res. 503 § 3. Dr. Eastman argues that none of the Select Committee's legitimate legislative purposes are related to his communications and documents. App. at 7–8. The Court finds that not only are the issues surrounding the 2020 election and the January 6th attacks clearly "subjects on which legislation could be had," there are numerous legislative measures that could relate to Dr. Eastman's communications.

Dr. Eastman's actions clearly fall within the bounds of an investigation into "the influencing factors that fomented such an attack on American representative democracy." H.R. Res. 503 § 3(1). Dr. Eastman wrote "two memoranda offering several scenarios for the Vice President to potentially change the outcome of the 2020 Presidential election;" "testified to Georgia state senators regarding alleged voter fraud and . . . argued that that the state legislature could reject election results and directly appoint electors;" and "spoke at the rally at the White House Ellipse" that led into the attack on the Capitol. Cover Letter at 1–2 (quoted in Opp'n at

4–5). Dr. Eastman later called Vice President Pence "spineless" for refusing to follow Dr. Eastman's plan. Opp'n at 15 (citing New York Times article[14]).

Not only are the issues surrounding the 2020 election and the January 6th attacks clearly "subjects on which legislation could be had," there are numerous plausible legislative measures that could relate to Dr. Eastman's communications. As the D.C. Circuit recently noted with respect to a subpoena of President Trump's documents under Resolution 503, Congress could respond to information about Dr. Eastman's actions by "amend[ing] the Electoral Count Act to shore up the procedures for counting electoral votes and certifying the results of a presidential election." *Trump v. Thompson*, 20 F.4th 10, 42 (D.C. Cir. 2021) (quoting H.R. Res. 503 § 4(a)(2)(D)). The Congressional Defendants suggest that Congress could "prevent campaign fundraising based on knowing misrepresentations regarding election fraud." Opp'n at 13. Congress could also increase penalties for encouraging seditious actions relating to elections. The Select Committee's subpoena is well within its legitimate legislative purpose.

Dr. Eastman next argues that the Select Committee is acting with a law enforcement purpose, making its actions *ultra vires*. App. at 6; Compl. ¶¶ 35–37. Dr. Eastman cites statements from members of the Select Committee that he alleges demonstrate this law enforcement purpose. For example, Dr. Eastman quotes Representative Adam Kinzinger describing the committee's work: "[O]ur mission is very simple: to ensure the trust and ensure accountability;" Representative Jamie Raskin stating, "we're perfectly willing to turn over evidence of criminal acts to the Department of Justice;" and Representative Liz Cheney stating that a "key question before this Committee" was "did Donald Trump through action or inaction corruptly seek to obstruct or impede Congress' official proceedings to count electoral votes?" Compl. ¶ 35. Dr. Eastman also implies that the Court can infer a law enforcement purpose from the fact that three members of the Select Committee were part of the House impeachment teams for one or both of President Trump's impeachments. *Id.* ¶ 36.

Despite Dr. Eastman's allegations, the Supreme Court has held that it is not "a valid objection to the investigation that it might possibly disclose crime or wrongdoing." *McGrain*,

---

[14] Luke Broadwater, *Trump Lawyer Blamed Pence for Violence as Rioters Stormed the Capitol*, N.Y. TIMES (Oct. 30, 2021), www.nytimes.com/2021/10/30/us/politics/eastman-pence-capitol-riot.html.

273 U.S. at 180. As the Congressional Defendants note, Congress has previously conducted similar investigations into attacks on our country, such as those of September 11, 2001 and the War of 1812. Opp'n at 14 n.8. In these circumstances, it is reasonable that investigations might reveal evidence of criminal acts or other wrongdoing. Moreover, the subjective "motives of committee members . . . alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served." *Watkins*, 354 U.S. at 200. Accordingly, the Select Committee's subpoena is within its legitimate legislative authority and the Court DENIES Dr. Eastman's Application as to his *ultra vires* claim.

### B. First Amendment

Dr. Eastman argues that disclosure of the emails and information sought by the Select Committee "would infringe on the First Amendment speech, association, assembly and petition rights not only of Dr. Eastman but of those with whom he associated." Compl. ¶ 81.

Congressional committee investigations and subpoenas are restrained by the First Amendment. *Watkins*, 354 U.S. at 197. "Abuses of the investigative process may imperceptibly lead to abridgment of protected freedoms . . . [particularly] when those forced revelations concern matters that are unorthodox, unpopular, or even hateful to the general public." *Id.* However, these protections "do not afford a witness the right to resist inquiry in all circumstances." *Barenblatt v. United States*, 360 U.S. 109, 126 (1959). Courts must engage in a fact-specific "balancing" of the "competing private and public interests at stake in the particular circumstances shown." *Id.*

The public interest here is weighty and urgent. Congress seeks to understand the causes of a grave attack on our nation's democracy and a near-successful attempt to subvert the will of the voters. Congressional action to "safeguard [a presidential] election" is "essential to preserve the departments and institutions of the general government from impairment or destruction, whether threatened by force or by corruption." *Burroughs v. United States*, 290 U.S. 534, 545 (1934).

In contrast to the significant public interest, Dr. Eastman has identified neither any specific associational interest threatened by production of his Chapman communications, nor

any particular harm likely to result from their production. Dr. Eastman has therefore failed to make the required *prima facie* showing that "enforcement of the subpoenas will result in (1) harassment . . . or (2) other consequences which objectively suggest an impact on, or 'chilling' of, [his] associational rights." *Brock v. Loc. 375, Plumbers Int'l Union of Am.*, 860 F.2d 346, 350 (9th Cir. 1988). *See also New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 13 (1988) ("[N]ot . . . every setting in which individuals exercise some discrimination in choosing associates . . . is protected by the Constitution.").

Dr. Eastman further argues that the subpoena is a "clear effort to chill the speech" of the Select Committee's "political adversaries." Compl. ¶ 85. To support this assertion, Dr. Eastman notes that seven of the Committee's members belong to the opposing party and two opposed the president Dr. Eastman supported. *Id.* ¶ 86. However, as discussed above, the Select Committee is acting within its power, and "the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Barenblatt*, 360 U.S. at 132 (citing *Arizona v. California*, 283 U.S. 423, 455 (1931)).

Accordingly, the Court DENIES Dr. Eastman's Application as to his First Amendment claim.

### C. Fourth Amendment

Dr. Eastman asserts that the subpoena to Chapman violates his Fourth Amendment rights because it is "so broad and indefinite as to exceed the lawfully authorized purpose" of the Select Committee. Compl. ¶ 98.

A subpoena is not impermissibly broad if it calls for the production of documents tethered to "the nature, purposes and scope" of the congressional inquiry. *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 209 (1946). Where the committee's area of inquiry is relatively broad, "the permissible scope of materials that could reasonably be sought [is] necessarily equally broad." *McPhaul v. United States*, 364 U.S. 372, 382 (1960).

The documents and communications sought are directly within the scope of the Select Committee's legislative purpose of investigating the January 6 attack on the Capitol. The subpoena seeks documents only between the election on November 3, 2020, and the

1 inauguration on January 20, 2021. As Dr. Eastman notes, the 2020 election was perceived by
2 some as "tainted by fraud, disregard of state election law, [and] misconduct by election
3 officials." Compl. ¶ 1. Additionally, the Select Committee had "credible evidence" that during
4 December 2020 and January 2021 Dr. Eastman encouraged the Vice President and other
5 legislators to reject or delay legitimate election results. Cover Letter at 1. The Committee's
6 purpose is expansive—it covers both "the facts and circumstances" surrounding the attack on
7 the Capitol and the "influencing factors that fomented such an attack." H.R. Res. § 503(3)(1). It
8 is reasonable to infer that public perception of the election and Dr. Eastman's attempts to
9 invalidate the results constituted "influencing factor[s]" for some of those who stormed the
10 Capitol on January 6, 2021.

11 Chapman and the Select Committee also made efforts to narrow the scope of production
12 under the subpoena after it was issued. At the hearing, the Select Committee explained that the
13 subpoena initially produced nearly 30,000 documents for review. The Select Committee then
14 worked with Chapman to devise search terms to further limit the results. By doing so Chapman
15 was able to cut the search results by over a third, leaving just under 19,000 documents. Resp. at
16 5. Although the number of documents produced is substantial, the volume is more likely a
17 reflection of the extent of relevant communications rather than of an impermissibly broad
18 inquiry. *See Eastland*, 421 U.S. at 509 ("Nor is the legitimacy of a congressional inquiry to be
19 defined by what it produces. The very nature of the investigative function—like any research—
20 is that it takes the searchers up some 'blind alleys' and into nonproductive enterprises. To be a
21 valid legislative inquiry there need be no predictable end result.").

22 The Court does not find the subpoena to be overbroad or indefinite given its context. As
23 such, the Court DENIES Dr. Eastman's claims with respect to the Fourth Amendment.

### D. Attorney-Client Privilege

25 While Dr. Eastman was employed as a law professor at Chapman, he accepted pro bono
26 and privately retained clients in addition to his academic work. Compl. ¶¶ 6–7. Dr. Eastman
27 argues that the requested information includes privileged communications between him and his

clients, including President Trump. App. at 8. The Congressional Defendants respond that Dr. Eastman fails to establish that any specific communications are privileged. Opp'n at 16.

"[A] party asserting the attorney-client privilege has the burden of establishing the relationship *and* the privileged nature of the communication." *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009) (citation omitted) (emphasis in original). The party must assert the privilege "as to each record sought to allow the court to rule with specificity." *Clarke v. Am. Com. Nat. Bank*, 974 F.2d 127, 129 (9th Cir. 1992). It is "extremely disfavored" when a "subpoena [i]s met by blanket assertions of privilege." *In re Grand Jury Witness*, 695 F.2d 359, 362 (9th Cir. 1982).

Here, neither Dr. Eastman's Complaint nor his Application mention any specific communications or explain why the communications are privileged. Dr. Eastman's sweeping statement that the "information sought, . . . if it exists, would on its face be protected by attorney-client" privilege is precisely the sort of "blanket assertion of privilege" that the Ninth Circuit has repeatedly instructed courts to reject. *See Clarke*, 974 F.2d at 129; *United States v. Cromer*, 483 F.2d 99, 102 (9th Cir. 1973).

Dr. Eastman previously argued that he was unable to assert specific privilege claims because he had not been provided the documents for review. Reply at 3–4. However, the parties clarified at argument that Dr. Eastman was previously given the opportunity to produce a privilege log and refused based on the Fifth Amendment.

After discussion at the hearing, the Select Committee renewed their offer to provide Dr. Eastman with all responsive documents. Dr. Eastman accepted the offer and agreed to make a privilege log while producing all unprivileged documents to the Committee on a rolling basis.

The Select Committee's counsel spoke to the Chair and Vice-Chair of the Select Committee, and Plaintiff's counsel spoke with Dr. Eastman, and the parties stipulated that the Court would decide any privilege disputes over specific documents or communications.

Accordingly, the Court DENIES Dr. Eastman's application as to his privilege claims, but gives leave for him to reassert those claims in the context of specific documents.

## IV. DISPOSITION

For the reasons given above, the Court **DENIES** Dr. Eastman's Motion for Preliminary Injunction. Dr. Eastman may renew his attorney-client privilege and attorney work product claims as to specific documents during production.

DATED: January 25, 2022

*David O. Carter*

DAVID O. CARTER

UNITED STATES DISTRICT JUDGE