UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(SOUTHERN DIVISION - SANTA ANA)

```
JOHN C. EASTMAN,              ) CASE NO: 8:22-CV-00099-DOC-DFM
                             )
            Plaintiff,       )          CIVIL
                             )
    vs.                      )     Santa Ana, California
                             )
BENNIE G. THOMPSON, ET AL.,  )   Monday, January 24, 2022
                             )   (2:22 p.m. to 3:35 p.m.)
            Defendants.      )   (4:00 p.m. to 4:18 p.m.)
                                 (4:32 p.m. to 4:40 p.m.)
                                 (4:56 p.m. to 5:12 p.m.)
```

HEARING RE:

PLAINTIFF DR. JOHN EASTMAN'S APPLICATION FOR TEMPORARY
RESTRAINING ORDER AS TO SUBPOENA [DKT.NO.2];

PRODUCTION AND PRIVILEGE LOG

BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE

**APPEARANCES**:            SEE PAGE 2

Court Reporter:            Recorded; CourtSmart

Courtroom Deputy:          Karlen Dubon

Transcribed by:            Exceptional Reporting Services, Inc.
                           P.O. Box 8365
                           Corpus Christi, TX 78468
                           361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>**APPEARANCES**</u>:


For Plaintiff:                   CHARLES BURNHAM, ESQ.
                                 Burnham & Gorokhov, PLLC
                                 1424 K Street NW
                                 Suite 500
                                 Washington, DC 20005
                                 202-386-6920

                                 ANTHONY T. CASO, ESQ.
                                 Constitutional Counsel Group
                                 174 W. Lincoln Avenue
                                 No. 620
                                 Anaheim, CA 92805
                                 916-601-1916

Also present:                    DR. JOHN C. EASTMAN

For Defendants:                  DOUGLAS N. LETTER, ESQ.
                                 Office of General Counsel
                                 U.S. House of Representatives
                                 5140 O'Neill House Office Building
                                 Washington, DC 20515
                                 202-225-9700

                                 FRED M. PLEVIN, ESQ.
                                 Paul Plevin Sullivan & Connaughton
                                 101 West Broadway
                                 9th Floor
                                 San Diego, CA 92101

Also present:                    JANINE DUMONTELLE
                                 PHILLIP LYLE

1    **Santa Ana, California; Monday, January 24, 2022; 2:22 p.m.**

2              **(Remote and courtroom appearances)**

3                        **Call to Order**

4         **THE COURT:**  First of all, good -- well, good

5    afternoon.

6         **MR. BURNHAM:**  Good afternoon, Judge.

7         **THE COURT:**  And we're on the record in Case Number

8    22-00099, Titled, *John Eastman versus Bernie* [sic] *Thompson.*

9         And if I could start slowly on behalf of the

10   plaintiffs or petitioners in this matter.

11        **MR. BURNHAM:**  Good afternoon again, Your Honor.

12        **THE COURT:**  With your identification.  You just can

13   remain seated, please.

14        **MR. BURNHAM:**  Good afternoon again, Your Honor.

15   Charles Burnham here on behalf of Dr. John Eastman.

16        **THE COURT:**  All right.  And?

17        **MR. CASO:**  And Anthony Caso, Your Honor.

18        **THE COURT:**  Anthony Caso.  And you are John Eastman,

19   obviously, and you're present in court today.

20        **MR. BURNHAM:**  Good to see, Judge.

21        **THE COURT:**  All right.  Thank you.

22        And then on behalf of the responding party.

23        **MR. PLEVIN:**  Good afternoon, Your Honor.  Fred Plevin

24   representing Chapman University.

25        **THE COURT:**  All right.

1         **MR. PLEVIN:**  I also wanted to note for the Court that

2 on Zoom, but not on the panel, are Chapman's vice president and

3 general counsel, and an assistant vice president of information

4 technology in case the Court has a need to hear anything from

5 them.

6         **THE COURT:**  All right.  And their names, please, for

7 the record.

8         **MR. PLEVIN:**  Janine DuMontelle is the vice president

9 and general counsel, and Phillip Lyle is the assistant vice

10 president for information technology.  They're both together

11 identified on the Zoom as Janine DuMontelle.

12         **THE COURT:**  All right.  Thank you so much.  And then

13 on behalf of the Select Committee?

14         **MR. LETTER:**  Good afternoon, Your Honor.  This is

15 Douglas Letter.  I'm the general counsel of the United States

16 House of Representatives appearing on behalf of the Committee

17 and the Chairman.

18         And Your Honor, I'm sorry.  I might not have heard

19 properly.  I thought maybe you said "Bernie" Thompson; its

20 Bennie Thompson --

21         **THE COURT:**  Oh, I see.

22         **MR. LETTER:**  -- obviously, the name of the Chairman.

23         **THE COURT:**  My apologies.

24         First, I received Dr. Eastman's application for a

25 temporary restraining order Thursday, a few days ago, on

1   January 20th, about 5:30 p.m., and I want to express the

2   Court's appreciation to all counsel for working the nights and

3   throughout the weekend on this matter.

4         And I'd like to begin by giving 10 minutes to each

5   party for your oral argument, and then I may take a brief

6   recess if I have questions and follow up questions.

7         So, counsel.  You can remain seated if you'd like to.

8         **MR. BURNHAM:**  Thank you, Your Honor.  I'll start -- I

9   submitted a brief to readdress the factors for temporary

10   restraining order.  I won't repeat that, but I'll expand a

11   little bit on what I see as the most critical issues.

12         Starting with the likelihood of success, we raised a

13   number of issues in our complaint, but I think the most salient

14   and the one we focused most on the briefs at the TRO stage is

15   the attorney-client privilege, which is also the most urgent in

16   our view.

17         And so somewhat surprisingly to us anyway, the

18   Government, in a --

19         **THE COURT:**  Just a little slower.

20         **MR. BURNHAM:**  All right.  I'm trying to get it all in

21   in 10 minutes.  I'll go slower.

22         The Government, in a way, seems to be contesting

23   either the very existence of attorney-client privilege

24   information in the responsive documents and materials to the

25   subpoena, or the fact that we've identified enough -- with

1   enough particularity, whatever privileged information might be

2   in there.

3          So, I'll address that to begin with.  And I think it

4   should be an obvious fact from multiple sources that there's

5   privileged information responsive to the subpoena.

6          **THE COURT:**  Now you've dropped your voice.  I can see

7   real time, and we didn't get that.  Please repeat that.

8          **MR. BURNHAM:**  I think it should be obvious from a

9   number of sources that there is a great deal of attorney-

10  privilege and work product information that's potentially

11  responsive to the subpoena, and we know that from a number of

12  sources.

13         Dr. John Eastman has long been an activist law

14  professor.  He was never an ivory tower-type professor.  That's

15  the very reason the Committee is interested in him in their

16  investigation, because he was representing the President of the

17  United States in a number of matters.

18         The Chapman website continues to advertise his legal

19  work.  His briefs are all over Pacer, they're all over the

20  Internet.  Even the Government itself talks about his work as a

21  lawyer while at Chapman, so it shouldn't be a subject of great

22  dispute here today that the subpoena does seek --

23         **THE CLERK:**  Slow down for us.

24         **MR. BURNHAM:**  -- I'm sorry?

25         **THE CLERK:**  Slow down.

1           **MR. BURNHAM:**  That the subpoena does seek privilege

2    materials.

3           Now, turning from there to the Government's claim

4    that we didn't respond with enough specificity in identifying

5    privilege materials, that's sort of the whole point of this

6    case is we didn't have an opportunity to do so because of the

7    timeline of the Government's service of the subpoena with such

8    a short window to respond to it, and the fact that neither

9    Chapman nor the Select Committee was willing to give us access

10   to the documents.

11          So, we think that claim fails as well and, in fact,

12   that's not the only claim the congressional defendants make.

13   They --

14          **THE COURT:**  Okay.  During your opening, I'd like to

15   hear what that timeframe was.

16          I have your briefing, but I want to make certain I

17   understand the claim that the subpoena first issued last

18   Tuesday, January 18th, with a timeline of Friday, January 21st

19   at 7:00 a.m. Pacific time; is that correct?

20          **MR. BURNHAM:**  That's right.  That's right.

21          **THE COURT:**  All right.  Please continue.

22          **MR. BURNHAM:**  And the subpoena was emailed to me, I

23   think, in the early evening of the 18th itself.  I didn't see

24   it until the next morning.  It was some, you know, 9:00 or

25   10:00 o'clock the next morning, I realized the subpoena was

 1   there.

 2          To the extent the Court considers it relevant, I'm

 3   more than happy to go into sort of the preliminary discussions

 4   prior to the subpoena about the subject that the briefs allude

 5   to.  I don't think that's relevant, but I'm ready to address it

 6   should the Court have any questions.  But the timeline, yes,

 7   was as Your Honor stated it.

 8          So, even if we -- even if we had had access to the

 9   potentially responsive materials, which apparently consist of

10   some 20,000 responsive documents, there was no way we were

11   going to be able to come up with any kind of a detailed

12   privilege claim in that timeframe.  But the more important fact

13   is we simply didn't even have access to the materials, and we

14   don't to this day.

15          The congressional defendants also argue that even if

16   there is attorney-client privilege as we contend, that any

17   privilege has been waived.  And they make two basic arguments,

18   two basic waiver arguments; one having to do with the Chapman

19   University email system --

20          **THE COURT:**  Just a moment.  Yeah.  Do you have it?

21          **THE CLERK:**  No.

22          **THE COURT:**  It's just a little too quick, counsel.

23   So, if you want a good record, please.

24          **MR. BURNHAM:**  Sure.

25          **THE COURT:**  One has to do with Chapman's email

1    system.

2         **MR. BURNHAM:**  Email system.  And the second waiver

3    argument from the congressional defendants relates to public

4    statements by Dr. Eastman.  So, I'll address them one at a

5    time.

6         The congressional defendants' argument that the

7    privilege was waived based on the Chapman University email

8    policies that the briefs address is based on a collection of

9    cases, all of which usually involve an employee who themselves

10   retain a lawyer and email that lawyer at their work email

11   address, and perhaps they waived the privilege by doing so.

12   Not in every case, but in some of the cases, that Government or

13   private employee has been found to waive their privilege with

14   their attorney by using their work email, and the analysis

15   turns on the particularities of the email system involved.

16        Those cases are inapplicable to the current scenario

17   for many reasons, two of which I'll focus on here.  The first

18   is, in each of the cases relied upon by the congressional

19   defendants, the privilege was waived not by the attorney, but

20   by the client through using their work email.  The attorney-

21   client privilege belongs to the client, and so it was the

22   client's actions that waived the privilege.

23        None of the cases relied upon by the congressional

24   defendants deal with the situation we have here where the

25   argument is that the lawyer waives the privilege.

1          In addition to that, and I think more importantly,

2   none of the waiver cases relied upon by the congressional

3   defendants, and of course, by "congressional defendants", I

4   mean the Committee itself and Chairman Thompson, none of those

5   cases come from the context we have here, which is a law

6   school.  That's a completely unique context, and it's not the

7   same as an undergraduate college apart from a law school, or

8   the U.S. Government, or a private employer.

9          There's very much a reasonable expectation that law

10  professors practicing law, and taking clients under the

11  auspices of their law schools, do so with a reasonable

12  expectation on the part of themselves and their clients that

13  those communications are subject to privilege.

14         That's reinforced by many decades of historical

15  practice where activists law professors have played such an

16  important role in developing the law, which continues to this

17  day.  That's reinforced by public statements on the website of

18  Chapman University, which runs something like eight clinics to

19  this day, several of which use ".edu" email addresses.

20         The Elder Law Clinic, for example, this is publicly

21  accessible, says to potential clients, it says, "Please" -- I'm

22  quoting here.  "Please email us", and then the email is

23  elderlaw@chapman.edu.  One of the most prominent members of

24  this Committee, Rep. Raskin, who happens to be my congressman,

25  practiced law for decades as a professor at American.

1          **THE COURT:**  All right, just one moment.

2          **MR. BURNHAM:**  Uh-huh.

3          **THE COURT:**  Allow the court reporter to catch up.

4          **MR. BURNHAM:**  All right.  I hope I've tried to slow

5     down.

6          **THE COURT:**  Yeah.  And if you need to go to

7     CourtSmart.

8          **THE CLERK:**  I did.

9          **THE COURT:**  Did you?

10         **THE CLERK:**  Yeah, it's recording.

11         **THE COURT:**  Okay.  All right, counsel, please.

12         **MR. BURNHAM:**  My final point was that on the subject

13    of why it's reasonable to expect that the law school context

14    confers a reasonable expectation of privacy was, even a member

15    of the Select Committee practiced law for many years under the

16    auspices of the law school where he taught; that's Rep. Raskin.

17         So, for all of those reasons, we disagree with the

18    congressional defendants' assertion completely that any use of

19    a law school email system waived not the client's reasonable

20    expectation of privilege with respect to their communications

21    with Dr. Eastman.

22         The second waiver argument advanced by the

23    congressional defendants is that certain public statements by

24    Dr. Eastman on TV shows and such about his representation of

25    the former President constitute a waiver of the privilege.

12

```
 1          And as an initial matter, that would only apply to

 2   Donald Trump, not any of the other clients that Dr. Eastman

 3   would have handled during the subpoena period.  But even with

 4   respect to President Trump, by no means do any of the

 5   statements made by Dr. Eastman constitute a waiver.

 6          Whenever you have an attorney representing a high-

 7   profile client, and it doesn't get any more high-profile than

 8   the President, it's only natural that part of that attorney's

 9   role will be to speak as appropriate to the press, and this

10   happens many times where you talk to the client and decide

11   certain information we'll talk about to the press, certain

12   items of information we don't.  That happens all the time, and

13   we're looking at nothing more than that here.

14          And I go into detail in the briefs about why the

15   various quotes from podcasts and stuff don't come anywhere

16   close to constituting a waiver even with respect to the one

17   client.

18          So, in sum, Your Honor, as to the attorney-client

19   privilege issues, I think the likelihood of success is quite

20   clear.  And the same goes for requirement number two,

21   irreparable harm.

22          And here, as I understand the congressional

23   defendants' arguments as to this factor are very much the same

24   as their arguments with the first factor, likelihood of

25   success.  They don't think we're dealing with a privilege claim
```

1   here at all, which is understandable because when you're

2   dealing with a privilege issue, the irreparable harm, and the

3   cases bear this out, is the disclosure of the attorney-client

4   information itself.  We bear no burden to prove that Client A

5   would be harmed by his information being disclosed because of

6   his circumstances; that's not how the cases have analyzed this

7   at all.

8          Violating the sacred attorney-client privilege itself

9   is irreparable harm.  The bell cannot be unrung, and that's

10  what we're seeking to prevent here.  That's the second factor.

11         The third and fourth factors, the balance of the

12  equities and the public interest can, to a certain extent, be

13  treated together, and that's how I'll treat them here for

14  efficiency.

15         So, what interest have the congressional defendants

16  offered to Your Honor to justify why they need this information

17  so badly?  They rely in their briefs largely on the claimed

18  importance of the January 6 investigation itself, writ large.

19         The proper subject of analysis for this Court though

20  is not the investigation writ large, but the particular items

21  of evidence at issue here.  Why does the January 6 committee

22  have such a great interest in the emails from a year ago or two

23  years ago from Dr. Eastman on his University email address?

24         The only thing the defendants offer in support of

25  that question are highly conclusory statements offering no

1    specifics, and that's important because as *Trump versus*

2    *Thompson* from the D.C. Circuit reminded us, the purpose of

3    congressional investigations is not to assist in educating the

4    public or write history, or certainly not to do anything

5    partisan.

6           The purpose of this whole exercise is to give the

7    members of Congress the information they need to write laws,

8    write better laws.  And what the defendants have not identified

9    is why Dr. Eastman's emails will help them impose more criminal

10   penalties on individuals who misbehave on federal property, or

11   revise the Electoral Count Act, or any of the legislative

12   purposes at issue in the *Trump versus Thompson* case.

13          They don't show why Dr. Eastman's emails and other

14   materials are so important to that, which is particularly

15   salient because Dr. Eastman's role in the 2020 election is

16   quite well-known, as the defendants themselves emphasize.  He's

17   not alleged to have entered the Capital or planned to enter the

18   Capital; he was counsel to the President.

19          He's spoken at length in multiple fora in print, on

20   Internet, on TV, about what he did.  It's enough to give me

21   even more gray hairs than I have now, because there's a lot of

22   fodder out there for the defendants to pick out statements that

23   are useful to them as they did in this case.

24          But based on all the information we know, Dr. Eastman

25   was simply counsel to the President.  Some people liked his

1   legal advice; the Committee didn't particularly care for it,

2   but they've offered no particular reason why they need further

3   information on his legal advice to continue their

4   investigation.

5           So, the interest of the defendants, we would submit,

6   is weak.  That has to be weighed against, in these third and

7   fourth factor analyses, the important concerns weighing in the

8   other direction.  Now, what are those?

9           We submit there's significant concerns here of, I'll

10  just say, abuse of the congressional subpoena process.  And I

11  say that not based on my own authority submitted.  I think the

12  best authority for that is the *Budowich* case relied on so

13  heavily by the defendants in their own briefing.  The

14  transcript for that was submitted just this morning.

15          And what happened in that case was, the Select

16  Committee served a subpoena.  It was on a bank in that case

17  seeking financial records.  It had a pretty short timeline,

18  although many times longer than our subpoena.  It was a week or

19  two, and it was extended, and then there was a deadline on

20  Christmas Eve or something.

21          And long story short, the defendants received the

22  documents before the plaintiff could get into court and ask for

23  a TRO.  The judge in that case saw the problem, and asked --

24  the defendants' position was once we have the documents, that's

25  the end of the case.  That was what Mr. Letter argued in that

1   case.  And the judge very reasonably said, "Doesn't this create

2   an incentive for congressional committees to totally evade any

3   judicial oversight of their subpoenas by including unreasonably

4   short timelines"?  And in that case, it was about two weeks.

5         And the response from counsel for the House of

6   Representatives was, "No, that's not a concern; the Court

7   doesn't need to be worried about that.  It's going to be fine".

8         And now, here we are maybe a month later, and Your

9   Honor is presented with a subpoena to the former attorney to

10  the President of the United States, of all people, with about a

11  three-day turnaround time.

12        So, we would submit that the *Budowich* case, legally

13  correct though it may have been, set a troubling precedent that

14  the January 6 Committee is even now pushing to extremes far

15  beyond anything confronted in the *Budowich* case.  And that's an

16  important consideration here.

17        Secondly, I'll add just as an addendum to that, I

18  think it's totally legitimate for Your Honor to consider the

19  effect enforcement of this subpoena will have on the current

20  and future presidents' decisions to hire private counsel.

21  Presidents throughout history have turned to the professoriate

22  for help in legal advice beyond their inhouse lawyers, and if

23  this subpoena is enforced, that's absolutely a matter of public

24  concern cognizable by this Court what effect that will have on

25  future presidents and President Biden.

1          And finally, it's a highly relevant consideration

2   what effect this will have on the legal academy writ large.  We

3   rely heavily in our pleadings on a law review article written

4   some 10 years ago called -- about a ticking time bomb.  And we

5   cite it several times.

6          And that's an article by a far-thinking professor who

7   realized that one day a litigant was going to come into court

8   armed with a collection of cases relied on by the congressional

9   defendants where employees waived their privileges by emailing

10  their lawyers on the job, and try to invade the attorney-client

11  privilege in the law school setting.  That's why the article is

12  called a "Ticking Time Bomb", because that problem that Your

13  Honor is faced with today was foreseen.

14         And the bomb is about to go off right here in this

15  courtroom, and the January 6 Committee are the ones lighting

16  the fuse.  And so, we ask Your Honor simply to defuse the bomb,

17  and grant our application for the temporary restraining order.

18         Thank you.

19         **THE COURT:**  All right, counsel.  Thank you.  Would --

20  Mr. Plevin, would you like to respond first on behalf of

21  Chapman, or Mr. Letter, would you like to respond on behalf of

22  the Select Committee first?

23         **MR. LETTER:**  Your Honor -- Your Honor, this is

24  Douglas Letter.  I'm happy to respond now if that's okay with

25  Your Honor.

1          **THE COURT:**  Please.  Thank you.

2          **MR. LETTER:**  Thank you, Your Honor.

3          **THE COURT:**  Would you identify yourself, I certainly

4    know, who you are and who you represent once again for the

5    record?

6          **MR. LETTER:**  Thank you.  This is Douglas Letter.  I'm

7    the general counsel of the United States House of

8    Representatives.

9          Your Honor, I will assume that you or the court

10   reporter will let me know if I am speaking too quickly.

11         Your Honor, first, let me just say, we immensely

12   appreciate the speed with which you are taking this up.  So,

13   you know, you mentioned -- you thanked us for getting our

14   briefs done quickly; we thank you for jumping right on this

15   because time really is of the essence here.

16         And I'm sure it won't surprise you to know that,

17   frankly, I don't recognize the case that my friend,

18   Mr. Burnham, is talking about.  It's certainly -- it's very

19   different from the case that we understand.

20         So, first, there was an argument made, I think it's

21   initially in the brief, that Your Honor should find that the

22   Speaker of the House doesn't know House procedures and House

23   rules, and they want you to tell her, to instruct her on how

24   the House runs.  They're saying the Committee, the Select

25   Committee was not validly appointed, it's not run properly, et

1  cetera.  And again, that the Speaker doesn't really know how to

2  manage the House.

3           This was one of the arguments that Judge Boasberg

4  rejected in the *Budowich* case in large part, not surprisingly,

5  because the rules clause of the Constitution provides that each

6  Chamber sets its own rules, and many courts have recognized

7  that it really is largely not the role of judges to tell the

8  House and Senate how to operate themselves.

9           And that was what Judge Boasberg here in D.C.

10  concluded, and we thought Your Honor would be interested in

11  that.

12           I'm not going to spend a whole lot of time on it

13  because, frankly, it seems like a quite silly argument, and I

14  think that's probably why Mr. Burnham skipped over it.

15           Next, we have, they argue that there's no valid

16  legislative purpose here.  I think I heard my friend,

17  Mr. Burnham, concede that the D.C. Circuit swatted that aside

18  very quickly and easily, and the Supreme Court recently

19  declined the plea by Professor Eastman's client, Mr. Trump, to

20  review that; the Supreme Court refused to, and left that in

21  place.

22           So, I think Mr. Burnham's argument is well,

23  obviously, there's a valid legislative purpose for the

24  Committee, and I don't think anybody with a straight face could

25  possibly argue otherwise.  So, what they're saying is, well,

1  there's no valid legislative purpose with regard to

2  Mr. Eastman's records, Professor Eastman's records.

3          Well, let's remember who Professor Eastman was or

4  purported to be sort of the architect of the strategy to

5  overturn the 2020 election providing these legal memos, as we

6  understand it, they've been described at length, to overturn

7  the presidential election.

8          And, you know, he's not just an attorney here.  He

9  was a very public speaker on January 6 itself, the day of the

10 attack on the Capital.  Professor Eastman spoke at one of those

11 rallies, making extremely inflammatory statements.

12         So, this isn't just, you know, somebody who is a

13 bystander or a lawyer in an ivory tower, as Mr. Burnham said

14 Professor Eastman is not.

15         Professor Eastman is extremely relevant to the (audio

16 glitch) by the Committee, the Select Committee.  In fact, he's

17 so relevant that we first, starting on November 8th, sought to

18 get material from him.  And I think Mr. Burnham mentioned this,

19 but largely it was set aside.  He made it sound like this was

20 some crazy rushed effort to try to get material before anybody

21 could reply, which is absolutely not an accurate picture here.

22         We engaged with Professor Eastman and said that we,

23 the Committee, wanted these materials, that they were highly

24 relevant, and Professor Eastman -- and the Committee attempted

25 to engage in accommodation with Professor Eastman.  We're not

21

1   stupid.  We knew that there were possibly issues of attorney-

2   client, et cetera, so we said, let's see if we can work out a

3   way that we can do this.  Professor Eastman refused to engage.

4   He just said no.

5          And then, Professor Eastman really lowered the boom

6   when he said, "I can't release anything to you"; 146 times he

7   asserted the Fifth Amendment, privilege against self-

8   incrimination.

9          So, we tried.  We tried over an extended period to

10  work with Professor Eastman to get this material.  It was so

11  important, and is so central, and in fact, that he's been on

12  mass media talking about, saying that his client, President

13  Trump, wants him to talk about it.  It's so important that

14  President Trump, former President Trump, wants him to talk

15  about it.

16          And by the way, one other thing to note, Your Honor,

17  is the subpoena itself is very limited.  It asks for materials

18  from a period of from the election to Inauguration Day when

19  President Trump left office.  So, we tried hard to narrow this.

20  We also provided Chapman University with search terms to help

21  narrow it, but Professor Eastman refused to engage with us.  So

22  what did we do?  We went to Chapman University where Professor

23  Eastman did much of his work was our understanding.

24          And Mr. Burnham says basically that if you don't give

25  relief here we're going to destroy the law clinics at law

1  schools.  That's completely wrong.  One of the ways we know

2  that is Professor Sisk (phonetic), who just is a person on the

3  side who used to work for me at the Justice Department,

4  Professor Sisk described what's out there in the way of law

5  schools and he indicated that the system that Chapman

6  University has is a small minority of the schools.

7        With Your Honor's permission, I would just like to

8  describe to you briefly -- and this is at page 18 and 19 of our

9  brief, just describe briefly to you what Professor Chapman knew

10  about his work at Chapman -- I'm sorry -- Professor Eastman

11  knew about his work at Chapman University.

12        So one, Chapman has a policy that is publicly

13  available.  It says, (quote):

14        "The right to retrieve the contents of

15        university-owned computers and email messages for

16        (audio glitch) reasons is reserved to the

17        university."

18        Here's another quote.

19        "As such, users should not expect privacy in the

20        contents of university-owned computers or email

21        messages," (end/quote).

22        Next, we're very pleased that Chapman University

23  recognizes its public duties and it says that it may disclose

24  information accounts, (quote), "if required to do so to comply

25  with law or legal process," (unquote), including in response to

1    subpoenas.

2         Then it said, (quote):

3         "University-owned resource and business tool to be

4         used only by authorized persons for educational

5         purposes or to carry out the legitimate business of

6         the university," (end/quote).

7          And then when Professor Eastman signed on, he was

8    told, (quote):

9         "Use of this computer system constitutes your consent

10        that your activities on or information you store in

11        any part of the system is subject to monitoring and

12        recording by Chapman University or its agents,

13        consistent with the Computer and Acceptable Use

14        Policy without further notice."

15        And that use policy -- by the -- (end/quote).

16        That use policy I mentioned, that's the one that says

17   that users should not expect privacy.

18        And then last, the President of Chapman University

19   was clearly quite disturbed when he found out what was

20   happening with Professor Eastman's use of Chapman facility --

21   computer facilities and he said that the university, (quote):

22        "Has clear policies in place regarding outside

23        activity.  In fact, when acting privately, Chapman

24        faculty and staff are not free to use Chapman

25        University's email address, physical address, or

1           telephone number, in connection with the support of a

2           political candidate."

3           I don't need to quote anymore.  Professor Eastman

4    obviously either knew -- he's a professor there for many years.

5    I think he was a dean of the law school.  I think we can all

6    assume that he knew very well all of this.

7           So no, this is not going to bring down university law

8    school clinics.  Again, I rely on my friend, Professor Sisk,

9    saying that this is a small minority.  That's in the article

10   that my friend, Mr. Burnham, heavily relies on.

11          Let's also focus on a very very important fact here.

12          Excuse me, Your Honor, while I just get a sip of

13   water.

14       **(Pause)**

15          Chapman University -- which this is their computer

16   system, these are their computer records -- they want to comply

17   with the subpoena.  They were attempting to comply with the

18   subpoena.  Professor Eastman then rushed to court to stop it

19   because remember, Professor Eastman refused to do what so many

20   other witnesses have patriotically done.  Those people have

21   cooperated with the Committee because of the astonishing

22   importance of what the Committee is doing.

23          I don't think anybody can reasonably dispute that it

24   is not absolutely essential to find out why there was an

25   attempt to coup against the United States Government and our

1   democratic foundations, how it happened, what happened with the

2   attack on the Capitol, what brought it about?  What statements

3   were out there?  What was getting Americans so worked up about

4   all of these patently false claims about the election being

5   stolen?  What was behind all that?  Where did that come from?

6   And then, how did the attack happen, how can it all be

7   prevented in the future?  This is absolutely essential that the

8   Committee be able to get to the bottom of this.  And the way it

9   can do that is primarily by people cooperating with the

10  Committee as so many other officials are doing, former

11  officials.

12         And we need this material in part, for example, not

13  just for what is in the documents, the materials, but also so

14  that we can question other witnesses who we've got coming up

15  quickly.  That's one of the reasons why we need this material

16  and we need it now.

17         And so what's on the other side?  The other side is

18  that Professor Eastman can claim executive privilege but

19  there's a burden on him.  He's supposed to do it, he's supposed

20  to show -- I'm sorry, if I said "executive privilege" I meant

21  attorney-client privilege.  He's supposed to show that

22  attorney-client privilege will be violated here.   And again,

23  we gave him ample opportunity to do that and we met with a

24  stone wall.

25         So he's supposed to identify and put together a

1    privilege log.  Mr. Trump, his client, what -- what materials,

2    what conversations, et cetera, are privileged?  Why?

3              Was -- I'm not certain.  I had the sense that maybe

4    we were being told that Vice President Pence was Professor

5    Eastman's client.  I'm not sure of that; that'll be interesting

6    since then on mass media I believe Professor Eastman called the

7    vice president spineless because he refused to overturn the

8    2020 presidential election.

9              We're not sure.  Who are these other clients?  When

10   Professor Eastman says, "Well, their clients of the clinic,"

11   remember, we're talking about a very short period when

12   Professor Eastman was at Chapman.  And I'm sorry, I have to

13   stop myself and say actually, he was on leave of absence during

14   that period from Chapman.  So what clinic clients' materials,

15   private, confidential attorney client materials are we talking

16   about?  Who are these clients?  And if we're talking about

17   President Trump, (audio glitch) say Professor Eastman's been

18   all over mass media saying that President Trump wants him to

19   talk.

20             So under these circumstances, all put together, we

21   think that this is actually a very narrow case with very

22   special circumstances, very special facts.  You're not going to

23   have many situations like this with attorneys claiming

24   attorney-client privilege but not identifying -- not doing a

25   privilege log, not cooperating with the Committee at all to try

1    to figure this out, stonewalling us; and instead, we then go to

2    Chapman University that has been totally willing to comply with

3    the subpoena.

4            I'm happy to answer, obviously, any questions that

5    Your Honor has.  Let me just emphasize again, the Committee is

6    working at great X speed. I suspect that you are well aware of

7    that from the courts in the media.  We tried to get stuff done

8    and we're trying to do it fast and we're trying to talk to as

9    many witnesses as we can to get to the bottom of this in order

10   to protect our democracy.

11           Thank you, Your Honor.

12           **THE COURT:**  Thank you.  And let me turn to -- I'm

13   sorry.  Thank you, Mr. Letter.

14           Let me turn to Mr. Plevin representing Chapman.

15           **MR. PLEVIN:**  Thank you, Your Honor.  I'll be brief.

16           As I have noted in our brief we filed, this dispute

17   really is not between Chapman and anybody, it's between the

18   congressional defendants and Dr. Eastman.  Chapman's interest

19   is in complying with its legal obligations as defined by this

20   Court to provide information in response to the subpoena.

21   However, I think there are a few factual issues that Chapman

22   can clarify which may be of assistance to the Court.

23           First, as Mr. Letter noted, during the period of time

24   covered by the subpoena, Professor Eastman was on a leave of

25   absence from Chapman.  He was a visiting professor at the

1    University of Colorado.

2           Second, the only client that has ever been identified

3    that Professor Eastman was representing during this period of

4    time in question was the former president.  The former

5    president obviously was a candidate for elective office and any

6    use of university resources to support a political campaign or

7    a candidate for elective office is incompatible with Chapman's

8    501(c)(3) status.

9           So the next fact I would want to say is Mr. Eastman's

10   representation of the former president was not authorized by

11   Chapman University.  He didn't ask for authorization to

12   represent former president and had he asked for such

13   authorization, it would have been denied on the basis of the

14   IRS rules.

15          There has been some reference to other potential

16   clients for whom there may be an attorney-client privilege in

17   the subpoenaed materials.  No such clients have ever been

18   identified.  Chapman asked Professor Eastman's lawyer to

19   identify any such other clients but no such clients have been

20   identified.

21          The issue of the law school clinics is I think a bit

22   of a red herring, Your Honor.  Sure, Chapman University has law

23   school clinics and clients are represented through those

24   clinics, and there are emails sent and received on the system

25   for those legitimate clinic representations that are authorized

1    and permitted and encouraged at Chapman.  The former president

2    was not a clinic client, nor would he have been eligible to be

3    a clinic client of Chapman.  And so from Chapman's point of

4    view, whatever Professor Eastman was doing in representing the

5    former president was improper, unauthorized; and in a sense, I

6    liken it to having contraband on our system.  It's not --

7    information is not something that we have any interest.  The

8    university has no interest in expending its resources to

9    identify or protect.  It simply does not have an interest in

10   doing anything other than complying with its subpoena as its

11   obligations are defined by the Court.

12          The last thing I just want to note is when Professor

13   Eastman departed from Chapman University in January of 2021, he

14   was given an opportunity to remove any alleged attorney-client

15   privilege information from Chapman's system and that did not

16   occur.  And so whatever is left on the system is still there.

17          That's all the factual information I wanted to

18   convey, Your Honor.  I'm happy to answer any questions if you

19   have any.

20          **THE COURT:**  All right.

21          First of all, I want to thank all of the parties once

22   again for their hard work over the weekend and the briefings

23   submitted to the Court this weekend.

24          I want to start with the negotiations so I have a

25   clear record because the briefing caused some confusion, either

1    through information that was not initially conveyed or

2    responsive briefing that leaves me with an unclear record.  So

3    I have a few questions regarding the timeline details of these

4    negotiations.

5            So first, Mr. Letter, to you I'm going to be asking

6    you four questions in just a moment and then I'm going to turn

7    minimally to Dr. Eastman and Counsel to respond to

8    approximately four more questions.

9            Let me propose those four questions to you first of

10   all, Mr. Letter, to mull for just a moment before I ask them

11   individually.

12           The first is, is it true that the House Select

13   Committee issued the subpoena last Tuesday, January 18th, with

14   a deadline of Friday, January 21st at 7:00 a.m. Pacific Time.

15   And don't respond for just a moment but I want absolute clarity

16   concerning that.

17           The second, is it true that Chapman University was to

18   produce approximately 19,000 of Dr. Eastman's emails within a

19   three-day period?

20           The third question goes to both you as the counsel

21   for the Select Committee and to Mr. Plevin for Chapman and that

22   is, at what point was Dr. Eastman made aware that there were

23   approximately 19,000 documents to be disclosed?

24           The fourth question, Mr. Letter, is it true that

25   Dr. Eastman was not given the opportunity to look at those

1  emails over the course of those three days?  And I understand

2  your present position and your response in your papers that he

3  was given the opportunity at an earlier time and you can

4  respond at your leisure.

5         So let me start with the first very simple question.

6         Was the subpoena issued in fact last Tuesday, January

7  18th, with a deadline of Friday, January 21st at 7:00 a.m.

8  Pacific Time?

9         **MR. LETTER:**  Yes, Your Honor.

10        **THE COURT:**  All right.  Thank you, sir.

11        Was Chapman University asked or expected to produce

12  the representation by all counsel of approximately 19,000 to

13  20,000 of Dr. Eastman's email within that three-day period?

14        Mr. Letter?

15        **MR. LETTER:**  Your Honor, I believe you said

16  represented by all counsel.  I -- we are relying entirely --

17  Chapman is the one who came up with that figure.  To my

18  knowledge, we have absolutely no idea whether that figure is --

19        **THE COURT:**  All right.  Let me turn then to Mr. --

20        **MR. LETTER:**  -- accurate or not.  We have no reason

21  to think it isn't.

22        **THE COURT:**  Okay, let me turn to Mr. Plevin.

23        **MR. LETTER:**  But I just wanted  --

24        **THE COURT:**  Mr. Plevin, just to make my record when I

25  write the factual situation, it wasn't -- the Court was not

 1  aware of the volume of this material until the opposition by

 2  the Select Committee and by Chapman.

 3           Are there approximately 19,000 to 20,000 emails?

 4           **MR. PLEVIN:**  You're addressing your question to me,

 5  Your Honor?

 6           **THE COURT:**  Yes.  Mr. Letter referred that over to

 7  you so let me ask you.

 8           **MR. PLEVIN:**  Okay.  So as Mr. Letter noted, at some

 9  point during the negotiations --

10           **THE COURT:**  I'm sorry, my question is very --

11           **MR. PLEVIN:**  -- his office --

12           **THE COURT:**  I don't mean -- my question is very

13  simple.

14           Are there approximately 19,000 to 20,000 pieces of

15  email?

16           **MR. PLEVIN:**  Yes --

17           **THE COURT:**  Okay, thank you.

18           **MR. PLEVIN:**  -- that is what is in the production

19  (audio glitch).  It's just short of 19,000, Your Honor.

20           **THE COURT:**  Okay.

21           **MR. LETTER:**  And Your Honor --

22           **THE COURT:**  Just a moment, Counsel.  My questions are

23  very succinct.  I'm going to give all of you argument in just a

24  moment on this.

25           But I want to be certain then -- and back to the

1  Select Committee -- whether you knew the volume or not?

2  Nineteen thousand.  Or the emails.  Whatever that volume you

3  were aware of, expected to be produced in these three days?

4        Mr. Letter?

5        **MR. LETTER:**  Your Honor, this is my understanding.

6        I believe we did not know when the subpoena was

7  issued how many documents.  I am asking my colleagues to inform

8  me while this hearing is going on.

9        The reason for the three days, Your Honor, was we had

10  been in constant communication with Chapman and Chapman

11  University told us that they needed three days to respond.

12        **THE COURT:**  I see.

13        **MR. LETTER:**  So it was -- three days was because

14  that's what Chapman told us that it needed.

15        **THE COURT:**  So then I've absorbed the following

16  information; and that is, in your discussion with Chapman, you

17  weren't aware of the volume of these emails and you relied upon

18  Chapman for this three days.  And from that I might assume that

19  your time period might have been different depending upon

20  whether it was a hundred emails or 19,000 emails.

21        **MR. LETTER:**  Again, Your Honor, I am -- my colleagues

22  are listening and I think I will very shortly have an answer.

23  I believe we did not know the number.

24        **THE COURT:**  All right.

25        **MR. LETTER:**  I don't think Chapman had told us

1    until --

2              THE COURT:  Why don't you check before you make a

3    statement just to be certain, okay, as a courtesy.

4              MR. LETTER:  I am doing that, Your Honor.

5              THE COURT:  Is it correct that Mr. Eastman was not

6    given the opportunity to look at those emails over the course

7    of those three days?  And so I can turn to Mr. Plevin or to

8    Mr. Letter, either one.

9              Mr. Plevin?

10             MR. LETTER:  I think it would be useful for

11   Mr. Plevin to start and then me after that, I believe.

12             THE COURT:  Mr. Plevin?

13             MR. PLEVIN:  I believe, Your Honor, that Chapman made

14   Professor Eastman's lawyers aware of the subpoena and that it

15   intended to comply.

16             THE COURT:  I'm sorry.  I don't mean to cut you off

17   but my questions are very concise now.

18             My question is, was Dr. Eastman given the opportunity

19   to look at those emails over the course of those three days?

20             MR. PLEVIN:  So over the course of those three days I

21   believe the answer is no.

22             THE COURT:  Okay.  And do you need to check with

23   anybody?  Because the word "I believe," I want to make certain

24   I write an accurate factual situation for both parties.  And if

25   you need to make a phone call, I'm not affronted at all.

1          **MR. PLEVIN:**  I am -- I am just checking with my

2    client now to confirm that.

3          **THE COURT:**  Okay.  All right.  And if you wish to

4    change your answer, I'm not affronted by that, just both of you

5    be on the phone so I have accuracy in writing a fact situation.

6          Then in the briefing, Mr. Letter, on your portion --

7    and as you've argued today -- Dr. Eastman learned -- when I

8    received your briefing -- that the House Select Committee would

9    be requesting Chapman University emails in early December 2021.

10   And since then, it appears that there have been at least six

11   weeks to voluntarily to disclose these Chapman emails.

12         So counsel on behalf of Dr. Eastman, did you send a

13   letter, as represented in the opposition briefing, to the

14   Select Committee refusing to produce these Chapman University

15   emails?

16         **MR. BURNHAM:**  We sent a letter that did not

17   specifically reference the Chapman University emails but it

18   could be fairly read to cover those emails to the extent they

19   were proven to exist.  We asserted an Act of Production Fifth

20   Amendment privilege.

21         **THE COURT:**  And where would I see that email because

22   -- or that letter?  That was not attached to any briefing over

23   the weekend.

24         **MR. BURNHAM:**  It was not.  I'd be happy to submit it,

25   either as a filing to chambers and it's also on the Internet.

36

1          **THE COURT:**  Thank you, Counsel.

2          Mr. Letter, do you have any objection to the Court

3    looking at the actual document?  Because when I write a factual

4    history of this, I want to be absolutely accurate.  And

5    apparently there is an email now, that the Court's aware of,

6    that was sent and -- to the Select Committee with, allegedly,

7    Mr. Eastman refusing to produce Chapman University emails.

8          Do you have that letter?

9          **MR. LETTER:**  Yes, Your Honor.  I may be wrong; I'll

10   wait till Mr. Burnham is done because my --

11         **THE COURT:**  Well why don't all of you consult

12   because --

13         **MR. LETTER:**  I believe Mr. Burnham --

14         **THE COURT:**  I'm sorry, Mr. Letter.

15         **MR. LETTER:**  I'm sorry, Your Honor.  I believe

16   Mr. Burnham attached -- oh, no, I'm sorry.  This letter was

17   printed.  It's publicly available, if I recall --

18         **THE COURT:**  I'm not looking at a public document, I'm

19   depending upon each of you for these answers now so --

20         **MR. BURNHAM:**  Can I add something, Your Honor, to

21   my --

22         **THE COURT:**  No, you may not.  I'm asking a very

23   succinct question now.  Answer my question.

24         Where can I see this letter?  Because I don't want

25   you both interpreting it; I'd like to look at it.

1          **MR. BURNHAM:**  I said I'd be happy to email it or if

2    the Court would just Google John Eastman Fifth Amendment

3    Letter, I'm sure it'll be in the top few results, it's on the

4    Internet.

5          **THE COURT:**  Would that be acceptable, Mr. Letter, if

6    I Googled that then?

7          **MR. LETTER:**  Yes, Your Honor.  I believe we made it

8    easy for you.  If I'm not mistaken, if you look at page 5 --

9          **THE COURT:**  Thank you.

10          **MR. LETTER:**  -- of our brief.

11          **THE COURT:**  Just a moment.

12          So this would -- for all your edification, this would

13    be Document 21, I believe, filed with the Court.  And on Page

14    5?

15          **MR. LETTER:**  I have 23-1, Your Honor.

16          **THE COURT:**  At Page 5, what line please?

17          **MR. LETTER:**  Page 5, Footnote 4.

18          **THE COURT:**  Available at https?  Is that correct?

19          **MR. LETTER:**  That is exactly right, Your Honor.

20          **THE COURT:**  All right.  Counsel, could I have your

21    stipulation then that I can pull that off the Internet without

22    a formal submission to the Court?

23          **MR. BURNHAM:**  Your Honor, I actually just tried it

24    myself and I got a message saying we're sorry but that page

25    cannot be found.

1      **(Laughter)**

2              **THE COURT:**  Let me help both of you.  I'm ordering

3      you to produce that letter.  Would that help each of you?

4              **MR. BURNHAM:**  My pleasure, Your Honor.

5              **THE COURT:**  All right, thank you very much.  And I

6      want that, Counsel, within the hours now.  All right.

7              **MR. BURNHAM:**  Certainly.

8              **THE COURT:**  I want to ask Dr. Eastman and I'm asking

9      you, Counsel, to respond, did your client assert, did

10     Dr. Eastman assert the Fifth Amendment right against self-

11     incrimination with respect to producing these documents?

12             **MR. BURNHAM:**  Not by name, he didn't.  If I could

13     elaborate.  Dr. Eastman received a subpoena himself before the

14     Chapman subpoena to testify and produce documents.  It did not

15     mention Chapman by name but perhaps some of the items in the

16     subpoena, depending on who you talk to, could have been

17     interpreted to apply to that.  And he asserted his Fifth

18     Amendment right in response to that subpoena by the letter

19     we've recently been discussing.

20             **THE COURT:**  Typically the party whose communications

21     are being sought has an opportunity to specify which

22     communications are privileged and therefore protected from

23     disclosure.  And that of course is subject to review.

24             On behalf of Dr. Eastman, Counsel, did your client

25     ever produce such a privilege log of his communications?

1        **MR. BURNHAM:**  We did  not.  We did not and the reason

2   for that was there's case law with respect to the Fifth

3   Amendment active production case privilege stating that

4   producing a privilege log and acknowledging that certain

5   documents exist can be a waiver of the Fifth Amendment active

6   production privilege, and so for that reason we didn't.  We put

7   that in our letter to the Government.  They knew that was our

8   position.  We tried to make it very clear.

9        **THE COURT:**  So therefore I think you've responded to

10  my next question, and that is what efforts did you make to

11  produce the privilege log in that time period, and that was

12  none subject to your argument.

13        **MR. BURNHAM:**  Correct.

14        **THE COURT:**  Did your client, did Dr. Eastman assert

15  the Fifth Amendment right against self-incrimination with

16  respect to creating a privilege log for these documents?

17        **MR. BURNHAM:**  Among others, yes, Your Honor.

18        **THE COURT:**  Okay.

19        **MR. BURNHAM:**  And not -- again not specifically

20  naming these documents, but --

21        **THE COURT:**  Counsel, you'll find that that question

22  is based upon the Opposition, Mr. Letter, at Page 5 that you

23  filed.

24        The House Select Committee offered to apparently

25  connect Dr. Eastman with Chapman's General Counsel,

1   Ms. DuMontelle, to review the documents and produce a privilege

2   log.  And that's found at the Opposition submitted on behalf of

3   the House Select Committee at Page 5.  And it states that

4   Dr. Eastman did not respond to this offer.  I need a clear

5   record of what occurred here.

6          So first to Mr. Letter on behalf of the House Select

7   Committee, when was that offer made?

8          **MR. LETTER:**  Your Honor -- and by the way, Your

9   Honor, I have an answer to your earlier question to me --

10         **THE COURT:**  No, let's stay with this question --

11         **MR. LETTER:**  -- whenever you want that.

12         **THE COURT:**  -- and come back to it.  When was that

13   offer made?

14         **MR. LETTER:**  On this one I mentioned, Your Honor, I

15   believe again that the folks with that exact information are on

16   the line and I believe they will be emailing me shortly with

17   the specific answer to your question.

18         **THE COURT:**  Well I'll take a recess in just a moment,

19   and I appreciate the answer.

20         And if that occurred my next question is obvious, and

21   that is why did you, on behalf of counsel representing

22   Mr. Eastman, why did you not respond to that offer?

23         Now that's assuming that the offer was made.  I don't

24   have a clear record of that yet.  Somebody is on the phone

25   gathering that information.  But assuming that that offer was

1  made, why didn't you respond?

2          **MR. BURNHAM:**  I did respond.  I didn't accept the

3  offer.  But there's an email chain I'm looking at now with one

4  of the staff for the Committee where that subject was

5  discussed, and I think it starts around, I'm looking at

6  November 8th, and then maybe there's another email November the

7  23rd, so it came up a couple times on email.  And the reason

8  why we didn't accept that offer was because, just to be totally

9  frank with the Court, we at that point intended and later did

10 assert the Fifth Amendment active production privilege.  My

11 research is that's a very fragile, very easily waivable

12 privilege.  Both the Select Committee and Congress throughout

13 history have been extraordinarily aggressive with waiver

14 arguments --

15         **THE COURT:**  All right, thank you.

16         **MR. BURNHAM:**  -- and both parties, on both parties,

17 and that was the reason.

18         **THE COURT:**  Thank you.

19         Mr. Letter, did the House Select Committee --

20         **MR. LETTER:**  Well, Your Honor --

21         **THE COURT:**  -- provide Dr. Eastman with any other

22 opportunity to conduct a privilege review?

23         **MR. LETTER:**  Your Honor, the information I've been

24 given is by email on November 24th is when we raised this and

25 offered it.  In addition, the staff attorney who did that

42

```
 1   believes that it was offered earlier by telephone as well but

 2   at least there would be a written record in the email on

 3   November 24th.

 4            My understanding is that -- is that the offer was

 5   flatly rejected, along with --

 6            THE COURT:  All right.

 7            MR. LETTER:  -- anything else.

 8            THE COURT:  Do either counsel have any objection, so

 9   that I have an accurate record, of those emails being submitted

10   to the Court?

11            MR. BURNHAM:  Can I have a moment, Your Honor?

12            THE COURT:  Certainly.

13            In other words, when I'm writing the factual basis

14   I'd like to be as accurate as possible, and a lot of things are

15   now getting filled in from the briefing and I don't want a

16   summation of what each counsel thinks that these emails are

17   about, I'd like to see the actual emails.

18            MR. BURNHAM:  Just to clarify, would these be --

19            MR. LETTER:  Your Honor --

20            MR. BURNHAM:  -- submitted in camera or shared

21   with --

22            THE COURT:  I want complete transparency.

23            MR. BURNHAM:  There's a long chain of emails.  I'd

24   have to sort of take out what's privileged, speaking of

25   privilege.  I could try and take -- because I forward emails to
```

1    my client and so I would have to kind of clean it up, but I

2    could certainly do that.

3              Your Honor, I think can take out the relevant emails

4    one by one and take out the parts of the chain that are

5    privileged and put something together for the Court.

6              And it actually may be easier for the Defendants to

7    do it because they have the whole chain as well and they don't

8    have -- I mean they may have forwarded it to other people as

9    well, but they could produce it.

10             **MR. LETTER:**  May I be heard, Your Honor, or should I

11   wait?

12             **THE COURT:**  Please, Mr. Letter.

13             **MR. LETTER:**  Your Honor, let me first say that we

14   deeply appreciate your willingness and desire to get to the

15   bottom of this right away.  So when you were saying before you

16   hoped it was okay, or whatever, it's more than okay from our

17   perspective.  I will speak to the author of these emails, et

18   cetera, I might hear from him by email shortly.  I believe that

19   he will have absolutely no objection to sharing any of this

20   with Your Honor.

21             **THE COURT:**  All right.  Mr. Letter, was a taint team

22   ever considered?  And I think we're all aware of what a taint

23   team is.  Was a taint team ever considered by the House Select

24   Committee?

25             **MR. LETTER:**  Your Honor, I do not know if we raised

1    that possibility with Mr. Burnham.  As far as the things that

2    we internally, various possibilities that we talked about and

3    considered internally, Your Honor, that's not something that I

4    can share publicly.  The internal operations of the House of

5    Representatives are protected.

6         THE COURT:  Last week Dr. Eastman asked the House

7    Select Committee if he could conduct a privilege review of the

8    Chapman documents and in the Reply at Page 4 the House Select

9    Committee declined this request.  I'd like from counsel

10   representing Dr. Eastman when this request was made.

11        MR. BURNHAM:  I'm speaking from memory.  I'll verify

12   it in a moment.

13        THE COURT:  Well then take a moment and verify it

14   now.

15      (Pause)

16        MR. BURNHAM:  Okay, Your Honor.  I'm looking here at

17   an email with Ms. DuMontelle on Wednesday, January 19th, at

18   7:00 o'clock Eastern time.

19        THE COURT:  DC time or telephone?

20        MR. BURNHAM:  That's DC time.

21        THE COURT:  Thank you.

22        MR. BURNHAM:  And if nobody objects to my simply

23   quoting a sentence or two, she's responding to me and says,

24           "I have checked with the lawyers who are coordinating

25           the subpoena and asked about us giving the production

45

1          to you and relieving us of the subpoena.  They have

2          responded that they wish to leave it as is with the

3          existing deadline."

4          End quote.

5          **THE COURT:**  Mr. Letter, can you verify that that's

6    correct or not?

7          **MR. LETTER:**  I believe it is, Your Honor, and the

8    reason was, quite simply, we had made this offer before and I

9    think we now understood it was flatly rejected, at this point

10   we were under the impression we're getting absolutely nothing

11   from Professor Eastman and therefore we wanted to obtain the

12   materials from Chapman University ASAP.

13          Your Honor, I do want to say if this is considered

14   something that is important to do now, we would certainly

15   entertain it.  We would want -- we think it would be essential

16   that if the material is provided to Professor Eastman now there

17   be a very quick schedule on a rolling basis for him to produce

18   a privilege log.  But I have to admit I don't -- I don't

19   believe --

20          **THE COURT:**  Let's stop at that point for a moment

21   because I want to repeat back what I heard, and that is you

22   would be willing at the present time to submit these materials

23   to Dr. Eastman with the expectation that this would be a short

24   turnaround time he could review these.  Is that correct?

25          **MR. LETTER:**  Yes, Your Honor --

1          **THE COURT:**  Okay.

2          **MR. LETTER:**  -- on a rolling basis, so --

3          **THE COURT:**  Just a moment.

4          **MR. LETTER:**  -- we're talking about --

5          **THE COURT:**  I'm sorry.  What does rolling basis mean?

6    Because to my perception this would be a continuing basis,

7    including weekends.

8          **MR. LETTER:**  Yes, Your Honor, and maybe we're using

9    the same term --

10          **THE COURT:**  Okay.

11          **MR. LETTER:**  -- meaning the same thing.

12          **THE COURT:**  Twenty-four/seven, right?

13          **MR. LETTER:**  That Professor Eastman --

14          **THE COURT:**  Twenty-four/seven?

15          **MR. LETTER:**  Yes.

16          **THE COURT:**  Okay, good.

17          **MR. LETTER:**  And that Professor Eastman would --

18          **THE COURT:**  Now, Mr. Eastman and Counsel, are you

19    accepting this offer from the Government?

20          **MR. BURNHAM:**  I don't have authority to accept it as

21    I'm sitting right --

22          **THE COURT:**  Well talk to your client.  He's right

23    next to you.

24      **(Counsel confers with Plaintiff)**

25          **MR. BURNHAM:**  We're not accepting it right now.

 1  There's issues I could go into --

 2            **THE COURT:**  No, just a moment.  When are you willing

 3  to accept the Government's offer?

 4            **MR. BURNHAM:**  I could talk to Dr. Eastman and --

 5            **THE COURT:**  Good, talk to your client.

 6      **(Counsel confers with Plaintiff)**

 7            **MR. BURNHAM:**  The most obvious is in our Complaint we

 8  raise claims beyond attorney-client privilege --

 9            **THE COURT:**  I'm sorry, I apologize.  When are you

10  willing to accept this offer?

11            **MR. BURNHAM:**  I don't have a specific time to --

12            **THE COURT:**  Talk to your client.

13      **(Counsel confers with Plaintiff)**

14            **MR. BURNHAM:**  So we're not willing to accept it then

15  is the answer.

16            **THE COURT:**  All right, thank you.

17            **MR. LETTER:**  Your Honor, may I be heard very quickly?

18            **THE COURT:**  Please.

19            **MR. LETTER:**  On this -- I did want to end with this

20  speedy review, but -- and  part of it would be if there aren't

21  claims made as to certain material, that Chapman University

22  would produce that material immediately.

23            **THE COURT:**  Dr. Eastman and Counsel, you previously

24  it appears declined to produce a privilege log because of your

25  Fifth Amendment right, but at present you're currently

48

1  requesting the opportunity to do so.  I don't understand.

2          MR. BURNHAM:  I just have to be open with.  If these

3  documents --

4          THE COURT:  I can't hear you.

5          MR. BURNHAM:  If these documents are delivered to the

6  Government there is a argument that I think has some force to

7  it that the active production privilege is waived by that

8  production.  So at that point once they're subject to a

9  subpoena then that defeats the -- arguably could defeat the

10  previous assertion of privilege and for reasons I could get

11  into I think we were totally within our rights to wait till we

12  were obliged by subpoena to --

13          THE COURT:  I'll let you conclude your argument in

14  just a moment.  I have some specific questions for both of

15  you --

16          MR. BURNHAM:  Okay.

17          THE COURT:  -- so I appreciate brevity.

18          I'm going to take a 10-minute recess, so all of you

19  can take a 10-minute recess for a moment.  And the next brief

20  category is going to concern Dr. Eastman's work at Chapman.

21  And to preview that, Dr. Eastman, as I understand, was a

22  professor at Chapman University during the time of the

23  subpoena, but today for the first time I've heard that he was

24  on leave and I'd like to make certain that I have a clear

25  record concerning his status when we come back, from both of

1    you, and you have a comfort level in your statement to the

2    Court.

3            And in addition to his academic work at Chapman,

4    Dr. Eastman represented several clients.  So to prepare you so

5    you can discuss this during the recess, the House Select

6    Committee has argued that Dr. Eastman's representation of

7    clients was unauthorized because it supported a political

8    activity which was barred by IRS rules for nonprofit

9    universities.  And according to Dr. Eastman's contract with

10   Chapman University, Dr. Eastman was authorized to direct the

11   Center for Constitutional Litigation, a program jointly

12   sponsored by Chapman University and the Claremont Institute,

13   and you'll find that at the Reply, Exhibit 1, Docket 31-1, and

14   through the Center Dr. Eastman and the students represented a

15   number of different clients.

16           So Counsel, so you can discuss with your client, two

17   questions I will initially have to Dr. Eastman is did you

18   conduct all your work for the Center for Constitutional

19   Litigation using your Chapman University email account and

20   which clients did you represent through the Center between

21   November of 2020 and January of 2021, which I assume would be

22   the date of the election through the date of the inauguration.

23           And from the briefing Dr. Eastman also potentially

24   represented clients outside the Center for Constitutional

25   Litigation, so another question is did you retain pro bono

1    clients outside of the Center between November of 2020 and

2    January of 2021, or the subpoena dates, and who were they.

3          And the next questions would be did you retain

4    private clients outside of the Center between November of 2020

5    and January of 2021 and approximately how many clients did

6    Dr. Eastman represent between November of 2020 and January of

7    2021.  And for any clients represented outside the Center for

8    Constitutional Litigation, did you receive explicit

9    authorization for that work from Chapman University.

10         Once again I'm going to ask was Dr. Eastman's

11   representation to President Trump through the Center for

12   Constitutional Litigation, through a private retainer

13   agreement, or through another arrangement.

14         And then Mr. Plevin, I'm going to turn back to you

15   with a question so you can be prepared as you ably are, and

16   that is did you, meaning Chapman University, authorize

17   Dr. Eastman's representation of President Trump between

18   November of 2020 and January of 2021.  Because the briefing is

19   a little bit hazy and Dr. Eastman's come back and made the

20   argument that Chapman not only well knew about this but was a

21   champion and therefore impliedly approved of this.

22         Dr. Eastman worked as an expert witness for the

23   Florida Legislature's Select Joint Committee on the election

24   involving President Bush and Candidate Al Gore and was retained

25   by the Florida Legislature to advise it on a resolution on

1   electoral votes.  You'll find that at Exhibit 2, Docket 31-2.

2   So you can prepare, to Chapman University, did Chapman

3   authorize this work and was this work in violation of the IRS

4   policies for nonprofit universities, and I think you've

5   previously answered that but I'd like to hear that one more

6   time, and was that work completed using the Chapman University

7   email.

8           I'm going to stop there for a moment.  Counsel, why

9   don't we take a 10-minute recess so you're comfortable.  In

10  fact, let's say 15 just to be sure.

11          Thank you very much.

12      **(Court in recess from 3:35 p.m. to 4:00 p.m.)**

13          **THE COURT:**  We're back on the record then.  Deb, are

14  we on the record?

15          **THE CLERK:**  Yes, we are.

16          **THE COURT:**  All right.  And I see -- Mr. Letter,

17  thank you.  And, Mr. Plevin, thank you.  And we're back on the

18  record with Mr. Eastman and Counsel and Court.

19          I'd like to follow up on the earlier discussion

20  concerning these privilege logs to make certain I understand

21  your respective positions about Dr. Eastman producing a

22  privilege log.

23          Mr. Letter, you've stated that the House Select

24  Committee is amenable to Dr. Eastman being given the documents,

25  producing a privilege log and then Chapman producing

1   unprivileged documents on a rolling basis which to me means a

2   continuing basis.  And I take that to mean almost immediately.

3          So, Dr. Eastman or Counsel, earlier it sounded like

4   you were saying that you could not agree to make a privilege

5   log at this point given your other legal arguments against the

6   subpoena as a whole.  I'm understanding that you mean your

7   arguments about the Select Committee's formation and purpose,

8   second, Dr. Eastman's First Amendment rights and Dr. Eastman's

9   Fourth Amendment rights; is that correct?

10          **MR. BURNHAM:**  That's correct.

11          **THE COURT:**  All right.  If the Court were to

12   tentatively rule against you with respect to those three

13   arguments leaving only the privilege argument, would

14   Dr. Eastman accept the offer of making a privilege log?

15          **MR. BURNHAM:**  And whose -- was the term "tentatively"

16   rule against us?

17          **THE COURT:**  Yes.

18          **MR. BURNHAM:**  The Court's indulgence.

19       **(Counsel confer)**

20          In the terms Your Honor put it, yes, we would accept

21   that with the small proviso that there might be issues we would

22   have to work out about the particulars of the privilege log but

23   in theory, yes, that would be the next best resolution to

24   prevailing on all of our claims.

25          **THE COURT:**  Okay.  These will be quick questions,

 1   quick answers.  They'll be somewhat repetitive but let me

 2   remind all of us that during the time of the subpoena when

 3   Dr. Eastman was a professor at the university, this is the

 4   first time I've heard that he was on a leave of absence.

 5            Mr. Plevin, on behalf of the university, was

 6   Dr. Eastman on leave of absence from Chapman University from

 7   the time of the election to the time of the inauguration?

 8            **MR. PLEVIN:**  Yes, he was.

 9            **THE COURT:**  All right, thank you.

10            Counsel, do you agree or disagree with the statement

11   by counsel for Chapman?

12            **MR. BURNHAM:**  I disagree that it was a complete leave

13   of absence and what I mean by that is Dr. Eastman was teaching

14   at Colorado but he remained -- he was still paid a stipend to

15   continue running the clinic that we've been discussing.  So he

16   was on a leave of absence but he was still getting paid to work

17   for Chapman.  So that's the answer.

18            **THE COURT:**  Then I'd like to understand which clients

19   Dr. Eastman represented between -- I'm going to say November

20   2020 which constantly repeating the date of the election and

21   the date of the inauguration in January 2021 and if those

22   clients were authorized by Chapman University and whether

23   Dr. Eastman used Chapman email for work.

24            So can you confirm, Dr. Eastman, through your counsel

25   that you were not working as a Chapman professor in that time

1  period or is your statement, Counsel, that he was on stipend of

2  some kind?

3          **MR. BURNHAM:**  He was on a stipend to continue to run

4  the clinic.

5          **THE COURT:**  Okay.

6          **MR. BURNHAM:**  He was not teaching classes at that

7  time.

8          **THE COURT:**  Mr. Plevin, on behalf of Chapman, what

9  are the policies for professors on leaves of absence?  Are they

10 still able to use the Chapman emails?  Is their work authorized

11 by Chapman or within Chapman's purview at all?

12         **MR. PLEVIN:**  Yes, I believe they -- I believe that to

13 be true as stated, Your Honor.

14         **THE COURT:**  And true as to what, so I'm certain for

15 my record?

16         **MR. PLEVIN:**  I believe that a Chapman professor on a

17 leave of absence still has access to --

18         **THE COURT:**  Okay.

19         **MR. PLEVIN:**  -- the Chapman email network and is

20 authorized to use that email network for legitimate authorized

21 purposes --

22         **THE COURT:**  Okay.

23         **MR. PLEVIN:**  -- consistent with the university rules.

24         **THE COURT:**  So to either, you, Dr. Eastman, or to

25 you, Mr. Plevin, on behalf of Chapman, how many clients did

1   Dr. Eastman represent between November 2020 and January 2021?

2          **MR. PLEVIN:**  Chapman does not know the answer to that

3   question.  We actually asked for that information from

4   Professor Eastman's lawyer during the course of these

5   discussions about a potential privilege issue and no client

6   names were ever provided.

7          **THE COURT:**  But you've gone through these records.

8   Do you know which were authorized by Chapman University, if

9   any?

10         **MR. PLEVIN:**  No.  The records were -- I don't.  I can

11  explain if you like.  The answer is "No."

12         **THE COURT:**  Okay.  On November 8th, 2021, the Select

13  Committee, Mr. Letter, issued a subpoena to Dr. Eastman with an

14  accompanying letter from Chairman Thompson dated November 8th,

15  2021.  It's the Select Committee cover letter to Eastman at 1.

16  And I take judicial notice of the Chairman's letter.  It's now

17  a publicly available Government document which was cited in the

18  House Select Committee's briefing in this case.

19         So I'd like to walk through the events cited in that

20  letter and ask the following questions.  Dr. Eastman reportedly

21  "wrote two memorandum offering several scenarios for the Vice

22  President to potentially change the outcome of the 2020

23  Presidential election."  That's in your Select Committee cover

24  letter at 1 citing a CNN article.  Mr. Plevin, on behalf of

25  Chapman, did Chapman University authorize this work?

56

```
 1            MR. PLEVIN:  No, Your Honor.

 2            THE COURT:  Did Dr. Eastman or through his counsel,

 3   was that work conducted through an attorney-client relationship

 4   and if so, which clients?  And was any aspect of that work

 5   conducted using Chapman University email?

 6            MR. BURNHAM:  The representation of President Trump

 7   was not conducted using Chapman University email.  Was there

 8   another part to the question?

 9            THE COURT:  Well, was any aspect of that work

10   conducted using Chapman University email?

11            MR. BURNHAM:  Court's indulgence.

12        (Counsel confer)

13            Substantially, no.  We can't rule out some

14   inadvertent use of Chapman email with respect to the former

15   President.

16            THE COURT:  Okay.  And was that work conducted

17   through an attorney-client relationship?  And if so, which

18   clients?

19            MR. BURNHAM:  An attorney-client relationship existed

20   with the President.

21            THE COURT:  Okay.  On December 3rd of 2021,

22   Dr. Eastman reportedly testified to the Georgia State Senators

23   on alleged voter fraud and shared a paper arguing that the

24   State Legislature could reject the results and directly appoint

25   electors themselves.  Once again, it came to the Court through
```

1   the Select Committee cover letter at 2 citing a *Washington Post*

2   article.

3        The same question.  Mr. Plevin, did Chapman

4   University authorize this work?

5        **MR. PLEVIN:**  I can't answer that explicitly.  I

6   believe the answer to be "No" but I cannot answer it with the

7   same accuracy.

8        **THE COURT:**  Then I don't understand your answer.

9        **MR. PLEVIN:**  I'm sorry?

10        **THE COURT:**  I don't understand your answer.

11        **MR. PLEVIN:**  I don't have the information to say -- I

12   believe the answer to be "No."  I don't have enough information

13   to make that representation to the Court.

14        **THE COURT:**  Well, let me stop you for a moment.  "I

15   believe" is a big word.  How would you obtain that information

16   to make a concise answer to the Court?

17        **MR. PLEVIN:**  I've been informed by both -- through

18   the president's office and through the law school dean at the

19   time that Dr. Eastman was not authorized to engage in any

20   activity on behalf of the political campaign or in support of a

21   candidate for elective office.  And if he had asked to be

22   authorized to do that, the answer would have been "No."

23        **THE COURT:**  Okay, thank you.

24        Dr. Eastman or Counsel, was that work conducted

25   through an attorney-client relationship and if so, once again,

1  which clients?

2       **MR. BURNHAM:**  The Court's indulgence.

3       **(Counsel confer)**

4       The answer to Your Honor's question is "No" with the

5  proviso that dealings with perspective clients, privilege can

6  attach to those as well.  So I would make that clarification.

7       **THE COURT:**  On January 2nd, 2021, Dr. Eastman

8  reportedly participated in briefing for nearly 300 State

9  Legislatures from several states regarding purported election

10 fraud during which Dr. Eastman told the group that it was the

11 duty of the Legislatures to fix this -- this egregious conduct

12 and make sure that "we're not putting in the White House some

13 guy that didn't get elected." from the Select Committee cover

14 letter submitted to the Court at 2 citing a *PR Newswire*

15 article.

16      Once again, Mr. Plevin, on behalf of Chapman

17 University, did the university authorize this work?

18      **MR. PLEVIN:**  I'd answer the same way as before, Your

19 Honor.  I don't have a specific answer for that specific

20 activity but he was not authorized to engage in any activity on

21 behalf of a political campaign or elective office nor would he

22 have been authorized if he had asked.

23      **THE COURT:**  And, Dr. Eastman, through your counsel,

24 was that work conducted, once again, through an attorney-client

25 relationship?  If so, which clients?  And was any aspect of

1   that work conducted using your Chapman University email?

2           **MR. BURNHAM:**  I'm sorry.  I was trying to listen to

3   two folks at once.

4           **THE COURT:**  Oh.

5           **MR. BURNHAM:**  Can you repeat the question?

6           **THE COURT:**  Was the work conducted through an

7   attorney-client relationship and if so, which clients?  Let's

8   take that question first.

9           **(Counsel confer)**

10          **MR. BURNHAM:**  That work was done pursuant to

11  representation of the President and if -- begging the Court's

12  indulgence for ten seconds, I want to make clear on the record

13  that we're attempting to give narrow answers here to aid Your

14  Honor making this narrow decision on the temporary restraining

15  order.  This should not be taken as any intent to waive the

16  previously asserted Fifth Amendment privilege which we

17  absolutely maintain.  I have to have that on the record.  Thank

18  you.

19          **THE COURT:**  Was any aspect of the work conducted

20  using Chapman University email?

21          **(Counsel confer)**

22          **MR. BURNHAM:**  It's possible.  We haven't seen all the

23  emails.  It's possible that some of it could have been.

24          **THE COURT:**  Okay.  On January 3rd, Dr. Eastman

25  allegedly met with President Trump and Vice President Pence to

1  explain his theory that the Vice President had authority to

2  decide the results of the election.  That came to the Court in

3  Select Committee cover letter at 2, I believe, on Saturday

4  citing *New York Times* article.  So once again, Mr. Plevin, did

5  Chapman University authorize this work?

6          **MR. PLEVIN:**  No, it did not.

7          **THE COURT:**  To Dr. Eastman through his counsel, was

8  that work conducted through an attorney-client relationship and

9  if so, which client or clients?

10         **MR. BURNHAM:**  President Trump.

11         **THE COURT:**  All right.  Was any aspect of that work

12 conducted using Chapman University email?

13     **(Counsel confer)**

14         **MR. BURNHAM:**  Same answer, it's possible.

15         **THE COURT:**  On the days leading up to January 6th,

16 "Dr. Eastman was in the Willard Hotel 'war room' with Steve

17 Bannon and others where the focus was on delaying or blocking

18 the certification of the election" that came to the Court on

19 Saturday and the briefing on Select Committee cover letter at 2

20 citing *The Washington Post* article.

21         Once again, Mr. Plevin, on behalf of Chapman

22 University, did Chapman University authorize this work?

23         Mr. Plevin?

24         **MR. PLEVIN:**  I'm sorry.  I thought I said, "No."

25 Maybe I was muted.  I apologize.

61

1          **THE COURT:**  I didn't hear that.  Is the answer "No"?

2          **MR. PLEVIN:**  The answer is "No."

3          **THE COURT:**  All right.  Thank you.

4          To Dr. Eastman through his counsel, was that work

5  conducted through an attorney-client relationship and if so,

6  for which client or clients?

7          **MR. BURNHAM:**  President Trump.

8          **THE COURT:**  And was any aspect of that work conducted

9  using Chapman University email?

10          **MR. BURNHAM:**  We can't rule it out.

11          **THE COURT:**  On January 6, 2000 -- or January 6th,

12  2000 -- well, '21, Dr. Eastman spoke at a rally at the White

13  House Ellipse that led to the attack on the Capitol and

14  Dr. Eastman reportedly emailed Vice President Pence's counsel

15  saying that the -- "The siege is because Vice President and his

16  boss did not do what was necessary."  And following the attack,

17  Dr. Eastman reportedly told the Vice President's counsel that

18  "Pence should still not certify the results."

19          So once again to Chapman University, Mr. Plevin, did

20  Chapman University authorize this work?

21          **MR. PLEVIN:**  The answer is "No," Your Honor.

22          **THE COURT:**  And to Dr. Eastman through his counsel,

23  was that work conducted through an attorney-client relationship

24  and if so, which clients?

25          **MR. BURNHAM:**  Court's indulgence.

1          **(Counsel confer)**

2               Your Honor, we don't necessarily agree with the

3     factual description in the letter but Dr. Eastman was at that

4     time period representing President Trump.

5               **THE COURT:**  All right.  Can you help me with a

6     general question?  How many clients did Mr. Eastman -- or Dr.

7     -- I'm sorry -- Dr. Eastman have between November 2020 and

8     January 2021 and who were those clients?

9               **MR. BURNHAM:**  Putting aside potential clients who I

10    don't understand to be responsive to Your Honor's question but

11    to whom privilege would apply, I believe what I -- there's --

12    that I can talk about my name, I'm aware of four.  There's a

13    certain category of clients for whom the identity of the client

14    can be privileged and so I have to operate within that

15    constraint but there's four that I'm aware of and can talk

16    about.

17              **THE COURT:**  To Chapman University -- and then I'd

18    like to take another brief recess -- are clinical professors,

19    Mr. Plevin, at Chapman University given an alternative email

20    account to use for their clients' work?

21              **MR. PLEVIN:**  I don't know for sure.  I can find out.

22    I believe the answer is "No" but I don't -- I'll need to check

23    on that, Your Honor.

24              **THE COURT:**  And do you -- and by "you," I mean

25    Chapman University, of course -- educate clinical professors on

63

1   any confidentiality concerns regarding using their Chapman

2   email for client work?

3          **MR. PLEVIN:**  Once again, Your Honor, it's something I

4   would need to check with the right folks on and get back to

5   you.

6          **THE COURT:**  Do any trainings or warnings they receive

7   include a discussion of the attorney -- or waiving the

8   attorney-client privilege by using Chapman email accounts?

9          **MR. PLEVIN:**  I'd have to give you the same response,

10  Your Honor.

11         **THE COURT:**  Do Chapman's clinical professors waive

12  all attorney-client privilege when they use their Chapman email

13  accounts to provide legal advice to clinic clients?

14         **MR. PLEVIN:**  I don't believe Chapman has ever taken

15  that position, Your Honor.

16         **THE COURT:**  Okay.  I know you just had a recess.  I'd

17  like about ten minutes.  I'm sorry it took so long but we were

18  getting some of the letters that you submitted to the Court.

19  This time it will be ten minutes and we'll be right back with

20  you.  I've just got a very short period of questions for you

21  and then I'll give you a chance to summarize in whatever area

22  you choose to.  Thank you for your courtesy.

23         **(A recess is taken from 4:18 p.m. to 4:32 p.m.)**

24         **THE COURT:**  All right.  Karlen, if you'd be so kind,

25  at your convenience, would you plug everybody in?

64

1          **THE CLERK:**  Okay.

2          **THE COURT:**  Okay.  Well, we're back on the record and

3   I can -- Mr. Letter, I can see you.  Mr. Plevin, thank you.

4   And Mr. Eastman and counsel are in court.

5          Dr. Eastman, through counsel, you stated that

6   Dr. Eastman had four clients whose communications would be

7   responsive to the subpoena.  Who were those clients?

8          **MR. BURNHAM:**  Donald Trump is one.

9          **THE CLERK:**  Your microphone is off.

10          **MR. BURNHAM:**  I'm sorry.  Is my microphone --

11          **THE COURT:**  Thank you.

12          **MR. BURNHAM:**  Donald Trump is one.  The Pasadena

13   Republican Club is another.

14          **THE COURT:**  Okay, thank you.

15          **MR. BURNHAM:**  The Claremont Center for Jurisprudence

16   -- I'm sorry -- Center for Constitutional Jurisprudence --

17          **THE COURT:**  Thank you.

18          **MR. BURNHAM:**  -- is another and then the final one

19   was a case involving the emoluments clause whose -- the name of

20   which I'll come to in a second.  Professor Hamerman.

21          **THE COURT:**  Thank you.

22          **MR. BURNHAM:**  Hamermesh, I'm sorry.  Professor

23   Hamermesh and I have the name here in my notes.  Lawrence

24   Hamermesh, *Trump versus Citizens for Responsive Government*.

25   Trump was a named party.  Dr. Eastman was not representing

1   President Trump in that but that was a case involving the

2   emoluments clause.

3            **THE COURT:**  Why would some of -- why would some

4   clients' identities be privileged?

5            **MR. BURNHAM:**  The law is clear, Your Honor, that in

6   general the identity of a client is not privilege but if there

7   are specific circumstances that would make it prejudicial to

8   the clients or reveal it such as in a highly charged political

9   atmosphere with multiple investigations hovering around, we

10  would contend, would be the type of circumstances where that

11  exception to the normal rule would very much apply.

12           **THE COURT:**  Which of those clients were through the

13  Chapman clinic?

14           **MR. BURNHAM:**  All except for the President.

15           **THE COURT:**  Okay, just a moment.

16           **MR. BURNHAM:**  Court's indulgence.

17       **(Counsel confer)**

18           Mr. Letter, if the House Select Committee's purpose

19  involves investigating sedition, which is a Federal crime, why

20  is the Committee not raising the crime-fraud exception which

21  would independently destroy the attorney-client privilege?

22           **MR. LETTER:**  Your Honor, one of the points that I was

23  possibly going to raise with you today was that it might very

24  well be that we would at some point raise that -- the crime-

25  fraud exception.

66

1           At the moment, it just wasn't clear to us yet whether

2    that --

3           **THE COURT:**  All right.

4           **MR. LETTER:**  -- was something that would reasonably

5    be applied to Professor Eastman.  In a rush to get everything

6    done, we, therefore, did not include that but, yes, Your Honor,

7    that is something that if there were further proceedings in

8    this case, we would certainly look very closely at.

9           **THE COURT:**  I anticipate handing down a ruling for

10   the edification of both counsel -- or all counsel sometime

11   tomorrow ruling against Dr. Eastman on the Select Committee's

12   authority, the First and the Fourth Amendment.  And I choose to

13   write on that so it's not simply an oral record for appellate

14   purposes.

15          And given the parties' representations about your

16   willingness to work on a privilege log, if the Court rules

17   against Dr. Eastman on the other three claims, I would prepare

18   to order that the parties begin work on the production and

19   creating a privilege log immediately.  And this Court would

20   expect that the parties will work together with the urgency

21   that this case requires.

22          And, therefore, I'm prepared to order that a joint

23   status report be to this Court on Wednesday, January 26th and

24   Friday, January 28th at 2:00 p.m. Pacific Time.  And that

25   report should summarize the progress made in any disputes that

1    the parties are facing.  I've then set a status conference for

2    next Monday, January 31st at 2:00 p.m.

3             And in doing so, I'm going to ask the parties who you

4    want to decide any contested assertions of privilege.  Will it

5    be this Court or do you want a taint team established and what

6    is a reasonable time for getting through all of those

7    documents?  And I would expect that we're going to be working

8    on Saturday and so for church purposes, et cetera, half a day

9    Sunday.

10            Now, if you want to have a private discussion

11   concerning that by phone with one another as a courtesy -- but

12   I'm prepared to hand down those orders in just a moment.

13            Do you want to have a private conversation,

14   Mr. Letter, with Dr. Eastman and his counsel in that regard?

15   In other words, you're going to have to get somebody out here

16   in that location which seemed to be most appropriate at Chapman

17   because that's where the records are located.

18            **MR. LETTER:**  Your Honor --

19            **THE COURT:**  Now, I don't want to have a long

20   discussion about this.  I think the two of you can communicate

21   by phone concerning this but I'm happy to entertain any

22   thoughts.

23            So let me begin with Mr. Plevin.

24            **MR. PLEVIN:**  Yes, this is on behalf of Chapman.  So

25   what we have right now is -- I believe it's a PST file.  It's

 1   an email file.  That is a digital file that can be transferred

 2   to somewhere.  I don't believe there's any need for Dr. Eastman

 3   or anyone else to come to Chapman to review it.

 4            **THE COURT:**  Well, there is if there's a dispute.  So

 5   it really passes the question and that is whether it's a taint

 6   team of this court.  I want to resolve or have those disputes

 7   resolved forthwith.  And so, therefore, it would seem to me

 8   that you have these files.  Dr. Eastman is here.  And it would

 9   seem to me it would be much more efficient and much quicker if

10   you can't travel, Mr. Letter, that a designee travel forthwith

11   and that we get started on this.

12            I'm going to suggest this.  I'm going to leave the

13   bench.  Place some calls to each other privately outside my

14   presence.  Come up with a solution.  Otherwise, I'll simply

15   hand down my solution.  So I want courtesy between all of you

16   but now we're in continuous session concerning this matter.

17            So I'll be back in about ten minutes or when you tell

18   Karlen that you've had the time, Mr. Letter, to talk to

19   Mr. Eastman's counsel along with Mr. Plevin.  If you can work

20   out a better methodology, so be it.  We're in recess.  Thank

21   you.

22            **MR. SPEAKER:**  Can I get a phone number for --

23            **THE COURT:**  Will you give him your phone number?

24            **MR. BURNHAM:**  I have Mr. Letter's phone number.  I

25   can call him now.

69

1          THE COURT:  Text it.  You don't want that public.

2          MR. BURNHAM:  I can text Mr. Letter and email

3    Mr. Plevin my phone number.

4          THE COURT:  Call me as soon as you have the courtesy

5    of a time.

6          **(A recess is taken from 4:40 p.m. to 4:56 p.m.))**

7          THE COURT:  Well, then are we unmuted, Karlen?  Thank

8    you so much.

9          Then we're back on the record.  The record should

10   reflect all counsel are present or by Zoom.

11          So, Counsel, your thoughts?

12          MR. BURNHAM:  I can start.  We had a -- I don't know

13   which counsel Your Honor was addressing.

14          THE COURT:  Well, I'm looking between Zoom and then

15   court counsel, so whoever would like to start.  Mr. Letter,

16   Mr. Plevin or counsel Mr. Burnham.

17          MR. BURNHAM:  We agreed -- I think all parties agreed

18   based on the discussion just now on the phone that Chapman

19   would produce in the very, very near future the documents to

20   our side to begin a privilege log.

21          THE COURT:  Let me stop.  The near future -- when?

22          MR. BURNHAM:  Well, it sounded like it was -- we

23   didn't have a specific.  It sounded like it probably could

24   happen today.

25          THE COURT:  Just a moment.  We will.  When?

1          **MR. PLEVIN:**  Your Honor, I think -- I'm waiting for

2   my tech people to confirm but I'm -- with good certainty, I can

3   say it will be done by noon Pacific tomorrow.

4          **THE COURT:**  All right, just a moment.  By noon

5   tomorrow.  Thank you, Mr. Plevin.

6          All right.  Please continue, Counsel.

7          **MR. BURNHAM:**  And then Mr. Letter can speak for

8   himself but my understanding is he has to consult with the

9   Committee members about what their position would be on the

10  proper party to resolve disputes.  He'll get his position on

11  that and we'll have further discussions before providing a

12  concrete proposal.

13         **THE COURT:**  No, no.  Just a moment.

14         I respect the fact, Mr. Letter, that you'll consult

15  with the Committee.  Please do so.  But I expect an immediate

16  answer concerning that.  I expect us to start tomorrow at noon.

17  Is that understood?

18         **MR. LETTER:**  Yes, Your Honor.  I need to make sure

19  there's --

20         **THE COURT:**  Now, the question will simply be then,

21  who would be the deciding party?  The Court's quite prepared to

22  take on these contested assertions of privilege or you can form

23  a taint committee but I do not want further delay or bickering

24  over what that taint committee would be or who they'd be

25  composed of.  So I'm concerned about that.

71

1          And, Mr. Letter, you want speed?  Then move.

2    Understood?

3          **MR. LETTER:**  Yes, Your Honor.  The only delay on my

4    part --

5          **THE COURT:**  Thank you very much.

6          Now, how will we resolve that?  Because I want an

7    answer to that and I assume that the Committee is not in

8    session at 8:00 o'clock and you don't have the ability to reach

9    out to the chairman; is that correct?

10         **MR. LETTER:**  That is correct, Your Honor.

11         **THE COURT:**  Okay.

12         **MR. LETTER:**  As soon as the call is over, I will

13   initiate this.  The -- only the chairman in consultation with

14   the vice-chairman can make this decision.

15         **THE COURT:**  Okay.

16         **MR. LETTER:**  But they will -- I suspect they've

17   already been informed on what's happening but I just need to,

18   as I say --

19         **THE COURT:**  All right.  And you both understand that

20   my concern is that -- and I would welcome a taint committee.

21   That's fine.  But then we get into the composition of the taint

22   committee which then, Mr. Letter, works against your request

23   for a speedy resolution.  And I represent to both of you that

24   if you can't reach that agreement, the Court's quite prepared

25   but I do expect that we'll be working -- if it's with this

1    Court, that you'll be working this weekend.  Is that understood

2    by all parties?

3              Now, how do we resolve this, Mr. Letter, so that you

4    have time to consult the chairperson out of courtesy?

5              **MR. LETTER:**  Your Honor, I'll be totally honest with

6    you.  I do not know how fast I can reach the chairman.  It's

7    usually fast but I don't think -- he may be traveling, et

8    cetera.  I don't know and I cannot --

9              **THE COURT:**  Could we take a moment and find out

10   through his offices?

11             **MR. LETTER:**  I can try to reach the staff but I'm

12   sure the chairman won't --

13             **THE COURT:**  All right.  So perhaps this is the answer

14   for all of this and that is, we can certainly start the process

15   as of 12:00 noon tomorrow.  How those disputes are resolved,

16   whether it's a taint committee or this Court, can probably be

17   delayed out of courtesy to all the parties certainly until

18   Thursday because those assertions will start coming up, if they

19   do, and I can start as early as Thursday giving you 24 to 48

20   hours to start the process.  Would that be fair to both

21   parties?

22             **MR. BURNHAM:**  Court's indulgence.  Yes, Your Honor.

23             **THE COURT:**  All right.

24             **MR. SPEAKER:**  Yes, Your Honor.

25             **THE COURT:**  Then is there anything further this

1    evening other than thanking all of you folks in Washington

2    D.C.?  It's a little bit late there.  And, Counsel, thank you

3    for your presence here in court today.  Is there anything

4    further?

5              **MR. BURNHAM:**  Court's indulgence.  Can I have about

6    five minutes, Your Honor, to put some other things on the

7    record?  The Court had mentioned a brief closing.

8              **THE COURT:**  Please.

9              **MR. BURNHAM:**  I'd like to avail myself of that.

10             **THE COURT:**  Please.  So you can make a record --

11             **MR. BURNHAM:**  Okay.

12             **THE COURT:**  -- and I'll afford the same courtesy,

13   Mr. Letter, to you and Mr. Plevin.

14             **MR. BURNHAM:**  Thank you, Your Honor.  And I'm going

15   to go through my list from the argument in, hopefully, some

16   kind of a logical order but perhaps not.

17             I think an important point is the Government

18   represented this subpoena to be narrow and perhaps by its terms

19   you could characterize it that way but I think the terms of the

20   subpoena itself have to be considered in conjunction with the

21   list of suggested search terms that were apparently

22   communicated along with the subpoena and that neither Your

23   Honor or us, the Plaintiffs, have seen.

24             We don't know what those search terms were and,

25   perhaps, depending on the exact terms in which they were

74

```
1    communicated, if it was more than just a mere suggestion, they
2    could modify the scope of the subpoena.  So we think that's
3    important.
4            The use of law school email systems has to be
5    considered within the practice of the legal community going
6    back since emails started being a thing.  For example, I was a
7    public defender and used dot gov emails.  They were not my
8    property but the prosecution couldn't subpoena them.  And
9    that's sort of the standard of practice among -- we all operate
10   when it comes to government emails or law school emails.
11           Your Honor asked a series of questions to counsel for
12   Chapman about, was Dr. Eastman authorized for this?  Was he
13   authorized for that?  We'd like to make our position on that
14   clear.
15           Our position is, first, that there was no mechanism
16   in place to request such authorization nor was that a common
17   practice either for Dr. Eastman himself or for the various
18   other law professors at Chapman who took clients.  It was -- it
19   just wasn't something that was done.
20           Dr. Eastman relied on his practice of 20 years there
21   where he could take what clients he wanted in pursuit of his
22   teaching and scholarship.  He was rewarded for that and, in
23   fact, he filed periodic reports -- "faculty reports," I think
24   was the term, with the university detailing his representations
25   of this person and that person testifying and so forth.
```

1            And the understanding was if there was ever anything

2    there that the university deemed improper, a violation or

3    political activity or something like that, it could be

4    addressed in the proper context.  And there was never any

5    objection raised to his clients either within the auspices of

6    the clinic or not, either pro bono or retained.  It never came

7    up.  We're happy to submit those faculty reports.  We have

8    them.  They go back years.  We'll share them with whoever wants

9    to see them.  So that's about the authorization.

10            The subject of whether Dr. Eastman was engaged in

11    improper political activity came up several times.  Our

12    position is very much that under IRS rules, university policy,

13    whatever other applicable restrictions governed, representation

14    of a client as a lawyer who happens to be running for a

15    political office is not the same thing as political activity or

16    electioneering or any of these terms that were thrown around.

17            Dr. Eastman was Donald Trump's lawyer.  He was not

18    his campaign manager which gets him very much within the rules

19    of the IRS, the university's tax status, the university's

20    policy and so forth.  And, in fact, we proffer there's been a

21    lot of facts just simply proffered to the Court and so I'll

22    proffer that Dr. Eastman discussed his representation of Donald

23    Trump with the Dean of Chapman Law School so that it was well

24    aware that that was a client of his and the only response to

25    him sharing that was to take the Chapman name off of

76

1    correspondence but still use the Chapman address.

2         Apparently up and to that point, for outside

3    representations, letters and briefs could say, John Eastman,

4    care of Chapman and that would be how mail was sent and

5    received.  And the decision was, because Donald Trump during

6    the election was such a controversial representation, the

7    Chapman name would be removed from the paperwork but the

8    Chapman address could be -- remain.  So the idea that he was

9    somehow going rogue against the wishes of the university in

10   representing the President, absolutely not the case.

11        And, finally, there were some statements that, oh,

12   well, Dr. Eastman was given the chance to take off his

13   privileged information from the servers when he left.  We

14   dispute that as well.  The fact was he was given the

15   opportunity to delete what he wanted to delete from the

16   servers, was not told that regardless of the extent to which he

17   took advantage of that opportunity, which he did in certain

18   ways, Chapman would nonetheless retain an archived copy of

19   everything.

20        That was not communicated to him.  He didn't know it.

21   We didn't find out that everything he had was still in

22   Chapman's possession until we received the subpoena.

23        **THE COURT:**  Counsel, thank you.

24        **MR. BURNHAM:**  Thank you, Your Honor.

25        **THE COURT:**  Let me turn to either Mr. Plevin or

1   Mr. Letter for any further comments.

2          **MR. PLEVIN:**  Thank you, Your Honor.  Just briefly in

3   response to the factual representations just made by

4   Mr. Burnham, Chapman does view the representation of a

5   candidate for political office as a violation of its rules and

6   the IRS rules.  There was -- I'm informed that the dean

7   expressly told Professor Eastman that if he was going to be

8   representing President Trump that he shouldn't be using

9   university resources for that.

10          And in the past, whether there was approval or not

11   approval is not the issue.  The issue here has to do with the

12   political bar on 501(c)(3)s.

13          The only thing I want to ask Your Honor if in your

14   order you're considering directing the parties on the

15   production of the documents.  On behalf of Chapman, I would

16   request that Chapman be removed from the process and that if we

17   produce the documents to Mr. Burnham's office, as we will, that

18   any further production to the House be handled between the

19   House and Dr. Eastman.  There's no reason that Chapman be in

20   the middle of that.

21          **THE COURT:**  Let me help you with that.  I'm going to

22   decline that at the present time until I have, let's say, more

23   confidence in the process.  Chapman was originally apparently

24   designated to go through these emails and you were put in the

25   position or you took the position of deciding what emails would

78

1   be forthcoming.  So I'd like to delay that decision at the

2   present time.  I'm going to decline that invitation.

3            **MR. PLEVIN:**  Yes.  Your Honor, just a brief

4   correction.  I think Chapman ran search terms that were

5   provided by the Committee and we didn't really have any

6   decision-making process.  We just ran the terms and the --

7            **THE COURT:**  All right, thank you.

8            **MR. PLEVIN:**  -- result of that search is what it is.

9            **THE COURT:**  I'll take that up again with you but not

10  at the present time, Counsel.  I'll let you conclude your

11  argument --

12           **MR. PLEVIN:**  Thank you.

13           **THE COURT:**  -- and your thoughts.

14           **MR. PLEVIN:**  Yes, that's all I have.  Thank you, Your

15  Honor.

16           **THE COURT:**  Thank you for your courtesy.

17           Mr. Letter?

18           **MR. LETTER:**  Yes, Your Honor.  I'll be very brief.

19  First of all, I just got an answer from the Committee.  The

20  Committee would like to take the -- Your Honor up on your offer

21  that if there are disputes about the privilege claims, we

22  believe it's most appropriate for Your Honor to make those

23  determinations.

24           **THE COURT:**  All right.  Is that acceptable also to

25  Chapman?

1          **MR. PLEVIN:**  Yes, Your Honor.

2          **THE COURT:**  All right.  That's been resolved.  And I

3     want to thank both of you for getting back to me quickly on

4     that matter.

5          **MR. LETTER:**  Thank you.  And then I just want to say

6     several very quick things just, again, so they're on the

7     record.

8          First, Your Honor, we raised the possible question

9     that if Chapman is the entity that actually makes the

10    disclosures, would that alleviate any Fifth Amendment concerns

11    by Professor Eastman because Chapman would be making the

12    production, not Mr. -- not Professor Eastman.

13         Second, I have more accurate information on two

14    questions you asked me and so I just wanted them to be in

15    record.  The -- on Wednesday, January 12th, Chapman's general

16    counsel told us there were over 11,000 emails within the date

17    range.  She, the general counsel, requested search terms from

18    us to narrow the set.  We responded the same day with the

19    search terms.  The next day, Chapman University then emailed to

20    us, said there had been a mistake.  The actual number of emails

21    were more like 30,000.  After running the search terms, the

22    population was 19,620.

23         We spoke to Chapman general counsel on January 14th

24    to discuss ways to narrow the universe and Chapman general

25    counsel determined she would review only what implicated

1    Chapman's own privilege and produce the rest.  She was not

2    interested in us providing any revised search terms.  The

3    subpoena was then issued on Tuesday, January 18.

4              As far as the -- so we heard the -- oh, I'm sorry.

5    As far as the question of -- earlier whether to -- Professor

6    Chapman could -- Professor Eastman could get from Chapman the

7    records earlier and do a privilege log, that offer was made.

8    The last time it was made was orally in the -- at the December

9    9th deposition.  And then -- but we never got an answer.

10             And then we just stopped raising it because on

11   December 14 is when Professor Chapman sued us in D.C. over the

12   subpoena to him.  So, obviously, we stopped making the offer at

13   that point.

14             I don't have anything further, Your Honor.

15             **THE COURT:**  And, Counsel, is there anything further?

16             **MR. BURNHAM:**  Just briefly.  We're not raising a

17   Fifth Amendment objection to complying with Your Honor's order,

18   just in the terms that the Court has telegraphed to us but

19   other than that, we absolutely maintain our Fifth Amendment

20   objections as previously stated to their fullest extent.

21             **THE COURT:**  All right, thank you.  Any further --

22   Mr. Plevin?

23             **MR. PLEVIN:**  Nothing further, Your Honor.

24             **THE COURT:**  And Mr. Letter?

25             **MR. LETTER:**  Nothing further, Your Honor.

1          **THE COURT:**  By the way, I want to thank all of you

2     for your courtesy.  Please stay healthy.  Please stay well.

3     Good night.

4          **MR. BURNHAM:**  Than you, Your Honor.

5          **THE CLERK:**  Good-bye.

6       **(Proceeding adjourned at 5:12 p.m.)**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    <u>January 26, 2022</u>

          Signed                                                  Dated

*TONI HUDSON, TRANSCRIBER*