Anthony T. Caso (Cal. Bar #88561)
Email: atcaso@ccg1776.com
CONSTITUTIONAL COUNSEL GROUP
174 W Lincoln Ave # 620
Anaheim, CA 92805-2901
Phone: 916-601-1916
Fax: 916-307-5164

Charles Burnham (D.C. Bar# 1003464)*
Email: charles@burnhamgorokhov.com
BURNHAM & GOROKHOV PLLC
1424 K Street NW, Suite 500
Washington, D.C. 20005
Telephone: (202) 386-6920
* admitted pro hac vice

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| JOHN C. EASTMAN,<br><br>    *Plaintiff,*<br>vs.<br><br>BENNIE G. THOMPSON, *et al.*<br><br>    *Defendants* | Case No.: 8:22-cv-00099-DOC-DFM<br><br>**PLAINTIFF'S BRIEF IN SUPPORT OF PRIVILEGE ASSERTIONS**<br><br>Date: March 9, 2022<br>Time: 9:00 a.m.<br>Judge: Hon. David O. Carter<br><br>Magistrate Judge: Hon. Douglas F. McCormick<br>Crtrm.: 9D<br>Trial Date: not set |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES....................................................................................3

INTRODUCTION ................................................................................................6

ARGUMENT ......................................................................................................10

I.   The Materials Identified in Plaintiff's Log are All Covered by Attorney Client and/or Work Product Privilege ..................................................10

II.  Document by Document Detailed Response to Defendant's Objections ..........12

III. The Congressional Defendants Have Waived Their Right to Object to Privilege on the Basis of Public Statements by Dr. Eastman, the Particulars of Chapman University's Email System, or Any Other "Generalized" Waiver Argument ........................................................................22

IV. Plaintiff Did Not Waive Privilege Through Any Public Statements ...................23

V.  Plaintiff Did Not Waive Privilege Through Use of Chapman University Email .....................................................................................................25

VI. The Privilege Was Not Waived Through Inclusion of Third Parties on Communications ....................................................................................30

VI. This Court Should Revisit its TRO Holding on the First Amendment...............31

VII. This Court Should Revisit the TRO Holding on the Fourth Amendment ........36

CONCLUSION ..................................................................................................39

CERTIFICATE OF SERVICE............................................................................41

1

## TABLE OF AUTHORITIES

2

### Cases

3

*Admiral Inc. Co. v. U.S. Dist. Ct.,*
4
    881 F.2d 1486 (9th Cir. 1989)....................................................................10

5
*Americans for Prosperity Found. v. Bonta,*
    141 S. Ct. 2373 (2021) ...............................................................................9
6

7
*Brown v. Socialist Workers '74 Campaign Comm. (Ohio),*
    459 U.S. 87 (1982) .....................................................................................9
8
*Carpenter v. United States,*
    138 S. Ct. 2206 (2018) ..............................................................................36
9

10
*Convertino v. U.S. Dep't of Just.,*
    674 F. Supp. 2d 97 (D.D.C. 2009) ...........................................................25

11
*Doe I v. George Washington Univ.,*
    480 F. Supp. 3d 224 (D.D.C. 2020) ........................................................25
12

13
*Goldstein v. Lees,*
    46 Cal.App. 3d 614 (1975)........................................................................23

14
*Hunt v. Blackburn,*
15
    128 U.S. 464 (1888) ..................................................................................30

16
*Katz v. United States,*
    389 U.S. 347 (1967) ..................................................................................36
17

18
*McPhaul v. United States,*
    364 U.S. 372 (1960) ............................................................................ 35, 36

19
*NAACP v. Alabama,*
    357 U.S. 449 (1958) ...................................................................................9
20

21
*Oklahoma Press Pub. Co. v. Walling,*
    327 U.S. 186 (1946) ............................................................................ 35, 36

22
*Senate Select Committee on Ethics v. Packwood,*
    845 F.Supp 17 (D.C. Dist. Ct. 1994) .......................................................36
23

24
*Trump v. Kemp,*
    No. 1:20-cv-05310 (N.D. Ga., filed Dec. 31, 2020) ................................17

25

*Trump v. Raffensperger*,
  No. 2020CV343255 (Fulton Cnty, Ga. Super. Ct., filed Dec. 4, 2020) ...............17

*Trump v. Thomp*,
  20 F.4th 10 (D.C. Cir. Dec. 9, 2021)....................................................................38

*U.S. v. Zolin*,
  491 U.S. 554 (1989) ...........................................................................................15

*United States v. Hirsch*,
  803 F.2d 493 (9thCir. 1986).................................................................................10

*United States v. Long*,
  64 M.J. 57 (C.A.A.F. 2006) ............................................................................ 27, 28

*United States v. Nables*,
  422 U.S. 225 (1975) ............................................................................................11

*United States v. Rumley*,
  345 U.S. 41 (1943) ..............................................................................................32

*United States v. Sanmina Corp.*,
  968 F.3d 1107 (9th Cir. 2020)........................................................................ 17, 30

*Watkins v. United States*,
  354 U.S. 178 (1957) ...................................................................................... passim

*Weil v. Investment/Indicators, Research and Management, Inc.*,
  647 F.2d 18 (9th Cir. 1981)...................................................................................24

**Statutes**

CA Business and Professions Code § 6068(e)(1)....................................................26

Cal. Evid. Code § 1015 ..........................................................................................26

Cal. Evid. Code § 953 ............................................................................................30

Cal. Evid. Code § 995 ............................................................................................26

**Other Authorities**

Brief of Respondent Albert Gore, Jr., *Bush v. Gore*, No. 00-949 (S.Ct. 2000).......29

Durkee, Alison, *Trump Attorney Cleta Mitchell Resigns From Law Firm After
  Participating in President's Georgia Call*, Forbes (Jan. 5, 2021)................. 9, 11

Edsall, Thomas B., *The Capitol Insurrection Was as Christian Nationalist as it Gets*, New York Times (Jan. 28, 2021) ...............................................................34

Florida Legislature Select Joint Committee on the 2000 Presidential Election, Hearing on the Matter of the Appointment of Presidential Electors (Nov. 29, 2000)..............................................................................................................29

Frankel, Todd C., *A majority of the people arrested for Capitol riot had a history of financial trouble*, Washington Post (Feb. 10, 2021)..........................................34

Nietzel, Michael T*., John Eastman Retires from Chapman University*, Forbes (Jan. 13, 2021)................................................................................................................9

Nietzel, Michael T., *University of Colorado Takes Action Against John Eastman*, Forbes (Jan. 23, 2021) .........................................................................................9

*Peter Boyles Show,* 710KNUS News/Talk (May 5, 2021) .....................................24

Rule 26, Commentary to 1983 amendments......................................................11

Sisk, Gregory C. & Halbur, Nicholas, *A Ticking Time Bomb? University Data Privacy Policies and Attorney-Client Confidentiality in Law School Settings*, 2010 Utah L. Rev. 1277, 1293-94 (2010) ............................................................26

**Rules**

California Rule of Professional Conduct Rule 1.6 ...............................................23

California Rules of Professional Conduct 3-100(A) .............................................26

Feb R. Civ. Pro 26(b)(5)(A)................................................................................11

**Constitutional Provisions**

U.S. Const. amend. I ....................................................................... passim

U.S. Const. amend. IV ........................................................... 10, 35, 36, 38

# INTRODUCTION

Plaintiff, Dr. John Eastman, is a nationally-recognized constitutional attorney and scholar.  He is frequently called upon by Congress and state legislatures to provide expert testimony on important constitutional issues.  For more than 20 years, he was a law professor at Chapman University's Fowler School of Law, holding an endowed professorship or chair for 15 of those years, and also served as the School's Dean from 2007 to 2010.

As previously noted in his reply brief in support of his application for temporary restraining order, Dr. Eastman's employment contract with Chapman University specifically included representation of clients, both through the law school clinic and outside clients through the Center for Constitutional Jurisprudence, a public interest law firm he operated in affiliation with a separate non-profit organization, the Claremont Institute. Corrected Reply Br. (ECF #35) at 14, *citing* Eastman Decl. ¶ 5 and Ex. 1. (employment contract in which Chapman expressly "acknowledges that, separate and apart from his employment as a Faculty Member, Faculty Member may also direct a Center for Constitutional Litigation …." (emphasis added)); *see also* 2nd Eastman Decl. ¶ 3 (attached hereto as Exhibit 1).

One such high-profile representation occurred in the aftermath of the 2000 presidential election.  Dr. Eastman was called upon by the Florida legislature to give expert testimony about constitutional issues arising under the elector and electoral college provisions of the Constitution; was retained by the Florida legislature to craft legislation that would protect that State's electoral votes; and participated as an attorney on behalf of the George W. Bush presidential campaign

in post-election litigation in Florida. 2nd Eastman Decl. ¶ 4. With the full support and encouragement of the law school's dean, Dr. Eastman utilized law students and library resources for these efforts, utilized his Chapman email address (which was also his professional bar address) and included his Chapman affiliation on the testimony he submitted to the Florida legislature. Dr. Eastman's work was even touted by the Law School's Rank and Tenure Committee when it recommended him for an early award of tenure, "as a once in a lifetime opportunity for a scholar with [Dr. Eastman's] expertise to build a truly national reputation." "It was in the Law School's interest that Professor Eastman pursue this opportunity to the fullest," the Committee added. 2nd Eastman Decl. ¶ 5.

That was not the only post-election litigation in which Dr. Eastman was involved during his tenure as a Chapman law professor and in which, pursuant to common law school practice, he utilized his professional Chapman University address, phone, and email account. In 2008, and utilizing students in the Law School's constitutional jurisprudence clinic that Dr. Eastman co-directed, Dr. Eastman filed a brief in a post-election legal challenge to a California ballot initiative, using his professional Chapman University address. *Id.* ¶ 13. Other law professors, not affiliated with any Chapman law school clinic, filed a brief in support of the other side in the post-election dispute, explicitly on behalf of "individual Chapman University organizations, faculty, staff, and students," thereby conveying the impression that the University itself was taking a position in that post-election legal challenge. *Id.* ¶ 14. Draft guidelines issued by the University's general counsel thereafter proposed that in the future, "The words

'Chapman University' may not appear on the brief *except as part of a c/o address for the author.*" *Id.* ¶ 15 (emphasis added).

Because of his election law and constitutional expertise, Dr. Eastman was retained by then- President Trump, in his capacity as a candidate for re-election, as well as Trump's official campaign committee, Donald J. Trump for President, Inc., in the fall of 2020 to represent President Trump "in federal litigation matters in relation to the 2020 presidential general election, including election matters related to the Electoral College." *Id.* ¶¶ 23, 24.  For purposes of the January 4-7, 2021, documents at issue in this brief, that engagement letter clearly demonstrates the existence of an attorney-client relationship between Dr. Eastman and Candidate Trump and the Trump campaign committee.

But to anticipate and hopefully forestall future disputes about materials generated prior to that formal engagement letter, Dr. Eastman's election-related work on behalf of the President began three months earlier.  On September 3, 2020, Dr. Eastman was invited by Cleta Mitchell to join an Election Integrity Working Group to begin preparing for anticipated post-election litigation.  Ms. Mitchell, one of the nation's preeminent election law attorneys, had been asked by President Trump in late August 2020 to undertake such an effort.  *Id.* ¶ 25.  After joining the Election Integrity Working Group, Dr. Eastman began conducting legal research and collaborating with academic advisors and other supporters of the President about the myriad number of factual and legal issues he anticipated might arise following the election.  *Id.* ¶ 26.  All of that work is therefore classic attorney work product.

Many of the statistical experts and others with whom Dr. Eastman collaborated on his work product requested anonymity lest, in the hyper-partisan times in which we find ourselves, their livelihoods be put into jeopardy and they and/or their families be harassed (or worse). *Id.* ¶ 29. As the examples of Dr. Eastman himself and his co-counsel, Cleta Mitchell, demonstrate, these were not (and are not) unfounded speculative fears. Dr. Eastman's classes at the University of Colorado, where he was serving as a visiting professor, were abruptly canceled in January 2021 and he was banned from performing outreach or speaking at the University, and he was pressured to resign from his tenured position at Chapman University that same month, for his work on behalf of President Trump. *See, e.g.*, Michael T. Nietzel, *University of Colorado Takes Action Against John Eastman*, Forbes (Jan. 23, 2021);[1] Michael T. Nietzel, *John Eastman Retires from Chapman University*, Forbes (Jan. 13, 2021).[2] Cleta Mitchell's long relationship as a partner with the law firm of Foley & Lardner likewise came to an abrupt end when her representation of President Trump became public. *See, e.g.*, Alison Durkee, *Trump Attorney Cleta Mitchell Resigns From Law Firm After Participating in President's Georgia Call*, Forbes (Jan. 5, 2021).[3] The concerns about loss of livelihoods and risks of harassment and even violence expressed by several of the people with whom Dr. Eastman was collaborating in his preparation of work product give rise to significant First Amendment concerns should the identities of those individuals

---

[1] Available at https://www.forbes.com/sites/michaeltnietzel/2021/01/23/university-of-colorado-takes-action-against-john-eastman/?sh=3eca7a8e2696.

[2] Available at https://www.forbes.com/sites/michaeltnietzel/2021/01/13/john-eastman-retires-from-chapman-university/?sh=bdcd04865e76.

[3] Available at https://www.forbes.com/sites/alisondurkee/2021/01/05/trump-attorney-cleta-mitchell-resigns-from-law-firm-after-participating-in-presidents-georgia-phone-call/?sh=85752711f61f.

be made public.  *See, e.g.*, *NAACP v. Alabama*, 357 U.S. 449 (1958)*; Brown v. Socialist Workers '74 Campaign Comm. (Ohio)*, 459 U.S. 87 (1982); *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373 (2021).  By ordering that Dr. Eastman's privilege logs, and the Select Committee's objections, be filed under seal, this Court has already recognized the privacy concerns at issue.

Finally, the sheer breadth of the Select Committee's subpoena at issue here demonstrates that the materials the Committee is seeking are far removed from any valid legislative purpose.  All communications related in any way to the election aims at communications that are core political speech protected by the First Amendment.  It also is the very definition of a "fishing expedition," designed not to develop recommendations for legislation but to try to find some evidence that might implicate Dr. Eastman in some as-yet-unspecified crime. Such a subpoena is tantamount to a general warrant, the very thing that the Fourth Amendment was designed to prevent.  Because Dr. Eastman has not previously had the opportunity to brief the significant First and Fourth Amendment issues at stake here, he does so below.

## ARGUMENT

I.     **The Materials Identified in Plaintiff's Log are All Covered by Attorney Client and/or Work Product Privilege**

Under the attorney-client privilege, confidential communications made by a client to an attorney to obtain legal services are protected from disclosure.  *United States v. Hirsch*, 803 F.2d 493, 496 (9thCir. 1986).

The work product doctrine is a qualified privilege that protects from discovery documents and tangible things prepared by a party or his representative

in anticipation of litigation.  *Admiral Inc. Co. v. U.S. Dist. Ct.,* 881 F.2d 1486, 1494 (9th Cir. 1989).  The doctrine protects "mental processes of the attorney providing a privileged area within which he can analyze and prepare his client's case. *United States v. Nables*, 422 U.S. 225, 237-39 (1975).  It protects material prepared by agents for the attorney as well as those prepared by the attorney himself. *Id.* at 238-39.

The congressional defendants have already acknowledged in writing that Dr. Eastman "served as an attorney for President Trump in his capacity for re-election." Ex. 2.  Dr. Eastman has provided further details about his representation of President Trump in a declaration to this Court.  Ex. 1, ¶¶ 19-30.  The attorney-client relationship between Dr. Eastman and President Trump should be beyond dispute.

The communications in Dr. Eastman's privilege log are covered by attorney client privilege and/or work product. As stated in Dr. Eastman's declaration, his representation of then-President Trump covered "federal litigation matters in relation to the 2020 presidential general election, including election matters related to the Electoral College."  Ex. 1, ¶ 23 and Ex. A.

As provided for in Feb R. Civ. Pro 26(b)(5)(A), plaintiff has provided defendants a series of logs of privileged materials "in a manner that, without revealing information itself privileged or protected, will allow the other parties to assess the claim."  As the notes to the various amendments of Rule 16 make clear, if there is a dispute about the privilege, the privileged materials themselves should be submitted for *in camera* review to protect the privilege. *See, e.g.*, Rule 26, Commentary to 1983 amendments ("Nor does the rule require a party or an

attorney to disclose privileged communications or work product…[t]he provisions of Rule 26(c), including appropriate orders after in camera inspection by the court, remain available to protect a party claiming privilege or work product protection.")

Pursuant to this Court's order of January 26, 2021 (ECF #50), Plaintiff has already submitted the challenged documents themselves for *in camera* review.  For further elaboration, plaintiff has submitted an *in camera* supplement to this filing to address some specifics about the documents previously produced to this Court *in camera*.

## II.    Document by Document Detailed Response to Defendant's Objections

The Select Committee has objected to 132 of the 166 documents contained in Plaintiff's privilege logs for January 4-7, 2021, documents.  In all but 4 of those 132 documents (Chapman005513, Chapman005514, Chapman005667, and Chapman005704), the Select Committee has objected on the grounds that there was insufficient information to determine whether the client was President Trump or the Donald J. Trump for President, Inc. campaign committee.  That issue is addressed globally in section I above, and involves the following documents:

| | | | | |
|---|---|---|---|---|
| Chapman004493 | Chapman004547 | Chapman004594 | Chapman004713 | Chapman004766 |
| Chapman004494 | Chapman004549 | Chapman004631 | Chapman004720 | Chapman004767 |
| Chapman004496 | Chapman004551 | Chapman004632 | Chapman004721 | Chapman004788 |
| Chapman004539 | Chapman004553 | Chapman004669 | Chapman004722 | Chapman004789 |
| Chapman004540 | Chapman004555 | Chapman004670 | Chapman004723 | Chapman004790 |
| Chapman004541 | Chapman004556 | Chapman004707 | Chapman004744 | Chapman004791 |
| Chapman004545 | Chapman004593 | Chapman004708 | Chapman004745 | Chapman004792 |

| | | | | |
|---|---|---|---|---|
| Chapman004793 | Chapman005017 | Chapman005114 | Chapman005261 | Chapman005492 |
| Chapman004794 | Chapman005018 | Chapman005130 | Chapman005268 | Chapman005498 |
| Chapman004827 | Chapman005023 | Chapman005131 | Chapman005283 | Chapman005510 |
| Chapman004828 | Chapman005024 | Chapman005134 | Chapman005299 | Chapman005515 |
| Chapman004833 | Chapman005045 | Chapman005135 | Chapman005300 | Chapman005519 |
| Chapman004834 | Chapman005046 | Chapman005154 | Chapman005329 | Chapman005547 |
| Chapman004835 | Chapman005061 | Chapman005155 | Chapman005338 | Chapman005551 |
| Chapman004839 | Chapman005064 | Chapman005156 | Chapman005406 | Chapman005578 |
| Chapman004841 | Chapman005066 | Chapman005157 | Chapman005412 | Chapman005668 |
| Chapman004963 | Chapman005067 | Chapman005158 | Chapman005423 | Chapman005672 |
| Chapman004964 | Chapman005068 | Chapman005159 | Chapman005424 | Chapman005676 |
| Chapman004976 | Chapman005087 | Chapman005160 | Chapman005433 | Chapman005677 |
| Chapman004977 | Chapman005088 | Chapman005161 | Chapman005477 | Chapman005678 |
| Chapman004979 | Chapman005091 | Chapman005177 | Chapman005478 | Chapman005680 |
| Chapman004990 | Chapman005094 | Chapman005178 | Chapman005484 | Chapman005719 |
| Chapman004992 | Chapman005096 | Chapman005248 | Chapman005488 | Chapman005720 |
| Chapman005011 | Chapman005097 | Chapman005249 | Chapman005489 | Chapman005722 |
| Chapman005012 | Chapman005101 | Chapman005251 | Chapman005490 | |
| Chapman005014 | Chapman005113 | Chapman005252 | Chapman005491 | |

The Select Committee objected to 130 of the 132 documents on the ground that they were supposedly from an "Unauthorized use of Chapman University email account" or that there had been a "subject matter waiver." (The Selection Committee has advised counsel for Plaintiff that it has withdrawn its objection to the remaining two documents, Chapman005667, and Chapman005704)  The

"unauthorized use" assertion is rebutted globally in Section V below; the "subject-matter waiver" objection is rebutted globally in Section IV below.  Both objections involve the following documents:

| | | | | |
|---|---|---|---|---|
| Chapman004493 | Chapman004670 | Chapman004794 | Chapman005017 | Chapman005113 |
| Chapman004494 | Chapman004707 | Chapman004827 | Chapman005018 | Chapman005114 |
| Chapman004496 | Chapman004708 | Chapman004828 | Chapman005023 | Chapman005130 |
| Chapman004539 | Chapman004713 | Chapman004833 | Chapman005024 | Chapman005131 |
| Chapman004540 | Chapman004720 | Chapman004834 | Chapman005045 | Chapman005134 |
| Chapman004541 | Chapman004721 | Chapman004835 | Chapman005046 | Chapman005135 |
| Chapman004545 | Chapman004722 | Chapman004839 | Chapman005061 | Chapman005154 |
| Chapman004547 | Chapman004723 | Chapman004841 | Chapman005064 | Chapman005155 |
| Chapman004549 | Chapman004744 | Chapman004963 | Chapman005066 | Chapman005156 |
| Chapman004551 | Chapman004745 | Chapman004964 | Chapman005067 | Chapman005157 |
| Chapman004553 | Chapman004766 | Chapman004976 | Chapman005068 | Chapman005158 |
| Chapman004555 | Chapman004767 | Chapman004977 | Chapman005087 | Chapman005159 |
| Chapman004556 | Chapman004788 | Chapman004979 | Chapman005088 | Chapman005160 |
| Chapman004593 | Chapman004789 | Chapman004990 | Chapman005091 | Chapman005161 |
| Chapman004594 | Chapman004790 | Chapman004992 | Chapman005094 | Chapman005177 |
| Chapman004631 | Chapman004791 | Chapman005011 | Chapman005096 | Chapman005178 |
| Chapman004632 | Chapman004792 | Chapman005012 | Chapman005097 | Chapman005248 |
| Chapman004669 | Chapman004793 | Chapman005014 | Chapman005101 | Chapman005249 |

| Chapman005251 | Chapman005338 | Chapman005484 | Chapman005513 | Chapman005672 |
| Chapman005252 | Chapman005406 | Chapman005488 | Chapman005514 | Chapman005676 |
| Chapman005261 | Chapman005412 | Chapman005489 | Chapman005515 | Chapman005677 |
| Chapman005268 | Chapman005423 | Chapman005490 | Chapman005519 | Chapman005678 |
| Chapman005283 | Chapman005424 | Chapman005491 | Chapman005547 | Chapman005680 |
| Chapman005299 | Chapman005433 | Chapman005492 | Chapman005551 | Chapman005719 |
| Chapman005300 | Chapman005477 | Chapman005498 | Chapman005578 | Chapman005720 |
| Chapman005329 | Chapman005478 | Chapman005510 | Chapman005668 | Chapman005722 |

The Select Committee also objected to all of the above documents on the ground that the information provided is insufficient to determine whether an exception to privilege, "such as crime-fraud," is applicable. The Committee has offered no evidence, much less a "showing of a factual basis adequate to support a good faith belief" that an in camera review may reveal the existence of a crime-fraud exception, as required by *U.S. v. Zolin*, 491 U.S. 554, 572 (1989). An *in camera* review on this ground is therefore inappropriate.

The Select Committee objected to 5 of the 132 documents on the ground that they contained no "Sender" information. Each case appears to be the result of a glitch in the e-discovery platform's upload of the *.PST file from Chapman, which truncated the sender information. In each case, a duplicate of the document with the "sender" information included immediately follows the truncated document. Those five documents are:

| Chapman004670 | Chapman004963 | Chapman004964 | Chapman005248 | Chapman005249 |

The Select Committee objected to 11 of the 132 documents on the ground that work product protection were "overcome by substantial/compelling need of Select Committee." Yet it has offered no argument or evidence of the Select Committee's need for any of these particular documents in pursuit of any valid legislative purpose, much lass a need that would qualify as substantial or compelling in support of a legislative purpose. Moreover, the Select Committee agreed to the process of privilege review by Dr. Eastman and assessment of privilege by the Court that is being undertaken; the Select Committee should not be allowed to make that become an exercise in futility by its own assertion, after the fact, that it will override the Court's determination of privilege. The documents objected to by the Select Committee on the ground that it has a substantial or compelling need for Dr. Eastman's work product are as follows:

Chapman005023     Chapman005088     Chapman005477     Chapman005513

Chapman005061     Chapman005178     Chapman005478     Chapman005514

Chapman005087     Chapman005406     Chapman005510

The Select Committee objected to 90 of the 132 documents on the ground that they "include persons apparently outside the attorney-client relationship." The people in 60 of those 90 documents whom the Select Committee believed to be "apparently outside the attorney-client relationship" were in fact attorneys working with the Trump legal team or in common interest with the Trump legal team. Those are:

██████████, an attorney working with ██████████'s team on Trump's legal efforts, and whose email, ██████████@donaldtrump.com, reflects his

affiliation with the Trump campaign.  The Select Committee's objected to

██████'s inclusion on communications for the following documents:

| | | | | |
|---|---|---|---|---|
| Chapman004707 | Chapman004789 | Chapman004964 | Chapman005014 | Chapman005261 |
| Chapman004722 | Chapman004790 | Chapman004976 | Chapman005023 | Chapman005268 |
| Chapman004723 | Chapman004791 | Chapman004977 | Chapman005024 | Chapman005484 |
| Chapman004744 | Chapman004792 | Chapman004979 | Chapman005061 | Chapman005510 |
| Chapman004745 | Chapman004833 | Chapman004990 | Chapman005248 | Chapman005578 |
| Chapman004766 | Chapman004834 | Chapman004992 | Chapman005249 | |
| Chapman004767 | Chapman004835 | Chapman005011 | Chapman005251 | |
| Chapman004788 | Chapman004963 | Chapman005012 | Chapman005252 | |

████████████, an attorney who was working, at President Trump's behest,

on anticipated election litigation as early as late August 2020.  ████was also

involved with the post-election litigation efforts, primarily in Georgia, including

*Trump v. Raffensperger*, No. 2020CV343255 (Fulton Cnty, Ga. Super. Ct., filed

Dec. 4, 2020); and *Trump v. Kemp*, No. 1:20-cv-05310 (N.D. Ga., filed Dec. 31,

2020).  Those documents are:

Chapman004493   Chapman004793   Chapman004794

████████████, an attorney who served as ████████████ for the Fulton

County Republican Party and ████████████ for the Georgia

Republican Party.  On information and belief, he was coordinating with ████

████████ and other members of the Trump legal team on a common interest

understanding, but even if not, he was clearly not an "adversary" or "conduit to an
adversary" who's inclusion would constitute a waiver of a work product privilege.
*United States v. Sanmina Corp.*, 968 F.3d 1107, 1120 (9th Cir. 2020). The
documents objected to by the Select Committee because ████████ was on the
distribution list are Chapman005478 and Chapman005478, and the documents that
included both Mitchell and Kaufman are:

| | | | | |
|---|---|---|---|---|
| Chapman004539 | Chapman004545 | Chapman004555 | Chapman004594 | Chapman004669 |
| Chapman004540 | Chapman004549 | Chapman004556 | Chapman004631 | |
| Chapman004541 | Chapman004551 | Chapman004593 | Chapman004632 | |

████████████████ were both attorneys with the Trump
campaign, as reflected by their @donaldtrump.com email addresses.  The
documents objected to by the Select Committee because ██████████ were
on the distribution list are Chapman004549 and Chapman004551.

████████████ was one of the many volunteer attorneys working with the
Trump legal team.  The documents objected to by the Select Committee because
██████ was on the distribution list are Chapman005299 and Chapman005300.

████████ is an attorney who reached out to Dr. Eastman offering to
serve as a volunteer attorney helping with his efforts on behalf of President Trump.
The email exchange between Dr. Eastman and ████████ contains a work product
discussion.  The documents objected to by the Select Committee because ████

PLAINTIFF'S BRIEF IN SUPPORT OF PRIVILEGE ASSERTIONS - 18

was either the sender or recipient are Chapman005423, Chapman005424, and Chapman005433.

### Non-Attorney Work Product

The person in another 8 of the 90 documents whom the Select Committee believed to be "apparently outside the attorney-client relationship," ███████████, is a physicist, providing expert advice to Dr. Eastman on behalf of a team of statistical experts that were conducting statistical analyses of election returns in a number of jurisdictions to aid Dr. Eastman and others on the Trump legal team with their work product in anticipation of litigation.  The documents objected to by the Select Committee because████ was either the sender or recipient are as follows:

| Chapman004547 | Chapman004841 | Chapman005490 | Chapman005492 |
| Chapman004839 | Chapman005488 | Chapman005491 | Chapman005498 |

The person in another 6 of the 90 documents whom the Select Committee believed to be "apparently outside the attorney-client relationship," ██████████████████, is ████████████, a member of a citizen volunteer organization, the "Every Legal Vote Coalition," who was following up with Dr. Eastman about a meeting he had had with forensic experts who had information that might have been useful in anticipated litigation.  The documents objected to by the Select Committee because ███████████was either the sender or recipient are as follows:

1

Chapman005668      Chapman005676      Chapman005678

2

Chapman005672      Chapman005677      Chapman005680

3

4      Another 8 of the 90 documents whom the Select Committee believed to be

"apparently outside the attorney-client relationship" were communications with

5

scholars affiliated with The Claremont Institute where Dr. Eastman is a Senior

6

Fellow: ███████████████████████████████████████

7

███████████████████████████  They all worked with Dr.

8

Eastman, either as sounding board or by offering ideas of their own, as Dr.

9

Eastman was developing work product in anticipation of election litigation.  Two

10

other individuals, ████████████, a former ████████████ with whom

11

Dr. Eastman was working on election integrity efforts, and ████████████, an

12

attorney and the ██████████████████████, were copied

13

on one of the documents (Chapman005515), but because neither was an adversary

14

nor a conduit to an adversary, their inclusion on the email exchange does not

15

destroy the work product privilege.  *United States v. Sanmina Corp.*, 968 F.3d

16

1107, 1120 (9th Cir. 2020).  The documents objected to by the Select Committee

17

because any of these individuals were either the sender or recipient are as follows:

18

Chapman004494          Chapman005283          Chapman005338          Chapman005515

19

Chapman004496          Chapman005329          Chapman005489          Chapman005519

20      Four of the documents were emails or attachments sent by ████████████, a

21

data technology expert who was working with Dr. Eastman on work product in

22

23

24

25

anticipation of litigation. Recipients were ███████, one of the volunteer Trump attorneys described above, and ███████, a telecommunications expert who was working with ███████. The documents objected to by the Select Committee because any of these individuals were either the sender or recipient are as follows:

Chapman005130          Chapman005131          Chapman005134          Chapman005135

Two of the documents – an email (Chapman005547) and an attached memo (Chapman005551) – were from ███████, a former potential client of Dr. Eastman's who had been communicating back and forth with Dr. Eastman since before the election about legal theories in anticipating of electoral college disputes and anticipated litigation over them. The exchanges contain mental impressions from Dr. Eastman about the legal theories and are therefore work product.

Finally, there are 24 documents for which we are withdrawing our assertion of privilege. Most were simply transmittals of filings in pending litigation that do not convey mental impressions. In addition, we inadvertently claimed Attorney-Client and Work-Product privilege over an email (Chapman005087) an attachment (Chapman005088) because the email recipients included ███████ and other members of the President's staff and legal team. On further review, we withdraw our claims of privilege over these documents and will include them in the next production.

Chapman004493     Chapman004539     Chapman004540     Chapman004541     Chapman004545

| Chapman004549 | Chapman004593 | Chapman004669 | Chapman005177 | Chapman005478 |
| Chapman004551 | Chapman004594 | Chapman004670 | Chapman005178 | Chapman005513 |
| Chapman004555 | Chapman004631 | Chapman005087 | Chapman005406 | Chapman005514 |
| Chapman004556 | Chapman004632 | Chapman005088 | Chapman005477 | |

### III. The Congressional Defendants Have Waived Their Right to Object to Privilege on the Basis of Public Statements by Dr. Eastman, the Particulars of Chapman University's Email System, or Any Other "Generalized" Waiver Argument

At the temporary restraining order hearing in this case, the congressional defendants initially argued that *no* privilege could exist in *any* of the Chapman materials. They argued that any attorney client privilege that existed in the Chapman materials had been waived by Dr. Eastman's public statements about former President Trump.  ECF 23-1 at 20-21.  They also argued that use of Chapman's email system constituted a waiver.  *Id*. at 17-19.

However, following initial argument from both parties and some questioning from the Court, the congressional defendants conceded a privilege log was appropriate.  Counsel for the congressional defendants stated:

> **MR. LETTER:**  Your Honor, I do want to say if this [a privilege review] is considered something that is important to do now, we would certainly entertain it.  We would want – we think it would be essential that if the

material is provided to Professor Eastman now there be a very quick schedule.

**THE COURT:**  Let's stop at that point for a moment because I want to repeat back what I heard, and that is you would be willing at the present time to submit these materials to Dr. Eastman with the expectation that this would be a short turnaround time he could review these.  Is that correct?

**MR. LETTER**:  Yes, Your Honor--

ECF 44 (transcript of January 24, 2022 hearing) at 45.

By conceding that a privilege log is appropriate, the congressional defendants have necessarily conceded the possibility that at least some privileged content exists in the Chapman materials.  They have waived their claim that any "generalized" waiver applies to the Chapman materials.

### IV.    Plaintiff Did Not Waive Privilege Through Any Public Statements

Even if the congressional defendants had not abandoned their "general waiver" arguments, it is clear that no public statements by Dr. Eastman effected such a waiver.  As already briefed and argued to this Court in connection with the temporary restraining order hearing, Dr. Eastman did not waive privilege through any of his public statements.

As an initial matter, it is by no means clear that any statements by Dr. Eastman about President Trump revealed *any* privileged material, let alone constituted a complete waiver of such material, as the defendants contend.  A lawyer's duty to protect a client's information is broader than the duty to protect privileged information.  As California Rule of Professional Conduct Rule 1.6 states:

> The principle of lawyer-client confidentiality applies to information a lawyer acquires by virtue of the representation, *whatever its source*, and encompasses matters communicated in confidence by the client, and therefore protected by the lawyer-client privilege, matters protected by the work product doctrine, *and matters protected under ethical standards of confidentiality*, as established in law, rule and policy.

*Id.* at n. 2 (and cases cited therein, *e.g. Goldstein v. Lees*, 46 Cal.App. 3d 614, 621 (1975) (italics added).

The statements about President Trump attributed to Dr. Eastman by the defendants make no reference to privilege.  *See, e.g.*, Resp. to TRO at 28 (Dr. Eastman's statement to Bob Woodward that the President had authorized him to "talk about these things.").  In fact, the defendants are only able to give Dr. Eastman's public statements the superficial appearance of privilege waivers by omitting highly relevant facts.  For example, the defendants attempt to characterize Dr. Eastman's statement on the Peter Boyles Show that he had authority from the President to discuss a "private conversation."  Resp. at 20.  Conveniently omitted by defendants are Dr. Eastman's statements in the very same interview that the conversation in question occurred in the presence of three non-clients in addition to the President.[4]  The "private conversation" of which Dr. Eastman spoke was therefore obviously unprivileged.  The defendants attempt to characterize Dr. Eastman's discussion of a *non-privileged conversation* as somehow a waiver of

---

[4] To hear Dr. Eastman's description of this conversation, the reader is referred to minutes 12:00 – 15:00 of the podcast cited in the defendants' brief.  *Peter Boyles Show,* 710KNUS News/Talk (May 5, 2021) (available https://omny.fm/shows/peter-boyles-show/peter-boyles-may-5-8am-1).

attorney client privilege is misleading in the extreme.  At most, the statements

show that the President had authorized Dr. Eastman to disclose a limited amount of

confidential (as opposed to privileged) information.  They provide this Court no

basis to hold that Dr. Eastman has made any sort of privilege waiver with respect

to former President Trump.

Even if Dr. Eastman had disclosed some sort of privileged information about

the former President, it would be at most a limited waiver.  Courts have long

recognized that disclosure of privileged information on a particular subject does

not necessarily imply a complete waiver of the privilege.  *See*, e.g., *Weil v.

Investment/Indicators, Research and Management, Inc.*, 647 F.2d 18, 25 (9th Cir.

1981) ("We conclude, therefore, that the fund has waived its attorney-client

privilege....only as to communications about the matter actually disclosed.").  It is

publicly known that Dr. Eastman represented President Trump in several matters

during the subpoena period.  The government has merely quoted statements from

Dr. Eastman relating to a legal memorandum and an unspecified "private

conversation."  No reasonable interpretation of these statements could construe

them as a total waiver of privilege between Dr. Eastman and the former president.

## V.      Plaintiff Did Not Waive Privilege Through Use of Chapman University Email

As stated above, the congressional defendants have waived the argument

that there was a wholesale waiver of privilege through use of school email.

However, even without this concession, it is clear that use of the email system was

not a waiver.

The congressional defendants relied during the TRO proceedings primarily on *Doe I v. George Washington Univ.*, 480 F. Supp. 3d 224 (D.D.C. 2020), which unlike the present case, involved use by *students* of the University's email system, not use by law professors whose contractual duties include client representations. That distinction is of great significance, as it supports Dr. Eastman's claim that he had a subjective expectation of confidentiality in his communications with or related to clients and prospective clients, and that his expectation of confidentiality is objectively reasonable. *Id.* at 226.  The more relevant case is therefore the other case relied upon (somewhat inexplicably) by the congressional defendants, *Convertino v. U.S. Dep't of Just.*, 674 F. Supp. 2d 97 (D.D.C. 2009). In that case, the same court that decided *Doe I* held that a Department of Justice employee's emails to his outside private attorney, using the Department's email system, retained their attorney-client privilege. "Although DOJ does have access to personal e-mails sent through his account, Mr. Turkel was unaware that they would be regularly accessing and saving emails sent from his account," the Court noted. *Id.* at 110.  As Chapman itself acknowledges, and just like the DOJ in *Convertino*, "Chapman does not make a practice of monitoring email" even though it reserves the right the right to retrieve the contents of emails "for legitimate reasons, such as to find lost messages, to comply with investigations of wrongful acts, to respond to subpoenas, or to recover from system failure."  DuMontelle Decl. ¶ 5.  It is Dr. Eastman's contention, and his subjective expectation, that such "legitimate reasons" would not include the University accessing emails protected by attorney-client and work product privileges without his authorization.  Were the rule otherwise, then every single clinical professor—whether in the law school or in

other departments with clients or patients—would be in breach of their ethical

duties to protect client and patient confidences.  *See*, *e.g.,* California Rules of

Professional Conduct 3-100(A) ("A member shall not reveal information protected

from disclosure by California Business and Professions Code § 6068, subdivision

(e)(1) without the informed consent of the client, …"); Cal. Evid. Code § 995

(describing physician's obligation to assert privilege on behalf of his patient's

confidential communications); Cal. Evid. Code § 1015 (same re psychotherapist

obligation).  *See also*, *generally*, Gregory C. Sisk & Nicholas Halbur, *A Ticking

Time Bomb? University Data Privacy Policies and Attorney-Client Confidentiality

in Law School Settings*, 2010 Utah L. Rev. 1277, 1293-94 (2010) (concluding that

"attorneys practicing in the university law school environment may well be able to

distinguish [cases in corporate settings] and successfully overcome a challenge to

the privilege, even if the university does maintain a formal data privacy policy

reciting that users have no expectation of privacy in data on university computers

or messages sent through university networks.)

　　　That Chapman has a policy—and perhaps even a banner warning[5]—

announcing that emails sent across its system are subject to monitoring for certain

specified purposes does not defeat Dr. Eastman's reasonable expectation of

confidentiality.  Other cases involving similar banner warnings in circumstances

where the expectation of privacy would be even lower than in a University setting

with its strong commitment to academic freedom, have held that such a warning

---

[5] Dr. Eastman disputes Chapman's claim that a "splash screen" message appeared "every time
Eastman logged on to Chapman's network."  During his employment at Chapman, Dr. Eastman
used a laptop computer, connecting through the University's VPN. To his recollection, no such
message ever appeared when he logged on to the network in that fashion, or when he accessed
his Chapman email account via Outlook.

does not necessarily give rise to a waiver of confidentiality.  *United States v. Long*,
64 M.J. 57 (C.A.A.F. 2006), is particularly salient.  There, the Court of Appeals for
the Armed Forces held that a member of the military had a reasonable expectation
of privacy in emails she sent and received using the Department of Defense's email
system, and which were stored on that system.  There, like Chapman claims to be
the case here, a banner appeared anytime a user logged on to the system notifying
the user that the system was "provided only for authorized U.S. Government use"
and that it "may be monitored for all lawful purposes, including to ensure that their
use is authorized, for management of the system, to facilitate protection against
unauthorized access, and to verify security procedures, survivability and
operational security."  *Id.* at 60.  Yet the Court nevertheless upheld the service
member's expectation of privacy in the personal emails she sent using the
government system.  There, as here, each individual user "had his or her own
unique password known only to them."  *Id.*  There, as here, users were told to
change passwords frequently.  *Id.*  There, as here, network administrators did not
have access to individual users' passwords, *id.*, but could access the entire
network, including personal email.  If that was good enough for the expectation of
confidentiality to be deemed reasonable in the context of the military and highly-
secure Department of Defense computers, surely it is sufficient for Dr. Eastman's
expectation of confidentiality to be deemed reasonable in the context of a private
University in which his duties included representation of clinic and other clients.

Defendant Chapman has previously intimated that Dr. Eastman's use of the
University's email system was "unauthorized."  Chapman Opp. at 4.  The
congressional defendants take that intimation as an "indisputably" proven fact.

Cong. Opp. at 22.  It is not.  Dr. Eastman's duties specifically included representation of clients, both through the law school clinic and outside clients through the Center for Constitutional Jurisprudence, a public interest law firm he operated in affiliation with a separate non-profit organization, the Claremont Institute.  Eastman Decl. ¶ 5 and Ex. 1. (employment contract in which Chapman expressly "acknowledges that, *separate and apart from his employment as a Faculty Member*, Faculty Member may also direct a Center for Constitutional Litigation …." (emphasis added)).  Like other law faculty, Dr. Eastman's promotion and tenure decisions, and his annual performance reviews and merit pay increases, were based in part on scholarship and service that expressly included representation of outside clients in matters related to his scholarship or that served the public interest.  That Dr. Eastman's election integrity work at issue here easily qualified under established University practice is not speculative, but fully supported by nearly identical outside work Dr. Eastman performed early in his career at Chapman in the aftermath of the 2000 presidential election.  Then, as now, he provided pro bono legal work in election challenges,[6] gave expert

---

[6] Chapman's General Counsel intimates that such work may run afoul of IRS prohibitions on electioneering activity.  DuMontelle Decl. ¶ 3; *see also* Chapman Br. at 3 (ECF #??).  But the IRS prohibits non-profit organizations like Chapman "from directly or indirectly participating in, or intervening in, any political campaign on behalf of (or in opposition to) any candidate for elective public office."  It identifies "[c]ontributions to political campaign funds or public statements of position (verbal or written) made on behalf of the organization in favor of or in opposition to any candidate for public office" as things that "clearly violate the prohibition against political campaign activity."  It does not mention post-election legal disputes over election integrity, and we are aware of no instance where the IRS has challenged a University's non-profit status because its law faculty have participated as counsel in post-election litigation despite that having occurred in some rather high-profile matters.  *See, e.g.*, Brief of Respondent Albert Gore, Jr., *Bush v. Gore*, No. 00-949 (S.Ct. 2000) (listing Harvard Law Professor Laurence Tribe as "counsel of record" and depicting his official Harvard University office address).

testimony to a state legislature,[7] and was even retained by the state legislature to help craft legislation to protect its electoral votes.  Eastman Decl. ¶ 6.  For that "outside" work, Dr. Eastman utilized his Chapman address and Chapman email. He even utilized the research services of Chapman's library and Chapman students.  Far from being chastised for engaging in "unauthorized" work using Chapman's resources, Chapman praised Dr. Eastman's work, the national recognition of his expertise that it reflected, and the phenomenal opportunity it provided to his students.

Even if Dr. Eastman's work here was somehow "unauthorized" under Chapman's post-hoc interpretation of its rules, however, such would be irrelevant to the issue of whether Dr. Eastman and, as importantly, his clients, had a reasonable expectation of confidentiality in his email communications sent and received using Chapman's email system.  The privilege is held by the client, after all.  Cal. Evid. Code § 953; *Hunt v. Blackburn*, 128 U.S. 464, 470 (1888) ("the privilege is that of the client alone").

## VI.   The Privilege Was Not Waived Through Inclusion of Third Parties on Communications

The congressional defendants have objected to many of Plaintiff's work product designations on the ground that communications included parties outside the attorney client relationship.  However, the defendants themselves have already conceded that "unlike the attorney-client privilege, the work product privilege is

---

[7] *See* Florida Legislature Select Joint Committee on the 2000 Presidential Election, Hearing on the Matter of the Appointment of Presidential Electors (Nov. 29, 2000), available at https://www.c-span.org/video/?160847-1/manner-appointment-presidential-electors (last visited Jan. 22, 2022).

not automatically waived by any disclosure to a third party." ECF 23-1 at 21 (response to plaintiff's motion for temporary restraining order). Disclosures to a third party do not waive the work product privilege unless the third party is a "conduit" to the adversary. *United States v. Sanmina Corp*., 968 F.3d 1107, 1120 (9th Cir. 2020).

As set forth in Plaintiff's declaration, none of the third parties included on work product communications were adversaries or conduits to adversaries. To the contrary, the third parties had interests aligned with Dr. Eastman's client. Including such parties in work product communications does not waive the privilege.

## VI.  This Court Should Revisit its TRO Holding on the First Amendment

In deciding Plaintiff's privilege claims, this Court should revisit whether the defendant's subpoena violates the First Amendment. Although the Court denied this claim at the TRO stage, the issue had not been fully briefed. Moreover, Plaintiff at that point had no access to the Chapman materials which did not allow him to make a specific First Amendment claim. As the Court stated,

> In contrast to the significant public interest, Dr. Eastman has identified neither any specific associational interest threatened by production of his Chapman communications, nor any particular harm likely to result from their production. Dr. Eastman has therefore failed to make the required prima facie showing that enforcement of the subpoenas will result in (1) harassment or (2) other consequences which objectively suggest an impact, on or chilling of, his associational rights.

ECF 43 at 13 (ellipses, quotes and brackets omitted).

Having reviewed a large portion of the Chapman materials, Plaintiff is now positioned to address this concern of the Court's.

*Watkins v. United States*, 354 U.S. 178 (1957), cited in this Court's January 26 order, provides the best guidance to the Court, so we discuss it at some length. In that case, the petitioner, a labor activist, had appeared before a subcommittee of the House UnAmerican Activities Committee (HUAC).  *Id*. at 182.  The petitioner answered some questions but refused to answer others.  The petitioner stated:

> I will answer any questions which this committee puts to me about
> myself. I will also answer questions about those persons whom I knew
> to be members of the Communist Party and whom I believe still are. I
> will not, however, answer any questions with respect to others with
> whom I associated in the past. I do not believe that any law in this
> country requires me to testify about persons who may in the past have
> been Communist Party members or otherwise engaged in Communist
> Party activity but who to my best knowledge and belief have long
> since removed themselves from the Communist movement.

*Id*. at 185.

The petitioner was convicted of contempt and appealed.  In considering petitioner's claim, the Court held that, "[c]learly, an investigation is subject to the command that the Congress shall make no law abridging freedom of speech or press or assembly."  *Id*. at 197.  The Court held further that, "when First Amendment rights are threatened, *the delegation of power to the committee must*

*be clearly revealed in its charter.*" *Id*. at 198 *citing*, *United States v. Rumley*, 345 U.S. 41 (1943) (italics added).

> The Court then turned to HUAC's charter, which it quoted as follows:
> The Committee on Un-American Activities, as a whole or by subcommittee, is authorized to make from time to time investigations of (1) the extent, character, and objects of un-American propaganda activities in the United States, (2) the diffusion within the United States of subversive and un-American propaganda that is instigated from foreign countries or of a domestic origin and attacks the principle of the form of government as guaranteed by our Constitution, and (3) all other questions in relation thereto that would aid Congress in any necessary remedial legislation.

*Id*. at 202. The Supreme Court was rightly troubled by the breadth of this commission, stating "[i]t would be difficult to imagine a less explicit authorizing resolution. Who can define the meaning of 'un-American'?" *Id*. at 202.

> HUAC claimed that this resolution gave them broad powers sufficient to cover the petitioner's refused testimony, arguing that, "[the Court] must view the matter hospitably to the power of the Congress—that if there is any legislative purpose which might have been furthered by the kind of disclosure sought, the witness must be punished for withholding it."

*Id*. at 204. This is the same argument the congressional defendants raise here, and have raised in many cases across the country.

The Supreme Court was rightly skeptical of this argument, stating that:

> The consequences that flow from this situation are manifold…[t]he Committee is allowed, in essence, to define its own authority, to choose the direction and focus of its activities. In deciding what to do with the power that has been conferred upon them, members of the Committee may act pursuant to motives that seem to them to be the highest. *Their decisions, nevertheless, can lead to ruthless exposure of private lives in order to gather data that is neither desired by the Congress nor useful to it.*

*Id.* at 204-05 (italics added).

In this case, the Select Committee's resolution poses the same First Amendment risks of unrestrained congressional power that the Supreme Court identified in *Watkins*. In addition to tasking the Select Committee with investigating January 6 itself, the authorizing resolution has several phrases every bit as nebulous as those in the HUAC resolution, including those empowering the committee:

> To investigate the facts, circumstances, and the causes relating to the January 6, 2021 domestic terrorist attack…*as well as the influencing factors* that fomented such an attack on American representative democracy while engaged in a constitutional process.
>
> ***
>
> To build upon the investigations of other entities…*including investigating influencing factors related to such an attack.*

H.Res. 503, § 3 (italics added).

This broad resolution raises the exact same concerns which the Supreme Court identified in the HUAC authorizing resolution.  What possible limit could there be in a charge to investigate the "influencing factors" of a historical event such as Jan 6?  For example, some commentators have suggested that certain religious beliefs contributed to January 6.  *See,e.g.* Thomas B. Edsall, *The Capitol Insurrection Was as Christian Nationalist as it Gets*, New York Times (Jan. 28, 2021).  Is the January 6 committee therefore entitled to exercise its investigative authority to pry into the religious beliefs of certain Americans?  Other commentators have posited a link between individual financial struggles and participation in January 6.  *See*, *e.g*., Todd C. Frankel, *A majority of the people arrested for Capitol riot had a history of financial trouble*, Washington Post (Feb. 10, 2021).  Is the committee therefore empowered to pry into the financial lives of Trump supporters?

The potential scope of the committee's authority is not merely theoretical.  It is clearly illustrated in the present case.  The concern for First Amendment freedoms expressed by the *Watkins* Court in the 1950's is magnified many times over in the digital age.  Here, the select committee is using its investigatory power to seize tens of thousands of emails and attached documents from Dr. Eastman.  As is apparent from plaintiff's *in camera* productions, the committee's broad request has necessarily swept up private information from dozens of individuals.  Although these persons had no substantial connection with January 6 itself, the communications in question reveal much about these persons identities, associational choices, political beliefs and other protected First Amendment areas. In certain social and professional circles these days, having disfavored views on

the 2020 election can be as personally damaging as being labeled a communist was in the 1950's.   Disclosing this information to a committee comprised of politicians hostile to these views could expose these individuals to public scorn, job loss, harassment and even death threats.  It will have an unconstitutional chilling effect on the First Amendment.

## VII.   This Court Should Revisit the TRO Holding on the Fourth Amendment

Plaintiff's complaint alleges that the congressional defendants' subpoena violates his Fourth Amendment Rights.  Although this Court denied this claim following the TRO hearing, the issue had not been fully briefed nor, as explained below, had the full scope of the committee's subpoena been made clear.

In denying Plaintiff's Fourth Amendment claim at the TRO stage, this Court relied on two historic Supreme Court cases applying a simple overbreadth standard for Fourth Amendment analysis of congressional subpoenas.  *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 209 (1946); *McPhaul v. United States,* 364 U.S. 372, 382 (1960).

*McPhaul* and *Oklahoma Press* both predate the Supreme Court's important Fourth Amendment decisions in *Katz v. United States,* 389 U.S. 347 (1967), and *Carpenter v. United States*, 138 S. Ct. 2206 (2018).  These two decisions expanded Fourth Amendment protections.  *Katz* held that the Fourth Amendment applies where an individual has a reasonable expectation of privacy, regardless of whether there is a physical trespass.  389 U.S. 347 (1967).  *Carpenter* held that a warrant was required to access historical cell site data in the possession of a third party

phone company.  138 S. Ct. 2206 (2018).  If *McPhaul* and *Oklahoma Press* were to be decided today they would be likely to come out quite differently.

In fact, at least one court has already implicitly recognized the *de facto* obsolescence of *McPhaul* and *Oklahoma Press*.  In *Senate Select Committee on Ethics v. Packwood*, the D.C. district court considered a challenge from a sitting Senator to a congressional subpoena seeking his personal diary entries.  845 F.Supp 17 (D.C. Dist. Ct. 1994).  The Senator argued the subpoena violated his right to privacy under the Fourth Amendment *Id*. at 21.  Instead of simply applying the *McPhaul* "overbreadth" standard, the Court "balanc[ed] Senator Packwood's expectations of privacy in his personal diaries against the Ethics Committee's interest in examining them for evidence of misconduct, and the nature of the scrutiny it proposes to give them."  *Id*. at 22.  Although the court ultimately upheld the subpoena, it's analysis shows that by 1994 the *McPhaul* standard had already been recognized as superseded by more recent developments in 4th amendment law like *Katz*.

Here, it is clear that Dr. Eastman's Fourth Amendment expectations of privacy outweigh the needs of the committee.

The defendants' subpoena represents a major invasion of Dr. Eastman's private papers. The subpoena, by its terms, seeks emails from Dr. Eastman, "that are related in any way to the 2020 election or the January 6, 2021 Joint Session of Congress…during the time period November 3, 2020 to January 20, 2021."  But, as proceedings before this Court have revealed, the subpoena is actually a great deal broader than that.  As discussed at the TRO hearing, Chapman reported to the congressional defendants that there were approximately 30,000 emails "within the

date range." ECF 44 at 79  The committee provided Chapman with a list of search

terms. *Id*. Chapman "ran terms that were provided by the Committee and we

didn't really have any decision making process." *Id*. at 78. Running the search

terms reduced the number of emails from 30,000 to 19,620. *Id*.

The fact that Chapman "didn't really have any decision making process" and

simply produced documents in the date range which contained a search term is

highly significant. It effectively excised the clause "related in any way to the 2020

election or the January 6, 2021 Joint Session of Congress" from the subpoena and

replaced it with "any email within the date range that contains a search term."

The search term procedure has been represented to this court as narrowing

the subpoena but in fact the opposite is true.  The search terms (provided to

plaintiff by defendants) are in no way limited to the election or the Joint Session of

Congress. *See* Ex. 3. They greatly expanded the scope of the subpoena beyond its

original terms. The search terms are not limited to Dr. Eastman's legal theories

about the electoral college or his brief remarks on January 6. For example, the

search terms included ".gov", "antifa", "Cruz", "Hawley", "China", "Luttig", and

many other terms which might naturally return documents completely unrelated to

the election or the certification of results. The subpoena is in reality a license for

the committee to sift through several months of Dr. Eastman's political and

personal communications which may have no connection to January 6. It is a

major invasion of his Fourth Amendment expectation of privacy.

Meanwhile, the congressional defendants have not demonstrated a

compelling interest in accessing these communications. As the recent *Trump v.

Thompson* decision reminded us, the purpose of congressional investigations is to

write laws.  20 F.4th 10, 41-42 (D.C. Cir. Dec. 9, 2021).   There is no congressional "power to expose for the sake of exposure." *Watkins*, 354 U.S. at 200.  Despite several chances to do so over the course of this case, the congressional defendants have identified no piece of legislation that is being unduly delayed through want of access to Dr. Eastman's emails.  They have certainly not identified legislation which depends upon access to Dr. Eastman's correspondence about "antifa", "China", "Venezuela", or any of the other search terms.  This Court should hold that any congressional interest in Dr. Eastman's private papers that were retained (unknownst to Eastman) in stored archives by Chapman University is outweighed by Dr. Eastman's strong Fourth Amendment expectation of privacy.

## CONCLUSION

For the foregoing reasons, plaintiff requests this Court order that the materials identified on plaintiff's privilege logs are protected from disclosure to the defendants by the attorney client and work product privileges.

February 22, 2022                          Respectfully submitted,

                                           /s/*Anthony T. Caso*
                                           Anthony T. Caso (Cal. Bar #88561)
                                           CONSTITUTIONAL COUNSEL GROUP
                                           174 W Lincoln Ave # 620
                                           Anaheim, CA 92805-2901
                                           Phone: 916-601-1916
                                           Fax: 916-307-5164
                                           Email:  atcaso@ccg1776.com

<u>*/s/ Charles Burnham*</u>
Charles Burnham (D.C. Bar # 1003464)
Burnham & Gorokhov PLLC
1424 K Street NW, Suite 500
Washington, D.C. 20005
Email: charles@burnhamgorokhov.com
Telephone: (202) 386-6920

*Counsel for Plaintiff*

1

2

### CERTIFICATE OF SERVICE

I have served this filing on all counsel through the Court's ECF system.

Respectfully submitted,

/s/ Charles Burnham
Charles Burnham
BURNHAM & GOROKHOV PLLC
1424 K Street NW, Suite 500
Washington, D.C. 20005
Telephone: (202) 386-6920
Email: charles@burnhamgorokhov.com