1   OFFICE OF GENERAL COUNSEL
2   U.S. HOUSE OF REPRESENTATIVES
    5140 O'Neill House Office Building
3   Washington, D.C. 20515

4   SHER TREMONTE LLP
    90 Broad Street, 23rd Floor
5   New York, New York 10004

6   ARNOLD & PORTER
7   601 Massachusetts Ave, NW
    Washington, D.C. 20001
8

9   Counsel for the Congressional Defendants
10

11              **UNITED STATES DISTRICT COURT**

12              **CENTRAL DISTRICT OF CALIFORNIA**

13                  **SOUTHERN DIVISION**

14

15   JOHN C. EASTMAN                    Case No. 8:22-cv-00099-DOC-DFM

16          Plaintiff,                  **CONGRESSIONAL DEFENDANTS'**
                                        **BRIEF IN OPPOSITION TO**
17   vs.                                **PLAINTIFF'S PRIVILEGE**
                                        **ASSERTIONS**
18   BENNIE G. THOMPSON, *et al.*,
19                                      Date:      March 8, 2022
            Defendants.                 Time:      9:00 a.m.
20                                      Location: Courtroom 9D

21

22

23

24

25

26

27

28

─────────────────────────────────────────────────
                **DEFENDANTS' MEMORANDUM OF LAW**

# INTRODUCTION

The Select Committee is investigating the violent attack on our Capitol on January 6, 2021, and an effort by the former President of the United States to remain in office by obstructing Congress' count of the electoral votes.  Plaintiff John Eastman purports to have been the former President's lawyer in connection with that effort.  But Plaintiff's role was not simply as an advisor; he spoke at the rally on the morning of January 6, spreading proven falsehoods to the tens of thousands of people attending that rally, and appears to have a broader role in many of the specific issues the Select Committee is investigating.  The Select Committee requires a detailed understanding of all of Plaintiff's activities in order to inform Congress' legislative judgments and to help ensure that no President can threaten the peaceful transition of power ever again.

Plaintiff has already invoked his Fifth Amendment right against self-incrimination in response to 146 separate questions posed by the Select Committee.[1]  Now he is attempting to conceal a range of relevant documents behind claims of attorney-client privilege and work-product protection.  Below, the Select Committee focuses on Plaintiff's (and apparently Mr. Trump's) claims for documents dated January 4-7, 2021, and respectfully urges the Court to reject every such claim.

*First,* to the extent attorney-client privilege applies in the context of a Congressional subpoena,[2] "[a] party asserting [privilege] has the burden of establishing the relationship *and* the privileged nature of the communication."  *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009) (internal quotation omitted).  Plaintiff here fails to carry his burden of establishing the existence of a legitimate attorney-client relationship with former President Donald Trump during the period at issue.  And even if Plaintiff could make such a showing, many of the communications during this period included individuals outside of any attorney-client or confidential relationship—and Plaintiff has not demonstrated the necessary common interest arrangement with these

---

[1] Ex. A, Eastman Deposition.
[2] *Infra* at 37-39

**DEFENDANTS' MEMORANDUM OF LAW**

third parties to preserve the privilege.  And even if Plaintiff could establish an attorney-client relationship and some broad common interest agreement, Plaintiff chose to distribute these communications over an unprotected university server even after he was expressly admonished by the University President and reminded that he was not free to use University email and computers in support of a political candidate.  Finally, Plaintiff admitted that President Trump authorized him to discuss their communications in public, apparently in an effort to establish some form of defense for President Trump's conduct.  Any privilege over these subjects was, therefore, waived.

*Second*, as to work product, Plaintiff falls far short of meeting his burden to establish that the documents are prepared by party, or a party's representative, in anticipation of litigation.  Even had Plaintiff met that burden, the work product doctrine provides nothing close to absolute protection from disclosure.  Courts have already held that former President Trump's interests in secrecy of certain materials ordinarily shielded by executive privilege are outweighed by the Select Committee's interests.  *Trump v. Thompson*, No. 21-5254, 2021 U.S. App. LEXIS 36315, at *60 (D.C. Cir. Dec. 9, 2021), *stay denied*, 142 S. Ct. 680 (2022) (holding that any such privilege was overcome by the Select Committee's "uniquely compelling need," the sitting President's judgment that release was in the country's best interest, and the careful compromise negotiated between the two branches of government).  Here, Mr. Trump's (or Plaintiff's) interests in protecting work product are outweighed by the Select Committee's substantial need; the Select Committee cannot, without undue hardship, obtain their substantial equivalent by other means.

*Third*, Plaintiff's documents should be reviewed *in camera* by this Court for application of the crime/fraud exception.  The Court inquired about that exception, and the Select Committee has seriously considered that issue.[3]  Although the investigation is continuing and will provide substantial further relevant information, sufficient

---

[3] *See* Scheduling Conference Tr. 6, ECF No. 113.

**DEFENDANTS' MEMORANDUM OF LAW**

information already exists to justify *in camera* review and likely rejection of those privileges.

*Finally*, this Court should deny Plaintiff's effort to shoehorn into this current briefing on privilege issues a motion to reconsider this Court's prior constitutional holdings.

## SUMMARY OF BACKGROUND[4]

Before the 2020 election even took place, President Trump and his supporters began to lay the groundwork to cast doubt on the results.[5]  On election night, Mr. Trump began falsely asserting, without basis, that he had prevailed and called on States to stop counting mail-in and absentee votes.[6]  In the six weeks that followed, President Trump's legal team and his supporters took their allegations to the courts, ultimately litigating and losing more than 60 challenges to the election results in seven States.[7]  State Bars of both

---

[4] The Select Committee is in the midst of its investigation, but has already developed many thousands of pages of evidence.  A full recitation of that evidence—with attached exhibits—would be overwhelmingly lengthy, so the Select Committee here briefly summarizes key points relevant to the documents at issue.  The Select Committee stands ready to make further submissions on specific relevant topics of interest to the Court (under seal, if appropriate).  Order re: Prod. and Priv. Log (Jan. 26, 2022), ECF No. 50, at 3.  Several other federal courts have already summarized the events of January 6, 2021.  *See*, *e.g.*, *Trump v. Thompson*, No. 21-5254, 2021 U.S. App. LEXIS 36315 (D.C. Cir. Dec. 9, 2021), *stay denied*, 142 S. Ct. 680 (2022); *United States v. Nordean*, No. 21-175, (D.D.C.) Mem. Op. (Dec. 28, 2021) (ECF No. 263).

[5] Kevin Liptak, *A List of the Times Trump Has Said He Won't Accept the Election Results or Leave Office if He Loses*, CNN (September 24, 2020), https://www.cnn.com/2020/09/24/politics/trump-election-warnings-leaving-office/index.html.

[6] *President Trump Remarks on Election Status*, C-SPAN (November 4, 2020), https://www.c-span.org/video/?477710-1/president-trump-remarks-election-status ("This is a fraud on the American public.  This is an embarrassment to our country.  We were getting ready to win this election.  Frankly, we did win this election.").

[7] William Cummings, Joey Garrison and Jim Sergent, *By the numbers: President Donald Trump's failed efforts to overturn the election*, USA Today (Jan. 6, 2021), https://www.usatoday.com/in-depth/news/politics/elections/2021/01/06/trumps-failed-efforts-overturn-election-numbers/4130307001/.  For relevant examples of decisions

---

**DEFENDANTS' MEMORANDUM OF LAW**

New York and Washington, D.C. suspended the law license of one of President Trump's lead attorneys, Rudolph Giuliani.  *In re Rudolph W. Giuliani*, 2021 Slip Op. 04086 (N.Y. 1st Dept. June 24, 2021) (explaining that Giuliani had "communicated demonstrably false and misleading statements to courts, lawmakers and the public at large in his capacity as lawyer" and emphasizing that "[t]he seriousness of [Giuliani's] uncontroverted misconduct cannot be overstated"); *see also In re Rudolph W. Giuliani*, Order, App. D.C., No. 21-BG-423 (July 7, 2021).  Other counsel in litigation challenging the election have also faced sanctions.  *See King v. Whitmer*, 20-cv-13134,  2021 WL 3771875, at *1 (E.D. Mich. 2021). (sanctioning Lin Wood, Sidney Powell, and seven others and explaining, "[i]t is one thing to take on the charge of vindicating rights associated with an allegedly fraudulent election.  It is another to take on the charge of deceiving a federal court and the American people into believing that rights were infringed, without regard to whether any laws or rights were in fact violated.  This is what happened here").  On March 1, 2022, the State Bar of California's Chief Trial Counsel announced an investigation into Plaintiff's actions "following and in relation to the November 2020 presidential election."[8]

---

addressing President Trump's claims of fraud and irregularities, *see*, *e.g.*, *Donald J. Trump for President, Inc. v. Boockvar*, 502 F. Supp. 3d 899, 906 (M.D. Pa. 2020) ("[T]his Court has been presented with strained legal arguments without merit and speculative accusations, unpled in the operative complaint and unsupported by evidence."); *Ward v. Jackson*, No. CV-20-0343-AP/EL, 2020 Ariz. LEXIS 313, at *2, 6-7 (Dec. 8, 2020) (plaintiff failed "to present any evidence of 'misconduct,' 'illegal votes' or that the Biden Electors 'did not in fact receive the highest number of votes for office,' let alone establish any degree of fraud or a sufficient error rate that would undermine the certainty of the election results"); *Trump v. Wis. Elections Comm'n*, 506 F. Supp. 3d 620 (E.D. Wis. 2020); *Trump v. Wis. Elections Comm'n*, 983 F.3d 919, 927 (7th Cir. 2020); *Wood v. Raffensperger*, 501 F. Supp. 3d 1310, 1331 (N.D. Ga. 2020); *Wood v. Raffensperger*, 981 F.3d 1307, 1310 (11th Cir. 2020).

[8] State Bar of California, *State Bar Announces John Eastman Ethics Investigation* (Mar. 1, 2022), https://www.calbar.ca.gov/About-Us/News/News-Releases/state-bar-announces-john-eastman-ethics-investigation.  Disciplinary investigations are launched if a complainant "sufficiently alleges misconduct," including a potential interview of

---

**DEFENDANTS' MEMORANDUM OF LAW**

As the courts were overwhelmingly ruling against President Trump's claims of election misconduct, he and his associates began to plan extra-judicial efforts to overturn the results of the election and prevent the President-elect from assuming office.[9]  At the heart of these efforts was an aggressive public misinformation campaign to persuade millions of Americans that the election had in fact been stolen.  The President and his associates persisted in making "stolen election" claims even after the President's own appointees at the Department of Justice and the Department of Homeland Security, along with his own campaign staff, had informed the President that his claims were wrong.

According to the President's senior campaign advisor, soon after the election, a campaign data expert told the President "in pretty blunt terms" that he was going to lose.[10]  On November 12, 2020, the Department of Homeland Security's Cybersecurity and Infrastructure Security Agency (CISA) issued a public statement noting "unfounded claims and opportunities for misinformation" about the election, and affirming that "[t]here is no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised."[11]  The following month, Attorney General William Barr

---

complainants, and a review of open-sourced and legal documents. California State Bar, *2020 Annual Discipline Report*, at C-2 (Apr. 27, 2021), https://www.calbar.ca.gov/Portals/0/documents/reports/2020-Annual-Discipline-Report.pdf. While Plaintiff is entitled to a presumption of innocence in that process, the Bar's Chief Trial Counsel has determined that the public announcement was "warranted for protection of the public."  State Bar of California, *State Bar Announces John Eastman Ethics Investigation* (Mar. 1, 2022), https://www.calbar.ca.gov/About-Us/News/News-Releases/state-bar-announces-john-eastman-ethics-investigation (citing Cal. Bus. And Prof. Code, s. 6086.1(b)(2); State Bar Rule of Procedure 2302(d)(1).)

[9] President Trump's January 30, 2022 public statement acknowledges that he was attempting to "overturn" the election on January 6, 2021.  *See Statement by Donald J. Trump, 45th President of the United States of America*, SAVE AMERICA (Jan. 30, 2022), https://www.donaldjtrump.com/news/news-hktthafwz61481.

[10] Ex. D, Jason Miller Deposition 90-91.

[11] CISA, *Joint Statement from Elections Infrastructure Government Coordinating Council & The Election Infrastructure Sector Coordinating Executive Committees* (November 12, 2020), https://www.cisa.gov/news/2020/11/12/joint-statement-elections-infrastructure-government-coordinating-council-election (concluding that "[t]he

---

**DEFENDANTS' MEMORANDUM OF LAW**

stated publicly that the "U.S. Justice Department ha[d] uncovered no evidence of widespread voter fraud that could change the outcome of the 2020 election," a position he reiterated on December 21 when rejecting calls to appoint a special prosecutor to investigate election fraud.[12]  A senior advisor to the President's campaign agreed with Barr's analysis and said that to the President on multiple occasions.[13]

Evidence obtained by the Select Committee reveals that Acting Attorney General Jeffrey Rosen and Acting Deputy Attorney General Richard Donoghue discussed allegations of voter fraud with President Trump on multiple occasions in December of 2020—and informed him, both as to specific allegations and more generally, that the President's claims of massive fraud sufficient to overturn the election were not supported by the evidence.[14]  According to Rosen, at a December 15, 2020 meeting at the White House that included Rosen, Donoghue, Ken Cuccinelli (Department of Homeland Security), Pat Cipollone (White House Counsel), and Mark Meadows (White House Chief of Staff), participants told the President that "people are telling you things that are

---

November 3rd election was the most secure in American history," and "[t]here [wa]s no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised").

[12] Michael Balsamo, *Disputing Trump, Barr says no widespread election fraud*, ASSOCIATED PRESS (December 1, 2020); *AG Barr says he won't appoint a special counsel to investigate voter fraud*, YAHOO NEWS (December 21, 2020).  In a new book, Mr. Barr reportedly blames the President for the events of January 6, stating that Trump had "lost his grip" and that "[t]he absurd lengths to which [the President] took his 'stolen election' claim led to the rioting on Capitol Hill."  Sadie Gurman, *Ex-Attorney General William Barr Urges GOP to Move On From Trump*, WALL. ST. J. (Feb. 27, 2022), https://www.wsj.com/articles/ex-attorney-general-william-barr-urges-gop-to-move-on-from-trump-11645959600.

[13] Ex. D, Miller Tr. 118-19.

[14] *See* Interview of Jeffrey Rosen (Aug. 7, 2021), United States Senate Committee on the Judiciary, at 30, https://www.judiciary.senate.gov/rosen-transcript-final; *see also* Ex. B, Donoghue Tr. 59–62 (discussing specific allegations that Donoghue and Rosen discredited to the President, including a 68% error rate in Michigan; a truck driver who had allegedly driven ballots from New York to Pennsylvania; suitcases of fraudulent ballots allegedly counted in Georgia; and the repeated scanning of ballots, among many others).

**DEFENDANTS' MEMORANDUM OF LAW**

not right."[15]  According to Donoghue, he personally informed the President on a December 27, 2020 phone call "in very clear terms" that the Department of Justice had done "dozens of investigations, hundreds of interviews," had looked at "Georgia, Pennsylvania, Michigan, Nevada" and concluded that "the major allegations are not supported by the evidence developed."[16]

The President nevertheless continued to insist falsely through January that he had "won the election in a landslide." And despite being repeatedly told that his allegations of campaign fraud were false, the President continued to feature those same false allegations in ads seen by millions of Americans.[17]  (The Select Committee will address these issues in detail in hearings later this year.)


As the President and his associates propagated dangerous misinformation to the public, Plaintiff was a leader in a related effort to persuade state officials to alter their election results based on these same fraudulent claims.

President Trump, Plaintiff, and several other associates of the President reached out directly to state officials to communicate unsubstantiated allegations of election fraud

---

[15] Interview of Jeffrey Rosen (Aug. 7, 2021), United States Senate Committee on the Judiciary, at 30, https://www.judiciary.senate.gov/rosen-transcript-final.

[16] *Id.* at 59-60; *see also id.* at 61-62 (reflecting Donoghue's notes of a phone call, which state, "Told [the President] flat out that much of the information he's getting is false and/or just not supported by the evidence.  We look[ed] at the allegations but they don't pan out.").  *See also* Interview of Richard Donoghue (Aug. 6, 2021), United States Senate Committee on the Judiciary, at 59, 156, https://www.judiciary.senate.gov/richard-donoghue-transcript.

[17] *See* Alex Wayne, Mario Parker, and Mark Niquette, *Trump Campaign to Run Ads Promoting Effort to Overturn Election*, Bloomberg (Dec. 11, 2020), https://www.bloomberg.com/news/articles/2020-12-11/trump-campaign-to-run-ads-promoting-effort-to-overturn-election; Donald J. Trump, The evidence is overwhelming – FRAUD!, FACEBOOK, https://www.facebook.com/DonaldTrump/videos/1803802073100806/; Donald J. Trump, Stop the Steal, FACEBOOK, https://www.facebook.com/officialteamtrump/videos/711114792881749/.

**DEFENDANTS' MEMORANDUM OF LAW**

and request that state legislatures disregard popular election results.[18]  On January 2, 2021, the President and Plaintiff convened a video conference with hundreds of state legislators from swing states won by candidate Biden.[19]  The Trump team reportedly urged the legislators to "decertify" the election results in their States.[20]  According to Michigan State Senator Ed McBroom, this call focused (without any valid legal or factual basis) on the purported power of state legislators to reject the rulings of federal and state courts and overturn already certified election results.[21]  That same day, President Trump spoke with Georgia Secretary of State Brad Raffensperger, pressing false and unsubstantiated claims of election fraud, and ultimately asking Raffensperger to "find 11,780 votes" for Trump in the State.[22]

President Trump also took steps that would have corrupted the Department of Justice; he offered the role of Acting Attorney General to another Justice Department

---

[18] The Select Committee has interviewed a number of state officials, and their accounts are consistent with the press reports cited in the paragraph that accompanies this footnote. Plaintiff has claimed privilege over several communications with state legislators referring to potential legislative action.  *See, e.g.*, 024762 ("Comm with agent of potential client re statistical report in anticipation of legislative action or litigation."); 024778 ("Comm with co-counsel re possible legislative action in support of pending litigation").

[19] M. Leahy, *President Trump Joins Call Urging State Legislators to Review Evidence and Consider Decertifying 'Unlawful' Election Results*, BREITBART (Jan. 3, 2021), https://www.breitbart.com/politics/2021/01/03/president-trump-joins-call-urging-state-legislators-to-review-evidence-and-consider-decertifying-unlawful-election-results/; *see also* J. Alemany, *Ahead of Jan. 6, Willard Hotel in Downtown DC was a Trump Team 'Command Center' for Effort To Deny Trump the Presidency*, WASHINGTON POST (Oct. 23, 2021), https://www.washingtonpost.com/investigations/willard-trump-eastman-giuliani-bannon/2021/10/23/c45bd2d4-3281-11ec-9241-aad8e48f01ff_story.html.

[20] J. Alemany, *Ahead of Jan. 6, Willard Hotel in Downtown DC was a Trump Team 'Command Center' for Effort To Deny Trump the Presidency*, WASHINGTON POST (Oct. 23, 2021), https://www.washingtonpost.com/investigations/willard-trump-eastman-giuliani-bannon/2021/10/23/c45bd2d4-3281-11ec-9241-aad8e48f01ff_story.html.

[21] *Id.*

[22] A. Gardner, *Here's the full transcript and audio of the call between Trump and Raffensperger*, Washington Post (Jan. 5, 2021), https://www.washingtonpost.com/politics/trump-raffensperger-call-transcript-georgia-vote/2021/01/03/2768e0cc-4ddd-11eb-83e3-322644d82356_story.html.

**DEFENDANTS' MEMORANDUM OF LAW**

political appointee, Jeffrey Clark, knowing that Mr. Clark was pressing to issue official letters to multiple state legislatures falsely alerting them that the election may have been stolen and urging them to reconsider certified election results.[23]  The Department's senior leadership and President Trump's White House Counsel threatened to resign if President Trump elevated Clark and fired those who were resisting Clark's requests.[24]

Mr. Trump's team also mounted an effort to obtain false election certificates purporting to demonstrate that the electors of seven States were committed to President Trump rather than President Biden.  (The Select Committee has deposed several signers of these false certificates, and plans to interview others.)  Michigan Republican Co-Chair, Meshawn Maddock publicly stated, for example, that she "fought to seat the electors" because "the Trump campaign asked us to do that."[25]  The certificates included false statements that they were official.[26]

When the Electoral College met on December 14, 2020, and confirmed the certified results of the election, the results of the election should have been final.  But Plaintiff advised President Trump to press an unconstitutional plan to disregard those

---

[23] *See* Ex. B, Donoghue Tr. 77-81, 123-24 (discussing the proposed letter to states and Oval Office meeting).

[24] Ex. C, Rosen Tr. at 105-106, 118; Ex. B, Donoghue Tr. 125-27.

[25] *MAGA confession: Trump lawyer admits fraudulent electors plot*, MSNBC (Jan. 21, 2022), https://www.msnbc.com/the-beat-with-ari/watch/maga-confession-trump-lawyer-admits-fraudulent-electors-plot-131436613579.

[26] Five of the seven certificates submitted to federal officials on behalf of Trump-Pence electors in the States falsely claimed to be "the duly elected and qualified Electors for President and Vice President of the United States of America from the State of [Arizona, Georgia, Michigan, Nevada, Wisconsin]." Ex. E, NARA Unofficial Certificates. The certificate submitted on behalf of the Trump-Pence electors in two other States included language indicating that the undersigned electors "might later be determined [to be]" (Pennsylvania) or may "ultimately [be] recognized as" (New Mexico) the duly elected and qualified electors. Ex. E, NARA production 37941, 37944, 37945, 37946, 37947, 38948, 37949.

**DEFENDANTS' MEMORANDUM OF LAW**

results on January 6.[27]   The text of the Twelfth Amendment to the Constitution clearly

describes Congress's obligation to count certified electoral votes: "The President of the

Senate shall, in the presence of the Senate and House of Representatives, open all the

certificates and the votes shall then be counted; the person having the greatest Number of

votes for President, shall be the President."   U.S. Const., amend. XII.   Nothing in the

Constitution permits Congress or the presiding officer (the President of the Senate,

Michael R. Pence) to refuse to count certified electoral votes in this context, yet that is

precisely what Plaintiff suggested.   Plaintiff's proposal was the subject of heated

discussions in the White House in the days before January 6, including with the Vice

President's legal counsel and others who told Plaintiff that what he was proposing was

illegal.[28]

This did not deter either Plaintiff or President Trump.   Describing his own

proposals in a now-public memorandum, Plaintiff characterized his proposed options as

"BOLD, Certainly," but necessary because "this Election was Stolen by a strategic

Democrat plan to systematically flout existing election laws for partisan advantage,"

advising that "we're no longer playing by Queensbury Rules."[29]

---

[27] *See* Ex. F, Jacob Tr. 89-96.   Plaintiff's proposals, in the form of two memoranda, are
now in the public domain.   *See READ Trump lawyer's memo on six-step plan for Pence
to overturn the election*, CNN (September 21, 2021),
https://www.cnn.com/2021/09/21/politics/read-eastman-memo/index.html and Jan. 3
Memo on Jan. 6 Scenario, CNN,
http://cdn.cnn.com/cnn/2021/images/09/21/privileged.and.confidential.--
.jan.3.memo.on.jan.6.scenario.pdf (provided by Plaintiff to CNN per CNN reporting, *see*
Tweet by @jeremyherb, Sept. 21, 2021 at 5:46PM,
https://twitter.com/jeremyherb/status/1440432387263922185).

[28] *See, e.g.*, Ex. F, Jacob Tr. 105-11, 127-28.

[29] *Id.*   The Marquess of Queensberry rules are "a code of fair play presumed to apply in
any fight" and were developed to regulate boxing matches. *Marquis of Queensberry
Rules*, Merriam-Webster, https://www.merriam-
webster.com/dictionary/Marquis%20of%20Queensberry%20rules.

**DEFENDANTS' MEMORANDUM OF LAW**

Following this advice from Plaintiff—advice that Plaintiff admitted no member of the Supreme Court would accept[30]—President Trump repeatedly attempted to instruct, direct, or pressure the Vice President, in his capacity as President as of the Senate, to refuse to count the votes from six States.  For example, on January 4, 2021, President Trump and Plaintiff met with Vice President Pence and his staff.  In that meeting, according to one participant, Plaintiff tried to persuade the Vice President to take action on the electors.[31]  Again the next day, Plaintiff tried to persuade the Vice President and his staff that the Vice President should reject certain electors.[32]

The pressure continued on January 6.  At 1:00 a.m., President Trump tweeted, "If Vice President @Mike_Pence comes through for us, we will win the Presidency . . . Mike can send it back!"[33]  At 8:17 a.m., the President tweeted, "States want to correct their votes . . . All Mike Pence has to do is send them back to the States, AND WE WIN.  Do it Mike, this is a time for extreme courage!"[34]  Shortly after this tweet, President Trump placed a phone call to Vice President Pence.[35]  He later connected with the Vice President by phone around 11:20 a.m.[36]  General Keith Kellogg and others were with President Trump during that call, and General Kellogg described the pressure that Trump put on Pence:

---

[30] Ex. F, Jacob Tr. 109-11, 117 ("[Plaintiff] had acknowledged that he would lose 9-0 at the Supreme Court.").

[31] Ex. F  at 82, 95.

[32] *Id.* at 92.

[33] Twitter, @realdonaldtrump "Donald J. Trump" Jan. 6, 2021 1:00:50 AM EST, https://web.archive.org/web/20210106060056/https://twitter.com/realdonaldtrump/status/1346698217304584192.

[34] Twitter, @realdonaldtrump "Donald J. Trump" Jan. 6, 2021 8:17:22 AM EST, https://web.archive.org/web/20210106131747/https://twitter.com/realdonaldtrump/status/1346808075626426371.

[35] Ex. I, Short Tr. 12.

[36] Ex. H, Private Schedule, P-R000285 (handwritten notes on President's private schedule indicate call with VPOTUS at 11:20 AM)]; *see also* Ex. I, Short Tr. at 16; Ex. F, Jacob Tr. 168.

**DEFENDANTS' MEMORANDUM OF LAW**

Q:  It's also been reported that the President said to the Vice President that
something to the effect of, "You don't have the courage to make a hard
decision."  And maybe not those exact words, but something like that.  Do
you remember anything like that?

A:  Words—and I don't remember exactly either, but something like that,
yeah.  Like you're not tough enough to make the call.[37]

In his speech to the crowd and television crews that came to the capital on January
6, President Trump explicitly identified the advice given by Plaintiff Eastman when
imploring Vice President Pence:

John [Eastman] is one of the most brilliant lawyers in the country and he
looked at this, and he said what an absolute disgrace that this could be
happening to our Constitution, and he looked at Mike Pence, and I hope Mike
is going to do the right thing.  I hope so.  I hope so because if Mike Pence
does the right thing, we win the election. . . . And Mike Pence, I hope you're
going to stand up for the good of our Constitution and for the good of our
country.  And if you're not, I'm going to be very disappointed in you.[38]

Vice President Pence had repeatedly made clear that he would not unilaterally
reject electors or return them to the states.[39]  Nevertheless, just before President Trump
spoke, Plaintiff falsely alleged widespread manipulation and fraud with voting machines,
purportedly altering the election outcome, and then delivered this message to the crowd:

And all we are demanding of Vice President Pence is this afternoon at 1:00
he let the legislators of the state look into this so we get to the bottom of it,
and the American people know whether we have control of the direction of
our government, or not.  We no longer live in a self-governing republic if we
can't get the answer to this question.  This is bigger than President Trump.  It
is a very essence of our republican form of government, and it has to be done.

---

[37] Ex. G, Kellogg Tr. 87, 90-92.

[38] Donald J. Trump Speech on January 6, 2021.  The speech transcript can be found at
https://wehco.media.clients.ellingtoncms.com/news/documents/2021/01/13/Trump_Jan._
6_speech.pdf.

[39] *See, e.g.*, Ex. I, Short Tr. 26-27.

**DEFENDANTS' MEMORANDUM OF LAW**

And anybody that is not willing to stand up to do it, does not deserve to be in the office.  It is that simple.[40]

Shortly thereafter—with the assault on the United States Capitol already underway—Trump tweeted at 2:24 p.m., "Mike Pence didn't have the courage to do what should have been done to protect our Country and our Constitution, giving States a chance to certify a corrected set of facts, not the fraudulent or inaccurate ones which they were asked to previously certify.  USA demands the truth!"[41]  The evidence obtained by the Select Committee indicates that President Trump was aware that the violent crowd had breached security and was assaulting the Capitol when Mr. Trump tweeted.[42]  The evidence will show that rioters reacted to this tweet, resulting in further violence at the Capitol.[43]  Indeed, rioters at the Capitol were shouting for the Vice President to be

---

[40] John Eastman at January 6 Rally, C-SPAN, https://www.c-span.org/video/?c4953961/user-clip-john-eastman-january-6-rally.
Rudy Giuliani likewise described this plan in his January 6, 2021 rally speech.  *See* Rudy Giuliani Speech, March for Trump, (Jan. 6, 2021) ("[Vice President Pence] can decide on the validity of these crooked ballots, or he can send it back to the legislators, give them five to 10 days to finally finish the work."), https://www.rev.com/blog/transcripts/rudy-giuliani-speech-transcript-at-trumps-washington-d-c-rally-wants-trial-by-combat.
[41] Tweet by @realDonaldTrump "Donald J. Trump" Jan. 6, 2021 2:24:22PM ET, https://web.archive.org/web/20210106192450/https://twitter.com/realdonaldtrump/status/1346900434540240897.
[42] *See, e.g.*, Ex. J, Williamson Tr. 60-65.
[43] *See United States of America v. Derrick Evans*, https://www.justice.gov/usao-dc/pressrelease/file/1351946/download ("They're making an announcement right now saying if Pence betrayed us you better get your mind right because we're storming that building."); *United States of America v. Marhsall Neefe and Charles Bradford Smith*, https://www.justice.gov/usaodc/case-multi-defendant/file/1432686/download ("Then we heard the news on [P]ence . . . And lost it . . . So we stormed."); *United States of America v. Joshua Matthew Black*, https://www.justice.gov/opa/page/file/1354806/download ("Once we found Pence turned on us and that they had stolen the election, like officially, the crowd went crazy.  I mean, it became a mob.  We crossed the gate.").

**DEFENDANTS' MEMORANDUM OF LAW**

hanged.[44]  A minute after President Trump's tweet, Plaintiff sent an email to Vice

President Pence's lawyer stating:  "The 'siege' is because YOU and your boss did not do

what was necessary to allow this to be aired in a public way so the American people can

see for themselves what happened."[45]

Later that evening, Plaintiff made a final plea to the Vice President's lawyer:  "I

implore you to consider one more relatively minor violation [of the Electoral Count Act]

and adjourn for 10 days to allow the legislatures to finish their investigations, as well as

to allow a full forensic audit of the massive amount of illegal activity that has occurred

here."[46]  Plaintiff *knew* what he was proposing would violate the law, but he nonetheless

urged the Vice President to take those actions.

The Vice President rejected Plaintiff's pleas that he violate the law, and has since

indicated that what the President and Plaintiff were insisting he do was "Un-American."[47]

Former Fourth Circuit Judge Michael Luttig—for whom Plaintiff had previously worked

as a law clerk—described Plaintiff's view of the Vice President's authority as "incorrect

at every turn."[48]  Evidence obtained by the Select Committee to date indicates that

President Trump's White House Counsel confronted Plaintiff before the rally, and

rejected Plaintiff's advice to Mr. Trump.  And Plaintiff admitted that not a single Justice

of the Supreme Court would agree with his view that the Vice President could refuse to

count certain electoral votes.[49]

---

[44] A. Parker,  *How the rioters who stormed the Capitol came dangerously close to Pence*,
Washington Post (Jan. 15, 2021), https://www.washingtonpost.com/politics/pence-
rioters-capitol-attack/2021/01/15/ab62e434-567c-11eb-a08b-f1381ef3d207_story.html.
[45] Ex. L (005379, Email from John Eastman (via his Chapman University email account)
to Gregory Jacob on January 6, 2021, 12:25 p.m. MST).
[46] Exs. L, M (005479, Email from John Eastman (via his Chapman University email
account) to Gregory Jacob on January 6, 2021, 9:44 p.m. MST).
[47] *See Pence slams Trump for 'un-American' bid to overturn vote*, BBC News (Feb. 4,
2022), https://www.bbc.com/news/av/world-us-canada-60268412.
[48] Tweets by @judgeluttig, Sept. 21, 2021 at 11:50 PM,
https://twitter.com/judgeluttig/status/1440523766920933389.
[49] Ex. F, Jacob Tr. 117.

**DEFENDANTS' MEMORANDUM OF LAW**

As documents now available to the Select Committee demonstrate, Plaintiff used his Chapman University email account to email Greg Jacob, Counsel to the Vice President, on January 5 and 6 urging the Vice President to take illegal action and refuse to count electoral votes.[50]

\*     \*     \*

The Select Committee's investigation is continuing to gather evidence on the planning for the violent assault, communications between those who participated, and communications by the Trump team from the Willard war room and elsewhere.  Various individuals planned for violence that day, including with the placement of pipe bombs, the accumulation of weaponry for potential use on January 6 across the river in Virginia, and the use of tactical gear and other weaponry.[51]  Evidence also indicates that the violent rioters who attacked police, breached the Capitol, and obstructed and impeded the electoral vote were provoked by President Trump's fraudulent campaign to persuade the American people that the election was in fact stolen.[52]  Indeed, the President's rhetoric

---

[50] Exs. L, M [Chapman005235, Chapman005236, Chapman005479].

[51] *See* Grand Jury Indictment, *United States v. Crowl et al.*, No. 21-cr-28-APM (Jan 12, 2022), available at: https://www.justice.gov/opa/press-release/file/1462476/download ("Rhodes and certain regional leaders of the Oath Keepers began recruiting others to travel to Washington, D.C., to participate in operations aimed at stopping the transfer of presidential power.  They coordinated travel across the country to enter Washington, D.C., equipped themselves with a variety of weapons, donned combat and tactical gear, and were prepared to answer Rhodes's call to take up arms at Rhodes's direction.  Some also amassed firearms on the outskirts of Washington, D.C., distributed them among 'quick reaction force' ('QRF') teams, and planned to use the firearms in support of their plot to stop the lawful transfer of presidential power.").

[52] *See United States v. Chrestman*, No. 1:21-mj-00218 (DDC), https://www.justice.gov/usao-dc/defendants/chrestman-william; K. Polantz, , *Sobbing Capitol rioter described his assault of police Officer Michael Fanone: 'My God. What did I just do?'*, CNN (December 1, 2021) (rioter charged with assaulting Metropolitan Police Department Officer Michael Fanone on January 6 with an "electroshock weapon" told investigators: "Trump called us.  Trump called us to D.C. . . .  If he's the commander in chief and the leader of our country, and he's calling for help—I thought he was calling

---

15

**DEFENDANTS' MEMORANDUM OF LAW**

persuaded thousands of Americans to travel to Washington for January 6, some of whom marched on the Capitol, breached security, and took other illegal actions.  The Select Committee's hearings will address those issues in detail.

Ultimately, President Trump issued a video and a tweet urging the rioters to leave the Capitol, stressing "[w]e love you, you're very special.  You've seen what happens, you see the way others are treated that are so bad and so evil.  I know how you feel."[53]  At 6:00 p.m., the President tweeted: "These are the things and events that happen when a sacred landslide election victory is so unceremoniously & viciously stripped away from great patriots who have been badly & unfairly treated for so long.  Go home with love & in peace.  Remember this day forever!"[54]

The January 6 attack resulted in multiple deaths, physical harm to more than 140 law enforcement officers, and trauma among government employees, press, and

---

for help"); *United States v. Grayson*, No. 1:21-mj-00163 (DDC), https://www.justice.gov/opa/page/file/1360506/download; *United States v. Cua*, No. 21-CR-107 (DDC), https://www.justice.gov/usao-dc/case-multi-defendant/file/1365571/download; Sergeant Aquilino Gonell Testimony, House Select Committee to Investigate the January 6th Attack on the United States Capitol, *The Law Enforcement Experience on January 6th* (July 27, 2021) (Capitol Police Sergeant Aquilino Gonell testifying that during hand-to-hand combat with rioters "all of them, all of them, were telling us 'Trump sent us.'"").  A number of defendants in pending criminal cases have identified President Trump's allegations about the "stolen election" as a motivation for their activities at the Capitol; several also specifically cite President Trump's tweets asking that supporters come to Washington, D.C. on January 6.  *See, e.g.*, *United States v. Sandlin*, https://www.justice.gov/opa/page/file/1362396/download: ("I'm going to be there to show support for our president and to do my part to stop the steal and stand behind Trump when he decides to cross the rubicon."); *United States v. Neefe et al.*, https://www.justice.gov/usao-dc/case-multi-defendant/file/1432686/download ("Trump is literally calling people to DC in a show of force. Militias will be there and if there's enough people they may fucking storm the buildings and take out the trash right there.'").
[53] *President Trump Video Statement on Capitol Protesters*, C-Span (Jan. 6, 2021), https://www.c-span.org/video/?507774-1/president-trump-claims-election-stolen-tells-protesters-leave-capitol.
[54] Tweet by @realDonaldTrump "Donald J. Trump" Jan. 6, 2021 6:01:04 PM ET, https://web.archive.org/web/20210106230114/https://twitter.com/realdonaldtrump/status/1346954970910707712

**DEFENDANTS' MEMORANDUM OF LAW**

Members of Congress.  *See* H. Res. 503, Preamble.  Law enforcement eventually cleared
the rioters, and the electoral count successfully resumed at 8:06 p.m. in the Senate after a
nearly six-hour delay.

## **PROCEDURAL HISTORY**

        In furtherance of its duty to investigate the facts, circumstances, and causes of the
attack on January 6, the Select Committee has issued subpoenas to various government
agencies, private companies, and numerous individuals, including Plaintiff and his
former employer, Chapman University.  In a cover letter accompanying the subpoena at
issue here, Chairman Thompson explained that the Select Committee had "credible
evidence" that Plaintiff knew about, and "may have participated in, attempts to encourage
the Vice President of the United States to reject the electors from several states or, at the
very least, to delay the electoral college results to give states more time to submit
different slates of electors."  Nov. 8, 2021 Select Committee Cover Letter to Eastman at
1.[55]  Chairman Thompson noted that Plaintiff wrote "two memoranda offering several
scenarios for the Vice President to potentially change the outcome of the 2020
Presidential election."  *Id.*  Chairman Thompson also explained that Plaintiff had
"participated in a briefing for nearly 300 state legislators from several states regarding
purported election fraud," "testified to Georgia state senators regarding alleged voter
fraud and reportedly shared a paper that argued that the state legislature could reject
election results and directly appoint electors," was "at the Willard Hotel 'war room' with
Steve Bannon and others on the days leading up to January 6 where the focus was on
delaying or blocking the certification of the election," and on January 6, "spoke at the
rally at the White House Ellipse."  *Id.* at 2.

        After Plaintiff refused to produce any documents responsive to a subpoena issued
to him directly (which is not before this Court), and invoked the Fifth Amendment

---

[55]     *Available at* https://perma.cc/ZV8J-P2QS.

**DEFENDANTS' MEMORANDUM OF LAW**

privilege against forced self-incrimination repeatedly during his deposition, the Select Committee issued a separate subpoena to Chapman for certain documents in its possession "attributable to Dr. John Eastman, that are related in any way to the 2020 election or the January 6, 2021 Joint Session of Congress." Compl. Ex. B at 4, ECF No. 1-2. That subpoena requested documents from November 3, 2020 to January 20, 2021. *Id.* The deadline to produce the subpoenaed documents was January 21, 2022. *Id.* at 3.

The day before the subpoena's deadline, Plaintiff initiated this action and sought to enjoin Chapman from producing responsive records. In his application for emergency injunctive relief, Plaintiff made broad assertions of attorney-client privilege without identifying individual communications to which these privileges applied. This Court granted Plaintiff's request for a four-day *ex parte* temporary restraining order until the parties appeared for a January 24 hearing to discuss Plaintiff's request for a temporary restraining order. *See* Civil Minutes, Jan. 20, 2022, ECF No. 12.

At the January 24 hearing, the parties agreed that Plaintiff would expeditiously produce a privilege log with particularized assertions of privilege. The Court denied Plaintiff's application to maintain the temporary restraining order, rejected his First Amendment, Fourth Amendment, and Congressional authority claims, and ordered Plaintiff to produce all non-privileged, responsive documents to the Select Committee on a rolling basis. The Court also denied Plaintiff's blanket attorney-client privilege and attorney work product protection claims with the proviso that Plaintiff retained the right to raise these claims as to specific documents during production. *See* Order, Jan. 25, 2020, ECF No. 43.

Although Plaintiff produced the requested logs, those logs failed to provide sufficient information to allow the Select Committee to assess the privilege assertions' validity. After several efforts to secure adequate information from Plaintiff, Congressional Defendants asked this Court to establish a briefing schedule to address Plaintiff's outstanding privilege assertions and the insufficiency of the information provided on his daily logs. *See* Notice, Feb. 11, 2022, ECF No. 101. This Court granted

**DEFENDANTS' MEMORANDUM OF LAW**

that request as to the privilege assertions on Plaintiff's January 4-7 document logs and set a hearing to address these issues.  *See* Civil Minutes, Feb. 14, 2022, ECF No. 104.  At Congressional Defendants' request, the Court also ordered Plaintiff to produce "evidence of all attorney-client and agent relationships asserted in the privilege log," including "evidence documenting any attorney-client relationships that existed with his clients." *Id.*  The Court's order did not address motions for reconsideration.

## STANDARD OF REVIEW

"As with all evidentiary privileges, the burden of proving that the attorney-client privilege applies rests not with the party contesting the privilege, but with the party asserting it."  *Weil v. Inv./Indicators, Rsch. & Mgmt., Inc.*, 647 F.2d 18, 25 (9th Cir. 1981) (citations omitted); *United States v. Richey*, 632 F.3d 559, 566 (9th Cir. 2011). The same is true of the work product doctrine.  *United States v. City of Torrance*, 163 F.R.D. 590, 593 (C.D. Cal. 1995); *Cameron v. City of El Segundo*, No. 20-CV-04689, 2021 WL 3466324, at *12 (C.D. Cal. Apr. 30, 2021).  "Evidentiary privileges in litigation" like those at issue here "are not favored."  *Herbert v. Lando*, 441 U.S. 153, 175 (1979).

"[A] party asserting the attorney-client privilege has the burden of establishing the relationship *and* the privileged nature of the communication."  *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009) (internal quotation omitted).  "Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed."  *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002), *as amended on denial of reh'g* (Mar. 13, 2002) (internal quotation omitted).

## ARGUMENT

"[T]he power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function."  *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927).  Inherent in this investigative authority, Congress can compel production of documents and testimony through legislative subpoenas.  It should now be beyond dispute that the Select Committee is operating properly with an appropriate legislative

**DEFENDANTS' MEMORANDUM OF LAW**

purpose.  Order, Dkt. No. 43 at 10 (holding that "the issues surrounding the 2020 election and the January 6th attacks" are "clearly 'subjects on which legislation could be had'"); *see also Thompson*, No. 21-5254, 2021 U.S. App. LEXIS 36315, at *6 (describing "Congress's uniquely vital interest in studying the January 6th attack on itself to formulate remedial legislation and to safeguard its constitutional and legislative operations).

## I.   Plaintiff Has Not Met His Burden to Establish Application of the Common Law Attorney-Client Privilege

### A.   Plaintiff Has Neither Met His Burden to Establish the Attorney-Client Relationship Nor Has He Sufficiently Established the Privileged Nature of the Communications

Plaintiff claims that "[t]he attorney-client relationship between Dr. Eastman and President Trump should be beyond dispute," Br. at 11, and declares that he filed briefs on behalf of the Trump campaign in state litigation in December 2020.  Pl.'s Ex. 1, Eastman Decl. ¶ 20.  But Plaintiff does not even attempt in his declaration to claim attorney-client privilege over the relevant matters and the relevant time at issue here.

Over the past months, the Congressional Defendants repeatedly asked Plaintiff to disclose the engagement letters that show the identity of his client and the period of the representation.  Ex. 1, Email Exchange Between Douglas Letter and Charles Burnham.  Appended to his declaration, Plaintiff finally revealed what he purports is an engagement letter.  That letter identifies the client as "Donald J. Trump for President, Inc."  Ex. A to Ex. 1 at 1.  But—despite a clearly delineated signature page with lines for the client and attorney to sign—that letter is unsigned.  Ex. A to Ex. 1 at 4.  *See In re W/B Assocs.*, 307 B.R. 476, 483 (Bankr. W.D. Pa. 2004), *aff'd sub nom. Est. Partners, Ltd. v. Leckey*, No. 04CV1404, 2005 WL 4659380 (W.D. Pa. Aug. 31, 2005), *aff'd sub nom. In re W/B Assocs.*, 196 F. App'x 105 (3d Cir. 2006) ("An unsigned agreement, in and of itself, raises material questions as to its validity and applicability."); *Solis v. Taco Maker, Inc.*, No. 1:09-CV-3293, 2013 WL 4541912, at *5 (N.D. Ga. Aug. 27, 2013) (unsigned

engagement letter insufficient to establish attorney client relationship).[56]  And Plaintiff provided no declaration from his client regarding the scope of his representation.

The lack of signatures is critical because the letter itself states that it becomes operative "[u]pon the proper signatures by all parties hereto."  Ex. A to Ex. 1 at 1.  By the terms of the letter, therefore, the absence of signatures suggests the letter was not operative.  Plaintiff's declaration, moreover, does not authenticate this unsigned letter, nor does Plaintiff include the cover email by which the engagement letter was "transmitted."  Ex. 1, Eastman Decl.  ¶ 23.[57]  Although Plaintiff had the burden to establish the elements of the privilege in his opening brief, this unsigned and unauthenticated engagement letter is insufficient to establish an attorney-client relationship during the period at issue (January 4 through 7) as to either President Trump the individual or President Trump's campaign.  Any belated effort to cure this defect in his reply by appending a signed engagement letter or the cover email to the letter should not be permitted.  *See U.S. ex rel. Giles v. Sardie*, 191 F. Supp. 2d 1117, 1127 (C.D. Cal. 2000) ("It is improper for a moving party to introduce new facts or different legal arguments in the reply brief than those presented in the moving papers.").

Nor can Plaintiff meet his burden by noting his involvement prior to the election in a so-called "Election Integrity Working Group." Ex. 1, Eastman Decl. ¶ 25.  No documentation accompanies this assertion, which in any event provides no indication that

---

[56]  Plaintiff emphasizes his appearances in a number of cases, but simply naming these cases does not meet Plaintiff's burden to show that the disputed communications related to any of those cases.  One of the cases had already concluded before the time at issue here, *see State of Texas v. Commonwealth of Pennsylvania, et al.*, No. 22O155 (motion for leave to file a bill of complaint denied on December 11, 2020), and nowhere do Plaintiff's privilege logs identify communications linked to either of the other cases.

[57]  Plaintiff had the burden to establish the elements of the privilege in his opening brief.  Any belated effort to cure this defect in his reply by appending a signed engagement letter or the cover email to the letter should not be permitted.  *See U.S. ex rel. Giles v. Sardie*, 191 F. Supp. 2d 1117, 1127 (C.D. Cal. 2000) ("It is improper for a moving party to introduce new facts or different legal arguments in the reply brief than those presented in the moving papers.").

---

21

**DEFENDANTS' MEMORANDUM OF LAW**

Plaintiff had a relevant attorney-client relationship during January 4 through January 7. "[T]he burden of establishing the existence of the relationship rests on the claimant of the privilege against disclosure. That burden is not, of course, discharged by mere conclusory or ipse dixit assertions, for any such rule would foreclose meaningful inquiry into the existence of the relationship, and any spurious claims could never be exposed." *In re Bonanno*, 344 F.2d 830, 833 (2d Cir. 1965). Nor does Plaintiff provide any basis to conclude that the "Working Group" was providing legal advice at the client's request.

Furthermore, 004722, 004723, 004744, 004745, 004766, 004767, and 004788 were received by various third parties, and Plaintiff fails to meet his burden to show that such disclosure did not destroy the privilege. "[V]oluntarily disclosing privileged documents to third parties will generally destroy the privilege." *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1126–27 (9th Cir. 2012); *see also Reiserer v. United States*, 479 F.3d 1160, 1165 (9th Cir. 2007) ("there is no confidentiality where a third party . . . either receives or generates the documents"). "Because the attorney-client privilege applies only where the communication between attorney and client is confidential, there is no privilege protecting the documents the [Select Committee] seeks in the present action." *Reiserer*, 479 F.3d at 1165.

"The mere presence of a third party at an attorney-client meeting does not necessarily destroy the privilege," *United States v. Landof*, 591 F.2d 36, 39 (9th Cir. 1978) because "[t]he attorney-client privilege may extend to communications with third parties who have been engaged to assist the attorney in providing legal advice," *Richey*, 632 F.3d at 566. But "a shared desire to see the same outcome in a legal matter is insufficient to bring a communication between two parties within this [common interest] exception." *In re Pac. Pictures Corp.*, 679 F.3d at 1129. To invoke the common interest exception, "the parties must make the communication in pursuit of a joint strategy in accordance with some form of agreement—whether written or unwritten." *Id.* Moreover, "[a] person who is not represented by a lawyer and who is not himself or herself a lawyer cannot participate in a common-interest arrangement." Restatement

**DEFENDANTS' MEMORANDUM OF LAW**

(Third) of the Law Governing Lawyers § 76 (2000); *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 365 (3d Cir. 2007), *as amended* (Oct. 12, 2007) (common interest privilege "only applies when clients are represented by separate counsel").[58]

Plaintiff makes no effort to meet his burden of establishing that the third-party recipients of his emails were retained to assist Plaintiff in providing legal advice, nor does he even try to establish that Plaintiff and these parties had "some form of agreement" to pursue a joint legal strategy. *In re Pac. Pictures Corp.*, 679 F.3d at 1129. This Court instructed Plaintiff to "file with the Court and the Select Committee evidence of all attorney-client and agent relationships asserted in the privilege log." Order, ECF No. 104. ¶ 2. Plaintiff did not identify a single common interest agreement. Plaintiff's self-serving assertion of a common interest "on information and belief" and conclusory claims about a general common interest—as opposed to an actual agreement—do not satisfy his burden to show that these third parties were brought within the ambit of the privilege such that inclusion of these third parties did not destroy any privilege. Br. 17-21; *see also, e.g.*, *Sony Computer Ent. Am., Inc. v. Great Am. Ins. Co.*, 229 F.R.D. 632, 634 (N.D. Cal. 2005) ("Where a third party is present, no presumption of confidentiality obtains, and the usual allocation of burden of proof, resting with the proponent of the

---

[58]  *See also Sec. & Exch. Comm'n v. Aequitas Mgmt., LLC*, No. 16-CV-438, 2017 WL 6329716, at *3 (D. Or. July 7, 2017), *objections overruled,* 2017 WL 6328150 (D. Or. Dec. 11, 2017) (common interest privilege "only applies when clients are represented by separate counsel"); *Swortwood v. Tenedora de Empresas, S.A. de C.V.*, No. 13CV362, 2014 WL 895456, at *4 (S.D. Cal. Mar. 6, 2014), *clarified on denial of reconsideration sub nom. Swortwood v. Empresas*, No. 13CV362, 2014 WL 12026069 (S.D. Cal. Apr. 18, 2014) ("Since Mr. Diez Barroso was not individually represented by counsel, Defendant can not establish the applicability of the common interest doctrine."); *Finisar Corp. v. U.S. Bank Tr. Nat. Ass'n*, No. C 07-04052, 2008 WL 2622864, at *4 (N.D. Cal. June 30, 2008) ("Under the strict confines of the common interest doctrine, the lack of representation for the remaining parties vitiates any claim to a privilege.") (quoting *Cavallaro v. United States*, 153 F. Supp. 2d 52, 61 (D. Mass. 2001), aff'd, 284 F.3d 236 (1st Cir. 2002)); *OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*, No. CV-14-085, 2015 WL 11117150, at *2 (E.D. Wash. June 1, 2015) (for common interest to apply, "[t]he communications, however, must be shared by attorneys for the separate parties").

---

**DEFENDANTS' MEMORANDUM OF LAW**

privilege, applies in determining whether confidentiality was preserved under [the relevant privilege statute]."); *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1427 (3d Cir. 1991) (voluntary disclosure to third party waives attorney-client privilege even if third party agrees not to further disclose communication).[59]

Ninth Circuit precedent is clear: "A party claiming the privilege must identify specific communications and the grounds supporting the privilege as to each piece of evidence over which privilege is asserted." *Martin*, 278 F.3d at 1000. Plaintiff's privilege log and brief instead summarily label a multitude of documents as privileged without properly identifying a client, establishing the advice as legal (as opposed to political or strategic), or showing that the third parties included on the communication were agents of the client. Such "[b]lanket assertions [of privilege] are 'extremely disfavored.'" *Id.* (quoting *Clarke v. Am. Com. Nat'l Bank*, 974 F.2d 127, 129 (9th Cir.1992)). Accordingly, Plaintiff's attorney-client claims must be rejected.

In addition, to the extent that the Court finds that Plaintiff was providing advice on political or campaign strategy rather than law, the communications are not privileged, because "advice on political, strategic, or policy issues . . . would not be shielded from disclosure by the attorney-client privilege." *In re Lindsey*, 148 F.3d 1100, 1106 (D.C. Cir. 1998); *Md. Restorative Just. Initiative v. Hogan*, No. 16-01021, 2017 WL 4280779, at *3 (D. Md. Sept. 27, 2017) ("A claim of attorney-client privilege is only legitimate where the client has sought the giving of *legal*, not *political*, advice.").

---

[59] "It is appropriate that the proponent of the privilege has the burden of proving that a third party was present to further the interest of the proponent because, in this situation, where the privilege turns on the nature of the relationship and content of communications with the third party in question, the proponent is in the better posture to come forward with specific evidence explaining why confidentiality was not broken." *Sony Computer Ent. Am., Inc.*, 229 F.R.D. at 634 n.1.

**DEFENDANTS' MEMORANDUM OF LAW**

## B.    Plaintiff Cannot Invoke Attorney-Client Privilege Over Documents on Chapman's Server[60]

"Confidentiality is an aspect of a communication that must be shown to exist to bring the communication within the attorney-client communication privilege.  When the confidentiality element is not shown to exist, the assertion of the attorney-client privilege to safeguard a communication from disclosure, is improper."  *Long v. Marubeni Am. Corp.*, No. 05CIV.639, 2006 WL 2998671, at *3 (S.D.N.Y. Oct. 19, 2006) (use of employer email or internet not privileged when policy disclaimed any right to personal privacy and company retained right to monitor data flowing through its systems).

As the Supreme Court explained, an employee's expectation of privacy "may be reduced by virtue of actual office practices and procedures, or by legitimate regulation." *O'Connor v. Ortega*, 480 U.S. 709, 717 (1987).  In the context of email communication over an employer's email system, "the question of privilege comes down to whether the intent to communicate in confidence was objectively reasonable."  *Doe 1 v. George Washington Univ.*, 480 F. Supp. 3d 224, 226 (D.D.C. 2020), *reconsideration denied*, — F. Supp. 3d —, 2021 WL 5416631 (D.D.C. Nov. 19, 2021) (quoting *Convertino v. U.S. Dep't of Just.*, 674 F. Supp. 2d 97, 110 (D.D.C. 2009)); *see also In re Asia Glob. Crossing, Ltd.*, 322 B.R. 247, 258 (Bankr. S.D.N.Y. 2005).

Courts confronting the issue have applied four factors: "(1) does the corporation maintain a policy banning personal or other objectionable use, (2) does the company monitor the use of the employee's computer or e-mail, (3) do third parties have a right of access to the computer or e-mails, and (4) did the corporation notify the employee, or was the employee aware, of the use and monitoring policies?"  *George Washington Univ.*, 480 F. Supp. 3d at 226 (quoting *In re Asia Glob. Crossing, Ltd.*, 322 B.R. at 257). These factors point to the conclusion that any intent Plaintiff may have had to communicate confidentially over the Chapman server was not objectively reasonable.

---

[60]  Plaintiff's assertion that the Congressional Defendants waived this argument, Br. 22-23, is addressed at 53-57, *infra*.

Chapman's Computer and Network Policy directly undermines any purported expectation of confidentiality.  That policy is clear: "Users should not expect privacy in the contents of University-owned computers or e-mail messages."  *Policies and Procedures: Computer and Network Acceptable Use Policy*, Chapman University, https://perma.cc/7ZUA-ZALN (last visited Mar. 2, 2022) (emphasis added).

The policy also expressly bans personal use on its network and computing systems. *Id.* (all university computing and network systems and services are a "University-owned resource and business tool to be used only by authorized persons for educational purposes or to carry out the legitimate business of the University").  And through its policy, Chapman reserves "the right to retrieve the contents of University-owned computers and e-mail messages for legitimate reasons."  *Id.*

Chapman's policy is notable in that, in response to the known risks to privilege posed by university email policies, many other universities have in the past decade developed policies that are more protective of user privacy.[61]   The use of "bare-bones-no-privacy policies" like Chapman's, in which users are warned "that they do not have an expectation of privacy," is followed by only a "small minority" of universities.  Sisk & Halbur, *supra* at n.61, at 1297, 1301; *Policies and Procedures: Computer and Network*

---

[61]  *See, e.g.*, UCLA Policy 410: Nonconsensual Access to Electronic Communications Records (effective on Aug. 16, 2010) (requiring the consent of the user before accessing electronic communications records except in exceptional circumstances), https://perma.cc/3CP4-QSYD; Stanford Administrative Guide, Privacy and Access to Electronic Information 6.1.1 (last updated on Oct. 4, 2016) (acknowledging the importance of users' right to privacy and requiring the consent of the user before accessing electronic communications except in exceptional circumstances), https://perma.cc/E4C5-Z37P; *see generally* American Bar Association, Standing Committee on Ethics and Professional Responsibility, Formal Opinion 11-459 (2011) https://perma.cc/VF5N-VFFB; State Bar of California, Standing Committee on Professional Responsibility and Conduct, Formal Opinion 2010-179 §3(a)(iii) (2010), https://perma.cc/6737-D8NV; G. Sisk & N. Halbur, *A Ticking Time Bomb? University Data Privacy Policies and Attorney-Client Confidentiality in Law School Settings*, 2010 Utah L. Rev. 1277 (2010).

**DEFENDANTS' MEMORANDUM OF LAW**

*Acceptable Use Policy*, Chapman University ("Users should not expect privacy in the contents of University-owned computers or e-mail messages").

Plaintiff was notified of Chapman's relatively stringent policy and can be presumed to be aware of the it.  Plaintiff served on the Chapman faculty for over twenty years and was previously the Dean of Chapman's law school.  According to the University, whenever Plaintiff logged on to Chapman's network during the relevant period he received a "splash screen" message stating: "Use of this computer system constitutes your consent that your activities on, or information you store in, any part of the system is subject to monitoring and recording by Chapman University or its agents, consistent with the Computer and Acceptable Use Policy without further notice."  Decl. of Janine DuMontelle ¶ 6, ECF No. 17-1.

Moreover, in reference to Plaintiff's representation of President Trump in Supreme Court litigation, Chapman's President publicly emphasized the university's "clear policies in place regarding outside activity," explaining that "acting privately, Chapman faculty and staff are not free to use Chapman University's email address, physical address or telephone number in connection with the support of a political candidate." Dawn Bonker, *President Struppa's Message on Supreme Court Case*, Chapman University (Dec. 10, 2020), https://perma.cc/3CTG-4DBN.

At this Court's hearing on January 15, Chapman's counsel emphasized that President Trump "was not a clinic client, nor would he have been eligible to be a clinic client of Chapman," that Plaintiff's representation of the President was "improper" and "unauthorized," and that Plaintiff's use of his Chapman account for such representation was like "having contraband on our system."  Hearing Tr. Re: Pl.'s App. for TRO at 29.

Putting all of this together, Plaintiff certainly had no legitimate expectation of confidentiality during the dates at issue here—January 4-7, 2021—nearly one month after the University President's public statement.

Plaintiff insists that this Court should disregard Chapman's policy because Plaintiff is a professor, not a student.  The information provided by the university to this

Court provides no indication that this makes any difference.  To the contrary, less than a month before the period at issue here, Chapman's President admonished Plaintiff's use of the Chapman server and email address for the very purpose used here, and was crystal clear that the policy applied to "*faculty and staff*."  *See* Bonker, *supra* (emphasis added).

Plaintiff's reliance on *Convertino v. U.S. Dep't of Just.*  is misplaced.  *Convertino*, like the cases the Congressional Defendants cite above, holds that "for documents sent through e-mail to be protected by the attorney-client privilege there must be a subjective expectation of confidentiality that is found to be objectively reasonable."  674 F. Supp. 2d at 110.  "Because his expectations were reasonable," the District Court for the District of Columbia held in that situation that "[the official's] private e-mails will remain protected by the attorney-client privilege."  *Id.*  Here, by contrast, Plaintiff had no reasonable expectation that his documents would remain protected.  Not only was the University's policy clear, but any expectation of confidentiality was manifestly unreasonable following the admonishment by Chapman's President.  *See* Bonker, *supra*.

For the same reason, *United States v. Long*, 64 M.J. 57 (C.A.A.F. 2006) is inapposite.  *See* Br. at 28 (relying on *Long*).  Applying a clearly erroneous standard, the Court of Appeals for the Armed Forces concluded there that the lower court did not err in finding a subjective expectation of privacy because "the agency [had a] practice of recognizing the privacy interest of users in their e-mail."  *Long*, 64 M.J. at 63.  By contrast, here, as we have highlighted, the University President (in specific reference to Plaintiff and his political work for President Trump) emphasized that Plaintiff and other faculty had staff had no privacy interest.  This fact is also fatal to Plaintiff's reliance on his prior practices violating Chapman's policy.  *See* Br. 29-30.

Likewise, Plaintiff's suggestion that his unauthorized use of Chapman's system is "irrelevant" because "[t]he privilege is held by the client," Br. 30, makes little legal difference.  As the Ninth Circuit has recognized, "[t]here are several instances in which an attorney's behavior may waive the privilege, even without an explicit act by the client."  *In re Pac. Pictures Corp.*, 679 F.3d at 1130.  Plaintiff's decision to continue

**DEFENDANTS' MEMORANDUM OF LAW**

using a server and email account in an unauthorized way after being specifically

admonished by the University President against doing so is precisely such an instance

where, as the attorney, Plaintiff's actions defeated application of the privilege.

## C.  President Trump Waived Privilege By Expressly Asking for Disclosure to Third Parties

"[A] fundamental prerequisite to assertion of the privilege" is "confidentiality both

at the time of the communication and maintained since." *Coastal States Gas Corp. v.*

*Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980).  "Voluntary disclosure of

privileged communications constitutes waiver of the privilege for all other

communications on the same subject."  *Richey*, 632 F.3d at 566 (citation omitted); *see*

*also United States v. Sanmina Corp.*, 968 F.3d 1107, 1116 (9th Cir. 2020).

Plaintiff has stated publicly that President Trump authorized Plaintiff's discussion

of advice relating to the election and the events leading up to January 6.  Two

memoranda that Plaintiff wrote outlining how former Vice President Pence could

overturn the results of the Presidential election are already in the public domain and have

been provided to the media, and discussed, by Plaintiff.[62]

Plaintiff discussed the advice in his legal memo at length on a podcast, noting that

Plaintiff himself provided the memorandum to author Bob Woodward, and saying at the

outset that Mr. Trump had "authorized" him "to talk about these things."[63]  Plaintiff has

also made extensive public remarks regarding the events of January 6 and his advice to

President Trump on numerous other occasions.[64]  These "[v]oluntary

---

[62] *READ Trump lawyer's memo on six-step plan for Pence to overturn the election*, CNN
(Sept. 21, 2021), https://perma.cc/LP48-JRAF; Jan. 3 Memo on Jan. 6 Scenario, CNN,
https://perma.cc/B8XQ-4T3Z (provided by John Eastman to CNN per CNN reporting,
*see* Jeremy Herb (@jeremyherb), Twitter (Sept. 21, 2021, 5:46 PM),
https://perma.cc/GX4R-MK9B.

[63] *Another Way: Discussing the John Eastman Memo with Eastman*, Equal Citizens
(Sept. 27, 2021), https://perma.cc/A2RZ-MFWP.

[64] *See, e.g.*, M. Schmidt , *The Lawyer Behind the Memo on How Trump Could Stay in
Office*, N.Y. Times (Oct. 2, 2021),https://perma.cc/9BQQ-5Y39; John McCormack, *John*

**DEFENDANTS' MEMORANDUM OF LAW**

disclosure[s] . . . constitute[] waiver of the privilege for all other communications on the same subject" of the events surrounding the January 6, 2021 joint session of Congress. *United States v. Richey*, 632 F.3d at 566.

Plaintiff asserts that "[t]he statements about President Trump attributed to Dr. Eastman by the defendants make no reference to privilege," Br. 24, but nowhere does he cite authority that waiver must make explicit reference to privilege.  And, undermining Plaintiff's representation, Plaintiff indeed recognized the privileged nature of attorney-client relationships.  On May 5, 2021, Plaintiff appeared on the Peter Boyles Show and stated that "I would normally not talk about a private conversation I have with a client, but I have express authorization from my client, the President of the United States at the time, to describe what occurred—to truthfully describe what occurred in that conversation."[65]

Plaintiff states the unremarkable proposition that "[c]ourts have long recognized that disclosure of privileged information on a particular subject does not necessarily imply a complete waiver of the privilege."  Br. 25.[66]  But no one here has asserted a "complete waiver of the privilege."  At issue is former President Trump's waiver of the subject matter of issues the events of January 6 and Plaintiff's advice about the effort to interfere with the counting of the electoral votes on January 6 in violation of the Electoral Count Act.

Plaintiff insists that this statement does not waive privilege because his "statements in the very same interview that the conversation in question occurred in the presence of

---

*Eastman vs. the Eastman Memo,* Nat'l Rev. (Oct. 22, 2021), https://perma.cc/VD6N-R9Q9; John C. Eastman, *John Eastman: Here's the Advice I Actually Gave Vice President Pence on the 2020 Election*, Sacramento Bee (Oct. 7, 2021), https://www.sacbee.com/opinion/op-ed/ai1icle2548 l 2552.html.

[65] *Peter Boyles Show: Peter Boyles May 5 8am*, 710KNUS News/Talk (May 5, 2021), https://perma.cc/Q6YE-KD5F.

[66] Plaintiff relies on *Weil*, 647 F.2d at 25, which is inapposite.  Whereas *Weil* involved a company's *inadvertent* disclosure, Plaintiff's disclosure was both intentional and repeated.

**DEFENDANTS' MEMORANDUM OF LAW**

three non-clients in addition to the President."  Br. 24.  Waiver, however, does not attach
to individual "conversations;" instead, it applies to "all other communications *on the
same subject*."  *Richey*, 632 F.3d at 566 (emphasis added and citation omitted).  President
Trump—presumably for strategic and political gain—approved of Plaintiff's public
disclosures of his advice on the subject of the effort to interfere with the counting of the
electoral votes on January 6 in violation of the Electoral Count Act.  He cannot now
come back and reclaim privilege over communications "on the same subject."  *Richey*,
632 F.3d at 566.  Neither former President Trump nor Plaintiff can use attorney-client
privilege "both as a sword and a shield."  *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156,
1162 (9th Cir. 1992) (citation omitted); *In re EchoStar Commc'ns Corp.*, 448 F.3d 1294,
1301-02 (Fed. Cir. 2006).

## II.  The Documents Sought from Chapman Are Not Protected by the Common Law Attorney Work-Product Doctrine

"The work-product doctrine is a qualified privilege that protects from discovery
documents and tangible things prepared by a party or his representative in anticipation of
litigation."  *Sanmina Corp.*, 968 F.3d at 1119 (internal quotation marks and citation
omitted).  To qualify for work-product protection, documents must: "(1) be prepared in
anticipation of litigation or for trial and (2) be prepared by or for another party or by or
for that other party's representative."  *Richey*, 632 F.3d at 567  (internal quotation marks
and citation omitted).

"The party claiming work product immunity has the burden of proving the
applicability of the doctrine."  *Verizon California Inc. v. Ronald A. Katz Tech. Licensing,
L.P.*, 266 F. Supp. 2d 1144, 1147 (C.D. Cal. 2003) (citations omitted).  The work product
doctrine does not protect against disclosure if the party seeking the discovery "has
substantial need for the materials to prepare its case and cannot, without undue hardship,
obtain their substantial equivalent by other means."  Fed. R. Civ. P. 26(b)(3)(ii).  Plaintiff
fails both steps of the test.  *First*, he fails to satisfy his burden to invoke the work product
doctrine because he cannot show that the disputed materials were prepared in anticipation

of litigation (as opposed to political purposes).  *Second*, Plaintiff fails to undercut the Select Committee's substantial need for the documents.

### A.     Plaintiff Failed To Meet His Burden To Invoke The Work Product Doctrine

Plaintiff has failed to meet his burden to establish that these materials were prepared in anticipation of litigation, as opposed to primarily for another purpose. Numerous documents make no reference to any pending litigation and or anticipated litigation for which these materials were prepared.[67]  Indeed, Plaintiff emphasized "[t]he main thing here is that Pence should do this without asking for permission—either from a vote of the joint session *or from the Court*."[68] (emphasis added).

Even if litigation was of some concern, Plaintiff does not prove that these materials were created "because of" the prospect of litigation—Plaintiff does not and cannot establish that these documents "would not have been created in substantially similar form but for the prospect of . . . litigation." *Am. C.L. Union of N. California v. United States Dep't of Just.*, 880 F.3d 473, 485-86 (9th Cir. 2018); *United States v. Richey*, 632 F.3d 559, 568 (9th Cir. 2011).  Congressional Defendants believe that many (if not the vast majority) of the communications at issue involved efforts to interfere with the counting of the electoral votes on January 6 in violation of the Electoral Count Act.  *See* 20-24,

---

[67] *See* 004494; 004496; 004547; 004553; 004707; 004708; 004713; 004720; 004721; 004722; 004723; 004744; 004745; 004766; 004767; 004788; 004789; 004790; 004791; 004792; 004793; 004794; 004827; 004828; 004833; 004834; 004835; 004839; 004841; 004963; 004964; 004976; 004977; 004979; 004990; 004992; 005011; 005012; 005014; 005017; 005018; 005023; 005024; 005045; 005046; 005061; 005064; 005066; 005067; 005068; 005091; 005094; 005096; 005097; 005101; 005113; 005114; 005130; 005131; 005134; 005135; 005154; 005155; 005156; 005157; 005158; 005159; 005160; 005161; 005248; 005249; 005251; 005252; 005261; 005268; 005283; 005299; 005300; 005329; 005338; 005412; 005423; 005424; 005433; 005484; 005488; 005489; 005490; 005491; 005492; 005498; 005510; 005515; 005519; 005547; 005551; 005578; 005667; 005668; 005672; 005676; 005677; 005678; 005680; 005704; 005874; 005876; 006023; 006024; 006028; 006032; 006035; 006039; 006041; 006591; 006592; 006601.

[68] *See supra* n.27.

**DEFENDANTS' MEMORANDUM OF LAW**

*supra.*   There is no reason to believe that such communications would not have been "created in substantially similar form" absent the possibility that litigation would somehow ensue.  Plaintiff's repeated and unsupported assertions that the documents were prepared "in anticipation of litigation" do not make it so.

Furthermore, it would pervert the purpose of the work-product doctrine to allow Plaintiff to claim protection for his advice aimed at—to put it bluntly—overturning a democratic election.  Because the purpose of the work-product doctrine "is to protect the integrity of the adversary process[,] ... it would be improper to allow an attorney to exploit the privilege for ends that are antithetical to that process."  *United States v. Christensen*, 828 F.3d 970, 1010 (9th Cir. 2015) (quoting *Parrott v. Wilson*, 707 F.2d 1262, 1271 (11th Cir. 1983)); *see also* 38-53, *infra* (discussing the crime-fraud doctrine).  Conduct that is "merely unethical, as opposed to illegal" is "enough to vitiate the work product doctrine" here.  *Id.*  As noted above, *see* n.8 *supra*, Plaintiff is currently the subject of a California State Bar ethics investigation.

Second, Plaintiff fails to establish that all the documents over which he asserts work-product protection were "prepared by or for another party or by or for that other party's representative."  *Richey*, 632 F.3d at 567.  In numerous documents, Plaintiff has asserted privileges over communications with like-minded lawyers, pundits, and "scholar advisors" that purportedly contain work product prepared on behalf of President Trump. [69]  Plaintiff's overreach here is twofold.  First, the paltry descriptions in his privilege claims can scarcely support a claim that his own communications were work product for

---

[69] *See* 004494; 004496; 004547; 004707; 004722; 004723; 004744; 004745; 004766; 004767; 004788; 004789; 004790; 004791; 004792; 004793; 004794; 004833; 004834; 004835; 004839; 004841; 004963; 004964; 004976; 004977; 004979; 004990; 004992; 005011; 005012; 005014; 005023; 005024; 005061; 005130; 005131; 005134; 005135; 005248; 005249; 005251; 005252; 005261; 005268; 005283; 005299; 005300; 005329; 005338; 005423; 005424; 005433; 005484; 005488; 005489; 005490; 005491; 005492; 005498; 005510; 005515; 005519; 005547; 005551; 005578; 005668; 005672; 005676; 005677; 005678; 005680; 005874; 005876; 006023; 006024; 006028; 006032; 006035; 006039; 006041; 006591; 006592; 006601.

**DEFENDANTS' MEMORANDUM OF LAW**

a client, rather than mere discussions about the election with like-minded correspondents. *See, e.g.,* 023956 (describing a communication "re legal perspectives on the election and possible litigation"). Second, Plaintiff's correspondents themselves are often not lawyers, *e.g.*, 005338; even when they are—and even when they are lawyers working on election-related matters—he has not met his burden to demonstrate that they were generating work product on behalf of President Trump. Indeed, Plaintiff has presented no evidence that he had an agent relationship with any of these people, despite this Court's order instructing Plaintiff to "file with the Court and the Select Committee evidence of all attorney-client and agent relationships asserted in the privilege log." Order, ECF No. 104. ¶ 2. In his declaration (Ex. 1 Eastman Decl. ¶ 29), he claims to have communicated extensively with "statistical and other experts," but makes no attempt to show that these people—or any of the others on his logs—had agent or attorney-client relationships. Plaintiff cannot retrospectively designate communications with ideological or political confreres as deserving work-product protection absent establishing that those people were representatives of his client.

   Finally, Plaintiff waived any claim to work product protection when he shared these materials with "potential adversaries." *Sanmina*, 968 F.3d at 1121. *See, e.g.*, 004494 (journalists); 005489 ("advisor[s]"); 005283 ("scholar advisors"); 024795 ("legislative allies"). Not only is Plaintiff's disclosure "inconsistent with the maintenance of secrecy," *id.*, Plaintiff acted with complete disregard of the maintenance of secrecy against someone with interests that were potentially adverse to his or those of his client, especially Congress. *See United States v. Caldwell*, 7 F.4th 191, 207 (4th Cir. 2021) ("[W]hen an attorney freely and voluntarily discloses the contents of otherwise protected work product to someone with interests adverse to his or those of the client,

**DEFENDANTS' MEMORANDUM OF LAW**

. . . he may be deemed to have waived work product protection.") (quoting *In re Doe*, 662 F.2d 1073, 1081 (4th Cir. 1981)).[70]

For example, in 004494-95 and 004496-538, Plaintiff lists as "W/P" an email exchange with ██████████████████████████. Plaintiff cannot claim work product protection over an email with a journalist, who could well have published the exchange.[71]  Plaintiff's

> voluntary disclosure of his alleged work product to present or potential adversaries, in this instance, constituted a waiver of the work product privilege.  It was [Plaintiff's] self-interested decision to disclose information to [the Vice President, his staff, and state officials] so as to [facilitate reversal of the election result].  Yet, [Plaintiff] now seeks work product protection for those same disclosures and documents against different adversaries in suits revolving around the same matters disclosed[.]

*Loustalet v. Refco, Inc.*, 154 F.R.D. 243, 248 (C.D. Cal. 1993).  The work-product doctrine does not stretch that far.

Further, whether Plaintiff "intended that result or not," work-product protection should cease here because fairness requires it.  *Sanmina*, 968 F.3d at 1122.  When assessing the fairness principle underlying waivers, "the overriding concern in the work-product context is not the confidentiality of a communication, but the protection of the

---

[70] To the extent the work product doctrine can apply to legislative subpoenas, the term "potential adversaries" should be read broadly.  Plaintiff cannot have it both ways:  He cannot apply a *litigation* privilege to a *legislative* subpoena but at the same time restrict waiver of that privilege to *litigation* adversaries.

[71] *See Flaherty v. Seroussi*, 209 F.R.D. 300, 307 (N.D.N.Y. 2002) ("dissemination of materials prepared by plaintiff's counsel to the media is conceptually inconsistent with his claim that those documents provide an indication of his closely guarded trial strategy, and should therefore be shielded from disclosure"); *Anderson v. SeaWorld Parks & Ent., Inc.*, 329 F.R.D. 628, 637 (N.D. Cal. 2019) ("Work product protection does not attach to an attorney's work directing a public relations campaign, nor is there any expectation of confidentiality where [attorney] directed the consultants to share the list with a journalist."); *Montesa v. Schwartz*, No. 12CIV6057, 2016 WL 3476431, at *9 (S.D.N.Y. June 20, 2016) ("Plaintiffs cannot argue that their adversaries in this litigation were not substantially more likely to obtain this information by virtue of its disclosure to a journalist, who very well could have published this entire e-mail exchange.")

**DEFENDANTS' MEMORANDUM OF LAW**

adversary process." *Id.* at 1124.  Here, Plaintiff's selective disclosure of information he now contends is work product weighs heavily against applying the protection.[72]  Plaintiff "cannot be allowed, after disclosing as much as he pleases, to withhold the remainder." *Weil v. Inv./Indicators, Rsch. & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981).

"[U]nder the totality of the circumstances, [Plaintiff] acted in such a way that is inconsistent with the maintenance of secrecy" against the Select Committee regarding the contested documents.  *Sanmina*, 968 F.3d at 1124.

## B.  The Select Committee Has A Substantial Need For The Documents And Cannot Obtain The Substantial Equivalent Of The Documents Without Undue Hardship

Even had Plaintiff sufficiently invoked the work product doctrine, the Select Committee has a substantial need for the documents and cannot, without undue hardship, obtain their substantial equivalent by other means.  *See Admiral Ins. Co. v. U.S. Dist. Court for Dist. of Arizona*, 881 F.2d 1486, 1494 (9th Cir. 1989) ("work-product materials nonetheless may be ordered produced upon an adverse party's demonstration of substantial need or inability to obtain the equivalent without undue hardship").  "The undue hardship prong examines the burden obtaining the information from an alternate source would impose on the party requesting discovery." *Fletcher v. Union Pac. R.R. Co.*, 194 F.R.D. 666, 671 (S.D. Cal. 2000).

Here, the Select Committee has already sought the materials from an alternate source: Chapman University.  This case involves Plaintiff's attempt to impede the Select Committee from obtaining the documents from that alternate source.  Even if some third source were available for the requested documents, Plaintiff would likely attempt to prevent disclosure in that circumstance as well.  Because the disputed documents are pivotal to the Select Committee's investigation and it would be nearly impossible to access these communications otherwise, the work product doctrine does not apply.  *See*

---

[72] It also indicates that these documents were created for political or strategic purposes and not "because of" anticipated litigation. *Am. C.L. Union of N. California*, 880 F.3d at 485-86.

**DEFENDANTS' MEMORANDUM OF LAW**

*U.S. v. McGraw-Hill Companies, Inc.*, 2014 WL 8662657, at *6-7 (C.D. Cal.) (party established entitlement to opinion work product by showing (1) it would be nearly impossible to get these communications otherwise; (2) the work product was pertinent to the party's "most salient defense"; and (3) the attorney's mental impressions were a pivotal issue).

Plaintiff was a central figure in the effort to encourage the former Vice President to reject the electors from several states and in the strategy to facilitate different slates of electors. He may also have played other important roles in the events under investigation. Plaintiff's "strategy, mental impressions and opinion" concerning these efforts "are directly at issue" in the Select Committee's investigation. *Reavis v. Metro. Prop. & Liab. Ins. Co.*, 117 F.R.D. 160, 164 (S.D. Cal. 1987). The Select Committee, therefore, has a substantial need for these materials.[73]

Plaintiff claims that Congressional Defendants have "offered no argument or evidence of the Select Committee's need for any of these particular documents in pursuit of any valid legislative purpose, much lass [*sic*] a need that would qualify as substantial or compelling in support of a legislative purpose." Br. 16. Congressional Defendants cannot specifically address documents they have not seen, many of which are scantly described in the privilege logs. *See, e.g.*, 004707 ("[c]omm with co-counsel"); 004494 ("[c]omm re statistical evidence"); 004708 ("[c]omm with co-counsel re legal advice"); 004720 ("comm with co-counsel re legal strategy"); 005874 ("comm re fact information"); 004964 ("[a]ttachment"). But as this Court has noted, Plaintiff's "actions clearly fall within the bounds of an investigation into 'the influencing factors that fomented such an attack on American representative democracy,'" ECF No. 43 at 9 (Jan.

---

[73] Plaintiff's privilege log does little to reveal whether the materials he seeks to withhold are ordinary work product or opinion work product. The Select Committee, however, meets either test: It has both a "substantial need" and a "compelling need" for the materials sought. *Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573, 577 (9th Cir. 1992) ("opinion work product may be discovered and admitted when mental impressions are at issue in a case and the need for the material is compelling").

**DEFENDANTS' MEMORANDUM OF LAW**

25, 2022) (quoting H.R. Res. 503 § 3(1)) and "there are numerous plausible legislative measures that could relate to Dr. Eastman's communications," *id.* at 10.  The pressing need to complete a full investigation into an unprecedented attack on American democracy by reviewing documents involving a key participant is both substantial and compelling.[74]

## III.   The Court Should Review the Documents *In Camera* Under the Crime Fraud Exception

Communications in which a "client consults an attorney for advice that will serve him in the commission of a fraud or crime" are not privileged from disclosure.  *In re Grand Jury Investigation*, 810 F.3d 1110, 1113 (9th Cir. 2016) (internal quotations omitted).  This exception to the attorney-client privilege applies where (1) "the client was engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme," and (2) the attorney-client communications for which production is sought are "sufficiently related to" and were made "in furtherance of [the] intended, or present, continuing illegality."  *Id.* at 381-83 (internal quotation marks omitted).

It bears emphasizing that this is true even if "the attorney is unaware that his advice may further an illegal purpose."  *United States v. Laurins*, 857 F.2d 529, 540 (9th Cir. 1988), *cert. denied*, 492 U.S. 906 (1989).  And it is likewise true where the crime or

---

[74] Congress has consistently taken the view that its investigative committees are not bound by judicial common law privileges such as the attorney-client privilege or the work product doctrine.  *See generally*, Congressional Research Service, Congressional Oversight Manual 61-62 (March 21, 2021).  This aspect of Congress's investigative authority is rooted in the separation of powers inherent in the Constitution's structure.  *Id.*  Congress and its committees make decisions regarding such common law privileges by balancing the important institutional, constitutional, and individual interests at stake on a case-by-case basis.  Here, Congressional Defendants have determined, consistent with their prerogatives, not to submit an argument on this point.  This is not, however, intended to indicate, in any way, that Congress or its investigative committees will decline to assert this institutional authority in other proceedings.

fraud is ultimately unsuccessful. *In re Grand Jury Proceedings (Corporation)*, 87 F.3d 377, 382 (9th Cir. 1996).

Critically for this case, an *in camera* review of the documents is warranted when the party seeking production has provided "a factual basis adequate to support a good faith belief by a reasonable person that in camera review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *United States v. Zolin*, 491 U.S. 554, 572 (1989) (citation omitted). That standard has plainly been met here. As discussed in the Background section above, evidence and information available to the Committee establishes a good-faith belief that Mr. Trump and others may have engaged in criminal and/or fraudulent acts, and that Plaintiff's legal assistance was used in furtherance of those activities. Accordingly, this Court should conduct an *in camera* review of the documents to determine whether the crime-fraud exception applies.

### A.        Obstruction of an Official Proceeding

The evidence detailed above provides, at minimum, a good-faith basis for concluding that President Trump has violated section 18 U.S.C. § 1512(c)(2). The elements of the offense under 1512(c)(2) are: (1) the defendant obstructed, influenced or impeded, *or attempted* to obstruct, influence or impede, (2) an official proceeding of the United States, and (3) that the defendant did so corruptly. *Id.* (emphasis added). To date, six judges from the United States District Court for the District of Columbia have addressed the applicability of section 1512(c) to defendants criminally charged in connection with the January 6th attack on the Capitol. Each has concluded that Congress's proceeding to count the electoral votes on January 6th was an "official proceeding" for purposes of this section, and each has refused to dismiss charges against defendants under that section.[75]

---

[75] *United States v. DeCarlo*, No. 21-73, (D.D.C.) Minute Entry (Jan. 21, 2022) (rejecting motion to dismiss for "the reasons stated on the record," after deciding to rule orally "rather than adding a sixth written opinion to those already excellent opinions written by my colleagues"); *United States v. Nordean*, No. 21-175, (D.D.C.) Mem. Op., at 9-12

**DEFENDANTS' MEMORANDUM OF LAW**

Section 1512(c) requires a nexus between the obstructive conduct and a "specific official proceeding" that was either "pending or was reasonably foreseeable[.]"  *United States v. Lonich*, 2022 U.S. App. LEXIS 623*, at *49-*50 (9th Cir. 2022).  The statutory definition of "official proceeding" includes proceedings of various kinds, one of which (as noted above) is "a proceeding before the Congress[.]"  18 U.S.C. § 1515(a)(1)(B).  Although the Ninth Circuit has not defined "corruptly," as used in Section 1512(c), it has held that the *mens rea* component of Section 1512(c) is, if anything, more than satisfied simply by proving that a person acted with "consciousness of wrongdoing."  *Lonich*, 2022 U.S. App. LEXIS 623*, at *52-*53; *see also United States v. Watters* 717 F.3d 733, 735 (9th Cir. 2013) (upholding district court's jury instructions).  Section 1512(c) does not require proof that the accused acted "with an evil or wicked purpose."  *Id.* at 735-36 (distinguishing *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005)).

Congressional proceedings to count electoral votes are governed by the Twelfth Amendment to the U.S. Constitution and by the Electoral Count Act.  The Twelfth Amendment requires presidential electors to meet in their respective States and *certify* their State's votes for President and Vice President.  U.S. Const., amend. XII.   The Twelfth Amendment's text regarding the counting of votes is clear and unequivocal in this context: "The President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted; The person having the greatest Number of votes for President, shall be the President."  *Id.* Although some have theorized that there may be ambiguity about which slate to count if a state submits two slates officially certified by the state's Governor, no such ambiguity was present on January 6, 2021.  Each state submitted only one officially-certified

(Dec. 28, 2021) (ECF No. 263); *United States v. Montgomery*, No. 21-46 (D.D.C.), Mem. Op. and Order, at 8-21 (Dec. 28, 2021) (ECF No. 87); *United States v. Mostofsky*, No. 21-138 (D.D.C.), Mem. Op., at 21-24 (Dec. 21, 2021) (ECF No. 88); *United States v. Caldwell*, No. 21-28 (D.D.C.) Mem. Op. and Order, at 8-16 (Dec. 20, 2021) (ECF No. 558); *United States v. Sandlin*, No. 21-88, (D.D.C.) Mem. Op., at 5-9 (Dec. 10, 2021) (ECF No. 63).)

**DEFENDANTS' MEMORANDUM OF LAW**

electoral slate.  Also, the specific text of the Twelfth Amendment makes clear that the

presiding officer cannot delay the count in this context, by instructing that the presiding

officer shall "open all the certificates and the votes shall then be counted . . ."  It is not

permissible to wait 10 days or any other extended period before counting certified

electoral votes.

The Electoral Count Act of 1887 provides for objections by House and Senate

members, and a process to resolve such objections through votes in each separate

chamber.  3 U.S.C. §§ 5, 6, 15.  Nothing in the Twelfth Amendment or the Electoral

Count Act provides a basis for the presiding officer of the Senate to unilaterally refuse to

count electoral votes—for any reason.  Any such effort by the presiding officer would

violate the law.   This is exactly what the Vice President's counsel explained at length to

Plaintiff and President Trump before January 6.[76]  Plaintiff acknowledged that the

Supreme Court would reject such an effort 9-0.[77] And the Vice President made this

crystal clear in writing on January 6: any attempt by the Vice President to take the course

of action the President insisted he take would have been *illegal*.[78]

Nevertheless, pursuant to Plaintiff's plan, the President repeatedly asked the Vice

President to exercise unilateral authority illegally, as presiding officer of the Joint

Session of Congress, to refuse to count electoral votes.  *See supra* at 11-13.  In service of

this effort, he and Plaintiff met with the Vice President and his staff several times to

advocate that he unilaterally reject and refuse to count or prevent the counting of certified

---

[76] *See, e.g.,* Ex. F, Jacob Tr. 82, 96-97, 107-10 ("[Plaintiff] had acknowledged that he
would lose 9-0 at the Supreme Court."); Ex. N, Email Exchange Between John Eastman
and Gregory Jacob ("Respectfully, it was gravely, gravely irresponsible for you to entice
the President with an academic theory that had no legal viability, and that you well know
we would lose before any judge who heard and decided the case.").

[77] Ex. N, Email Exchange Between John Eastman and Gregory Jacob.

[78] Public Letter from Michael R. Pence to Congress (Jan. 6, 2021),
https://int.nyt.com/data/documenttools/pence-letter-on-vp-and-counting-electoral-
votes/9d6f117b6b98d66f/full.pdf. *See also* Ex. N. Ex. N, Email Exchange Between John
Eastman and Gregory Jacob.

electoral votes, and both also engaged in a public campaign to pressure the Vice
President.  *See supra* at 3-17.

The President and Plaintiff also took steps to alter the certification of electors from
various States.  *See supra* at 18.  For example, the President called and met with state
officials, met numerous times with officials in the Department of Justice, tweeted and
spoke about these issues publicly, and engaged in a personal campaign to persuade the
public that the election had been tainted by widespread fraud.

As indicated, there can be no legitimate question that the Joint Session of Congress
held on January 6th pursuant to the Twelfth Amendment and the Electoral Count Act
constitutes an "official proceeding" under Section 1512(c).[79]

The evidence supports an inference that President Trump and members of his
campaign knew he had not won enough legitimate state electoral votes to be declared the
winner of the 2020 Presidential election during the January 6 Joint Session of Congress,
but the President nevertheless sought to use the Vice President to manipulate the results
in his favor.  By December 14, 2020, the Electoral College had voted to send 306
certified electoral votes for Biden and 232 certified electoral votes for Trump.[80]  No state
legislature had certified an alternate slate between that time and January 6, 2021.
Moreover, no court had endorsed the Trump campaign's numerous attempts to challenge
state election results in the wake of the election.[81]  Thus, even if the Vice President had
authority to reject certified electoral certificates (and he did not), there was no valid
lawful basis to do so. *See supra* at 3-17.

---

[79] *See supra* at 40 n.75 (citing cases).

[80] M. Sherman, *Electoral College makes it official: Biden won, Trump lost*, Associated
Press (Dec. 14, 2020), https://apnews.com/article/joe-biden-270-electoral-college-vote-
d429ef97af2bf574d16463384dc7cc1e.

[81] *See supra* at 3-5.  In the single case the President won, his campaign challenged a state-
ordered deadline extension in Pennsylvania for the submission of personal identification
for mailed ballots, affecting a small number of votes.  *See* Order, *Trump v. Boockvar*, No.
602 M.D. 2020 (Pa. Commonwealth Ct. Nov. 12, 2020),
https://www.pacourts.us/Storage/media/pdfs/20210604/020642-file-10440.pdf.

**DEFENDANTS' MEMORANDUM OF LAW**

Nevertheless, as shown above (*see supra* at 11-13), the President and Plaintiff engaged in an extensive public and private campaign to convince the Vice President to reject certain Biden electors or delay the proceedings, without basis, so that the President and his associates would have additional time to manipulate the results.   Had this effort succeeded, the electoral count would have been obstructed, impeded, influenced, and (at the very least) delayed, all without any genuine legal justification and based on the false pretense that the election had been stolen.  There is no genuine question that the President and Plaintiff *attempted* to accomplish this specific illegal result.

The evidence is also more than sufficient to establish a good faith belief that Plaintiff's advice was used to further these ends.  Plaintiff was the architect of the strategies proposed to the Vice President both directly and through his staff.  His memos provided the basis for arguments made to the Vice President by both the President and Plaintiff himself.  Plaintiff was likewise personally involved in persuading state legislators that they had authority to reject the election results and submit alternate slates of electors to Congress.[82]  And he was even involved in the effort to spread false allegations of election fraud to the public.[83]

## B.    Conspiracy to Defraud the United States

The Select Committee also has a good-faith basis for concluding that the President and members of his Campaign engaged in a criminal conspiracy to defraud the United States in violation of 18 U.S.C. § 371.

An individual "defrauds" the government for purposes of Section 371 if he "interfere[s] with or obstruct[s] one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest." *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924).  The conspiracy need not aim to deprive the government of property.  *See Haas v. Henkel*, 216 U.S. 462, 479 (1910).  It need not involve any detrimental reliance by the government.  *See Dennis v. United States*, 384 U.S. 855, 861-

---

[82] *See supra* at 8, 11.
[83] *See supra* at 13 n.40.

62 (1966).  And "[n]either the conspiracy's goal nor the means used to achieve it need to
be independently illegal." *United States v. Boone*, 951 F.2d 1526, 1559 (9th Cir.1991).

To establish a violation Section 371's "defraud" clause, "the government need only
show" that (1) the defendant entered into an agreement (2) to obstruct a lawful function
of the government (3) by deceitful or dishonest means, and (4) that a member of the
conspiracy engaged in at least one overt act in furtherance of the conspiracy. *United
States v. Meredith*, 685 F.3d 814, 822 (9th Cir. 2012) (citation omitted).  The
"agreement" need not be express and can be inferred from the conspirators' conduct in
furtherance of their common objectives. *Ianelli v. United States*, 420 U.S. 770, 777 &
n.10 (1975); *see also United States v. Renzi*, 769 F.3d 731 (9th Cir. 2014).

"This is a very broad provision, which subjects a wide range of activity to
potential criminal penalties." *United States v. Caldwell*, 989 F.2d 1056, 1059 (9th Cir.
1993), *partially overruled on unrelated grounds as recognized by United States v. Conti*,
804 F.3d 977, 980 (9th Cir. 2015).

The evidence supports an inference that President Trump, Plaintiff, and several
others entered into an agreement to defraud the United States by interfering with the
election certification process, disseminating false information about election fraud, and
pressuring state officials to alter state election results and federal officials to assist in that
effort.  As noted above, in particular, the President and Plaintiff worked jointly to attempt
to persuade the Vice President to use his position on January 6, 2021, to reject certified
electoral slates submitted by certain States and/or to delay the proceedings by sending the
count back to the States. *See supra* at 11-13.  Plaintiff first crafted a "plan" to justify this
course of action.[84]  Plaintiff and the President then met and spoke with the Vice President

---

[84] *READ Trump lawyer's memo on six-step plan for Pence to overturn the election*, CNN
(Sept. 21, 2021),https://www.cnn.com/2021/09/21/politics/read-eastman-
memo/index.html; Jan. 3 Memo on Jan. 6 Scenario, CNN,
http://cdn.cnn.com/cnn/2021/images/09/21/privileged.and.confidential.--
.jan.3.memo.on.jan.6.scenario.pdf (provided by John Eastman to CNN per CNN
reporting, *see* Tweet by @jeremyherb, Sept. 21, 2021 at 5:46PM,
https://twitter.com/jeremyherb/status/1440432387263922185).

**DEFENDANTS' MEMORANDUM OF LAW**

and members of his staff on several occasions on January 4-6 in an attempt to execute Plaintiff's plan.[85]  Plaintiff continued these efforts to persuade the Vice President via ongoing conversations with the Vice President's staff, and the President employed numerous public statements to exert additional pressure on Pence.[86]  The evidence developed to date indicates that these actions were all part of a concerted effort to achieve a common goal: to prevent or delay the certification of the 2020 presidential election results.

In addition to the legal effort to delay the certification, there is also evidence that the conspiracy extended to the rioters engaged in acts of violence at the Capitol.  In a civil case filed against the President and others by several members of Congress, Judge Amit Mehta in the District of Columbia specifically found that it was plausible to believe that the President entered into a conspiracy with the rioters on January 6, 2021, "to disrupt the Certification of the Electoral College vote through force, intimidation, or threats." *Thompson v. Trump*, No. 21-cv-00400 (APM), --- F.3d ---, 2022 WL 503384, at *33. (D.D.C. Feb. 18, 2022).  Judge Mehta's opinion demonstrates the breadth of conspiratorial conduct and further supports the existence of common law fraud.

As part of the effort described above, the conspirators also obstructed a lawful governmental function by pressuring the Vice President to violate his duty to count the electoral certificates presented from certain States.  As an alternative, they urged the Vice President to delay the count to allow state legislatures to convene and select alternate electors.  The apparent objective of these efforts was to overturn the results of the 2020 presidential election and declare Donald Trump the winner.  In this way, the conspiracy aimed to obstruct and interfere with the proper functioning of the United States government.

As summarized *supra* at 11-13, the President and Plaintiff engaged in an extensive campaign to persuade the public, state officials, members of Congress, and Vice

---

[85] *See supra* at 11.
[86] *See supra* at 11-13.

**DEFENDANTS' MEMORANDUM OF LAW**

President Pence that the 2020 election had been unlawfully "stolen" by Joseph Biden. The President continued this effort despite repeated assurances from countless sources that there was no evidence of widespread election fraud. *See supra* at 6. On November 12, 2020, CISA issued a joint statement of election security agencies stating: "There is no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised." [87] At around the same time, researchers working for the President's campaign concluded that several the claims of fraud relating to Dominion voting machines were false.[88]

In December, Attorney General Barr publicly announced that there was no widespread election fraud.[89] By January 6, more than 60 court cases had rejected legal claims alleging election fraud.[90] The New York court that suspended Giuliani's law license said that certain of his allegations lacked a "scintilla of evidence."[91] On multiple occasions, acting Attorney General Rosen and acting Deputy Attorney General Donoghue told the President personally that the Department of Justice and Federal

---

[87] Department of Homeland Security Cybersecurity and Infrastructure Security Agency, *Joint Statement from Elections Infrastructure Government Coordinating Council & The Election Infrastructure Sector Coordinating Executive Committees* (November 12, 2020), https://www.cisa.gov/news/2020/11/12/joint-statement-elections-infrastructure-government-coordinating-council-election; *see also* Christopher Krebs, *Opinion: Trump fired me for saying this, but I'll say it again: The election wasn't rigged*, WASHINGTON POST (Dec. 1, 2020), https://www.washingtonpost.com/opinions/christopher-krebs-trump-election-wasnt-hacked/2020/12/01/88da94a0-340f-11eb-8d38-6aea1adb3839_story.html.

[88] *Read the Trump campaign's internal memo*, N.Y. Times (Sept. 21, 2021), https://www.nytimes.com/interactive/2021/09/21/us/trump-campaign-memo.html.

[89] Michael Balsamo, *Disputing Trump, Barr says no widespread election fraud*, ASSOCIATED PRESS (December 1, 2020); *AG Barr says he won't appoint a special counsel to investigate voter fraud*, YAHOO NEWS (December 21, 2020).

[90] William Cummings, Joey Garrison and Jim Sergent, *By the numbers: President Donald Trump's failed efforts to overturn the election*, USA Today (Jan. 6, 2021), https://www.usatoday.com/in-depth/news/politics/elections/2021/01/06/trumps-failed-efforts-overturn-election-numbers/4130307001/.

[91] *In re Rudolph W. Giuliani*, 2021 Slip Op. 04086 (N.Y. 1st Dept. June 24, 2021); *see also In re Rudolph W. Giuliani*, Order, App. D.C., No. 21-BG-423 (July 7, 2021).

**DEFENDANTS' MEMORANDUM OF LAW**

Bureau of Investigations had found no evidence to substantiate claims being raised by the President.[92]  Georgia Secretary of State Brad Raffensperger likewise rebutted many of the President's allegations of fraud in Georgia.[93]  Despite these refutations and the absence of any evidence to support the allegations he was making, the President and his associates continued to publicly advance the narrative that the election had been tainted by widespread fraud.[94]

As noted above, the President called and met with state officials regarding the election results, met numerous times with officials in the Department of Justice, tweeted and spoke about these issues publicly, and engaged in a personal campaign to persuade the Vice President to alter the certification results.  *See supra* at 11-13.  For his part, Plaintiff drafted legal memoranda outlining several possible ways to ensure that Donald Trump would be named the winner of the 2020 election, met with the Vice President and his staff to press this plan, and spoke publicly on these issues in advance of the attack on the Capitol.  *See supra* at 12.

A review of the documents at issue is likely to reveal that the President engaged Plaintiff's counsel in furtherance of these conspiratorial ends.

---

[92] Senate Judiciary Committee Staff Report, Subverting Justice, How the Former President and His Allies Pressured DOJ to Overturn the 2020 Election, at 5, 14-16, 19, 27-28, https://www.judiciary.senate.gov/imo/media/doc/Interim%20Staff%20Report%20FINAL.pdf; *see also* Interview of Richard Donoghue (Aug. 6, 2021), United States Senate Committee on the Judiciary, at 59, 156, https://www.judiciary.senate.gov/richard-donoghue-transcript; Interview of Jeffrey Rosen (Aug. 7, 2021), United States Senate Committee on the Judiciary, at 30, https://www.judiciary.senate.gov/rosen-transcript-final;

[93] Amy Gardner & Paulina Firozi, *Here's the full transcript and audio of the call between Trump and Raffensperger*, Washington Post (Jan. 5, 2021), https://www.washingtonpost.com/politics/trump-raffensperger-call-transcript-georgia-vote/2021/01/03/2768e0cc-4ddd-11eb-83e3-322644d82356_story.html.

[94] *See*, *e.g.*, *Donald Trump Rally Speech Transcript Dalton, Georgia: Senate Runoff Election*, The Rev (Jan. 4, 2021), https://www.rev.com/blog/transcripts/donald-trump-rally-speech-transcript-dalton-georgia-senate-runoff-election (reiterating numerous allegations of election fraud before crowd in Dalton, Georgia on January 4th).

**DEFENDANTS' MEMORANDUM OF LAW**

## C.   Common Law Fraud

There is also evidence to support a good-faith, reasonable belief  that *in camera* review of the materials may reveal that the President and members of his Campaign engaged in common law fraud in connection with their efforts to overturn the 2020 election results.

The District of Columbia, where these events occurred, defines common law fraud as: (1) a false representation; (2) in reference to material fact; (3) made with knowledge of its falsity; (4) with the intent to deceive; and (5) action is taken in reliance upon the representation.  *Atraqchi v. GUMC Unified Billing Servs.*, 788 A.2d 559, 560 (D.C. 2002).[95]

As described above, the evidence shows that the President made numerous false statements regarding election fraud, both personally and through his associates, to the public at-large and to various state and federal officials.  *See supra* at 6-7.  These statements referred to material facts regarding the validity of state and federal election results.  *See supra* at 7-8.  And the evidence supports a good-faith inference that the President did so with knowledge of the falsity of these statements and an intent to deceive his listeners in hopes they would take steps in reliance thereon.

In addition to the numerous refutations of fraud mentioned above, *see supra* at 7-8, a specific example helps illustrate the point: On December 3, 2020, Trump's YouTube channel posted an edited video clip, purporting to show Georgia officials pulling suitcases of ballots from under a table after poll workers had left for the day.[96] The next morning, a Georgia official responded to the allegation on Twitter, indicating that the video "was watched in its entirety (hours) by @GaSecofState investigators" and

---

[95] The definition of fraudulent deceit under California law largely tracks these elements. *See Small v. Fritz Cos., Inc.*, 65 P.3d 1255, 1258 (Cal. 2003) (requiring 1) a misrepresentation; 2) knowledge of falsity (or scienter); 3) intent to defraud, *i.e.*, to induce reliance; 4) justifiable reliance; and 5) resulting damage).

[96] Donald J. Trump, *Video from GA shows suitcases filled with ballots pulled from under a table AFTER poll workers left*, YOUTUBE, https://www.youtube.com/watch?v=nVP_60Hm4P8.

**DEFENDANTS' MEMORANDUM OF LAW**

"[s]how[ed] normal ballot processing.[97]  That same day, a local news outlet ran a fact-checking segment debunking the President's claims.[98]  After the broadcast,  the Georgia official tweeted: "You can watch the @wsbtv report to show that the President's team is intentionally misleading the public about what happened at State Farm Arena on election night.  They had the whole video too and ignored the truth."[99]

The next day, the Georgia Secretary of State's office released the full video to local news outlets, which thoroughly debunked the President's claims.[100]  On December 6, 2020, the Chief Investigator in the Georgia Secretary of State's Office issued a sworn declaration affirming that "there were no mystery ballots that were brought in from an unknown location and hidden under tables as has been reported by some" and explaining the context of the video clip.[101]  The following day, Georgia election officials addressed the issue yet again in a public press conference, stating that "what you saw, the secret suitcases with magic ballots, were actually ballots that had been packed into those absentee ballot carriers by the workers in plain view of the monitors and the press."[102]

Nevertheless, on December 11, 2020, and December 23, 2020, the Trump campaign ran two advertisements on Facebook with the same selectively edited footage

---

[97] Gabriel Sterling, Twitter (6:41 A.M., Dec. 4, 2020), https://twitter.com/gabrielsterling/status/1334825233610633217.

[98] Stephen Fowler, *Fact Checking Rudy Giuliani's Grandiose Georgia Election Fraud Claim*, GPB (Dec. 4, 2020), https://www.gpb.org/news/2020/12/04/fact-checking-rudy-giulianis-grandiose-georgia-election-fraud-claim.

[99] Gabriel Sterling, Twitter (2:58 P.M., Dec. 4, 2020), https://twitter.com/gabrielsterling/status/1334950232526884873.

[100] Georgia election officials shows frame-by-frame of State Farm Arenda Election Night video," WSB-TV (Dec. 5, 2020), available at: https://www.youtube.com/watch?v=h-9jFuieH_U.

[101] *Coreco Ja'Qan Pearson, et al. v. Brian Kemp, et al.*, 1:20-cv-4809 (N.D. Ga.) (Docket No. 72-1), available at: https://www.documentcloud.org/documents/20420664-frances-watson-affidavit.

[102] Transcript, Press Conference: Georgia Election Officials Briefing Transcript December 7: Will Recertify Election Results Today (Dec. 7, 2020), available at: https://www.rev.com/blog/transcripts/georgia-election-officials-briefing-transcript-december-7-will-recertify-election-results-today.

**DEFENDANTS' MEMORANDUM OF LAW**

and the same claim that the video showed "suitcases of ballots added in secret in Georgia."[103]  On December 27 and 31, 2020, Acting Deputy Attorney General Donoghue again debunked this claim directly to the President.[104]

Undeterred, the Trump campaign continued to run the ads on Facebook.  And the President continued to rely on this allegation in his efforts to overturn the results of the election.  During a January 2, 2021, telephone conversation with Georgia Secretary of State Brad Raffensperger, the President suggested that suitcases of illicit ballots explained a "minimum" of 18,000 votes for President Biden, ultimately asking Raffensperger to "find 11,780 votes" for him in Georgia.[105]  During this call, Raffensperger explained to the President that the video in question had been selectively edited, and that Raffensperger's office had reviewed the full tape and found no evidence of fraud.[106]  Raffensperger also offered to provide the President a link to the full video, to which the President responded: "I don't care about the link.  I don't need it."[107]  The following day, the President tweeted: "I spoke to Secretary of State Brad Raffensperger yesterday about Fulton County and voter fraud in Georgia.  He was unwilling, or unable, to answer questions such as the 'ballots under table' scam, ballot destruction, out of state

---

[103] Donald J. Trump, *The evidence is overwhelming – FRAUD!*, FACEBOOK, https://www.facebook.com/DonaldTrump/videos/1803802073100806/; Donald J. Trump, *Stop the Steal*, FACEBOOK, https://www.facebook.com/officialteamtrump/videos/711114792881749/.

[104] [Cite Donoghue TI at 43] (informing President Trump that the "allegations about ballots being smuggled in a suitcase and run through the machines several times, it was not true, that we had looked at it, we looked at the video, we interviewed the witnesses, and it was not true").

[105] Amy Gardner & Paulina Firozi, *Here's the full transcript and audio of the call between Trump and Raffensperger*, Washington Post (Jan. 5, 2021), https://www.washingtonpost.com/politics/trump-raffensperger-call-transcript-georgia-vote/2021/01/03/2768e0cc-4ddd-11eb-83e3-322644d82356_story.html.

[106] *Id.*

[107] *Id.*

---

**DEFENDANTS' MEMORANDUM OF LAW**

'voters', dead voters, and more.  He has no clue!"[108]  On January 6th, Trump once again reiterated the claim that Georgia "election officials [had] pull[ed] boxes . . . and suitcases of ballots out from under a table" in his speech just before rioters attacked the Capitol.[109]

The evidence also shows that many members of the public acted in reliance on the President's statements.  *See infra* at 52-53.   Several defendants in pending criminal cases identified the President's allegations about the "stolen election" as a motivation for their activities at the Capitol.  And a number specifically cited the President's tweets asking his supporters to come to Washington, D.C. on January 6.  For example, one defendant who later pled guilty to threatening Nancy Pelosi texted a family member on January 6 to say: "[Trump] wants heads and I'm going to deliver."[110]  Another defendant released a statement through his attorney, stating: "I was in Washington, D.C. on January 6, 2021, because I believed I was following the instructions of former President Trump and he was my president and the commander-in-chief.  His statements also had me believing the

---

[108] Jason Braverman, *Trump asks Georgia election officials to 'find' votes during call with Sec. of State*, 11Alive, https://www.11alive.com/article/news/politics/elections/trump-tweets-about-fulton-county-brad-raffensperger-brian-kemp/85-a503efec-df8a-42ee-a92f-70271eac840f (original tweet link broken https://twitter.com/realDonaldTrump/status/1345731043861659650).

[109] Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021) ("Then election officials pull boxes, Democrats, and suitcases of ballots out from under a table. You all saw it on television, totally fraudulent. And illegally scanned them for nearly two hours, totally unsupervised. Tens of thousands of votes. This act coincided with a mysterious vote dump of up to 100,000 votes for Joe Biden, almost none for Trump. Oh, that sounds fair. That was at 1:34 a.m."), https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

[110] Jordan Fischer et al., *Georgia man who wanted to 'remove some craniums' on January 6 sentenced to more than 2 years in prison*, WUSA9 (Dec. 14, 2021), https://www.wusa9.com/article/news/national/capitol-riots/georgia-man-cleveland-meredith-jr-who-wanted-to-remove-some-craniums-on-january-6-sentenced-to-more-than-2-years-in-prison-trump-noggin-pelosi-bowser/65-e3e4de7e-cf5e-4c62-af1f-53fb214576f0.

**DEFENDANTS' MEMORANDUM OF LAW**

election was stolen from him."[111]  There are many other examples of this kind.[112]  Indeed,
even today, polling suggests that "[m]ore than 40% of Americans still do not believe that
Joe Biden legitimately won the 2020 presidential election despite no evidence of
widespread voter fraud."[113]

As explained at length above, it appears that President Trump's false statements to
his supporters and government officials were informed by Dr. Eastman's extensive
advice that the election was stolen and that Congress or the Vice President could change
the outcome of the election on January 6.[114]

---

[111] Dan Mangan, *Capitol rioter Garret Miller says he was following Trump's orders,
apologizes to AOC for threat*, CNBC (Jan. 25, 2021).

[112] *See, e.g.*, *United States v. Sandlin*,
https://www.justice.gov/opa/page/file/1362396/download ("I'm going to be there to show
support for our president and to do my part to stop the steal and stand behind Trump
when he decides to cross the rubicon."); *United States v. Neefe et al.*,
https://www.justice.gov/usao-dc/case-multi-defendant/file/1432686/download ("Trump is
literally calling people to DC in a show of force.  Militias will be there and if there's
enough people they may fucking storm the buildings and take out the trash right there.");
*United States v. Caldwell et al.*, https://www.justice.gov/usao-dc/case-multi-
defendant/file/1369071/download ("Trump said It's gonna be wild!!!!!!!  It's gonna be
wild!!!!!!!  He wants us to make it WILD that's what he's saying. He called us all to the
Capitol and wants us to make it wild!! !  Sir Yes Sir!!!  Gentlemen we are heading to DC
pack your shit!!").

[113] Maya Yang, *More than 40% in US do not believe Biden legitimately won election –
poll*, GUARDIAN (Jan. 5, 2022), https://www.theguardian.com/us-
news/2022/jan/05/america-biden-election-2020-poll-victory.

[114] This does not represent the entirety of the evidence obtained by the Select Committee
with respect to these issues.  In addition, the Select Committee is receiving new evidence
on a regular basis as part of its ongoing investigation.  The Select Committee can make
additional evidence available to the Court as requested.

**IV.    The Select Committee Has Not Waived Its Arguments That Plaintiff Is Not Entitled To Attorney-client Or Work-Product Protections Over The Documents At Issue**

Plaintiff contends that the Select Committee has "waived" its right to object to privilege based on Plaintiff's public statements, the "particulars" of the Chapman University email system, or "any other 'generalized' waiver argument." Br. at 22. That contention is obviously wrong.

Plaintiff reasons that the Select Committee "necessarily conceded the possibility that at least some privileged content exists in the Chapman materials" because it "conced[ed] that a privilege log is appropriate." Br. at 22. The Select Committee made no such concessions. As reflected in the statement quoted in Plaintiff's brief, counsel for the Select Committee stated at the hearing, "if this [a privilege review] is considered something that is important to do now, we would certainly entertain it." *Id.* That is, *if* this Court believed that an initial privilege review and log were appropriate, the Select Committee would not object to such a process. In no way did counsel's statement concede that any of the documents at issue may ultimately be withheld because of privilege.

Indeed, as Plaintiff recognizes, Br. at 22, the Select Committee argued in its brief in opposition to a temporary restraining order that Plaintiff could not claim attorney-client privilege or work product protection over any of the documents at issue (*see* ECF No. 23-1 at 17-23), and the Select Committee never abandoned that argument. To the contrary, in each of the notices the Select Committee has filed with its privilege log objections, it has explicitly "preserve[d] its ability to argue in subsequent briefing on Plaintiff's privilege claims that, as a general matter, none of the documents contained in the Chapman University production set can be withheld on the basis of attorney-client or work product privilege." *See, e.g.*, ECF No. 71 at 2. Plaintiff cites no case law supporting his view of waiver, and the Select Committee is aware of none.

**DEFENDANTS' MEMORANDUM OF LAW**

## V.      This Court Should Not Revisit Its Ruling Rejecting Plaintiff's First and Fourth Amendment Claims

Plaintiff asks this Court to "revisit" its holding denying a preliminary injunction based on Plaintiff's First and Fourth Amendment claims.  Br. at 31-37.  That request is procedurally improper.  This Court directed Plaintiff to "file briefing … supporting his assertions of privilege for each document between January 4 and January 7, 2021."  ECF No. 104.  Inserting into such briefing a request for reconsideration of the Court's ruling on Plaintiff's First and Fourth Amendment claims—which are not relevant to the privilege claims—is entirely inappropriate.

Local Rule 7-18 describes the proper procedure for seeking the Court's reconsideration of a previous ruling, and the grounds on which such a request may be made.  Barring a showing of good cause, the rule requires that a motion be made no later than 14 days after the Order at issue was entered.  In this case, the relevant Order was entered on January 25, almost one month before Plaintiff filed this brief.  *See* ECF No. 43.  Thus, Plaintiff both failed to submit his request in the proper format of a motion for reconsideration and failed to file it in a timely manner.

Moreover, under Local Rule 7-18, a motion for reconsideration may only be made on the following grounds:

> (a) a material difference in fact or law from that presented to the Court that, in the exercise of reasonable diligence, could not have been known to the party moving for reconsideration at the time the Order was entered, or (b) the emergence of new material facts or a change of law occurring after the Order was entered, or (c) a manifest showing of a failure to consider material facts presented to the Court before the Order was entered.

Consistent with this rule, "the Federal Rules of Civil Procedure provide that a motion for reconsideration 'should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law.'"  *Zhur v. Neufeld*, No. 17-9203, 2018 WL 4191325, *1 (C.D. Cal. Aug. 29, 2018) (citing Fed. R. Civ. P. 59(e));

**DEFENDANTS' MEMORANDUM OF LAW**

*see also Sch. Dist. No. 1J, Multnomah Cnty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993).

Contrary to Plaintiff's assertion that his First and Fourth Amendment claims were not fully briefed (Br. at 31), the claims were first raised in Plaintiff's Complaint, the Select Committee responded to these claims in their opposition, ECF No. 23-1 at 24-25, and Plaintiff addressed the First and Fourth Amendments claims in his reply, ECF No. 27 at 23). Following briefing and oral argument, this Court denied Plaintiff's request for a temporary restraining order or preliminary injunction, specifically rejecting his First and Fourth Amendment claims. *See* ECF No. 43 at 12-14. For the reasons stated in the Select Committee's opposition and this Court's Order, that ruling was correct.

Instead of relying on new evidence or intervening case law, Plaintiff simply reargues the merits, relying on precedents addressed in both the Select Committee's opposition and the Court's Order. With respect to the First Amendment claim, Plaintiff discusses "at some length" the Supreme Court's decision in *Watkins v. United States*, 354 U.S. 178 (1957), a decision that this Court correctly applied in its Order. See Br. at 32; ECF No. 43, at 12. Similarly, in reraising his Fourth Amendment claim, Plaintiff unpersuasively attempts to distinguish two "historic" Supreme Court decisions (cited in his Complaint), on which this Court correctly relied in denying a preliminary injunction. *See* Compl. ¶¶ 95, 98; ECF No. 43, at 13; Br. at 36 (citing *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 209 (1946); *McPhaul v. United States*, 364 U.S. 372, 382 (1960)). Plaintiff offers no explanation as to how his argument raises "a material difference in fact or law from that presented to the Court" previously or "the emergence of new material facts or a change of law." Local Rule 7-18. It does not.

In addition, Plaintiff has not shown that this Court committed clear error. The Court appropriately analyzed the interests at stake in rejecting Plaintiff's First Amendment claim. To determine whether the First Amendment bars the Select Committee's access to information it seeks through a duly-authorized subpoena depends on a balancing of "the competing private and public interests at stake in the particular

**DEFENDANTS' MEMORANDUM OF LAW**

circumstances shown." *Barenblatt v. United States*, 360 U.S. 109, 126 (1959).  The

Court considered the competing interests at stake and found that "[t]he public interest

here is weighty and urgent," ECF No. 43, at 12, and that Plaintiff identified no "specific

associational interest threatened by" or "any particular harm likely to result from"

production of the materials sought by the Select Committee.  *Id.* at 12-13.

Plaintiff's brief fails to address the substantial public interest in the Select

Committee's investigation, instead arguing that "the Select Committee's resolution poses

the same First Amendment risks of unrestrained congressional power that the Supreme

Court identified in *Watkins*."  Br. at 34.  But, again, Plaintiff has not identified any

specific associational interest threatened by production of his Chapman communications

or any particular harm likely to result from their production.  *See* ECF No. 43, at 12-13.

His vague reference to communications that "reveal much" about third-parties'

"identities, associational choices, political beliefs and other protected First Amendment

interests"—and the notion that "having disfavored views on the 2020 election" can be

"personally damaging"—is insufficient.  Br. at 35-36.  The Court's rejection of Plaintiff's

First Amendment claim was thus unquestionably correct, and Plaintiff provides no

persuasive reason for the Court to reconsider it now.

The Court also appropriately rejected Plaintiff's Fourth Amendment claim, finding

that the subpoena is not "overbroad or indefinite given its context."  ECF No. 43, at 14.

A subpoena is not impermissibly overbroad so as to violate the Fourth Amendment as

long as its call for documents or testimony are within the scope of the Congressional

inquiry at issue.  *See McPhaul*, 364 U.S. at 382.  The requests at issue are well within the

scope of the Select Committee's inquiry.  *See* ECF No. 23-1 at 25.  And Plaintiff's

belated attempt to distinguish *McPhaul* and *Oklahoma Press* is unavailing.  Relying on

recent Supreme Court decisions in distinct Fourth Amendment contexts, the most

Plaintiff can say is that "if *McPhaul* and *Oklahoma Press* were to be decided today they

would be likely to come out quite differently."  Br. 36-37.  Even if that doubtful

**DEFENDANTS' MEMORANDUM OF LAW**

proposition were correct, Plaintiff does not (and cannot) argue that this Court is free to
disregard those Supreme Court rulings.

## **CONCLUSION**

For the reasons set forth above, Plaintiff's claims of privilege should be rejected,
leaving Chapman University free to comply with the House subpoena at issue here as it
has stated it wishes to do.

Respectfully submitted,

/s/  *Douglas N. Letter*
DOUGLAS N. LETTER
  *General Counsel*
TODD B. TATELMAN
  *Principal Deputy General Counsel*
ERIC R. COLUMBUS
  *Special Litigation Counsel*
MICHELLE S. KALLEN
  *Special Litigation Counsel*
STACIE M. FAHSEL
  *Associate General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF
REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C.  20515
(202) 225-9700
Douglas.Letter@mail.house.gov

-and-

SHER TREMONTE LLP
Justin M. Sher
Michael Tremonte
Noam Biale
Maya Brodziak
Kathryn E. Ghotbi
90 Broad Street, 23rd Floor

**DEFENDANTS' MEMORANDUM OF LAW**

New York, New York 10004
(212) 202-2600
JSher@shertremonte.com
MTremonte@shertremonte.com
NBiale@shertremonte.com
MBrodziak@shertremonte.com
KGhotbi@shertremonte.com

-and-

ARNOLD & PORTER
John A. Freedman
Paul Fishman
Amy Jeffress
601 Massachusetts Ave, NW
Washington, D.C. 20001
(202) 942-5000
John.Freedman@arnoldporter.com
Paul.Fishman@arnoldporter.com
Amy.Jeffress@arnoldporter.com

Dated:  March 2, 2022

**DEFENDANTS' MEMORANDUM OF LAW**

## <u>CERTIFICATE OF SERVICE</u>

### WASHINGTON, DISTRICT OF COLUMBIA

I am employed in the aforesaid county, District of Columbia; I am over the age of 18 years and not a party to the within action; my business address is:

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515

On March 2, 2022, I served the **CONGRESSIONAL DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S PRIVILEGE ASSERTIONS** on the interested parties in this action:

Anthony T. Caso
Constitutional Counsel Group
174 W Lincoln Ave #620
Anaheim, CA 92805-2901
atcaso@ccg1776.com

Charles Burnham
Burnham & Gorokhov PLLC
1424 K Street NW, Suite 500
Washington, DC 20005
charles@burnhamgorokhov.com

*Attorneys for Plaintiff John C. Eastman*

☒  **(BY E-MAIL OR ELECTRONIC TRANSMISSION)**
The document was served on the following via The United States District Court – Central District's CM/ECF electronic transfer system which generates a Notice of Electronic Filing upon the parties, the assigned judge, and any registered user in the case:

☒  **(FEDERAL)**    I declare under penalty of perjury that the foregoing is true and correct, and that I am employed at the office of a member of the bar of this Court at whose direction the service was made.

Executed on March 2, 2022 here, at Bethesda, Maryland.

*/s/* Douglas N. Letter

CERTIFICATE OF SERVICE