|    |                                                      |
|----|------------------------------------------------------|
| 1  | OFFICE OF GENERAL COUNSEL                            |
|    | U.S. HOUSE OF REPRESENTATIVES                        |
| 2  | 5140 O'Neill House Office Building                   |
|    | Washington, D.C. 20515                               |
| 3  |                                                      |
| 4  | SHER TREMONTE LLP                                    |
|    | 90 Broad Street, 23rd Floor                          |
| 5  | New York, New York 10004                             |
| 6  | ARNOLD & PORTER                                      |
|    | 601 Massachusetts Ave, NW                            |
| 7  | Washington, D.C. 20001                               |
| 8  |                                                      |
| 9  | Counsel for the Congressional Defendants             |

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| JOHN C. EASTMAN,          | Case No. 8:22-cv-00099-DOC-DFM |
|---------------------------|--------------------------------|
| Plaintiff,                |                                |
| vs.                       |                                |
| BENNIE G. THOMPSON, *et al.*, |                            |
| Defendants.               |                                |

# Exhibit D

1

2

3

4      SELECT COMMITTEE TO INVESTIGATE THE

5      JANUARY 6TH ATTACK ON THE U.S. CAPITOL,

6      U.S. HOUSE OF REPRESENTATIVES,

7      WASHINGTON, D.C.

8

9

10

11         DEPOSITION OF:    JASON MILLER

12

13

14

15                               Thursday, February 3, 2022

16

17                               Washington, D.C.

18

19

20            The deposition in the above matter was held via Webex, commencing at 10:04

21      a.m.

22            Present:   Representatives Aguilar, Lofgren, Murphy, Cheney, and Kinzinger.

| | |
|---|---|
| 1 | <u>Appearances:</u> |
| 2 | |
| 3 | For the SELECT COMMITTEE TO INVESTIGATE |
| 4 | THE JANUARY 6TH ATTACK ON THE U.S. CAPITOL: |
| 5 | |
| 6 | KATIE ABRAMS, STAFF ASSOCIATE |
| 7 | ALEJANDRA APECECHEA, INVESTIGATIVE COUNSEL |
| 8 | MAGGIE EMAMZADEH, STAFF ASSOCIATE |
| 9 | SADALLAH A. FARAH, RESEARCHER |
| 10 | DANIEL A. GEORGE, SENIOR INVESTIGATIVE COUNSEL |
| 11 | TIMOTHY HEAPHY, CHIEF INVESTIGATIVE COUNSEL |
| 12 | CASEY LUCIER, INVESTIGATIVE COUNSEL |
| 13 | JOE MAHER, DETAILEE, DEPARTMENT OF HOMELAND SECURITY |
| 14 | EVAN B. MAULDIN, CHIEF CLERK |
| 15 | DENVER LEE RIGGLEMAN, SENIOR TECHNICAL ADVISOR |
| 16 | GRANT SAUNDERS, STAFF ASSOCIATE |
| 17 | |
| 18 | For THE WITNESS: |
| 19 | |
| 20 | NATHAN MUYSKENS |
| 21 | MICHAEL PUSATERI |
| 22 | Greenberg Traurig, LLP |
| 23 | 101 L Street, N.W. |
| 24 | Suite 1000 |
| 25 | Washington, D.C.   20037 |

1                Mr. Heaphy.    Yeah.

2                       BY MR. HEAPHY:

3        Q    Mr. Miller, I appreciate your answers to Mr. George's questions.

4        One other subject matter, did anyone in the meeting raise the campaign's internal

5   polling data and whether it was consistent with the result as called by the networks?

6        A    I don't remember any polling data being discussed.   I mean, especially 5

7   days or so after an election, I think at that point pre-election data probably would have

8   been relatively worthless.   For sure we would have discussed the -- again, the piece of

9   information that we had that were forming are decisionmaking was essentially was that

10  we didn't see where the ballots would ultimately come from to deliver victory.

11       Q    Okay.   So the campaign didn't -- was not in any way or you in this meeting

12  were not relying in any way on sort of internal exit or other polling data to compare to

13  the results?   That wasn't part of the calculus?

14       A    I don't remember it being a numbers-heavy conversation.

15       Q    Okay.   Do you know if anyone in the meeting conveyed to the President,

16  separate from the legal strategy, that crunching of the numbers, evaluation of the actual

17  results made it unlikely that he would win or essentially confirming that he had lost?

18  Again, not the litigation, but:   Hey, we've looked at the numbers.   We've evaluated the

19  results, and the numbers aren't there.   You've lost, or, you know, this is correct.

20  Something along those lines?

21       A    That conversation I believe happened the day before with the data team or

22  at least the lead of data team joining by phone.

23       Q    Okay.   The day before this conversation with the President, there was a

24  discussion about the -- sort of the numbers and what they showed?

25       A    Yes.

1    Q    Okay.  Tell us more about that.  Who was present for that conversation?

2    A    I don't remember who all was present in person.  I was in the Oval Office.

3 And at some point in the conversation Matt Oczkowski, who was the lead data person,

4 was brought on, and I remember he delivered to the President in pretty blunt terms that

5 he was going to lose.

6    Q    And that was based, Mr. Miller, on Matt and the data team's assessment of

7 this sort of county-by-county, State-by-State results as reported?

8    A    Correct.

9    Q    Okay.  And what was the President's reaction then when Matt said to him,

10 "Hey, we've looked at the numbers, you're going to lose"?

11    A    I think it's safe to say he disagreed with Matt's analysis.

12    Q    On what basis?  Did he give a basis?

13    A    He believed that Matt was not looking at the prospect of legal challenges

14 going our way and that Matt was looking at purely from what those numbers were

15 showing as opposed to broader things to include legality and election integrity issues

16 which, as a data guy, he may not have been monitoring.

17    Q    I see.  Okay.  Who else, Mr. Miller, was present that you recall in the Oval

18 Office for that meeting that was more focused on the numbers and the data?

19    A    I believe we had -- I -- to the best of my memory, I think it was Jared

20 Kushner, Bill Stepien, and Justin Clark.  But again, that's -- that's the best of my memory.

21 The Oval Office meetings were frequently people coming in and out at various times.

22 And so it is tough to say who was definitely in a meeting or not.

23    Q    Yeah.  And I appreciate that.  I know where you're going on memory here.

24 So you were present, along with Matt.  And you mentioned Mr. Kushner, Mr. Stepien,

25 Mr. Clark, Justin Clark, and the President?  Those are the folks you remember being

1   A   Meaning the post-press-conference coverage was not positive, even by FOX

2   News, for example.

3   Q   Why did that upset him?

4   A   Because this was supposed to be a press conference where a number of

5   these details were going to be laid out, these irrefutable details, and they weren't.

6   Q   Did he know that some of the claims that she was making were not true?

7   A   I can't speak to what necessarily he knew or didn't know specific to

8   Ms. Powell's claims.

9   Q   Did you ever tell the -- we just spoke about dead people voting and your

10  team's analysis of that.   Did you ever communicate your team's findings to the

11  President, that there were some instances that you thought there might be dead people

12  voting but there wasn't widespread -- a proof of widespread dead people voting?

13  A   Well, I said that, from what we had been able to determine -- but keep in

14  mind, my team -- when I say "my team," meaning the remnants of the campaign team

15  that were still around -- were relying on evidence that had been pulled by outside people.

16  So it's not as though the inside campaign team was out doing the original research.

17  They were just verifying the results.

18  Q   Okay.   But did you communicate those findings?   Understanding they may

19  be kind of from a limited set here, but did you communicate that to the President?

20  A   I don't remember if I specifically talked about the numbers that we had from

21  the limited findings.   I just don't remember.

22  Q   Do you remember ever telling him -- well, let me back up.

23      In early December, I believe, Attorney General Barr made a public statement that

24  DOJ had looked into issues and he had not seen widespread fraud that would change the

25  outcome of the election.

1      A, is that consistent with your understanding about the allegations of fraud in the
2      election?
3          A     My understanding is that I think there are still very valid questions and
4      concerns with the rules that were changed under the guise of COVID, but, specific to
5      election day fraud and irregularities, there were not enough to overturn the election.
6          Q     And did you give your opinion on that to the President?
7          A     Yes.
8          Q     What was his reaction when you told him that?
9          A     "You haven't seen or heard" -- I'm paraphrasing, but -- "you haven't seen or
10     heard all the different concerns and questions that have been raised."
11         Q     How many times did you have this conversation with the President?
12         A     Several.   I couldn't put a specific number on it, though.
13         Q     But more than one?
14         A     Correct.
15         Q     Did he say what the types of things he was seeing were?
16         A     Sometimes, although I didn't commit to memory what specific examples he
17     was hinging on, for example, as there were so many different issues being raised during
18     that stretch, it was tough to keep track of all of them.
19         Q     Did you do anything or have your team do anything to look into any of the
20     allegations he was raising?
21         A     Again, by that point, most of the investigative-type work would've been
22     done by Rudy and his legal team as opposed to anyone in-house, or if there was
23     quasi-still-in-house.
24         Q     All right.
25             So Mr. Kerik has publicly stated through his attorney that, as investigator for