OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515

SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004

ARNOLD & PORTER
601 Massachusetts Ave, NW
Washington, D.C. 20001

Counsel for the Congressional Defendants

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| JOHN C. EASTMAN<br><br>Plaintiff,<br><br>vs.<br><br>BENNIE G. THOMPSON, *et al.*,<br><br>Defendants. | Case No. 8:22-cv-00099-DOC-DFM |

# Exhibit A

1

2

3

4

5       SELECT COMMITTEE TO INVESTIGATE THE

6       JANUARY 6TH ATTACK ON THE U.S. CAPITOL,

7       U.S. HOUSE OF REPRESENTATIVES,

8       WASHINGTON, D.C.

9

10

11

12      DEPOSITION OF:     JOHN EASTMAN

13

14

15

16                               Thursday, December 9, 2021

17

18                               Washington, D.C.

19

20

21              The interview in the above matter was held in Room 1309, Longworth House

22      Office Building, commencing at 12:57 p.m.

23              Present:     Representatives Lofgren, Raskin, Cheney, and Kinzinger.

1

2     Appearances:

3

4

5     For the SELECT COMMITTEE TO INVESTIGATE

6     THE JANUARY 6TH ATTACK ON THE U.S. CAPITOL:

7

8     JOHN WOOD, SENIOR INVESTIGATIVE COUNSEL

9     AND OF CHAIR TO THE VICE CHAIR

10    CASEY LUCIER, INVESTIGATIVE COUNSEL

11    JOE MAHER, DETAILEE

12    DAN GEORGE, SENIOR INVESTIGATIVE COUNSEL

13    JENNA HOPKINS, PROFESSIONAL STAFF

14    EVAN MAULDIN, CHIEF CLERK

15

16

17    For JOHN EASTMAN:

18

19    CHARLES BURNHAM

1

2

3      Mr. <u>Wood.</u>     Good afternoon.

4      This is a deposition of Dr. John Eastman conducted by the House Select

5  Committee to Investigate the January 6th Attack on the U.S. Capitol.

6      My name is John Wood.    I'm a senior investigative counsel for the committee,

7  and I'm also of counsel to the vice chair of the committee, Representative Liz Cheney.

8      And I'll let everybody introduce themselves.

9      Mr. <u>Maher.</u>     Joe Maher, senior counsel to the vice chair.

10     Ms.     <u>Lucier.</u>     Casey Lucier, investigative counsel to the select committee.

11     Mr. <u>George.</u>     Dan George, senior investigative counsel to the committee.

12     Ms. <u>Hopkins.</u>     Jenna Hopkins, professional staff member.

13     Mr. <u>Burnham.</u>     Charles Burnham, counsel for Dr. John Eastman.

14     The <u>Witness.</u>    Dr. John Eastman.

15     Mr. <u>Wood.</u>     And just to let you know, there may be members of the committee

16  that will either come in person or participate by video.    We will keep an eye on that to

17  try to let you know and say on the record when members join.

18     We probably won't say on the record when they leave just because if they're by

19  video, they can just hit exit and we won't necessarily notice when they leave.     So the

20  record might not always show when the members leave.

21     The questions will be led by staff, but we will occasionally pause and see if any of

22  the members want to ask any questions before we move on.

23     As you know, there is a court reporter here.

24     And why don't we go ahead and administer the oath?

25     The <u>Reporter.</u>     Please raise your right hand.

1          Do you solemnly declare and affirm under the penalty of perjury that the

2   testimony you are about to give will be the truth, the whole truth, and nothing but the

3   truth?

4          The Witness.   I do.

5          Mr. Wood.   So, Dr. Eastman, as you know, there is a court reporter here who will

6   be making a verbatim transcript of the interview.   You will be given an opportunity -- or

7   your counsel -- to review the transcript, probably here in the House office buildings, and

8   to identify any errors you identify.   The committee can take those into consideration

9   before finalizing the transcript.   Also, as we said, there's a video as well as audio

10  recording.

11         As far as logistics, if at any time you want to take a break, we'd be happy to allow

12  that.   Just say so.   If the witness needs to speak with counsel privately, we can take a

13  break for that to occur.

14         Dr. Eastman, I want to make sure you understand that you're appearing pursuant

15  to the subpoena dated November 8th, 2021, which is exhibit 1 in the binder that you've

16  been provided.

17         I want to make sure you also understand that you're under oath, so any knowing

18  false statements could constitute perjury or violation of other Federal laws, such as 18

19  U.S.C. 1001, so it's important that you always tell the truth.

20         If you either don't hear a question or don't understand a question, please say so,

21  so that we can either repeat it or try to clarify it.   Also, if you don't recall or don't know

22  the answer, feel free to say so.

23         With that said, I'll turn to Mr. Burnham, who I understand wants to make a

24  statement for the record.

25         Mr. Burnham.   Thank you, Mr. Wood.

1      First, on December 1st, I sent a letter to Chairman Thompson raising our objection

2  to the subpoena you referred to, and I'd like to ask if that could be made a part of the

3  official record of today's deposition.

4      Mr. Wood.   Yes.   And I believe that is in the binder as exhibit 2.   And so that

5  will be in the record.

6      Mr. Burnham.   Okay.

7      And then just -- I hadn't planned to say this, but you mentioned earlier that

8  committee members might be joining here and there.   To the extent possible, can you

9  let us know who's here and who's coming?

10      Mr. Wood.   Yes.   So we will try to keep an eye on the video screen.   It should

11  pop up with their names on it.   Sometimes it's only a first name or a last name, but we

12  will try to notice it when we do, between questions, pause, and note for the record that

13  they've joined.

14      Mr. Burnham.   And I can watch it.   They'll show up on this big TV here?

15      Mr. Wood.   Yes.

16      Mr. Burnham.   All right.   So I can watch as well.   Thank you.

17      With that said, short statement on behalf of my client.

18      We wish to preserve the objections in full noted in the letter I referred to a

19  moment ago, but need not elaborate on them further here, with one exception.

20      I wish to emphasize to the committee the importance of the Fifth Amendment to

21  the United States Constitution, which I have counseled my client to invoke.

22      This right is fundamental to our system of justice.   As I stated in my letter, our

23  Supreme Court has called the Fifth Amendment a safeguard against heedless, unfounded,

24  or tyrannical prosecution to protect the innocent, as well as the guilty.

25      Invoking the Fifth Amendment is not an admission of guilt and no one should

1    describe it as such.    We make no apologies for seeking Fifth Amendment protection as

2    so many law-abiding Americans have done throughout history.

3            In asserting this privilege on my client's behalf, I cannot reveal information

4    protected by the attorney-client privilege.    Doing so would violate my duty as a lawyer,

5    the importance of which I need not explain to a committee with distinguished lawyers

6    among its members and staff.

7            But, in fact, there is no need to reveal privileged information to establish Dr.

8    Eastman's basis for Fifth Amendment protection.    One need only look to the public

9    record to understand why claiming the Fifth Amendment is a necessity forced upon Dr.

10   Eastman.

11           I have detailed on pages 8 and 9 of my letter, which is now a part of the record,

12   examples of statements from committee members and other voices of influence which

13   made clear that Dr. Eastman has a legitimate fear of criminal prosecution.

14           I could offer many additional examples beyond those in my letter, but out of

15   respect for this committee's time, I will limit myself to two further examples beyond what

16   I've already put in the letter.

17           The first one:    According to news reports, on December 1st a United States

18   district judge, who herself has a background in Federal prosecution, stated during the

19   criminal sentencing of a defendant charged with committing crimes on January 6th that

20   the President, former President Trump, and others who spoke at the rally on the Ellipse

21   that day, quote, "bear greater responsibility and should be held accountable," unquote.

22   This from a judge in the very courthouse where over 600 people were criminally charged

23   in connection with January 6th.

24           My second example, second and final example, is there is an active bar complaint

25   against Dr. Eastman in California bearing on the exact subject matter of this deposition.

1    The bar complaint alleges that Dr. Eastman may have assisted former President Donald

2    Trump in criminal conduct in connection with the 2020 election and January 6th.

3         In other words, there is currently pending today against Dr. Eastman formal legal

4    process specifically alleging criminal activity in connection with the very event described

5    in the cover letter to this committee's subpoena.

6         I submit that based on these facts, Dr. Eastman has a clear case, as clear a case for

7    Fifth Amendment protection as this committee -- or indeed any committee -- is ever likely

8    to encounter.

9         In closing, I wish to emphasis that Dr. Eastman's purpose here is simply to do his

10   duty as a citizen.    Dr. Eastman is a distinguished lawyer and scholar of the law.    He

11   recognizes his legitimate responsibilities to the United States Congress.

12        The law is clear that invocation of the Fifth Amendment must, if Congress

13   requested, be offered on a question-by-question basis.    This committee has made such a

14   request and Dr. Eastman has come here today from far out of town, at his own expense,

15   to comply.

16        And with that, the committee may inquire.    Thank you.

17   Mr. <u>Wood.</u>    Great.    Thank you, Mr. Burnham, for your statement.    Both your

18   statement, which you've just provided to the committee, as well as your letter of

19   December 1st, are in the record.

20        And I would note for the record, I believe two members of the committee have

21   joined us, Vice Chair Cheney and Mr. Raskin.    The way it's set right now, unfortunately,

22   we can't see both of them, but we will try to get it switched to grid view so that we can

23   keep track of who's joining.

24        I am going to just very quickly, in order to save time, go over a little bit of the

25   witness' professional background.

1                                        EXAMINATION

2                          BY MR. WOOD:

3          Q     Dr. Eastman, you are a lawyer, correct?

4          A     Correct.

5          Q     And are you a graduate of the University of Chicago Law School?

6          A     Yes.

7          Q     And I know of your very distinguished clerkships.    Can you tell us who you

8    clerked for after law school?

9          A     Judge Michael Luttig and Justice Clarence Thomas -- like you, John.

10         Q     Yes.    And then did you practice at a law firm following your clerkships?

11         A     I did, at Kirkland & Ellis.

12         Q     For how long?

13         A     Two years.

14         Q     And following that --

15         A     Not including time as summer associate.

16         Q     I understand.    And what did you do after leaving Kirkland & Ellis?

17         A     I went into teaching and founded a public interest law firm called the Center

18   for Constitutional Jurisprudence at the Claremont Institute.

19         Q     And do I understand that you both have taught in an academic setting and

20   also represented clients as well?

21         A     That's correct.

22         Q     If nobody has any questions about the background of the witness, I'll just

23   start getting into the more substantive questions.

24               Dr. Eastman, in an interview with Larry Lessig and Matt Seligman on the "Another

25   Way" podcast, September 27th, 2021, you were asked about the memoranda that you

1    wrote regarding the role of the Vice President in counting the electoral college votes on

2    January 6th, and you said, quote, "Although I did have a client in this, the client, the

3    President, the former President of the United States, has authorized me to talk about

4    these things.    I want to make that clear upfront," close quote.

5         Did President Trump authorize you to talk publicly about the memoranda that you

6    wrote?

7         Mr. Burnham.    I beg the committee's indulgence.

8         The Witness.    On the advice of counsel, I hereby assert my Fifth Amendment

9    right against being compelled to be a witness against myself.    And with the committee's

10   permission, I will invoke this right as necessary in response to further questions by simply

11   stating "The Fifth."

12            BY MR. WOOD:

13        Q    So is it your position that you can discuss those memoranda in public

14   settings, but will not discuss those memoranda with the committee pursuant to a

15   subpoena?

16        A    Fifth.

17        Q    On May 5th, 2021, in an interview with -- of the "Peter Boyle Show," you

18   said, "I met with the President and the Vice President on January 4th in the Oval Office

19   and the President had been advised, based on law review articles that were done after

20   the 2000 election, that, in fact, maybe the Vice President had unilateral authority to

21   determine the validity of contested electoral votes."

22        You said later in the interview that, quote, "I would normally not talk about a

23   private conversation I had with a client, but I have express authorization from my client,

24   the President of the United States, at that time to describe what occurred, to truthfully

25   describe what occurred in that conversation," close quote.

1       Did President Trump authorize you to discuss publicly your January 4th, 2021,

2   conversation with him?

3       A    Fifth.

4       Q    So is it your position that you can discuss in the media direct conversations

5   you had with the President of the United States, but you will not discuss those same

6   conversations with this committee?

7       A    Fifth.

8       Mr. Burnham.    And, committee's indulgence, just to be clear, I advised my client

9   not only to take the Fifth, but we're not in a position to go into the basis of the Fifth

10  without defeating the position itself, which is likely to be answers to -- similar answers

11  will be offered to questions such as the one just asked, if that helps.

12          BY MR. WOOD:

13      Q    Dr. Eastman, you've not produced any documents in response to the

14  subpoena, which is in exhibit 1.    Why have you not produced any documents to the

15  committee?

16      A    Fifth.

17      Q    Just so I understand, is it your position that the act of producing documents,

18  as opposed to the content of the documents themselves, could tend to incriminate you?

19      A    Fifth.

20      Q    Dr. Eastman, did you use a Chapman University email account for any

21  communications related to the 2020 election?

22      A    Fifth.

23      Q    Dr. Eastman, did you use a Gmail account for any communications related to

24  the 2020 election?

25      A    Fifth.



1       Q       Dr. Eastman, did you use any other email account for communication related

2       to the 2020 election?

3       A       Fifth.

4       Q       Did you send or receive any text messages related to the 2020 election using

5       your personal cell phone?

6       A       Fifth.

7       Q       Do you have any documents regarding the 2020 election on your personal

8       computer?

9       A       Fifth.

10      Q       Do you have any documents regarding the 2020 election on any server?

11      A       Fifth.

12      Q       Dr. Eastman, were you in Philadelphia in connection with your participation

13      in a panel on federalism and separation of powers at the Federalist Society National

14      Lawyers Conference that took place in November 2020?

15      A       Fifth.

16      Q       While you were in Philadelphia, did you meet with Corey Lewandowski?

17      A       Fifth.

18      Q       Dr. Eastman, did you represent President Trump or his campaign in

19      challenging the results of the 2020 election?

20      A       Fifth.

21      Q       Dr. Eastman, do you have an engagement letter or other document

22      memorializing your relationship with President Trump or his campaign?

23      A       Fifth.

24      Q       Dr. Eastman, did you receive any legal fees for your work on behalf of

25      President Trump or his campaign?

1          A       Fifth.

2          Q       During a Georgia State Senate Judiciary Committee hearing dated

3    December 3rd, 2020, Mayor Rudy Giuliani stated that the legislators were provided with

4    copies of a 7-page paper that you authored.

5          Will you produce to the committee this document that was previously shared with

6    Georgia legislators?

7          A       Fifth.

8          Q       Okay.   Dr. Eastman, did you reach out to State legislators after the 2020

9    Presidential election?

10         A       Fifth.

11         Q       Okay.   Just so I understand, we've been trying to save -- allow you to save

12   some time by saying "Fifth," but I just want to make sure that with regard to the question

13   of whether you reached out to State legislators after the 2020 Presidential election,

14   you're invoking your Fifth Amendment right on the grounds that answering the question

15   could potentially incriminate you?

16         Mr. Burnham.   That's correct.

17         Mr. Wood.   I think I need the witness to say it.

18         The Witness.   I'm claiming the Fifth.

19              BY MR. WOOD:

20         Q       Dr. Eastman, did you contact any State legislative leadership in Arizona?

21         A       Fifth.

22         Q       Dr. Eastman, did you contact the office of Arizona House Speaker Rusty

23   Bowers in mid-December?

24         A       Fifth.

25         Q       Dr. Eastman, are you going to take -- invoke your Fifth Amendment right

1       against self-incrimination with regard to any other questions that I would ask regarding

2       whether you reached out to State legislators regarding the 2020 election?

3               Mr. Burnham.    If I may, Dr. Eastman will probably assert the Fifth in response to

4       that question, but from my perspective as counsel the answer is yes.

5               Mr. Wood.    Okay.    And Ms. Lofgren, I believe, has joined us.    And we're going

6       to need to take just a very short break, and we'll go off the record.

7               [Discussion off the record.]

8               Mr. George.    I think we just need to hear from Dr. Eastman the invocation of the

9       Fifth that counsel just made.

10              The Witness.    Yes.    I'm taking advice of counsel and invoking the Fifth.

11              Mr. Wood.    Okay.    We'll take a 5-minute break and then we'll come back on the

12      record.    And I'll just remind you that the camera is still rolling.    If you want to talk

13      privately, you can use that room.    I think we need to speak amongst each other also.

14      So 5 minutes.

15              [Recess.]

16              Mr. Wood.    Okay.    We'll go back on the record.

17      I believe Mr. Kinzinger has joined us.    So I believe we have Vice Chair Cheney, Mr.

18      Raskin, Ms. Lofgren, and Mr. Kinzinger on.

19                  BY MR. WOOD:

20      Q       Dr. Eastman, if you could turn your attention to exhibit 7 in your binder,

21      which has a cover memo dated December 14th, 2020.    If you turn to the next page, it's a

22      document entitled, "Certificate of the votes of the 2020 electors from Arizona."

23              Dr. Eastman, have you seen that document before?

24      A       Fifth.

25      Q       Dr. Eastman, did you have any role in drafting that document?

1          A     Fifth.

2          Q     Dr. Eastman, do you know who drafted that document?

3          A     Fifth.

4          Q     Dr. Eastman, did you draft any certificates of electoral votes for any other

5     States?

6          A     Fifth.

7          Mr. Wood.   Okay.   I think Mr. Raskin may have a question.

8          Mr. Raskin.   Yes.   Thank you.

9          I wanted to ask Dr. Eastman whether he's asserting the Fifth just with respect to

10    the actions he took on January 6th and days leading up or whether he is asserting the

11    Fifth with respect to the ideas that he has promoted about the electoral college.

12         Mr. Burnham.   I beg the Congressman's pardon.   As I mentioned to Mr. Wood a

13    moment ago, I've instructed my client that he should claim the Fifth not only in response

14    to questions about the subject matter of the subpoena, but also as to questions about the

15    basis for the Fifth Amendment, as doing so would defeat the protection of the Fifth

16    Amendment itself.

17         But to help, as best as I can, I suspect that most of the questions asked under the

18    heading of the general subject matters that were just offered would probably result in an

19    invocation.

20         I hope that's helpful.

21         Mr. Raskin.   I appreciate that.   But I'm not asking with respect to the basis for

22    his invocation of the Fifth.   I'm asking for which questions he will answer and which not.

23         Will he answer questions with respect to the substantive content of his ideas

24    about the Vice President and the electoral college?

25         Mr. Burnham.   I've advised him not to answer such questions on Fifth

1    Amendment grounds.

2          Mr. Raskin.    Well, then, if he's going to assert it, would he assert it so I can hear

3    that?

4          Mr. Burnham.    Certainly.

5          The Witness.    Yes.    On advice of counsel, I'm asserting the Fifth.

6          Mr. Raskin.    Okay.    So to be clear, you're asserting the Fifth Amendment as to

7    whether or not you were answering -- you're asserting the Fifth as to whether or not

8    you're refusing to answer questions just about all of your actions or also about the ideas

9    that you have about the electoral college.    Is that right?

10         The Witness.    And on advice of counsel, yes, I'm asserting the Fifth.

11         Mr. Raskin.    Thank you.    I yield back.

12         Mr. Wood.    Do any other members have questions?

13             BY MR. WOOD:

14    Q      Dr. Eastman, if you could turn your attention to exhibit 10 in your binder,

15    which has a -- the first page is an email from Jeffrey Clark at the Department of Justice

16    dated December 28th, 2020, and then the next several pages are a draft of a letter to

17    Governor Brian Kemp, Speaker of the House David Ralston, President Pro Tem of the

18    Senate Butch Miller, all of the State of Georgia.

19         Have you seen this letter before?

20    A      Fifth.

21    Q      Dr. Eastman, did you have any role in drafting this letter?

22    A      Fifth.

23    Q      Dr. Eastman, did you speak to Jeffrey Clark about this letter?

24    A      Fifth.

25    Q      Dr. Eastman, did you speak with anyone else at the Department of Justice

1    regarding efforts to overturn the results of the 2020 Presidential election?

2        A    Fifth.

3        Q    Dr. Eastman, regarding the 2020 election, did you speak with Representative

4    Scott Perry?

5        A    Fifth.

6        Q    Dr. Eastman, with regard to the 2020 election and any efforts to change the

7    outcome of the election, did you speak with Senator Josh Hawley?

8        A    Fifth.

9        Q    And just so I understand, Dr. Eastman, with regard to whether you had any

10   conversations with Senator Josh Hawley about efforts to overturn the results of the 2020

11   election, you're taking the Fifth Amendment on the grounds that your answer could tend

12   to incriminate you?

13       A    Fifth.

14       Q    Is that a yes?

15       Mr. Burnham.    That was an invocation of the Fifth in response to your question

16   about his basis for taking the Fifth, but I think it could be taken as a yes.

17       Mr. Wood.    Okay.    Just to be clear, I wasn't trying to ask about the basis for

18   taking the Fifth, I just wanted to clarify that he was taking the Fifth on the grounds that it

19   could incriminate him, not anything about the factual basis or legal basis underlying that.

20              BY MR. WOOD:

21       Q    Dr. Eastman, did you clerk with now Senator Ted Cruz.

22       A    Yes.

23       Q    Dr. Eastman, did you have any communications with Senator Ted Cruz

24   regarding efforts to change the outcome of the 2020 election?

25       A    Fifth.

1      Q      Dr. Eastman, did you have any conversations with any other Members of

2   Congress regarding the efforts to overturn the outcome of the 2020 election?

3      A      Fifth.

4      Q      Dr. Eastman, it's been publicly reported that on or about December 31st,

5   2020, a member of the Trump legal team reached out to you while you were on vacation

6   with your family in Texas.

7           Dr. Eastman, who contacted you from the Trump legal team?

8      A      Fifth.

9      Q      Did that person ask you to do anything?

10      A      Fifth.

11      Q      Did the Trump legal team ask you to prepare a memorandum regarding the

12   Vice President's role in the counting of electoral votes at the joint session of Congress on

13   January 6th, 2021?

14      A      Fifth.

15      Q      Dr. Eastman, did you have a conversation with Senator Mike Lee?

16      A      Fifth.

17      Q      Dr. Eastman, when asked about a call with Senator Mike Lee by the National

18   Review, you stated to the National Review that you had a conversation with Senator Lee

19   and that, quote, "We were working on broader things," close quote.

20           Dr. Eastman, what were those broader things on which you were working with

21   Senator Mike Lee?

22      A      Fifth.

23           Mr. Wood.   Okay.   I'll pause.   Anybody have any questions?

24           Do any members have any questions at this time?

25           Mr. Raskin.   I'd like to ask one further question if I could.

1          Mr. Wood.    Yes, of course.

2          Mr. Raskin.    I'd like to ask Dr. Eastman whether the Vice President has ever

3   exercised unilateral authority to reject electoral college votes coming from a particular

4   State before in American history?

5          The Witness.    Fifth.

6          Mr. Raskin.    I yield back.

7              BY MR. WOOD:

8      Q    Just so I understand, in response to Mr. Raskin's question about a historical

9   fact, not about your conduct, you are invoking your Fifth Amendment right against

10  self-incrimination?

11     A    I claim the Fifth.

12     Q    Dr. Eastman, on January 2nd, 2021, you appeared on Steve Bannon's "War

13  Room" podcast.    I'm going to read you some brief excerpts there.

14         Mr. Bannon said, quote, "Are we to assume that this is going to be a climactic

15  battle?" close quote.

16         Dr. Eastman, you said, quote, "Well, I think a lot of that depends on the courage

17  and the spine of the individuals involved," close quote.

18         Dr. Eastman, what did you understand Mr. Bannon to mean when he said on this

19  podcast asking whether there could be a climactic battle?

20     A    Fifth.

21     Q    Dr. Eastman, at the time that you engaged in the podcast on January 2nd,

22  2021, with Mr. Bannon, had you heard that there would be protests on January 6th?

23     A    Counsel, can you clarify the date of the "War Room" podcast in your last

24  question?    I thought you had said January 21st.

25     Q    I certainly didn't mean to.    If I did, I apologize.    The date of the podcast

1    was January 2nd, 2021.    So I'm happy to repeat the question.

2         A    If you would, please.

3         Q    When you were on the January 2nd, 2021, podcast with Steve Bannon called

4    the "War Room," had you heard that there would be protests on January 6th?

5         A    Fifth.

6         Q    When you were on the podcast with Mr. Bannon, had anyone mentioned to

7    you the possibility that protests on January 6th could turn violent?

8         A    Fifth.

9         Q    So on that podcast, after you said, "Well, I think a lot of that depends on the

10   courage and the spine of the individuals involved," Mr. Bannon said, quote, "When you

11   just said the courage and the spine, are you talking on the other side of the football?

12   Would you be -- would you be -- that'd be a nice way to say a guy named Mike, Vice

13   President Mike Pence," close quote.

14        Your answer:    "Yes."

15        What did you mean when you stated that a lot of that would depend on the

16   courage and spine of Vice President Mike Pence?

17        A    Fifth.

18        Q    On that same podcast, you also told Mr. Bannon that Mayor Rudy Giuliani

19   was working in the Senate to stop the election certification.    What work was Mayor

20   Giuliani doing in the Senate to stop the certification?

21        A    Fifth.

22        Q    Dr. Eastman, did you speak with any United States Senators about stopping

23   the certification on January 6th?

24        A    Fifth.

25        Q    Dr. Eastman, will you answer any of my questions regarding your public

1 appearance on Steve Bannon's "War Room" podcast on January 2nd, 2021?

2   A No. Fifth.

3   Mr. <u>Wood.</u> I'll move on.

4   Any members have any questions at this point?

5   Okay.

6   Dr. Eastman, I'm going to ask you some questions about your involvement in a

7 so-called "war room" at the Trump -- I'm sorry. No.

8   First, I'm going to ask you about some meetings at both the Trump Hotel and the

9 Willard, the latter of which meaning the Willard, we understand, had a war room.

10   Did you stay at the Willard Hotel between January 3rd and January 8th, 2021?

11   Mr. <u>Burnham.</u> Can I interpose a point of order?

12   Mr. <u>Wood.</u> Yes.

13   Mr. <u>Burnham.</u> It just occurred to me that on several occasions both the

14 Congressman and yourself have asked questions along the lines of, Dr. Eastman, will you

15 answer any questions about some category of topics, like the podcast, and he said no.

16   Mr. <u>Wood.</u> Uh-huh.

17   Mr. <u>Burnham.</u> I just want to make clear that that's not meant to be a blanket

18 assertion. If any of the members of the committee or yourself want to ask however

19 many questions as you want about any subject, we're happy to answer them.

20   Mr. <u>Wood.</u> Okay. Answer them or invoke privileges?

21   Mr. <u>Burnham.</u> Most likely the latter.

22   Mr. <u>Wood.</u> Okay. I understand that and I appreciate it. I'm also trying to save

23 some time. So if on any of these topics if I ask a question whether or not he'd be willing

24 to answer, I'm asking would he be willing to answer any of them without invoking the

25 Fifth Amendment. If for any of them he is willing, then I would have a much longer list

1    of questions.

2            Mr. Burnham.    I understand.

3            Mr. Wood.    Okay.    So are you comfortable with me asking that type of question

4    or do you prefer that I go through question by question?

5            Mr. Burnham.    Perfectly comfortable with that type of question.

6            Mr. Wood.    Okay.

7            Mr. Burnham.    I just wanted to make clear we weren't trying to do an improper

8    blanket assertion.

9            Mr. Wood.    No, I understand.

10           Mr. Burnham.    I appreciate the question.

11           Mr. Wood.    Yeah.    Thank you for that clarification.

12                   BY MR. WOOD:

13       Q    Dr. Eastman, did you stay at the Willard Hotel between January 3rd and

14   January 8th, 2021?

15       A    Fifth.

16       Q    With whom did you meet at the Willard Hotel between January 3rd and

17   January 8th, 2021?

18       A    Fifth.

19       Q    Dr. Eastman, did you participate in a so-called "war room" at the Willard

20   Hotel between January 3rd and January 8th, 2021?

21       A    Fifth.

22       Q    Dr. Eastman, what was the purpose of this war room?

23       A    Fifth.

24       Q    Dr. Eastman, while you were at the war room between January 3rd and

25   January 8th, 2021, did you have any conversations with President Donald Trump?

1      A      Fifth.

2      Q      Just so I understand, Dr. Eastman, with regard to the question of whether

3  you had any conversations with President Donald Trump while at the Willard Hotel war

4  room, you're invoking the Fifth Amendment right against self-incrimination?

5      A      Fifth Amendment right not to be compelled to be a witness against myself.

6      Mr. Wood.   All right.   Before I move on to some of the legal memoranda you

7  wrote, I'll pause to see if anybody has any other questions.

8      Nope?

9      Okay.

10          BY MR. WOOD:

11      Q      Dr. Eastman, I'm going to ask you about a couple of legal memoranda that, I

12  believe, don't have your name on them, but have been in public reports attributed to you.

13          If you could look at exhibit 14 in your binder.   There is a two-page memorandum.

14  And just for ease of reference, I may refer to this as the two-page memorandum to

15  distinguish it from another memorandum that I believe you wrote later.

16          Dr. Eastman, did you write this two-page memorandum?

17      A      Fifth.

18      Q      Just so I understand, Dr. Eastman, you're invoking your Fifth Amendment

19  right against self-incrimination with regard to whether you are the author of this legal

20  memorandum?

21      A      I'm invoking my Fifth Amendment right not to be compelled to be a witness

22  against myself.

23      Q      Dr. Eastman, did anyone ask you to write this memorandum?

24      A      Fifth.

25      Q      Dr. Eastman, did you discuss this memo with Jenna Ellis?

1          A      Fifth.

2          Q      Dr. Eastman, to whom did you give this memo?

3          A      Fifth.

4          Q      Dr. Eastman, the first sentence of the memo starts off by saying, "7 States

5    have transmitted dual slates of electors to the President of the Senate."

6          Is that statement in this memo true?

7          A      Fifth.

8          Q      Dr. Eastman, at the bottom of page 1 this memorandum states, "So here's

9    the scenario we propose."

10         Dr. Eastman, who is the "we" you were -- who is the "we" that the author of this

11   memo referred to?

12         A      Fifth.

13         Q      Dr. Eastman, on the next page there are six numbered paragraphs.    The

14   one that starts with third reads, quote, "At the end, he announces that because of the

15   ongoing dispute in the 7 States, there are no electors that can be deemed validly

16   appointed in those States," close quote, and so President Trump would have a majority of

17   the electors counted, and, quote, "Pence then gavels President Trump as re-elected,"

18   close quote.

19         Dr. Eastman, did you advise the President of the United States that the Vice

20   President could reject electors from seven States and declare that the President had been

21   re-elected?

22         A      Fifth.

23         Q      In the paragraph starting with -- paragraph No. 4, it starts with, "Howls, of

24   course" -- you describe that the Vice President could declare that no candidate received a

25   majority of the electoral votes and, therefore, the election would go to the House of

1    Representatives, where Republicans control the majority of State delegations and

2    President Trump is re-elected there as well.

3         Dr. Eastman, did you advise the President of the United States that the Vice

4    President could reject electors from seven States and cause the selection of the President

5    of the United States to be made by the U.S. House of Representatives?

6         A    Fifth.

7         Q    Dr. Eastman, in the paragraph No. 5 that starts with, "One last piece," the

8    memo states -- and I'm not quoting here, but summarizing -- when the Vice President got

9    to the electoral votes for Arizona and Members of Congress objected, someone in the

10   Senate should filibuster in order to create more time for States to send alternate slates of

11   electors.

12        Dr. Eastman, did you advise the President of the United States that he should have

13   Members of Congress object to the electors from several States in order to create more

14   time for States to send alternate slates of electors?

15        A    Fifth.

16        Q    And, again, are you invoking your Fifth Amendment right against

17   self-incrimination with regard to that question?

18        A    I'm invoking the Fifth Amendment right not to be compelled to be a witness

19   against myself.

20        Q    Dr. Eastman, did the President of the United States encourage Members of

21   Congress to object to electors from several States in order to create more time for States

22   to send alternate slates of electors?

23        A    Fifth.

24        Q    Dr. Eastman, did you discuss with any Members of Congress your plan to

25   have Members of Congress object to State electors in order to prevent certification of the

1    electoral votes on January 6th, 2021?

2        A    Fifth.

3        Q    If you look at exhibit 16 -- I'm staying on the topic of that two-page

4    memo -- but exhibit 16 is an opinion and commentary under the heading "Viewpoints"

5    published in The Sacramento Bee.    It indicates that it was authored by you.

6        In that commentary, you describe your two-page memo, which I believe is the one

7    we just went over, as, quote, "a preliminary and incomplete one, a draft of a more

8    complete memo that outlined all the scenarios that had become topics of discussion

9    following the November 2020 election," close quote.

10       Do you know whether your two-page memo, despite being preliminary and

11   incomplete, was provided to the President of the United States?

12       A    Fifth.

13       Q    Do you know whether that memo was provided to any advisers of the

14   President of the United States?

15       A    Fifth.

16       Q    Dr. Eastman, did you write the opinion piece that's in tab 16?

17       A    Fifth.

18       Q    Okay.    Just so I understand, Dr. Eastman, you're invoking your Fifth

19   Amendment right against self-incrimination to question whether this opinion and

20   commentary piece with the byline John C. Eastman, you're invoking the Fifth Amendment

21   right to not answer that question?

22       A    On advice of counsel, I'm invoking the Fifth.

23       Mr. Wood.    Okay.    I'm going to pause there to see if any members have any

24   questions.    And we're still on the first memo, so we haven't yet gotten to the longer

25   version of the memo.

1          Does anybody have any questions about the two-page memo?

2          Mr. Raskin.    Yeah, I do have a question about that.

3          In this commentary, Dr. Eastman takes exception to Dean Chemerinsky's

4   statements that he was involved in trying to overthrow the government or stage a coup.

5          Why did you take exception to those statements?

6          The Witness.    Fifth.

7          Mr. Wood.    Anything else?

8          Mr. Raskin.    I'm sorry.    Did he assert the Fifth Amendment about that?

9          Mr. Wood.    He did.

10          Mr. Raskin.    Okay.    I just wanted to go back to something that was asked

11   before.

12          Did you -- were you acting as a lawyer for Donald Trump during the events leading

13   up to January 6th?

14          The Witness.    Fifth.

15          Mr. Raskin.    Are you asserting the Fifth Amendment in your capacity as a lawyer

16   and a citizen or just as a citizen?

17          The Witness.    Fifth.

18          Mr. Raskin.    Okay.    I yield back.

19          Mr. Wood.    Any other members have questions?

20          Any other staff have questions?

21          Go ahead.

22              BY MR. GEORGE:

23          Q    Along those lines, Mr. Eastman, if you could turn to exhibit No. 5.    And this

24   is a filing in the Supreme Court of the United States that is titled, "A Motion of Donald J.

25   Trump, President of the United States, to Intervene in His Personal Capacity as Candidate

1    for Re-Election, Proposed Bill of Complaint in Intervention, and Brief in Support of Motion

2    to Intervene."

3           And you are listed, John C. Eastman, as counsel of record, from One University

4    Drive in Orange, California, with an email address at Chapman University.

5           Are you the person that's listed on that Supreme Court filing at exhibit No. 5?

6      A    Fifth.

7      Q    Could you please turn to exhibit No. 8?    That is another filing in the

8    Supreme Court of the United States that is titled, "Motion for Expedited Consideration,"

9    where, again, John C. Eastman, Esq., is listed as counsel for petitioner, which is Donald J.

10   Trump for President, Inc.

11          Are you the person that's listed there as counsel of record in exhibit No. 8?

12     A    On advice of counsel, I'm asserting the Fifth.

13     Q    If you could turn to exhibit No. 9.    That is a filing in the Supreme Court of

14   the United States that's titled, "Reply to Secretary Boockvar's Response in Opposition to

15   the Motion for Expedited Consideration of the Petition for a Writ of Certiorari."

16          And that is Donald J. Trump for President, Inc. as petitioner, with Kathy Boockvar,

17   Secretary of the Commonwealth of Pennsylvania, as respondent, with John C. Eastman

18   listed as counsel of record for the petitioner.

19          Is that you who is listed on that filing in the United States Supreme Court?

20     A    On advice of counsel, I'm asserting the Fifth.

21     Q    And just to be clear, are you asserting the Fifth Amendment because a

22   truthful answer might tend to incriminate you --

23     A    I'm asserting --

24     Q    -- on this question?

25     A    I'm asserting the Fifth.

1              BY MR. WOOD:

2        Q      Okay.    While we're on those documents, tab 9 has a John C. Eastman, and

3    then at the bottom there has a Gmail account.    And I'm not going to read the address in

4    case you still use that email account.

5              Do you still have access to the emails in the Gmail account referenced in the

6    bottom of that page?

7        A      Fifth.

8        Q      And going back to tab 5, similarly, there's a John C. Eastman, counsel of

9    record.    At the bottom, there is a Chapman.edu email address.

10              Do you still have access to the emails in the Chapman email account?

11       A      Fifth.

12       Q      Okay.    Going back to exhibit 16, on the fourth page, sort of in the middle of

13    the page, with regard -- and the context is the Vice President's authority to reject

14    electors.

15              The John C. Eastman who wrote this article, whether that's you or not, wrote, "But

16    as The New York Times confirmed through thorough investigation and reporting on this

17    critical issue, I did not advise Pence to exercise such authority."

18              You further wrote, quote, "It would be foolish to exercise it" -- meaning that

19    authority -- "in the absence of certifications of alternate Trump electors from the

20    contested States' legislatures," close quote.

21              Dr. Eastman, do you acknowledge that there were no alternate electors sent from

22    contested States?

23       A      Fifth.

24       Q      Dr. Eastman, if, in fact, there were no alternate electors from contested

25    States, why did you write in the first sentence of the two-page memo that, quote, "7

1 States have transmitted dual slates of electors to the President of the Senate," close

2 quote?

3   A Fifth.

4   Q Dr. Eastman, the passage that I read to you from The Sacramento Bee found,

5 at tab 16, where it says, "I did not advise Pence to exercise such authority," why did you

6 write the two-page memorandum stating, "Here's the scenario we propose," if, in fact,

7 you were not proposing that scenario?

8   A Fifth.

9   Q Dr. Eastman, did your views change regarding the Vice President's authority

10 after you wrote the two-page memo?

11   A Fifth.

12   Q Dr. Eastman, do you now disagree with the scenario you proposed in the

13 two-page memo?

14   A Fifth.

15   Mr. Wood. Okay. I will pause there before I turn to the longer six-page memo.

16   Do any members have any questions?

17   Staff?

18   Okay.

19    BY MR. WOOD:

20   Q Dr. Eastman, if you turn to tab 15, this is another memorandum, which for

21 ease of reference and to distinguish it from the other memo that we went over, I'll refer

22 to the memo in tab 15 as being the six-page memo.

23   Dr. Eastman, did you write this memo?

24   A Fifth.

25   Q Dr. Eastman, did anyone ask you to write this memo?

1        A    Fifth.

2        Q    Dr. Eastman, was anyone else involved in writing this memo?

3        A    Fifth.

4        Q    Okay.    Going back to exhibit 16, again, the Sacramento Bee article, you

5    wrote, quote, "Neither version of the memo reflects the advice I gave to then-Vice

6    President Pence, paren, (though, to be precise, the final scenario laid out in the complete

7    memo does), close paren," close quotes.

8        Was this six-page memo, which you say does not reflect the advice you gave to

9    the Vice President, nonetheless given to President Donald Trump?

10       A    Fifth.

11       Q    Dr. Eastman, was the six-page memo given to any advisers of the President?

12       A    Fifth.

13       Q    Dr. Eastman, did you write a memo that did not reflect your actual advice?

14       A    Fifth.

15       Q    Dr. Eastman, did your view regarding the Vice President's role change after

16    you wrote the six-page memo?

17       A    Fifth.

18       Q    Turning to the memo itself, the memo then, quote, "war games," close

19    quote, several scenarios, including scenarios in which the Vice President rejects ballots

20    from certain States and President Trump is elected.

21       Dr. Eastman, on the bottom of page 4 of your memo, did you advise the President

22    of the United States that if State legislatures in contested States certified the Trump

23    electors, the Vice President could count those electors and, quote, "Trump wins," close

24    quote?

25       A    Fifth.

1    Q    And, again, just so I understand, you're invoking your Fifth Amendment right

2    against self-incrimination in refusing to answer the question of whether you advised the

3    President of the United States that if State legislatures from contested States certified the

4    Trump electors, the Vice President could count those electors and Trump wins.

5    A    I'm invoking my Fifth Amendment, which specifically says in its text not to be

6    a witness -- compelled to be a witness against myself.

7    Q    On the bottom of page 4, did you advise the President of the United States

8    that even if the seven States did not send alternate slates of electors, Vice President

9    Pence, nonetheless, could still refuse to count electors from those States and declare that

10   Trump wins?

11   A    Fifth.

12   Q    And, again, you're invoking your Fifth Amendment right against

13   self-incrimination.    Is that correct?

14   A    The language of the Fifth Amendment is I shall not be compelled to be a

15   witness against myself, and that's what I'm invoking.

16   Q    On page 5 of the memo, did you advise the President of the United States

17   that Vice President Pence could refuse to count electors from seven States because of

18   ongoing election disputes and that, therefore, the U.S. House of Representatives would

19   pick the next President, and that under that scenario Trump wins?

20   A    Fifth.

21   Q    On page 5, did you advise the President of the United States that Vice

22   President Pence could adjourn the joint session of Congress and allow State legislatures

23   to convene and certify alternate slates of electors, allowing President Trump to be

24   re-elected?

25   A    Fifth.

1    Q    Dr. Eastman, did you discuss this six-page memo with the President of the

2    United States?

3    A    Fifth.

4    Mr. Wood.    Okay.    Next, I'm going to ask you about a January 4th, 2021,

5    meeting with President Trump and the Vice President of the United States, but before I

6    do that, I'm going to pause to see if any members have questions on the six-page memo.

7    Ms. Lofgren.    I have a question really related to a prior comment made by our

8    witness.

9    No person shall be held to answer for a capital, or otherwise infamous crime,

10    unless on a presentment or indictment of a grand jury, except in cases arising in the land

11    or naval forces, or in the militia, when in actual service in time of war or public danger;

12    nor shall any person be subject for the same offense to be put twice in jeopardy of life or

13    property; nor shall be compelled in any criminal case to be a witness against himself.

14    Is that in the Fifth Amendment, Dr. Eastman?

15    Mr. Burnham.    Madam Congresswoman, I've instructed my client, as I've

16    discussed with your colleagues, I think, before you may have joined, that I've counseled

17    him not to discuss the basis for his invoking the Fifth.    I would offer only an --

18    Ms. Lofgren.    I'm not asking the basis.    I'm just asking, is that what the Fifth

19    Amendment says?

20    Mr. Burnham.    I expect he'll invoke his Fifth in response to that question.    As far

21    as I could tell, it was quoted correctly, and I would just refer this body to cases such as

22    Watkins from the Supreme Court that hold that the Fifth applies in congressional

23    proceedings, and we're invoking it on that basis today.

24    Ms. Lofgren.    I yield back.

25    Mr. Raskin.    Could I just follow up on that for a moment?

1          Counsel invoked the bar proceeding which is taking place against Dr. Eastman in

2     California.    Is it the bar proceeding that is troubling Dr. Eastman with respect to

3     answering these questions or is it something else, Dr. Eastman?

4          Mr. Burnham.    If I could respond to the question.    The bar proceeding is just

5     one of many, many bases that led us to take the -- make the invocation we're making

6     here today.

7          Mr. Raskin.    Okay.    But, Dr. Eastman, you understand that a bar proceeding is

8     civil in nature, do you not?

9          The Witness.    Yes.

10         Mr. Raskin.    Okay.    So when you're asserting the Fifth Amendment, it is with

11    respect to other potential criminal prosecutions.    Is that right?

12         The Witness.    Fifth.

13         Mr. Raskin.    Okay.    I yield back.

14         Mr. Wood.    Okay.    Do any other members have questions?

15         And I think we've noted the members as they have joined.    As you can see, Vice

16    Chair Cheney and Mr. Raskin are still on.    Ms. Lofgren was on, but may have left.    And I

17    believe Mr. Kinzinger might still be on.    Nope, Ms. Lofgren and Mr. Kinzinger are both

18    still on.

19              BY MR. WOOD:

20    Q    So, Dr. Eastman, I'm now going to ask you some questions about the

21    January 4th, 2021, meeting with President Donald Trump and others in the Oval Office.

22         Dr. Eastman, did you meet with the President of the United States on January 4th,

23    2021, to provide advice regarding the Vice President's role in counting the electoral votes

24    on January 6th?

25    A    Fifth.

1          Q      Dr. Eastman, if I could turn your attention to exhibit 17.    This is a National

2    Review article dated October 22nd, 2021, by John McCormack.     The title is, "John

3    Eastman vs. The Eastman Memo."

4          And the bottom of page 7 says, "A source close to Pence tells National Review that

5    the position of Trump and some of his advisers was initially to pressure Pence to reject

6    outright the count of the electoral college votes in decisive States."

7          Dr. Eastman, did President Trump pressure Vice President Pence to reject outright

8    the electors from contested States?

9          A      Fifth.

10         Q      And, Dr. Eastman, I want to be clear here.    I'm not asking about anything

11   you did.    I'm asking whether or not President Donald Trump pressured Vice President

12   Pence to reject outright the electors from contested States?

13         A      Fifth.

14         Q      That same article on page 9 states, "According to the source close to Pence,

15   quote" -- and now it's quoting a source -- "'In the last 24 hours or so [before January 6th],

16   it became crystal clear finally -- even though the Vice President had been telling them this

17   for three weeks -- it's finally sunk in he wasn't going to do that.    So, then their position

18   moved to:    Well, would you delay it and send it back [to the State legislatures]?'" close

19   quote.

20         And I'll note there were some brackets in there.

21         Dr. Eastman, did President Donald Trump change his position from pressuring the

22   Vice President to reject electors to instead pressuring Vice President Pence to delay

23   certification and send the election back to State legislatures?

24         A      Fifth.

25         Q      And again, Dr. Eastman, I'm not asking here about your conduct.    I'm asking

1    whether President Donald Trump changed his position from pressuring Vice President

2    Pence to reject electors to instead pressuring Vice President Pence to delay certification

3    and send the election back to State legislatures.

4            A    Fifth.

5            Q    Dr. Eastman, did your position change from the position in your first memo,

6    what I referred to as the two-page memo, that the Vice President could reject electors, to

7    the position that the Vice President should instead delay certification beyond January 6th

8    to give States more time to send alternate slates of electors?

9            A    Fifth.

10           Q    Dr. Eastman, regarding your position that the certification of the election

11   should be delayed beyond January 6th, isn't that exactly what the rioters who attacked

12   the Capitol were trying to accomplish on January 6th?

13           A    Fifth.

14           Mr. Wood.    I'll pause there to see if there are other questions regarding that

15   meeting with the President in the Oval Office.

16           No members?

17           Any staff?

18           Okay.

19           Dr. Eastman, I'm now going to ask you about a meeting that we understand you

20   had with the staff to Vice President Pence the next day, so January 5th, 2021.

21           Dr. Eastman, did you meet with Marc Short, chief of staff for the Vice President,

22   and Greg Jacob, counsel to the Vice President, in the Eisenhower Executive Office Building

23   on January 5th, 2021?

24           The Witness.    Fifth.

1

2        [1:57 p.m.]

3              BY MR. WOOD:

4        Q      Dr. Eastman, what did you discuss with Vice President Pence's staffers?

5        A      Fifth.

6        Q      Dr. Eastman, if you look at exhibit 13, there's a Washington Post article

7    dated October 29th, 2021.    It says, "Read:    Pence aide Greg Jacob's draft opinion article

8    denouncing Trump's outside lawyers."

9              Just to make clear on the record, what this appears to be is The Washington Post

10   reprinting something written by Greg Jacob who previously had been counsel to Vice

11   President Pence.

12             In that piece, Mr. Jacob writes that, quote, "One of the President's key outside

13   lawyers agreed with me the day before the events at the Capitol that not a single

14   member of the Supreme Court would support his position," close quote.

15             Dr. Eastman, when Mr. Jacob refers to one of the President's key outside lawyers,

16   was he referring to you?

17       A      Fifth.

18       Q      Dr. Eastman, did you, in fact, agree with Mr. Jacob that not a single member

19   of the Supreme Court would support your position?

20       A      Fifth.

21       Q      And, Dr. Eastman, which position was that that Mr. Jacobs said not a single

22   member of the Supreme Court would support?

23       A      Fifth.

24       Q      Mr. Jacob then writes that this outside lawyer, quote, "acknowledged that

25   230 years of historical practices were firmly against it, and that no reasonable person

1    would create a rule that invested a single individual with unilateral authority to determine

2    the validity of disputed electoral votes for President of the United States," close quote.

3          Did Mr. Jacob accurately describe what you said to him on January 5th?

4          A     Fifth.

5          Q     Dr. Eastman, Mr. Jacob then writes that a fallback plan of this lawyer he

6    refers to was that the Vice President could instead stop the electoral vote count and refer

7    it out to the States.

8          Of this fallback plan, Mr. Jacob writes, quote, "That suggestion violated several

9    provisions of the Electoral Count Act, had no historical analog, and would deprive

10   Congress of its historical and statutory role in vote counting decisions," close quote.

11         Dr. Eastman, how do you respond to Mr. Jacob's description of the legal advice

12   you gave the President and Vice President of the United States?

13         A     Fifth.

14         Q     Dr. Eastman, at the beginning of the meeting on January 5th, 2021, with

15   Marc Short and Greg Jacob, did you, on behalf of the President of the United States, ask

16   that the Vice President reject electors from contested States on January 6th, 2021?

17         A     Fifth.

18         Q     And just so I understand it, in response to the last question, you're invoking

19   your Fifth Amendment right not to be a witness against yourself?

20         A     Yes.

21         Mr. Wood.     Okay.    Do any members have any questions?

22         Mr. Raskin.    I have a question.    I'd like to ask Dr. Eastman about the judicial

23   authority going up to January 6th.

24         More than 60 Federal and State courts have rejected every claim of electoral fraud

25   and corruption advanced by the Trump campaign.

1       Did you have any reason then, or do you have any reason today, to believe that

2   there was electoral fraud and corruption in the States that materially affected the

3   outcome of the Presidential election?

4       Mr. Burnham.   If I could have the committee's indulgence.

5       [Discussion off the record.]

6   The Witness.   I claim the Fifth.

7       Mr. Raskin.   Attorney General Bill Barr famously called Donald Trump's claims of

8   electoral fraud and corruption "bullshit."   Do you disagree with that conclusion?

9   The Witness.   Fifth.

10      Mr. Raskin.   I yield back.

11      Mr. Wood.   Do any other members have questions?   Okay.

12      Dr. Eastman, I've asked you a series of questions about the January 5th meeting

13  with Greg Jacob and Marc Short.

14      Dr. Eastman, did Greg Jacob on January 6th send you an email summarizing your

15  conversation?

16  The Witness.   Fifth.

17      Mr. Wood.   Dr. Eastman, would you provide to the select committee the email

18  that Greg Jacob sent you on January 6th summarizing your January 5th conversation?

19      Mr. Burnham.   I beg your pardon.   Could you repeat the last question?

20      Mr. Wood.   Yes.

21      BY MR. WOOD:

22  Q   I was asking Dr. Eastman, would he provide to the select committee the

23  January 6th email from Greg Jacob to Dr. Eastman that summarized their January 5th

24  conversation?

25  A   Fifth.

1    Q    And is it your position that the mere act of producing such email could tend

2    to incriminate you?

3    A    On advice of counsel, I invoke the Fifth.

4    Q    Okay.    I'm now going to ask you some questions about the January 6th,

5    2021, speech at the so-called "Stop the Steal" rally.

6    Dr. Eastman, did you speak at the White House Ellipse before a large crowd on

7    January 6th, 2021?

8    A    Fifth.

9    Q    Okay.    Dr. Eastman, if I could turn your attention to tab 12.    This is a

10    transcript of speeches given at the Ellipse on January 6th, 2021.

11    At the bottom of page 1, Mayor Rudy Giuliani -- I recognize this is Mayor Giuliani,

12    not you -- but Mayor Giuliani says, "Last night one of the experts that has examined these

13    crooked Dominion machines has absolutely what he believes is conclusive proof that in

14    the last 10 percent, 15 percent of the vote counted, the votes were deliberately changed.

15    By the same algorithm that was used in cheating President Trump and Vice President

16    Pence.    Same algorithm, same system, same thing was done with the same machines."

17    Dr. Eastman, do you have any evidence to support Mayor Giuliani's allegations

18    that the Dominion voting machine algorithm switched votes from President Trump to

19    Vice President Biden?

20    A    Fifth.

21    Q    Dr. Eastman, in the middle of the second page of that transcript -- and now

22    it's quoting you -- it says, "We know there was fraud, traditional fraud that occurred.

23    We know that dead people voted.    But we now know, because we caught it live last time

24    in real time, how the machines contributed to that fraud," close quote.

25    Dr. Eastman, what evidence do you have to support your statement that there

1     was traditional fraud?

2          A     Fifth.

3          Q     Dr. Eastman, what evidence do you have that dead people voted?

4          A     Fifth.

5          Q     Dr. Eastman, are you aware that the secretary of state of Georgia conducted

6     a review of this allegation and found that only four votes were cast in the name of dead

7     people?

8          A     Fifth.

9          Q     Dr. Eastman, when you said, quote, "how the machines contributed to that

10    fraud," close quote, do you have evidence that Dominion voting machines changed votes

11    from President Donald Trump to Vice President Biden?

12         A     Fifth.

13         Q     Dr. Eastman, you made that statement in front of tens of thousands of

14    people and many, many television cameras.     It's now your position that you will not

15    answer the select committee's question regarding the factual basis for alleging that

16    machines contributed to fraud?

17         A     Fifth.

18         Q     Dr. Eastman, what factual research did you do regarding the voting machines

19    before telling tens of thousands of angry people that the machines contributed to fraud?

20         A     Fifth.

21         Q     Okay.    Dr. Eastman, at the bottom of page 2 of the transcript you state, and

22    this is a fairly lengthy quote, "And let me, as simply as I can, explain it.    You know the old

23    way was to have a bunch of ballots sitting in a box under the floor, and when you needed

24    more, you pulled them out in the dark of night.    They put those ballots in a secret folder

25    in the machines, sitting there waiting until they know how many they need.    And then

1    the machine, after the close of polls, we now know who's voted, and we know who

2    hasn't.    And I can now in that machine match those unvoted ballots with the unvoted

3    voter and put them together in the machine.

4            "And how do we know that happened last night in real time?    You saw when it

5    got to 99 percent of the vote total, and then it stopped.    The percentage stopped, but

6    the votes didn't stop.

7            "What happened, and you don't see this on FOX or any of the other stations, but

8    the data shows that the denominator, how many ballots remain to be counted, how else

9    do you figure out the percentage that you have, how many remain to be counted, that

10   number started moving up.    That means they were unloading the ballots from that

11   secret folder, matching them to the unvoted voter, and, voila, we have enough votes to

12   barely get over the finish line," close quote.

13           Dr. Eastman, what evidence do you have to support your allegation that there

14   were secret folders of ballots that were matched against the names of people who had

15   not voted and then loaded into the machines?

16       A    Fifth.

17       Q    Dr. Eastman, what factual research did you do regarding this allegation of

18   secret folders of ballots before tens of thousands -- before you made it before tens of

19   thousands of angry people on January 6th?

20       A    Fifth.

21       Q    On page 3 of the transcript you state, quote, "And all we are demanding of

22   Vice President Pence is this afternoon at 1 o'clock he let the legislators of the State look

23   into this so we get to the bottom of it, and the American people know whether we have

24   control of the direction of our government or not," close quote.

25           Dr. Eastman, did you call upon Vice President Pence to delay certification so State



1      legislators could have more time to send alternate slates of electors?

2          A     Fifth.

3          Q     Dr. Eastman, what did you think would happen next if State legislators sent

4      alternate slates of electors?

5          A     Fifth.

6          Q     Dr. Eastman, who asked you to speak at the Ellipse on January 6th?

7          A     Fifth.

8          Q     Dr. Eastman, were you told in advance that you would be speaking at the

9      Ellipse on January 6th?

10         A     Fifth.

11         Q     Dr. Eastman, did you have time to prepare your remarks before you were

12     asked to speak on the Ellipse on January 6th?

13         A     Fifth.

14         Q     Dr. Eastman, do you know whether Senators Hawley and Cruz were invited

15     to speak on the Ellipse on January 6th?

16         A     Fifth.

17         Q     Dr. Eastman, do you know why Senators Hawley and Cruz did not, in fact,

18     speak on the Ellipse on January 6th?

19         A     Fifth.

20         Mr. Wood.    Okay.    I'm going to pause here and see if any members have

21     questions about the speeches on the Ellipse.

22         No?

23         Staff?

24         Okay.

1

2          BY MR. WOOD:

3     Q     Dr. Eastman, I'm going to turn your attention back to exhibit 13, which again

4     is the Washington Post publication of Greg Jacob's draft opinion article dated October

5     29th, 2021.

6          In that piece, Mr. Jacob writes that one of the President's lawyers emailed him

7     during the assault on the Capitol, quote, "The 'siege' is because YOU and your boss did

8     not do what was necessary to allow this to be aired in a public way so that the American

9     people can see for themselves what happened," close quote.

10         Dr. Eastman, are you the person who emailed the Vice President's counsel on

11    January 6th to say that the siege was because of him and his boss -- meaning the Vice

12    President of the United States -- for not doing what was necessary to allow this to be

13    aired in a public way so that the American people can see for themselves what

14    happened?

15    A     Fifth.

16    Q     Dr. Eastman, do you dispute the accuracy of the quote that Greg Jacob

17    provided to The Washington Post?

18    A     Fifth.

19    Q     Dr. Eastman, did you email Greg Jacob on January 6th, after the riot had

20    ended, to say that the Vice President still should send the election back to the States

21    rather than certifying it?

22    A     Fifth.

23    Mr. Wood.    Anybody else have anything?

24    Okay.    I'm at the end of my prepared questions.    Do any members of the

25    committee have questions on that or anything else for Dr. Eastman?

1          Yes.    Mr. Raskin.

2          Mr. Raskin.    Thank you.

3          Going back to the short memorandum, after recommending that the electoral

4   votes from six or seven States be returned and rejected by Congress, you wrote in that

5   memorandum, Dr. Eastman, "Pence should do this without asking permission -- either

6   from a vote of the joint session or from the Court."    And you concluded, "The fact is that

7   the Constitution assigns this power to the Vice President as the ultimate arbiter."

8          What was your basis for writing that?

9          The Witness.    Fifth.

10          Mr. Raskin.    You write in the longer 6-page memorandum that, "This election

11   was stolen by a strategic Democrat plan to systematically flout existing election laws for

12   partisan advantage."

13          What is your basis for having written that?

14          The Witness.    Fifth.

15          Mr. Raskin.    Okay.    Your client, President Trump, has said, "The mob takes the

16   Fifth.    If you're innocent, why are you taking the Fifth Amendment?"

17          Do you agree with that?

18          The Witness.    Fifth.

19          Mr. Raskin.    Because I do not.

20          Okay.    All right.    I yield back.

21          Mr. Wood.    Do any other members have questions?

22          Okay.    Why don't we take just another 5-minute break, and -- oh.    Do you have

23   something to ask.

24          Mr. George.    A quick followup.    Just a couple questions.

25          In exhibit 14, which is the shorter memorandum that Mr. Raskin was just

1    mentioning, it says at the top that seven States had transmitted dual slates of electors to

2    the President of the Senate.

3        And then in exhibit 15, which is the longer one, on page 2 it says that the Trump

4    electors in the above six States, plus New Mexico -- meaning Georgia, Pennsylvania,

5    Wisconsin, Michigan, Arizona, Nevada, and New Mexico -- met on December 14th to cast

6    their electoral votes and transmitted those votes to the President of the Senate -- in

7    parentheses -- (Vice President Pence).

8        Do you know whether Trump electors met in any of those States to send those

9    elector -- alternate electoral votes?

10        The Witness.    Fifth.

11        Mr. Wood.    Dr. Eastman, do you believe that the Electoral Count Act is

12    constitutional?

13        The Witness.    Fifth.

14        Mr. Wood.    Dr. Eastman, do you have any recommendations to the select

15    committee on how it can help prevent the horrific events of January 6th from ever

16    happening again?

17        The Witness.    Fifth.

18        Mr. Wood.    Okay.    Why don't we take a 5-minute break to see if there are any --

19        Ms. Cheney.    [Inaudible.]

20        Mr. Wood.    Yes.    Go ahead, Representative Cheney.

21        Ms. Cheney.    I have a quick question.

22        Dr. Eastman, do you believe that the violence on January 6th was justified?

23        The Witness.    Fifth.

24        Ms. Cheney.    I yield back.

25        Mr. Wood.    Okay.    We'll take a 5-minute break just to see if there's anything we

1       want to cover before we leave for the day, and we'll go off the record now.

2               [Recess.]

3               Mr. Wood.    Okay.    We're back, and we'll go back on the record.

4               We have just a couple of topics that my colleague, Dan George, wanted to ask

5       about, and then at least one member had some questions to wrap up.

6                       BY MR. GEORGE:

7               Q       Dr. Eastman, were you in attendance at a December 21st meeting at the

8       White House with Members of Congress and the President?

9               A       Fifth.

10              Q       On January 2nd, 2021, it's been reported that you participated in a briefing

11      with members of State legislatures as well as others, including officials from the campaign

12      and the President.

13              Were you a participant to that Zoom meeting or call?

14              A       Fifth.

15              Q       On that call you reportedly stated, quote, "The duty of the legislature is to fix

16      this, this egregious conduct, and make sure that we're not putting in the White House

17      some guy that didn't get elected."

18              Is that an accurate quote from your statements during this briefing?

19              A       Fifth.

20              Q       Did you speak with any of the State legislators who participated in that call

21      afterwards?

22              A       Fifth.

23              Mr. Wood.    Okay.    Mr. Raskin has some questions.

24              Mr. Raskin.    Thank you.

25              Dr. Eastman, the effort to force Vice President Pence to reject electoral college

1   votes was surrounded, as you know, by a lot of violence.

2         Do you believe that violence was necessary to succeed in the plan of prevailing in

3   the electoral college for Donald Trump?

4         The Witness.   Fifth.

5         Mr. Raskin.   Did you participate in any conversations about the demonstrations

6   that became a violent riot?

7         The Witness.   Fifth.

8         Mr. Raskin.   Okay.   I yield back.

9         Mr. Wood.   Do any other members have questions?   Okay.

10        Dr. Eastman, is there anything else that you think that the select committee

11   should know.

12        Mr. Burnham.   No, thank you.   We're done.

13        Mr. Wood.   Okay.   So with that, we will recess the deposition subject to the call

14   of the chair.   And we'll go off the record now.

15        [Whereupon, at 2:24 p.m., the deposition was concluded.]

1                         Certificate of Deponent/Interviewee

2

3

4         I have read the foregoing _____ pages, which contain the correct transcript of the

5    answers made by me to the questions therein recorded.

6

7

8

9                              _____

10                              Witness Name

11

12

13                              _____

14                              Date

15