OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515

SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004

ARNOLD & PORTER
601 Massachusetts Ave, NW
Washington, D.C. 20001

Counsel for the Congressional Defendants

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| | |
|---|---|
| JOHN C. EASTMAN<br><br>Plaintiff,<br><br>vs.<br><br>BENNIE G. THOMPSON, *et al.*,<br><br>Defendants. | Case No. 8:22-cv-00099-DOC-DFM |

# Exhibit B

SELECT COMMITTEE TO INVESTIGATE THE

JANUARY 6TH ATTACK ON THE U.S. CAPITOL,

U.S. HOUSE OF REPRESENTATIVES,

WASHINGTON, D.C.

INTERVIEW OF:   RICHARD PETER DONOGHUE

Friday, October 1, 2021

Washington, D.C.

The interview in the above matter was held via Webex, commencing at 10:02 a.m.

Present: Representatives Schiff, Lofgren, Murphy, Raskin, and Cheney.

1    <u>Appearances:</u>

2

3

4

5    For the SELECT COMMITTEE TO INVESTIGATE

6    THE JANUARY 6TH ATTACK ON THE U.S. CAPITOL:

7

8    TIM HEAPHY, CHIEF INVESTIGATIVE COUNSEL

9    MARC HARRIS, SENIOR INVESTIGATIVE COUNSEL

10   SOUMYA DAYANANDA, SENIOR INVESTIGATIVE COUNSEL

11   JOE MAHER, DETAILEE

12   DAN GEORGE, SENIOR INVESTIGATIVE COUNSEL

13   JACOB NELSON, RESEARCHER

14   JENNA HOPKINS, PROFESSIONAL STAFF

15   EVAN MAULDIN, CHIEF CLERK

16   KRISTIN AMERLING, DEPUTY STAFF DIRECTOR

17   SAMANTHA STILES, CHIEF ADMINISTRATIVE OFFICER

18

19   For the DEPARTMENT OF JUSTICE:

20

21   KIRA ANTELL, OFFICE OF LEGISLATIVE AFFAIRS

22   BRAD WEINSHEIMER, OFFICE OF THE DEPUTY ATTORNEY GENERAL

| | |
|---|---|
| 1 | |
| 2 | For RICHARD PETER DONOGHUE: |
| 3 | |
| 4 | GREG ANDRES |
| 5 | CHARLES KLUG |
| 6 | KATHERINE SWAN |
| 7 | BROOK JACKLING |
| 8 | Davis Polk |
| 9 | 901 15th Street, NW |
| 10 | Washington, D.C. 20005 |

1   that they came up in subsequent conversations with the President.   And DAG Rosen and
2   I essentially told him, "We looked into that, and it's just not true."
3           Ms. Cheney.   Okay.   So he was informed?
4           Mr. Donoghue.   I told the President myself that several times, in several
5   conversations, that these allegations about ballots being smuggled in in a suitcase and
6   run through the machines several times, it was not true, that we had looked at it, we
7   looked at the video, we interviewed the witnesses, and it was not true.
8           Ms. Cheney.   And that timeframe of those -- when you informed the President,
9   do you have a sense of the dates when that would've occurred?
10          Mr. Donoghue.   I believe it was in the phone call on December 27th.   It was also
11  in a meeting in the Oval Office on December 31st.   I believe I mentioned that specifically
12  both times.
13          Ms. Cheney.   Okay.
14          Okay.   And then do we have a date for the briefing that you mentioned with AG
15  Barr, Rosen, Wray?   I think this would've been the briefing with CISA about the Antrim
16  County.
17          Mr. Donoghue.   I don't remember specifically.   It may be on a calendar
18  someplace.   But we did that somewhere between December 14th and December 18th.
19  Because --
20          Ms. Cheney.   Okay.
21          Mr. Donoghue.   -- the email from Ken Cuccinelli on December 18th was pursuant
22  to that briefing and the discussion we had at the briefing.
23          Ms. Cheney.   Okay.
24          And then, just to note for the record -- and, Tim, you might have done this,
25  but -- the exhibit 3, that email that we received, the subject line here is "From POTUS."   I

1    corrupt, that he's asking, essentially, not for you to resolve all of these specific

2    allegations, but just say that the election was corrupt, leave the rest to this political

3    strategy?

4         A    Right.   So the Department had zero involvement in anyone's political

5    strategy.   I think he understood that, right?

6         Q    Uh-huh.

7         A    So he wanted us to say it was corrupt, you know, for whatever reason.   I'll

8    leave that to him or others to explain or determine.   But he wanted us to say that it was

9    corrupt.

10        And this was consistent with some things he said at other points about, the

11   Department should publicly say that the election is corrupt or suspect or not reliable.   At

12   one point, he mentioned the possibility of having a press conference.   We told him we

13   were not going to do that.

14        Q    Yeah.

15        A    So this was something that was brought up more than once.

16        Q    Yeah.   So, again, there was a focus on public statements that something

17   was corrupt, as opposed to trying specifically to get to the bottom of the individual

18   allegations.

19        A    Right.

20        Q    All right.   You at this point start talking.   Is that right?   You

21   directly -- "RPD" I assume, Mr. Donoghue, refers to statements that you now made on the

22   call.

23        A    Yes.   So I tried to, again, put this in perspective and to try to put it in very

24   clear terms to the President.   And I said something to the effect of, "Sir, we've done

25   dozens of investigations, hundreds of interviews.   The major allegations are not

1   supported by the evidence developed."

2   We've looked in "Georgia, Pennsylvania, Michigan, Nevada."

3   "We are doing our job.   Much of the info you're getting is false."   And then I
4   went into, "For instance, this thing from Michigan, this report about 68 percent error
5   rate -- reality is, it was only 0.0063 percent error rate, less than 1 in 15,000."

6   So the President accepted that.   He said, "Okay, fine.   But what about the
7   others?"

8   And, again, this gets back to the point that there were so many of these
9   allegations that, when you gave him a very direct answer on one of them, he wouldn't
10  fight us on it, but he would move to another allegation.

11  So then I talked a little bit about the Pennsylvania truck driver.   This is another
12  allegation that had come up.   And this claim was by a truck driver who believed, perhaps
13  honestly, that he had transported an entire tractor-trailer truck full of ballots from New
14  York to Pennsylvania.   And this was, again, out there in the public and discussed.

15  And I essentially said, look, we looked at that allegation, we looked "at both ends,"
16  both the people who load the truck and the people who unload the truck, and that that
17  allegation was not supported by the evidence.

18  Again, he said, "Okay."   And then he said, "Note, I didn't mention that one.
19  What about the others?"

20  And I said, okay, well, with regard to Georgia, we "looked at the tape, we
21  interviewed the witnesses.   There is no suitcase."   The President kept fixating on this
22  suitcase that supposedly had fraudulent ballots and that the suitcase was rolled out from
23  under the table.   And I said, no, sir, there is no suitcase.   You can watch that video over
24  and over; there is no suitcase.   There is a wheeled bin where they carry the ballots, and
25  that's just how they move ballots around that facility.   There's nothing suspicious about

1    that at all.

2    I told him that there was "no multiple scanning of the ballots."  One part of that 3 allegation was that they were taking one ballot and scanning it through three or four or 4 five times to rack up votes presumably for Vice President Biden.  I told him that the 5 video did not support that.

6    Then he went off on "double voting," at the top of the next page.  He said "dead 7 people" are voting, "Indians are getting paid" to vote.  He meant people on Native 8 American reservations.  He said, there's "lots of fraud" going on here.

9    Then he said, in Arizona, "I only lost by 9,000 votes.  There's clearly more fraud 10 than that" just in Arizona alone.

11    Then he got into these civil cases that were being brought around the country, 12 and he says -- and I think this was in response to DAG Rosen saying, look, the Department 13 has nothing to do with many of these allegations.  To the extent you want to challenge 14 the way that the election was conducted in various States -- we understood that there 15 were complaints about the rules being changed by certain State officials after the fact and 16 that it was not done pursuant to State legislatures' power.

17    DAG Rosen tried to say, we, the Department, have nothing to do with that.  18 You're free to bring lawsuits.  Your campaign can bring lawsuits.  That can be litigated 19 before judges.  But we, the Department, don't do that.  We do, essentially, criminal 20 investigations and civil-rights matters.

21    And so the President's response was, well, the "judges keep saying, where's the 22 DOJ?  Why is the DOJ not filing these cases?"  And we both responded, "we," the 23 Department, "are not in a position based on the evidence.  We can only act on the 24 actual evidence developed."

25    My next note says, "Told him flat out that much of the information he's getting is

1   false and/or just not supported by the evidence.    We look at the allegations but they

2   don't pan out."

3       The President was getting very frustrated.    He said, "This is electioneering fraud."

4       And then, again, I have a quote from him:    "We have an obligation to tell people

5   that this was an illegal, corrupt election."

6       Then he said, "People tell me Jeff Clark is great" and that "I should put him in.

7   People want me to replace DOJ leadership."

8       At which point I responded, sir, that's fine, you should have the leadership you

9   want, but understand, changing the leadership in the Department won't change anything.

10  The --

11      Q    All right.    Let me stop you there.

12      A    -- Department operates --

13      Q    Let me stop you there, Mr. Donoghue.    Just two things.

14      So, going back to, "We have an obligation to tell people that this was an illegal,

15  corrupt election," is it fair to say that what he was asking you to do, primarily, was tell

16  people, in some form, a press conference or otherwise, that there was corruption so that

17  some other political strategy could unfold?    Was it your impression that the precise ask

18  from the President was more about a public statement than actually the day-to-day

19  investigative work?

20      A    I think he probably cared about both of them, but -- I don't want to

21  speculate about what was in his mind, but this is what he said.    And I think what you

22  take away from that, logically, is that he wanted the Department to say something

23  publicly.

24      Q    Right.    So there's pressure on you and Mr. Rosen, to which you push back,

25  to say something publicly, to say something publicly without basis, that there is an illegal,

1          But we weren't reporting back to the White House simply because the President

2   mentioned some allegations.

3          Q     I see.   It wouldn't be consistent with protocol for you to go back to the

4   President every time something that comes up in a discussion is investigated or resolved?

5          A     He didn't instruct us to do that, and we weren't going to do it.   So.

6          Q     Yeah.   All right.   I want to turn your attention, if you can now to

7   exhibit 10, which we get back into Mr. Clark.   The next day, December 28th, you and Mr.

8   Rosen get an email from Mr. Clark, and he is asking for two urgent action items.   Tell us

9   about this email, the two actions that he requested, and what your response was.

10         A     Right.   So DAG Rosen and I spoke, I think, probably several times on the

11  27th and certainly the 28th because that was a Monday.   DAG Rosen and Jeff Clark had

12  a long personal and professional relationship.   They had known each other for decades.

13  They had worked at the same law firm together.   He knew Jeff Clark much better than I

14  did.   And, you know, we discussed why Jeff Clark's name was coming up, why it was

15  coming from the President, why it was coming from this Congressman.   And Jeff Rosen

16  said:   Well, look, I am going to talk to Jeff Clark to find out what's going on here.   We

17  got to get to the bottom of this.

18         So I think he had conversations with Jeff Clark earlier on the 28th.   They

19  preceded this email, which came fairly late in the day.   I did not talk to Jeff Clark before

20  this.

21         So, at 4:40, I received this email from Jeff Clark.   I read it.   I read the

22  attachment.   I had to read it more than once to make sure I really understood what he

23  was proposing.   And then I drafted a response.   I don't know where Jeff Rosen was at

24  this point, but I went to his office, and he wasn't there.   So I didn't get to discuss my

25  response with him before I sent it.   But I sent it out.   And then I saw him shortly

1  afterward, and he was very upset by Jeff Clark's request.   And he said that he had
2  instructed one of his administrative support personnel to get Jeff Clark in his conference
3  room.   He was -- he was a little angry.   And he said:   I want him down here.   We
4  need to talk to this guy and find out what's going on.
5       So I think there's some emails that show up.
6       Q    Yeah.   And I don't want to jump ahead too much, Mr. Donoghue, because I
7  want to get to that conversation.   But let's go back to Mr. Clark's email.   The first thing
8  he asks of you is:   I would like to have your authorization -- "you" meaning you and Mr.
9  Rosen -- to get a classified briefing tomorrow from ODNI led by DNI Ratcliffe on foreign
10 election interference issues.   And he mentions activating the IEEPA and 2018 EO powers
11 about the Dominion machine access to the internet through a smart thermostat with a
12 net connection trail leading back to China.   He is essentially asking if you can get a
13 briefing about this allegation of Chinese control of Dominion machines through a
14 thermostat.   Did that strike you as odd, and what was your reaction to that specific
15 request?
16      A    Yes, it struck me as odd.   I won't go into details, but we received briefing
17 about what the IC, the intelligence community, knew about the election in advance.
18 This was inconsistent with what we had been told.   And I had not heard anything about
19 smart thermostats and internet connections leading back to China and things like that.
20 So the whole thing struck me as very odd.
21      Q    Yeah, and that Mr. Clark, the head -- acting head of the Civil Division is asking
22 for a classified briefing with the Director of National Intelligence about this allegation.
23 That also procedurally was odd?
24      A    Yes.
25      Q    Okay.   He also then -- the second ask is this draft letter, which I believe is

1   attached to the email that he sends you and Mr. Rosen.   And that letter is a draft letter

2   that you and Mr. Rosen and he, Mr. Clark, would sign to the Governor, the Speaker of the

3   House, and the president pro tempore of the Georgia legislature, essentially asking them

4   to stand down and not certify the results of their election.   How did that request strike

5   you, and what did you do about it?

6       A   It struck me as very strange and somewhat alarming.   And, as I said, I had

7   to read it more than once to make sure I understood what he was proposing here.   It

8   was completely inconsistent with the Department's role, generally.   And it was

9   inconsistent with what our investigations, to date, had revealed.   And so I think I made

10   my views known in the email response I sent to him.

11       Q   Yeah, which we'll get to.   To be clear, he asks that -- a version of this letter

12   be sent to each relevant State.   So was his request to send this letter, drafted for

13   Georgia, not just to Georgia officials but to officials in other States where there had been

14   allegations of election fraud?

15       A   Yes.   That was my understanding of his proposal.

16       Q   All right.   He writes that he put it together quickly -- "it" being the

17   letter -- but other messages suggest that it may have been drafted by Ken Klukowski.

18   Do you know Ken Klukowski and what his role may have been within the Department's

19   Civil Division at that time?

20       A   No.   I don't.

21       Q   Okay.   Did you know whether or not Mr. Clark was talking to anyone else in

22   the Department about this letter or other election issues?

23       A   No.   I had no reason to think that.

24       Q   All right.   So you respond, Mr. Donoghue.   We get to your response, which

25   is tab 11.   You drafted a pretty comprehensive, specific response reflecting your

1   frustration on the 28th, just about a little over an hour later, at 5:50.   I won't ask you to

2   read it to us, but just summarize for us your overall reaction and what's reflected in the

3   email.

4        A   I tried to make it clear to him that this is not the Department's role.   Again,

5   we don't do quality control for State elections.   The States run the elections.   We

6   investigate crimes, and we look at civil rights matters.   So I tried to make it clear to him

7   that this is simply not our role, to recommend to the States what they do and, secondly,

8   that we have conducted investigations and that the factual claim he was making here was

9   simply not accurate.   And so I reminded him that AG Barr had made public statements

10  on this point, less than a week prior, or, I guess, exactly a week prior was the last time he

11  had made some public statements, and that this was just completely unacceptable and

12  not anything that I would ever sign.   And I know Jeff Clark -- or Jeff Rosen, rather, had

13  the same response.

14       Q   You say in the first paragraph:   There's no chance that I would sign this

15  letter or anything remotely like this.   You sort of lead with the conclusion.   You then, in

16  the first paragraph, challenge his factual assumptions.   You said:   The investigations

17  that I am aware of relate to suspicions of misconduct that are of such a small scale that it

18  would simply not impact the outcome of the election.   AG Barr made that clear to the

19  public only last week, and I am not aware of intervening developments that would change

20  that conclusion.

21       So, setting aside whether it would be appropriate for the Department to tell a

22  State what to do, you're challenging -- is it fair to say you're challenging the factual basis

23  included in his letter to the State official?

24       A   That's right.   And he himself, Jeff Clark, would have no way of knowing

25  what investigations we had conducted or not because he was not involved in election

 1  matters.
 2      Q   Right.  You then, in the second paragraph, Mr. Donoghue, you say:  I
 3  cannot imagine a scenario in which the Department would recommend that a State
 4  would assemble its legislature to determine whether already certified election results
 5  should somehow be overridden by legislative action.  This would be a grave step for the
 6  Department to take and could have tremendous constitutional, political, and social
 7  ramifications for the country.
 8      Is that your sort of procedural response here that this is just not the Department's
 9  role to be quality control for State elections and tell a State legislature what to do?
10      A   Yes.  That's the point I was making.  Yes.
11      Q   All right.  So, when you and Mr. Rosen get this letter, you compose the
12  response.  You indicated previously that Mr. Rosen essentially summons Mr. Clark up to
13  the 5th floor for a face-to-face meeting.  Does that meeting then occur?
14      A   Yes.  He is on the 4th floor.  But, yes, in the DAG conference on the 4th
15  floor.
16      Q   Okay.  So you are personally present, Mr. Donoghue, for that meeting
17  between Clark and Rosen?
18      A   Yes.  It was the three of us.
19      Q   Tell us about the conversation there with Mr. Clark.
20      A   Mr. Clark explained that he had been looking at some of these allegations on
21  his own, that he had information, that he had concerns about the reliability of the
22  outcome of the election.  He mentioned this smart thermostat thing.  It was clear that
23  he had been reading some affidavits that were attached to some of the civil filings in
24  some of the cases that were pending or already dismissed around the country.  He had
25  various theories that seemed to be derived from the internet about why the outcome of

1    so when you joined at the President's invitation?

2    A    That's right.

3    Q    All right.   And who was inside the meeting when you got there?

4    A    When I entered the Oval Office, the President was behind the desk, and it

5    was Pat Cipollone, Pat Philbin, a White House lawyer named Eric Herschmann, Jeff Clark,

6    Jeff Rosen, Steve Engel, and then me.

7    Q    Are you sure Mr. Herschmann was a White House lawyer?

8    A    He was a lawyer who worked at the White House.   I'm not -- initially I

9    thought he worked in the White House Counsel's Office, but I think later someone told

10   me that wasn't the case.   I don't remember.   His role was never clear to me.   I know

11   he was a lawyer from New York.   I know he had been a prosecutor at some point.   But I

12   don't know what his title exactly was.   I'd seen him in some meetings previously, but I

13   didn't know exactly what his role was.

14   Q    Okay.

15        All right.   And, again, no notes of this meeting.   Is that right?   You don't take

16   notes -- you were inside the Oval Office and, you indicated before, didn't take notes when

17   you were in discussions inside that office.

18   A    No.

19   Q    All right.   Well, tell us what you remember, then, about the conversation.

20   What was the topic when you arrived, and how did it evolve from there?

21   A    The meeting took about another 2-1/2 hours from the time I entered.   It

22   was entirely focused on whether there should be a DOJ leadership change.   So the

23   election allegations played into this, but they were more background than anything else.

24        And the President was basically trying to make a decision and letting everyone

25   speak their minds.   And it was a very blunt, intense conversation that took several

1  hours.   And Jeff Clark certainly was advocating for change in leadership that would put
2  him at the top of the Department, and everyone else in the room was advocating against
3  that and talking about what a disaster this would be.
4      Q    What were Clark's purported bases for why it was in the President's interest
5  for him to step in?   What would he do, how would things change, according to Mr. Clark
6  in the meeting?
7      A    He repeatedly said to the President that, if he was put in the seat, he would
8  conduct real investigations that would, in his view, uncover widespread fraud; he would
9  send out the letter that he had drafted; and that this was a last opportunity to sort of set
10 things straight with this defective election, and that he could do it, and he had the
11 intelligence and the will and the desire to pursue these matters in the way that the
12 President thought most appropriate.
13     Q    You said everyone else in the room was against this.   That's Mr. Cipollone,
14 Mr. Philbin, Mr. Herschmann, you, and Mr. Rosen.   What were the arguments that you
15 put forth as to why it would be a bad idea for him to replace Rosen with Clark?
16     A    So, at one point early on, the President said something to the effect of,
17 "What do I have to lose?   If I do this, what do I have to lose?"   And I said,
18 "Mr. President, you have a great deal to lose.   Is this really how you want your
19 administration to end?   You're going hurt the country, you're going to hurt the
20 Department, you're going to hurt yourself, with people grasping at straws on these
21 desperate theories about election fraud, and is this really in anyone's best interest?"
22     And then other people began chiming in, and that's kind of the way the
23 conversation went.   People would talk about the downsides of doing this.
24     And then -- and I said something to the effect of, "You're going to have a huge
25 personnel blowout within hours, because you're going to have all kinds of problems with

1  resignations and other issues, and that's not going to be in anyone's interest."

2  And so the President said, "Well, suppose I do this" -- I was sitting directly in front

3  of the President.   Jeff Rosen was to my right; Jeff Clark was to my left.   The President

4  said, "Suppose I do this, suppose I replace him," Jeff Rosen, "with him," Jeff Clark, "what

5  do you do?"   And I said, "Sir, I would resign immediately.   There is no way I'm serving

6  1 minute under this guy," Jeff Clark.

7  And then the President turned to Steve Engel, and he said, "Steve, you wouldn't

8  resign, would you?"   And Steve said, "Absolutely I would, Mr. President.   You'd leave

9  me no choice."

10  And I said, "And we're not the only ones.   You should understand that your

11  entire Department leadership will resign.   Every AAG will resign."   I didn't tell him

12  about the call or anything, but I made it clear that I knew what they were going to do.

13  And I said, "Mr. President, these aren't bureaucratic leftovers from another

14  administration.   You picked them.   This is your leadership team.   You sent every one

15  of them to the Senate; you got them confirmed.   What is that going to say about you,

16  when we all walk out at the same time?   And I don't even know what that's going to do

17  to the U.S. attorney community.   You could have mass resignations amongst your

18  U.S. attorneys.   And then it will trickle down from there; you could have resignations

19  across the Department.   And what happens if, within 48 hours, we have hundreds of

20  resignations from your Justice Department because of your actions?   What does that say

21  about your leadership?"

22  So we had that part of the conversation.   Steve Engel, I remember, made the

23  point that Jeff Clark would be leading what he called a graveyard; there would be no one

24  left.   How is he going to do anything if there's no leadership really left to carry out any of

25  these ideas?

1       I made the point that Jeff Clark is not even competent to serve as the Attorney

2   General.   He's never been a criminal attorney.   He's never conducted a criminal

3   investigation in his life.   He's never been in front of a grand jury, much less a trial jury.

4       And he kind of retorted by saying, "Well, I've done a lot of very complicated

5   appeals and civil litigation, environmental litigation, and things like that."   And I said,

6   "That's right.   You're an environmental lawyer.   How about you go back to your office,

7   and we'll call you when there's an oil spill."

8       And so it got very confrontational at points.

9       And Pat Cipollone weighed in at one point, I remember, saying, you know, "That

10  letter that this guy wants to send, that letter is a murder-suicide pact.   It's going to

11  damage everyone who touches it.   And we should have nothing to do with that letter.

12  I don't ever want to see that letter again."   And so we went along those lines.

13      I remember Eric Herschmann chimed in several times, saying that, whatever Jeff

14  Clark wanted to do or thought he could do, there was no reason to think he could really

15  do it.

16      I remember saying at some point that, you know, Jeff wouldn't even know how to

17  find his way to Chris Wray's office, much less march in there and direct the FBI what to

18  do, and that, if you walked into Chris Wray's office, he wouldn't even know who you are.

19      So we had these conversations that went around and around and were very blunt

20  and direct.   And that went on for 2-1/2 hours.

21      Q    At one point, did the President disparage Mr. Rosen or talk about

22  Mr. Rosen's inaction or unwillingness to do anything about the election?

23      A    He did say several times, "You two," pointing at Mr. Rosen and me, "You two

24  haven't done anything.   You two don't care.   You haven't taken appropriate actions.

25  Everyone tells me I should fire you," and things of that nature.

1  He came back to that at the very end when he decided against a leadership

2  change. And he announced that, and then he came back to that point and he said, "And

3  I know that these two here, they're not going to do anything. They're not going to fix

4  this. But that's the way it is, and I'm going to let it go anyway."

5  Q  Did Mr. Cipollone say anything about what he would do with respect to a

6  potential resignation if the President made this change?

7  A  He did at some point. I guess that was on the heels of us talking about how

8  there would be resignations in the Department. And I think Pat Cipollone said, "Well,

9  I'm not going to stand for this, I'm not going to be here if this happens either."

10  Q  So he said he would resign or not stand for it, would not be here, if the

11  President made this change.

12  A  Right.

13  Q  Who, Mr. Donoghue, was, sort of, the primary advocate or voice against the

14  leadership change? Was it you personally, or was it sort of a consensus and everyone

15  was sort of equally chiming in? Or just give me a better sense as to, sort of, who was

16  doing most of the talking and was the most strenuous advocate.

17  A  It was definitely a consensus. We were all on the same page except for Jeff

18  Clark. But we played different roles.

19  For one thing, Jeff Rosen was in a bad position because he was defending his own

20  job. So anything he said, obviously, was very self-interested. And so he wasn't in the

21  best position to make some of these arguments. And by demeanor, he just has a

22  different demeanor, as does Pat Cipollone, as does Steve Engel. So everyone played

23  their own role. My demeanor is more aggressive and more blunt, and so I played that

24  role.

25  And so everyone was on the same page, advocating for the same thing in very