OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515

SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004

ARNOLD & PORTER
601 Massachusetts Ave, NW
Washington, D.C. 20001

Counsel for the Congressional Defendants

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

JOHN C. EASTMAN

    Plaintiff,

vs.

BENNIE G. THOMPSON, *et al.*,

    Defendants.

Case No. 8:22-cv-00099-DOC-DFM

# Exhibit F

1

2

3

4     SELECT COMMITTEE TO INVESTIGATE THE

5     JANUARY 6TH ATTACK ON THE U.S. CAPITOL,

6     U.S. HOUSE OF REPRESENTATIVES,

7     WASHINGTON, D.C.

8

9

10

11    DEPOSITION OF:    GREG JACOB

12

13

14

15                                  Tuesday, February 1, 2022

16

17                                  Washington, D.C.

18

19

20          The deposition in the above matter was held in room 5480, O'Neill House Office

21    Building, commencing at 10:05 a.m.

22          Present:    Representatives Aguilar, Schiff, Murphy, Raskin, Cheney, and Kinzinger.

1

2    Appearances:

3

4

5    For the SELECT COMMITTEE TO INVESTIGATE

6    THE JANUARY 6TH ATTACK ON THE U.S. CAPITOL:

7

8    KATIE ABRAMS, STAFF ASSOCIATE

9    KRISTIN AMERLING, DEPUTY STAFF DIRECTOR & CHIEF COUNSEL

10   STEPHEN DEVINE, SENIOR LEGISLATIVE COUNSEL

11   MAGGIE EMAMZADEH, STAFF ASSOCIATE

12   SADALLAH A. FARAH, RESEARCHER

13   DANIEL A. GEORGE, SENIOR INVESTIGATIVE COUNSEL

14   TIMOTHY HEAPHY, CHIEF INVESTIGATIVE COUNSEL

15   CASEY ERIN LUCIER, INVESTIGATIVE COUNSEL

16   JOE MAHER, DETAILEE, DEPARTMENT OF HOMELAND SECURITY

17   EVAN B. MAULDIN, CHIEF CLERK

18   BARRY PUMP, PARLIAMENTARIAN

19   GRANT SAUNDERS, STAFF ASSOCIATE

20   JOHN F. WOOD, SENIOR INVESTIGATIVE COUNSEL AND OF COUNSEL TO THE VICE CHAIR

21   BRITTANY M.J. RECORD, COUNSEL

1

2       For THE WITNESS:

3

4       A.B. CULVAHOUSE

5       AMANDA SANTELLA

6       O'Melveny & Myers

7       1625 Eye Street, NW

8       Washington, D.C.    20006

1    When, as far as you can recall, was the first time you had interaction with Dr. Eastman

2    regarding the 2020 election?

3        A    To the best of my recollection, it was at the Oval Office meeting on

4    January 4th.

5        Q    And do you know how that January 4th meeting in the Oval Office came

6    about?

7        A    So what I do know is the Vice President and Marc were down in Georgia that

8    morning at a rally for Senators Perdue and Loeffler, and I received a call, I believe

9    midmorning, and I think it was from Marc giving me a heads up that I was going to be

10    asked down for a meeting in the Oval Office.

11        Q    Do you know -- so that's sort of how you learned about it, but do you know

12    how the meeting was initiated?

13        A    No.

14        BY MR. HEAPHY:

15        Q    And I'm sorry.   When you say "Marc," you mean Marc Short, or

16    Mark Meadows?

17        A    Marc Short.

18        Q    Okay.

19        BY MR. WOOD:

20        Q    And then did you, in fact, attend such a meeting?

21        A    Yes.

22        Q    Okay.   Who else attended the meeting?

23        A    Marc Short and the Vice President, John Eastman, the President.   There

24    was about a 5-minute period that Mark Meadows came in on a different subject and then

25    left.

1    advocated for Pence to reject electors, do you agree or disagree with that statement by

2    Dr. Eastman?

3          A      So I think the most accurate way to -- because I think a yes-and-no question

4    is going to be difficult on this.    I think, at the meeting on the 4th, Eastman expressed the

5    view that both paths were legally viable, but that the preferred course would be a

6    procedural course where the Vice President would send it back to the States, that that

7    would be more palatable than a mere invocation of raw authority to determine

8    objections himself.

1

2      [1:18 p.m.]

3              BY MR. WOOD:

4      Q      Did he start out with that position, or did he gravitate towards that position

5      over the course of the meeting?

6      A      I think that was threaded throughout, that, again, both were legally viable

7      but that the preferred course would be to send it back to the States.

8      Q      Okay.    Then exhibit 31, the next one in your binder, is the longer

9      version -- or a longer version of a memo.    Again, I'll represent to you that this is from

10     John Eastman.    I assume that -- I think you said actually earlier that you didn't see either

11     of his memos --

12     A      I don't recall seeing it.

13     Q      -- while you were in the White House.

14     Do you have any idea whether this was written before or after the one we already

15     looked at?

16     A      Since it's longer, I assume after, but I have no basis to know.

17     Q      This goes through several different scenarios.    Page 4, Roman numeral III,

18     "War Gaming the Alternatives," some of which Biden wins; some of which Trump wins.

19     Can you tell us whether Dr. Eastman went through all of these alternatives with

20     the President in the meeting on the 4th?

21     A      I don't think he said.

22     Q      Can you tell us whether he went through some of these alternatives in the

23     meeting with the President on the 4th?

24     A      Not at length.    We had a longer discussion of them on the 5th.    And I just

25     don't recall.    It's hard for me to disaggregate what he might have said in shorthand

1    during the conversation on the 4th.

2    Q     Okay.    So I'm going to share with you another description that Dr. Eastman

3    gave of his meeting that you attended with the President and the Vice President on

4    January 4th.

5        Mr. Wood.    Do we have this one?

6        Mr. Saunders.    One?

7        Mr. Wood.    So Boyles, yes.

8        Mr. Saunders.    Yes.

9        Mr. Wood.    Okay.    So why don't we go ahead and play it.

10       And this is a podcast, I believe, where -- or a radio show, I believe, where Dr.

11   Eastman was interviewed by Peter Boyles.

12       [Audio recording played.]

13       Mr. Wood.    You can stop.

14           BY MR. WOOD:

15   Q     Do you think that's an accurate description of the advice Dr. Eastman gave to

16   the President and Vice President?

17   A     Not all of it.

18   Q     Okay.    Can you tell us which parts -- and we can go sentence by sentence if

19   you want or you can just tell us which parts you take issue with.

20   A     Well, it's the part where he -- up to the point where he says, "Open

21   question," that sounds -- he might have used those words.    I don't recall whether he

22   used them specifically.

23       As I've noted before, he thought that the more prudent course was a procedural

24   send it back to the States, rather than reject electors.

25       But I do not recognize the statements that he makes thereafter where he says

1    that it would be foolish to reject the slates.    I don't recall him using that word, and I

2    would be shocked if he had.    And I don't recall any of that sequence that sort of goes

3    from that point forward.

4         Q      And what he describes there as being a foolish move, meaning the Vice

5    President unilaterally rejecting electors, is that exactly what he urged the Vice President

6    to do when he met with you on the 5th?

7         A      When he met on the 5th -- and I have contemporaneous notes of that

8    meeting that reflect this -- he came in and said, "I'm here asking you to reject the

9    electors."    That's how he opened at the meeting.

10        Q      Did he say, "I'm here on behalf of the President to ask you to reject the

11   electors"?

12        A      I don't -- I don't recall.    I don't think that he specifically said on behalf of the

13   President.

14        Q      Okay.    But I believe you had said that in at least one email around that

15   time, whether it was before or after, he stated that he was representing the President?

16        A      In an email on the 6th, he referred to the President as his client.

17        Q      And prior to that he had been -- I can represent to you he had been listed on

18   pleadings as representing the President, whether you're aware of that or not.

19             So I'm going to ask you more about the meeting on the 5th later, but I don't want

20   to forget to follow up on what you just mentioned about contemporaneous notes.

21             Are those contemporaneous notes that you have in your personal possession or

22   are those in the Archives, or where would they be?

23        A      No, they're personal notes, about three lines of notes, and I think we have

24   them.    You're welcome to them.

25        Q      Okay.    Great.    Maybe during a break we can ask you to give us to

1      them -- give them to us.

2              Mr. Culvahouse.   You have them with you, right?

3              Ms. Santella.   Uh-huh.

4              Mr. Wood.   Great.   So we'll get to that.   But before we do that, I want to play

5      another clip here.   And I think this is -- is this next one from the same radio show

6      interview?

7              Mr. Saunders.   Immediately afterwards.

8              Mr. Wood.   Okay.

9              [Audio recording played.]

10             BY MR. WOOD:

11     Q      So we'll leave aside that Dr. Eastman got your name egregiously wrong and

12     we'll leave aside whether or not Marc Short, in fact, leaked something to The New York

13     Times.

14             But Dr. Eastman describes as a false story the reporting that he had asked the Vice

15     President to simply unilaterally declare President Trump reelected.

16             I know you said that he presented alternatives.   Is it, in fact, false to say that Dr.

17     Eastman at some point during the meeting asked the Vice President to simply unilaterally

18     declare President Trump reelected?

19     A      So I've got to disaggregate the 4th and the 5th.

20     Q      Okay.   On the 4th.

21     A      On the 4th, I think that he said that both were legally viable options.   But I

22     do think that he said that he was not saying that that was the one that the Vice President

23     should do.

24     Q      Okay.

25     A      That it would be more prudent to do the other.

1       Q       And we're going to get to more detail on the 5th, but since you brought it

2    up, what was his advice on the 5th?

3       A       He, again, came into the meeting saying, "What I'm here to ask you to do is

4    to reject the electors."

5              And aside from my contemporaneous notes from that meeting, which weren't

6    much, you have my email from January 6th where I refer to the fact that he retreated to a

7    position the evening of the 5th asking for what I would call the procedural solution of

8    send it back to the States as opposed to what he had been asking for in the earlier

9    meeting.

10      Q       So it sounds like you're saying that at the beginning of the meeting on the

11   5th, Dr. Eastman was taking an even more aggressive position regarding the role of the

12   Vice President than the position he took in the Oval Office on the 4th?

13      A       Yes.

14      Q       And do you know what caused him to take the more aggressive position on

15   the 5th?

16      A       I don't.

17      Q       At the meeting on the 4th, did the President take a position?

18      A       Again, I can't speak to the President's communications in that meeting.    I'm

19   happy to confirm or deny accounts with respect to Mr. Eastman.

20      Q       Okay.    Did you believe -- well, I'll ask it this way.

21             In light of the conversation you had had with the President and others on the 4th,

22   were you surprised by the position that Dr. Eastman took at the beginning of the meeting

23   on the 5th?

24      A       So I was at least mildly surprised because I had done a -- well, you have the

25   memorandum that I did for the Vice President analyzing what I had understood Mr.

1    Eastman's proposal, you know, the thing that he thought was the preferred course of

2    action, from the night before.    And so I was surprised that we instead had a stark ask to

3    just reject electors.

4          Mr. Wood.    Okay.    I'm going to get to that in a moment, but I will ask if we

5    should take a lunch break now, or does anybody want to ask a question before we get to

6    the lunch break?

7          Mr. Heaphy.    Yeah.    Can I just quickly follow up on the January 4th meeting?

8             BY MR. HEAPHY:

9       Q    Did you or the Vice President or Mr. Short make clear during that meeting

10   what the Vice President's now consistently held position was about his authority?

11      A    So the Vice President mostly asked a series of questions in that meeting of

12   Mr. Eastman.    And from my -- and, again, I mentioned this before -- from my very first

13   conversation with the Vice President on the subject, his immediate instinct was that there

14   is no way that one person could be entrusted by the Framers to exercise that authority.

15   And never once did I see him budge from that view, and the legal advice that I provided

16   him merely reinforced it.

17         So everything that he said or did during that meeting was consistent with his first

18   instincts on this question.

19      Q    Yeah.    And were you -- was your impression going into that meeting that

20   his position, the Vice President's position, was clear to Mr. Eastman and the President

21   before that meeting began on January 4th?

22      A    I mean, it was clear to me that Mr. Eastman was trying to persuade the Vice

23   President to what he understood to be a different place than where the Vice President

24   was.

25      Q    Okay.    And when you talk about the preferred course -- you a couple of

1    times have said the preferred course or the more prudent course -- was your impression

2    that Mr. Eastman thought it was preferred because it might be more palatable to the Vice

3    President or it was preferred on the merits of a constitutional analysis?

4          A      So on the -- in one of my conversations with him on the 5th, the afternoon of

5    the 5th, or maybe early evening, he acknowledged that the legal basis for the two

6    positions was the same.    You couldn't get there either way unless you -- because to get

7    to the procedural position, you had to set aside a number of the positions of the Electoral

8    Count Act, which you couldn't do unless the President basically had plenary constitutional

9    authority to resolve these things.

10          So the legal theory wasn't different.    He thought that it was more politically

11    palatable.    I don't think that he ever termed that in terms of more palatable to the Vice

12    President as opposed to -- my impression was he was thinking more acceptance of the

13    country of the action taken.

14          Q      I see.    So my question is really was he -- you described it as trying to

15    convince the Vice President, to move the Vice President.    Was this preferred course of

16    just delay, in your sense, an attempt to get something that he thought the Vice President

17    could potentially agree to as opposed to a unilateral rejection of or acceptance of

18    alternate electors?

19          A      So it's possible with respect to the 4th.

20          So on the 5th we have the meeting that starts late morning because he was

21    delayed for the Georgia proceedings, and there he makes it clear:    Reject.

22          When he comes back with the procedural theory later, at that point he's very

23    clear, "I know you are not going to just reject.    Would you consider this?"

24          Q      Yeah.    It's been described to us as a pivot, that he takes the pivots from,

25    okay, if you're not going to reject these electors, maybe you will just delay, send it back to

1    the States for some period of time.

2           It sounds like to me -- first of all, would you agree that it was a pivot?    And, if so,

3    did it occur really late on the 5th as opposed to before the meeting on the 4th?

4           A      So, yes.    I mean, there was -- before the meeting on the 4th, there was

5    nothing for him to pivot from.

6           Q      Okay.

7           A      That was the first time that I saw Mr. Eastman or heard anything from him

8    with respect to the whole thing.

9           I agree that it was a pivot, and he was quite clear in saying, "I've heard you loud

10   and clear.    You're not going to do that.    Would you now consider this?"

11          Q      I see.    And that occurred in an evening conversation on the 5th, which I

12   think Mr. Wood will get to.

13          A      Starts in the afternoon and then a couple of calls into the evening.

14          Mr. Heaphy.    That's great.    Thank you.

15          Mr. Wood.    Okay.    Take a lunch break?

16          Mr. Maher.    Actually, can I ask one more question about the 4th?

17          Mr. Wood.    Yes.

18          Mr. Maher.    So after the meeting on the 4th, did anybody from the White House

19   Counsel's Office reach out and ask you your view of the legality of any of those issues?

20          The Witness.    So I want to be careful in general with respect to conversations

21   with the White House Counsel's Office.    I think on this one I'm, given this narrow

22   timeframe, I'm happy to say no.    But I'm also sensitive to the fact that they've robustly

23   invoked privilege with respect to my interactions with Counsel's Office.

24          So if I was concerned that an answer would start to give away substance of any of

25   that, I wouldn't be able to answer.    But the answer to that is no.

1    January 5th as it pertains to the Vice President's role in the 2020 election.

2         A    Sure.    So at the end of the meeting on the 4th, it had been left that I would,

3    as I've indicated, I would meet with Mr. Eastman, I would receive whatever materials it

4    was that he wanted us to look at that he thought supported his view.

5         This sort of serves two functions.    One, it freed the Vice President up to just

6    focus on getting his statement done, because he was working on it up at the residence

7    that morning; and it enabled me to make sure that there were no, sort of what I would

8    call procedural faults on our part, that there was nothing we had ever failed to look at.

9    No one was ever going to say that the Vice President only reached this conclusion

10   because we just didn't take the time to look.

11        So I think we were originally supposed to meet first thing in the morning, but he

12   had an argument in court in Georgia that went long.

13        So my recollection is that he got over at about 11 o'clock.    We met in Marc

14   Short's office.    The meeting --

15        Q    Which office, in the West Wing or in the Old Executive Office Building.

16        A    Marc's office in the West Wing was about the size of the inside of this U right

17   here [indicating].

18        [Laughter.]

19        So in the Old Executive Office Building.    And it was me, Marc, and Eastman.

20   And he came in and said that the request that he was there to make of us is that we

21   reject the electors.

22        He acknowledged that there had been discussions of other possibilities the day

23   before, but that's what he was here to talk about today.

24        Q    Okay.    I'm just going to interrupt you briefly.

25        So you've given us handwritten notes.    I'd like to have this marked as exhibit 86.

1    And feel free to refer to that.

2         A    I'm not sure I actually have a copy myself.

3         Q    Okay.

4         A    But, yes, you'll see what I -- I didn't write down a lot because there wasn't a

5    lot that he said that was new to me.

6         Ah, I do have a copy.

7         So, yes, the first thing that I wrote was, "Requesting VP reject."    That was the

8    context.

9         Q    And that meant Dr. Eastman was requesting that the Vice President reject

10   the Biden electors from certain contested States.    Is that right?

11        A    Yes, from a set of between five and seven contested States.    New Mexico

12   and Nevada, as I understood it, were sort of on the bubble in his thinking as to whether

13   they were disputed or not.    But the other five, Georgia, Arizona, Michigan, Wisconsin,

14   Pennsylvania, were all in the clearly disputed bucket.    And then there were two that

15   were of a more uncertain status, as I understood it.

16        Q    And I think you answered this earlier, but he -- is it correct that Dr. Eastman

17   did not expressly state whether the President had asked him to make this request?

18        A    I don't recall him saying that.

19        Q    Okay.    But you were aware that he was a representative of the President in

20   some capacity, weren't you?

21        Let me rephrase that.

22        As you sit here today, knowing everything you know, is it fair to say that he was

23   there in some capacity representing the President of the United States?

24        A    He represented to me on the 6th that the President was his client, and there

25   was nothing inconsistent about the interactions I had with him on the 5th or the 4th with

1    that representation.    So I don't know it to be true, but I assumed it to be true for

2    purposes of my interactions with him.

3         Q      And what was your reaction when he requested that the Vice President

4    reject electors from certain States?

5         A      So I was surprised because it was one of the things that I felt he had been

6    pinned down on the day before, was that he was not saying that that's what we should

7    do, but now that's what we were being asked to do.

8              But it also, to some extent, simplified things for me because the complications of

9    the procedural case and having to go through all the different sections of the Electoral

10   Count Act that were at issue with that became somewhat less pertinent to the discussion.

11             So from his perspective, his objective was to persuade me.    I sort of viewed it as

12   my challenge to use Socratic questioning during the course of the thing to see if I could

13   persuade him that there's just no way that a small mind -- a small government

14   conservative would ever adopt the position that he was taking.    So that was my basic

15   reaction.

16             And we then had a very long discussion that covered the entire history of

17   constitutional provisions.    We discussed examples, like the Adams example and the

18   Jefferson example, both of which were brought to prominence by Bruce Ackerman, a law

19   review article that we were well aware of.

20             And I essentially got Mr. Eastman to -- or Dr. Eastman, I guess -- to acknowledge

21   that neither of those served as examples for the proposition that he was trying to support

22   of a Vice Presidential assertion of authority to decide disputes because no dispute was

23   raised in either case during the joint session.

24             And, moreover, there was no dispute as to the outcomes in those States.    In the

25   Jefferson example, everybody knew that Jefferson won Georgia, there was no question

1     about that, nor was any question raised about it in the Congressional Record for the

2     count.

3          There is a newspaper article from a few days after the count where one of the

4     tellers allegedly told someone that there was an irregularity with the certificate for

5     Georgia where a page was missing.    No question as to the authenticity of the page that

6     was received.    They had simply failed to attach a page that should have been there.

7          It was a technical defect.    No question about the outcome.    And Jefferson had

8     not called it to the attention of the larger body, according to the newspaper article,

9     despite the fact that the teller had expected him to.

10         That was hardly an example of a Vice President asserting authority to decide

11    disputes over electoral certificates.    And that was really the example Mr. Eastman kind

12    of pinned most of his hopes on, I suppose, in terms of a historical example of Vice

13    Presidential authority.

14         So we also walked through the history of all of the different disputes that had

15    arisen in Congress up to the Electoral Count Act.    He acknowledged -- by this point, I had

16    determined the Nixon example was not a counter example, and he agreed with me that,

17    indeed, since the Electoral Count Act had gone into effect, there were no instances of

18    departing from the Electoral Count Act.

19         And we sort of summed it up at the end saying that, so what we have here is an

20    admittedly not well-drafted sentence in the Constitution that simply does not provide for

21    the possibility of objections or how to resolve them.    It's just not in the constitutional

22    sentence.

23         The constitutional sentence refers to two activities.    The Vice President or the

24    President of the Senate shall open the certificates, and switches to the passive voice, and

25    they shall be counted.    Doesn't even specify who does the counting.

1          So there's nothing about objections.    There's nothing about resolution of

2    objections.

3          So you start with that.    And his premise was, well, the Vice President is the one

4    who does the counting because nobody else is mentioned and the Vice President opens

5    the certificate.

6          The constitutional provision doesn't say that, but that's his premise.    And his best

7    argument for that is actually a piece of paper that was attached to a copy of the

8    Constitution that was sent out to the different States.

9          They realized, wait a second, there was something that we forgot about here,

10   which is we won't have a sitting Vice President come the first count for George

11   Washington's election as President.

12         And so they recommended that a Senator be appointed to the role of presiding

13   over that session and serve as President of the Senate, even though they wouldn't have

14   one, and that he would do the counting.

15         So that was his best example, was that the Framers did seem to think that the Vice

16   President would have a real role in counting.    That's a far cry from resolving objections

17   or even thinking that there would be objections.

18         So he acknowledged that there was an ambiguous provision with 100 percent

19   consistent historical practice since the time of the Founding that the Vice President did

20   not have -- did not ever assert or exercise authority to do what he was suggesting we

21   should do.

22         And the 130 years of practice of following the Electoral Count Act every single

23   time.    We went through examples like Al Gore.

24         "Are you really saying, John, that Al Gore could have just declared himself the

25   winner of Florida and moved along?"

1          "Well, no, no, there wasn't enough evidence for that."

2          So it was a very contingent position in Mr. Eastman's mind about all of the

3    underlying unconstitutional things that he thought were happening in the States this time

4    around, and it wasn't clear how he drew the line that that worked.

5          But he acknowledged by the end that, first of all, no reasonable person would

6    actually want that clause read that way because if indeed it did mean that the Vice

7    President had such authority, you could never have a party switch thereafter.    You

8    would just have the same party win continuously if indeed a Vice President had the

9    authority to just declare the winner of every State.

10         He acknowledged that he didn't think Kamala Harris should have that authority in

11   2024; he didn't think Al Gore should have had it in 2000; and he acknowledged that no

12   small government conservative should think that that was the case.

13         And I said, "If this case got to the Supreme Court, we'd lose 9-0, wouldn't we, if we

14   actually took your position and it got up there?"    And he started out at 7 to 2.

15         And I said, "Who are the two?"

16         And he said, "Well, I think maybe Clarence Thomas."

17         And I said, "Really?    Clarence Thomas?"

18         And so we went through a few Thomas opinions and, finally, he acknowledged,

19   "Yeah, all right, it would be 9-0."    Except that his fallback --

20         Q      Did he say who the other one was?

21         A      I don't recall.    I don't recall.

22         But he ultimately acknowledged that none of them would actually back this

23   position when you took into account the fact that what you have is a mildly ambiguous

24   phrase, a nonsensical result that has all kinds of terrible policy implications, and uniform

25   historical practice against it.    It just didn't work.

1          So I kind of wound up, "Can't we just acknowledge that this is a really bad idea?"

2          And he didn't quite say yes, but, he said, "Well, all right.   I get everything you're

3     saying."   He said, "They're going to be really disappointed."

4          I don't know who the "they" is.   You can -- I know what your follow-up question

5     is going to be.   He said, "They're going to be really disappointed."

6          Q     My follow-up question is, who's the "they"?

7          [Laughter.]

8          A     I don't know.   I don't know.

9          He said, "They're going to be really disappointed that I wasn't able to persuade

10    you."   And he left.

11         I will say the one other thing that we had a lot of discussion on was the political

12    question doctrine and -- because once he acknowledged that they would lose in the

13    Court, he said, "Well, but I think that, you know, it's a political question and they

14    shouldn't get involved at all."

15         And a lot of our discussion was my view, A, that they would because they would

16    recognize if it wasn't them who was going to step in on a question that -- it's a pretty

17    easily presented question, right?   Here we have a statute, and the question is, is the

18    statute consistent with the text of the Constitution?

19         His view was that the Vice -- that the constitutional text has the Vice President

20    having the sole authority to do the counting, and that with that comes the authority to

21    resolve objections, and, therefore, anything in the Electoral Count Act to the contrary is

22    unconstitutional.

23         And indeed, if that's what the constitutional clause actually said, you couldn't have

24    a statute that was -- that contradicted that authority or removed it from the authority of

25    the Vice President.   But that's where he was.

1    about.

2         A    So it might have come up.    It certainly -- on one of the phone calls later in

3    the day when they had -- I think he used the word "pivot" before, once they pivoted away

4    from reject the electors and back to send it back to the States in some form, he had said

5    when addressing the viability of his legal theory as to why that worked, he said, "You

6    know, just between us University of Chicago chickens, you and I will understand this is the

7    same basic legal theory underneath it.    It's just more palatable in terms of the actual

8    claim being made to the public as to what the Vice President's authorities are."

9         Q    But at that point had he already admitted that the legal underpinnings for

10   what I'll call the more aggressive position were flawed?

11        A    So as I said, at the very end of our session he sort of all but admitted --

12        Q    Okay.

13        A    -- that it didn't work.

14        So he certainly knew we weren't going to do that and that we thought that the

15   position was -- wouldn't be accepted by any member of the Supreme Court, by any judge,

16   by any of the Framers, et cetera.

17        He had acknowledged that he would lose 9-0 at the Supreme Court.    He didn't

18   quite get to saying yes when I had asked him, "John, isn't this just a terrible idea?"    But it

19   was a near concession on that.

20        Q    So when he said that comment over the phone about just between us

21   University of Chicago type chickens, or whatever he said, did you understand him to be

22   suggesting that even the fallback legal position was a flawed legal theory, but that the

23   Vice President should pursue it anyway?

24        A    That it was an uphill climb on the underlying legal opinions position

25   certainly, flawed in the sense that he had ambiguous constitutional text, no history, no

1    The third is:    At the end of the joint session, direct that the electoral certificates for

2    these States will not be counted until each State's legislature certifies which of the

3    competing slates of electors for the State is true and correct.

4          I should note this memo is dated January 5th.

5          So you discussed the pivot by at least Dr. Eastman, if not also his client.    Where

6    in the course of that pivot were things when you wrote this?

7        A    So I think that this memo -- and this is -- I'll say, prior to getting documents

8    to refresh my recollection, I thought that this memo might have been written the evening

9    of the 5th.    Based on the time stamps that I saw with the emails that go along with this, I

10    think that this may have been written probably through the evening of the 4th after I met

11    with Mr. Eastman, and then, that morning, sent off to the Vice President, who was up at

12    the residence before Mr. Eastman arrived for the meeting.

13          So -- and one of the reasons I think that is that Professor Eastman does not

14    recommend -- we had talked before as to the term "should."    I think that does not

15    recommend had been an important concession that the Vice President had gotten sort of

16    during the meeting on the 4th from Mr. Eastman, that that was not the course that he

17    was recommending.

18          So then, from the 4th, we have a pivot into the morning of the 5th, where he

19    says -- comes in and says, "No, we want you to reject," and then sort of a pivot back to

20    send it back to the States.

21        Q    Under the heading "Legal Analysis" on the first page, you wrote:    Professor

22    Eastman acknowledges that his proposal violates several provisions of statutory law.

23    And then you've got several bullets there.

24          Can you describe -- you don't have to describe what's in your memo because that

25    speaks for itself.    But, to the extent you can -- and I know it may be somewhat

1   redundant of what you've already told us -- can you describe your recollection of in what

2   way Dr. Eastman acknowledged that his proposal violated several provisions statutory

3   law?

4        A     Well, and I've already largely discussed this, but, to do what he was

5   suggesting, A, the 10-day adjournment would violate a provision of the Electoral Count

6   Act.    Not allowing the Senators to object and instead to report to him -- have a

7   procedure where the State legislatures would decide those instead was inconsistent.

8        He would not have us calling for objections, which would trigger that, but the

9   Electoral Count Act says:    You shall call for objections.    Again, this had been one of

10  the -- the "shalls" were important to us, which was one of the reasons we had made sure

11  that the transcript or the scripts for January 6th had the call for objections because that

12  was one of the things that the statute specifically required.

13       So the memo lays out the four ways in which the proposal would violate

14  provisions of the Electoral Count Act, and he acknowledged as much in our conversations.

15       Now, most of that acknowledgement sort of on a point-by- point basis was in the

16  conversations the afternoon of the 5th.    We didn't get into all of the details on that in

17  the meeting on the 4th.

18       Q    Okay.    So then the last paragraph of the memo says:    Conclusion.    If the

19  Vice President implemented Professor Eastman's proposal, he would likely lose in court.

20       And that's something you've already discussed with us, that even Dr. Eastman

21  acknowledged that, if the court were to decide, rather than deeming it a political

22  question doctrine, that basically every judge would rule against the Vice President.    Is

23  that correct?

24       A    Yes.

25       Q    And then you wrote:    In a best case scenario in which the courts refused to

1   Pennsylvania Legislature, has tons of blank signature lines on it, indicating this is not even

2   one house of the Arizona Legislature speaking.

3        Q      Okay.   So when you got to the Vice President's residence on the morning of

4   the 6th, what was his demeanor?

5        A      I would say he was mostly -- he was warm with the staff and appreciative of

6   all the work that we had done to get things ready and sort of ready to face whatever the

7   day might bring.

8        Q      And did you work with him on the statement further?

9        A      At that point there were no substantive changes or rearrangements.    It was

10  really a matter -- I think he wanted to make sure that we were okay with the changes that

11  he had made the night before and that morning and that we didn't have any negative

12  reactions to those.    Otherwise, it was a matter of proofing it and getting it out.

13       Q      Okay.   If you'll look at exhibit 51, "Daily Diary of President Donald J.

14  Trump."

15       On the third page, the top entry is 11:17 a.m., the President talked on a phone call

16  to an unidentified person.

17       Do you know whether that was -- does that sound like around the time that the

18  President and Vice President talked that day?

19       A      So there was a time while we were up there that the Vice President left the

20  room to take a call from the President.    That could have been at 11:17, but I don't know

21  for sure.

22       Q      When the President -- when the Vice President came back, did he tell you

23  anything about his call with the President?

24       A      The Vice President's rule was never to divulge the contents of his

25  conversations with the President.