Anthony T. Caso (Cal. Bar #88561)
Email: atcaso@ccg1776.com
CONSTITUTIONAL COUNSEL GROUP
174 W Lincoln Ave # 620
Anaheim, CA 92805-2901
Phone: 916-601-1916
Fax: 916-307-5164

Charles Burnham (D.C. Bar# 1003464)*
Email: charles@burnhamgorokhov.com
BURNHAM & GOROKHOV PLLC
1424 K Street NW, Suite 500
Washington, D.C. 20005
Telephone: (202) 386-6920
* admitted pro hac vice

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| JOHN C. EASTMAN, <br><br>           *Plaintiff,* <br><br> vs. <br><br> BENNIE G. THOMPSON, *et al.* <br><br>           *Defendants* | Case No.: 8:22-cv-00099-DOC-DFM <br><br> **PLAINTIFF'S REPLY BRIEF IN SUPPORT OF PRIVILEGE ASSERTIONS** <br><br> Date: March 8, 2022 <br> Time: 9:00 a.m. <br> Judge: Hon. David O. Carter <br><br> Magistrate Judge: <br>   Hon. Douglas F. McCormick <br> Crtrm.: 9D <br> Trial Date: not set |

1

2

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................3

INTRODUCTION............................................................................................6

ARGUMENT .................................................................................................6

I.   Dr. Eastman's Attorney-Client Relationship With Former President Trump and his Campaign Committee Is Well-Established. .........................................7

   A. Formation of the Attorney-Client Relationship .......................................7

   B. Applicability of the Attorney-Client Privilege.........................................8

II.  No Waiver by Use of Chapman Email. .........................................................10

III. Defendants' Other Claims of Waiver Are Unavailing. ...................................12

   A. Trump's "Authorization" Was Not A Waiver...........................................12

   B. Disclosure to an "Agent" Is Not Waiver .................................................13

IV. The Work Product Protection Is Neither Waived Nor Overcome By "Substantial Need."..................................................................................14

   A. The Work Product Protection has Not Been Waived Through Disclosure to an Adversary or by Any Other Means. ...................................................14

   B. The Defendants Have Not Shown Any Substantial Need that Would Overcome Work Product Protection. .......................................................17

V.  The Committee's Crime-Fraud Claims Are Without Merit. ...........................19

   A. There is No Good Faith Basis to Conclude that President Trump Used Plaintiff's Legal Advice to Obstruct an Official Proceeding ...................19

   B. Conspiracy to Defraud the United States ................................................21

   C. Common Law Fraud ..............................................................................22

VI. Constitutional Claims.................................................................................23

CERTIFICATE OF SERVICE.........................................................................27

1
2

# TABLE OF AUTHORITIES

## Cases

*Admiral Ins. Co. v. U.S. Dist. Court for Dist. Of Arizona*,
881 F.2d 1486 (9th Cir. 1989)..............................................................18

*Am. C.L. Union of N. Cal. v. U.S. Dep't of Just.*,
880 F.3d 473 (9th Cir. 2018).................................................................15

*Atraqchi v. GMUC Unified Billing Servs.*,
788 A.2d 559 (D.C. 2002).....................................................................23

*Champion Int'l Corp. v. Int'l Paper Co.*,
486 F. Supp. 1328 (N.D. Ga. 1980).......................................................14

*Chiafalo v. Washington*,
140 S. Ct. 2316 (2020)...........................................................................21

*Delaney, Migdail & Young, Chartered v. IRS*,
826 F.2d 124 (D.C. Cir. 1987)...............................................................15

*Duplan Corp. v. Moulinage et Retorderie de Chavnaoz*,
509 F.2d 730 (4th Cir. 1974).................................................................19

*Fletcher v. Union Pacific R.R. Co.*,
194 F.R.D. 666 (S.D. Cal. 2000)...........................................................19

*FTC v. Grolier, Inc.*,
462 U.S. 19 (1983).................................................................................17

*Hickman v. Taylor*,
329 U.S. 495 (1947)...............................................................................17

*Holmgren v. State Farm Mut. Auto. Inc. Co.*,
976 F.2d 573 (9th Cir.1992)..................................................................19

*In re Dickens*,
174 A.3d 283 (D.C. 2017).......................................................................9

*In re Fay*,
111 A.3d 1025 (D.C. 2015).....................................................................9

*In re Grand Jury Subpoena (Mark Torf/Torf Environmental*,
357 F.3d 900 (9th Cir. 2004).................................................................15

*In re Kellogg Brown & Root, Inc.*,
756 F.3d 754 (D.C. Cir. 2014)...............................................................14

*In re Lieber*,
442 A.2d 153 (D.C. 1982).......................................................................8

*In re Ryan*,
670 A.2d 375 (D.C. 1996).....................................................................10

*Ins. Co. of N. Am. v. Super. Ct.*,
    108 Cal. App. 3d 758 (1980)...................................................................15

*Lister v. State Bar*,
    51 Cal.3d 1117 (1990)..........................................................................8

*McPhaul v. United States*,
    364 U.S. 372 (1960)............................................................................26

*Nolan v. Foreman*,
    665 F.2d 738 (5th Cir.1982).................................................................10

*Perrignon v. Bergen Brunswig Corp.*,
    77 F.R.D. 455 (N.D. Cal. 1978)...........................................................12

*Reavis v. Metro. Prop. & Liab. Ins. Co.*,
    117 F.R.D. 160 (S.D. Cal. 1987)..........................................................19

*Responsible Citizens v. Superior Court (Askins)*,
    16 Cal.App.4th 1717 (1993) .................................................................9

*Taylor v. Sheldon*,
    172 Ohio St. 118, 173 N.E.2d 892 (1961) ...........................................10

*Thompson v. Trump*,
    2022 WL 503385 (D.D.C. Feb. 18 2022) .............................................23

*Tillotson v. Boughner*,
    350 F.2d 663 (7th Cir. 1965)...............................................................12

*Trump v. Kemp*,
    No. 1:20-cv-05310 (N.D. Ga., filed Dec. 31, 2020) .............................9

*U.S. v. McGraw-Hill Companies, Inc.*,
    2014 WL 8662657 (C.D. Cal.).............................................................19

*United States v. Caldwell*,
    989 F.2d 1056 (9th Cir. 1993).............................................................22

*United States v. Christensen*,
    828 F.3d 763 (9th Cir. 2015)...............................................................14

*United States v. Lonich*,
    23 F.4th 881 (9th Cir. 2022) ...............................................................21

*United States v. Sandlin*,
    2021 WL 5865006 (D.D.C. Dec. 10, 2021)..........................................21

*United States v. Sanmina Corp.*,
    968 F.3d 1107 (9th Cir. 2020).................................................... 17, 18

*Upjohn v. United States*,
    449 U.S. 383 (1981) .................................................................. 16, 19

*Watkins v. United States*,
354 U.S. 178 (1957) ........................................................25

*Westinghouse Elec. Corp. v. Kerr-McGee Corp.*,
580 F.2d 1311 (7th Cir. 1978) ...........................................10

## Statutes

18 U.S.C. § 1512 ................................................... 20, 21

18 U.S.C. § 371 ................................................................22

Cal. Evid. Code § 951 .......................................................8

DC R RPC Rule 1.18 ........................................................8

## Other Authorities

8 Wigmore, Evidence § 2301 (McNaughten Rev. 1961) .........................................14

Daniel Brezenoff, *et al.*, Letter to Electors (Dec. 14, 2016)................................21

Jamie D. Halper, *Law School Professor Says 20 Republican Electors May Vote Against Trump*, The Harvard Crimson (Dec. 18, 2016) ........................................21

Kyle Cheney, *Lessig: 20 Trump electors could flip*, Politico (Dec. 13, 2016) .......21

Paul R. Rice, Attorney-Client Privilege in the United States § 3:3 (2014) .............14

*Sony Computer Ent. Am., Inc. v. Great Am. Ins. Co.*,
229 F.R.D. 632 (N.D. Cal. 2005) .......................................13

## Rules

Fed. R. Civ. Proc. 26(b)(3)(A)(ii) ................................................ 18, 19

Local Rule 7-18 ................................................................25

## Constitutional Provisions

U.S. Const. amend. I ................................................. 21, 25

U.S. Const. amend. IV ................................................. 25, 26

## INTRODUCTION

If there had previously been any question about whether the Select Committee views its purpose primarily as an unconstitutional exercise of law enforcement powers that belong to the executive branch rather than a legitimate legislative function, its opposition brief removes any doubt.[1] The Select Committee has used that brief, which was supposed to address privilege claims over 4 days of emails, as an opportunity to provide what is effectively a 60-page criminal indictment against the former President, bringing within its dragnet anyone who, like Dr. Eastman, provided legal advice or who otherwise fell within the former President's orbit. It is based on lies, distortions drawn from select snippets of behind-closed-door testimony, and innuendo.[23] *See* Statement of Disputed Facts. Yet the distortions cannot hide the fact that Dr. Eastman provided legal advice to a client in connection with numerous post-election legal challenges and a joint session of Congress from which litigation was certainly anticipated as a possibility, giving rise to attorney-client and work product protections of his communications.

## ARGUMENT

---

[1] *See also* Dkt.#178 ("The extent of potential wrongdoing and of Plaintiff's personal involvement are the very things the Select Committee is seeking to better understand through its request for documents in this case"). The Committee's law enforcement purpose could not be more clear.

[2] Responding to the torrent of allegations in defendants' "Introduction", "Summary of Background" and Crime/Fraud sections requires parsing a multi-layered assemblage of highly excerpted transcripts, tendentious paraphrasings, selective quotations and, at times, completely naked proffers. Plaintiff has prepared the attached Statement of Contested Facts to attempt to unwind some of defendants' most insupportable assertions.

[3] Similarly, defendants' have stretched the relaxed standard of evidence at pretrial hearings to its absolute breaking point. Although this Court need not strictly apply the FRE, evidence must still bear sufficient indicia of reliability. To illustrate this point, Plaintiff has prepared Exhibit B – Statement of Evidentiary Objections which illustrates the reliability problems with defendants' factual assertions and how quickly they would fall apart if subjected to true adversarial testing.

## I.     Dr. Eastman's Attorney-Client Relationship With Former President Trump and his Campaign Committee Is Well-Established.

In their opposition, the defendants claim that "Plaintiff does not even attempt in his declaration to claim attorney-client privilege over the relevant matters and the relevant time at issue here." Opp. at 20. That is not true. "Matters related to the Electoral College," which would include the counting of the Electoral College votes on January 6, 2021, was expressly addressed in Eastman's Declaration. 2d Eastman Decl. ¶ 24 (the representation was for "federal litigation matters in relation to the 2020 presidential general election, *including matters related to the Electoral College.*" (emphasis added)).

The Select Committee also fixates on the fact that the engagement letter Eastman produced was "unsigned," but that conflates the separate issues of the formation of an attorney-client relationship with the circumstances in which the attorney-client privilege applies. Further, Defendants misstate and misapply the law with respect to both.

### A. Formation of the Attorney-Client Relationship

Under California law, a "client" is "a person who, directly or through an authorized representative, consults a lawyer for the purpose of retaining the lawyer or securing legal service or advice from him in his professional capacity…."  Cal. Evid. Code § 951. In D.C., "A person who discusses with a lawyer the possibility of forming a client-lawyer relationship with respect to a matter is a prospective client." DC R RPC Rule 1.18. In both cases, obligations of confidentiality are triggered. There is no requirement that such a relationship be formed in writing. *Lister v. State Bar*, 51 Cal.3d 1117, 1126 (1990); *In re Lieber*, 442 A.2d 153, 156 (D.C. 1982) (observing that "[i]t is well established that neither a written agreement nor the payment of fees is necessary to create an attorney-client relationship"). All that is needed "is that the parties[,] explicitly or by their conduct, manifest an intention

to create" the relationship. *In re Dickens*, 174 A.3d 283, 296 (D.C. 2017) (internal quotation marks omitted).

Further, while the formation of such a relationship is bi-lateral, courts defer to the client's conduct in establishing the relationship's existence. *See Responsible Citizens v. Superior Court (Askins)*, 16 Cal.App.4th 1717 (1993) ("one of the most important facts involved in finding an attorney-client relationship is the expectation of the client based on how the situation appears to a reasonable person in the client's position." [internal quotes and citation omitted]). President Trump certainly considered Dr. Eastman to be his lawyer in the "relevant time period" and for the "relevant matters" at issue here. As the Select Committee has already acknowledged, Trump asked Dr. Eastman to an oval office meeting on January 4, 2021, to give advice on the constitutional authority of the Vice President while presiding over the joint session of Congress on January 6, 2021. Opp. at 10. Indeed, on January 5, 2021—smack dab in the middle of the time period at issue here—Dr. Eastman appeared in Court on behalf of the President, *Trump v. Kemp*, No. 1:20-cv-05310 (N.D. Ga., filed Dec. 31, 2020). Dr. Eastman's appearance in that case is a matter of public record. *See* Dkt.#17 (application for *pro hac vice* admission, approved Jan. 6, 2021).[4] Moreover, courts have consistently held that attorneys who file on behalf of a party represent to the court that an attorney-client relationship exists. *See*, *e.g.*, *In re Fay*, 111 A.3d 1025, 1030 (D.C. 2015) (stating that they "undertake the ethical duties stemming from an attorney-client relationship by making an appearance on behalf of the retained attorney's client").

## B. Applicability of the Attorney-Client Privilege

Even if this Court were to find that a formal attorney-client contractual relationship had not been formed, the law is plain that the attorney-client privilege is an ethical responsibility owed by attorneys to clients *and prospective clients*, irrespective of their contractual arrangement. *In re Ryan*, 670 A.2d 375, 380 (D.C.

---

[4] Available at https://www.courtlistener.com/docket/28917289/trump-v-kemp/.

1996). Such "ethical responsibilities exist independently of contractual rights and duties," and arise from the "establishment of a fiduciary relationship" that "is often established before a contract even exists." *Id.* at 379-80. "'All that is required…is that the parties, explicitly or by their conduct, manifest an intention to create the attorney/client relationship.'" *Id.* (quoting *Nolan v. Foreman*, 665 F.2d 738, 739 n. 3 (5th Cir.1982)). The Select Committee's assertion that the non-existence of a contractual relationship means the privilege cannot apply is therefore incorrect.

Drawing from the ABA Code of Professional Responsibility, the Seventh Circuit identified five "fairly common" situations in which an implied professional ethical obligation exists, despite no express formation of an attorney-client relationship. *Westinghouse Elec. Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1319 (7th Cir. 1978). Most directly on point is the duty owed to a client arising in "preliminary consultation by a prospective client with a view to retention of the lawyer, although actual employment does not result." *Id. See also*, *Taylor v. Sheldon*, 172 Ohio St. 118, 173 N.E.2d 892, 895 (1961) ("Communications in the course of preliminary discussion with a view to employing the lawyer are privileged though the employment is in the upshot not accepted.").

Election integrity is clearly a legal matter, and it was clearly a matter on which the former President was seeking legal advice. When Cleta Mitchell contacted Dr. Eastman on September 3, 2020, the communication was made to Dr. Eastman under the apparent authority of the President by one of his attorneys, whose client had authorized her to consult with other attorneys for the purpose of procuring legal advice regarding election integrity. 2d Eastman Decl. ¶ 25. That relationship continued through Dr. Eastman's "legal consultation" meeting in Philadelphia on November 7, *id.* ¶ 27; his appearances before the Supreme Court on behalf of President Trump on December 9 and 21, *id.* ¶ 20; his appearance in the Northern District of Georgia on December 31, *id.*; and his oval office meeting and further discussions on January 4, 2021, and beyond.

## II.      No Waiver by Use of Chapman Email.

The Select Committee's claim that Dr. Eastman's use of Chapman's email system was not authorized overstates the prior statements made by Chapman and ignores entirely that Dr. Eastman disputes even those post-hoc statements.

For example, the Committee does not address at all the assertions in Dr. Eastman's sworn declaration that his employment expressly authorized outside employment "separate and apart from [his] employment as a Faculty Member," that academically-oriented court briefs were considered as scholarship for promotion and tenure decisions at Chapman, and that American Bar Association Standard 402(c), which was incorporated by reference in the Chapman Law Faculty Handbook, specifically permits "outside professional activities" that "relate to major academic interests or enrich the faculty member's capacity as scholar and teacher [and] are of service to the legal profession and the public generally." 2d Eastman Decl. ¶¶ 3, 8, 9. Dr. Eastman cited three prior examples of such "outside" work using Chapman's email and other resources that involved post-election or other election-related litigation, for which Chapman praised his efforts. That in this instance Chapman, after the fact, decided to distance itself from that work because, well, Trump is apparently different, does not alter the fact that the prior precedent gave Eastman more than enough ground to subjectively and reasonably belief that this work was also permissible.

Nor does the University President's post-hoc "admonishment," as the Committee calls it, alter that conclusion. The statement notes that Struppa had directed Eastman "to remove from his private filing any direct or indirect reference to Chapman University and formally file such change with the court." Eastman did that the very next day. Struppa further notes that Eastman's freedom to represent whomever he chooses "should not be construed as implying any concurrence or approval for his actions by the University"—an implication that until that time had, as a matter of common practice and explicit guidance, been rebutted by the use of

"c/o" before the Chapman University name and address. Struppa further noted that, "as a nonprofit institution, Chapman University does not participate in, endorse or intervene in any political campaign on behalf of or in opposition to any candidate." But as we have previously noted, post-election litigation does not run afoul of that non-profit requirement.[5]

Nor is it true that, had the constitutional jurisprudence clinic which Eastman co-directed (and continued to co-direct, for a stipend, even while he was otherwise on leave) not been between semesters, his post-election litigation work would not have been a clinic project for interested students, just as his post-2000 election efforts had involved Chapman students. The assertion by Chapman's counsel to the contrary is not based on anything in DuMontelle's Declaration, prior practice, or on any requirement that the constitutional jurisprudence clinic (or any of the other law school clinics) obtain advance approval for particular matters they undertake.

As importantly, the case law upon which the Select Committee rests dealt with attorney-client privilege, not work product, where the standard for waiver is much less, as even the Committee concedes. So even if Dr. Eastman's use of Chapman's email system amounted to a disclosure to third parties, only the attorney-client privilege rather than the work product would be impacted. And even there, for the reasons set out above, such disclosure would not have been with the implied consent of the client necessary to effect a waiver. *See Tillotson v. Boughner*, 350 F.2d 663, 665 (7th Cir. 1965) ("the privilege is that of the client"); *Perrignon v. Bergen Brunswig Corp.*, 77 F.R.D. 455, 459 (N.D. Cal. 1978) ("Before there can

---

[5] Nor does the "splash" message about emails being subject to monitoring, or Chapman's policy about privacy, alter this expectation. Eastman's laptop use did not trigger the "splash" message, and the privacy policy necessarily had to have an implied exception for legal clinic work and "outside work" that included legal briefs in furtherance of scholarly and public service duties, lest the policy place all Chapman clinical professors in violation of their ethical obligations of confidentiality.

be a waiver, therefore, [the client] through its counsel must have voluntarily consented to [the] disclosure").

In sum, Eastman's employment agreement, the law faculty rank and tenure procedures and faculty manual, and prior practice all gave Eastman a subjective and reasonable belief that his work on this matter was not only authorized but that his email exchanges using his official bar-reflected Chapman email address did not constitute a waiver of any applicable privileges.

## III.   Defendants' Other Claims of Waiver Are Unavailing.

### A. Trump's "Authorization" Was Not A Waiver

The Select Committee's assertion that the Attorney-Client privilege has been waived because Dr. Eastman's client authorized him to "talk about these things" and had given him "express authorization" "to describe what occurred" is based, as seems to be the Select Committee's modus operandi, on statements taken wholly out of context. The first—the "talk about these things" statement made during a podcast with Harvard Law Professor Lawrence Lessig—quite explicitly referenced the constitutional authority of the Vice President under Article II and the 12th Amendment that was discussed in the scenarios memos, not election litigation or electoral college disputes more broadly. And the "express authorization … to describe what occurred" that was articulated by Dr. Eastman during his interview on the Peter Boyles Show was quite explicitly about the meeting that Dr. Eastman had with President Trump, Vice President Pence, and two of Pence's aids in the oval office on January 4, 2021. Eastman noted it was a "private conversation," but never claimed it was a "privileged conservation." Indeed, the presence of people outside the attorney-client relationship made it a non-privileged conversation from the outset. *See* Opp. at 22 (citing *Sony Computer Ent. Am., Inc. v. Great Am. Ins. Co.*, 229 F.R.D. 632, 634 (N.D. Cal. 2005) ("Where a third party is present, no presumption of confidentiality obtains")). The Select Committee's argument to the contrary completely overlooks that dispositive point.

Dr. Eastman has also not asserted attorney-client privilege over his memos outlining different scenarios for the January 6 joint session of Congress, so their disclosure cannot waive a privilege that did not exist. *Champion Int'l Corp. v. Int'l Paper Co.*, 486 F. Supp. 1328, 1330 n.2 (N.D. Ga. 1980) (disclosure of "nonprivileged documents" "does not waive the privileged communications … on the same subject"). Moreover, even if the release of Dr. Eastman's scenarios memos constituted a waiver of some privilege (more likely work product rather than attorney-client), Dr. Eastman has asserted attorney-client privilege only over 5 emails (four of which had an attachment) in the batch of production at issue here. As will be evident from the Court's *in camera* review, three of those emails (Chapman004722, Chapman004744, and Chapman004766) and their attachments (Chapman004723, Chapman004745, and Chapman004767) are duplicates, and a fourth email (Chapman004788) is identical except that it has a google docs link to the attachment rather than the attachment itself. Those four emails contain a discussion with co-counsel about advice to be given to Dr. Eastman's client that is on different matters than are addressed in the scenarios memos themselves, and is therefore not the "same subject" as the disclosed memos. And the fifth email (together with its attachment) addressed statutory and constitutional deadlines, not the process of the joint session of Congress addressed in the scenarios memos. It is therefore also not about the "same subject" as the memos.

**B. Disclosure to an "Agent" Is Not Waiver**

The law is beyond dispute that the attorney-client privilege attaches to communications between an attorney and the client's agent and between an attorney's agent and the client. *United States v. Christensen*, 828 F.3d 763, 802-03 (9th Cir. 2015); *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 757 (D.C. Cir. 2014); Paul R. Rice, Attorney-Client Privilege in the United States § 3:3 (2014)); 8 Wigmore, Evidence § 2301 (McNaughten Rev. 1961). Agency law, since it permits someone to act as an agent on behalf of someone else even under color of authority,

combined with the attorney-client privilege, makes it evident that communications between an agent acting on behalf of either the client or the attorney with either the attorney or the client, whether directly or again, through agents, is given the same protections as those given when made directly, without an agent. This is because, if the communications are related to the representation and for the purpose of representing the client on a confidential matter, as is abundantly clear here, the purpose and intent of the law is to give that the highest protection to ensure adequate representation without the concern of those communications later being divulged to third parties.

The two people included on the only documents at issue here for which Attorney-Client privilege is claimed were attorneys working with the Trump legal team, and as such were "agents" of the client. *See Ins. Co. of N. Am. v. Super. Ct.*, 108 Cal. App. 3d 758, 771 (1980) (holding that attorney-client communications in the presence of an unpaid legal consultant remained privileged because the consultant was present to further the interest of the client).

**IV.     The Work Product Protection Is Neither Waived Nor Overcome By "Substantial Need."**

**A. The Work Product Protection has Not Been Waived Through Disclosure to an Adversary or by Any Other Means.**

The defendants first argue that the *in camera* materials are not prepared "in anticipation of litigation." Opp. at 31-32. However, the law is clear that memoranda noting likely legal challenges and potential defenses are unquestionably protected by the work product privilege. *See Delaney, Migdail & Young, Chartered v. IRS*, 826 F.2d 124, 127 (D.C. Cir. 1987) (cited with approval in *Am. C.L. Union of N. California v. United States Dep't of Just.*, 880 F.3d 473, 486-87 (9th Cir. 2018)); *In re Grand Jury Subpoena (Mark Torf/Torf Environmental*, 357 F.3d 900, 907 (9th Cir. 2004) (opinions prepared by expert to assess client's civil and

criminal liability are unquestionably protected).[6] Although plaintiff cannot discuss the details of the *in camera* materials without waiving the privilege, plaintiff submits their connection to anticipated litigation will be manifest during this Court's review. Many of the documents relate specifically to pending court cases. Those that relate to the electoral college were also prepared with potential litigation in mind. "Forcing an attorney to disclose [documents] … that reveal the attorney's mental processes" is "particularly disfavored." *Upjohn v. United States*, 449 U.S. 383, 399 (1981). This strong public policy in protecting an attorney's mental processes is the basis for the work product privilege, and the privilege applies to government investigations beyond the confines of regular litigation. *See id.* at 397-98. Although the proceedings of the electoral college themselves may not constitute litigation, legal representation with respect to the electoral college must obviously be undertaken with potential court challenges clearly in mind.[7]

The defendants then argue that the plaintiff's work product claim is "vitiat[ed]" due to unethical conduct by plaintiff. Opp. at 32. The defendants make the conclusory statement that Plaintiff's advice was aimed at "overturning a democratic election." *Id*. However, even a cursory view of the *in camera* materials will reveal a genuine motivation on behalf of plaintiff and others to protect the democratic process. The fact that the defendants may disagree with the factual predicates of that effort does not render the conduct unethical.[8] Defendants offer no evidence

---

[6] The Select Committee's litany of documents, Op. at 32 n.67, 36-37. that don't mention "anticipation of litigation" overlooks the fact that in each instance, Plaintiff's response to their objections already clarified that each was created in anticipation of litigation.

[7] The defendant's own evidence makes clear that litigation arising out of the electoral certification process was anticipated. The defendants rely heavily on testimony from Greg Jacob on how the Supreme Court would be likely to rule on various aspects of that process. Opp. at 10, 14, 40.

[8] The defendants also cite the fact that disciplinary case is currently pending against Plaintiff but offer no elaboration on the particulars other than to note the "presumption [of Dr. Eastman's] innocence." *Id*. This is obviously insufficient.

PLAINTIFF'S REPLY BRIEF IN SUPPORT OF PRIVILEGE ASSERTIONS - 15

sufficient for this Court to conclude as a matter of law that no material fraud or illegality existed in the 2020 election, let alone that Plaintiff should be imputed with knowledge of that fact in the January 4-7 time period. In fact, the 2020 election remains a hotly contested subject of debate to this day. *See Statement of Disputed Facts*. The Wisconsin Special Counsel has recently issued a report finding illegal and fraudulent voting practices that affected the outcome of the Presidential Election in that state. *See*, *e.g.*, Wisconsin Office of the Special Counsel, *Second Interim Investigative Report on the Apparatus & Procedures of the Wisconsin Elections System*, at 7-8 (March 1, 2022) (identifying numerous violations of election laws and outright fraud).[9] This Court would need a full-scale trial, complete with expert audits of the contested state election tallies before it could even consider Defendants' arguments for breaching the work product privilege.

Next, Defendants argue that Plaintiff's work product claims are defeated because he disclosed the materials to nonlawyers and persons with whom he did not share an "agent" relationship. Opp.33. Defendants cite no authority which limits sharing of work product to lawyers or agents because the work product doctrine contains no such limitation. *Hickman v. Taylor*, 329 U.S. 495, 498, 510-11 (1947) (work product privilege protects an attorney's opinions and strategies.).

In fact, as the defendants acknowledge, work product privilege is only waived by voluntarily sharing the protected information with an adversary. *United States v. Sanmina Corp.*, 968 F.3d 1107, 1120 (9th Cir. 2020). This is not only the rule in the Ninth Circuit, but also the rule of the "overwhelming majority" of circuits that have considered the question. *Id*. Further, the work product privilege survives the termination of the litigation (or the plans for litigation) for which the product was created. *See FTC v. Grolier, Inc.*, 462 U.S. 19, 25 (1983).[10]

---

[9] Available at https://legis.wisconsin.gov/assembly/22/brandtjen/media/1552/osc-second-interim-report.pdf.

[10] The only particular example of disclosure to a supposed adversary that defendants offer is a single email to a "journalist," which defendants claim the journalist

Next, the defendants offer a five-word quote from *Sanmia* which they claim requires disclosure because "fairness requires it." Opp.35 (*citing Sanmina*, 968 F.3d at 1122). However, the full quote from *Sanmina* shows very clearly that the case dealt only with disclosure to adversaries and did not announce an all encompassing "fairness" standard. The full quote from which defendants have excerpted a single phrase is as follows: "we may find the work-product immunity waived *where the disclosing parties conduct has reached a certain point of disclosure towards his adversary* such that fairness requires that his privilege shall cease, whether he intended that result or not." *Id* (internal quotation omitted and italics added). Thus, the defendants "fairness" argument rests on a misleading partial quotation of *Sanmina*.[11]

## B. The Defendants Have Not Shown Any Substantial Need that Would Overcome Work Product Protection.

The Federal Rules allow for the discovery of work product where "the party shows it has substantial need for the materials *to prepare its case*." Fed. R. Civ. Proc. 26(b)(3)(A)(ii) (italics added). The Select Committee is not seeking the Chapman materials to "prepare its case" but rather for the completely ancillary purpose of conducting a congressional investigation. The cases relied on by defendants all involve parties seeking discovery of materials for use in pending litigation rather than some ancillary purpose. *See, e.g.*, *Admiral Ins. Co. v. U.S. Dist. Court for Dist. Of Arizona*, 881 F.2d 1486, 1495 (9th Cir. 1989) (considering rule

---

"could well have published." Opp.34 (*citing* Chapman 004494-95 and 004496-538). But the individual in question was also a Fellow at the Claremont Institute, *see* https://bit.ly/3hNmhzs, and the email exchanges at issue were with others affiliated with the Claremont Institute, in which he was participating not as a "journalist" but has a fellow. *In camera* review of these items will make clear that the individual in question was not an adversary or conduit to adversary.

[11] The defendants reliance on *Weil v. Inv./Indicators, Rsch. & Mgmt.*, 647 F.2d 18 (9th Cir. 1981) is misplaced. The case involved attorney client privilege, not work product.

in the context of "information plaintiffs need to establish their claims"); *Fletcher v. Union Pacific R.R. Co.*, 194 F.R.D. 666 (S.D. Cal. 2000) (plaintiff seeking work product materials in support of employment claim). Plaintiffs have offered no substantial need for the *in camera* materials for purposes of litigation before this or any other court. Their claim therefore does not even implicate Rule 26's "substantial need" provision.

Even if Rule 26 could somehow be stretched to cover a party's "substantial need" for purposes unrelated to the litigation (or *any* litigation), the defendants have made no such showing. Because of the strong public policy protecting an attorney's opinions, something "far stronger" than a normal showing of necessity and unavailability is required to compel disclosure. *Upjohn*, 449 U.S. at 401-02. The Fourth Circuit has ruled that "no showing of relevance, substantial need or undue hardship should justify compelled disclosure of an attorney's mental impressions, conclusions, opinions or legal theories." *Duplan Corp. v. Moulinage et Retorderie de Chavnaoz*, 509 F.2d 730, 734 (4th Cir. 1974). The Ninth Circuit has limited discovery of opinion work product to situations where "mental impressions are at issue in a case and the need for the material is compelling." *Holmgren v. State Farm Mut. Auto. Inc. Co.*, 976 F.2d 573, 577 (9th Cir.1992).

*U.S. v. McGraw-Hill Companies, Inc.*, 2014 WL 8662657 (C.D. Cal.), and *Reavis v. Metro. Prop. & Liab. Ins. Co.*, 117 F.R.D. 160, 164 (S.D. Cal. 1987), relied on by Defendants, Opp. at 36, are beside the point. Both involved work product that was "pertinent to the party's 'most salient defense'" and the attorney's mental impressions were "directly at issue in the case." *McGraw-Hill*, at *6-7; *Reavis*, 117 F.R.D. at 164. Moreover, even if ancillary investigations such as the Select Committee's could be considered "a case," Dr. Eastman's "mental impressions" are at most relevant for law enforcement purposes in which the Committee has no constitutional role, not any legislative purpose. Defendants have therefore

not established a valid compelling need for disclosure of the work product privileged documents at issue.

## V.   The Committee's Crime-Fraud Claims Are Without Merit.

The Select Committee asserts that Dr. Eastman's email exchange with Greg Jacob, Counsel to Vice President Pence, "urg[ed] the Vice President to take illegal action and refuse to count electoral votes." That statement is misleading on two grounds. First, the email exchange on which it is based makes quite clear that Dr. Eastman had urged a delay, not a "refus[al] to count electoral votes." Second, the email exchange also makes clear that the Electoral Count Act's timing provisions had already been violated by Vice President Pence, the House of Representatives, and the Senate by allowing for extended debate past the statutory limit even after the session had reconvened after the Capitol had been cleared. Such technical violations of the Act were consistent with Dr. Eastman's own well-grounded legal opinion (shared by other scholars) that the Electoral Count Act was unconstitutional to the extent it infringed on authority given to the Vice President directly from the Constitution. Urging that one exercise constitutional authority without impediment from an unconstitutional statute is not urging of "illegal action," but rather a recognition at least as old as *Marbury v. Madison* that the Constitution is superior to a mere statute.

The Select Committee's other assertions of "crime" are equally meritless.

## A. There is No Good Faith Basis to Conclude that President Trump Used Plaintiff's Legal Advice to Obstruct an Official Proceeding

The Committee alleges that former President Trump used Plaintiff's legal advice in connection with an attempt to obstruct justice under 18 U.S.C. § 1512. This allegation has multiple flaws.

First, the fact that the Select Committee may disagree with Plaintiff's legal advice does not convert his representation of former President Trump into a criminal matter. Plaintiff disputes the characterization of his legal advice contained in

the deposition excerpts from Mr. Jacob, but even if Mr. Jacob's characterizations
are assumed *arguendo*, they do not create a criminal issue when the advice was
grounded on a good faith interpretation of the Constitution. (In contrast, the effort
undertaken by Harvard Law Professors Tribe and Lessig in 2016 to encourage
Trump electors to not vote for Trump was more problematic, to the extent the ef-
fort encouraged conduct that would have been contrary to state laws against faith-
less electors that exist in 33 states—one of which was upheld by the Supreme
Court in *Chiafalo v. Washington*, 140 S. Ct. 2316 (2020). *See* Kyle Cheney, *Les-
sig: 20 Trump electors could flip*, Politico (Dec. 13, 2016) (describing efforts by
Lessig's "anti-Trump group, 'Electors Trust,'" to provide pro bono legal counsel to
Trump electors "considering ditching Trump"); Jamie D. Halper, *Law School Pro-
fessor Says 20 Republican Electors May Vote Against Trump*, The Harvard Crim-
son (Dec. 18, 2016) (describing Lessig's effort but also a letter co-signed by Har-
vard Law Professor Lawrence Tribe encouraging electors not to vote for Trump);[12]
Daniel Brezenoff, *et al.* (including Professor Tribe), Letter to Electors (Dec. 14,
2016) (encouraging electors to vote against President-elect Trump because "ex-
traordinary circumstances call for extraordinary measures").[13]

Secondly, the defendants have not made a case that any of President
Trump's actions were done with criminal intent. "[A] defendant who … lawfully
lobbies Congress ahead of an official proceeding, or engages in First Amendment-
protected protest activity does not act 'corruptly' within the meaning of the stat-
ute." *United States v. Sandlin*, 2021 WL 5865006, at *12 (D.D.C. Dec. 10, 2021)
(internal citations and footnotes omitted).  As the defendants admit, the Ninth Cir-
cuit has upheld a jury instruction requiring proof of "consciousness of wrongdo-
ing" to obtain a 1512(c) conviction. Opp. at 40 (quoting *United States v. Lonich*,
23 F.4th 881, 906 (9th Cir. 2022)). The Defendants' own brief admits that

---

[12] Available at https://bit.ly/3IQ8nIL.

[13] Available at https://bit.ly/3KoC3gl.

PLAINTIFF'S REPLY BRIEF IN SUPPORT OF PRIVILEGE ASSERTIONS - 20

President Trump was presented with conflicting advice on whether the 2020 election was tainted by material fraud or illegality. As Plaintiff has previously noted, the defendants themselves offer testimony from former Acting Attorney General Jeffrey Rosen acknowledging this fact. ECF#172 at 4. Moreover, in their response to Plaintiff's request for exculpatory evidence, the defendants do not deny that the President received advice and information that material fraud and illegality had in fact occurred in the 2020 election. ECF#178. The defendants have refused to produce evidence in their possession of this conflicting advice, but the point was acknowledged by former Attorney General Will Barr as recently as this past weekend. *See* NBC Nightly News with Lester Holt (Barr: "one of the things is the President was surrounded by these people who would very convincingly make the case for fraud").

The Select Committee has presumably concluded that those who advised the President that no material fraud or illegality existed were correct and that those who offered the opposite advice were incorrect. The fact that former President Trump reached a different conclusion does not show "consciousness of wrongdoing." It merely shows that the President arrived at a view of various factual questions which the Select Committee does not share. The defendants have therefore failed to show that there is any good faith basis to conclude that President Trump or others acted with criminal intent.

### B. Conspiracy to Defraud the United States

The defendants also argue that this Court should review the *in camera* materials to determine if a good faith basis exists to conclude that President Trump used Plaintiff's advice in furtherance of the criminal offense of Conspiracy to Defraud the United States under 18 U.S.C. § 371. There is no basis for such a conclusion.

Conspiracy to defraud the United States means obstructing any government agency by any "deceit, craft or trickery, or at least by means that are dishonest." *United States v. Caldwell*, 989 F.2d 1056, 1058 (9th Cir. 1993).  As with the

Obstruction of an Official Proceeding allegation analyzed above, the defendants' theory relies on the fact that certain individuals advised the President they did not believe material fraud or illegality had occurred in the 2020 election. However, as also set forth above, the defendants are admittedly hiding evidence of multiple Presidential advisers who contended that there had been significant material fraud and/or illegality. It is not "deceit, craft or trickery" for the President, based on counsel from trusted advisors, to have arrived at conclusions on various factual matters which the Select Committee does not share.

Even if the defendants could show that the President had criminal intent, there is no basis to conclude that the conspiracy "extended to the rioters engaged in acts of violence at the Capitol." Opp. at 44. The defendants rely for this argument on a finding from a civil case against the President wherein the defendants claim the court found that "it was plausible to believe that the President entered into a conspiracy with the rioters." *Id.* (citing *Thompson v. Trump*, 2022 WL 503385 (D.D.C. Feb. 18 2022). The defendants neglect to mention that the opinion arose from a motion to dismiss, which required the court to view the "facts in the light most favorable to Plaintiffs, and drawing all reasonable inferences in their favor." *Id.* at 33. Judge Mehta's finding is simply that, viewed in the most favorable light, the plaintiffs had adequately alleged a conspiracy between the President and certain rioters. It is misleading in the extreme for the defendants to offer this case to the Court as actual evidence of a criminal conspiracy.

### C. Common Law Fraud

Finally, the defendants allege this Court has a good faith basis to review the *in camera* materials for common law fraud. As the defendants admit, common law fraud requires a knowingly false misrepresentation. Opp. at 46-47 (citing *Atraqchi v. GMUC Unified Billing Servs.*, 788 A.2d 559, 563 (D.C. 2002)). Thus, the same

arguments about culpable intent set forth above with respect to the criminal of-
fenses alleged by defendants also apply to common law fraud.[14]

**VI. Constitutional Claims**

_____

[14] In support of their common law fraud allegation, the defendants offer the "spe-
cific example" of a video of ballot counting in Georgia to "illustrate the point."
The defendants argue that the former President relied on this video to support a
challenge to the Georgia election results despite being advised by the Georgia Sec-
retary of State that it did not show fraud. As the defendants argue:

> During this call, [Georgia Secretary of State] Raffensperger explained to the
> President that the video in question had been selectively edited, and that
> Raffensperger's office had reviewed the full tape and found no evidence of
> fraud. Raffensperger also offered to provide the President a link to the full
> video, to which the President responded: "I don't care about the link. I don't
> need it."

Opp. at 49. However, a brief review of the full transcript reveals it is the defend-
ant's representation of that conversation which is itself "selectively edited." Ac-
cording to a Washington Post transcription of the phone call, the relevant portion
of the conversation was as follows:

> **Raffensperger**: Mr. President, we'll send you the link from WSB.
>
> **Trump**: I don't care about the link. I don't need it. Brad, I have much better
> –
>
> **Mitchell**: I will tell you. I've seen the tape. The full tape. So has Alex.
> We've watched it. And what we saw and what we've confirmed in the tim-
> ing is that they made everybody leave – we have sworn affidavits saying
> that. And then they began to process ballots. And our estimate is that there
> were roughly 18,000 ballots. We don't know that. If you know that --.

As this exchange shows, the congressional defendants have selectively edited a
portion of the phone call which supports their view, and omitted highly relevant
context which cuts against it. The full exchange shows that President Trump was
not dismissive of the full video, as defendants misleadingly suggest, but rather that
Trump advisor Cleta Mitchell had watched the full video and concluded that there
was in fact cause for concern. The defendants' easily exposed misleading presenta-
tion of this phone call should give the Court great skepticism about what other rel-
evant evidence the Select Committee is withholding.

In response to Plaintiff's First and Fourth Amendment arguments, the congressional defendants raise procedural objections while largely sidestepping the important constitutional questions presented.

Procedurally, the Defendants argue that Plaintiff's constitutional claims are barred by Local Rule 7-18, because the Court has already considered them at the TRO stage. Opp.52. However, Plaintiff is not currently asking this Court to enter a TRO, so the rule does not apply.

Even if Rule 7-18 did apply, it allows for reconsideration on the grounds of "a material difference of fact" which could not have been known by reasonable diligence at the time of the prior ruling. Such is the case here. With the respect to the Fourth Amendment claim, plaintiff was not aware at the TRO stage of the search terms communicated to Chapman by the defendants which largely superseded the terms of the subpoena itself.

The First Amendment claim also involves material facts unknown at the TRO stage. Although ignored by defendants, Plaintiff explicitly based his First Amendment argument on *in camera* productions made subsequent to the TRO order. ECF 144 at 35-36. At the TRO stage the First Amendment question was largely abstract, but the thousands of pages of email productions have now made it concrete. It is appropriate to reconsider the First Amendment claim in light of these productions.

While raising various procedural defenses to Plaintiff's First and Fourth Amendment claims, defendants offer no responses to the serious constitutional questions raised in Plaintiff's brief. As to the First Amendment, Plaintiff specifically posed the question of what limiting principle could apply to the Select Committee's claimed authority to investigate any "influencing factor" of January 6. ECF 132 at 35 (*citing Watkins v. United States*, 354 U.S. 178 (1957)). The defendants offer no answer to this question. Although Plaintiff is prohibited from divulging the details of *in camera* productions in a public filing, the First Amendment

implications of the vast investigative power claimed by the Select Committee are manifest. One need only imagine an idealistic young person inspired to volunteer in the 2022 federal elections. There is no reason why some controversial aspect of this election might not also be the subject of investigation of an as-yet-to-be-constituted congressional committee. Would such person be chilled in exercise the exercise of their speech rights by disclosure of the *in camera* materials?

Similarly, with respect to Plaintiff's Fourth Amendment claim, defendants do not address the implications of the search term procedure imposed by them upon Chapman university. They do not dispute that the committee's search terms effectively superseded the terms of the original subpoena and, in doing so, severed any necessary connection between the responsive documents and the 2020 election. For example, under the search term procedure, the Committee is effectively claiming a right to seize Plaintiff's email communications on (for example) "China" or "Ted Cruz", *even if such communications were completely unrelated to January 6 or the presidential election*. Again, it bears emphasis that the defendants have not disputed this necessary consequence of disregarding the subpoena language in favor of a collection of political search terms. Even putting aside subsequent developments in Fourth Amendment law and relying purely on the decisions in *McPhaul v. United States*, 364 U.S. 372, 382 (1960), and *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 209 (1946) (upon which defendants rely), the committee's search term procedure resulted in a subpoena that exceeded the scope of its legitimate inquiry.

## CONCLUSION

For the foregoing reasons, plaintiff requests this Court order that the materials identified on plaintiff's privilege logs are protected from disclosure to the defendants by the attorney client and work product privileges, and that the subpoena, particularly as implemented by the Committee's search terms, violates the First and Fourth Amendments.

PLAINTIFF'S REPLY BRIEF IN SUPPORT OF PRIVILEGE ASSERTIONS - 25

March 7, 2022

Respectfully submitted,

/s/*Anthony T. Caso*
Anthony T. Caso (Cal. Bar #88561)
CONSTITUTIONAL COUNSEL GROUP
174 W Lincoln Ave # 620
Anaheim, CA 92805-2901
Phone: 916-601-1916
Fax: 916-307-5164
Email: atcaso@ccg1776.com

*/s/ Charles Burnham*
Charles Burnham (D.C. Bar # 1003464)
Burnham & Gorokhov PLLC
1424 K Street NW, Suite 500
Washington, D.C. 20005
Email: charles@burnhamgorokhov.com
Telephone: (202) 386-6920

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I have served this filing on all counsel through the Court's ECF system.

Respectfully submitted,

/s/ Charles Burnham
Charles Burnham
BURNHAM & GOROKHOV PLLC
1424 K Street NW, Suite 500
Washington, D.C. 20005
Telephone: (202) 386-6920
Email: charles@burnhamgorokhov.com