```
            UNITED STATES DISTRICT COURT
            CENTRAL DISTRICT OF CALIFORNIA
            (SOUTHERN DIVISION - SANTA ANA)
```

JOHN C. EASTMAN,                ) CASE NO: 8:22-CV-00099-DOC-DFM
                                )
                Plaintiff,      )            CIVIL
                                )
        vs.                     )    Santa Ana, California
                                )
BENNIE G. THOMPSON, ET AL.,     )    Tuesday, March 8, 2022
                                )    ( 9:23 a.m. to 10:12 a.m.)
                Defendants.     )    (10:23 a.m. to 10:48 a.m.)
                                     (10:55 a.m. to 11:33 a.m.)
                                     (11:42 a.m. to 11:59 a.m.)
                                     (12:06 p.m. to 12:30 p.m.)


                STATUS CONFERENCE (VIA ZOOM)

            BEFORE THE HONORABLE DAVID O. CARTER,
                UNITED STATES DISTRICT JUDGE


APPEARANCES:                SEE PAGE 2


Court Reporter:             Recorded; CourtSmart


Courtroom Deputy:           Karlen Dubon


Transcribed by:             Exceptional Reporting Services, Inc.
                            P.O. Box 8365
                            Corpus Christi, TX 78468
                            361 949-2988



Proceedings recorded by electronic sound recording;
transcript produced by transcription service.
```

2

<u>APPEARANCES</u>:


For Plaintiff:              CHARLES BURNHAM, ESQ.
                            Burnham & Gorokhov, PLLC
                            1424 K Street NW
                            Suite 500
                            Washington, DC 20005
                            202-386-6920


Also present:               DR. JOHN C. EASTMAN


For Defendants:             DOUGLAS N. LETTER, ESQ.
                            Office of General Counsel
                            U.S. House of Representatives
                            5140 O'Neill House Office Building
                            Washington, DC 20515
                            202-225-9700

                            FRED M. PLEVIN, ESQ.
                            Paul Plevin Sullivan & Connaughton
                            101 West Broadway
                            9th Floor
                            San Diego, CA 92101

1       <u>Santa Ana, California; Tuesday, March 8, 2022; 9:23 a.m.</u>

2                       <u>(Remote appearances)</u>

3                        <u>(Call to Order)</u>

4           **THE COURT:**  We're on the record in the matter of

5    *Eastman versus Thompson*, 2200099.  And, counsel, would you

6    please make your appearances?

7           **MR. BURNHAM:**  Morning, Your Honor, Charles Burnham

8    appearing on behalf of Plaintiff, John Eastman.

9           **THE COURT:**  Good morning.  I can see Dr. Eastman

10   clearly.  And the next appearance, please.

11          **MR. PLEVIN:**  Good morning, Your Honor, Fred Plevin

12   here on behalf of Defendant Chapman University.

13          **THE COURT:**  All right.  Thank you.  And counsel on

14   behalf of the Committee.

15          **MR. LETTER:**  Your Honor, this is Douglas Letter.  I'm

16   the general counsel House of Representatives.  Just to let you

17   know, Your Honor, I don't know whether you can see them but

18   with me today are Eric Columbus and Peter Neal (phonetic) from

19   General Counsel's office, John Wood, Brittany Record, Fione

20   Moskowitz (phonetic), Casey Lucier, and Josh Wilson, all from

21   the Select Committee.  Thank you, Your Honor.

22          **THE COURT:**  All right.  Just one moment, please.  All

23   right.  First, I appreciate the parties' thorough briefing and

24   briefings on Dr. Eastman's privilege claims for the 111

25   documents between January 4th and January 7th of 2021.

4

```
 1          I remind the parties that the hearing is open to the
 2   public.  And given the sensitivity of unrelated third parties'
 3   identities, I previously ordered limited redaction of just
 4   names and other uniquely identifiable information.  And since
 5   this is an open session, I just remind the parties to be
 6   mindful and avoid referring to specific people by name in their
 7   arguments.
 8          I'm going to begin by hearing argument from all
 9   parties but I'd like to start with counsel for Dr. Eastman.
10          MR. BURNHAM:  Thank you, Your Honor.  I'll expand on
11   a few points from our briefs more or less in the order that
12   they were presented.  And I'll begin with the existence of the
13   attorney-client relationship.  I think this issue was to a
14   certain extent considered by Your Honor and decided at the TRO
15   stage.
16          But to the extent more evidence was needed in
17   connection with our privilege assertions, we're relying on the
18   engagement letter we submitted.  The fact that it's unsigned as
19   we argued is not dispositive.  Dr. Eastman's appearances in
20   multiple cases on behalf of the President, the Defendants'
21   concession in the very first subpoena that started this
22   process, that Dr. Eastman represented the President, and many
23   other evidences of the attorney-client relationship that
24   existed between those two men and the campaign.  So we hope
25   there's no issue there.  I'll respond to any questions from the
```

1    Court.

2            Secondly, the Defendants then argue that if there was

3    an attorney-client relationship, it was waived.  And this again

4    is somewhat of a rehash of the TRO proceedings which I think

5    implicit in Your Honor's argument is that there wasn't at least

6    a complete waiver.

7            But our argument at that point on this stage is the

8    same.  Any time there's a high profile case, part of the

9    attorney's responsibility is to speak to the media on

10   appropriate matters.  The attorney decides in consultation with

11   the client what can be disclosed and what can't.  And just

12   because the attorney makes public statements on certain matters

13   and limited matters in the media, it doesn't mean all of the

14   emails are up for grabs, particularly not when as here it's

15   clear that the information publicly discussed was to a large

16   extent not even privileged to begin with.  And we explained the

17   reasons for that in our brief.

18           The final issue that I think is again somewhat of a

19   rehash of Your Honor's temporary restraining order decision,

20   but the Defendants have raised it again so we'll -- we will

21   address it is the significance of the fact that these

22   communications took place on the Chapman University servers.

23           And I think that the best way for Your Honor to

24   conceptualize that issue is the Defendants are effectively

25   asking the Court to mediate what amounts to an HR dispute

6

1   involving internal Chapman University policies between

2   Dr. Eastman and his former employer.

3          Now, of course, we've submitted evidence that there

4   was no violation of Chapman policies.  But I repeat the law

5   does not require Your Honor to mediate that dispute.  The law

6   is clear that the attorney-client privilege belongs to the

7   client and, absent high unusual circumstances not present here,

8   no waiver can take place by the attorney, which is what the

9   Defendants are arguing.

10         Next I'll get into some of the issues that are more

11  newly raised by the current round of briefing, and I'll start

12  with the Defendants' argument the work product privilege here

13  has been waived through inclusion of third parties included in

14  the communications.  And primarily what we're dealing with here

15  is work product.  There's a few emails that where there's a

16  claim of attorney-client privilege.  Mostly we're looking at

17  work product.

18         So what's the significance here?  The law on work

19  product is clear that disclosure to a third party does not

20  waive the work product protection.  The law is also clear that

21  there doesn't need to be a formal written agreement between the

22  attorney and an expert or some other third party for the work

23  product privilege to apply.  That's not what the law requires

24  at all.

25         And the easiest way to show that I think is to

1    somewhat take ourselves out of perhaps the unusual context here

2    of a presidential campaign and all the circumstances that

3    attended on that and remember how work product functions in a

4    normal attorney-client relationship.  Let's say I as an

5    attorney have a case that presents a medical issue.  And before

6    formally retaining a doctor, I send an email to a college

7    friend that happened to become a doctor and say, I have this

8    case, it has these issues, I'd be interested in your thoughts,

9    what's jumped out at you, what -- do you know any good experts.

10   I don't have a formal retainer agreement with that person but

11   work product privilege would unquestionably apply to that sort

12   of communication.

13           And I think to a certain extent the analysis of this

14   question has to rely on Your Honor's review of the internal --

15   the in-camera materials themselves, which of course I can't get

16   into explicitly.  But I'll just say that the review of the

17   materials should make clear to the Court that none of the third

18   parties included constituted an adversary or a conduit to an

19   adversary.

20           The leading case in the Ninth Circuit is the *Sanmina*

21   decision.  Both sides have relied on that case.  It's clear

22   that disclosure of work product to a third party is not a

23   waiver.  It has to be a conduit to an adversary or an

24   adversary.

25           And we're comfortable that Your Honor's review of the

1  materials will make clear that no such disclosure took place.

2           I'll just mention here that there is one recurring

3  issue that has come up in the productions, and I'll just

4  explain to the Court how we handled it.  Your Honor has

5  probably already seen and the Defendants have seen that from

6  time to time in Dr. Eastman's representation of the President

7  in the campaign, there would be unsolicited communications

8  coming in from well-wishers.  Someone emails -- sends an email

9  saying I care about this situation, I want to help, what can I

10 do, perhaps I can -- I know some relevant information.

11          And the line that we drew for the Court which just to

12 explain our -- how we handled the production was if there was

13 an unsolicited communication with which Dr. Eastman and the

14 other attorney did not engage and there wasn't a preexisting

15 relationship, we produced that.  So the Defendants have those

16 documents.

17          If there was an unsolicited communication where

18 Dr. Eastman or the other attorney did engage and say we're

19 interested in what you have to say and they disclosed their

20 mental impression, potential strategies and so forth, on the

21 email change -- chains, we claim work product privilege for

22 those which we maintain is absolutely defensible.  And Your

23 Honor will see in the productions some exchanges that are like

24 that.  So that's how we handled that.

25          Finally, with respect to work product, the Defendants

1   have raised an argument that the way I understand it, even if

2   work product protections apply, that's overridden by the

3   substantial need of the Committee for the materials.

4          Now, we've previously responded to similar arguments

5   from the Committee on things like timing.  But they have not

6   identified a piece of legislation, which is the point of the

7   January 6th Committee, is to eventually write laws that

8   presents a substantial need for the in-camera materials.

9          But in fact, as we argue in the brief, we maintain

10   that Your Honor does not have to actually reach that issue

11   because the authorities relied on by the Defendants for the

12   substantial need argument all apply -- and the rule itself that

13   the cases are based on explicitly speaks in these terms, all

14   apply to substantial need for the materials in the particular

15   litigation to prepare a defense, to prepare a claim, and so on.

16          None of the authorities cited in the Defendants'

17   brief represent the proposition that a substantial need for an

18   ancillary purpose, such as a congressional investigation, and

19   override the important work product protections.

20          The Defendants' argument that they have a substantial

21   need for their Committee work would be the exact same argument

22   if let's say a litigant said, well, I have a substantial need

23   for these materials, not to prepare my defense but to write a

24   book or to start a business or to engage in some creative

25   activity.  That's in principle the same argument the Defendants

1    are making here, and it's without any support in the law.  So

2    that's not sufficient to override the work product protections.

3          I'll now address the crime-fraud argument that the

4    Defendants have raised.  It's a novel argument.  It's probably

5    why we have 200 some people here in the hearing today.  And

6    I'll make a couple points about that.

7          The first is obviously, and this is why we filed the

8    request for more information on this, you know, it puts us in

9    extraordinarily difficult position to defend another

10   individual, Dr. Eastman's former client, who we don't

11   represent, against groundbreaking criminal allegations, if they

12   were ever presented, you know, in an indictment, would take

13   years to litigate.  And we had, you know, three days and 20

14   pages.

15         But having said all that, as we argue in our briefs,

16   we think there's a -- there's two responses really we want to

17   offer to the Court.  One is it's relatively easy for this Court

18   we suggest to conclude that no even good faith basis exists for

19   a crime-fraud review of the materials.

20         And the reason for that is very simply that all three

21   theories upon which the Defendants' crime-fraud arguments are

22   based, and these are the obstruction theory, the 371 theory,

23   and the common law fraud, involve some sort of showing of

24   criminal intent on behalf of Dr. Eastman's former client.  The

25   exact nature of the criminal intent is phrased a little

1    differently from one case to another.  But all three arguments

2    require that showing.  And that is the most clear example

3    before Your Honor of a requirement that the Defendants have

4    failed to satisfy.

5             The Defendants' own evidence shows that multiple

6    presidential advisors were counseling the President, that there

7    were issues with the 2020 election:  fraud, illegality, and so

8    forth.  We've requested additional evidence on that from the

9    Defendants.  They didn't want to provide it.

10            But we don't really need it because the testimony of

11   Mr. Rosen combined with other publicly available sources, many

12   of which we've cited, show that the Defendants just simply

13   haven't come up with sufficient evidence to show not a mistaken

14   belief or a belief that the Defendants consider was mistaken on

15   behalf of the President about the 2020 election, but an actual

16   criminal intent.  They just haven't met that burden.

17            And we think that's easy for the Court to conclude,

18   and that resolves the crime-fraud issue without getting into

19   all the other technical issues that would be involved in the

20   proof of the Defendants' theory.

21            Secondly, I think we do well to remember that the

22   Defendants are not asking the Court to make a finding at this

23   point that the crime-fraud criteria are satisfied.  All the

24   Defendants are asking for is for Your Honor to do the review

25   for crime-fraud.  That's where we are.

12

1          And it is a little bit of a shadowboxing aspect to

2    this because Your Honor already has the materials and is going

3    to review them.  That's been clear from the beginning of this

4    case.  And we're comfortable with Your Honor doing that review.

5          And to sort of remove the suspense, I'll just say

6    there's not going to be an email where anybody involved in the

7    campaign effort says, you know, we've got to have some ruffians

8    rush the capitol if the vice president doesn't make the

9    decision we want.  It's not going to be there.  There's not

10   going to be an email that says we all know that the election

11   had no fraud or illegality but we've got to come up with

12   something.  That's not going to be there.

13         So we're quite comfortable that Your Honor's review

14   of the materials that we're quite comfortable with the Court

15   doing is not going to reveal anything close to the crime-fraud

16   territory.  It's just not going to be an issue here.

17         What the review is going to reveal to Your Honor is

18   that everybody involved in this effort, Dr. Eastman and others,

19   manifested through their communications a genuine belief in the

20   righteousness of what they were doing.  Others can disagree.

21         But what's clear is that the individuals representing

22   the President, Dr. Eastman and others, absolutely believed that

23   what they were doing was well-grounded in law in fact and was

24   necessary for what they believed was the best interest of the

25   country.  They believed that every bit as strongly as those

1   opposing them believe that what they were doing was necessary

2   for the country's best interest.

3           And that's the issue that we all confront here today

4   that's bigger from this -- bigger than this courtroom, that

5   there's a certain lack out there of a shared reality.  And the

6   country is divided on that basis, and it's simply not going to

7   be resolved by the two sides calling each other criminals.  So

8   that's our argument on crime-fraud.

9           Finally, we've also asked Your Honor to reconsider

10  the constitutional claims we've raised in this case, which are

11  particularly poignant in light of the crime-fraud allegations

12  that have been brought forth.  That sort of ratcheted up the

13  seriousness of all of this, we have to acknowledge.  And those

14  are of course the First Amendment and Fourth Amendment claims

15  which Your Honor can now reconsider in light of the in-camera

16  productions which weren't available to the Court of course at

17  the TRO stage.

18          And we acknowledge that the only authority really

19  Your Honor has to draw upon for considering that issue is a

20  very small number of precedents from the Supreme Court, mostly

21  -- about a half a dozen let's say, mostly arising out of the

22  McCarthy period.  So we're dealing with the first -- you know,

23  the 1950s into the early 1960s.  This was -- and the Supreme

24  Court really hasn't had a lot to say on the intersection of the

25  congressional investigatory power with constitutional

14

1   provisions since that time.

2           And so our position is that those precedents were

3   handed down before the internet, before email, before

4   electronic communications, and before the I think historic

5   assertions of a broad investigative authority that I think goes

6   beyond the House Un-American Activities Committee that the

7   January 6th Committee has claimed for itself.  And we see that

8   in some of the in-camera materials.

9           Without getting into any kind of details, names,

10  circumstances, Your Honor has seen communications from people

11  saying, I want to help you, this is an important effort, I

12  believe in it, but if my name gets out there, I'm going to get

13  fired.  And we know that that's a reality, which absolutely

14  indicates -- implicates the First and the Fourth Amendment.

15  And so we're duty bound to raise those claims and we submit

16  them for Your Honor's consideration.  Thank you.

17          **THE COURT:**  Counsel, thank you.  Let me turn to the

18  Committee, Mr. Letter.

19          **MR. LETTER:**  Thank you, Your Honor.  I do intend to

20  address all of the points made by my friend Mr. Burnham.  But

21  I'd like to start with part of what he said, and that's a

22  reminder exactly of why we're here.

23          Remember that the Committee issued a subpoena to

24  Dr. Eastman.  He came in and he basically pled the Fifth

25  Amendment.  I'm not making any comment on whether that was a

1    good or a bad thing whatever he did.  And we got -- we

2    therefore got basically nothing from him.

3            The Committee, though, was aware that there were key

4    materials from Dr. Eastman that were at Chapman University on

5    the university's system.  And so the Committee got in contact

6    with Chapman University and the university said that they would

7    be willing to turn over their material, it was on the

8    university's system, to the Committee, which after all, as we

9    all know, is engaged in one of the most important

10   investigations ever undertaken by the Congress of the United

11   States, you know, investigating why it happened and how to

12   prevent it in the future, an attack on the very heart of our

13   democracy.

14           So Chapman made clear to us that they were willing

15   and interested to do their patriotic duty and they would

16   provide us with the information.  They also said that they

17   would notify Dr. Eastman that they would be turning over the

18   university's information.  And that's when Dr. Eastman went to

19   court to try to get that stopped.

20           So, first of all, I'm very puzzled by my friend's

21   comment that this is like an HR dispute between Dr. Eastman and

22   Chapman that Your Honor -- and I'm not sure whether my friend

23   went this far but with saying it's an odd thing for to bring

24   before the Court.  But remember Dr. Eastman brought this

25   lawsuit.  We didn't have to bring any suit against Chapman.

1    Chapman was willing to provide the material.

2              So that raises what I think is probably the easiest

3    way to resolve this dispute, which is let's look at what the

4    situation was between Chapman and Dr. Eastman.  And fortunately

5    we have the papers that were filed by Chapman here and the

6    declaration from Chapman which made absolutely clear that

7    Chapman has a -- what we gather is a somewhat unusual for a

8    university system and makes quite clear, certainly clear to

9    former dean of the law school, longtime professor, that he had

10   no privacy interests in the materials on the Chapman system.

11   And in fact Chapman has said to this Court that what

12   Dr. Eastman was doing was unauthorized on that system.

13             So what Dr. Eastman has to do is take -- he has taken

14   on the burden by coming to this Court.  He didn't just go to

15   Chapman and say, gosh, I wish you wouldn't do this, you know,

16   this is an HR dispute.  Dr. Eastman brought this lawsuit.

17   Dr. Eastman now bears the burden of showing that this Court

18   should issue an injunction stopping Chapman from doing what it

19   intended to do:  turn over this material to the January 6

20   Committee.

21             And by the way, as Your Honor knows, we're talking

22   right now about these -- the three dates, the January 4th

23   through 7th.  Obviously we hope that what the Court rules will

24   govern the rest of the materials.  But we're only talking about

25   that period.

1          And so we have a situation where Chapman said no

2    private interest, where Chapman's president admonished

3    Dr. Eastman not to do what he was doing in the political realm,

4    not to use Chapman University and drag the university into

5    this.  And then the definitive statement that's been submitted

6    to this Court by Chapman, that what Dr. Eastman was doing,

7    using Chapman's system, was unauthorized.

8          So we have a situation where Dr. Eastman was misusing

9    a system that did not belong to him, belonged to somebody else

10   who wants to cooperate, and then says, yes, but I've got some

11   attorney-client issues.  And it seems to me primarily that's

12   Dr. Eastman's problem.  Dr. Eastman misused the system and then

13   he made a bigger mistake if he created problems for his client

14   or clients or these many other people who out of the blue

15   unsolicited contacted him on somebody else's system.

16          So to make this I think easier even to understand is,

17   Your Honor, I worked for many years at the justice department.

18   I appeared before Your Honor in matters as a justice department

19   lawyer.  Justice department allowed me to use their computer

20   system for personal purposes.  I could send birthday greetings

21   to my mother.  I could send things to my basketball group

22   saying, hey we're not playing tonight.  But it was absolutely

23   clear the justice department made obvious to all of us, it was

24   not our system.

25          And I could not do certain things.  I couldn't

1    practice law at all, and I certainly couldn't use the justice

2    department system to do it.  I couldn't run a business on the

3    justice department system.  I couldn't -- if I could -- I was

4    allowed to do certain kind of law practice with permission from

5    the deputy attorney general's office.  I managed to for free

6    probate one of my cousins' estates.  Fine, I got authorization

7    to do that.

8           But it never would have occurred to me that I could

9    put attorney-client material, personal business attorney-client

10   material on the justice department's system and then say, oh,

11   wait a minute, that's my -- I put my client's stuff on there

12   and so that's protected, justice department.  I don't think

13   anybody on this call would believe for a second that I could do

14   that.

15          So why is it different here?  Chapman made clear that

16   Dr. Eastman was not doing this right.  So that's the key here,

17   that Dr. Eastman apparently made a very serious mistake after

18   being -- with regard to the January 4th through 7th materials

19   after being warned about a month before from the president of

20   the university not to do this.  So let's not forget about that,

21   that that's why we are here.

22          Now, we have a batch of other -- of arguments, but as

23   I say, I think that's the -- by far the easiest to deal with.

24          The other key point to make right up front is this is

25   all Dr. Eastman's burden to convince the Court that you should

19

 1    thwart the efforts of the January 6th Committee based on

 2    attorney-client privilege.  So if there's any ambiguity here,

 3    anything that's left, you know, unproven, that all has to be

 4    decided against Dr. Eastman.

 5              So, for example, my friend Mr. Burnham says, well, we

 6    had this agreement, we have a written agreement, and he

 7    produced it, not signed.  Now, Mr. Burnham produced, came up

 8    with case law saying you don't necessarily need a signed

 9    agreement to have an attorney-client relationship.  Not

10    disputing that.

11              But at a minimum it raises serious question, was

12    there an attorney-client relationship, who was covered by it,

13    and what did it cover.  In attorney-client relations, normally

14    the parties to that, you know, agreement agree on that.  So we

15    have an unsigned agreement that is right there, raises a

16    serious problem.

17              We know Dr. Eastman did represent I think it's

18    candidate Trump in certain matters where he filed briefs.

19    We're not interested in that material.  We -- they're public

20    briefs, fine, we got that.

21              But what we do want to get is what the communications

22    that Dr. Eastman was having with other people, with his client,

23    that the burden has simply not been met here by Dr. Eastman to

24    say this material is all protected and should be, as I say,

25    kept hidden from the Committee.

1          And one of the big issues is we know attorney-client

2    privilege and work product privilege, they cover legal advice.

3    They don't cover political or campaign advice.  So a key

4    question here is I think Your Honor has seen some of the

5    exhibits that we've submitted, you see that there's a very

6    substantial amount of campaign advice, political advice.

7    That's not covered by attorney-client privilege.  Attorney-

8    client privilege requires that there be some legal advice.

9          You -- certainly you can have attorneys who are your

10   advisors.  You say, I'm running for, you know, Congress or the

11   presidency or whatever, and, you know, attorney so-and-so, I'd

12   really like -- I'd like your financial support and I'd like

13   your advice and help, etcetera.  Obviously you can do that.

14   That's not covered by attorney-client privilege.

15         So either the -- so the -- one of the things that we

16   think is important for Your Honor to look at is, is there

17   really -- is a lot of this legal advice?  If there are long

18   documents or long conversations or emails that happen to

19   mention a word here or there about legal, that may be one

20   thing.  And maybe that could be separated out, if necessary.

21   But otherwise the political and campaign advice should all be

22   disclosed.

23         And one of the things that I -- as I recall my friend

24   Mr. Burnham mentioned is, well, one of the documents that is --

25   that we've put as an exhibit in our filing is, you know, where

1   Dr. Eastman is having email contact with one of the vice

2   president's advisors and at some point says something like,

3   well, no Supreme Court justice would buy this cockamamie

4   theory.  And I believe Mr. Burnham says, ah-ha, they talked

5   about the Supreme Court, that must be legal advice.

6          But I think the context shows, no, it clearly wasn't.

7   What was being said there was this is hair-brained advice,

8   isn't it?  Nobody would buy this.  We couldn't even get a

9   single vote on the Supreme Court.  This wasn't, oh, yeah, let's

10  get this to the Supreme Court and maybe we can get so-and-so's

11  vote if we argue this and so-and-so's vote if we argue that.

12  So let's not get carried away here and say, oh, yeah, there's a

13  lot of legal advice here.

14         We have then this -- the focus that Mr. Burnham

15  spent a lot of time on, work product.  But there are several

16  problems there.  One is as we said over and over again in our

17  objections, how is this tied in with preparing and providing

18  legal advice and legal work?  If you have unsolicited outreach

19  from people to Dr. Burnham (sic), I think that was the term

20  that Mr. Burnham just said to Dr. Eastman.  Maybe that in some

21  way involves legal advice.  Is it with an agent?

22         Because I think Mr. Burnham stated the law wrong and

23  said that you could contact a friend of yours who's a doctor

24  and say, hey, give me -- tell me about this, is this -- does

25  this malpractice thing sound right to you.  You can do that and

22

1    it can be covered by work product if that doctor is an agent.

2          What you can't do is go around just getting

3    unsolicited advice or talking to people and say, well, that all

4    goes into work product, because there's no element of

5    confidentiality there.  The person you talk to, you say, hey,

6    look at this, tell me what you think of it, and that persons

7    says, sure, I think this is complete malarkey, and by the way

8    I'm providing this to the *Washington Post* and you have no

9    recourse, rather difficult to argue that that -- that your

10   outreach and what you got back is covered by attorney work

11   product.

12         Mr. Burnham also made an argument.  He said, well, we

13   have to show that the January 6 Committee has a need for this

14   material, for the work product test, for this material in

15   litigation.  Well that doesn't make any sense.  The January 6th

16   Committee doesn't engage in litigation.  January 6th Committee

17   has been sued by all sorts of people.  And if the January 6th

18   Committee brings its own lawsuits, okay, maybe.  But that's

19   certainly not what's involved here.

20         Mr. Burnham is confusing litigation subpoenas with

21   legislative subpoenas.  This is a legislative subpoena, and

22   therefore what we need to show is that there's a legislative

23   purpose for it and that it ties in with our legislative

24   purposes.  Again, the January 6th Committee, the House of

25   Representatives in general doesn't litigate.  It's -- sometimes

1   it get sued.  Some -- on very rare occasion it brings suits.

2   But that's not what this is about.

3          So what our burden here is to show through this

4   legislative subpoena, have we met the test that the Supreme

5   Court has set for the validity of congressional investigations.

6   And we obviously have.  This Court already so held, the D. C.

7   Circuit held in the case that then the Supreme Court declined

8   to review.  This Committee is operating properly and conducting

9   very, very serious investigations.  And that's what the

10  material is needed for.  And this is not a litigation subpoena.

11         This is again, back to where I started, Dr. Eastman

12  asking this Court to order Chapman not to provide its own

13  materials to a congressional committee carrying out one of the

14  most important investigations that has ever been undertaken by

15  Congress.

16         Crime-fraud, first Mr. Burnham said, well, this puts

17  them in an awkward position because, you know, they're

18  defending somebody else, the -- whether former President Trump

19  engaged in criminal activity.  Well, but that's what the crime-

20  fraud exception is about.  This isn't just something that we

21  made up and are applying to this case.  Not surprisingly Your

22  Honor asked us about it.

23         The crime-fraud exception, the primary thing that it

24  applies to is, is the client engaging in criminal conduct.  We

25  don't have to show that Dr. Eastman engaged in any criminal

1    conduct.  That's not what we're doing here.  It's did the

2    client engage in criminal conduct, and whether Dr. Eastman

3    intended it or not, was this material helpful for the

4    crime/fraud.

5            And there's a very good reason for that, which is

6    remember, as Mr. Burnham has reminded us, the privilege -- the

7    attorney-client privilege belongs to the client, not to the

8    attorney.  So the question is, was the client misusing this

9    information.  Again, it may very well be that the attorney was

10   part of it, and often, you know, will be part of a crime-fraud.

11   But the key question is what was Mr. Trump doing or the, you

12   know, the other -- any other clients.

13           So I -- if I heard him correctly, my friend

14   Mr. Burnham I think said he's perfectly comfortable with Your

15   Honor doing the in-camera review.  Okay.  That's great.  We're

16   already -- I think that just mooted a fair amount of what we're

17   talking about here because that's -- as Mr. Burnham pointed

18   out, that's the main thing we've asked for is that Your Honor

19   now do the in-camera review of the material for these days for

20   which an attorney-client privilege has been (indisc.) privilege

21   has been raised.

22           And we've certainly met the test.  I'm not even sure,

23   though, that we need to go through this anymore since (indisc.)

24   Mr. Burnham said he's perfectly comfortable with you doing

25   this.  But we obviously met the test.  Is there a, you know,

1  good faith belief that the material may provide, you know,

2  relevant information.  And obviously there can be no doubt

3  whatsoever about that.  And, again, I think Mr. Burnham

4  obviously understands that.

5          Now, we're not asking Your Honor to just do this to,

6  you know, because we don't think you have enough to do and we

7  want to give you more.  The whole idea here is for you to do

8  the in-camera review for this material now.  For all we know,

9  Your Honor has already done that.  And then to apply the law as

10  the Ninth Circuit described it in considerable depth in the

11  Napster (phonetic) case and other cases.

12          Then look at what comes next because the Napster case

13  makes very clear that if Your Honor concludes with a

14  preponderance of the evidence going that the crime-fraud

15  exception applies, then the material is not covered by

16  attorney-client privilege.

17          And so from the in-camera review, we believe that

18  it's very likely Your Honor will find that at least some of

19  this material has to be disclosed.  We haven't seen it so it's

20  a little hard for us to argue with specifics.  But we're -- we

21  are sure that Your Honor will be easily able to determine if

22  there's a preponderance of the evidence showing that the crime-

23  fraud exception applies.

24          Mr. Burnham said we have to -- we're missing a key

25  part, that the exception cannot possibly apply because no

26

1    criminal intent, that you're not going to find any messages

2    about ruffians rushing the capitol and Dr. Eastman urging that

3    that happen.  Yeah, we didn't -- we frankly didn't expect there

4    would be emails like that.

5              But, first of all, remember, it's the crime-fraud

6    exception, let's use a slash there.  And as we pointed out, we

7    believe that there is very substantial evidence to support our

8    burden with regards to two criminal statutes.

9              But in addition, common law fraud.  Common law fraud

10   is not criminal, doesn't have to be criminal so there doesn't

11   need to be criminal intent.  We've set out for you in the

12   briefs what the test is for common law fraud.  And it sure as

13   looks to us like those standards have been met.

14             In addition, as far as criminal intent goes, I think

15   we gave Your Honor very substantial amount of information about

16   criminal intent here.  First of all, Dr. Eastman himself in,

17   again, one of the emails that we've been able to produce for

18   Your Honor, Dr. Eastman said -- recommended that the President

19   commit a -- I think he used a minor violation of the Electoral

20   Count Act.  I have to admit, Your Honor, that it's unclear to

21   me how something in any of this could be a minor violation of

22   the law when we're talking about an insurrection that sadly

23   came very close to succeeding to overturn a presidential

24   election.

25             In addition, one of those emails -- and by the way,

1   this is in Exhibit M.  One of those emails to Greg Jacob in the

2   vice president's office, Dr. Eastman says something about, you

3   know, the President, President Trump, has been so advised.

4   He's been advised that the -- there's nothing there, the fraud

5   claims are all -- there's nothing there.  The justice

6   department looked at it, it was looked at by any -- I think 60

7   courts.  There was nothing there.

8           And as I recall, Dr. Eastman is asked, you know, have

9   you advised the President of that.  He replies:  "He's been so

10  advised as you know because you were on the phone when I did

11  it.  I should not discuss other conversations that I may or may

12  not have had privately on that (indisc.) with someone who is a

13  client."  Again, quote:  "But you know him, once he gets

14  something in his head, it's hard to get him to change course."

15          That's pretty strong evidence that as we pointed out

16  that President Trump was ignoring all of the very clear

17  evidence because he wanted something different.  He wanted the

18  vice president to do something that was plainly against the

19  Constitution.

20          And I'm -- I have to correct myself.  I apologize.

21  Thank you, Mr. Wood, that the has he been advised -- so advised

22  was that the vice president does not have unilateral authority

23  at the joint session to do what Dr. Eastman was proposing.  So

24  what Dr. Eastman was proposing was a violation of the statute

25  and a violation of the Constitution.  And if I'm correct, that

28

1    was what Dr. Eastman recognized not a single Supreme Court

2    justice would buy because there was nothing to it.

3           But the Exhibit N is the one where Dr. Eastman said,

4    I implore you to consider one more relatively minor violation

5    and adjourn for ten days to allow the legislatures to finish

6    their investigations.  Yeah, that was -- that would have been a

7    minor violation of the Electoral Count Act.  It would have been

8    so minor it could have changed the entire course of our

9    democracy.  That's how minor it was.  It could have meant that

10   the popularly elected President of the United States would have

11   been thwarted from taking office.  That's quite a minor

12   violation of the law that Dr. Eastman was strenuously urging.

13          Your Honor gives me a moment.  I just want to consult

14   my notes from Mr. Burnham's arguments.

15          Oh, I go to the point about, you know, waiver by

16   disclosures (indisc.) question of subject matter.  And, again,

17   this is where we're looking to Your Honor with your decades of

18   experience.  Once, you know, you look at the actual documents,

19   you'll be able to see whether these fit within the subject

20   matter.  The subject matter was obviously very, very broad.

21   Dr. Eastman went on social media, said, you know, I wouldn't

22   normally talk about privileged material but my client has urged

23   me to do so, so here goes.  And, again, Your Honor is in the

24   best position to see whether from an in-camera review whether

25   documents fit within that extremely broad waiver.

1          I talked already about the burden and the balancing

2   but I want to reemphasize it for the work product privilege.

3   The interest here, it's difficult to come up with, as I've

4   emphasized, a stronger interest in getting this material.

5   Everybody should want the Committee to get the material that it

6   needs to produce a report suggesting legislation telling the

7   American people what happened.  Everybody should want it, that

8   it have this material.  So the interest here is immense.

9          It's way beyond whatever interest Dr. Eastman has in

10  maintaining the privilege of a work product, especially given

11  the totality of the circumstances, that there were a whole lot

12  of contacts with people who couldn't possibly be covered by the

13  attorney-client or attorney work product relationship, by

14  talking on social media, by using somebody else's electronic

15  records system, etcetera.

16         Your Honor, I'm happy to answer any questions.  I

17  think everything else is covered in the brief.  But delighted

18  to answer questions.  And if you'll give me one moment, I just

19  want to look at my colleagues to see if there's something

20  important that I missed.  Thank you very much, Your Honor.

21         **THE COURT:**  All right.  Thank you.  Mr. Plevin on

22  behalf of Chapman, please.

23         **MR. PLEVIN:**  Thank you, Your Honor.  I'll be very

24  brief.  Chapman University takes no position on the legal

25  issues that have been briefed to the Court.  But there's a

30

 1   couple of factual issues that concern Chapman.

 2          On the issue of Chapman's -- on Dr. Eastman's use of

 3   Chapman's email server, as we pointed out in the TRO hearing

 4   and in the response that we filed to the TRO, our written

 5   brief, IRS rules strictly prohibit the use of Chapman's

 6   resources to represent or support a political campaign or

 7   political candidate.  And Chapman adheres to that rule.  That's

 8   why Chapman's president told Dr. Eastman not to use the

 9   university's resources for representing the former President

10   and why Chapman's law school dean did not authorize Dr. Eastman

11   to engage in those activities.

12          Dr. Eastman makes some arguments about his past

13   activities at Chapman in the other election cycles.  Those

14   arguments about past activities, Your Honor, in our view

15   conflate appropriate faculty activity, such as testifying to a

16   legislative body or adding to public discourse on an issue of

17   importance with the unauthorized and improper activity of using

18   the university's resources to represent a political candidate.

19   And so those -- in our view, those are two very different

20   things.  That's all I have to say, Your Honor.  I'm happy to

21   answer questions if you have any.

22          **THE COURT:**  No.  I'd like to take about a ten-minute

23   recess.  I initially had a number of questions of each of the

24   parties and I want to make certain that those aren't redundant

25   in light of your argument.  After I ask those questions, then I

1    would like you once again to argue your respective viewpoints.

2    So, counsel, we're in recess for ten minutes, 20 after the

3    hour.  Thank you.

4        **(Recess taken from 10:12 a.m. to 10:23 a.m.; parties**

5    **present)**

6            **THE COURT:**  I believe we're unmuted.  And, counsel,

7    can you see and hear me?  If so, just raise your hand and --

8    all right, thank you very much.

9            The Court clarifies that I have not read any of the

10   111 challenged emails submitted to the Court thus far.

11   Therefore, I note to the parties the willingness by the parties

12   to have the Court conduct an in-camera review.  And after the

13   hearing, the Court will decide under the standards set out by

14   the Supreme Court in *Zolin* whether to review the materials in-

15   camera.

16           I want to start with the attorney-client relationship

17   between Dr. Eastman and President Trump.  The Select Committee

18   previously asked Dr. Eastman to submit retainer agreements or

19   other evidence of an attorney-client relationship between him

20   and President Trump.  And Dr. Eastman has submitted an

21   unsigned, undated retainer agreement between Dr. Eastman,

22   President Trump as candidate, and President Trump's campaign

23   committee.  You'll find that at Docket 132-2.

24           So to both parties, Dr. Eastman and the Select

25   Committee, should the Court rely on an unsigned, undated

1    retainer agreement?  I'll begin with Mr. Burnham, please.

2          **MR. BURNHAM:**  Thank you, Your Honor.  The answer to

3    Your Honor's question is, yes, the Court should rely, and the

4    Court should rely on the agreement alongside all of the other

5    evidence of an attorney-client relationship that also exists.

6          **THE COURT:**  Okay, thank you.

7          **MR. BURNHAM:**  The law is clear that a signed

8    agreement is not required.  The Court should consider all the

9    evidence.  And, to be frank, in the rush of the events at that

10   time, the story is nobody got around to signing it.  But that's

11   not dispositive of the attorney-client relationship question.

12         **THE COURT:**  Okay.  Mr. Letter.

13         **MR. LETTER:**  Your Honor, as I indicated before, I do

14   not disagree with Mr. Burnham, an attorney-client relationship

15   can be developed without a signed agreement.

16         But, again, the burden here is on Dr. Eastman to

17   demonstrate the attorney-client relationship and its extent

18   (indisc.) with whom was the relationship and what subjects did

19   it cover, what matters did it cover.  And as we said, it seems

20   very odd to have a long-term relationship.  I -- my impression

21   is that Dr. Eastman's saying this attorney-client relationship

22   lasted quite a while.  And to never have something that's

23   written that demonstrates or, you know, establishes it.

24         So, again, with the burden being on Dr. Eastman, I

25   don't think that this Court could properly find that there was

1   a very broad attorney-client relationship that covered

2   everything for which it is being claimed here.

3           **THE COURT:**  The Select Committee argues in its

4   briefing that an unsigned, undated retainer letter is not

5   sufficient to provide an attorney-client relationship.

6   However, the Committee's letter to Dr. Eastman on November of

7   2021 stated:  "You served as an attorney for President Trump in

8   his capacity as a candidate for reelection."  Is it now the

9   Select Committee's position that there was no attorney-client

10  relationship between Dr. Eastman and President Trump between

11  January 4 through 7 of 2021?  And if you want to take a moment,

12  take a moment at this time and look back at the November, 2021

13  letter.

14          **MR. LETTER:**  Your Honor, I may have inarticulately

15  stated we -- our problem is we don't know the extent of the

16  relationship and with whom.  We don't --

17          **THE COURT:**  All right.

18          **MR. LETTER:**  We just -- we don't know.  And that's

19  all on Dr. Eastman.

20          **THE COURT:**  Mr. Burnham, I want to be absolutely

21  certain.  Are you aware of any signed retainer agreement

22  between the President --

23          **MR. BURNHAM:**  No, I'm not, Your Honor.

24          **THE COURT:**  All right.  Thank you.

25          **MR. BURNHAM:**  I apologize.  I thought --

34

1          THE COURT:  Then --

2          MR. BURNHAM:  -- that Your Honor was finished.

3          THE COURT:  Mr. Burnham, the retainer agreement

4    states that it becomes effective:  "upon the proper signature

5    by all parties."  And if you want to get out the retainer

6    agreement, look at page one, you'll see that wording.  Then I

7    assume that this is the best evidence that the Court has.

8          And once again I want to be absolutely certain and

9    ask you are there any other signed retainer agreements and, if

10   so, when were they signed.

11         MR. BURNHAM:  No, Your Honor, we're not aware of any

12   other signed agreements.  And I -- would Your Honor like me to

13   respond to the significance of that particular --

14         THE COURT:  No.  Let --

15         MR. BURNHAM:  -- provision?

16         THE COURT:  -- me ask the questions that I had that

17   -- for just a moment.  And then I'm going to give both of you

18   plenty of time in summary.  To both parties, if there was an

19   attorney-client relationship between January 4th through the

20   7th, what was its scope?  And, Mr. Burnham, you were about to

21   address that.  Now is the time to address that, and then I'll

22   turn to Mr. Letter.  What was the scope --

23         MR. BURNHAM:  Your Honor, I think that --

24         THE COURT:  -- of that relationship?

25         MR. BURNHAM:  -- the scope of the attorney-client

1  relationship applied to post-election litigation and

2  proceedings concerning the Electoral College.  That's --

3  there's evidence of that scope in the unsigned letter.  And

4  unsigned though it is, it's still good evidence of the scope,

5  and it clearly delineates those two subjects of representation.

6          And then I'd also point to publicly available

7  material and the in-camera materials themselves provide

8  corroboration that that was in fact how the representation

9  played out.

10          **THE COURT:**  If at any time, Mr. Burnham, you and

11  Dr. Eastman want to consult, tell me, because it appears that

12  you're in separate locations.  And Mr. Letter has a number of

13  staff members with him in the same location.  So certainly you

14  can go out of the room, consult, during any of these questions.

15  Just call that to my attention.  The same question --

16          **MR. BURNHAM:**  Thank you, Your Honor.

17          **THE COURT:**  -- then back to Mr. Letter.  What's the

18  scope?

19          **MR. LETTER:**  Your Honor, that's -- I think you've hit

20  the nail on the head.  We don't know what the scope is.  We

21  know that during the key time period Mr. Eastman (sic) appeared

22  in court for Mr. Trump in case in Georgia, so we assume that

23  there's attorney-client relationship for that case.  But we

24  don't know when the relationship began, we don't know when it

25  ended, we don't know what it covered, we don't know in what

1   capacity.  We don't -- the client was.  We know none of that.

2   And it has -- not only do we not know it, it has not been

3   established for the Court.  That's the most important thing.

4        **THE COURT:**  Should this Court limit the scope of

5   Dr. Eastman's representation of President Trump during this

6   period to the terms of the retainer agreement?  Mr. Burnham.

7        **MR. BURNHAM:**  (Indisc.) not necessarily, Your Honor.

8   The retainer -- the attorney-client relationship doesn't need

9   any written agreement to exist for privilege purposes.  And so

10  even a signed written agreement wouldn't necessarily control

11  that question.

12        Having said that, though, I think the large majority

13  of the in-camera materials will come within the ambit of the

14  unsigned agreement in practical terms.

15        **THE COURT:**  On behalf of the Committee, Mr. Letter.

16        **MR. LETTER:**  Once again, Your Honor, I don't know how

17  Mr. Burnham can say that what -- can say to you and to us that

18  the agreement covers certain terms and issues and matters and

19  times when there apparently is no evidence on this to -- for

20  you to determine that, yes, it did cover that except does it

21  say we know that Mr. Eastman -- Dr. Eastman appeared in court

22  in Georgia.  Other than that, I repeat we don't -- we just

23  don't know how Your Honor could accept a claim of anything

24  beyond that.

25        **THE COURT:**  The retainer agreement, and I hope that

1   each of you have that agreement in front of you, but the

2   retainer agreement specifies that it is limited to:  "federal

3   litigation matters in relation to the 2020 presidential general

4   election, including election matters related to the Electoral

5   College."  So take a moment.  You'll be looking at page one.

6   Would the work with State legislatures be outside or within the

7   scope of "federal litigation matters?"  Mr. Burnham.

8        **MR. BURNHAM:**  No, Your Honor.  We don't think it's

9   outside the scope.  The interpretation we think the Court

10  should place on the term "Electoral College," in light of both

11  its plain meaning and the factual scenario, is that it's --

12  should be understood broadly to include both proceedings before

13  the United States Congress itself and proceedings involving the

14  state certification process.  That definition would be

15  consistent with the use of the term itself and certainly with

16  the evidence of the attorney-client relationship as it

17  developed.

18       **THE COURT:**  The same question to the Committee.  And

19  once again, the question was would work with State legislatures

20  be outside or within the scope of "federal litigation matters"

21  pursuant to the retainer agreement?

22       **MR. LETTER:**  Your Honor, obviously we're at a major

23  disadvantage in addressing this.  But if there were state

24  matters and state legislatures who were involved in federal

25  litigation, it is possible that this could cover that.  But,

```
 1    again, it's very unclear, and the burden is with Dr. Eastman to

 2    say what that would cover.  So it's very -- it's certainly

 3    questionable.  And if it did apply at all, it's totally unclear

 4    what it would apply to and how far it would go.  And that

 5    ambiguity has to be decided against Dr. Eastman.

 6        (Pause)

 7            THE COURT:  The retainer agreement also specifies

 8    that Dr. Eastman needed a separate engagement letter for legal

 9    work not specified in the original agreement.  You'll find that

10    on pages one and two.  Were there other engagement letters

11    between Dr. Eastman and President Trump, Mr. Burnham?

12            MR. BURNHAM:  No.  There were no other engagement

13    letters --

14            THE COURT:  Okay.

15            MR. BURNHAM:  -- pursuant to that provision or

16    otherwise.

17            THE COURT:  And as a courtesy, Mr. Letter, do you

18    wish to add any other comment concerning that question by the

19    Court?

20            MR. LETTER:  Thank you for the opportunity.  No, Your

21    Honor, I don't -- I think what Mr. Burnham just said speaks

22    very loudly.

23            THE COURT:  Before I move to the next subset of

24    questions, would you like to consult with your client,

25    Mr. Burnham?  Or, Mr. Letter, would you like to consult with
```

1    any member of your staff?  And, if so, take that time now.

2        (No audible response)

3            And, counsel, while you're doing that, just a light-

4    hearted joke.  I see, Dr. Eastman, that you're moving and

5    talking.  If this was the NFL, all of the coaches cover their

6    mouths.  So I would just encourage you if we have any

7    lipreaders here to cover your conversation.  And the same with

8    Mr. Letter who now has a notebook over his face so --

9            **MR. SPEAKER:**  Thank you, Your Honor.

10           **THE COURT:**  Okay.  All right.  Are you satisfied

11   then, Mr. Burnham, that you've had a chance to consult your

12   client?  Mr. Letter, are you -- have you had a chance to

13   consult your staff?

14           **MR. BURNHAM:**  Yes, thank you, Your Honor.

15           **THE COURT:**  Okay.  Mr. Letter.

16           **MR. LETTER:**  Yes, Your Honor.  We're going to blitz

17   on third down.

18           **THE COURT:**  Okay.  Then I'd like to cover briefly

19   just a couple questions concerning agents and co-counsel.  And

20   I'm going to start with Dr. Eastman and then finish with a

21   question for the Committee.

22           Mr. Burnham and Dr. Eastman, in the privilege log,

23   Dr. Eastman listed several people as "attorney" or

24   "consultant."  This Court had previously ordered Dr. Eastman to

25   provide agreements or sworn declarations to support all third

 1   party relationships.  No agreements or declarations were

 2   provided to the Court.  Does Dr. Eastman claim that all of

 3   those attorneys were his co-counsel representing President

 4   Trump?

 5          **MR. BURNHAM:**  Your Honor, this is actually something

 6   I'm 99 percent prepared to answer but I want to perhaps --

 7          **THE COURT:**  Please.

 8          **MR. BURNHAM:**  -- talk briefly with Dr. Eastman to

 9   make --

10          **THE COURT:**  Please, please.

11          **MR. BURNHAM:**  -- sure.  Thank you.

12       **(Plaintiff/Counsel confer from 10:40 a.m. to 10:42 a.m.)**

13          **THE COURT:**  All right.

14          **MR. BURNHAM:**  We're ready to proceed, Your Honor.

15   Thank you.

16          **THE COURT:**  Thank you.  Mr. Burnham.

17          **MR. BURNHAM:**  The answer to I think your first -- the

18   first part of Your Honor's question is, no, we do not have any

19   agreements or anything like that to document the relationship

20   of the various attorneys and consultants listed there with the

21   President, the campaign, and so forth.  Obviously our position

22   is that such agreements wouldn't be required for work product

23   at least.  But we produced everything we have.

24          The attorneys that are listed there either were other

25   attorneys representing the campaign, some of them were

```
 1    volunteers, some of them worked with Dr. Eastman.  It'll be

 2    apparent from the materials themselves the different roles

 3    people played.

 4         THE COURT:  Mr. Letter, in your briefing, or in

 5    Dr. Eastman's briefing he noted that several attorneys had at

 6    Donald Trump dot com emails or were attorneys of record for the

 7    Trump campaign in legal filings.  Is there any reason that the

 8    Court should not consider that evidence of a co-counsel

 9    relationship?

10         MR. LETTER:  Your Honor, we're -- we are happy to

11    have you consider any and all evidence.  The question of

12    whether that is sufficient to establish attorney-client

13    relationship is we suggest somewhat doubtful.

14         For example, I've asked the folks here, they feel

15    that -- they believe it's the January 4 through 7 period.  It's

16    fair to say that the privilege logs have listed dozens of these

17    people.  And for the -- all the logs Dr. Eastman has identified

18    something approaching hundreds of people for whom he has

19    communications for whom he has claimed the privilege.

20         And things like -- at least one of the examples, the

21    attorneys with the signature block, strategic advisor Donald

22    Trump dot com email.

23         So, again, as I've said the question is are these

24    people providing things that relate to legal advice as opposed

25    to political or campaign or strategic advice.  So -- and it's
```

42

1  Dr. Eastman's burden.  So that's the best answer I can give

2  you.

3          THE COURT:  Mr. Plevin, I want to turn to the Chapman

4  emails for a moment.  I want to hear once again what Chapman's

5  position is on whether Dr. Eastman had a reasonable expectation

6  of privacy in his emails to clients, including those through

7  the Chapman Clinic.  Now take your time with that answer for a

8  moment, asking Chapman and the Chapman Clinic.

9          (Pause)

10         MR. PLEVIN:  Well, we provided Your Honor the policy

11 that Chapman published on emails.  And it's clear, as the House

12 briefing emphasized, that the policy says that Chapman has the

13 ability and right to access the emails.  The policy itself does

14 not distinguish between clinic emails and other emails.

15         THE COURT:  Okay.

16         MR. PLEVIN:  Dr. Eastman was a dean of the law school

17 and in an administrative position (indisc.) the other faculty.

18 We assume he was aware of Chapman's longstanding policies on

19 that.

20         We've also in our prior filings commented on this

21 flash stream that comes up on Chapman-owned computers when

22 someone logs into the Chapman network, which is a reminder.

23         My direct answer to your question is, no, we don't

24 believe that there should have been a reasonable expectation of

25 privacy.  And the policy itself does not distinguish between

1   emails regarding clinic matters and other emails.

2           **THE COURT:**  At our prior hearing, Mr. Plevin, you

3   stated that Dr. Eastman's representation of President Clump or

4   Trump was improper and unauthorized and likened to

5   Dr. Eastman's emails involving President Trump to be

6   "contraband" on the system.  That was a rather strong

7   statement.  Is that still your position?

8           **MR. PLEVIN:**  Yeah, I guess that statement was

9   (indisc.) repeated.  Yes, in the sense that it absolutely is

10  unauthorized for anyone at a not-for-profit university to use

11  university resources to represent a political candidate or a

12  political campaign.  To allow that would jeopardize Chapman's

13  tax-exempt status.

14          **THE COURT:**  Okay.

15          **MR. PLEVIN:**  And Dr. Eastman was advised of that

16  point and position back in, you know, at the relevant time

17  period.  It's always been Chapman's policy and position.  And

18  so to the extent someone goes ahead and does something that's

19  in violation of that policy and unauthorized, it is improper.

20  And I'll stand by my prior comment with that -- in that

21  context.

22          **THE COURT:**  Mr. Plevin, Dr. Eastman represented then-

23  candidate George W. Bush in post-election litigation in 2000.

24  Chapman University praised that work publicly at the time and

25  considered it as a positive factor in awarding Dr. Eastman

44

1    tenure.  Did Dr. Eastman's representation of candidate Bush,

2    was that through a Chapman clinic?

3              **MR. PLEVIN:**  I don't have any knowledge about that,

4    Your Honor.  I could get --

5              **THE COURT:**  Just a moment.  Would you like to get on

6    the phone and take time?  These answers are important, and if

7    you have a client you want to consult, then consult them

8    because you're going to be held to these answers --

9              **MR. PLEVIN:**  Sure.  I would --

10             **THE COURT:**  All right.  Thank --

11             **MR. PLEVIN:**  -- appreciate that, Your Honor.  I'm --

12             **THE COURT:**  I'll give you the next --

13             **MR. PLEVIN:**  -- going to do that right now.

14             **THE COURT:**  -- two questions to consider while you're

15   on the phone.  Was Dr. Eastman's --

16             **MR. PLEVIN:**  Okay.

17             **THE COURT:**  -- representation of candidate Bush in

18   violation of IRS policy at that time?  And was Dr. Eastman's

19   representation of candidate Bush an unauthorized use of Chapman

20   email or other university resources, such as students?

21             **MR. PLEVIN:**  Okay.  Thank you, Your Honor.  Let me

22   consult with my client and I will come back to you.

23             **THE COURT:**  All right.  Why don't we take just five

24   minutes, counsel, while we're waiting, just to give that

25   courtesy or whatever time you need, Mr. Plevin.  But I'd like

1    an answer, please.

2              **MR. PLEVIN:**  Thank you.

3              **THE COURT:**  Thank you.

4         **(Recess taken from 10:48 a.m. to 10:55 a.m.; parties**

5    **present)**

6              **THE COURT:**  All right.  Once again, I can see all of

7    the parties.  Can you see me?  And if you can, just raise your

8    hand so I know that I've got contact with you.  Thank you for

9    your courtesy.

10             So, Mr. Plevin, let me simply restate those

11   questions.  Did Dr. Eastman represent Candidate Bush through a

12   Chapman clinic?  Was Dr. Eastman's representation of Candidate

13   Bush in violation of IRS Policy 2000?  Was Dr. Eastman's

14   representation of Candidate Bush an unauthorized use of Chapman

15   email or other University resources such as students?

16             And during the recess, I had one more question.  You

17   appeared to say, Mr. Plevin, that no clinical law professor at

18   Chapman have reasonable expectations of privacy in their emails

19   to clients.  If that's your statement, has Chapman moved all of

20   its clinical law professors onto non-Chapman email accounts for

21   their client communications?

22             **MR. PLEVIN:**  I don't know the answer to that

23   question.  I could find out.  I don't believe so.

24             **THE COURT:**  Well, just a moment.  Mr. Plevin, when I

25   asked for --

1          **MR. PLEVIN:**  The answer --

2          **THE COURT:**  Mr. Plevin, then find out.

3          **MR. PLEVIN:**  Okay.  My client is listening to this

4    and I will get that answer.

5          **THE COURT:**  Thank you.

6          **MR. PLEVIN:**  Would you like me to respond to the

7    other parts of the question.

8          **THE COURT:**  No, I think that we need the questions to

9    all four.  Any why don't you consult with your client?

10          **MR. PLEVIN:**  Okay, very good, Your Honor.  I'll do

11   that right now.

12          **THE COURT:**  Thank you.

13      **(Pause)**

14          **MR. PLEVIN:**  Your Honor, thank you for that

15   opportunity.

16          **THE COURT:**  Thank you.

17          **MR. PLEVIN:**  Let me start with the last question

18   first because I personally don't have a response yet that I can

19   share.  We are working through the contact person at the law

20   school who would have the information about any potential

21   segregation of clinic-related emails.

22          I would -- I will say that the law school does

23   maintain a separate client management system for privileged

24   work which is for privileged work and is confidential and is

25   not accessed by the University.  What I don't know and I'm

47

1   trying to find out specifically relates to your questions about

2   emails and messaging.  So I'm hoping to get that answer while

3   we're still in the hearing and if I do, I will let the Court

4   know.

5            With respect to the other questions, Your Honor,

6   regarding Dr. Eastman's activities in 2000, all of your

7   questions assumed that Dr. Eastman was representing Candidate

8   Bush in the various activities that he engaged in in 2000.  The

9   University is not aware that Dr. Eastman was engaged by or

10  representing Candidate Bush in 2000.

11           I checked Dr. Eastman's declaration that he filed in

12  support of the privilege assertion where he describes that work

13  and he does not assert that he was engaged by or representing

14  Candidate Bush.  What he said was, he did post-election work

15  that was in support of Candidate Bush.

16           **THE COURT:**  I see.

17           **MR. PLEVIN:**  We did consult previously with the Law

18  School Dean at that time who was very clear that he had no

19  knowledge that Dr. Eastman was representing Candidate Bush or

20  engaged by Candidate Bush and that such activity would not be

21  authorized by the University for the exact same reason that

22  we're talking about now, that is, the IRS bright-line rule

23  against using university systems to represent a political

24  candidate.

25           So I think the answer to your questions in 2000 is

1    the University's understanding of what Dr. Eastman was doing

2    was very different and the University's understanding of what

3    he was doing was not a violation of IRS rules or University

4    policy.

5              THE COURT:  Okay.  Mr. Letter, Dr. Eastman asserts

6    the attorney-client privilege for five emails from January 4th

7    through January 7th, 2021 and claims work-product protection

8    over the remaining 106 documents.  Therefore, there are a total

9    of 111 documents.

10             Attorney-client privilege requires confidential

11   communications.  Work-product protection does not require

12   confidentiality.  It only requires that documents not be shared

13   with an adversary.  Is the Select Committee arguing that using

14   Chapman's email servers destroys work-product protection?

15             MR. LETTER:  Your Honor, I would like to extremely

16   briefly consult my colleagues --

17             THE COURT:  Please.

18             MR. LETTER:  -- if you would just give me a very

19   short time, please.

20             THE COURT:  And you don't have a time limitation.

21        (Pause)

22             MR. LETTER:  Your Honor, as we know, the Chapman

23   system says that they will comply with a subpoena and that's

24   exactly what happened here.  A subpoena was issued by the

25   Select Committee.  My understanding is that even with the very

49

1  narrow scope that Mr. Burnham said of how the privilege applies

2  that the Select Committee is an adversary to Dr. Eastman.  So

3  it certainly contemplated the Chapman policy would result in

4  happening what exactly is happening.

5           **THE COURT:**  Mr. Letter, the clinical law professors

6  represent clients as part of their university contracts.  Do

7  clinical professors at law schools have a reasonable

8  expectation of privacy when they use university email to

9  communicate with clients?

10          **MR. LETTER:**  Your Honor, we obviously don't want to

11  state an extremely broad position on certain subjects when we

12  know very little or maybe even nothing about.  However, I point

13  out to you that we had two responses on this.

14          We have a footnote where we note that just from a

15  very brief survey by us, other universities have a different

16  system and we pointed to the article by Mr. Sisk -- Professor

17  Sisk that I think Dr. Eastman first pointed this Court to where

18  Professor Sisk -- and I forget the other author -- describe

19  what systems are out there -- and we cited this also in our

20  brief -- and it appears that Chapman is quite unusual in its

21  policies.

22          So it may very well be that the differences in

23  policies between Chapman and what we understand to be the

24  significant majority of law schools make their situations

25  different.  And obviously I cannot in any way be prepared to

1   talk about what other systems -- other universities with other

2   systems and how they treat those, et cetera.

3            And the last point is, as we pointed out, there was

4   the admonishment that was issued to Dr. Eastman by the

5   President of Chapman.  We have absolutely no idea whether other

6   clinics get admonished by university officials, et cetera.

7            **THE COURT:**  Attorney-client privilege applies only

8   when a communication is for the purpose of legal advice.  Is

9   political advice protected by the attorney-client privilege,

10  Mr. Burnham?

11           **MR. BURNHAM:**  Surely, political advice, just to be

12  clear, is not but if it's legal advice that concerns political

13  matters, that would be covered.

14           **THE COURT:**  Mr. Letter?

15           **MR. LETTER:**  Your Honor, we view this is there would

16  be a scale, a sliding scale.  Obviously, there would be certain

17  circumstances where something political or a campaign is

18  mentioned but in a document that is overwhelmingly legal and

19  that we don't think and can imagine circumstances where that

20  would not destroy the privilege.

21           And so the -- I think the proper inquiry for the

22  Court would be, is it something that is largely or

23  overwhelmingly -- "largely" is probably the right -- political

24  or campaign where there than is some legal aspects to it than

25  either the whole document or at least significant chunks of it

1   would be redacted.  Significant would be -- significant chunks

2   would be produced with maybe minor parts redacted.

3           THE COURT:  All right.  Now, I'm going to ask that in

4   a different way then.  What is the line between legal and

5   political advice?  And I want you both to think very carefully

6   about that.  You used the words "largely" and "overwhelmingly"

7   but in writing, how should the Court judge this line between

8   legal and political advice?

9           And if you want to consult your client, Mr. Burnham,

10  you're more than welcome to.

11          And if you, Mr. Letter, want to consult your staff,

12  I'd appreciate that.

13          MR. BURNHAM:  Thank you, Your Honor.

14      (Pause)

15          THE COURT:  I don't care who responds to the question

16  first but if --

17          MR. BURNHAM:  I'll start, Your Honor.

18          THE COURT:  Thank you.

19          MR. BURNHAM:  I think a good working definition of

20  "political advice" that Your Honor could use would be advice

21  that's completely unrelated to actual or potential litigation

22  and completely unrelated to the interpretation of laws.  And

23  some examples of that would be fundraising, debate prep, making

24  advertisements, policy positions on issues and so on.

25          THE COURT:  All right, thank you.

52

1          Mr. Letter?

2          **MR. LETTER:**  Your Honor, our understanding is that

3     one of the things that Courts have looked at is primary

4     purpose.  I know that doesn't necessarily help you much but,

5     for example, the email exchanges that we got elsewhere that we

6     have attached as Exhibits M and N -- our view would be those

7     are largely political.

8          They are -- Mr. -- Dr. Eastman is suggesting that the

9     President -- the Vice President violate the law.  It's hard to

10    see that that's legal advice, telling somebody to violate the

11    law.  And instead, it appears to be completely or almost

12    completely political and campaign advice saying, here's how we

13    can try to have President Trump win this election if we just do

14    a violation of the Electoral Count Act.

15         **THE COURT:**  I'd like to turn to the work-product

16    production and specifically focus on anticipation of

17    litigation.  The work-product protection covers documents only

18    if they were prepared "in anticipation of litigation."  In the

19    privilege log, Dr. Eastman repeatedly states that emails were

20    made considering "possible litigation" or "contemplating

21    litigation."

22         When does litigation cross the line from possible to

23    anticipated, Mr. Burnham?

24         **MR. BURNHAM:**  I think if there's a reasonable

25    prospect that it could occur under the circumstances which we

53

1   think is well-established here both with respect to, obviously

2   litigation but the Electoral College as well.

3             THE COURT:  Mr. Letter?

4             MR. LETTER:  Your Honor, I'm reminded that at Page 31

5   of our brief, we set out what the test is for work product and

6   I will quote that in a second but it is Page 31.  I apologize.

7   I'm having trouble finding it.  Oh, yeah, I'm sorry, Your

8   Honor.  Were created "because of the prospect of litigation"

9   and would the document "would not have been created in

10  substantially similar form but for the prospect of litigation?"

11            THE COURT:  Okay.

12            MR. LETTER:  That's our understanding of the Ninth

13  Circuit test.

14            THE COURT:  Mr. Burnham, what litigation was

15  Dr. Eastman not possibly but actually anticipating at the time

16  of sending these emails?

17            MR. BURNHAM:  Well, we provided a number of case

18  numbers but the litigation I think that many of the emails are

19  going to relate to are court challenges following whatever --

20  at least in the January 4th and 5th emails, they would be --

21  and really the whole date.  They were largely concerned with

22  litigation that would follow what either might or had

23  transpired during the January 6th certification process.

24            Obviously, there's a higher likelihood that

25  litigation would have come out of that and the emails will make

1  apparent that they were prepared with the anticipation of such

2  litigation in mind.

3          THE COURT:  In this litigation, Dr. Eastman states

4  that advising State legislators of their right to choose

5  Presidential electors was in anticipation of litigation.

6  You'll find that at Paragraph 30 in the declaration.

7          Should this Court consider work advising State

8  legislators to be in anticipation of litigation, Mr. Burnham?

9          MR. BURNHAM:  Yes, Your Honor.

10          THE COURT:  Mr. Letter?

11          MR. BURNHAM:  For the same reasons I just offered.

12          THE COURT:  Okay.

13          Mr. Letter?

14          MR. LETTER:  I'm sorry, Your Honor.  May I let

15  Mr. Burnham finish?  I apologize.

16          THE COURT:  Oh, I'm sorry.  Mr. Burnham?

17          MR. BURNHAM:  I was mostly done.  I was just going to

18  say that this goes along with our definition of "Electoral

19  College" as including both the Congress and the State

20  legislators and it was manifestly possible that that process

21  was going to result in litigation and that was part of

22  Dr. Eastman's role.

23          THE COURT:  Okay.  Mr. Letter?

24          MR. LETTER:  Your Honor, we don't dispute that there

25  certainly could be documents, emails, et cetera that would be

1   providing advice to State legislators that could fall within

2   the work-product privilege.  And, again, we're perfectly happy

3   with you doing the in-camera review and making that

4   determination because we have not seen -- unlike what I was

5   referring to before, the emails between Dr. Eastman and

6   Mr. Jacob, since we have not seen these materials, it's very

7   difficult for us to give you helpful advice.

8           THE COURT:  Was Dr. Eastman's memo about Vice

9   President Pence's ability to delay the electoral count created

10  in anticipation of litigation?  And Dr. Eastman's memo states,

11  "The main thing here is that Pence should do this without

12  asking for permission either from a vote of the Joint Session

13  or from the Court."  Does this language suggest to this --

14          MR. BURNHAM:  Your Honor --

15          THE COURT:  I'm sorry.  Please.

16          MR. BURNHAM:  I thought Your Honor was finished.

17          THE COURT:  Well, does this language suggest that the

18  entire plan to delay the election results was not created in

19  anticipation of litigation?  Mr. Burnham?

20          MR. BURNHAM:  No, I don't think so, Your Honor.

21  First of all, the two memos were released to -- we're not

22  claiming any kind of privilege over those.  So those are public

23  documents.

24          Now -- but the answer to Your Honor's question is,

25  no, I don't think the language of the memos negates that the

1    representation with respect to the Electoral College was in

2    anticipation of litigation.

3              THE COURT:  So would you restate that?  Are you

4    saying that this wasn't anticipated -- that this was in

5    anticipation of litigation?

6              MR. BURNHAM:  The two memos that Your Honor was

7    referring to --

8              THE COURT:  No, be very specific -- I'm sorry.  I

9    didn't mean to cut you off.  My apologies.  Please continue.

10             MR. BURNHAM:  The two publicly released memos --- I

11   think Your Honor was referring to the shorter --

12             THE COURT:  Uh-huh.

13             MR. BURNHAM:  -- were prepared, I think, manifestly

14   in terms of preparation for litigation surrounding the

15   Electoral College.  I wanted to note that we're not claiming

16   any kind of privilege over those memos.  Those are public

17   documents.  And Your Honor focused on the provision, I think, a

18   moment ago that was quoted where it refers to the Vice

19   President doing something without asking for permission.

20             And what that alludes to is the dispute among

21   Dr. Eastman and others about whether the Electoral Count Act is

22   constitutional or not.  That's a legal dispute that's not

23   resolved and I think that's what that line alludes to.  I can

24   go on at more length about that but that's the significance of

25   that.

57

1          THE COURT:  Mr. Letter?

2          MR. LETTER:  Yes, Your Honor, we think that this is

3    an extremely good example of what we're talking about.  As I

4    mentioned a moment ago, one of the key questions is would they

5    have been -- the materials been produced in the same form if

6    they weren't in anticipation of litigation.

7          And it seems clear to us that with the possible

8    exception of one or two paragraphs that maybe could be redacted

9    although we wouldn't think that would be appropriate, these

10   would have been produced in the same form because as Your

11   Honor's question -- well, just thinking about Your Honor's

12   question shows what Mr. -- Dr. Eastman was proposing was

13   dubious and basically damn the consequences and that sure

14   doesn't sound like something that's in anticipation of

15   litigation.  That's, let's do this and we can see if we can

16   avoid litigation.

17         But, again, maybe one or two paragraphs would have

18   been different.  It seems quite clear that these memos would

19   have been virtually identical in the rest of their substance.

20         MR. BURNHAM:  Your Honor, may I beg the indulgence of

21   a 30-second response to that?

22         THE COURT:  Certainly.

23         MR. BURNHAM:  I think the issue here is if -- the

24   memos had several scenarios.  Right.  There's a couple

25   different ways they could go and they were sort of forecasting

58

1   different ways it could go.

2        And I think they are clearly -- we're not claiming

3   privilege over them but the plan itself, as articulated in the

4   memos, clearly implicated litigation because if the Vice

5   President took some of the possible routes outlined in the

6   memos, it would present the question very clearly of the

7   constitutionality of the Electoral Count Act which is something

8   that a Court would then have to decide in considering whether

9   the Vice President had proceeded properly.

10       So they were absolutely prepared in anticipation of

11  litigation.  Of course, they were then released which is why

12  we're not claiming privilege over them because they were shared

13  with various people there on the Internet.  But in terms of the

14  substance of them, litigation is clearly implicated including

15  by the quote Your Honor focused on.  Thank you.

16       **THE COURT:**  Mr. Letter?

17       **MR. LETTER:**  The only thing I would have to add, Your

18  Honor, is, again, since we haven't seen them, we suspect that

19  there are plenty of documents that are going to be very similar

20  to these where they are either entirely or mostly political or

21  campaign advice.  And they might even be legal but not --

22  having nothing to do with litigation.

23       So we hope that that is something that Your Honor

24  looks at them, you'll see and we trust your judgment obviously.

25       **THE COURT:**  In reply brief, if you turn to Page 6,

1   Dr. Eastman states that, "Litigation was certainly anticipated

2   as a possibility" from delaying the electoral count.

3           Mr. Burnham, what litigation was actually not

4   possibly anticipated regarding the events of January 6, 2021 or

5   the Electoral Count Act?

6           **MR. BURNHAM:**  Your Honor, I think if the Vice

7   President had followed any of -- several of the various courses

8   laid out in the memos of different ways he could handle the

9   situation, the highly -- near certain result, I would even say,

10  would have been a lawsuit naming the Vice President as a

11  defendant, making arguments about why his actions were improper

12  which would very likely have gone probably to the Supreme Court

13  and that was sort of the ever present subtext of the

14  representation with respect to the Electoral College.

15          **THE COURT:**  Mr. Letter?

16          **MR. LETTER:**  Your Honor, I apologize.  I'm having

17  trouble -- you said it's Page 6 of the reply brief?

18          **THE COURT:**  Yes.

19          **MR. LETTER:**  That's Page 15, I'm now told.  Sorry, I

20  apologize.  I'm sorry.  So the -- I apologize for my --

21      **(Counsel confer)**

22          **MR. LETTER:**  The last sentence of the introduction, I

23  am told.  "Distortions cannot hide the fact that Dr. Eastman

24          provided legal advice to a client in connection with

25          numerous post-election legal challenges and a joint

1        session of Congress from which litigation was

2        certainly anticipated as a possibility giving rise to

3        attorney-client and work-product protections of his

4        communication."

5        Well, one question is Dr. Eastman didn't -- did not

6   represent the Vice President and our understanding was that a

7   lot of this was directed to the Vice President and the Vice

8   President's people trying to convince them of what to do but

9   that certainly wasn't -- that was not advice to their client --

10  to his -- to Dr. Eastman's client since he didn't represent the

11  Vice President as far -- it's at least not a claim we've heard.

12       And, again, what our understanding is that

13  Dr. Eastman was urging the Vice President to do something that

14  would -- in a way that would either prevent or make litigation

15  largely meaningless, too late, et cetera.

16       So the main purpose here was to basically subvert the

17  Constitution and the Electoral Count Act and I think

18  Dr. Eastman's exchanges with Mr. Jacob demonstrate that that's

19  what was going on. They weren't planning how if there is

20  litigation, we'll be able to argue X and Y.  It's, instead, no

21  Supreme Court justice would possibly buy this and, again, I

22  don't -- I really don't think that that can fairly be described

23  as litigation advice as opposed to, wow, we recognized that all

24  of this is just way, way out there but let's -- it's one of the

25  -- the chance we have to overturn the election.  So let's go

61

1   with it.

2          **THE COURT:**  Dr. Eastman himself represented or did

3   post-election work -- and I'll look back at the record to make

4   certain -- in the post-election litigation in 2000 involving

5   George W. Bush and in that case, Dr. Eastman was part of the

6   team that used litigation to challenge vote counting in

7   December, well before the January Electoral College count.

8          What litigation did Dr. Eastman anticipate after the

9   completion of the January 2021 Electoral College count?  Now, I

10  ask that again of you, Mr. Burnham?

11         **MR. BURNHAM:**  It would have been a court challenge to

12  whatever action the Vice President ever ended up taking which

13  there are several different ways it could have unfolded.  But

14  the larger answer to Your Honor's question was there could very

15  -- there almost certainly would have been a challenge to that.

16         It's possible the President could have been named as

17  a defendant which would implicate Dr. Eastman directly but even

18  for that, I think the records show that in his capacity as an

19  attorney for President Trump, part of his task was delivering

20  -- articulating the President's position in a legally well-

21  supported way that could convince third parties that it would

22  withstand a court challenge.

23         **THE COURT:**  Mr. Burnham, Dr. Eastman's plan that

24  could be argued for Vice President Bush (sic) to take

25  unilateral action on January 6th of 2021 may be markedly

1  different from Dr. Eastman's litigation strategy in 2000 and by

2  choosing to encourage Vice President Pence to delay counting

3  the electoral results, hadn't Dr. Eastman already chosen to

4  pursue his plan outside of the courts?

5          **MR. BURNHAM:**  No, I don't think so, Your Honor, at

6  all.

7          **THE COURT:**  Why?

8          **MR. BURNHAM:**  The public materials and publicly

9  released statements from Dr. Eastman show that his position was

10  that the Vice President had the authority, at least arguably,

11  to delay the count.  There was all the various issues that were

12  out there and then to resume the count once they looked like

13  they were resolved which we all can acknowledge could result in

14  either a Trump victory or a Biden victory.

15          The figure you most often see for the length of delay

16  is ten days which gives more than enough time for any number of

17  parties that had standing to bring a lawsuit against the Vice

18  President that easily could have named the President as well

19  alleging that that delay violated the Electoral Count Act which

20  would then present the question of whether the Electoral Count

21  Act was constitutional or not and would also present the

22  question of whether Dr. Eastman's theories on the Twelfth

23  Amendment were right or wrong and a Court would decide that.

24          And that was the potential litigation that was in

25  mind.  And so I think so far from taking the matter outside of

 1   litigation, the reported advice from Dr. Eastman to the Vice

 2   President absolutely put litigation squarely in the crosshairs

 3   of what was likely to happen.  Thank you.

 4            **THE COURT:**  Mr. Letter, do you have any comments?

 5            **MR. LETTER:**  Very short, Your Honor.  The just do it

 6   and let them sue -- I think that's a quote.  Just do it and let

 7   them sue certainly doesn't sound to me like the advice that's

 8   in anticipation of litigation.  This is advice to -- as I said

 9   before, to high-level advisors to Vice President Pence.  Vice

10   President Pence should violate the law.  That's what

11   Dr. Eastman said he was -- he said that he was urging --

12   violate the law and let them sue.  That -- boy, that's not

13   legal advice that I've ever given in anticipation of

14   litigation.

15            **THE COURT:**  Concerning work product and

16   confidentiality sharing, to either of the parties or both of

17   the parties, the work-product protection -- or work-product

18   production does not require confidentiality.  It requires that

19   product not be shared with an adversary or a conduit to an

20   adversary.  What's the line -- when does a third party become a

21   conduit to an adversary?

22            **MR. BURNHAM:**  Can I start with that, Your Honor?

23            **THE COURT:**  Please.

24            **MR. BURNHAM:**  The Samena (phonetic) case doesn't give

25   a great definition of this but I think practically speaking,

64

1   what the Court did in that case was look at the particular

2   facts involved and see if they were facts from which the Court

3   could infer that the person to whom the work product was

4   disclosed had the potential based on specific facts to turn

5   into an adversary in the reasonable foreseeable future.

6           It does not apply to anybody that conceivably could

7   be an adversary or anybody that agrees to accept a subpoena.

8   That's not where the Courts have drawn the line at all.

9           **THE COURT:**  Okay.  Mr. Letter?

10          **MR. LETTER:**  Your Honor, our understanding from the

11  privilege logs is that Dr. Eastman was communicating with and

12  has claimed privilege over communications with people like

13  pundits and journalists.  It's certainly very likely that if

14  you are communicating with those people and sharing confidences

15  with them, many journalists are going to take that confidence,

16  take it to the other side and say, okay, Dr. Eastman is

17  recommending to President Trump that he do X or Y and that that

18  is legal or not legal or whatever.  What's your comment on

19  that?

20          So it seems the breadth of the claims that have been

21  made of work product or attorney-client are such that it was

22  actually quite likely that some of these people would be

23  conduits to adversaries.  And let me say one more time.  The

24  burden is on Dr. Eastman to establish that the privilege

25  applies here and that's very, very hard to do given what has

1     been provided.

2            **THE COURT:**  We're going to take another brief recess

3     but I promise you I don't have that many other questions.  I'm

4     going to cover three areas when we come back, a few questions

5     about the third-party work product, the crime-fraud exception

6     and finally a few questions about the attorney-client

7     relationship between Dr. Eastman and President Trump.

8            So why don't we take ten minutes but I'd like you to

9     be prepared for your summation in a relatively short period of

10    time.  Okay.  About ten minutes, Counsel.

11         **(Recess taken from 11:33 a.m. to 11:42 a.m.; parties**

12    **present)**

13            **THE COURT:**  All right.  Karlen, am I unmuted?  Thank

14    you.

15            Then, Counsel, once again, I'm just going to raise my

16    hand.  If you can see and hear me, would you do so as well?

17    Thank you so much.

18            Federal Rule of Civil Procedure 26(b)(3) protects

19    documents prepared in anticipation of litigation by or for a

20    party or its representative including its attorney.

21            To both parties, does work-product protection require

22    a formal agent relationship?

23            **MR. BURNHAM:**  No, Your Honor.

24            **MR. LETTER:**  (Inaudible)

25            **THE COURT:**  Mr. Letter, you were cut off.  I'm sorry.

1          **MR. LETTER:**  Our position is, yes, that the attorney

2    work product does require a relationship between -- at some

3    point in the relationship between the attorney and the -- and a

4    client.

5          **THE COURT:**  In Dr. Eastman's briefing, it's mentioned

6    consulting with -- there's a mention of consulting with several

7    academics and experts.

8          Mr. Burnham, were all communications from these

9    consultants made in anticipation of litigation?

10          **MR. BURNHAM:**  Yes, Your Honor.

11          **THE COURT:**  Were all of those consultants aware that

12    litigation was being pursued?

13          **MR. BURNHAM:**  I couldn't -- I wouldn't want to answer

14    with -- conclusively to other people's states of mind or what

15    they knew myself but, in general, I think that would have been

16    apparent.

17          **THE COURT:**  Well, to both parties then, to

18    Dr. Eastman and the Select Committee, to what extent do those

19    consultants need to have known about litigation?

20          **MR. BURNHAM:**  I don't think that's a requirement at

21    all, Your Honor, legally.

22          **THE COURT:**  Mr. Letter?

23          **MR. LETTER:**  Your Honor, we -- it's a difficult one

24    but we think, yes, because they're -- the point is they're

25    contributing to being used by the attorney to contribute to

67

1   litigation.  So, I mean, maybe you could come up with some very

2   weird hypothetical where it wouldn't be but, otherwise, it

3   would seem to be difficult to fit it within the work-product

4   privilege.

5          THE COURT:  To both parties, Mr. Eastman -- or

6   Dr. Eastman is President Trump's attorney.  Rule 26(b)(3) may

7   protect work product prepared by third parties for Dr. Eastman.

8          So for -- if a lawyer who is not Dr. Eastman's

9   co-counsel sends him a document, is that protected attorney

10  work product, Mr. Burnham?

11         MR. BURNHAM:  Not unless there's engagement pursuant

12  to being sent the document that would reveal strategy to mental

13  impression.

14         THE COURT:  Mr. Letter?

15         MR. LETTER:  Your Honor, our understanding of the law

16  is that it has to be in some way an agent of the attorney or

17  the client.  And Mr. Burnham earlier said that plenty of these

18  of which they're claiming privilege are unsolicited.

19         THE COURT:  And that was my next question.  Would the

20  work-product rule include all materials that non-lawyers

21  prepared and sent to Dr. Eastman such as unsolicited materials?

22         And I think, Mr. Letter, you've answered or stated

23  your position.  Mr. Burnham?

24         MR. BURNHAM:  It would not cover all such materials.

25  It would not.  If there was simply a communication from a third

1    party to Dr. Eastman and that's it, we've produced that, in

2    fact.  I don't think any communication like that is even at

3    issue here.

4              THE COURT:  Okay.

5              MR. BURNHAM:  What I tried to say before is if there

6    was an unsolicited communication which then prompted a

7    discussion between Dr. Eastman and other lawyers that would

8    reveal strategy and mental impression, then, yes, it does

9    become work product.  That's the line we've drawn.

10             THE COURT:  Okay.  Concerning the crime-fraud

11   exception, privileged communications -- oh, I'm sorry.

12             Mr. Letter, did you have a response?

13             MR. LETTER:  No, Your Honor, I didn't have anything

14   else.

15             THE COURT:  All right, thank you.

16             Concerning the crime-fraud exception, privileged

17   communications may be disclosed if the client attempted a crime

18   and the attorney's work was sufficiently related to and in

19   furtherance of that crime.  The Select Committee alleges in its

20   briefing that President Trump may have committed three crimes

21   related to the events of January 4th through the 7th, 2021,

22   obstruction of an official proceeding, conspiracy to defraud

23   the United States and common law fraud.

24             As this Court noted in its order last Friday, the

25   standard of evidence needed to apply the crime-fraud exception

1   is substantially lower than that required for a criminal

2   conviction.

3           So my question to both parties is, how should the

4   Court determine if any emails or documents are in furtherance

5   of any of these alleged crimes?  And I don't care which party

6   wants to respond first.

7           **MR. BURNHAM:**  I'll start, Your Honor.  First, our

8   fundamental position is that the Defendants haven't met their

9   burden for Your Honor even to make that review.  I stated

10  earlier that we didn't have any fear of it but that didn't mean

11  that they had met their burden.

12          Putting that aside and to answer Your Honor's

13  question if it's a fact in terms of inquiry, the standard is,

14  the crime has to use the lawyer's advice in connection with a

15  criminal offense.  And so there has to be proof by a

16  preponderance of the evidence of all the elements of whatever

17  offense it was.

18          And in addition to that, once that -- if that burden

19  isn't even met, then that's the end of the inquiry.  If that

20  burden is met, then the further review is, was the lawyer's

21  advice used in furtherance of the crime and I don't think I'm

22  surprising anybody by saying that that burden isn't anticipated

23  to be remotely satisfied here.

24          **THE COURT:**  Mr. Letter?

25          **MR. LETTER:**  Yes, Your Honor.  And, first of all, a

1    reminder that in our view, we're talking about two crimes and

2    common-law fraud that meet the crime-fraud exception, not three

3    crimes, just to make that clear.

4           What our understanding of the law in this is if the

5    legal advice was used in any way to further the objectives of

6    the two crimes or the fraud, then it is covered by the crime-

7    fraud exception.  And in our view, that certainly is true here

8    because the advice being provided by Dr. Eastman certainly

9    seemed to become a key part of the message that President Trump

10   was putting out in an attempt to overturn the election and

11   interfere with the unofficial function of Congress and to

12   misrepresent what was -- what the facts were and what the law

13   required.

14          **THE COURT:**  Mr. Burnham, Dr. Eastman has repeatedly

15   asked the Select Committee to turn over exculpatory evidence in

16   its possession.  Why did Dr. Eastman not provide any of his own

17   evidence to the Court?

18          **MR. BURNHAM:**  Well, we did provide evidence, Your

19   Honor, in terms of a declaration and publicly available

20   materials and we relied the Defendants' evidence.  The easy

21   answer, just to be perfectly honest, is Dr. Eastman is

22   litigating this case himself under a pending Fifth Amendment

23   claim and I think in light of the position taken here today by

24   the Defendants, everybody understands why we've made that

25   assertion and that limits our ability here.

1         But needless to say, there's more than enough

2    evidence we submitted for Your Honor to rule in favor of us,

3    submitted both by the Defendants and by us and by publicly

4    available materials.

5         **THE COURT:**  To both parties, Dr. Eastman stated in

6    his briefing that he had a "well-grounded legal opinion shared

7    by other scholars that the Electoral Count Act was

8    unconstitutional."  You'll find that at the brief at 19.  If a

9    client or attorney believes that a law is unconstitutional,

10    does that excuse a violation of that law?

11         **MR. BURNHAM:**  Well, it depends on the circumstances,

12    Your Honor, and, again, Your Honor doesn't have to agree with

13    Dr. Eastman's position.  That's not the issue before Your Honor

14    today.

15         I think the position espoused by Dr. Eastman both in

16    the evidence and the link to the law review article was that to

17    the extent the Electoral Count Act specifically conflicted with

18    the Twelfth Amendment, the Vice President would have been

19    within his rights to act pursuant to the dictates of the

20    Twelfth Amendment even to the extent they concluded with the

21    Electoral Count Act.

22         In those specific circumstances, that was the

23    position Dr. Eastman advocated for.  And Your Honor does not

24    have to agree with it or disagree with it.  That's not before

25    Your Honor today but to make clear for the record, that was the

1    argument.

2              **THE COURT:**  Mr. Letter?

3              **MR. LETTER:**  A couple of responses, Your Honor, and

4    I'll respond to this and then if you don't mind, Your Honor, I

5    think I didn't get a chance to respond to your prior question.

6    Mr. Burnham did and I was hoping to have a very short time

7    to --

8              **THE COURT:**  Oh, please -- yeah, I apologize.

9              **MR. LETTER:**  Thank you.  No, no need to, Your Honor.

10             Our reaction, first of all, it -- we don't think that

11   there is any way that a legal scholar, Dr. Eastman's abilities

12   could possibly think that it was consistent with the

13   Constitution to the -- for the Vice President to overturn the

14   electoral count sent in by -- certified by Governors and sent

15   in, all 50 of them, that the Vice President -- let's suppose,

16   for example, the Vice President was a candidate for the

17   President, that the Vice President could say, I just declared

18   myself the winner.  There is no possible way that that could be

19   constitutional.

20             And, again, I believe Dr. Eastman recognized that

21   that wouldn't -- couldn't possibly -- is so off that not a

22   single Supreme Court justice would treat it seriously.

23   Similarly, for -- you can't read the Twelfth Amendment and

24   think that the Vice President could unilaterally say, I'm

25   hereby delaying this and sending this back to the states when

1    the states had all reported and not a single state had

2    certified any other count.

3          It would just be astonishing if Dr. Eastman really

4    thought that that could possibly be consistent with the

5    Constitution.  And if he believed and if he wanted to tell his

6    client that the Electoral Count Act possibly was in some way

7    unconstitutional, President Trump could have brought some sort

8    of legal action, I suppose.

9          I don't believe -- in fact, I think Dr. Eastman

10   specifically said, we don't have to do -- it's not us who would

11   be bringing the litigation because we're going to do these

12   other things to make it so litigation would be irrelevant or

13   can't happen.

14         Your Honor, as to your prior question, as we've said

15   and I think you've already recognized it, there is no authority

16   for a Court to compel Congress to provide any information.  So

17   -- and that's been recognized.  The D.C. Circuit in particular

18   has recognized that, to provide separation of power to general

19   in the speech or debate clause so as far as any compulsion on

20   the House to provide exculpatory information.

21         Separately, this is not -- and we've emphasized, this

22   is not a criminal proceeding and note that the House cannot

23   engage in criminal proceedings, can't bring prosecutions --

24   criminal prosecutions.  And so it's just not a criminal

25   investigative body.  So talking about things like the Brady

74

 1  standard or exculpatory material or anything like that, they

 2  just don't enter in here.

 3          So it's not the kind of thing where we could search

 4  for and produce exculpatory information.  One is we can't be

 5  required to and, two, it has nothing to do with this case.  The

 6  case law makes clear -- I think it's *Nastor* that says that you

 7  don't have to produce anything like that.  This Court in its

 8  review can take into account things that Dr. Eastman wants to

 9  submit.  We don't have any problem with the Court doing that as

10  part of its consideration of the issues.

11          **THE COURT:**  My question in that area was why

12  Dr. Eastman had not provided his own evidence concerning

13  exculpatory evidence in this matter.

14          Then given Dr. Eastman's legal opinion, Mr. Burnham,

15  why did he not challenge the Electoral Count Act in the courts?

16          **MR. BURNHAM:**  Your Honor, I can't -- the evidence in

17  the record doesn't speak directly to that question and it would

18  just be me simply proffering and that would probably intrude on

19  privileged matters, frankly, between Dr. Eastman and his client

20  that I probably wouldn't want to disclose here.

21          **THE COURT:**  Okay.

22          **MR. BURNHAM:**  But as a matter of common sense,

23  there's practical and strategic reasons that obviously will

24  come to bear on those sorts of decisions.

25          **THE COURT:**  All right.  I want to thank both of you.

1   That concludes the Court's questions.  I'm going to take about

2   a five-minute recess.  Gather your thoughts for any summary

3   argument that you'd like to participate in in a few moments.

4   Thank you.

5       **(Recess taken from 11:59 a.m. to 12:06 p.m.; parties**

6   **present)**

7           **THE COURT:**  All right.  One again counsel --

8           (To Clerk):  And Karlen, am I unmuted?  Thank you so

9   much.

10          Counsel, if you can see and hear me, just raise your

11  hand if you'd be so kind.  Thank you very much.

12          Mr. Pleven, back to that last question you were

13  trying to get an answer for and I'll repeat it.  That you

14  appeared to say that no clinical law professor at Chapman has

15  or have reasonable expectations of privacy in their emails to

16  clients.  My question was, has Chapman moved all of its

17  clinical law professors onto non-Chapman email accounts for

18  their client communications?

19          **MR. PLEVIN:**  Thank you, Your Honor.  Yeah, the

20  information I got back from the law school administration is

21  that there is no separate messaging system for clinic clients

22  but the university authorizes clinics and authorizes professors

23  to represent clinic clients.  And the law school's

24  understanding is that there would be a reasonable expectation

25  of privacy in authorized privileged communications with clinic

1    clients on Chapman's system.  Of course, the former president

2    was not a clinic client, nor could he have been, and what

3    Professor Eastman was doing was not clinic work, it was outside

4    work which was not authorized and he was told so.

5           THE COURT:  And as we begin our summation, do you

6    have any summation that you would like to make on behalf of

7    Chapman, Mr. Plevin?

8           MR. PLEVIN:  No, thank you, Your Honor.  I have said

9    all I need to say unless there's a question for me.

10          THE COURT:  Then let me turn to Mr. Burnham on behalf

11   of Mr. Eastman.  And counsel, you can summarize in any area or

12   all areas if you'd like to, you can even repeat your prior

13   arguments.

14          MR. BURNHAM:  Thank you, Your Honor.  I'll respond

15   specifically to some points that were raised by the parties

16   after my opening argument and I'll pick up there where

17   Mr. Plevin left off with the Chapman issue.

18          Not -- our fundamental position remains as stated in

19   the opening statement that a violation of Chapman email

20   policies by no means -- even a flagrant violation, let's say --

21   by no means equates to a waiver of attorney client or work-

22   product privilege because as we've argued before, the client is

23   the holder of that privilege.

24          Having said that, we don't think that Chapman's case,

25   even if there was a violation, holds up.

1          We absolutely don't accept the distinction that

2     representation of a political candidate violates IRS rules for

3     universities.   There's been no support offered for that,

4     professors do that all the time from Harvard law school -- a

5     number of examples I could offer the Court.

6          We recognize absolutely no distinction between the

7     representation of Former President Bush in 2000, which was

8     celebrated by Chapman University on Dr. Eastman's behalf, and

9     the representation of Former President Trump in 2016; the only

10    difference perhaps being the 20 -- I'm sorry -- 2020; the only

11    difference perhaps being that the 2020 representation unleashed

12    a torrent of bad publicity for Chapman in a way that the

13    representation of President Bush in 2000 did not.

14         We also disagree with the position that the

15    representation of President Trump outside the legal clinic,

16    though it was, was unauthorized by the university.   Counsel for

17    Chapman has not engaged with or explicitly denied the

18    representations in the Declaration from Dr. Eastman in our

19    initial brief recounting a sort of arrangement he arrived at

20    with hen being where the name Chapman University would be taken

21    off the briefs filed on behalf of the president -- I'm sorry --

22    the "care of Chapman university" language that had theretofore

23    been used would be taken off but the Chapman address itself

24    would remain.   So that's unrefuted and so it's not credible to

25    suggest that somewhere down the road, after the bad publicity

 1    began to unroll, that Chapman can claim they had no idea this

 2    was going on and it was completely unauthorized.  The evidence

 3    doesn't support that at all.

 4          Next, I do want to clarify an argument we heard from

 5    the Congressional Defendants now about the substantial-need

 6    argument and this is the argument that has to deal with Rule

 7    26's substantial-need argument.

 8          Counsel for the Congressional Defendants responded to

 9    that argument effectively by arguing to the Court that well the

10    Committee never engages in litigation and I think that's really

11    the whole point here, right?  That's my argument as well is the

12    Committee is not seeking these materials for litigation.  The

13    Committee's seeking this material to complete its

14    investigation, to -- and presumably at some point through

15    legislation.

16          Whereas Federal Rule 26 of Civil Procedure and the

17    cases interpreting it, including those cited by the Defendants,

18    specifically speak in terms of substantial need for materials

19    to prepare the case in court, defenses' claims and so on which

20    is the Congressional Defendants are not even making an attempt

21    to make that showing.  In fact they've effectively I think

22    conceded the opposite.

23          Now, again, going to arguments from the Defendants,

24    Mr. Letter made a number of statements to the effect that I

25    conceded the crime-fraud review was appropriate and so the

1    issue is done.  Let me clarify that position.

2         I did make perhaps the rhetorical point -- which I

3    stand by -- that Dr. Eastman and I have no fear whatsoever of a

4    crime-fraud review of these materials.  That's not something

5    that fills us with dread.

6         However, what's important is that Your Honor not make

7    a finding, in writing -- which will have all sorts of

8    repercussions in the media, in history, and so on -- that the

9    Defendants have met their burden to allow such a crime-fraud

10   review.  That's an entirely different question from whether we

11   have any particular fear of the results of such a review.  And

12   our position remains very much for the reasons stated and for

13   some other reasons I'll get to in a moment that the Defendants

14   have not met that burden and Your Honor's ultimate ruling on

15   this case ought to reflect that for many, many reasons.

16        One brief clarification here.

17        In response to my arguments, Mr. Letter -- and I've

18   made the point -- responding to my argument that all of the

19   various theories for crime fraud require criminal intent, the

20   response from the Defendants was, well common-law fraud is a

21   civil offense so that doesn't -- that's not the same.

22   Common-law fraud, civil though it certainly is, does require

23   proof of a knowing misrepresentation of fact which is if it's

24   not exactly the same, it's substantially the same as the mens

25   rea for all sorts of frauds, criminal fraud statutes on the

1    federal books, including the two that the Defendants explicitly

2    rely on.  So all of the argument surrounding mens rea apply

3    substantially the same way to all three of the theories for

4    crime fraud.

5            There's been -- I think there's been repeated

6    references from the Defendants to Dr. Eastman's efforts to

7    overturn the election.  We heard that several times, "Overturn

8    the election, overturn the election."  And Your Honor actually

9    had some questions to engage with his particular legal theories

10   as well and we want to respond to those, making clear that Your

11   Honor is not tasked with deciding whether those theories are

12   correct or incorrect, but merely what relevance they have, if

13   any, to the crime-fraud inquiry or anything else so I want to

14   make very clear what the legal theories were.

15           One was with respect to the Electoral Count Act, as

16   I've already said, there are arguments there that became

17   relevant about whether that Act is unconstitutional.  I don't

18   want to go into a deep dive on that but the two main issues, as

19   I understand them, is whether the electoral count itself

20   supersedes the grant of authority to the vice president from

21   the 12th Amendment; and two, whether the electoral count

22   presents a problem of one Congress binding another.  Each

23   Congress is supposed to be able to make its own rules and

24   there's a view that the Electoral Count Act represents one

25   Congress attempting to bind subsequent ones.  And so those are

1   some of the issues involved in the Electoral Count Act.

2           Now, secondly, I'll address briefly the question of

3   if indeed the Electoral Count Act is unconstitutional, where

4   does that leave us?  Right?  What legal analysis remains to be

5   done at that point.  And that concerns specifically the

6   12th Amendment and what's the significance of it?

7           And the way I conceptualized Dr. Eastman's opinions

8   as embodied in the memos, the various public statements is,

9   let's assume there was absolutely overwhelming case for fraud,

10  video evidence from all 50 states that nobody could dispute.

11  The question then becomes, is the vice president totally

12  powerless to take any action at all other than counting what's

13  directly in front of him?  And so as the attorney for the

14  president, Dr. Eastman is tasked with answering the question,

15  is there an argument; and if so, what might that argument be

16  for whether the vice president could take any action and much

17  of the evidence we've seen involved Dr. Eastman's answers to

18  that question.

19          Again, Your Honor is not tasked with deciding those

20  questions.  They're controversial certainly.  We don't run away

21  from that, although they're no more controversial than any of

22  the other legal theories that happen to have arisen every four

23  years or so during presidential election season.  There's not a

24  lot of Supreme Court precedent on this.  In 2000 we had various

25  legislatures, some of which are still in Congress saying

82

1    Al Gore could reject the votes.  That happened, it was

2    rejected.  In 2016, we had various extremely high profile law

3    professors arguing -- and we cite this in our brief -- that

4    electors could just change their mind.  Even if I was elected

5    for Donald Trump, I could vote for Hilary Clinton and vice

6    versa.  This is a very controversial argument that was advanced

7    in 2016.  All of that to say, these sorts of

8    outside-the-envelope legal arguments tend to crop up every four

9    years and the situation Your Honor is presented with is

10   certainly no different than anything we've seen before in

11   history.

12          Finally, shifting gears here a little bit.

13          Your Honor asked a number of questions and I think

14   justifiably so surrounding the question of whether proceedings

15   before the electoral college went in anticipation of

16   litigation.  And I really think the best -- perhaps the best

17   evidence of that, to the extent it's not obvious, is the

18   Defendants' own evidence of the email exchanges between

19   Dr. Eastman and counsel for the vice president where the whole

20   discussion surrounded what would the Supreme Court think of

21   this if it ever were to go there?  That was sort of the

22   underlying question of all of it because it was obvious to

23   everybody involved that frankly there was probably already a

24   lawsuit typed up, ready to go if the vice president did

25   something that other people thought was illegal, and all that

1   would have had to have happened is they press SEND and there

2   would be a court case.  I'd be shocked if that wasn't the case

3   and this is all just based on common sense.

4          And in that connection, one clarification is it's

5   been represented repeatedly by the Defendants that Dr. Eastman

6   admitted that his views would lose nine to zero in the Supreme

7   Court.  Even if that were true, it doesn't mean he couldn't

8   argue them.  I argue things all the time I expect to lose on

9   but the fact is, even taking Mr. Jacob's testimony on its face,

10  that statement was made with respect to the prospect, as

11  Mr. Short alleged it, of the vice president simply declaring

12  President Trump the winner right there and then on the floor of

13  Congress.

14          When it came to the advice that was actually given to

15  the vice president, according to publicly available sources --

16  which was just to delay it and figure out what the issues of

17  the states were -- there's evidence submitted by the Defendants

18  in the form of emails from Dr. Eastman saying he did think that

19  proposal did have a chance in the courts so that clarification

20  is important.

21          Finally, finally I'll end with this.

22          Your Honor has asked the question -- it's a fair

23  question certainly, well where is all the evidence from

24  Dr. Eastman in response to the crime fraud?  Fair enough.  And

25  I gave somewhat of an answer to Your Honor before and I'll add

84

1    on to it now.  And I'll start with our motion requesting

2    exculpatory information.

3           I hoped I had made this clear in the filing itself

4    but if I didn't -- which some people seem to think I didn't --

5    I'll make it clear.

6           We are not contending that Brady versus Maryland

7    applies as a matter of law to a civil case.  No question about

8    that.  Our request was based specifically on not one but two

9    statements from the Defendants, in writing -- that anyone can

10   refer to to this day -- specifically offering to Your Honor to

11   provide any information that would be helpful in deciding this

12   case.  And so our argument was not that this was a criminal

13   case, obviously it's not, our argument was simply that in light

14   of those offers from the Defendants, Your Honor would be helped

15   by seeing not only the evidence that happens to support the

16   argument the Defendants are making now, but the evidence that

17   is on the other side which only the Defendants are in

18   possession of.  That's all in their possession.  They've been

19   investigating this for a year, they have deposed all the

20   relevant people.  We had no power ourselves or opportunity to

21   do that; moreover, we know the evidence exists.  The

22   Defendants' filings themselves talk about advisors to the

23   president, arguing in favor that there were problems with the

24   election that needed to be addressed.

25           We have the attorney general on TV just two days ago

1  saying that people were doing the same thing in a very

2  persuasive manner.  All of this is highly relevant evidence

3  that the Defendants don't deny exists.  In their filing they

4  had an opportunity to say there is no exculpatory evidence;

5  they didn't say that.  We thought it would be helpful to Your

6  Honor.  The Defendants didn't choose to take us up on our

7  offer, that's fine.  There's more than enough -- there's more

8  than enough evidence in the record I think for Your Honor to

9  decide this issue completely.  At least as to the crime fraud,

10 the standard is preponderance.  We don't even have all the

11 evidence so the question, strictly speaking, isn't before Your

12 Honor.  But as to that issue and any others, we submit we've

13 made more than enough case for Your Honor to rule in our favor

14 and sustain the privilege and work-product invocations.

15         Thank you.

16         **THE COURT:**  Mr. Burnham, do you need to consult with

17 Dr. Eastman before I turn to the Committee, or are you

18 satisfied and is Dr. Eastman satisfied with your argument and

19 your summation?

20         **MR. BURNHAM:**  I think we're okay, Your Honor.

21         **THE COURT:**  Okay.  Let me turn to the Committee and

22 Mr. Letter.

23         **MR. LETTER:**  Thank you, Your Honor, I'll try to be as

24 brief as possible.  I have to say that I continue to be

25 amazingly impressed with your patience.

86

```
 1          First, I feel it's essential that I say unequivocally
 2   the following:
 3          That neither the Constitution nor the Electoral Count
 4   Act provides any authority for the vice president to
 5   unilaterally reject any votes submitted by the states.  So I
 6   wanted to get that on the record.
 7          The -- Mr. Burnham just now was talking about the
 8   Federal Rules of Civil Procedure.  This just ties in with the
 9   point that I was making before which is this is a legislative
10   subpoena, this is not a litigation subpoena.  And so what
11   Mr. Burnham is saying that:
12          "Well, gosh, the Federal Rules of Civil Procedure
13          don't say anything about goals in legislation."
14          Sorry but my reaction is:
15          "Well, duh, 'cause the Federal Rules of Civil
16          Procedure have nothing to do with legislation or
17          legislative subpoenas,"
18   then also brings in the DC Circuit's opinion in In Re Lindsey
19   that we discussed in our brief, that's 158 F.3d 1263.
20          At page 1277 of that opinion, the DC Circuit is
21   looking at argument about whether there can be attorney-client
22   privilege when matters being discussed go to impeachment, which
23   is fundamentally a political exercise is what the DC Circuit
24   says.  And the DC Circuit points out that sure, an impeachment
25   could lead to litigation and as we know, for instance, Judge
```

1    Walter Nixon it did lead to litigation ultimately decided by

2    the Supreme Court, but the point is that that was a political -

3    - the DC Circuit makes clear it's a political context and

4    that's why the question about whether there is legal advice

5    being given in anticipation of litigation doesn't apply.  And

6    clearly here we're not dealing with impeachment but we're

7    dealing with legislative things entirely.  That's what this is

8    about.  It was about what was going on.  The kind of advice

9    that Dr. Eastman was giving was all -- was about legislative

10   activities, political activities.  And then this litigation is

11   about to this Court the stepping in to stop Chapman University

12   from complying with a legislative subpoena that is essential to

13   the preservation of democracy in the United States against the

14   attacks on it that went on.

15           What I did want to do then is say, Your Honor, we --

16   several arguments have been made in the briefs and today.  What

17   we urge you to do is, I think the best is, as I did, to start

18   with the Chapman University point because we think that's the

19   most straightforward.

20           We urge, if the Court would, to issue alternative

21   rulings because as we've said the -- we feel quite strongly

22   that the subject-matter waiver point is a key one.  Dr. Eastman

23   out there on social media talking about a variety of subjects

24   and saying that he had been authorized by his client to do

25   that, looking at a totality of the circumstances, certainly

1    doesn't look like the kind of situation when Dr. Eastman can

2    then say, Oh, yeah, yeah, yeah, I did all of that in public but

3    you know what?  Now I'm going to now dash back behind the

4    shield of attorney client and try to deprive the January 6th

5    Committee of information on which it has an immense need.  And

6    then, if appropriate, at that point Your Honor could

7    alternatively also reach crime fraud.  But as I say, we think

8    the first two are the easiest ways to resolve this

9    alternatively.

10          Now, this gets us to the burden which is the key.

11   And by the way I'll just note that as an aside, although I've

12   never been in private practice, I think all the controversy

13   here is part of the reason why lawyers have retainer agreements

14   and -- because they recognize that this is not the appropriate

15   way to do business, especially if you have to establish that

16   the attorney-client relationship governs.

17          So and I've said it a number of times but it bears

18   repeating, it's Dr. Eastman's burden to establish the evidence

19   necessary for this Court to enjoin Chapman University from

20   complying with a lawful congressional subpoena and every step

21   of the way he's failed to do that.  He provided minimal

22   evidence of attorney-client relationship with President Trump,

23   who the relationship covered, when it was effective, and what

24   issues it covered.  He's claimed work-product protection over

25   dozens or hundreds of people without providing any evidence

1   that they had an agency relationship with him or an

2   attorney-client relationship with President Trump; and finally,

3   Dr. Eastman's privilege logs are so minimal, they provide

4   almost no information about their content, much less meeting

5   the elements of attorney client or work-product privilege.

6           Once again, Your Honor, we thank you for your

7   patience and willingness to listen.

8           **THE COURT:**  Mr. Letter, the same courtesy.  Would you

9   like to consult with your trial team and make certain you've

10  covered all the arguments you'd like to cover?

11          **MR. LETTER:**  Thank you, Your Honor, I will do that,

12  I'll do it very fast.

13      **(Pause)**

14          I've got a satisfied group here, Your Honor.

15          **THE COURT:**  Mr. Burnham, your concluding argument

16  please?

17          **MR. BURNHAM:**  Nothing further, Your Honor.

18          **THE COURT:**  I want to thank all of you for your

19  courtesy, wish all of you the best of health.  Thank you very

20  much.  These proceedings are concluded.

21      **(Proceeding adjourned at 12:30 p.m.)**

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    <u>March 11, 2022</u>

              Signed                                         Dated


                    *TONI HUDSON, TRANSCRIBER*