

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

**Robert A. Heghmann**,
*Intervening Plaintiff*,

vs.                                                     Case No. 8:22-cv-099-DOC-DFM

**Pamela Harris**,
Vice President of the United States,
*Defendant*

and                                                    **Motion to Intervene**

**JOHN C. EASTMAN**
*Plaintiff*,                                          Date: March 21, 2022

vs.

**BENNIE G. THOMPSON**, *et al.*,
*Defendants*.

### INTERVENING PLAINTIFF'S MOTION TO INTERVENE

Since Vice President Biden took the Oath of Office as President of the United

States, the Intervening Plaintiff (hereinafter "Plaintiff") has been preparing to file an

action in federal court against Vice President Harris demanding that she inform the

Speaker of the House and Members of the Senate that the Electoral College election

held on December 14, 2020 was unconstitutional and that the House and Senate

would have to determine the winners of the Presidential Election of 2020. However,

after reading the <u>Congressional Defendants' Brief in Opposition to Plaintiff's</u>

<u>Privilege Assertions</u> dated March 8, 2022 in this ourt, the Plaintiff reconsidered and

decided in the interest of justice and conserving limited judicial capital to present his arguments to this Court in this proceeding. Frankly, the Plaintiff would sooner file an original action in federal court in Texas, however, as an officer of the court he believes in fairness to this Court that his arguments should be offered here in the first instance. If this court has no interest, please move *sua sponte* A.S.A.P. to deny the motion so that the Plaintiff can file his action in Texas expeditiously.

While this proceeding remained a dispute over privileged documents, the Plaintiff had no interest in this action. However, in the March 8th Brief the Defendants radically expanded the scope of this proceeding. It is clear that the Defendants intend to use this action to pursue a criminal proceeding against President Trump in an effort to make sure he cannot run for office in 2024. For example, the Brief raises the following arguments:

### Obstruction of an Official Proceeding

The evidence detailed above provides, at minimum, a good-faith basis for concluding that President Trump has violated section 18 U.S.C. § 1512(c)(2). The elements of the offense under 1512(c)(2) are: (1) the defendant obstructed, influenced or impeded, *or attempted* to obstruct, influence or impede, (2) an official proceeding of the United States, and (3) that the defendant did so corruptly. *Id.* (emphasis added). To date, six judges from the United States District Court for the District of Columbia have addressed the applicability of section 1512(c) to defendants criminally charged in connection with the January 6th attack on the Capitol. Each has concluded that Congress's proceeding to count the electoral votes on January 6th was an "official proceeding" for purposes of this section, and each has refused to dismiss charges against defendants under that section.

...

**Conspiracy to Defraud the United States**

The Select Committee also has a good-faith basis for concluding that the President and members of his Campaign engaged in a criminal conspiracy to defraud the United States in violation of 18 U.S.C. § 371.

The expansion if these proceedings brings the Defendants and the Plaintiff in direct opposition and whether in this proceeding or in Texas the Plaintiff is confident he will prevail. He would sooner do this here to save this Court time and effort.

The fatal flaw in the Defendants' legal argument is set forth in the following section of their Brief.

> When the Electoral College met on December 14, 2020, and confirmed the certified results of the election, the results of the election should have been final. …The *text* of the Twelfth Amendment to the Constitution clearly describes Congress's obligation to count certified electoral votes: "The President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted; the person having the greatest Number of votes for President, shall be the President." U.S. Const., amend. XII. *Nothing in the Constitution permits Congress or the presiding officer (the President of the Senate, Michael R. Pence) to refuse to count certified electoral votes in this context* (emphasis added)

Based solely upon the *text* of the Constitution, this argument seems to have an appeal. However, there are eight modalities of constitutional interpretation of which the textual is only one. Two of the other modalities are historical and structural. It is when the text is read within its structure against the historical back ground for the text that the argument put forward by the Defendants collapses.

On November 30, 2020. I submitted a legal opinion to President Trump through his personal counsel, Jay Sekulow, by hand delivery to the office of Attorney Sekulow at Regent University in Virginia Beach, VA. A copy of that opinion is attached as Exhibit 1. In that opinion I set forth the basis for my argument that the Electoral College election was unconstitutional.

> "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State *may be entitled in the Congress*." (emphasis added). Article II, Sec. 1 of the U.S. Constitution. This requirement was unchanged by the 12th Amendment. If States appointed a Number of Electors in excess of the whole number of Representatives to which the States *may be entitled*, the Electoral College is in violation of the Constitution and any election of the Electoral College is void in which case the election of the President goes to the House of Representatives under the 12th Amendment.

The election in the Electoral College was unconstitutional because the Blue States presented a Number of Electors in excess of the whole number of Representatives to which the States were entitled. I base this position on a 2004, Three Judge Panel decision in *Horsey v. Bysiewicz*, 3:99-cv-2250 (D. Conn. 1999). a copy of which is attached to the Intervening Plaintiff's Complaint. The Panel in *Horsey* decided that if the delta between the number of foreign-born, non-citizens in the congressional district with the most foreign-born, non-citizens and the congressional district with the least number meets or exceeds 10%, the congressional districts had to be re-apportioned in order to meet the One Person, One Vote mandate. While in 2004 in Connecticut that delta was 6%, since then due to

immigration both legal and illegal, many congressional districts in 8 to 10 Blue States violate what I call the *Horsey* Rule, including the states of Virginia and New York.

The Defendants cannot dispute that by creating congressional districts in the Blue States containing over whelming numbers of foreign-born, non-citizens, they have congressional districts and Electoral College votes in excess of what is justified by their citizen population. In *State of New York v. Trump*, 1:20-cv-05770 (S.D.N.Y. 2020), the case in which the Blue States lead by New York successfully challenged President Trump's <u>Memorandum on Excluding Illegal Aliens from the Apportionment Base following the 2020 Census</u>, the Blue States in their complaint admitted the impact unrestricted inclusion of Illegal Aliens in the apportionment base had upon the number of congressional districts the Blue States received.

113. Defendants' decision and actions to exclude undocumented immigrants from the apportionment base harm Plaintiffs' sovereign, quasi-sovereign, economic, and proprietary interests because they will cause some Plaintiffs to lose congressional seats *and decrease their share of presidential electors in the Electoral College;* skew the division of electoral districts within Plaintiffs' jurisdictions by impairing state and local redistricting efforts that rely on the census count; reduce federal funds to Plaintiffs' jurisdictions by deterring immigrants from responding to the decennial census that is currently underway; and degrade the quality of census data that Plaintiffs rely on to perform critical governmental functions. Emphasis added)

114. First, excluding undocumented immigrants from the apportionment count will likely cause several States to lose one or more Representatives in Congress, directly harming those Plaintiff States, as well as those Plaintiff counties

and cities within affected States, by diluting their political power and undermining their interest in fair congressional representation.

115. For example, large numbers of undocumented immigrants reside in California, Texas, New York, New Jersey, and Illinois. Defendants' decision to exclude undocumented immigrants from the apportionment count is likely to directly reduce representation for those jurisdictions in Congress, injuring the representational interests of Plaintiffs the State of New York, State of New Jersey, State of Illinois, City of Chicago, City of New York, City and County of San Francisco, Cameron County, El Paso County, Hidalgo County, and Monterey County. Other Plaintiffs may also suffer direct representational harms if undocumented individuals are excluded from the apportionment count. Complaint, *New York v. Trump*, supra. Dkt. 1

While not as great an impact as excluding illegal aliens completely, compliance with the *Horsey* Rule would have a significant impact upon the number of congressional districts in the Blue States. The reason for this is that in order to meet the *Horsey* Rule, urban congressional districts would have to be expanded geographically into suburban and perhaps rural areas in order to reduce the percentage of foreign-born, non-citizens. With geographical expansion of urban districts, the Blue States would not be able to create as many congressional districts within state borders as currently exist. The reduction of state congressional districts would be reflected in the reduction of Electors in the Electoral College. That is why an argument could validly be made that the Electoral College as currently comprised violates the Constitution as the Blue States would have more Electors than they are entitled to.

The Defendants in their Brief point out:

President Trump repeatedly attempted to instruct, direct, or pressure the Vice President, in his capacity as President as of the Senate, to refuse to count the votes from six States. For example, on January 4, 2021, President Trump … met with Vice President Pence and his staff. In that meeting, according to one participant, Plaintiff tried to persuade the Vice President to take action on the electors.

The pressure continued on January 6. At 1:00 a.m., President Trump tweeted, "If Vice President @Mike_Pence comes through for us, we will win the Presidency . . . Mike can send it back!" At 8:17 a.m., the President tweeted, "States want to correct their votes . . . All Mike Pence has to do is send them back to the States, AND WE WIN. Do it Mike, this is a time for extreme courage!" 12-15

The Defendants seem intent on arguing that this constitutes obstruction of an official proceeding and a conspiracy to defraud the United States, both criminal acts which if proved would prevent President Trump from running for re-election in 2014, the real purpose of the Defendants. But what if the President was convinced by Plaintiff's Opinion and other evidence that the vote of the Electoral College was unconstitutional?

Article II, Section 3 of the Constitution requires the President to "take Care that the Laws be faithfully executed." This clause, known as the Take Care Clause, requires the President to enforce all constitutionally valid Acts of Congress, regardless of his own Administration's view of their wisdom or policy. Under Article II of the Constitution and relevant Supreme Court precedents, the President must follow statutory mandates so long as there is appropriated money available and *the President has no constitutional objection to the statute*. So, too, the President

must abide by statutory prohibitions unless the President has a constitutional objection to the prohibition. *If the President has a constitutional objection to a statutory mandate or prohibition, the President may decline to follow the law* <u>*unless*</u> <u>*and*</u> <u>*until a final Court order dictates otherwise.*</u>

If the President was convinced by the Plaintiff's Opinion that the election in the Electoral College was unconstitutional, his Oath demanded that he decline to abide by the Electoral College election and order the Vice President to refuse to count the voted and instead send the election of the President and Vice President to the House and Senate respectively. What should have happened is this. The President ordered the Vice President not to count the votes. The Vice President should have obeyed and informed the Speaker of the House that, by order of the President, the Electoral College election was void. The next day the Speaker of the House would have filed a federal law suit in the U.S. District Court for the District of Columbia. The District Court would have immediately found for the Speaker thereby sending the case to the Supreme Court for resolution. I firmly believe my Opinion would have garnered five votes on the Supreme Court and the President's actions would have been sustained.

This did not happen because the Vice President violated the Constitution. This is how the Defendants described what happened in their Brief.

Nothing in the Twelfth Amendment or the Electoral Count Act provides a basis for the presiding officer of the Senate to unilaterally refuse to count

electoral votes—for any reason. Any such effort by the presiding officer would violate the law. This is exactly what the Vice President's counsel explained at length to Plaintiff and President Trump before January 6. *...And the Vice President made this crystal clear in writing on January 6: any attempt by the Vice President to take the course of action the President insisted he take would have been illegal.* (emphasis added)P. 15

The Defendants in their Brief fail to cite where in the Constitution the Vice President is authorized to act as a check or veto on a President's decision under Article II, Sec. 3 not to enforce a law he or she considers unconstitutional. With all due respect to Vice President Pence, he had no such authority. As a result, the counting of the votes on January 6 was and is unconstitutional and therefore void.

## ARGUMENT I

### Intervention Should be allowed as a Matter of Right

1) *Plaintiff-Intervenor's Motion is Timely.*

The timeliness of an application for intervention is evaluated "in the context of all relevant circumstances," including: (1) the point to which the suit has progressed; (2) the purpose for which intervention is sought; (3) the length of time preceding the application during which the proposed intervenors knew or should have known of their interest in the case; (4) the prejudice to the original parties due to the proposed intervenors' failure to promptly intervene after they knew or reasonably should have known of their interest in the case; and (5) the existence of unusual circumstances

militating against or in favor of intervention. *Jansen v. City of Cincinnati*, 904 F.2d 336, 340 (6th Cir. 1990); see *United States v. City of Detroit*, 712 F.3d 925, 930-31 (6th Cir. 2013) (same). Here, the case is still at the earliest stage. The parties will not be prejudiced by the intervention.

### 2) *The Plaintiff-Intervenor Has a Substantial Legal Interest in the Subject Matter of This Case.*

Courts of Appeals around the country have subscribed to a "rather expansive notion of the interest sufficient to invoke intervention of right." *Grutter*, 188 F.3d at 398 (citation omitted); see also *Bradley v. Milliken*, 828 F.2d 1186, 1192 (6thCir. 1987) ("[I]nterest' is to be construed liberally."). No specific legal or equitable interest is required, *see Grutter*, 188 F.3d at 398, and even "close cases" should be "resolved in favor of recognizing an interest under Rule 24(a)," *Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1247 (6th Cir. 1997).

The interest of the Intervening Plaintiff could not be more substantial. The Corruption of the Election in the Electoral College completely dilutes his right to vote. The creation of congressional districts in violation of the One Person, One Vote mandate discriminates against suburban and rural votes and directly benefits urban voters. As a suburban voter in 2020 and a rural voter today, this unconstitutional

districting has diluted the Plaintiff's right to vote in 2020. The corruption of the election in the Electoral College adds to this dilution.

3) *Intervention in this Case is Necessary to Protect the Plaintiff – Intervenor's Interest*

Under the third intervention prong, "a would-be intervenor must show only that impairment of its substantial legal interest is possible if intervention is denied." Miller, 103 F.3d at 1247. "This burden is minimal," and can be satisfied if a determination in the action may result in "potential stare decisis effects." Id.; see also *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 900 (9th Cir. 2011) ("[I]ntervention of right does not require an absolute certainty that a party's interest will be impaired").

The issues raised in the Defendants' Brief further damages the Plaintiff's right to vote. Clearly, this case is now being used to prevent President Trump from running for president in 2024. In 2016 the Plaintiff was the Trump Campaign Coordinator in the Town of Wolfeboro, N.H. where he then resided. He has been and remains a Trump supporter and hopes to vote for him again in 2024. Since the filing of the Defendants' Brief, this action is a direct threat to the ability of President Trump to run again in 2024 and is therefore a direct threat to the Plaintiff's right to vote for the candidate of his choice in 2024.

4)*The Existing Parties Cannot Protect the Interest of the Plaintiff Intervenor.*

The Plaintiff - Intervenor carries a minimal burden to show that the existing parties to this litigation inadequately represent the United States' interests. *Jordan v. Mich. Conference of Teamsters Welfare Fund,* 207 F.3d 854, 863 (6th Cir. 2000). A potential intervenor "need not prove that the [existing parties'] representation will in fact be inadequate, but only that it 'may be' inadequate." Id. (citations omitted) (emphasis added); see also *Davis v. Lifetime Capital, Inc.,* 560 F. App'x 477, 495 (6th Cir. 2014) ("The proposed intervenor need show only that there is a potential for inadequate representation.") (citation omitted) (emphasis in original). The Plaintiff – Intervenor satisfies this burden.

The Plaintiff wrote the Opinion that President relied upon when he directed Vice President Pence not to count the votes in the Electoral College. The Plaintiff totally stands by that Opinion. No one can defend that Opinion or President Trump as well as the Plaintiff. I stand ready to prove the Opinion was and is absolutely correct and that the actions of President Trump were not only warranted but required by the Constitution. No one else can possibly fill in for the Plaintiff in this litigation.

For the foregoing reasons, the Plaintiff-Intervenor respectfully requests that the Court grant the Plaintiff – Intervenor's Motion to Intervene.

## CONCLUSION

The Plaintiff is well aware of this Court's decision in *Barnett v. Obama*, Docket # SAVC 09-0082 (2009). That case has no application here. The Plaintiff is not attempting to remove President Biden. He is attempting to prove that because the election in the Electoral College was unconstitutional, Vice President Biden never became President.

I believe given the intent expressed in the Defendants' Brief, my arguments belong here. If the Court disagrees, the Plaintiff will be pleased to flee the Ninth Circus and file an original action in Texas where he now resides.

The Intervening Plaintiff

Robert A. Heghmann

P.O. Box 2108

Leander, TX  78646

Bob_Heghmann@Reagan.com

(603) 866-3089

## CERTIFICATE OF CONFERENCE

I certify that, on or about March 9, 2022, I served via e-mail counsel for the Defendants and counsel for the Plaintiffs this Motion and asked them to respond stating whether the supported or opposed this Motion. Counsel for the Plaintiff took no position on the Motion to Intervene. Counsel for the Defendants did not respond.

## CERTIFICATE OF SERVICE

I certify that, on March 19, 2022, I mailed a copy of this Motion to the Court and caused service of this this Motion through the CM/ECF upon the Defendants, Plaintiffs and Interested Parties.

*Exhibit 4*

Robert A. Heghmann

P.O. Box 6342

Virginia Beach, VA 23456

Bob_Heghmann@Reagan.com

(603) 866-3089

November 30, 2020

Jay Sekulow, Esq.                                   By Hand

American Center for Law and Justice

1000 Regent University Drive

Virginia Beach, VA 23464

Re: President Donald J. Trump's path to a Second Term.

Dear Attorney Sekulow,

I realize this proposal is coming out of left field but I implore you for the sake of the Nation to read this letter and the attached Memo and Exhibits with an open mind. The research that led to this submission was driven by one simple truth, namely, that John Dickenson, Delegate from Delaware at the Federal Convention of 1787 and intellectual leader of the Small States, would not have accepted an Electoral College unless there was a check elsewhere in the Constitution to protect the Small States from corruption of the Electoral College election. My task was to

find that check and I believe I have. If so, this is how President Trump has a path the re-election this year. .

"Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State *may be entitled in the Congress.*" (emphasis added). Article II, Sec. 1 of the U.S. Constitution. This requirement was unchanged by the 12th Amendment. If States appointed a Number of Electors in excess of the whole number of Representatives to which the States *may be entitled*, the Electoral College is in violation of the Constitution and any election of the Electoral College is void in which case the election of the President goes to the House of Representatives under the 12th Amendment.

U.S. District Court Judge Arenda L. Wright Allen, a Barack Obama appointee to the U.S. District Court for the Eastern District of Virginia, by acting as an agent of the Democratic National Committee instead of a U.S. District Court Judge, caused Virginia and 6 to 8 other large "Blue" states, to have more Electors in the Electoral College than they were entitled to in the Congress. Therefore, Vice President Pence sitting as President of the Senate is mandated by his oath to Defend and Protect the Constitution to reject the vote of the Electoral College and inform the House of Representatives that the House must elect the winner of the 2020 presidential election.

2

In the election of 2020, the election of the House of Representatives was in
violation of the One Person, One Vote Mandate. I base this position on a 2004, Three
Judge Panel decision in *Horsey v. Bysiewicz*, 3:99-cv-2250 (D. Conn. 1999). a copy
of which is attached. The Panel in *Horsey* decided that if the delta between the
number of foreign-born, non-citizens in the congressional district with the most
foreign-born, non-citizens and the congressional district with the least number
exceeds 10%, the congressional districts had to be re-apportioned. While in 2004 in
Connecticut that delta was 6%, since then due to immigration both legal and illegal,
many congressional districts in 8 to 10 Blue States violate what I call the *Horsey*
Rule, including my home state of Virginia.

To test the *Horsey* Rule in Virginia, on February 28, 2020 I filed a complaint,
*Heghmann v. Trump*, in the Eastern District of Virginia, Dkt. #2:20-cv-159. A copy
of the Complaint is attached hereto. The case was based upon *Horsey* and the
historical record which I used to convince the Three-Judge Panel who decided the
*Horsey* case. Attached is a Legal Memo which I filed in the case supporting my
motion for Declaratory Judgment. As relief, I asked that the congressional districts
in Virginia and other states be declared unconstitutional under the One Man, One
Person Mandate and be ordered to re-apportion prior to the 2020 elections. The
Complaint requested a Three Judge Panel as required by federal law.

The Virginia case was assigned to District Court Judge Wright Allen, a True-Blue Obama appointee to the federal bench. She recognized the significance of the case and in order to protect the Democratic Party, she refused to request a Three-judge Panel which effectively froze the case in place. Without a Three-Judge Panel, no judgment would be legitimate and there could be no appeal to either the Supreme Court or the Fourth Circuit Court of Appeals. See *Igartua v. Obama*, 842 F.3d 149, 152 (1st Cir. 2016*), cert. denied sub. nom. Igartua v. Obama*, 138 S. Ct. 2649 (2018). My only recourse was to file a Petition for a Writ of Mandamus to the Supreme Court which I have done. See *Heghmann v, Trump*, U.S. Supreme Court Dkt. # 20-626. That Petition is now pending. In the interim, the Virginia case is dead in the water.

*The Horsey Impact on this year's Electoral College Election*

In *State of New York v. Trump*, 1:20-cv-05770 (S.D.N.Y. 2020), the case in which the Blue States lead by New York successfully challenged President Trump's Memorandum on Excluding Illegal Aliens from the Apportionment Base following the 2020 Census, the Blue States admitted the impact unrestricted inclusion of Illegal Aliens in the apportionment base had upon the number of congressional districts the Blue States received.

113. Defendants' decision and actions to exclude undocumented immigrants from the apportionment base harm Plaintiffs' sovereign, quasi-sovereign, economic,

4

and proprietary interests because they will cause some Plaintiffs to lose congressional seats and decrease their share of presidential electors in the Electoral College; skew the division of electoral districts within Plaintiffs' jurisdictions by impairing state and local redistricting efforts that rely on the census count; reduce federal funds to Plaintiffs' jurisdictions by deterring immigrants from responding to the decennial census that is currently underway; and degrade the quality of census data that Plaintiffs rely on to perform critical governmental functions.

114. First, excluding undocumented immigrants from the apportionment count will likely cause several States to lose one or more Representatives in Congress, directly harming those Plaintiff States, as well as those Plaintiff counties and cities within affected States, by diluting their political power and undermining their interest in fair congressional representation.

115. For example, large numbers of undocumented immigrants reside in California, Texas, New York, New Jersey, and Illinois.[15] Defendants' decision to exclude undocumented immigrants from the apportionment count is likely to directly reduce representation for those jurisdictions in Congress, injuring the representational interests of Plaintiffs the State of New York, State of New Jersey, State of Illinois, City of Chicago, City of New York, City and County of San Francisco, Cameron County, El Paso County, Hidalgo County, and Monterey County. Other Plaintiffs may also suffer direct representational harms if undocumented individuals are excluded from the apportionment count. Complaint, *New York v. Trump*, supra. Dkt. 1

While not as great an impact as excluding illegal aliens completely, compliance with the *Horsey* Rule would have a significant impact upon the number of congressional districts in the Blue States. The reason for this is that in order to meet the *Horsey* Rule, urban congressional districts would have to be expanded geographically into suburban and perhaps rural areas in order to reduce the percentage of foreign-born, non-citizens. With geographical expansion of urban districts, the Blue States would not be able to create as many congressional districts within state borders as currently exist. This is especially true if we argue the districts

must be compact and contiguous to meet the Freedom of Association requirements. The reduction of state congressional districts would be reflected in the reduction of Electors in the Electoral College.

That is why an argument could validly be made that the Electoral College as currently comprised violates the Constitution as the Blue States would have more Electors than they are entitled to. The President should be able to utilize the resources of the Census Bureau to prove this. I believe approximately 8-10 Blue States have Electors that they are not entitled to under Art. II, Sec. 1. This federal challenge was filed sufficiently in advance of the November elections to allow for re-apportionment prior to the 2020 elections. Judge Wright Allen refused to allow the challenge to go forward. As a result, the election of Members of Congress in 2020 violated the One Person, One Vote Mandate. More importantly, since the Electoral College mirrors the House of Representatives, the election of the President in the Electoral College would violate the One Person, One Vote Mandate and would therefore be void.

The pleadings in the *New York v. Trump* Complaint could be extremely pivotal should the President of the Senate choose to void the Electoral College results. Judicial Estopple could block any federal court challenge to Vice President Pence's decision.

The doctrine of **judicial estoppel** precludes a party from taking inconsistent positions in separate **judicial** proceedings. It is invoked to prevent a party from changing its position over the course of **judicial** proceedings when such positional changes have an adverse impact on the **judicial** process. The policies underlying preclusion of inconsistent positions are general considerations of the orderly administration of justice and regard for the dignity of **judicial** proceedings. **Judicial estoppel** is intended to protect against a litigant playing fast and loose with the courts. It seems patently wrong to allow a person to abuse the **judicial** process by first advocating one position, and later, if it becomes beneficial, to assert the opposite. *The Swain Group, Inc. v. Segal*, 183 Cal. App. 4th 831, 832 (2010)

Having taken the position that the loss of *unrestricted* inclusion of illegal aliens in the apportionment base would significantly reduce the number of congressional districts and Electors in the Electoral College, the argument could be made that the Blue States are now bared from asserting that a "restriction" on the inclusion of illegal aliens in the apportionment base would reduce the number of congressional districts and therefore the number of Electors in the Electoral College.

*Now or Never*

Knowing as much as I do about the Federal Convention of 1787, the distrust of the Small States for the Big Three and John Dickenson of Delaware, the intellectual leader of the Small States, I cannot accept the proposition that Dickenson did not anticipate the possible corruption in the Electoral College and install a check on that corruption in the election of a President. Attached is a Memo representing what I believe is the check Dickenson insisted on to prevent the corrupt election of

a President and how it came into existence. It is grounded squarely on the Records of the Federal Convention of 1787 (which I have read twice) and correspondence of the Delegates in Vol. 4 of Farrand's work.

Vice President Pence sitting as President of the Senate must reject the results of the Electoral College election as unconstitutional and send a message to the House that the winner of the Presidential election be decided in the House of Representatives in a vote of the 50 States. If Vice President Pence does not rely on this check, declare the election by the Electoral College void, the critically important check insisted upon by John Dickenson will be waived and lost forever.

If nothing else, this action will halt the Electoral College election and announcement of the winner by the House. That will prevent the Defendant States in the various pending law suits from running out the clock on December 18th which they are undoubtedly planning. This action is bold, unanticipated and has a high potential for success in the Supreme Court. I urge you to present this argument to your client, President Trump. I live in Virginia Beach and would welcome an opportunity to defend my thesis in person.

Respectfully,


Robert A. Heghmann