

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

**Robert A. Heghmann**,
    *Intervening Plaintiff,*

vs.

**Pamela Harris,**
    Vice President of the United States,
        *Defendant*

and

**JOHN C. EASTMAN**
    *Plaintiff,*

vs.

**BENNIE G. THOMPSON**, *et al.*,
    *Defendants.*

Case No. 8:22-cv-099-DOC-DFM

**Complaint**

Date: March 21, 2022

Three Judge Panel Required

### INTERVENING PLAINTIFF'S COMPLAINT

1. "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State *may be entitled in the Congress.*" (emphasis added). Article II, Sec. 1 of the U.S. Constitution. This requirement was unchanged by the 12th Amendment. If States appointed a Number of Electors in excess of the whole number of Representatives to which the States *may be entitled*, the Electoral College is in violation of the Constitution and any election of the Electoral College is void in

1

which case the election of the President goes to the House of Representatives under the 12th Amendment.

2. The Plaintiff in this case will challenge the apportionment of Congressional Districts in Virginia, New York and other states based solely on population without regard to citizen population characteristics. Therefore, a Three Judge Panel is required under 28 U.S.C. 2284 (a). Under the Supreme Court ruling in *Baker v. Carr*, 369 U.S. 186 (1962), the Plaintiff has standing under Art. III, Sec. 2.

3. This action is brought by the Plaintiff pursuant to the United States Constitution including, but not limited to Article II, Sec.1, Amendments 14 and 15 of the Constitution, and the Declaratory Judgment Act, 28 U.S.C. Secs. 2201 and 2202. This Court has Subject Matter Jurisdiction under 28 U.S.C. Secs. 1331 and 1343 (3).

4. Since 1965, Democrats have used Open Borders to attract foreign born, non-citizens to create congressional districts in violation of the One Man, One Vote Mandate in Blue States. These are congressional districts to which the Blue States are not entitled. The result of this use of Immigration as a political tool was clearly visible in Virginia in 2018. As the New York Times, which along with the Washington Post is the

newspaper of record for the Democratic Party, reported new immigrants

handed Virginia in the congressional elections to Democrats.

> Around the advent of the modern immigration system, in 1965, foreign-born people made up only about five percent of the American population. Now they are nearly 14 percent, almost as high as the last peak in the early 20th century. The concentrations used to be in larger gateway cities, but immigrants have spread out considerably since then.
>
> Some went South. In 1980, 56 percent of adults eligible to vote in Virginia were born in the state. Today, that's down to 45 percent. Sabrina Tavernise and Robert Gebeloff, *How Voters Turned Virginia From Deep Red to Solid Blue*, N.Y. Times, 11/09/2019.

5. Whether the mass immigration of the past 10 years has been good or bad

for the United States can be hotly debated but what is beyond debate is

that it has been good for the Democratic Party.

> Mass legal immigration is driving Democrats towards full electoral dominance, with left-wing politicians winning nearly 90 percent of congressional districts with larger than average foreign-born populations, analysis finds.
>
> *The Atlantic* senior editor Ronald Brownstein analyzed Census Bureau statistics for the 2018 midterm elections, finding that the country's admission of more than a million legal immigrants every year is set to hand over electoral dominance to House and Senate Democrats.
>
> Among Brownstein's findings is that nearly 90 percent of House congressional districts with a foreign-born population above the national average were won by Democrats. This concludes that every congressional district with a foreign-born population exceeding 14 percent had a 90 percent chance of being controlled by Democrats

3

and only a ten percent chance of electing a Republican. Joe Klamar,
*Democrats Winning 90% Congressional Districts with Large
Foreign-Born Populations*, Breitbart, 02/07/2019

6. American Immigration Policy is being driven by the Democrat Party's
thirst for power, not necessarily what is best for the United States. Why
that is this Court's constitutional concern is that the Democrats are
pursuing this policy in violation of the "One Person, One Vote"
Constitutional Mandate.

7. Robert A. Heghmann resides in the State of Texas, County of Williamson.
As will be discussed below, prior to February of this year, the Plaintiff
resided in Virginia Beach, VA. The Plaintiff alleges that because of
apportionment of congressional districts in Virginia, New York and
throughout the United States based solely upon total population, without
regard to the citizen characteristics of the population, his vote and the
votes of other suburban and rural voters in the 2020 Presidential election
were debased and diluted in the election held in the Electoral College.

8. The Democratic Party's immigration policy caused New York, Virginia
and 6 to 8 other large "Blue" states, to have more congressional districts
and therefore more Electors in the Electoral College than they were
entitled to. Therefore, this Court should Order Vice President Pamala
Harris sitting as President of the Senate who is mandated by her oath to

Defend and Protect the Constitution to reject the vote of the Electoral College and inform the Speaker of the House of Representatives that the House must elect the winner of the 2020 presidential election.

9. Kamala Harris is the current Vice President of the United States. In that capacity she serves as President of the U.S. Senate. Her office is located at the White House, 1600 Pennsylvania Avenue, Washington D.C. 20500.

*The Horsey Rule*

10. Wade H. Horsey II is a citizen of the United States and resides in Avon, CT. In 1996 and 1998, Wade Horsey was a candidate in the Connecticut House of Representatives from the Town of Avon, a suburb of Hartford. In both elections Wade Horsey, an African American running as a Republican candidate, received in excess of 8,000 votes and lost.

11. After the 1998 loss, Wade Horsey reviewed the election results and realized that the Speaker of the Connecticut House of Representatives running as a Democrat in an urban voting district Hartford won with 1200 votes.

12. Further analysis revealed similar results. Republican candidates running in suburban and rural districts received thousands of votes and lost. Democrats running in urban voting district received hundreds of votes and won. Plaintiff Robert A. Heghmann, an attorney who served as Wade

Horsey's Federal Election Commission Compliance Officer for the
campaign, was asked if there might be a violation of the "One Man, One
Vote" Mandate. I advised Wade Horsey that I believed it was fair grounds
for litigation.

13. On November 18, 1999 a complaint was filed in the United States District
Court in Connecticut, *Wade H. Horsey v. Secretary of State*, #3:99-cv-
2250 and assigned to District Court Judge Underhill. As required a Three
Judge Panel was convened and Second Circuit Court of Appeals Judge
Ralph K. Winter and District Court Judge Hall joined the Panel.

14. The issue placed before the Court was as follows:

> Does apportionment of both state and congressional election districts
> based solely upon total population without regard for the percentage
> of citizens result in the effective impairment of suburban and rural
> votes cast in both statewide and congressional elections as those
> votes are debased and diluted thereby rendering the system of
> apportionment based solely upon total population without regard to
> citizen characteristics unconstitutional under the one person, one
> vote mandate?

15. The Secretary of State moved to Dismiss for failure to state a cause of
action. On June 1, 2001 the Three Judge panel denied the State's Motion
to Dismiss and later noted, "Because Horsey offers information regarding
the percentages of citizens and non-citizens in different states and certain
congressional districts, there may be some evidentiary support for his
claim that including non-citizens for apportionment purposes

6

substantially dilutes his vote." (citation to Record deleted) Horsey Slip Opinion at 11. A copy of that opinion is attached as Exhibit 1.

16. In the wake of the 2000 Census, the Census Bureau published detailed reports district by congressional district stating with 90% accuracy the number of non-citizens in each district thereby permitting the Plaintiff to factually demonstrate the potential constitutional violation. At the time of the 2000 Census, the Census Bureau announced that after the 2010 Census it would report state legislative district by state legislative district the number of non-citizens in each district but that information was not currently available. Therefore, the Plaintiff abandoned the claim with regard to state apportionment.

17. The Court then considered the Plaintiff's Offer of Proof and found, "The data reveal that the percentage of non-citizens in Connecticut's congressional districts varies from between 2.2 percent and 9.7 percent. However, this is within a generally accepted range of deviation from equality. See *Chen v. City of Houston*, 206 F.3d 502, 522 (5th Cir. 2000) (less than 10% deviation is constitutionally tolerated for state elections); *Garza v. County of Los Angeles*, 918 F.2d 763, 785 – 86 (9th Cir. 1990) (Kozinski, J., concurring in part, dissenting in part).

18. Thus, the rule in the District of Connecticut is that (1) if a plaintiff offers information regarding the percentages of citizens and non-citizens in different congressional districts, there is evidentiary support for his claim that including non-citizens for apportionment purposes substantially dilutes his vote and (2) that a 10% deviation is the red line in determining the generally accepted range of deviation from equality. In this case, the Plaintiff is asking the Court to adopt this rule and apply it to congressional voting districts in Virginia and New York.

*The Democratic Party's Reaction to Horsey*

19. The Democratic Party in Washington was well aware of the *Horsey* litigation. Gregory D'Oria, the Assistant Attorney General defending the case, advised me that when the Panel denied the State's Motion to Dismiss, his telephone (remember this was 2002) exploded. Every Democratic leader in Washington wanted updates on the litigation. As a result of the legal success of the *Horsey* litigation even though there was no remedy, when Barack Obama became President, he Ordered the Census Bureau to discontinue documenting the number of foreign-born non-citizens in congressional election districts and to abandon plans to document the number of foreign born, non-citizens in state legislative election districts. The Census Bureau continues to adhere to that Order.

20. The order of President Obama to the Census Bureau effectively made it impossible for a voter to impose the One Person, One Vote Mandate on the creation of Congressional districts in urban areas thereby permitting the Democrats to debase and dilute the votes of suburban and rural voters throughout the United States.

21. *The Earlier Virginia Litigation*

22. Although he Census Bureau no longer publishes the citizen percentage of congressional districts, parts of the Community Surveys it continues to publish continues to document the percentages of foreign-born citizens *and non-citizens* in each state and in counties and cities in each state. In Virginia, 12.1% of the population is foreign-born. Of these foreign -born persons, 51.1% are naturalized citizens while 48.9% of the foreign-born are non-citizens.

23. While the Census Bureau per President Obama's Order has not documented the percentage of foreign born who are naturalized citizens versus non-citizens in each congressional district as it did in 2004, we do know what counties comprise the 8th and 9th congressional districts in Virginia. I used county citizen/non-citizen statistics to calculate congressional district foreign-born citizen versus foreign-born non-citizen statistics.

9

24. According to the 2017-18 Census Department's Community Survey, the population in the 9th congressional district where the Plaintiff resided and voted, is 704,831. Of this the foreign-born population in the district is 15, 260 or 2.2% of the total population. By contrast the 8th congressional district has a population of 795, 467 of which 224,571 are foreign-born or 28.2% of the total population.

25. The 8th Congressional District comprises all of Arlington County, approximately half of Fairfax County and the City of Fairfax. Of Arlington County's 234,965 total population, 11.9% (27, 904) are foreign born non-citizens. Of Fairfax County's 1,148,433 total population, 14.4% (165, 387) are foreign born non-citizens. Of the City of Fairfax's 23,589 total population, 15.3% (3615) are non-citizens.

26. Combining Arlington County, half of Fairfax County and City of Fairfax, 14.4% of the population of the 8th Congressional District are foreign born non-citizens. Even assuming all of the foreign-born population in the 9th Congressional District, 2.2%, is non-citizen (which is not likely) the difference of 12.2% is outside the acceptable range to avoid violation of the One Person, One Vote Mandate.

*The Constitutional Violations in New York*

27. In New York City Immigrants make up 38% of the population. New York City contains 11 Congressional Voting Districts. Once again, the Census Bureau has not broken out the statistics on citizen versus non-citizen population in each congressional district but it has broken out the non-citizen statistics in each county. Three of the eleven congressional districts are contained in one county.

28. The sixth congressional district is contained entirely within the County of Queens. Out of a population of 2,278,722, the foreign-born population of Queens is 1,111,780. If these foreign-born, 482,104, or 21.2% of the total population, are non-citizens.

29. The ninth congressional district is entirely contained in Brooklyn. Of the 2,504,700 residents, 971,504 are foreign-born. Of these, 399,573, or 16% of the total population, are non-citizens.

30. The 15th congressional district is contained entirely in the Bronx. Of the 1,432,132 residents, 513,499 are foreign-born. Of the foreign-born, 264,531, or 18.5% of the total population, are non-citizens.

31. Compare these urban congressional districts with three suburban and rural New York congressional districts. The 21st congressional district has 701,112 residents of whom 26,295, or .03% of the total population, are

foreign born. The 22nd congressional district has 697,372 residents of whom 42,674, or .06% are foreign-born. The 23rd Congressional District has 693,764 residents of whom 27,591, or .04% of the total population, are foreign-born.

32. Even if all the foreign-born population in the 21st, 22nd and 23rd Congressional districts foreign born are non-citizens (which is not likely), the districts do not fall within the permissible 10% difference required by *Horsey*.

*Judicial Bias in the 4th Circuit and Virginia*

33. The extreme bias of the Democrat Appointees to the Fourth Circuit Court of Appeals and their willingness to jettison the U.S. Constitution to favor the Democrat Party and its political agenda has reached the point where the Minority Republican Appointees to the Fourth Circuit, clearly frustrated, are openly criticizing the undeniable bias of the Democrat Majority in a published opinion. *Compare* the Dissenting Opinion of Circuit Judge Wilkinson with the Concurring Opinion of Circuit Judge Wynn in *In re Donald J. Trump,* Fourth Circuit Doc. No. 18-2486. Or as Circuit Judge Wilkinson rhetorically asked in his Dissenting Opinion, "something other than law [is] afoot" here". *In re Donald J. Trump*, supra.

First Dissent at 22 This Democrat bias is also evident on the District Court
for the Eastern District of Virginia.

34. The Plaintiff attempted to raise the issues he first raised in the *Horsey*
litigation and now again raised herein in a complaint titled *Heghmann v,
Trump*, Case 2:20-cv-00159, was filed in the Eastern District of Virginia
on 3/26/2020. The Complaint clearly was challenging apportionment of
Congressional Districts in Virginia and New York. The Complaint
requested a Three-judge panel. Under 28 U.S.C. Sec. 2284 (b)(1), "Upon
the filing of a request for three judges, the judge to whom the request is
presented shall, unless he determines that three judges are not required,
*immediately* notify the chief judge of the circuit, who shall designate two
other judges, at least one of whom shall be a circuit judge." (emphasis
added) As the Supreme Court decided in *Shapiro v. McManus*, 136 S. Ct.
450 (2015), *immediate* notification is not discretionary.

35. In the Virginia case a decision for the Plaintiff could have an adverse
effect on the Democrat Party's chances of retaining control of the House
of Representatives in the 2020 elections and possibly even in winning the
Presidential Election. To avoid this, the Obama Appointed district court
judge simply refused to request the appointment a three-judge panel. This
effectively ended the case and the Plaintiff was effectively blocked by the

court from litigating the important issues raised in that litigation and this
case.

### *The Electoral College Election*

36. In order to make the urban congressional districts in Virginia, New York
and other Blue States comply with the One Person, One Vote Mandate
under the rationale of *Horsey*, those state will have to reduce the number
of congressional districts in each state. Virginia will lose one or two
congressional districts and New York will lose six to eight congressional
districts. That means they will also lose votes in the Electoral College.

37. As a result of President Obama's order to the Census Bureau not to
publish citizen statistics on each congressional district and the Virginia
District Court's refusal to reach the issues properly raised in the
Complaint, in the 2020 election in the Electoral College, Virginia, New
York and the other Blue States cast votes in excess of the number of
congressional districts they were entitled to.

38. If our Representative Democracy is to retain the confidence of The People
and survive, this Court must take a stand and defend the principle of One
Person, One Vote in congressional districting. If *Horsey* is good law (and
President Obama, a constitutional scholar apparently though so since he
ordered the Census Bureau to stop reporting the percentage of foreign-

born, non-citizens in congressional and state representative districts) then the 2020 congressional elections were in violation of the One Man, One Vote Mandate and, as a result, the Electoral College election was unconstitutional.

## Count I

39. The Plaintiff incorporates and re-states the allegations contained in paragraphs 1 through 38 as if fully set forth herein.

40. If *Horsey* is good law, the Electoral College Election in 2020 was and is unconstitutional.

Wherefore, the Plaintiff demands:

1. A Declaratory Judgment that the current apportionment of Congressional Districts based upon population without regard for citizen characteristics is unconstitutional;

2. This Court must direct the President of the Senate to advise the Speaker of the House that the Election in the Electoral College was unconstitutional and the House of Representatives must select the winner of the 2020 Presidential Election as provided by the 12th Amendment to the Constitution.

Robert A. Heghmann

P.O. B. 2108

Leander, TX 78646

Tel. 603-866-3089

Bob_Heghmnaa@Reagan.com

## CERTIFICATE OF SERVICE

I certify that, on March 21, 2022, I mailed a copy of this Complaint to the Court and caused service of this this Complaint through the CM/ECF upon the Defendants, Plaintiffs and Interested Parties.

1   UNITED STATES DISTRICT COURT        *Exhibit 1*

2   FOR THE

3   DISTRICT OF CONNECTICUT

4   Docket No. 3:99 CV 2250 (SRU)

5   - - - - - - - - - - - - - - - - - - - - - - - - -
6   - -
7
8   WADE H. HORSEY, II, Individually and on behalf of all other
9   Suburban and Rural Citizen Voters Similarly Situated,
10
11          Plaintiff,
12
13              - v. -
14
15   SUSAN BYSIEWICZ, Secretary of the State of Connecticut, JEFF
16   TRANDAHL, Clerk of the United States House of Representatives,
17   JOHN G. ROWLAND, Governor of the State of Connecticut, DENISE
18   L. NAPPIER, Treasurer of the State of Connecticut, NANCY
19   WYMAN, Comptroller of the State of Connecticut, and the 2001
20   REAPPORTIONMENT COMMITTEE OF THE STATE OF CONNECTICUT,
21
22          Defendants.
23
24   - - - - - - - - - - - - - - - - - - - - - - - - -
25   - -
26
27   B e f o r e:   WINTER, Circuit Judge, HALL, and UNDERHILL,
28                  District Judges.
29
30                          ROBERT A. HEGHMANN, Law Office of
31                          Piazza and Pickel, Stamford,
32                          Connecticut, for Plaintiff.
33
34                          SUSAN QUINN COBB, Assistant
35                          Attorney General of Connecticut,
36                          Hartford, Connecticut and KERRY
37                          W. KIRCHER, Deputy General
38                          Counsel for the United States
39                          House of Representatives,
40                          Washington, D.C. (Richard
41                          Blumenthal, Attorney General of
42                          Connecticut, Gregory T. D'Auria,
43                          Associate Attorney General of
44                          Connecticut, and Jane R.

1
2
3
4

Rosenberg, Assistant Attorney
General of Connecticut, of
counsel), _for_ _Defendants_.

2

MEMORANDUM AND ORDER

WINTER, <u>Circuit Judge</u>:

Wade H. Horsey moves for reconsideration of our grant of summary judgment to the defendants.   <u>See</u> <u>Horsey v. Bysiewicz</u>, No. 3:99CV2250 SRU, at 3 (D. Conn. Sept. 18, 2002) (memorandum and order) ("<u>Horsey I</u>").   He also asks us to order the defendants to show cause why they should not be ordered to request that the Department of Commerce, Bureau of Census provide the parties and the court with Census 2000 Supplementary Survey Profiles of fourteen Connecticut State House of Representatives voting districts established in 1991.

In our prior decision, <u>id.</u>, familiarity with which is assumed, we granted summary judgment against Horsey on his claim that apportioning voting districts solely on total population denies him equal protection of the laws because, as a suburban voter, his vote is diluted relative to that of an urban voter for purposes of elections to the United States House of Representatives and to the Connecticut House of Representatives.   Underlying this claim is Horsey's factual assertion that urban districts have disproportionate (to suburban districts) numbers of persons who are not eligible voters because they are aliens, minors, or we might add, felons.   We concluded that Horsey had submitted only

3

1    "speculative evidence based on various, often non-comparable

2    demographic data," that was insufficient as a matter of law to

3    support these factual claims, Horsey I, at 3, or to allow a

4    redrawing of the districts, id. at 14.  We did, however, hold

5    out the possibility that Horsey might cure the evidentiary

6    deficiencies on a motion for reconsideration.  See id. at 16-

7    17 n.3.

8         On October 17, 2002, Horsey moved for reconsideration and

9    submitted further evidentiary data in a supporting affidavit.

10   The defendants argue that Horsey's motion is untimely under

11   Rule 9(e)(1) of the Local Rules of the District of Connecticut

12   and that it has been submitted without the accompanying

13   memorandum of law as required under Rule 9(e).  Defendants

14   also request that this court deny Horsey's application for an

15   order to show cause because he has provided no legal basis for

16   requiring defendants to gather evidentiary support on his

17   behalf.  We grant Horsey's motion for reconsideration,

18   reaffirm our grant of summary judgment and deny Horsey's

19   request for an Order to Show Cause.

20                         DISCUSSION

21   A.  Untimely Filing under Local Rule 9(e)(1)

22        Local Rule 9(e)(1) requires that motions for

23   reconsideration be "filed and served within ten (10) days of

4

the filing of the decision or order from which such relief is sought, and [that such motions] shall be accompanied by a memorandum setting forth concisely the matters or controlling decisions which counsel believes the Court overlooked in the initial decision or order." D. Conn. L. Civ. R. 9(e)(1) (reserved and recodified at D. Conn. L. Civ. R. 7(c)(1) (2003)). Defendants are correct that Horsey's motion is untimely by almost three weeks and lacks a supporting memorandum of law.

Motions for reconsideration under Local Rule 9(e) are essentially motions for amendment of judgment under Fed. R. Civ. P. 59(e). See City of Hartford v. Chase, 942 F.2d 130, 133 (2d Cir. 1991). When such motions are untimely, they are construed as motions for relief from judgment under Fed. R. Civ. P. 60(b). See Wright, Miller & Kane, Federal Practice and Procedure § 2817 & n.16, at 184 (1995). Although a district court retains the "inherent power to decide when a departure from its Local Rules should be excused or overlooked," see Somlyo v. J. Lu-Rob Enters., 932 F.2d 1043, 1048 (2d Cir. 1991), specific provisions of the Federal Rules of Civil Procedure may shed light on whether a district court has abused its discretion in departing from its local rules. See Ass'n for Retarded Citizens of Conn., Inc. v. Thorne, 68

1    F.3d 547, 553-54 (2d Cir. 1995) (finding no abuse of

2    discretion where district court's consideration of untimely

3    motion was "[b]ased on rationales for granting Rule 60(b)

4    relief").

5        While reluctant to disregard rules and deadlines, and

6    mindful of Horsey's failure in other regards to observe

7    procedural niceties, see Horsey I, at 5-6, we will entertain

8    his motion.  First, Horsey's motion is somewhat unusual in

9    that we invited him to submit this data, see id., at 16-17

10   n.3, rendering his motion equally analogous to a supplement of

11   the summary judgment record as to a motion for

12   reconsideration.  Second, some of Horsey's claims raise

13   serious constitutional issues, in particular whether a

14   disproportionate number of non-voting-eligible persons in one

15   district violates the rights of voters in other districts.  We

16   are reluctant in such circumstances not to give him every

17   opportunity to pursue his claim.

18       Courts have the latitude to deal with extenuating

19   circumstances under Fed. R. Civ. P. 60(b)(6), which provides

20   that courts may relieve a party from a final judgment for "any

21   other reason justifying relief from the operation of the

22   judgment."  For these reasons, we grant Horsey's motion for

23   reconsideration and consider the impact of his new data on our

6

1  prior summary judgment order.

2  B.  The Nature of Horsey's Claims

3      In his pleadings and other submissions, Horsey challenges

4  the apportionment of: (i) Connecticut State House of

5  Representatives districts; (ii) United States congressional

6  districts within Connecticut; and (iii) Congressional

7  districts nationally, in particular, Connecticut, New York and

8  California.  Horsey also challenges the manner in which the

9  federal government allocates the number of seats to the United

10 States House of Representatives.

11     In our prior opinion, we viewed Horsey's claim of

12 unconstitutional dilution as mainly based on the

13 disproportionate combination of residents who were either non-

14 citizens or were citizens ineligible to vote (hereafter

15 "ineligible citizens").  See id. at 2.  However, we do note

16 that, at times, Horsey has characterized his apportionment

17 challenges as based solely on disparities in the numbers of

18 citizens and non-citizens among legislative districts,[1] and

19 that, at other times, he has described his claims as based

20 solely on disparities in the numbers of ineligible citizens.[2]

21 See Second Amended Compl. at ¶¶ 12, 13, 16, 17, 22, 25, 27,

22 28, 30, 33, 51.  See also Horsey I, at 2 (characterizing

23 Horsey's claim as focused on apportionment practices that have

7

1    "given no regard to whether the number of citizens eligible to

2    register to vote ('eligible voters') in the resultant

3    districts is also equal").  Our analysis of Horsey's new

4    evidence varies depending on whether his claims are

5    characterized as based on disparities resulting from the

6    number of aliens, ineligible citizens, or a combination

7    thereof.

8    C.   <u>Horsey's New Evidentiary Submission</u>

9         Horsey's affidavit offers three sets of data based on

10   Census 2000 Supplemental Survey Profiles.  Two sets compare

11   Connecticut's Sixth Congressional District[3] to a total of

12   eight or nine congressional districts in California and New

13   York.  Horsey's first set of data shows that the total number

14   of votes cast in the Sixth Congressional District exceeded by

15   more than 100,000 the total number of votes cast in the New

16   York and California districts.  <u>See</u> Heghmann Aff. at ¶ 8.

17   Horsey's second set of data shows that whereas Connecticut's

18   Sixth Congressional District has 2.9 percent non-citizens,

19   nine congressional districts spread across California and New

20   York have non-citizen populations of between 17.8 percent and

21   40.7 percent.  <u>See</u> <u>id.</u> at ¶ 12.  A third set of data shows

22   that Connecticut has a total non-citizen population of 4.9

23   percent whereas California's non-citizen population is 15.7

8

1    percent and New York's is 10.9 percent.  See id. at ¶ 14.[4]

2         We find this submission insufficient to justify

3    overturning our prior decision for the reasons that follow.

4         1.  Claims Regarding Ineligible Citizens or a Combination

5    of Ineligible Citizens and Aliens

6         Horsey's new submission provides no support for his

7    claims regarding disparities resulting from the number of

8    ineligible citizens or a combination of ineligible citizens

9    and aliens among Connecticut state legislative and federal

10   congressional districts.  The submission includes data showing

11   only the distribution of citizens and aliens within districts,

12   whereas his factual claims as to the inclusion of ineligible

13   citizens or a combination of ineligible citizens and aliens

14   require a different and more refined showing.

15        Although there is an overlap between citizenship and

16   voter eligibility, the need for naked speculation to support

17   his claim regarding the distribution of ineligible citizens in

18   the various voting districts at issue is not eliminated by the

19   new data.  To uphold his factual claim we would need to know

20   the distribution of those under 18 who are citizens in each

21   district and the distribution of those who are over 18 but

22   ineligible to vote as felons in each district.  It might also

23   be necessary for Horsey to provide evidence showing how many

9

1   residents of particular areas live in "institutions, college

2   dormitories, and other group quarters," their eligibility to

3   vote, and where they are registered to vote. See id., at A-6

4   note.  None of this information is included in the census data

5   presented. See id. Finally, for remedial purposes, far more

6   localized information would be necessary to redraw the

7   boundaries of the districts involved.

8        While we construe the record in the light most favorable

9   to the non-movant on a summary judgment motion, and draw all

10  permissible inferences in his favor, see Anderson v. Liberty

11  Lobby, Inc., 477 U.S. 242, 255 (1986), a non-movant cannot

12  "escape summary judgment merely by vaguely asserting the

13  existence of some unspecified disputed material facts,"

14  Borthwick v. First Georgetown Sec., Inc., 892 F.2d 178, 181

15  (2d Cir. 1989), "or defeat the motion through mere speculation

16  or conjecture," W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d

17  118, 121 (2d Cir. 1990) (internal quotation marks and

18  citations omitted).

19       As explained above, Horsey's new submission does not

20  eliminate the need for wholly speculative inferences, and we

21  therefore adhere to our prior grant of summary judgment to the

22  defendants on these claims.

23       2.  Claims Regarding Citizens and Aliens

10

1    Because Horsey offers information regarding the

2    percentages of citizens and non-citizens in different states

3    and certain congressional districts, <u>see</u> Heghmann Aff. at ¶¶

4    12, 14, there may be some evidentiary support for his claim

5    that including non-citizens for apportionment purposes

6    substantially dilutes his vote.

7                                    (i)

8    Apportionment of State House of Representatives Districts
9
10        The citizen/non-citizen evidence submitted by Horsey

11   relates only to the composition of districts for the United

12   States House of Representatives.  This evidence, therefore,

13   has no bearing on his claims regarding the composition of

14   Connecticut's House of Representatives' districts, and we

15   adhere to our prior ruling on this claim.

16                                   (ii)

17   Apportionment of Congressional Districts within Connecticut
18
19        In our prior decision, we noted that Horsey had expressly

20   waived mandatory relief relating to the apportionment of

21   congressional districts within Connecticut, <u>see</u> <u>Horsey I</u>, at

22   6, but that he continued to seek a declaratory judgment that

23   these apportionments are unconstitutional, <u>see</u> <u>id.</u>[5]

24        In his affidavit accompanying his new submission, Horsey

25   provides instructions on how to compile comparative

11

1   citizen/non-citizen data for Connecticut's six congressional

2   districts as they existed in the year 2000.  See Heghmann Aff.

3   at ¶ 5.  While Horsey states that, if we follow these

4   instructions we will have "all the statistical evidence [we]

5   need[] to rule [on] the issues raised by [Horsey] regarding

6   the dilution of his vote in congressional elections," id., he

7   neither compiles the statistical information nor elaborates on

8   its relevance to, or effect on, his equal protection claim.

9        While we are reluctant to interpret data that is not

10   properly submitted or explained, we consider it, such as it

11   is, but find it unpersuasive.  The data reveal that the

12   percentage of non-citizens in Connecticut's congressional

13   districts varies from between 2.2 percent and 9.7 percent.

14   However, this is within a generally accepted range of

15   deviation from equality.  See Chen v. City of Houston, 206

16   F.3d 502, 522 (5th Cir. 2000) (less than 10% deviation is

17   constitutionally tolerated for state elections); Garza v.

18   County of Los Angeles, 918 F.2d 763, 785-86 (9th Cir. 1990)

19   (Kozinski, J., concurring in part and dissenting in part)

20   (same).

21        Moreover, it is not at all clear, and Horsey's papers are

22   unhelpful in this regard, that the data offered is

23   sufficiently refined to allow the redrawing of congressional

12

1  districts to achieve the equality in citizen population that

2  he wants.  A similar lack of refined data was in part the

3  basis for our earlier decision.  See Horsey I, at 14.

4                          (iii)

5  Apportionment of Congressional Districts Nationally
6
7         As noted in our prior decision, Horsey filed a waiver of

8  relief of all claims relating to the apportionment of

9  congressional seats among the states, although he continues to

10  seek a declaratory judgment that these apportionments are

11  unconstitutional.  See id., at 6.  Horsey's new evidence --

12  which indicates that some states may receive a

13  disproportionate share of congressional seats due to higher

14  numbers of non-citizens -- provides factual support for his

15  claim.  Nevertheless, his claim is foreclosed by the text of

16  the Constitution.

17         The Fourteenth Amendment states that "Representatives

18  shall be apportioned among the several States according to

19  their respective numbers, counting the whole number of persons

20  in each state, excluding Indians not taxed."  U.S. Const.

21  amend. XIV, § 2 (emphasis added).  For Horsey's claim to have

22  merit, i.e., for us to conclude that the federal government

23  has unconstitutionally included non-citizens in its

24  apportionment determination, the meaning of "persons" would

                          13

1    have to be restricted to "citizens."   The text of the

2    Fourteenth Amendment clearly indicates that this

3    interpretation is incorrect.   Section 1 of the Fourteenth

4    Amendment uses both terms in a manner suggesting that

5    "persons" comprises a broader category of people that includes

6    both citizens and non-citizens.   See U.S. Const. amend. XIV, §

7    1 ("No State shall make or enforce any law which shall abridge

8    the privileges or immunities of citizens of the United States;

9    nor shall any State deprive any person of life, liberty, or

10   property, without due process of law; nor deny to any person

11   within its jurisdiction the equal protection of the laws.")

12   (emphasis added).

13        Nor does the pre-Civil War text of the Constitution lend

14   support to Horsey's argument that the apportionment of

15   representatives is restricted to citizens.   As originally

16   enacted, the Constitution deliberately "diluted" the voting

17   power of citizens living in free states by counting three-

18   fifths of all slaves in the apportionment determination.   See

19   U.S. Const. art. I, § 2, cl. 3 ("Representatives . . . shall

20   be apportioned among the several States . . . according to

21   their respective Numbers, which shall be determined by adding

22   to the whole Number of free Persons, including those bound to

23   Service for a Term of Years, and excluding Indians not taxed,

14

1    three fifths of all other Persons.").  While Horsey's new

2    evidence may support his argument that there is a disparity

3    between citizenship and the allocation of congressional

4    representatives among the fifty states, this disparity is

5    sanctioned by the Constitution.

6         Horsey's remaining claim is therefore limited to

7    disparities among congressional districts in California and

8    among congressional districts in New York with regard to the

9    numbers of resident citizens and non-citizens.  However,

10   Horsey lacks standing to bring such a claim.  As a non-

11   resident of either state, Horsey has suffered no cognizable

12   injury from the alleged malapportionment of California's or

13   New York's congressional districts.  Nor may Horsey bring an

14   equal protection claim on behalf of California and New York

15   residents who have had their votes diluted by their respective

16   states' redistricting.  See United States v. Hays, 515 U.S.

17   737, 739 (1995) (holding that plaintiff lacks standing to

18   assert an equal protection voting rights claim in a state

19   where he or she is not a resident of the challenged district);

20   see also Dillard v. Baldwin County Comm'rs, 225 F.3d 1271,

21   1279 (11th Cir. 2000) (interpreting Hays to mean that "if the

22   plaintiff lives in the racially gerrymandered district, she

23   has standing; if she does not, she must produce specific

15

evidence of harm other than the fact that the composition of her district might have been different were it not for the gerrymandering of the other district."); cf. Allen v. Wright, 468 U.S. 737, 755 (1984) (plaintiff only has standing to bring equal protection challenge where he is "personally denied equal treatment"); Valley Forge Christian Coll. v. Americans United for Separation of Church and State, 454 U.S. 464, 489-90 n.26 (1982) (disapproving the proposition that every citizen has "standing to challenge every affirmative-action program on the basis of a personal right to a government that does not deny equal protection of the laws").

c)   Request for an Order to Show Cause

Horsey requests that we order the defendants to show cause why they should not be ordered to request that the Bureau of Census provide the parties and the court with Census 2000 Supplemental Survey Profiles of fourteen Connecticut State House of Representatives voting districts established in 1991. We deny this request. Not only could Horsey have purchased a Special Tabulation showing the percentages of non-citizens in various Connecticut State House of Representatives districts from the Bureau of Census,[6] but it remains unclear whether such a tabulation would contain sufficient data to permit findings on the number of eligible voters in the state

16

1    districts.

2                            CONCLUSION

3        For the reasons indicated, we grant Horsey's motion for

4    reconsideration, reaffirm our earlier grant of summary

5    judgment for the defendants, and deny Horsey's request for an

6    Order to Show Cause.  We again emphasize that we intimate no

7    view on whether Horsey's claims, if factually supported, would

8    be valid.

9

10

11                   /s/ Ralph K. Winter
12                   Ralph K. Winter, U.S.C.J.

FOOTNOTES

1. See, e.g., Second Amended Compl. at 22 (demanding preliminary and permanent injunction preventing Clerk of the U.S. House of Representatives from including representatives from any state "in which election districts are not apportioned to reflect as nearly as possible equal percentages of the citizen population"); Plaintiff's Reply to Defendants' Objections to the Plaintiff's Motion for Reconsideration and Application for an Order to Show Cause at 2-3:

> Because the Census Bureau has now published detailed reports congressional district by congressional district stating with 90% accuracy the number of non-citizens in each district, the plaintiff if permitted to do so can now factually demonstrate the constitutional violation. The constitutional issue simply stated is does the disparity in the vote total between voting districts reflect the disparity in the distribution of the citizen population. . . . Now the plaintiff can use the Census Bureau Community Surveys to link the disparity in the distribution of the citizen population with the disparity in the vote totals.

(emphasis added)

2. An equal protection claim that apportionment must be based solely on the number of citizens resident in a district differs crucially from a claim that apportionment must be

18

based solely on the number of eligible voters.  Whereas upholding the former would exclude aliens, upholding the latter would exclude citizens as well, principally minors and felons.  There is of course a tension between equality of representation and equality of voting power.  However, a claim of dilution seems intuitively weaker when based solely on disparities in ineligible citizens resident in a district. For example, dilution of voting power in one district based on a disproportionate number of minor citizens in another does not discriminate between groups with differential claims to representation in the political process.  Minors are denied the right to vote on grounds of judgment and independence rather than a weak claim to representation.  Aliens, however, are denied the right to vote based on potential loyalty to another nation, their presumed smaller stake in the outcomes of American elections, etc.

3. Ironically, Connecticut's Sixth Congressional District no longer exists following reapportionment after the 2000 census although the apportionment of state House of Representatives districts is unaffected by these changes.  Horsey's claims as to federal House districts are nonetheless not moot because they might escape review and recur.  See Southern Pacific

19

Terminal Co. v. ICC, 219 U.S. 498, 515 (1911) (providing an exception to the mootness doctrine for situations "capable of repetition, yet evading review.").

4. Horsey has also instructed this court on how to compile a fourth data set providing information on the numbers of citizens and non-citizens in Connecticut's congressional districts.  See Heghmann Aff. at ¶ 5.


5. In view of our disposition, we need not reach the propriety of both waiving relief and seeking a declaratory judgment in these circumstances.


6. In order to obtain these numbers, Horsey would have had to determine which census tracts corresponded to the state house districts.  Once he had this information, the census could have performed a statistical breakdown similar to one Horsey provided for congressional districts in the affidavit accompanying his motion for reconsideration.

20

# UNITED STATES POSTAL SERVICE ®

# PRIORITY® MAIL



PRIORITY MAIL
POSTAGE REQUIRED



Retail

UNITED STATES POSTAL SERVICE®

**P** US POSTAGE PAID
**$15.40**
Origin: 78642
03/21/22
4851450611-25

PRIORITY MAIL 3-DAY®

2 Lb 14.10 Oz
1004

EXPECTED DELIVERY DAY: 03/25/22

C013

SHIP TO:
411 W 4TH ST
SANTA ANA CA 92701-4500

USPS TRACKING® #

9505 5121 1027 2080 6312 15

civil int.

FROM:

Robert Hershmann
P.O. Box 2108
Levander, TX
78646

RECEIVED
CLERK, U.S. DISTRICT COURT
MAR 25 2022
CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

TO:

Office of the Clerk
U.S. District Court
411 West 4th Street
Room 1053
Santa Ana, CA
92701-4516



**VISIT US AT USPS.COM®**
ORDER FREE SUPPLIES ONLINE

EP14 September 2021
OD: 15 x 11.625