Anthony T. Caso (Cal. Bar #88561)
Email: atcaso@ccg1776.com
CONSTITUTIONAL COUNSEL GROUP
174 W Lincoln Ave # 620
Anaheim, CA 92805-2901
Phone: 916-601-1916
Fax: 916-307-5164

Charles Burnham (D.C. Bar# 1003464)*
Email: charles@burnhamgorokhov.com
BURNHAM & GOROKHOV PLLC
1424 K Street NW, Suite 500
Washington, D.C. 20005
Telephone: (202) 386-6920
* admitted pro hac vice

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| JOHN C. EASTMAN,<br><br>                    *Plaintiff*,<br><br>vs.<br><br>BENNIE G. THOMPSON, *et al.*<br>                    *Defendants* | Case No.: 8:22-cv-00099-DOC-DFM<br><br>**PLAINTIFF'S BRIEF IN SUPPORT OF PRIVILEGE ASSERTIONS**<br><br>Judge: Hon. David O. Carter<br>Magistrate Judge: Hon. Douglas F.<br>                    McCormick<br>Crtrm.: 9D<br>Trial Date: not set |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iv

INTRODUCTION .................................................................................. 1

I.   Dr. Eastman's Attorney-Client Relationship with former President Trump Extended to the time periods at issue here. .....................................10

II.  The Communications Are Manifestly Privileged. ........................................12

III. Dr. Eastman's Communications With Other Clients Are Also Privileged. ..16

IV.  Dr. Eastman's Communications As A Potential Client Seeking Legal Representation Are Also Privileged. ..........................................17

V.   This Court's Prior Ruling That Dr. Eastman's Use of His Chapman Email Account Did Not Waive Privilege Is Controlling. ............................17

VI.  Work Product Protection Applies to Work Created by Attorneys as Well as Experts and Consultants Working With Them. ..............................18

    a.   Work Product Related to Specific Matters ...........................................18

    b.   Work Product In Anticipation of Litigation More Broadly .................23

VII. Work Product Protection Should Apply to Legislative Proceedings That Are Adjudicatory in Nature. ...............................................................24

    a.   Dr. Eastman's Communications with Congressmen and State Legislators are subject to the work product privilege and this Court should reconsider its finding. .....................................25

    b.   The congressional electoral count and state electoral selection pursuant to 3 U.S.C. § 2 are adjudicative proceedings, and documents prepared for them are prepared in anticipation of litigation. ......25

    c.   The documents at issue here over which Dr. Eastman has claim work product protection were prepared in anticipation of adjudicatory proceedings in Congress and/or the state legislatures. .........................26

VIII. Communications with "Dual Role" Attorneys or Advisors Do Not Lose Work Product Protection. .......................................................................27

IX.  The Fact that a Client Has Not Yet Been Determined Does Not Undermine Work Product. ...........................................................................30

X.   The Congressional Defendants' Subpoena is Unconstitutional as it Applies to Protected First Amendment Activity .........................................31

XI.  Crime Fraud Exception Is Inapplicable For The Documents Still in Dispute. ...................................................................................................34

    a.   The Court's Previous Crime Fraud Finding Does Not Apply to the Current *In Camera* Documents ...........................................................34

b.   Legal and Factual Issues with this Court's Prior Crime Fraud Ruling..36

i.   The Alleged Conduct is Not "Obstructive" As a Matter of Law Under 18. U.S.C. § 1512 ............................................................36

ii.   No Proof of "Deceitful or Dishonest Means" Under 18 U.S.C. § 371 ....................................................................................38

CERTIFICATE OF SERVICE ...........................................................................42

# TABLE OF AUTHORITIES

## Cases

*Admiral Ins. Co. v. U.S. Dist. Court for Dist. of Arizona*,
881 F.2d 1486 (9th Cir. 1989) ...................................................................17, 31

*Americans for Prosperity v. Bonta*,
141 S.Ct. 2373 (2021) ...............................................................................32

*Baird v. Koerner*,
279 F.2d 623 (9th Cir.1960) ......................................................................17

*Barton v. U.S. Dist. Ct. for Cent. Dist. of Cal.*,
410 F.3d 1104 (9th Cir. 2005) ...................................................................17

*Construction Industry Services Corp. v. The Hanover Ins. Co.*,
206 F.R.D. 43 (E.D.N.Y. 2001)..............................................................28, 29

*Donald J. Trump for President, Inc. et al. v. Boockvar et al.*,
No. 4:20-cv-02078 (M.D. Pa.)..............................................................11, 18

*Donald J. Trump for President, Inc. v. Brookvar*,
No. 20-845 (S.Ct., filed Dec. 23, 2020)...................................................10, 21

*Donald J. Trump v. Wisconsin Elections Bd.*,
No. 20-883 (S.Ct., filed Dec. 29, 2020)...................................................12, 22

*Donald J. Trump, et al. v. Brad Raffensberger, et al.*,
No. 2020-CV-343255 (Super. Ct. of Fulton Cnty, Ga, filed Dec. 4, 2020) .........12

*Donald J. Trump, et al. v. Joseph Biden, et al.*,
No. 20-882 (S.Ct., filed Dec. 29, 2020)...................................................12, 22

*Friedman v. 24 Hour Fitness USA, Inc.*,
No. CV 06-6282-AHM(CTX), 2008 WL 11336834 (C.D. Cal. Nov. 4, 2008) ...29

*Gohmert v. Pence*,
510 F. Supp. 3d 435 (E.D. Tex. 2021)...............................................................25

*Hammerschmidt v. United States*,
256 U.S. 182 (1924) ....................................................................................38

*Henry v. Quicken Loans, Inc.*,
No. 04-40346, 2008 WL 2610180 (E.D. Mich. June 30, 2008) .........................29

*In re Brokers, Inc.*
No. 04-06074, 2006 WL 897137 (Bankr. M.D.N.C. Mar. 27, 2006) ..................29

*In re Jordan*,
12 Cal.3d 575 (1974) .................................................................................16

*In re LDK Solar Sec. Litig.*,
  No. C07-5182 WHA (BZ), 2010 U.S. Dist. LEXIS 6474 (N.D. Cal.
  Jan. 7, 2010)..................................................................................................12

*In re Pac. Pictures Corp.*,
  679 F.3d 1121 (9th Cir. 2012)......................................................................22

*In re Richard Roe, Inc.*,
  68 F.3d 38 (2d Cir. 1995)..............................................................................35

*In re Sealed Case*,
  737 F.2d 94 (D.C. Cir. 1984).........................................................................28

*In re Teleglobe Commc'ns Corp.*,
  493 F.3d 345 (3d Cir. 2007), as amended (Oct. 12, 2007) ................................14

*Kelly v. Commonwealth*,
  240 A.3d 1255 (Pa. 2020), *cert. denied sub nom. Kelly v. Pennsylvania*,
  141 S. Ct. 1449 (2021) .................................................................................. 7

*Kelly v. Commonwealth*,
  No. 620 M.D. 2020, 2020 WL 7224280 (Pa. Commw. Ct. Nov. 27, 2020) ......... 7

*Marks v. Simpson*,
  1994 U.S. Dist. LEXIS 5273 (E.D. Pa. April 26, 1994)...................................... 1

*Matter of Bevill, Bresler & Schulman Asset Mgmt. Corp.*,
  805 F.2d 120 (3d Cir. 1986) .........................................................................17

*McLinko v. Pennsylvania* ,
  No. 244 M.D. 2021 (Commonwealth Ct. of PA. Jan. 28, 2022) ........................ 7

*NAACP v. Alabama*,
  357 U.S. 449 (1958).....................................................................................31

*Nat.-Immunogenics Corp. v. Newport Trial Grp.*,
  No. 815CV02034JVSJCGX, 2017 WL 10562991 (C.D. Cal. Sept. 18, 2017)....13

*Natta v. Zletz*,
  418 F.2d 633 (7th Cir. 1969) ........................................................................15

*New York Times v. Sullivan*,
  376 U.S. 254 (1964) ..................................................................................... 2

*Nixon v. United States*,
  506 U.S. 224 (1993).....................................................................................26

*Northfield Ins. Co. v. Royal Surplus Lines Ins. Co.*,
  No. SACV 03-0492-JVS, 2003 WL 25948971 (C.D. Cal. July 7, 2003) ...........28

*Perry v. Scharzenegger*,
  591 F.3d 1147 (9th Cir. 2010) ......................................................................34

*Republican National Committee v. Nancy Pelosi*,
No. 1:22cv659-TJK (D.D.C.) ...................................................................33, 34

*S.E.C. v. Wyly*,
No. 10 CIV. 5760 SAS, 2011 WL 3366491 (S.D.N.Y. July 27, 2011) ..............14

*SmithKline Beecham Corp. v. Apotex Corp.*,
232 F.R.D. 467 (E.D. Pa. 2005) ..........................................................................15

*Solin v. O'Melveny & Myers, LLP*,
89 Cal. App. 4th 451 (2001) ................................................................................16

*Symetra Life Ins. Co. v. JJK 2016 Ins. Tr.*,
No. CV-1812350-MASZNQ, 2019 WL 4931231 (D.N.J. Oct. 7, 2019)............14

*Texas v. Pennsylvania*,
No. 220155 (S.Ct., filed Dec. 7, 2020) .........................................................10, 20

*Trump v. Kemp*,
511 F. Supp. 3d 1325 (N.D. Ga. 2021) ..............................................................25

*Trump v. Kemp, et al.*,
No. 1:20-cv-05310 (N.D. Ga., filed Dec. 31, 2020)......................................11, 23

*Trump v. Raffensperger*,
No. 2020CV343255 (Ga. Ct., Fulton Cnty. 2020) ..........................................5, 19

*United States v. Caldwell*,
989 F.2d 1056 (9th Cir. 1993) .............................................................................38

*United States v. ChevronTexaco Corp.*,
241 F. Supp. 2d 1065 (N.D. Cal. 2002) ..............................................................28

*United States v. Christensen*,
828 F.3d 753 (9th Cir. 2015) ........................................................................13, 18

*United States v. Garrett Miller*, 1:21-cr-0119-CJN (D.D.C.)..............................37

*United States v. Garrison*,
888 F.3d 1057 (9th Cir. 2018) .............................................................................15

*United States v. Judson*, 322 F.2d 460, 462 (9th Cir. 1963)................................18

*United States v. Landof*,
591 F.2d 36 (9th Cir. 1978) .................................................................................13

*United States v. Layton*,
855 F.2d 1388 (9th Cir. 1988) ........................................................................13, 17

*United States v. Nobles*,
422 U.S. 225 (1975) .............................................................................................27

*United States v. Sanmina Corp.*,
968 F.3d 1107 (9th Cir. 2020) ......................................................................passim

*Upjohn Co. v. United States*,
   449 U.S. 383 (1981) .......................................................................14

*Watkins v. United States*,
   354 U.S. 178 (1957) .......................................................................31

*Wells Fargo Bank, N.A., Tr. v. Konover*,
   No. 3:05CV01924, 2010 WL 814894 (D. Conn. Mar. 5, 2010) ........................29

### Statutes and Constitutional Provisions

18 U.S.C. § 1512 ..............................................................................37

18 U.S.C. § 371 ................................................................................38, 39

3 U.S.C. § 14 ..................................................................................26

Cal. Bus & Prof Code § 6068 ..................................................................... 3

Cal. Evid. Code § 912(d) .......................................................................13

Cal. Evid. Code § 951 .......................................................................12, 17

U.S. Const. amend. I .......................................................................ii, 31, 33, 34

U.S. Const., amend. XII .......................................................................26, 27

U.S. Const., Art. II .......................................................................5, 6, 27

### Other Authorities

2018 Marshall Fellows, https://www.claremont.org/featured/former-john-
   marshall-fellows .......................................................................28

2020 US Presidential Election Related Lawsuits, https://election-
   integrity.info/2020_Election_Cases.htm .......................................................... 5

ABA Model Rule 1.18 .......................................................................17

ABA Model Rule of Professional Conduct Rule 3.8 ................................................. 3

Allied Security Operations Group, Antrim Michigan Forensics Report
   (Dec. 12, 2020) ........................................................................ 8

Andrew Hay, "North Carolina orders new U.S. House election after 'tainted'
   vote," Reuters (Feb. 21, 2019) .......................................................... 1

*Another Way: Discussing the John Eastman Memo with Eastman*, Equal
   Citizens (Sept. 27, 2021) ..............................................................11

Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product
   Doctrine* (2008) ........................................................................29

Here is the Evidence (Dec. 11, 2020, last updated Jan. 5, 2021) .............................. 7

J. Alex Halderman, "Analysis of the Antrim County, Michigan November
   2020 Election Incident" (Mar. 26, 2021) .................................................. 8

John C. Eastman, *John Eastman: Here's the Advice I Actually Gave Vice President Pence on the 2020 Election*, Sacramento Bee (Oct. 7, 2021) ..............11

Kipp Jones, "Jan. 6 Committee Chair Bennie Thompson Refuses DOJ Request for Transcripts: 'We're Not Giving Anyone Access'," MediaIte (May 17, 2022) ...........................................................................................25

Letter from PA Senate President Pro Tempore Jake Corman, *et al*. (Jan. 4, 2021) ........................................................................................ 8

M. Schmidt, *The Lawyer Behind the Memo on How Trump Could Stay in Office*, N.Y. Times (Oct. 2, 2021) ......................................................11

Mollie Hemingway, *Rigged: How the Media, Big Tech, and the Democrats Seized Our Elections* (Regnery 2021)................................................ 4

Nicholas, Peter, *Avalanche of Leaks Imperils Jan. 6 Committee's Delivering on Blockbuster Hearings*, nbcnews.com (May 1, 2022) ......................33

*Peter Boyles Show: Peter Boyles May 5 8am*, 710KNUS News/Talk (May 5, 2021) ......................................................................................11

Protecting American Election Integrity .................................................. 7

Restatement (Third) of the Law Governing Lawyers ¶ 70 .............................13, 20

Steve Cortes, The Statistical Case Against Biden's Win, The National Pulse (Nov. 9, 2020)........................................................................................ 7

The Chairman's Report of the Election Law Study Committee, Summary of Testimony From Dec. 3, 2020 Hearing ................................................ 6

TTV and 2000 Mules: Frequently Asked Questions (May 12, 2022) .................... 6

**Rules**

Fed. R. Civ. P. 26(b)(3)........................................................................31

## INTRODUCTION

The Select Committee has accused Dr. Eastman and his client of acting to obstruct the Joint Session of Congress with corrupt intent, based on its claim that Dr. Eastman and his client (and others) engaged in the "big lie" about election illegality and fraud. But that claim, that premise, is itself false. One might even say that the assertion of a "big lie" is itself the actual big lie.

The issue at the time the communications subject to the instant subpoena were made was not whether there had been illegality and fraud in the election—there was ample evidence of that at the time, and the evidence on that score has only grown since—but whether it was of sufficient scope to have altered the outcome of the election, warranting reversal,[1] or at least called it into question, warning a new election.[2] As is evident from the already-public materials, Dr. Eastman's efforts on behalf of his client, whether in litigation, or in urging legislative action, or in advice he gave about the conduct of the Joint Session of Congress, were all based on the well-grounded premise that illegality and fraud had occurred, and that further investigation was essential to determine the true winner of the 2020 election.

Ignoring this volume of evidence (and shielding from discovery similar evidence that is quite obviously in its possession), the Select Committee has crafted a counter narrative based on snippets from transcripts of depositions conducted without adversarial cross-examination, innuendo, hearsay, and outright lies. This Court, accepting the Government's representations, as it should be able to do (and historically has been able to do), found that Dr. Eastman and his client "more likely than not" made false statements in order to obstruct the Joint Session of Congress and prevent the peaceful transition of power to a duly-elected President, thereby undermining Democracy itself.

---

[1] *Cf. Marks v. Simpson*, 1994 U.S. Dist. LEXIS 5273 (E.D. Pa. April 26, 1994).
[2] *See* Andrew Hay, "North Carolina orders new U.S. House election after 'tainted' vote," Reuters (Feb. 21, 2019), https://www.reuters.com/article/us-usa-election-north-carolina/north-carolina-orders-new-u-s-house-election-after-tainted-vote-idUSKCN1QA1QG.

That prior holding makes the veracity of the Select Committee's accusations all the more important, and a key issue underlying this dispute over privileged documents. For if, as seemed clear to Dr. Eastman and his client at the time, there was illegality and fraud in the election of sufficient magnitude to have altered the outcome of the election, then far from "undermining" Democracy, Dr. Eastman's actions and advice must be seen for what they were—a legitimate attempt to prevent a stolen election. Perhaps Dr. Eastman was wrong about that. But even if he was, being wrong about factual claims is not and never has been criminal—indeed, it is constitutionally protected, *see New York Times v. Sullivan*, 376 U.S. 254 (1964)—unless the claims were known to be false when made. The Select Committee's evidence on that score is simply that news accounts and some government officials (including a few high-ranking ones) had belittled the substantial fraud and illegality evidence as false. But given the false claims, outright lies, and even documented efforts by many of those same sources to spy on and otherwise thwart the former President from fulfilling his constitutional duties for the entire four years of his term as President, one should hardly be surprised that President Trump did not take such claims at face value and preferred instead to rely on trusted advisors outside of the normal channels.

More importantly for present purposes, the mounting evidence about the scope of illegality and fraud in the 2020 election further undercuts any claim that the statements on that score made by Dr. Eastman and his client were made "corruptly" or "dishonestly."

Dr. Eastman could have produced all of his communications at the outset, as others have done. As this Court should know from its own *in camera* review, there is ample evidence in those communications of illegality, fraud, and statistical anomalies in the election results that lend significant support to the statements made by Dr. Eastman and his client. But Dr. Eastman was and remains duty bound by the rules of professional conduct to preserve the confidences of his clients at

every peril to himself, Cal. Bus & Prof Code § 6068, and also to fight to protect the work product of those who were assisting in the litigation efforts challenging illegality and fraud in the election.  The claims by the commentators on social media, magnified by the major corporate legacy media (what one late commentator used to describe, with reason, as the "drive-by media"), that Dr. Eastman was "hiding" his documents (and, impliedly, trying to shield nefarious conduct) simply ignores those bedrock ethical commands, and would in fact jettison them in service of a current political agenda and narrative.

Misrepresentations by the press are one thing, but this Court should not countenance such misrepresentations when made to this Court in formal pleadings. Even government attorneys representing members of Congress, who may themselves be shielded by the Speech and Debate Clause from being held to account for misrepresentations and lies, have a duty of candor to the courts.

In the prior round of briefing, Dr. Eastman raised numerous objections to the false statements of fact contained in the Select Committee's brief and submitted a separate statement of disputed issues of fact.  The objections were not ruled upon, and the Court in many instances simply accepted as true the Select Committee's assertions—based in many instances on unsupported newspaper articles and hearsay—of hotly disputed facts.  Perhaps the Court should be able to rely on representations made by government attorneys (or private attorneys representing the government).  Like prosecutors, they should have a high obligation on that score not only as as officers of the Court but as representatives of the government.  *See* ABA Model Rule of Professional Conduct Rule 3.8.  But at some point, as here, the claims are so manifestly false, or so distorted, or so taken utterly out of context, that the normal presumptions simply cannot stand.

And yet, the misrepresentations made by the Select Committee have colored every element in dispute here.  They have put a heavy thumb on the scale in favor of the claims of obstruction rather than a constitutionally-permitted right to petition

the government for redress of grievances, for example. They have induced a finding of "corrupt intent" when there was none. They have given rise to a holding of illegal advice instead of acknowledgement that the advice was based on valid or at least colorable constitutional arguments. And, most sensationally, they have provided ground for a finding of "undermining Democracy" when, at every turn, Dr. Eastman's efforts were designed to protect Democracy by ensuring that illegality and fraud did not alter the results of the election, and that full and transparent investigations into the serious anomalies would be had, even if the outcome of those investigations simply confirmed the initial certifications. A proper assessment of the factual circumstances in which Dr. Eastman's representations and advice were made is therefore essential to the proper resolution of the privilege claims at issue here.

It would require book-length treatment to address all of the factual misrepresentations that have been pushed by the Select Committee. Indeed, several books, such as Mollie Hemingway's *Rigged*, have already begun to plow that ground. A sampling here should be enough to make the point. One of the biggest misrepresentations is the Select Committee's claim, based on unsubstantiated news stories and other untested sources, that President Trump's claims of election illegality and fraud were "without basis," Opp. at 3, that he repeatedly pressed "false and unsubstantiated claims of election fraud," *id.* at 8, that Dr. Eastman's efforts were "based on these same fraudulent claims," *id.* at 7, and that he "spread proven falsehoods," *id.* at 1. These assertions by the Select Committee are demonstrably false, or at the very least hotly disputed. *See, e.g.*, Statement of Disputed Facts (Dkt. 185-1).

Countless examples of election illegality and fraud, and expert opinion indicating a high likelihood of fraud, were available to President Trump and Dr. Eastman at the time. Much of this information is available to this Court via its *in camera* review, but much of it is also available publicly, including in sworn affidavits

and verified complaints submitted in court actions that never were considered on the merits.[3]

*Trump v. Raffensperger*, No. 2020CV343255 (Ga. Ct., Fulton Cnty.), is a good example.  The thorough, 64-page verified complaint,[4] supported by sworn eyewitness and expert affidavits, documents scores of violations of Georgia election law that, together, affected as much as a half million votes in an election that was determined by less than 12,000 votes.  Signature verification requirements adopted by the Legislature pursuant to its plenary authority under Article II of the federal constitution to direct the "manner" for choosing presidential electors were unconstitutionally altered by the Secretary of State without approval of the legislature.  The resulting decline in the disqualification rate of absentee ballots from 2.9% in 2016 and 3.46% in 2018 to .34% in 2020 means that, as alleged in the complaint, the lax rules unconstitutionally agreed to by the Secretary of State allowed between 38,000 and 45,000 ballots that should have been disqualified to be submitted and counted.  Georgia Complaint ¶¶ 150-161.  The complaint and its supporting expert analysis also identified more than 66,000 underage individuals were allowed to register to vote before the time allowed by Georgia law, and then did vote, *id.* ¶¶ 63, 64, and Ex. 3; more than 40,000 voters who moved to another county more than 60 days before the election yet voted in their prior county in violation of Georgia law, *id.* ¶¶ 84-86 and Ex. 4; and more than 10,000 deceased individuals who had votes cast in their names, *id.* ¶¶ 101-03 and Ex. 3.  The complaint also documents that a deceased voter's registration was changed from "deceased" to "active" 8 days *after* he passed away, *id.* ¶ 110 and Ex. 6—tip-of-the-iceberg evidence that suggests a more wide-spread scheme of fraud.  Another example of tip-of-the-iceberg evidence was provided in sworn testimony by a Georgia Tech

---

[3] That point implicates another misrepresentation made by the Select Committee, namely, that the courts overwhelming ruled "against Trump's claims of election misconduct," Opp. at 5.  In almost every instance, the cases were decided on jurisdictional grounds without ever reaching the merits of the claims of illegality and fraud.  *See, e.g.*, 2020 US Presidential Election Related Lawsuits, https://election-integrity.info/2020_Election_Cases.htm, for a good summary.

[4] https://cdn.donaldjtrump.com/public-files/press_assets/verified-petition-to-contest-georgia-election.pdf

college student, who discovered upon showing up at her polling place that some-one had applied for an absentee ballot in her name, had it delivered to an address unknown to her, and fraudulently cast the ballot on her behalf. *See* The Chair-man's Report of the Election Law Study Committee, Summary of Testimony From Dec. 3, 2020 Hearing ("Ligon Report"), at 12.[5] This evidence was known by Dr. Eastman and his client at the time, but it has recently been lent additional support by revelations contained in a new documentary film by Dinesh D'Souza, 2000 Mules, supported by exhaustive analysis of geospatial cell phone data and drop box video surveillance footage, of a massive and illegal ballot harvesting scheme. *See, e.g.*, TTV and 2000 Mules: Frequently Asked Questions (May 12, 2022).[6]

Other examples of election illegality and potential fraud that were known at the time, and subsequently confirmed, abound. As documented in an election chal-lenge filed in Wisconsin, for example, Wisconsin election officials altered or sus-pended key anti-fraud provisions of Wisconsin state law without the approval of the legislature, as constitutionally required by Article II of the U.S. Constitution. As alleged in the complaint and then reiterated in the petition for writ of certiorari that was subsequently filed (and then dismissed without confronting the merits of the claims, just as the state supreme court below had done with respect to all but one of the claims), that illegal conducted affected more than 50,000 ballots, well in excess of the 20,000 vote margin in the state. That, too, was known at the time, and recently confirmed by a Special Counsel hired by the Wisconsin Legislature to investigate allegations of illegality and fraud in the election. The interim report submitted by the Special Counsel on March 1, 2022, identified numerous viola-tions of state law (specifically including state laws designed to prevent fraud) that cast "grave doubt on Wisconsin's 2020 Presidential election certification." Office

---

[5] http://www.senatorligon.com/THE_FINAL%20REPORT.PDF
[6] https://www.truethevote.org/ttv-2000mules-faqs/

of the Special Counsel, Second Interim Investigative Report on the Apparatus & Procedures of the Wisconsin Elections System, at 9 (Mar 1, 2022).[7]

Similarly, a Pennsylvania Court has recently held that the no-excuse mail-in balloting utilized in the 2020 election violated the Pennsylvania Constitution. *McLinko v. Pennsylvania*, No. 244 M.D. 2021 (Commonwealth Ct. of PA. Jan. 28, 2022) (decision stayed pending appeal).  The law had been successfully (though preliminarily) challenged in the aftermath of the election and certification prelimi-nary enjoined, *Kelly v. Commonwealth*, No. 620 M.D. 2020, 2020 WL 7224280, at *6 (Pa. Commw. Ct. Nov. 27, 2020), but that decision was then vacated by the Pennsylvania Supreme Court on *laches* jurisdictional grounds, without reaching the merits of the challenge.  *Kelly v. Commonwealth*, 240 A.3d 1255, 1256 (Pa. 2020), *cert. denied sub nom. Kelly v. Pennsylvania,* 141 S. Ct. 1449 (2021).

These are just a few of the cases where election challenges, based on exten-sive evidence, were brought but dismissed without the merits of the claims being addressed.  But there is much more.  Statistical evidence, contained in Dr. East-man's privileged email exchanges, *see*, *e.g.*, Cons. Priv. Log 15965, 17416, 63119, but also that which was publicly available at the time, strongly indicated "the in-tense improbability of the accuracy of the present Biden lead."  Steve Cortes, The Statistical Case Against Biden's Win, The National Pulse (Nov. 9, 2020);[8] *see also* Here is the Evidence (Dec. 11, 2020, last updated Jan. 5, 2021) (summarizing some of the statistical evidence)[9]; Protecting American Election Integrity[10] (containing links to a number of statistical reports that highlighted significant enough anoma-lies to cast doubt on the election or at least to have warrant further investigation and audit).  As one of the experts noted to Dr. Eastman following his team's re-view of the absentee ballot patterns in the Georgia Senate runoff election of Janu-ary 5, 2021, "it reeks of a computer algorithm."  Cons. Priv. Log 63479.

---

[7] https://legis.wisconsin.gov/assembly/22/brandtjen/media/1552/osc-second-interim-report.pdf
[8] https://thenationalpulse.com/2020/11/09/case-against-biden-win/
[9] https://hereistheevidence.com/election-2020/stats/
[10] https://election-integrity.info/

State legislators, too, weighed in, highlighting significant illegalities and ir-regularities in their elections.  A study subcommittee of the Georgia Senate Judici-ary Committee, for example, found after an extensive hearing with sworn witness and expert testimony that the 2020 election was "chaotic and the results cannot be trusted," that state and county election officials violated several provisions of Georgia election law, and that it had received "ample evidence that the 2020 Geor-gia General Election was so compromised by systemic irregularities and voter fraud that it should not be certified."  Ligon Report at 12.  The President Pro Tem of the Pennsylvania Senate, joined by a large number of his colleagues, advised Congress that because of "unlawful violations" of Pennsylvania election law, Pennsylvania's "election results should not have been certified."  Letter from PA Senate President Pro Tempore Jake Corman, *et al*. (Jan. 4, 2021).

The Select Committee has relied on statements to the contrary, of course, but the inaccuracy of the statements is manifest.  It touted a November 12, 2020 state-ment by the Department of Homeland Security's Cybersecurity and Infrastructure Security Agency that "[t]he November 3rd election was the most secure in Ameri-can history," and "[t]here [wa]s no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised."  Opp. at 5 n.11.  The fo-rensic audit conducted in Antrim County proved that statement to be false, as even the State's own expert acknowledged that votes were switched in the machine due to an improper software upgrade.[11]  The Select Committee has also touted a media statement by former Attorney General William Barr that the "U.S. Justice Depart-ment ha[d] uncovered no evidence of widespread voter fraud that could change the outcome of the 2020 election," but as we have subsequently learned, the Depart-ment did very little in the way of investigations of election illegality and fraud.

---

[11] Allied Security Operations Group, Antrim Michigan Forensics Report (Dec. 12, 2020), https://www.michigan.gov/-/media/Project/Websites/sos/30lawens/An-trim.pdf?rev=fbfe881cdc0043a9bb80b783d1bb5fe9; J. Alex Halderman, "Analysis of the Antrim County, Michigan November 2020 Election Incident," p. 22 (Mar. 26, 2021), https://www.michigan.gov/-/me-dia/Project/Websites/sos/30lawens/Antrim.pdf?rev=fbfe881cdc0043a9bb80b783d1bb5fe9

Finally, we should correct the record on the Select Committee's claim that Dr. Eastman has acknowledged that there was no support for his legal positions about the unconstitutionality of the Electoral Count Act's provisions intruding on whatever powers the Vice President has directly from the Constitution, and that he would lose any case brought in the Supreme Court 9-0. As seems to be a common tactic of the Select Committee, Eastman's acknowledgement is taken out of context. It referred to the suggestion that had been made by others, and which (as has been public reported[12]) Eastman contended in his January 4, 2021 oval office meeting with President Trump and Vice President Pence would be foolish to do, was that the Vice President simply reject electoral votes and declare Trump re-elected. But as for the more limited proposal Dr. Eastman actually made, namely, that the Vice President to simply accede to requests by numerous state legislators to delay proceedings for a week or ten days to allow them time to assess the impact of acknowledged illegality in the election, Eastman noted to Jacob on January 6, 2021 that he "remain[ed] of the view not only would that have been the most prudent course, but also had a fair chance of being approved (or at least not enjoined) by the Courts." 5394.

In sum, there is ample evidence on which Dr. Eastman and his client could credibly rely to support the statements they made about election illegality and fraud, and colorable legal arguments about the meaning of ambiguous constitutional provisions and an untested though quite arguably unconstitutional statute, to demonstrate not only that Eastman had a good faith basis in fact and law for his statements and recommendations, but that even if he was wrong, they do not rise to the level of "corrupt intent" or "dishonesty" that the Select Committee must demonstrate by a preponderance of the evidence to avail itself of a crime-fraud exception to Dr. Eastman's claims of privilege that might remain at issue.

---

[12] *See* "He Drafted Plan To Keep Trump In White House," New York Times (Oct. 3, 2021) (

PLAINTIFF'S BRIEF IN SUPPORT OF PRIVILEGE ASSERTIONS - 9

## I.   Dr. Eastman's Attorney-Client Relationship with former President Trump Extended to the time periods at issue here.

This Court has already found that "[t]he evidence clearly supports an attorney-client relationship between President Trump, his campaign, and Dr. Eastman during January 4-7, 2021." Order at 15 (Dkt. 260).  In addition to the draft retainer agreement spelling out the terms of the attorney-client relationship already in place, *see* 2nd Eastman Decl. ¶ 23 and Ex. A (Dkt. 132-1), that evidence included Dr. Eastman's court appearances on behalf of then-President Trump and his campaign, meetings with and on behalf of President Trump, and public statements confirming the attorney-client relationship.  Order at 14-15 (Dkt. 260).  The same or similar evidence, together with sworn declarations by Dr. Eastman (Dkt. 132-1) and others (e.g., Klukowski Decl. ¶ 3; Olsen Decl. ¶ 3), also conclusively supports the existence of the attorney-client relationship for the remainder of time period covered by the subpoena, November 3, 2020, through January 20, 2021.

On December 9, 2020, Dr. Eastman filed on President Trump's behalf a motion to intervene in the original action Texas had filed in the Supreme Court two days earlier.  *Texas v. Pennsylvania*, No. 220155 (S.Ct., filed Dec. 7, 2020).  Two weeks later, he appeared again in the Supreme Court of the United States as counsel of record on the petition for writ of certiorari he filed on behalf of President Trump's campaign committee, seeking review of three election-related decisions of the Pennsylvania Supreme Court.  *Donald J. Trump for President, Inc. v. Brookvar*, No. 20-845 (S.Ct., filed Dec. 23, 2020).  That case remained pending until February 22, 2021, more than a month after the latest date covered by the subpoena at issue here.  *See* Order List, at 17, 592 U.S. -- (Feb. 22, 2021, *cert. denied sub nom. Donald J. Trump for President, Inc. v. Brookvar*).[13]  For these matters, Dr. Eastman also communicated directly with President Trump by phone and by email through his assistant or attorney agents.  3rd Eastman Decl. ¶ 3; *see also*, *e.g.*,

---

[13] At https://www.supremecourt.gov/orders/courtorders/022221zor_2cp3.pdf.

1   24324, 27492, 61631 (documents produced to Select Committee).  He also made

2   public statements about the representation.[14]

3       Moreover, as noted in his Declaration, Dr. Eastman's attorney-client rela-

4   tionship with President Trump as candidate began two months before the Novem-

5   ber 3, 2020 election (the beginning date of the materials sought by the Select Com-

6   mittee's subpoena) when he was invited by Cleta Mitchell to join an Election In-

7   tegrity Working Group to begin preparing for anticipated litigation, and kicked into

8   high gear when he was asked to meet with the campaign's legal team in Philadel-

9   phia on November 7, 2020 to assist with the preparation of an election challenge

10  being prepared.  Eastman Decl. ¶¶ 25-27 (Dkt. 132-1).  That case, *Donald J.

11  Trump for President, Inc. et al. v. Boockvar et al.*, No. 4:20-cv-02078 (M.D. Pa.),[15]

12  was filed two days later.  Email correspondence among members of the Trump

13  campaign legal team and Dr. Eastman conveying privileged information about le-

14  gal claims under consideration at the time, which has been produced to the Select

15  Committee or listed on Dr. Eastman's privilege log, further confirms that an attor-

16  ney-client relationship was understood by the campaign legal team to have existed

17  in early November 2020 as well.  *See*, *e.g.*, 7394 (produced to Select Committee),

18  Consolidated Privilege Log (Dkt. 342), Nos. 7402, 7403, 7414; *see also* Klukowski

19  Decl. ¶ 3; Olsen Decl. ¶ 3.

20      In addition, as this Court has already acknowledged, Dr. Eastman formally

21  appeared *pro hac vice* on behalf of the President in *Trump v. Kemp, et al.*, No.

22  1:20-cv-05310 (N.D. Ga., filed Dec. 31, 2020).  *See* Order of March 28, 2022, pp.

23  14-15 (Dkt. 260). And, as noted in his Declaration and confirmed by entries in his

24  privilege log, Dr. Eastman also provided legal advice on behalf of the President as

---

25  [14] *See, e.g.*, *Another Way: Discussing the John Eastman Memo with Eastman*, Equal Citizens (Sept. 27,

26  2021), https://equalcitizens.us/discussing-the-john-eastman-memo-with-john-eastman/; M. Schmidt, *The Lawyer Behind the Memo on How Trump Could Stay in Office*, N.Y. Times (Oct. 2, 2021),

27  https://perma.cc/9BQQ-5Y39; John C. Eastman, *John Eastman: Here's the Advice I Actually Gave Vice President Pence on the 2020 Election*, Sacramento Bee (Oct. 7, 2021), https://www.sacbee.com/opin-ion/op-ed/article254812552.html; *Peter Boyles Show: Peter Boyles May 5 8am*, 710KNUS News/Talk

28  (May 5, 2021), https://perma.cc/Q6YE-KD5F.
    [15] https://cdn.donaldjtrump.com/public-files/press_assets/2020-11-09-complaint-as-filed.pdf.

candidate and his campaign committee in several other legal challenges that were
brought in December 2020, including *Donald J. Trump, et al. v. Brad Raffens-
berger, et al.*, No. 2020-CV-343255 (Super. Ct. of Fulton Cnty, Ga, filed Dec. 4,
2020); *Donald J. Trump, et al. v. Joseph Biden, et al.*, No. 20-882 (S.Ct., filed Dec.
29, 2020); and *Donald J. Trump v. Wisconsin Elections Bd.*, No. 20-883 (S.Ct.,
filed Dec. 29. 2020).  2nd Eastman Decl. ¶ 28; *see also, e.g.*, Consolidated Privi-
lege Log Nos. 21814, 55012, and 60478.  By withdrawing its objections to at least
some of these materials, *see, e.g.,* Feb 16 Privilege Log No. 21815 (Dkt. 119) ("At-
tachment [to email dated 12/3/20]: Draft Complaint"); Apr 8 Privilege Log No.
60746 (Dkt. 302) (email dated 12/31/20), the Select Committee has apparently rec-
ognized the validity of Dr. Eastman's privilege claims and, hence, his attorney-cli-
ent relationship.

## II.    The Communications Are Manifestly Privileged.

Dr. Eastman has asserted attorney-client privilege (in addition to work-prod-
uct protection) over 113 documents containing communications with agents of for-
mer President Trump or with other attorneys working on Trump's legal team.[16]

Six of those[17] were communications with the President of the non-profit or-
ganization with which Dr. Eastman's public interest law firm is affiliated and its
outside non-profit counsel, to determine whether Eastman would undertake the
representation under the auspices of that organization.  Although the exchange in-
dicates that the particular representation had not yet been determined, the Califor-
nia Evidence Code defines as a client not just one who has retained counsel but
also one who is seeking counsel.  Cal. Evid. § 951.  Federal common law also rec-
ognizes that the privilege attaches to communications with prospective clients

---

[16] Some of the email exchanges include logistical or other discussions that are arguably not themselves
privileged (though they may be protected work product, *see In re LDK Solar Sec. Litig.,* No. C07-5182
WHA (BZ), 2010 U.S. Dist. LEXIS 6474 (N.D. Cal. Jan. 7, 2010)).  23421, 23554, 23826, 23852, 24310,
61357, 61371, 61517, 61531, 61555, 61560, 61561, 61562, 61563, 61565.  Because they are part of email
threads that include privileged information, we have withheld the entire thread because the non-privileged
portions (to the extent there are any) are innocuous.  If, after its *in camera* review, the Court disagrees, we
can produce any non-privileged portions of these emails with the privileged portions redacted.
[17] 23056, 23060, 23107, 23113, 23233, 23240

PLAINTIFF'S BRIEF IN SUPPORT OF PRIVILEGE ASSERTIONS - 12

seeking legal advice.  *See United States v. Layton*, 855 F.2d 1388, 1406 (9th Cir. 1988) (*overruling on other grounds recognized in People of Territory of Guam v. Ignacio*, 10 F.3d 608, 612 n.2). The exchange includes a limited amount of privileged information, but the California Evidence Code also provides that a disclosure made in confidence to a third party – here, the non-profit President and its outside counsel – does not waive the privilege where "disclosure is reasonably necessary for the accomplishment of the purpose for which the lawyer" was consulted.  Cal. Evid. § 912(d); *United States v. Christensen*, 828 F.3d 753, 802-03 (9th Cir. 2015); *Nat.-Immunogenics Corp. v. Newport Trial Grp.*, No. 815CV02034JVSJCGX, 2017 WL 10562991, at \*4 (C.D. Cal. Sept. 18, 2017).  The limited disclosure at issue, pursuant to the organization's case approval process, was "reasonably necessary" to determine in which capacity Dr. Eastman would undertake the representation, and was therefore not a waiver of the privilege.

Seventy-two of the documents over which Dr. Eastman has asserted attorney-client privilege are communications between Dr. Eastman (or Dr. Eastman and other attorneys on the Trump legal team) and one or more of six conduits to or agents of the former President with whom Dr. Eastman dealt.[18]  "The attorney-client privilege may extend … to communications with third parties 'acting as agent' of the client." *United States v. Sanmina Corp.*, 968 F.3d 1107, 1116 (9th Cir. 2020) (quoting *United States v. Landof*, 591 F.2d 36, 39 (9th Cir. 1978)).  The Third Restatement recognizes as "privileged persons" covered by the attorney-client privilege agents of either the client or the lawyer "who facilitate communications between them."  Restatement (Third) of the Law Governing Lawyers ¶ 70.  "A person is a confidential agent for communication if the person's participation is reasonably necessary to facilitate the client's communication with a lawyer … and if

---

[18] 23289, 23290, 23291, 23292, 23306, 23308, 23310, 23325, 23326, 23333, 23343, 23344, 23549, 23550, 23554, 23555, 23556, 25167, 25170, 25220, 25905, 28487, 28530, 30038, 30118, 49527, 49528, 55012, 55029, 55039, 55050, 55112, 55127, 55141, 55152, 55457, 55569, 60113, 60114, 60117, 60118, 60120, 60123, 60126, 60131, 60149, 60153, 60183, 60193, 60362, 60453, 60475, 60478, 60487, 60498, 60526, 60528, 60565, 61296, 61356, 61357, 61371, 61424, 61449, 61452, 61531, 61555, 61560, 61561, 61562, 61563, 61565.

the client reasonably believes that the person will hold the communication in confidence." *Id.* Comment f; *see also, e.g.*, *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 359 (3d Cir. 2007), as amended (Oct. 12, 2007); *Symetra Life Ins. Co. v. JJK 2016 Ins. Tr.*, No. CV-1812350-MASZNQ, 2019 WL 4931231, at *3 (D.N.J. Oct. 7, 2019); *S.E.C. v. Wyly*, No. 10 CIV. 5760 SAS, 2011 WL 3366491, at *1 (S.D.N.Y. July 27, 2011) (subsequent modifications on other grounds omitted) ("the privilege can apply to communications with agents of an individual where the agent is necessary to the lawyer's representation—on an analogy to *Upjohn Co. v. United States*, 449 U.S. 383 (1981)).

Three of the individuals had formal roles with former President Trump's campaign committee, as evidenced by their @donaldtrump.com email addresses, and are also attorneys.  *See, e.g.*, Cons. Priv. Log 55012, 55457; *see also* Order re Redactions at 2 (Dkt 139) (noting @donaldtrump.com email address reflects affiliation with the Trump campaign); Order re Privilege at 21 (Dkt 260) (suggesting that agent status could be inferred from a @donaldtrump.com email address).  The other three were members of former President Trump's immediate staff, one of whom is also an attorney.  3rd Eastman Decl. ¶ 3; *see also, e.g.*, Cons. Priv. Log 49527.  While Dr. Eastman could (and did) communicate directly with former President Trump at times, 3rd Eastman Decl. ¶ 3, many of his communications with the President were necessarily through these agents.  Given that Dr. Eastman's client was the *President of the United States*, the use of these intermediaries easily qualifies as "reasonably necessary to facilitate the client's communication with a lawyer."

Two of the documents[19] were communications from another attorney working with the campaign to the Trump Campaign manager outlining a potential legal challenge.  The campaign manager was an agent both of the Campaign and of the

---

[19] 15944, 16194.  The Attorney-Client assertion for 15944 was inadvertently omitted from the Consolidated Privilege Log.  Dr. Eastman seems to have been blind copied on 16194.

former President as candidate; in either case, the communication is attorney-client privileged.

The remaining 33 documents over which Dr. Eastman has asserted attorney-client privilege were communications among attorneys working on the Trump legal team either relaying confidential communications from former President Trump or discussing advice to be provided to him.[20]  Such communications between co-counsel discussing confidential communications from the client or advice to be given to the client are as privileged as communications between counsel and client.  *United States v. Garrison*, 888 F.3d 1057, 1062 n.2 (9th Cir. 2018) (noting that privilege extends to attorneys of different clients); *Natta v. Zletz*, 418 F.2d 633, 637 n.3 (7th Cir. 1969) ("insofar as inter-attorney communications or an attorney's notes contain information which would otherwise be privileged as communications to him from a client, that information should be entitled to the same degree of protection from disclosure"); *SmithKline Beecham Corp. v. Apotex Corp.*, 232 F.R.D. 467, 481 (E.D. Pa. 2005) (holding that "confidential communications between co-counsel forwarding information and legal advice for the purpose of formulating further legal advice and providing legal services" are privileged).

Twenty-one of the documents identified above are attachments to the email communications.  Most are legal analysis memos (and their supporting data)[21] or drafts of pleadings,[22] quintessential privileged material (as well as work product). Two include hand-written notes from former President Trump about information that he thought might be useful for the anticipated litigation[23]—again, quintessential privileged material. Six of the attachments are otherwise public documents,[24] but as the California courts have recognized, "the privilege covers the *transmission*

---

[20] 23421, 23826, 23833, 23839, 23845, 23852, 23858, 23862, 23866, 23870, 23875, 23880, 23885, 23894, 23899, 23906, 23910, 23918, 24310, 24732, 24739, 24746, 24752, 24803, 24866, 25167, 25170, 26836, 26869, 26874, 26885, 48373, 61176, 61186, 61517
[21] 23291, 23292, 23306, 23308, 23310, 23550, 55039, 55569
[22] 60487, 60498, 60526, 60528, 61186
[23] 23555, 25905
[24] 23326, 23344, 23556, 25167, 25170, 49528,

of documents which are available to the public, and not merely information in the sole possession of the attorney or client. In this regard, it is the actual fact of the transmission which merits protection, since discovery of the transmission of specific public documents might very well reveal the transmitter's intended strategy. *Solin v. O'Melveny & Myers, LLP*, 89 Cal. App. 4th 451, 457 (2001) (emphasis added) (citing *In re Jordan*, 12 Cal.3d 575, 580 (1974)).

### III.    Dr. Eastman's Communications With Other Clients Are Also Privileged.

Among the 601 documents still in dispute, Dr. Eastman has also asserted attorney-client privilege over fifty documents[25] where the client (or potential client) was other than former President Trump or his campaign committee.  (He also asserted attorney-client privilege and/or work product protection over nearly 600 additional documents totaling more than 3500 pages for communications with more than 60 other clients, to which the Select Committee did not object but which Chapman University had advised Dr. Eastman it was going to produce before this lawsuit was initiated).  Those 50 documents include attorney-client privileged communications with 9 different clients or potential clients who were seeking Dr. Eastman's legal advice regarding the constitutional authority of state legislatures to deal with election illegality and fraud.  Seven were themselves state legislators; one was a party committeewomen and also agent of one of the legislators; and the last was a citizen coordinating information sessions for state legislators.  Confidential communications between an attorney and his client are protected even if unrelated to litigation.  *See Admiral Ins. Co. v. U.S. Dist. Court for Dist. of Arizona*,

---

[25] 23532, 23539, 23542, 23551, 23552, 23582, 23584, 23591, 23631, 23638, 24727, 24730, 24760, 24762, 24778, 24795, 24797, 24893, 24897, 25035, 51402, 51403, 51407, 51408, 52958, 53452, 59448, 60185, 60188, 61695, 61697, 61701, 61767, 61768, 61904, 61905, 62674, 62675, 62698, 62706, 62776, 62841, 62842, 62844, 62858, 62859, 62861, 62863, 62865, 62868.  The attorney-client privilege assertion was inadvertently omitted from 24778, 61904, and 61905 in the Consolidated Privilege Log.  In addition, "Trump" is incorrectly identified as the client in 24778; it should be Burt Jones and Brandon Beach.

881 F.2d 1486, 1492 (9th Cir. 1989).  The requirement is that the communication is made for obtaining "legal advice of any kind."  *Id.*[26]

## IV.   Dr. Eastman's Communications As A Potential Client Seeking Legal Representation Are Also Privileged.

Among the 601 documents over which the Select Committee has objected to Dr. Eastman's assertion of privilege are three in which Dr. Eastman was seeking legal representation *for himself* in a potential case asserting breach of contract and violation of constitutional rights.[27]  Although the representation did not materialize, that fact is immaterial, for both the model rules and California law afford attorney-client privileged protection to communications from *prospective* clients.  ABA Model Rule 1.18; Cal. Evid. § 951; *Barton v. U.S. Dist. Ct. for Cent. Dist. of Cal.*, 410 F.3d 1104, 1108 (9th Cir. 2005) ("under California law the privilege applied to pre-employment communications with an attorney by a prospective client with a view to employing the attorney"). The same is true under the federal common law. *United States v. Layton*, 855 F.2d at 1406; See *Matter of Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d 120, 124 (3d Cir. 1986); *Baird v. Koerner*, 279 F.2d 623, 635 (9th Cir.1960).

## V.   This Court's Prior Ruling That Dr. Eastman's Use of His Chapman Email Account Did Not Waive Privilege Is Controlling.

Despite this Court's March 28 holding that Dr. Eastman's use of the Chapman University email system "did not destroy attorney-client privilege" or work product protection, Order at 16, 20, 29, the Select Committee has continued to object to Dr. Eastman's attorney-client privilege and work-product claims with respect to every document still in dispute on the ground, *inter alia*, that they were waived due to a supposedly "unauthorized use of Chapman University email account."  *See* Consolidated Priv. Log. 52452 through 65452.  It did not move for

---

[26] Dr. Eastman has also asserted work product protection over 39 of these documents.  That issue is addressed in Section **Error! Reference source not found.**, *infra.*
[27] 64305, 64331, 64715

reconsideration of this Court's ruling, and in any event has offered no new evidence that would undercut the Court's prior holding or warrant reconsideration. Moreover, the Court's reasoning for the holding with respect to the January 4-7 documents that were then at issue is equally applicable to the remainder of the documents now at issue. Dr. Eastman's use of his Chapman University email did not constitute a waiver of either attorney-client privilege or work product protection.

## VI.  Work Product Protection Applies to Work Created by Attorneys as Well as Experts and Consultants Working With Them.

Dr. Eastman has asserted work product protection over 557 of the 601 documents still in dispute, including 150 for which he also asserted attorney-client privilege (addressed above). Of those, 472 involve client work product on behalf of former President Trump and/or his campaign committee, Donald J. Trump for President, Inc.

### a.  Work Product Related to Specific Matters

380 of the Trump work product documents are related to specific matters (set out below). 309 documents are work product communications exclusively among lawyers working with the Trump legal team, either as formally retained or as volunteer attorneys. Another 69 constitute communications on these specific matters among attorneys and non-attorney experts or consultants assisting with the litigation of those specific matters, and 2 involved communications with lawyers representing states considering joining one of the lawsuits in support of then-President Trump.[28]

The specific matters and their related work-product documents are as follows:

- ***Donald J. Trump for President, Inc. v. Boockvar***, No. 4:20-cv-02078 (M.D. Pa., filed Nov. 9, 2020). There are 45 documents over which Dr. Eastman has

---

[28] Communications with experts and others to assist in the representation of potential client are protected under the attorney-client privilege as well. *See Christensen*, 828 F.3d at 802-03 (communications with private investigator are protected by the attorney-client privilege); *United States v. Judson*, 322 F.2d 460, 462 (9th Cir. 1963) (privilege covers communications with accountant).

asserted work product protection related to an election challenge filed in the Middle District of Pennsylvania.  29 documents[29] are work-product communications either in anticipation of or during the pendency of the case exclusively among the following attorneys (in addition to Dr. Eastman), all of whom made formal appearances or otherwise assisted with the litigation.[30]  Another 14 documents[31] involve communications among one or more of those attorneys and a team of experts and attorneys conducting statistical and other technical analyses in support of the litigation.  3rd Eastman Decl. ¶ 11.  The remaining 2 documents[32] are communications between one of the attorneys and the agent for the campaign committee that are both attorney-client privileged and work product.

- ***Trump v. Raffensperger***, No. 2020CV343255 (Ga. Ct., Fulton Cnty.).  Dr. Eastman has assert work product protection over 15 documents containing communications related to the election challenge filed in the Fulton County, Georgia Superior Court.  9 of the documents[33] were communications exclusively among lawyers working with the Trump legal team who entered appearances in or otherwise assisted with the case. One document[34] was an email communication from one of those attorneys requesting a legal assessment from Dr. Eastman, on which, in addition to his law partner, a non-lawyer officer of the non-profit with which they are affiliated, and who cannot be viewed as a conduit to an adversary, was copied.  *See Sanmina*, 968 F.3d at 1121.  Two other email communications[35] included several non-attorney individuals who were either employed by the Trump campaign or working under agreement with the Trump legal team to assist in gathering

---

[29] 03268, 03269, 03270, 03271, 06854, 07100, 07101, 07106, 07177, 07254, 07320, 07402, 07403, 07414, 07416, 07419, 07650, 07652, 16892, 16893, 16894, 16895, 16901, 17124, 18270, 22912, 23042, 30666, 30669

[30] See Parties and Attorneys, https://www.courtlistener.com/docket/18618673/parties/donald-j-trump-for-president-inc-v-boockvar/; Klukowski Decl. ¶ 4; Hilbert Decl. ¶ 4.

[31] 11779, 15393, 16182, 16184, 16285, 16349, 16350, 16354, 16561, 17416, 18110, 18592, 18593, 23905

[32] 15944, 16194

[33] 28853, 29007, 15960, 15584, 15636, 20142, 24905, 28952, 21814

[34] 30111.

[35] 21854, 62657.

PLAINTIFF'S BRIEF IN SUPPORT OF PRIVILEGE ASSERTIONS - 19

information for the anticipated litigation. The final 3 documents[36] are communications among the team of statistical and other experts providing assistance to the legal team on the litigation.  Hilbert Decl. ¶ 4-6.

• **Texas v. Pennsylvania, et al.**, No. 22O155 (S.Ct. filed Dec. 7, 2020).  Dr. Eastman has asserted work product protection over 160 documents containing communications related to the original action Texas filed in the Supreme Court and then-President Trump's motion to intervene[37] in that action.  122 documents[38] are work-product communications either in anticipation of or during the pendency of the Original action. Ten of the attorneys included on the communications (in addition to Dr. Eastman) were working on behalf of then-President Trump or his campaign committee directly[39]), and the other three were assisting Dr. Eastman separately.[40]  Olson Decl. ¶ 3; Eastman Decl. ¶ 7.  6 of the documents[41] are the communications with the President of the non-profit organization with which Dr. Eastman's public interest law firm is affiliated and its outside non-profit counsel

---

[36] 18901, 18902, 18919

[37] https://www.supremecourt.gov/DocketPDF/22/22O155/163234/20201209155327055_No.%
2022O155%20Original%20Motion%20to%20Intervene.pdf

[38] 28104, 31209, 23156, 23244, 23248, 24899, 23047, 23049, 23101, 23998, 24906, 25031, 25108, 25111, 25553, 26757, 26869, 26885, 28074, 28078, 30013, 30015, 30176, 23285, 23349, 23421, 23431, 23434, 23774, 23819, 23833, 23839, 23845, 23852, 23870, 23875, 23899, 23918, 24133, 24218, 24310, 24732, 24739, 24752, 24866, 29444, 28399, 28426, 24332, 24618, 24653, 24697, 29783, 21760, 23383, 24931, 23160, 23910, 24703, 29420, 30052, 29560, 28168, 23893, 24714, 24725, 24776, 24800, 24802, 25908, 23048, 23061, 23242, 23324, 23408, 23426, 23673, 23740, 23777, 23826, 23858, 23862, 23866, 23880, 23885, 23894, 23898, 23906, 24212, 24234, 24698, 24716, 24746, 24777, 24803, 24895, 24947, 25028, 25033, 25900, 26385, 26452, 26789, 26836, 26874, 26884, 26885, 28064, 28075, 28148, 28154, 28783, 29397, 29457, 29734, 29791, 30012, 30039, 30040, 30048, 30175, 31213, 23674

[39] One of these individuals, through his attorney, has advised Dr. Eastman (after *someone* provided him with information from Dr. Eastman's privilege log, which this Court had ordered to be filed under seal) that he was not co-counsel on these matters.  As the Court will see from its *in camera* review, that assertion is not consistent with the nature of the communications, but even if that individual was not involved as an attorney, he was at the very least an agent or conduit to the President for those who were attorneys representing the former President, and his participation was "reasonably necessary to facilitate the client's communication with a lawyer."  Restatement (Third) of the Law Governing Lawyers ¶ 70.  His inclusion on these communications therefore would not waive attorney-client privilege, much less the work product protection at issue here.

[40] Dr. Eastman has also asserted Attorney-Client Privilege over 29 of these documents, 23421, 23826, 23833, 23839, 23845, 23852, 23858, 23862, 23866, 23870, 23875, 23880, 23885, 23894, 23899, 23906, 23910, 23918, 24310, 24732, 24739, 24746, 24752, 24803, 24866, 26836, 26869, 26874, 26885.  But these three individuals are not copied on any of those documents.

[41] 23056, 23060, 23107, 23113, 23233, 23240

PLAINTIFF'S BRIEF IN SUPPORT OF PRIVILEGE ASSERTIONS - 20

addressed above as attorney-client privileged; they also contain work product.  21 of the documents[42] contain work product as well as attorney-client privileged communications (discussed above) transmitted to then-President Trump through his executive assistant.  2 documents[43] involve communication by the executive assistant of one of the other attorneys on the matter forwarding a legal memo to Dr. Eastman over which the Select Committee has held its objection in abeyance.  The inclusion of members of an attorney's staff on work product does not waive the protection.  *Sanmina*, 968 F.3d at 1120 (noting that the "overwhelming majority" of circuits to consider the question holds that work product privilege is *only* waived by sharing the information with an adversary).  Similarly, another 7 documents[44] involve communications between Dr. Eastman and another attorney with whom he was collaboratively discussing legal issues in the litigation, transmitted via intermediaries (a family member of the lawyer and a mutual friend).  Neither of the intermediaries could be said to be a conduit to an adversary, *see id.* at 1120, and the Select Committee has held in abeyance its objections over the legal memos themselves.  The remaining 2 documents[45] generated with respect to the original action are communications with the Solicitor General of a State seeking to intervene in the action.  On further review, Dr. Eastman is withdrawing his assertion of work product and will produce the documents to the Select Committee.

- ***Donald J. Trump for President, Inc. v. Boockvar***, No. 20-845 (S.Ct.).  30 of the still-contested documents relate to the petition for writ of certiorari Dr. Eastman (together with Bruce Marks) filed on behalf of the Donald J. Trump for President, Inc. campaign committee seeking review of three decisions of the Pennsylvania Supreme Court.  19 of the documents[46] are work-product communications

---

[42] 23289, 23290, 23291, 23292, 23306, 23308, 23310, 23325, 23326, 23333, 23343, 23344, 23549, 23550, 23554, 23555, 23556, 25220, 25905, 28487, 28530
[43] 23052, 23110
[44] 29233, 29273, 29322, 29352, 29417, 32015, 32021
[45] 28070, 28071
[46] 31640, 32079, 32106, 33360, 47433, 47436, 48373, 60648, 60832, 60862, 60889, 60891, 60897, 61035, 61134, 61231, 61373, 61437, 61763.

PLAINTIFF'S BRIEF IN SUPPORT OF PRIVILEGE ASSERTIONS - 21

either in anticipation or during the pendency of the cert petition exclusively among attorneys working on the case.  The attorneys involved in these communications represented Donald J. Trump for President, Inc. campaign committee, then-President Trump, or both.  Marks Decl. ¶ 6; Olsen Decl. ¶ 3.  The remaining 11 documents[47] involve communications between Dr. Eastman and two other attorneys – one with whom he has regularly collaborated in the past and the attorney with whom he was collaboratively discussing legal issues in the litigation, transmitted via intermediaries (a family member of the lawyer and members of Dr. Eastman's staff).  Neither the attorneys nor the intermediaries could be said to be a conduit to an adversary, *Sanmina*, 968 F.3d at 1120, and the Select Committee has withdrawn its objections over the legal memos themselves.

- ***Donald J. Trump, et al. v. Joseph Biden, et al.***, No. 20-882 (S.Ct.) and ***Donald J. Trump v. Wisconsin Elections Bd.***, No. 20-883 (S.Ct.).  13 documents[48] involve work-product communications among the attorneys working on behalf of then-President Trump (in his capacity as candidate) in anticipation or during the pendency of two cert petitions that were filed from election cases in Wisconsin. In addition to Dr. Eastman, those attorneys include three who are listed on the *Trump v. Biden* cert petition,[49] the Counsel of Record in *Trump v. Wisconsin Elections Board*,[50] five other attorneys representing candidate Trump and/or his campaign committee, and three attorneys affiliated with the campaign itself.  *See* Marks Decl. ¶ 6.  These communications are also protected by attorney-client privilege.  *See In re Pac. Pictures Corp.*, 679 F.3d 1121, 1129 (9th Cir. 2012) (communications in pursuit of a joint strategy protected under attorney-client privilege).

---

[47] 38210, 43503, 49668, 46183, 47297, 45886, 46154, 49527, 49528, 55453.  The latter document involves a "dual role" attorney, and is further addressed in Section VIII, *infra*.

[48] 55012, 55029, 55039, 55050, 55112, 55127, 55141, 55152, 55457, 55569, 61666, 61862, 61868.

[49] https://www.supremecourt.gov/DocketPDF/20/20-882/164938/20201229165341814_No.%2020-__PetitionForAWritOfCertiorari.pdf

[50] https://www.supremecourt.gov/DocketPDF/20/20-883/165018/20201230144119028_20-___PetitionForWritOfCertiorari.pdf.

1      • ***Trump v. Kemp, et al.***, No. 1:20-cv-05310 (N.D. Ga.).  Dr. Eastman has as-

2      serted work-product protection over 117 documents related to the federal action

3      filed on December 31, 2020 in the Northern District of Georgia, for which he

4      served as co-counsel.  111 of those documents[51] are work-product communications

5      exclusively among attorneys representing then-President Trump (as candidate) in

6      the case, working directly as an in-house attorney for the Trump campaign com-

7      mittee, or working directly for the President.[52]  The remaining 6[53] communications

8      involved one or more of the above attorneys and the President's close staff,

9      through whom the lawyers communicated with their client.

### b.  Work Product In Anticipation of Litigation More Broadly

11           The remaining 100 of the Trump work product documents are related to

12     other litigation efforts with which Dr. Eastman was peripherally involved, or ge-

13     neric development of statistical and other evidence that was prepared in anticipa-

14     tion of litigation.  12 documents[54] relate to the Wisconsin recount and related elec-

15     tion litigation, and include both attorneys working on the cases and a team of ex-

16     pert analysts.  Another 12 documents[55] relate to pending litigation in Michigan

17     and a potential cert petition, and include both attorneys working on the cases and a

18     team of expert analysts.  2 documents[56] were a communication between Dr. East-

19     man and one of the other Trump attorneys about a possible original action in the

---

[51] 53065, 53537, 53565, 53826, 55522, 56070, 56115, 57872, 57889, 57908, 57961, 58684, 59210, 59222, 59253, 59418, 59452, 59485, 59498, 59500, 59504, 59506, 59510, 59613, 59651, 59685, 59691, 59729, 59799, 59802, 59813, 59825, 59834, 59844, 59855, 59867, 59874, 59895, 59902, 59916, 59924, 59931, 59946, 59962, 59970, 59978, 59987, 60033, 60070, 60097, 60106, 60113, 60114, 60117, 60118, 60120, 60123, 60126, 60131, 60142, 60145, 60149, 60153, 60155, 60163, 60183, 60193, 60201, 60210, 60230, 60353, 60362, 60453, 60456, 60465, 60475, 60478, 60487, 60498, 60526, 60528, 60565, 60578, 60587, 60748, 60758, 60798, 60803, 60812, 61068, 61078, 61176, 61186, 61259, 61296, 61309, 61356, 61357, 61359, 61371, 61397, 61424, 61449, 61452, 61517, 61531, 61543, 61560, 61561, 61562, 61563, 61565, 61580, 62749, 62761, 62778

[52] On the latter's role, *see supra* note 39.

[53] 61356, 61424, 61555, 61357, 61449, 61452

[54] 06855, 07799, 08739, 08742, 17247, 18550, 18552, 18684, 18793, 18796, 18797, 19889

[55] 18858, 18863, 18887, 18897, 18406, 18865, 26075, 20826, 18875, 19169, 48793, 49452

[56] 17197, 17257

Pennsylvania Supreme Court, while another 12[57] involved analysis of the legal is-
sues in another pending Pennsylvania case.  Two emails[58] sought information on
the status of a legislative subpoena in Arizona and the related enforcement litiga-
tion.   Another[59] addressed issues about the pending cert petition in an Arizona
case.  8 documents[60] involved attorney deliberations about a possible lawsuit in the
District of Columbia, and 4[61] addressed the legal issues in a suit filed in Texas.  9
address electors or legislatures[62] (discussed below, *infra* Section VII), and 1 ad-
dresses issues about a possible new representation.[63]  The remaining 24 docu-
ments[64] involved statistical and other technical analyses that were being prepared
for possible use as needed in election litigation.  Some are specially marked "At-
torney Work Product privilege" in the subject line.[65]  Others expressly ask about
the gameplan for getting the analyses "for legal to review and present" (16181), or
indicate that the statistical analysis demonstrates "evidence of fraud that the courts
cannot ignore" (18554), thereby demonstrating that the analyses contained or dis-
cussed in all of these documents were being conducted in anticipation of litigation.

## VII.   Work Product Protection Should Apply to Legislative Proceed-
ings That Are Adjudicatory in Nature.

While this Court has previously rejected Dr. Eastman's claims of work prod-
uct privilege over his communications with members of Congress and the various
state legislatures, the circumstances and context of the communications, as well as
case law on this issue, are sufficient to warrant reversal of that finding.

---

[57] 21094, 21105, 21106, 21111, 21112, 21113, 21116, 21117, 21122, 21124, 21126, 55486.  These com-
munications also involved a "dual role" attorney, and are discussed further in Section VIII, *infra*.
[58] 61724, 61764
[59] 50327
[60] 51017, 51290, 51291, 51311, 51316, 51759, 52452, 55271
[61] 51303, 56980, 57425, 57790.
[62] 30119, 31598, 31602, 31628, 31634, 31635, 32071, 32072, 51059
[63] 64995
[64] 15965, 15966, 15968, 15980, 15982, 16022, 16181, 16301, 16334, 16379, 16381, 16458, 18554,
18813, 18814, 18821, 18822, 18920, 18956, 19686, 19888, 20163, 22679, 28479. Identification of
"Trump" as client was inadvertently omitted from the Consolidated Privilege Log.
[65] *See, e.g.,* 16022, 16334.  *Cf.* 16182, 16184 (similar analyses deployed in the Pennsylvania ligation).

PLAINTIFF'S BRIEF IN SUPPORT OF PRIVILEGE ASSERTIONS - 24

### a. Dr. Eastman's Communications with Congressmen and State Legislators are subject to the work product privilege and this Court should reconsider its finding.

In its Order Re Privilege of Documents Dated January 4-7, 2021 [Docket No. 260] (the "Order"), this Court rejected many of Dr. Eastman's claims of work product privilege because the documents were not made in anticipation of litigation, but only in anticipation of various legislative proceedings – specifically, state electoral certification and the congressional electoral count. Order at 22, 23.[66] The documents at issue do not pertain to ordinary legislative proceedings, however, but to proceedings in which Congress is acting in an adjudicative capacity. They are therefore the direct subject of the legislative equivalent of litigation.

### b. The congressional electoral count and state electoral selection pursuant to 3 U.S.C. § 2 are adjudicative proceedings, and documents prepared for them are prepared in anticipation of litigation.

President Trump's legal team brought legal challenges to the election results in a number of key states. President Trump's legal team and others also asked courts in those states to adjudicate the validity of the disputed certifications of electors. These overtures were rejected due, in no small part, to the finding that Article III courts are not the properly empowered bodies to adjudicate electoral certification. *Trump v. Kemp*, 511 F. Supp. 3d 1325, 1335 (N.D. Ga. 2021); *see also Gohmert v. Pence*, 510 F. Supp. 3d 435, 438 (E.D. Tex. 2021). Specifically, the court in *Trump v. Kemp* held that "The Sole Remedy for Objecting to the Counting of Electoral Votes After Certification Lies with the Congress of the United States." *Id.*

---

[66] Ironically, the Select Committee has itself recently claimed work product protection on response to a Department of Justice request for transcripts.  Kipp Jones, "Jan. 6 Committee Chair Bennie Thompson Refuses DOJ Request for Transcripts: 'We're Not Giving Anyone Access'," MediaIte (May 17, 2022) ("'They made a request. We told them that as a committee, our work product was ours, and we're not giving anyone access to the work product,' Thompson reportedly said Tuesday").

The court's reasoning for rejecting President Trump's claim rested squarely on the finding that the Electoral Count Act and the 12th Amendment place Congress in an adjudicative capacity with respect to the validity of the states' electors. This concept is not entirely novel, as the Electoral Count Act specifies the precise procedure whereby both houses of Congress are to make factual findings and judge (by either accepting or rejecting) the validity of each state's electors.[67] Moreover, while it is certainly not common for Congress to act in an adjudicative capacity, the electoral count is not the only circumstance in which Congress does so –the Senate's role in "trying" impeachment proceedings is another notable example. *Nixon v. United States*, 506 U.S. 224, 113 (1993).

Additionally, if the terms of the Electoral Count Act are followed, state legislatures likewise serve as adjudicatory bodies with respect to their own electors. This is explicit in 3 U.S.C. § 2, which confers adjudicative power to state legislatures in the event of a failed election in that state.

Furthermore, and more significantly, if, as the court in *Trump v. Kemp* contends, asking a body other than Congress to adjudicate the matter "presumes that the federal statutory remedy under 3 U.S.C. § 14 is inadequate," then not only is Congress an adjudicative body for the purposes of electoral certification, but the final arbiter of it as well. This, too, would be consistent with other circumstances in which Congress acts in an adjudicative capacity, and, indeed, the Supreme Court has found that congressional standards for adjudication in such contexts are not subject to judicial review. *Nixon*, 506 U.S. at 113.

c. **The documents at issue here over which Dr. Eastman has claim work product protection were prepared in anticipation of adjudicatory proceedings in Congress and/or the state legislatures.**

---

[67] Dr. Eastman has previously contended that the Electoral Count Act is unconstitutional to the extent it intrudes on powers the 12th Amendment vests in the Vice President. But even if unconstitutional, it reflects the understanding that the 12th Amendment, which the Act was adopted to implement, itself envisions an adjudicative function.

There are 39 documents[68] involving communications with state legislators
and another 4 more involving communications containing advice for President
Trump about electors[69] over which Dr. Eastman has asserted work product protec-
tion.  Because he has also asserted attorney-client privilege over these communica-
tions, the issue whether the state legislature's functions under 3 U.S.C. § 2 and/or
Article II, or the function of the Vice President and/or Congress under the 12th
Amendment and the Electoral Count Act being adjudicative in nature may not need
to be resolved with respect to these documents.  But there are 4 other documents[70]
addressing this issue for which attorney-client privilege does not apply, and there-
fore whether or not they qualify as work product because generated in anticipation
of the legislative equivalent of litigation is squarely at issue.

## VIII.  Communications with "Dual Role" Attorneys or Advisors Do Not Lose Work Product Protection.

As this Court recognized in its earlier privilege order (Dkt. 260), "work
product protection is only waived when attorneys disclose their work to "an adver-
sary or a conduit to an adversary in litigation."  Order at 29, citing *Sanmina*, 968
F.3d at 1121; *United States v. Nobles*, 422 U.S. 225, 239 (1975).  The Select Com-
mittee previously contended that "Plaintiff cannot claim work product protection
over an email with a journalist," Opp. at 34, but this court ordered the production
of two communications (4494) and (4496) "with … an opinion editor at
Newsweek," *id.*, not because he was a journalist, as the Select Committee had
urged, but because the email indicated the material had been prepared for select
members of Congress rather than in anticipation of litigation.  *Compare* Opp. at 34
(Dkt. 165-1) with Order at 27 (Dkt. 260).

---

[68] 23582, 23584, 23591, 23631, 23638, 24727, 24730, 24760, 24762, 24778, 24795, 24797, 24893, 24897, 25035, 51402, 51403, 51407, 51408, 52958, 59448, 60185, 60188, 61695, 61697, 61701, 61767, 61768, 61904, 61905, 62674, 62675, 62698, 62706, 62844, 62858, 62859, 62861, 62863
[69] 30119, 31598, 32071, 32072.
[70] 31602, 31628, 31634, 31635

This Court also ordered production of a "memo that had been disclosed to the media," Order at 30 (Doc. 4713), but that ruling does not appear to have adopted the blanket position urged by the Select Committee that any communication with a member of the media waives work product protection.  Nor should it.  Many members of the modern "media" have multiple roles.  The opinion editor is a good example, for in addition to being an "opinion editor at Newsweek," he is also a research fellow at the Edmund Burke Foundation (4494) and a former John Marshall Fellow at the Claremont Institute.[71]  Dr. Eastman has previously produced one email clearly sent to him in his media role (64527), but others, dealing with him in his research fellow role, were withheld as non-responsive and not objected to by the Select Committee.[72]

In such "dual role" situations, the courts have routinely analyzed both attorney-client and work product issues in light of the role that was being played at the time.  This frequently arises in the context of in-house counsel, who often serve both as attorney and business advisor, and attorney-client privilege and work product protections apply only when the counsel is acting in the former role.  *See, e.g.*, *In re Sealed Case*, 737 F.2d 94, 99 (D.C. Cir. 1984); *United States v. ChevronTexaco Corp.*, 241 F. Supp. 2d 1065, 1076 (N.D. Cal. 2002).  It arises in the context of fact witnesses who are also litigation consultants.  *See, e.g., Northfield Ins. Co. v. Royal Surplus Lines Ins. Co.,* No. SACV 03-0492-JVS, 2003 WL 25948971, at *2 (C.D. Cal. July 7, 2003).  And it arises in the context of experts serving both as litigation consultants and testifying experts.  *See, e.g., Construction Industry Services Corp. v. The Hanover Ins. Co.*, 206 F.R.D. 43, 52 (E.D.N.Y. 2001).  In such circumstances, "the work product doctrine may be invoked to protect work completed by the expert in [his] consultative capacity as long as there exists a clear distinction be the two roles."  *Friedman v. 24 Hour Fitness USA, Inc.*, No. CV 06-6282-

---

[71] 2018 Marshall Fellows, https://www.claremont.org/featured/former-john-marshall-fellows/
[72] 6646, 6677, 6683, 6689, 18101, 18190, 20895, 20902, 20901, 20927, 20943, 20990, 21011, 26341, 26370.

AHM(CTX), 2008 WL 11336834, at *3 (C.D. Cal. Nov. 4, 2008) (quoting *Construction Industry Services Corp.*, 206 F.R.D. at 52). A "court must determine which 'hat' the [individual] was wearing at the time the communication was made." *Wells Fargo Bank, N.A., Tr. v. Konover*, No. 3:05CV01924, 2010 WL 814894, at *2 (D. Conn. Mar. 5, 2010) (citing *In re Brokers, Inc.* No. 04-06074, 2006 WL 897137, at *2 (Bankr. M.D.N.C. Mar. 27, 2006)). Because "[l]awyers often wear two hats … it is often necessary to determine in what capacity the particular communication was made." *Henry v. Quicken Loans, Inc.*, No. 04-40346, 2008 WL 2610180, at *4 (E.D. Mich. June 30, 2008), *aff'd*, 263 F.R.D. 458 (E.D. Mich. 2008) (quoting Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine* (2008), § 1.III.E4.F.1).

While Plaintiff has not located any case addressing the work product in the specific context of "dual role" attorneys who are also members of the media, the reasoning of the above cases is equally applicable. And it should control the thirteen documents at issue here that involved work product communications with attorneys who also wear media "hats."

Twelve of those documents[73] involved communications between Dr. Eastman and another individual who, in addition to his role as a radio talk show host, is also an attorney, former long-time President (and current board Chairman) of a public interest law firm, and also a former fellow at The Claremont Institute. Dr. Eastman has collaborated on litigation matters with him in the past, and the twelve documents at issue here, addressed to his personal email address rather than his media address, were communications in that capacity. 3rd Eastman Decl. ¶ 13. Three other communications with this individual at an email address that clearly indicates his media role (***.show@citcomm.com), have been produced. (55413, 55415, and 55461).

---

[73] 021105, 21094, 21106, 21111, 21112, 21113, 21116, 21117, 21122, 21124, 21126, 55486.

PLAINTIFF'S BRIEF IN SUPPORT OF PRIVILEGE ASSERTIONS - 29

The remaining communication at issue (55453) was likewise addressed to a "dual role" attorney wearing his attorney rather than media hat.  3rd Eastman Decl. ¶ 13.  Indeed, it was specifically designated as "between you and me, please," which is to say, confidential.  *Id.*  The attorney involved has long been an informal advisor and sounding board for Dr. Eastman.  *Id.*  And, as the privilege log notes, the communication addressed a potential jurisdictional issue in pending litigation.

In its prior order, this Court noted, at 29, that "The Ninth Circuit makes two inquiries to assess whether disclosure to "a conduit to an adversary" constitutes waiver: whether the party selectively disclosed materials, and whether the party reasonably believed that the recipient would keep the disclosed documents confidential."187, citing *Sanmina*.  Despite their media roles, Dr. Eastman reasonably believed that the communications with these two individuals in their attorney roles would be kept confidential (and they have in fact been so kept.  Work product was therefore not waived.

## IX.   The Fact that a Client Has Not Yet Been Determined Does Not Undermine Work Product.

46 of the documents[74] are communications between Dr. Eastman and a group of statisticians working with him conducting statistical analyses of the Georgia Senate Runoff election in anticipation of election litigation that did not materialize.  Although Dr. Eastman did not yet have a client for that litigation, it is relatively common for public interest attorneys to begin preparation of a potential case before securing a client.  The strength of the factual and legal case will often determine whether the prospective client wishes to pursue the litigation.  Eastman Decl. ¶ 11.  Such preparatory work, whether fact development or legal assessment, is nonetheless work product, which applies not just to the client but to the attorneys

---

[74] 62940, 62944, 62948, 62951, 62955, 62958, 62984, 62987, 62996, 63000, 63054, 63058, 63081, 63084, 63091, 63095, 63103, 63114, 63119, 63125, 63131, 63139, 63146, 63154, 63194, 63407, 63416, 63425, 63438, 63448, 63449, 63450, 63451, 63479, 63503, 63512, 63515, 63518, 63519, 63520, 63717, 63919, 63920, 63973, 63974, 63977

1    and their experts and consultants.  *Admiral Ins.*, 881 F.2d at 1494  (citing Fed. R.

2    Civ. P. 26(b)(3)).

3    ### X.    The Congressional Defendants' Subpoena is Unconstitutional as it

4    Applies to Protected First Amendment Activity

5    In the first brief on privilege assertions, Plaintiff argued that the Select Com-

6    mittee's subpoena violates the First Amendment.  Dkt. 132 at 31-36.  Relying pri-

7    marily on *Watkins v. United States*, Plaintiff argued that the Select Committee's

8    overbroad charter created an unconstitutional chilling effect on First Amendment

9    rights.  354 U.S. 178 (1957).  Plaintiff reasserts those arguments here.  *See*, Dkt.

10   343 at 2 ("The parties may cross reference…arguments made in their previous

11   briefings.").

12   A group of thirty emails[75] from the current *in camera* production bring this

13   argument into sharp relief. The documents all relate to a group of civic minded citi-

14   zens of a conservative viewpoint who meet semi-regularly[76] to socialize and dis-

15   cuss issues of public concern.  The meetings also seem to have a religious aspect,

16   as the agendas indicate each meeting closed with a prayer.

17   During the relevant period, many of the group's discussions naturally in-

18   volved the presidential election, although some did not.  On two occasions, the

19   group invited Dr. Eastman to make a brief guest appearance to offer his perspec-

20   tive on current events.  Many members, organizers, and "special guests" are men-

21   tioned by name in the email correspondence with Dr. Eastman.

22   The Supreme Court has long held that such activity is deserving of First

23   Amendment protection.  *See*, *e.g. NAACP v. Alabama*, 357 U.S. 449, 460 (1958)

24   ("Effective advocacy of both public and private points of view, particularly contro-

25   versial ones, is undeniably enhanced by group association.").  As recently as July

26   2021 the Supreme Court reversed on First Amendment grounds a Ninth Circuit

27

28   ---
[75] As indicated on the consolidated privilege log, these documents are: 21115, 21119, 21120, 21242, 21243, 21245, 21253, 21429, 21430, 22779, 22780, 23038, 23956, 24948, 24950, 25165, 25438, 25558, 25877, 26072, 26091, 26790, 26791, 26793, 26903, 26910, 28376, 30032, 31471, 31537.
[76] All meetings mentioned on the email were virtual, presumably due to COVID.

decision requiring a conservative charitable foundation to disclose its donors to the state. *Americans for Prosperity v. Bonta*, 141 S.Ct. 2373 (2021).  In doing so, the Supreme Court employed an "exacting scrutiny" test formulated as follows:

> [E]xacting scrutiny requires that there be a substantial relation be-
> tween the disclosure requirement and a sufficiently important govern-
> mental interest, and that the disclosure requirement be narrowly tai-
> lored to the interest it promotes.

*Bonta*, 141 S.Ct. 2373 at 2385 (internal quotations and citations omitted).

This Court's *in camera* review will make clear that the congressional de-
fendants' subpoena cannot survive exacting scrutiny as it applies to the emails in question. First, the Select Committee does not have a strong interest in acquiring these materials.  The materials predate January 6 and do not discuss demonstra-
tions at the Capitol on that or any other day.  In fact, the emails contain little sub-
stance at all, consisting mostly of scheduling, agenda setting, and communicating login information.  The emails are of little use to the Select Committee's investiga-
tion.

Whatever slight interest the Select Committee may have in these emails is easily outweighed by the "seriousness of the actual burden" imposed on the indi-
viduals involved.   The emails show that the group in question put a premium on confidentiality of its discussions.  The group is described as "small … off the rec-
ord … cone of silence." 021120.  Members were required to provide a phone num-
ber in advance "[f]or the security of the Zoom meeting." 021242.  Several emails contained a footer stating "[t]his invitation is Not Transferable."  Other emails stated "[w]e are careful about who is on the phone and who is in the room and <u>we do not leak</u> what happens, what is said or who is in the meeting – <u>ever</u>!"  *See*, *e.g.* 21430 (emphasis in original).

Allowing disclosure of the group's communications to a politically misa-
ligned congressional committee would manifestly discourage membership and

chill any discussion among the members who remained.  *Cf., Republican National Committee v. Nancy Pelosi*, 1:22cv659-TJK (D.D.C.) (Dkt. 33 at 39, district court's statement that "the [RNC's First Amendment] argument has some force, especially given that the Select Committee is dominated by members of the Democratic Party.").  This is especially true because the Select Committee has stated publicly and in Court filings that it is planning a series of sensational public hearings to "present the conclusions of its investigation to the public."  Dkt. 336 (May 6, 2022 Status Report by Congressional Defendants).[77]  Much of this information has been leaked to the press already.  *See, e.g.* Nicholas, Peter, *Avalanche of Leaks Imperils Jan. 6 Committee's Delivering on Blockbuster Hearings*, nbcnews.com (May 1, 2022).[78]  Plaintiff himself has received correspondence (readily producible *in camera* upon request) that this Court's under seal privilege logs themselves have been leaked to third parties.  Moreover, any individuals included in these emails may be subject to congressional subpoena and forced to suffer unwanted public exposure and significant legal costs.[79]  It is manifestly clear that enforcing the Select Committee's subpoena as to the emails in question would violate the First Amendment rights of the individuals involved.

The fact that the district court denied the First Amendment challenge in *RNC v. Pelosi* does not change this conclusion.  The two situations are distinct and the analysis of *RNC v. Pelosi* clearly supports finding a First Amendment violation here.  First, in denying RNC's first amendment challenge, the court relied on the Select Committee's need to evaluate whether RNC's mass email campaigns to thousands of citizens contributed to January 6.  *RNC*, ECF 33 at 45.  The committee has no such need here, where there are only 30 emails in dispute, circulated among at most a couple dozen persons.

---

[77] As we discuss elsewhere in this brief, the Select Committee has a pattern of releasing information without the proper context.

[78] https://www.nbcnews.com/politics/congress/avalanche-leaks-risks-jan-6-committee-delivering-block-buster-hearings-rcna26549

[79] Even for those who do not retain counsel, costs may be significant.  The Select Committee does not pay for flights and hotels, even for witnesses who live far from Washington, D.C.

Second, the First Amendment intrusion is greater here than in *RNC v. Pelosi*. There, the Select Committee was "not seeking any information that would individually identify any of the RNC's donors, volunteers, or email recipients." *Id*. at 33. Here, names and identities *will* be disclosed.  Moreover, much of the RNC's confidential information had already been disclosed (*Id*. at 33), which is not the case here.  In sum, the Select Committee's need for the materials in question is much weaker here than it was in *RNC v. Pelosi*, whereas the threat to First Amendment freedoms is much greater.

*Perry v. Scharzenegger* is a factually similar Ninth Circuit case which reinforces the conclusion that the Select Committee's subpoena violates the First Amendment as to the emails in question.  591 F.3d 1147 (9th Cir. 2010).  The case involved a challenge to Proposition 8, a California ballot initiative defining marriage as between a man and a woman.  *Id*. at 1152.  The plaintiff challengers served discovery on "the official Proposition 8 campaign committee." *Id*.  The discovery sought among other things "internal campaign communications concerning strategy and messaging." *Id*.  The campaign committee objected on First Amendment grounds.  *Id*.  The campaign committee submitted a sample of the documents to the district court for *in camera* review.  *Id*. The district court ordered the documents disclosed.  On appeal, the Ninth Circuit held that it was "self-evident" that "important First Amendment interests are implicated by the plaintiffs' discovery request" and that the campaign had therefore "made a prima facie showing of infringement." *Id*. at 1164.  The same is true here.

## XI.   Crime Fraud Exception Is Inapplicable For The Documents Still in Dispute.

### a.  The Court's Previous Crime Fraud Finding Does Not Apply to the Current *In Camera* Documents

In its March 28 order, this Court found that Dr. Eastman and former President Trump had more likely than not violated two federal criminal statutes by

conspiring to obstruct the joint session of congress.  Dkt. 260 at 36-40.  The Court ordered one otherwise privileged document produced pursuant to this finding.  *Id.* at 42.  As stated in this filing and elsewhere, Dr. Eastman respectfully but strenuously disagrees with the Court's decision.  However, even accepting this Court's crime-fraud finding, it is clear the Court's analysis does not apply to any of the documents in the current *in camera* production.

Part of this Court's finding was that "pursuing legal recourse itself did not advance any crimes." *Id.* at 41. The Court therefore did not order documents involving "litigation purposes" disclosed because "legal recourse itself did not advance any crimes." *Id.*  Most of the documents in the current *in camera* production deal directly with litigation.

With respect to the electoral college and the authority of a sitting Vice President, this Court drew a distinction between one document which "discuss[ed] Vice President Pence's refusal to reject or delay the electoral count [but] was not itself in furtherance of the plan" and a second document which this Court found to be "the first time members of President Trump's team transformed a legal interpretation of the Electoral Count Act into a day-by-day plan of action." *Id*. at 41(internal quotations omitted and emphasis in original); *see also*, *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995) (crime fraud applies where communication or work product "was itself in furtherance of the crime or fraud) (emphasis in original). The Court ordered the second document produced pursuant to crime fraud but not the first.  *Id*.

All documents involving the electoral college in the current *in camera* materials fall decidedly in the former category.  They are discussions of legal issues as opposed to a concrete plan.  Documents fitting this description include (without limitation) the following:

- 51759, 52452 – Legal discussion regarding authority of Vice President. Variety of views expressed and no specific plan of action offered. Also relates to potential litigation.
- 57425, 51316 – Opinions offered on litigation strategy and Vice Presidential authority. No concrete plan of action.
- 55050, 55127 – Discussing various scenarios for Jan 6 but offering no concrete proposal. Also relates to litigation.
- 55141 – Discussing need to pursue election integrity litigation even in the event of Trump loss for the good of the country.

All of these documents (as well as others) show no more than what would be expected from legal advisers to any presidential candidate or campaign – brainstorming the relevant legal issues to identify any viable strategy that might benefit the client. This Court may disagree with some of the views tentatively expressed in these discussions, but that does not bring them within the ambit of the previous crime fraud finding.

### b. Legal and Factual Issues with this Court's Prior Crime Fraud Ruling

As argued above, the *in camera* documents here do not present a crime fraud question even under the terms of this Court's March 28 order. However, if this Court concludes that any of the documents do come within the ambit of that ruling, Plaintiff continues to insist respectfully that several aspects of the March 28 crime fraud findings were legally and factually flawed, including the following:

### i. The Alleged Conduct is Not "Obstructive" As a Matter of Law Under 18. U.S.C. § 1512

This Court previously found that former President Trump obstructed an official proceeding (the electoral count). Dkt. 260 at 33. The Court's finding was based on a series of meetings, tweets, phone calls and public statements during

which the President urged the Vice President to refer the electoral certification

back to the states for further examination of claims of fraud an illegality.  *Id.* at 32.

However, at least one district judge has cast serious doubt on whether such

acts can constitute "obstruction" as that term is used in 18 U.S.C. § 1512.  Section

1512 defines obstruction in two ways:

(1)    Alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with intent to impair the object's integrity for use in an official proceeding; or

(2)    Otherwise obstructs, influences or impedes any official proceeding, or attempts to do so.

The congressional intent behind these two clauses is not immediately clear.

Subsection one is very specific, referring only to tampering with documents or objects, whereas subsection two is extraordinarily broad.  Did congress merely include subsection one as an example of conduct that would violate subsection two?

Or should subsection two be limited by subsection one, i.e. limited to conduct involving tampering with documents or other evidence involved in an official proceeding?

These questions were recently put before a district judge in one of the January 6th criminal cases by the defendant's motion to dismiss the obstruction charge.

*United States v. Garrett Miller*, 1:21-cr-0119-CJN (D.D.C.), ECF 72.   The district judge undertook an exhaustive analysis of the statute, related caselaw, and legislative history.  *Id.* at 10-28 (18 pages).  Ultimately, the court concluded that the statue suffered from "serious ambiguity."  *Id.* at 28.  Relying on the long tradition of judicial "restraint in assessing the reach of a federal criminal statute," the court gave §1512 a narrow construction.  Specifically, the court held that:

§1512(c)(2) must be interpreted as limited by subsection (c)(1), and thus requires that the defendant have taken some action with respect

1  to a document, record, or other object in order to corruptly obstruct,

2  impede or influence an official proceeding.

3  *Id.*

4      To be sure, as the defendants have pointed out (Dkt. 201), Judge Nichols is

5  the only judge to dismiss a § 1512(c) charge in the January 6 cases on this basis.

6  However, Plaintiff submits that the *Miller* decision is the most well-grounded not

7  only in law, but in common sense and sound public policy.  If Section 1512(c) is

8  read as the Select Committee suggests, it will expose anyone who anyone who

9  speaks out, criticizes, or even "tweets" about an official proceeding to prosecution

10  if the authorities can somehow come up with an argument that they did so with

11  corrupt intent.  Judge Nichols was rightly hesitant to construe this statue to give the

12  Department of Justice such power to prosecute those involved in the political pro-

13  cess.

14          **ii.  No Proof of "Deceitful or Dishonest Means" Under 18**

15          **U.S.C. § 371**

16      In finding that Dr. Eastman and President Trump likely violated 18 U.S.C. §

17  371, this Court acknowledged that that statute requires proof of obstruction of a

18  lawful government function by "deceit, craft or trickery, or at least means that are

19  dishonest."  Dkt. 260 at 38 (citing *Hammerschmidt v. United States*, 256 U.S. 182,

20  188 (1924)).  This Court found that intent requirement satisfied because "the evi-

21  dence demonstrat[ed] that Dr. Eastman likely knew the plan was unlawful."  *Id.*

22      Dr. Eastman of course disagrees with the Court's finding of "likely"

23  knowledge of illegality—there are serious scholars who believe, as he does, that

24  the Electoral Count Act is unconstitutional to some extent.  But even accepting that

25  Eastman knew is recommendation would violate a constitutionally-valid Electoral

26  Count Act, that is not sufficient to show the requisite intent.  In *United States v.*

27  *Caldwell*, the Ninth Circuit held as follows:

28

The Supreme Court has made it clear that "defraud" is limited only to wrongs done by deceit, craft or trickery, or at least by means that are dishonest.  Obstructing government functions in other ways—for example, by violence, robbery or advocacy of illegal action—can't constitute "defrauding."

989 F.2d 1056, 1059 (9th Cir. 1993) (internal quotations and citations omitted) (italics added).  Thus, even if Dr. Eastman knew the advice he offered to the President and Vice President was unlawful, that would be insufficient.  To find "defrauding" for § 371 purposes, this Court would have to conclude not simply that Dr. Eastman proposed an unlawful course of conduct, but rather that he intended to somehow "trick" the Vice President.  Clearly, the record does not support such a finding.  Vice President Pence is an experienced politician who, the record of this case shows, was closely attended by capable lawyers.  There can be no inference that Dr. Eastman intended to somehow deceive him.  If Dr. Eastman's views were to prevail, it would have to be done through persuasion and argument, rather than trickery.

Of course, Dr. Eastman's position remains that his legal theories, controversial though they may have been, were not unlawful.  They were not foreclosed by the Constitution or Supreme Court precedent.  Throughout this litigation, neither the congressional defendants nor the Court have produced a Supreme Court case passing upon the constitutionality of the Electoral Count Act or the limits of the constitutional authority of the Vice President during electoral college proceedings.  There were and remain open questions.  Dr. Eastman's alleged admission that his argument would be "unanimously rejected by the Supreme Court" (Dkt. 260 at 7) is not only an inaccurate characterization of his position, *see supra* at 9, but it does not change this conclusion.  On average the Supreme Court decides 48% of its case unanimously and the losing party is not typically accused of having criminally obstructed a government function.

Moreover, the current *in camera* materials show that Dr. Eastman and others were not engaging in a fraud scheme but rather in a genuine effort to probe the limits of an area of constitutional law for which no precedent existed.  This Court previously observed that "Dr. Eastman heard from numerous mentors and like-minded colleagues that his plan had no basis in history or precedent."  *Id.* at 38.  The *in camera* emails show that Dr. Eastman was not the only attorney who doubted whether the Vice President's role was strictly ministerial, or whether the Electoral Count Act could bind another branch of government or a future congress.

Finally, the current *in camera* materials show that this Court's prior conclusion that Dr. Eastman's "plan was driven not by preserving the Constitution, but by winning the 2020 election" (*Id.* at 39) was incorrect.  As the Court will observe during *in camera* review, there are multiple instances of Dr. Eastman and others acknowledging that their efforts may well have resulted in a victory for now-President Biden, but that the efforts were nonetheless worthwhile to prevent what they genuinely viewed as a deeply flawed election from ever happening again.  The Court may have deep disagreement with this sentiment, but these private statements conclusively show that Dr. Eastman and others involved in the effort were manifestly not motivated by "deceit, craft or trickery."

## CONCLUSION

For the foregoing reasons, plaintiff requests this Court order that the materials identified on plaintiff's privilege logs are protected from disclosure to the defendants by the attorney client and work product privileges.

March 19, 2022                              Respectfully submitted,

/s/*Anthony T. Caso*
Anthony T. Caso (Cal. Bar #88561)
CONSTITUTIONAL COUNSEL GROUP
174 W Lincoln Ave # 620
Anaheim, CA 92805-2901

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Phone: 916-601-1916; Fax: 916-307-5164
Email: atcaso@ccg1776.com

*/s/ Charles Burnham*
Charles Burnham (D.C. Bar # 1003464)
BURNHAM & GOROKHOV PLLC
1424 K Street NW, Suite 500
Washington, D.C. 20005
Email: charles@burnhamgorokhov.com
Telephone: (202) 386-6920

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I have served this filing on all counsel through the Court's ECF system.

Respectfully submitted,


*/s/ Charles Burnham*

Charles Burnham

BURNHAM & GOROKHOV PLLC

1424 K Street NW, Suite 500

Washington, D.C. 20005

Telephone: (202) 386-6920

Email: charles@burnhamgorokhov.com