OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515

SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004

ARNOLD & PORTER
601 Massachusetts Ave, NW
Washington, D.C. 20001

Counsel for the Congressional Defendants

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| JOHN C. EASTMAN<br><br>            Plaintiff,<br><br>vs.<br><br>BENNIE G. THOMPSON, *et al.*,<br><br>            Defendants. | Case No. 8:22-cv-00099-DOC-DFM<br><br>**CONGRESSIONAL DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S PRIVILEGE ASSERTIONS**<br><br>Date:      unscheduled<br>Time:      9:00 a.m.<br>Location: Courtroom 9D |

**DEFENDANTS' MEMORANDUM OF LAW**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................ii

INTRODUCTION ............................................................................................... 1

BACKGROUND .................................................................................................. 2

STANDARD OF REVIEW ................................................................................ 3

ARGUMENT ....................................................................................................... 4

I.    This Court Has Already Rejected Many of Dr. Eastman's Arguments ................................. 5

    A.    The Crime-Fraud Exception Prevents Dr. Eastman from Shielding the Contested Documents ..................................................... 5

    a.    Dr. Eastman's Legal Advice Furthered the Fraud and Crimes Throughout the Time Period Covered by the Subpoena ............................ 6

    b.    *United States v. Miller* is an Outlier that Should Not Alter this Court's Analysis .......................................................... 11

    c.    Dr. Eastman's Repeated Lies About Election Fraud Were—and Still Are—Dangerous .............................................................. 14

    d.    President Trump Likely Engaged in Common Law Fraud ........................... 22

    B.    The Select Committee Subpoena Does Not Violate the First Amendment.... 23

II.   Dr. Eastman Has Not Met His Burden to Establish an Attorney-Client or Agency Relationship ............................................................................. 27

    A.    Dr. Eastman Failed to Meet His Burden of Establishing Attorney-Client Privilege as to the Documents Related to Purported Representation of Former President Trump or His Campaign ........................ 27

    B.    Dr. Eastman Has Not Met His Burden to Establish the Attorney-Client Relationship as to Documents Related to Other Purported Clients...................... 33

    C.    At the Very Least, Dr. Eastman Must Produce Redacted Versions of Email Threads ............................................................................... 35

III.  Dr. Eastman Has Not Met His Burden to Establish Protection of the Work Product Doctrine ................................................................................ 36

    A.    Dr. Eastman Failed to Meet His Initial Burden to Invoke the Work Product Doctrine .............................................................................. 37

    B.    Dr. Eastman Waived His Claims to Protection of the Work Product Doctrine 41

    C.    The Select Committee Has a Substantial Need for the Documents and Cannot Obtain the Substantial Equivalent of the Documents Without Undue Hardship ......................................................... 44

CONCLUSION ................................................................................................. 45

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

# **TABLE OF AUTHORITIES**

*Admiral Ins. Co. v. U.S. Dist. Ct. for Dist. of Ariz.,*
    881 F.2d 1486 (9th Cir. 1989) .................................................................44

*Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Fed. Election Comm'n,*
    333 F.3d 168 (D.C. Cir. 2003)................................................................24

*Americans for Prosperity v. Bonta,*
    141 S. Ct. 2373 (2021).............................................................................24

*Anderson v. Trustees of Dartmouth Coll.,* No. 19-CV-109,
    2020 WL 5031910 (D.N.H. Aug. 25, 2020).............................................24

*Atraqchi v. GUMC Unified Billing Servs.,*
    788 A.2d 559 (D.C. 2002) .......................................................................19

*Barenblatt v. United States,*
    360 U.S. 109 (1959).................................................................................29

*Bd. of Trustees of State Univ. of New York v. Fox,*
    492 U.S. 469 (1989).................................................................................30

*Bean LLC v. John Doe Bank,*
    291 F. Supp. 3d 34 (D.D.C. 2018)...........................................................32

*Bittaker v. Woodford,*
    331 F.3d 715 (9th Cir. 2003) ...................................................................40

*Boskoff v. Yano,*
    57 F. Supp. 2d 994 (D. Haw. 1998).........................................................13

*Bowyer v. Ducey,*
    506 F. Supp. 3d 699 (D. Ariz. 2020) .......................................................12

*Breon v. Coca-Cola Bottling Co. of New England,*
    232 F.R.D. 49 (D. Conn. 2005) ...............................................................15

*Brock v. Loc. 375, Plumbers Int'l Union of Am., AFL-CIO,*
    860 F.2d 346 (9th Cir. 1988) ...................................................................17

*Buckley v. Valeo,*
    424 U.S. 1 (1976).....................................................................................19

*Burroughs v. United States*,
    290 U.S. 534 (1934)......................................................................................20

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013)......................................................................................21

*Constantino v. Detroit*, No. 20-014780-AW
    (Wayne Cnty. Cir. Ct. 2020).......................................................................22

*Donald J. Trump for President, Inc. v. Boockvar*,
    502 F. Supp. 3d 899 (M.D. Pa. 2020)........................................................23

*Donald J. Trump for President, Inc. v. Sec'y of Pa.*,
    830 F. App'x 377 (3d Cir. 2020) ................................................................24

*Durling v. Papa John's Int'l, Inc.*,
    No. 16-cv-3592, 2018 WL 557915 (S.D.N.Y.) .........................................26

*Eastman v. Thompson et al.*,
    No. 1:21-cv-03273 (D.D.C. 2021)...............................................................26

*Eastland v. U. S. Servicemen's Fund*,
    421 U.S. 491 (1975)......................................................................................39

*Exxon Corp. v. FTC*,
    589 F.2d 582 (D.C. Cir. 1978).....................................................................14

*Flaherty v. Seroussi*,
    209 F.R.D. 300 (N.D.N.Y. 2002) ...............................................................34

*Fletcher v. Union Pac. R.R. Co.*,
    194 F.R.D. 666 (S.D. Cal. 2000).  ..............................................................35

*Herbert v. Lando*,
    441 U.S. 153 (1979)......................................................................................16

*In re Bonanno*,
    344 F.2d 830 (2d Cir. 1965) ........................................................................43

*In re Grand Jury Investigation*,
    810 F.3d 1110 (9th Cir. 2016) .....................................................................43

*In re Grand Jury Proc. (Corp.)*,
    87 F.3d 377 (9th Cir. 1996) .........................................................................26

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

*In re Pac. Pictures Corp.*,
    679 F.3d 1121 (9th Cir. 2012) ..................................................................31

*In re W/B Assocs.*,
    307 B.R. 476 (Bankr. W.D. Pa. 2004) .....................................................40

*John Doe No. 1 v. Reed*, 561 U.S. 186, 200 (2010) .......................................20

*Kelly v. Commonwealth of Pa.*,
    No. 68-MAP-2020 (Pa. 2020) .................................................................36

*Perry v. Schwarzenegger*,
    591 F.3d 1147 (9th Cir. 2010) ..................................................................43

*Reavis v. Metro. Prop. & Liab. Ins. Co.*,
    117 F.R.D. 160 (S.D. Cal. 1987) ..............................................................19

*Reiserer v. United States*,
    479 F.3d 1160 (9th Cir. 2007) ..................................................................18

*Repub. Nat'l Comm. v. Pelosi ("RNC")*,
    No. 22-659, 2022 WL 1294509 (D.D.C.)................................................17

*Rockwell Int'l Corp. v. U.S. Dep't of Just.*,
    235 F.3d 598 (D.C. Cir. 2001)..................................................................16

*Small v. Fritz Cos., Inc.*,
    65 P.3d 1255 (Cal. 2003) .........................................................................15

*Senate Permanent Subcomm. v. Ferrer*,
    199 F. Supp. 3d 125 (D.D.C. 2016).........................................................12

*Solis v. Taco Maker, Inc.*,
    No. 1:09-CV-3293, 2013 WL 4541912 (N.D. Ga.) .................................11

*Trump v. Raffensperger*,
    No. 2020CV343255 (Ga. Super. Ct., Fulton Cnty.).................................10

*Trump v. Thompson*,
    20 F.4th 10 (D.C. Cir. 2021)......................................................................8

*United States v. Bingert*,
    No. 21 (D.D.C. 2022) ................................................................................9

*United States v. Bozell*, No. 21-cr-216,
    2022 WL 474144 (D.D.C. 2022)..................................................................7

*United States v. Bryan*,
    72 F. Supp. 58 (D.D.C 1947).....................................................................6

*United States v. Caldwell*, No. 21-cr-28, 2021
    WL 6062718 (D.D.C. 2021).......................................................................6

*United States v. Deloitte LLP*,
    610 F.3d 129 (D.C. Cir. 2010)..................................................................5

*U.S. ex rel. Giles v. Sardie*,
    191 F. Supp. 2d 1117 (C.D. Cal. 2000)....................................................4

*United States v. Fischer*, No. 1:21-CR-00234,
    2022 WL 782413 (D.D.C. 2022)...............................................................4

*United States v. Grider*, No. 21-cr-22,
    2022 WL 392307 (D.D.C. 2022)...............................................................8

*United States v. Lawrence*,
    189 F.3d 838 (9th Cir. 1999).....................................................................6

*United States v. Martin*,
    278 F.3d 988 (9th Cir. 2002).....................................................................6

*United States v. McHugh*, No. CR 21-453,
    2022 WL 1302880 (D.D.C. 2022).............................................................7

*United States v. Miller*, No. 21-CR-119,
    2022 WL 823070 (D.D.C. 2022)...............................................................7

*United States v. Montgomery*, No. 21-cr-46,
    2021 WL 6134591 (D.D.C. 2021).............................................................7

*United States v. Mostofsky*, No. 21-cr-138,
    2021 WL 6049891 (D.D.C. 2021).............................................................7

*United States v. Nordean*, No. 21-cr-175, 2021
    WL 6134595 (D.D.C. 2021).......................................................................7

*United States v. Puma*, No. 21-cr-454,
    2022 WL 823079 (D.D.C. 2022)...............................................................7

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

*United States v. Reffitt*, No. 21-CR-32,
    2022 WL 1404247 (D.D.C. 2022) ...................................................................7

*United States v. Ruehle*,
    583 F.3d 600 (9th Cir. 2009) .......................................................................4

*United States v. Richey*,
    632 F.3d 559 (9th Cir. 2011) .....................................................................36

*United States v. Sandlin*, No. 21-cr-88,
    2021 WL 5865006 (D.D.C. 2021) .............................................................12

*United States v. Sanmina Corp.*,
    968 F.3d 1107 (9th Cir. 2020) ....................................... 36, 41, 42, 43, 44

*United States v. Zolin*,
    491 U.S. 554 (1989) .....................................................................................6

*Weil v. Inv./Indicators, Rsch. & Mgmt., Inc.*,
    647 F.2d 18 (9th Cir. 1981) .................................................................4, 44

**Constitutional Provision & Statutes**

U.S. Const. Art. VI, cl. 3 ...........................................................................42

18 U.S.C. § 371 ..........................................................................................11

18 U.S.C. § 1512 ..................................................................... 6, 11, 12, 13

**Rules**

Fed. R. Civ. P. 34(b)(2)(C) ......................................................................36

Fed. R. Crim. P. 29 ...................................................................................13

Fed. R. Evid. 104(a) ...................................................................................6

**Other Authorities**

8 Charles Alan Wright & Arthur R. Miller,
    *Federal Practice & Procedure* § 2024 (3d ed. 2020) .............................42

CISA, *Joint Statement from Elections Infrastructure Government Coordinating Council & The Election Infrastructure Sector Coordinating Executive Committees* (Nov. 12, 2020), https://perma.cc/NQQ9-Z7GZ ......................................................20

Clara Hendrickson, *et al.*, *Antrim County hand tally affirms certified election results*, (Dec. 17, 20202), https://perma.cc/3MFZ-5YFL ......................................................7

Gabriel Sterling, *Georgia Secretary of State Office Press Conference Transcript January 4: Trump Call, Senate Runoff Election*, Rev Blog (Jan. 4, 2022), https://perma.cc/3WG2-TKS9 ......................................16

Joe Hoft, *Auditor Bryan Geels Identified Nearly 100,000 Ballots in Georgia that Were Invalid-Raffensperger Blew It Off, Misrepresented the Data, and Certified the 2020 Election Anyway*, Gateway Pundit (Feb. 11, 2022), https://perma.cc/E8PD-TBBH...........................................................................16

John C. Eastman, *The American Mind, The Constitutional Authority of State to Choose Electors*, The American Mind (Dec. 1, 2020), https://perma.cc/Y4TF-Y9JJ.............................................................................10

Jordan Fischer, *The only judge to dismiss obstruction charges in a Capitol riot case is "seriously contemplating" reconsidering*, WUSA 9, (May 3, 2022), https://perma.cc/RKD3-QHTM ........................................ 12

Josh Gerstein, *Barr OK for Election-fraud Investigations Roils Justice Department*, Politico (Nov. 9, 2020, 9:04 PM), https://perma.cc/JQG2-BF2L.............................. 21

Katherine Fung, *Trump Claimed Thousands of Dead Voted in Georgia Election, Investigation Found Only Four*, Newsweek (Dec. 27, 2021), https://perma.cc/9UQX-V4BZ ...........................................................................19

Letter from Chairman Bennie G. Thompson, Chair of the Select Comm. to Investigate the January 6th Attack on the U.S. Capitol, to John Eastman (Nov. 8, 2021), https://perma.cc/ZV8J-P2QS..............................................................................2

Letter from Sec'y of State Brad Raffensperger to Congress (Jan. 6, 2021), https://perma.cc/C2HS-VRU7 ............................................................................42

Mark Niess, *Georgia Elections Chief Counters False Claims in Letter to Congress*, Atlanta J.-Const. (Jan. 7, 2021), https://perma.cc/5G4M-C757 ...........................................42

Mem. from Att'y Gen. to U.S. Att'ys (Nov. 9, 2020), https://perma.cc/7N6E-27N2 ..............................................................................21

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

Nathaniel Rakich, *Why So Few Absentee Ballots Were Rejected in 2020*, FiveThirtyEight (Feb. 17, 2021, 6:00 AM), https://perma.cc/P3RW-ZKLM ....................................15

Paul Rice, *Attorney-Client Privilege in the United States* § 11:21 (2014) .......................36

Philip Bump, *Discussing the Gaps in '2000 Mules' with Dinesh D'Souza*, Wash. Post (May 17, 2022), https://perma.cc/3WHS-NVVL............................................................ 22

*The never-before-told backstory of Pence's Jan. 6 argument*, Politico (Feb. 18, 2022, 5:00 AM), https://perma.cc/AQY7-KAXZ ..................................................................... 43

Tony Adams, *et al.*, *Scientists say no credible evidence of computer fraud in the 2020 election outcome, but policymakers must work with experts to improve confidence* (Nov. 16, 2020), https://perma.cc/WAK5-GE4V .....................................................21

William Cummings et al., *By the Numbers: President Donald Trump's Failed Efforts to Overturn the Election*, USA Today (Jan. 6, 2021), https://perma.cc/M52G-K3GC .................................................................................14

viii

## **INTRODUCTION**

Of the 3,907 documents over which Plaintiff John Eastman initially asserted privilege, 601 are currently before the Court.  Each of Dr. Eastman's remaining privilege assertions within this population of documents fails for three reasons.

*First*, this Court has already rejected many of Dr. Eastman's arguments.  As this Court already held, the crime-fraud exception uncloaks any privilege shield that may otherwise exist for many of the contested documents.  Dr. Eastman has reiterated his debunked claims that the 2020 Presidential election was stolen.  These claims were false when Dr. Eastman and President Trump originally made them and they helped lead to one of the most tragic episodes in this Nation's history.  As to his argument that the subpoena issued by the Select Committee to Chapman University violates the First Amendment, Dr. Eastman's arguments fail for the same reasons they failed the prior times Dr. Eastman raised this argument.

*Second*, Dr. Eastman has failed to meet his burden to establish entitlement to the attorney-client privilege for the 162 documents over which he claims such privilege.  This Court directed Dr. Eastman to file "with the Court and the Select Committee evidence of all attorney-client and agent relationships asserted in the privilege log" and to "provide evidence documenting any attorney-client relationships that existed with his clients."  Order Re. Briefing Sched. at 1, May 12, 2022, ECF 343.  Absent such contemporaneous written documentation, this Court ordered Dr. Eastman to provide "a sworn statement from an attorney, client, or agent *in each relationship* attesting that written documentation does not exist and specifying the timing and scope of the relationship."  *Id.* at 2 (emphasis added).  Dr. Eastman has failed to introduce a single contemporaneous document reflecting any attorney-client or agency relationship.  Instead, he provides conclusory declarations (one unsigned) that nowhere attest that "written documentation does not exist[,]" and fail to "confirm the timing and scope of each attorney relationship and each agent relationship[.]"  *Id.* at 1, 2.  As to former

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

President Trump, many of the documents at issue include the same third parties that this Court already concluded destroyed any privilege.

*Third*, Dr. Eastman is not entitled to work product protection for the 557 documents over which he claims it. As before, Dr. Eastman has failed to show that the documents were prepared by a party, or a party's representative, in anticipation of litigation. And, in any event, the Select Committee has a substantial need to obtain these documents quickly.

## BACKGROUND

This Court and Congressional Defendants have already described in detail the tragic events of January 6, 2021, and Dr. Eastman and former President Trump's actions leading up to and on that day. *See* Order Re. Privilege Docs. at 3-11, Mar. 28, 2022, ECF 260; Cong. Defs.' Br. Opp'n Pl's. Privilege Assertions at 3-6, Mar. 3, 2022, ECF 164-1; Defs.' Mem. Opp'n Pl's. Emergency Mot. at 2-5, ECF 23-1. Congressional Defendants rely on those descriptions here.

The Select Committee issued a subpoena to Dr. Eastman in furtherance of its duty to investigate the facts, circumstances, and causes of the attack on January 6. Rather than cooperate with the Select Committee, Dr. Eastman refused to produce any documents responsive to that subpoena and repeatedly invoked his Fifth Amendment privilege during his deposition. Dr. Eastman also filed suit in the District of Columbia asking that court to invalidate a subpoena issued to Dr. Eastman's cell phone service provider seeking non-content information. Not only has Dr. Eastman asked to be relieved from any obligation to comply with the subpoena in that litigation, but he also asked that court to declare the Select Committee itself void. *See* Compl. Prayer for Relief ¶¶ b-c, *Eastman v. Thompson* et al., No. 21-cv-03273, ECF 1, (D.D.C. Dec. 14, 2021).

Because Dr. Eastman resisted the subpoena issued directly to him, the Select Committee issued a subpoena to Dr. Eastman's former employer, Chapman University. Letter from Chairman Bennie G. Thompson, Chair of the Select Comm. to Investigate the

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

January 6th Attack on the U.S. Capitol, to John Eastman (Nov. 8, 2021).[1]  The day before the subpoena's deadline, Dr. Eastman initiated this action seeking to enjoin Chapman from producing responsive records.  At a hearing in January, the parties agreed that Dr. Eastman would expeditiously produce a privilege log with particularized assertions of privilege.  The Court denied Dr. Eastman's application to maintain a temporary restraining order, rejected his First Amendment, Fourth Amendment, and Congressional authority claims, and ordered Dr. Eastman to produce all non-privileged, responsive documents to the Select Committee on a rolling basis.  The Court also denied Dr. Eastman's blanket attorney-client privilege and work product protection claims with the proviso that Dr. Eastman retained the right to raise these claims as to specific documents during production.  *See* Order Den. Pl's. Mot. Prelim. Inj. at 2, Jan. 25, 2022, ECF 43.

Over the next four months, Dr. Eastman produced privilege logs broadly asserting attorney-client and agency relationships but providing little detail about the nature of the asserted privilege.  This Court granted Congressional Defendants' request for prioritization of and briefing related to the privilege assertions on Dr. Eastman's January 4-7 document logs and set a hearing to address these issues.  *See* Order Setting Briefing Sched. at 2, Feb. 14, 2022, ECF 104.  Soon after the hearing, this Court issued an order upholding Dr. Eastman's privilege claims over certain documents while denying his privilege claims over many other documents.  *See* ECF 260 at 44.  Consequently, the parties revised their respective privilege claims and objections and now address the 601 documents over which Dr. Eastman maintains his assertions of privilege and that are currently before the Court.

## **STANDARD OF REVIEW**

"Evidentiary privileges in litigation" like those at issue here "are not favored." *Herbert v. Lando*, 441 U.S. 153, 175 (1979).  The burden of proving that the attorney-client privilege or work product protection applies rests with the party asserting the

---

[1] *Available at* https://perma.cc/ZV8J-P2QS.

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

privilege. *Weil v. Inv./Indicators, Rsch. & Mgmt., Inc.*, 647 F.2d 18, 25 (9th Cir. 1981). "[A] party asserting the attorney-client privilege has the burden of establishing the relationship *and* the privileged nature of the communication." *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009) (internal quotation omitted). "Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed." *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002), *as amended on denial of reh'g* (Mar. 13, 2002) (internal quotation omitted).

## **ARGUMENT**

Following this Court's March 28 Order, and with the additional information the Select Committee has learned in the months since Congressional Defendants filed their brief regarding documents in the January 4 through 7 timeframe, it is evident that the documents currently before the Court are extremely important to the Select Committee's work.

Because Congressional Defendants must challenge the privilege assertions without seeing the documents, Congressional Defendants cannot respond to many of Dr. Eastman's representations about particular documents. Congressional Defendants, moreover, were compelled to base their objections on Dr. Eastman's vague and summary representations in his privilege log. For the first time since he began producing privilege logs, Dr. Eastman provides some detail about why he believes certain documents are privileged. It is only in his current brief, five months into the privilege log process, that Dr. Eastman links particular documents to particular cases. *See* Pl.'s. Br. Supp. Privilege Assertions at 20-23, May 19, 2022, ECF 345. This effort comes too late and does not shield the documents at issue from the crime-fraud exception to any privilege claim.

This Court's March 28 order already rejected many of the argument Dr. Eastman makes now. This Court should reject Dr. Eastman's effort to revisit them.[2] As to Dr.

---

[2] This Court also concluded that Dr. Eastman's unauthorized use of Chapman's email server did not destroy attorney-client privilege. *See* ECF 260 at 15-20. Because Dr. Eastman's renewed claims of privilege fail for the various reasons discussed below,

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

Eastman's other arguments, he fails to meet his burden to establish either attorney client privilege or work product protection.

## I.   This Court Has Already Rejected Many of Dr. Eastman's Arguments

Rather than apply this Court's Order addressing the January 4-7, 2021 documents, Dr. Eastman asks this Court to reverse its prior decisions.  There is no reason to do so.

### A.   The Crime-Fraud Exception Prevents Dr. Eastman from Shielding the Contested Documents

For the same reasons the Court found the crime-fraud exception applicable to the January 4-7 documents, it should review the remaining materials to determine whether the legal advice reflected in them was used in furtherance of the former President's crimes.

As this Court has explained, communications in which a "client consults an attorney for advice that will serve him in the commission of a fraud or crime" are not privileged from disclosure.  *In re Grand Jury Investigation*, 810 F.3d 1110, 1113 (9th Cir. 2016) (internal quotations omitted); *see* ECF 260 at 30.  This exception to the attorney-client privilege applies where (1) "the client was engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme," and (2) "the attorney-client communications for which production is sought are sufficiently related to and were made in furtherance of [the] intended, or present, continuing illegality."  *Id.* (internal quotation marks omitted).  This is true even if the crime or fraud is ultimately unsuccessful.  *In re Grand Jury Proc. (Corp.)*, 87 F.3d 377, 382 (9th Cir. 1996).

---

Congressional Defendants do not address the Chapman University email use in this filing.  Instead, Congressional Defendants cross-reference and stand by their arguments in their prior briefing.  *See* ECF 164-1 at 24-28; ECF 343 at 2 (permitting the parties to cross reference or restate arguments made in their previous briefings for the January 4-7, 2021).  Congressional Defendants, however, do not abandon the issue and reserve the right to raise it should it be relevant as the case proceeds.

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

*In camera* review of the contested communications is warranted when the party seeking production has provided "a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *United States v. Zolin*, 491 U.S. 554, 572 (1989) (citation omitted).  The party seeking disclosure must ultimately establish applicability of the exception by a preponderance of the evidence, meaning "the relevant facts must be shown to be more likely true than not." *United States v. Lawrence*, 189 F.3d 838, 844 (9th Cir. 1999); *see* Fed. R. Evid. 104(a).

This Court has already held that a preponderance of the evidence implicates President Trump in the commission of two federal felonies: (1) attempted obstruction of an official proceeding, 18 U.S.C. § 1512(c)(2); and (2) conspiracy to defraud the United States, 18 U.S.C. § 371.  ECF 260 at 36 ("[T]he Court finds it more likely than not that President Trump corruptly attempted to obstruct the Joint Session of Congress on January 6, 2021."); *id.* at 40 ("[T]he Court finds that it is more likely than not that President Trump and Dr. Eastman dishonestly conspired to obstruct the Joint Session of Congress on January 6, 2021.").

### a. Dr. Eastman's Legal Advice Furthered the Fraud and Crimes Throughout the Time Period Covered by the Subpoena

Public reporting and evidence available to the Committee establish a good-faith belief that Dr. Eastman's legal assistance was used throughout the period covered by the subpoena in furtherance of those crimes.  Defendants therefore ask the Court to review the remaining documents for application of the crime-fraud exception.[3]

---

[3] Congressional Defendants are aware that the Court is already conducting an *in-camera* review of the contested documents.  ECF 343 at 2.  Congressional Defendants believe that the evidence supports including an assessment of the crime-fraud exception in that review.  The Court's *in-camera* knowledge of the communications may then help determine whether specific documents satisfy the preponderance threshold.  *See In re Grand Jury Investigation*, 810 F.3d at 1114 (requiring a district court to "examine the individual documents themselves to determine that the specific attorney-client

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

Dr. Eastman's role in the effort to obstruct the counting of electoral votes and the conspiracy to prevent the certification of President Biden's electoral victory is, by now, well-established. *See, e.g.*, ECF 260 at 3-8. Two additional points bear emphasis. *First*, the evidence shows that Dr. Eastman's role extended well beyond the January 4-7 period. *Second*, President Trump's and Dr. Eastman's criminal obstruction of the electoral count was not merely limited to their efforts to pressure Vice President Pence in the days before January 6th; rather, it was the culmination of a monthslong effort corruptly to subvert the results of the 2020 election. Most prominently, new evidence produced by Dr. Eastman illustrates his contemporaneous involvement with the submission of the fraudulent slates of Trump electors that were the basis for his legal arguments regarding the vice president.

From the very outset, Dr. Eastman's theory of Vice Presidential power was predicated upon the existence of "competing" slates of electors. Indeed, as the Court recognized in ordering one document from the January 4-7 period produced to the Select Committee pursuant to the crime-fraud exception, a lawyer identified in Dr. Eastman's recent Declaration as an attorney on the "Trump legal team" suggested this "'President of the Senate' strategy" as early as December 13, 2020.[4] *See* ECF 260 at 30 n.193 (discussing the "November 18, 2020 memo from Kenneth Chesebro"). As the documents Dr. Eastman produced to the Select Committee only after the Court ordered the submission of a final privilege log show, Dr. Eastman was communicating with this lawyer on these same issues as early as December 7, 2020. On that day, Dr. Eastman forwarded to Rudy Giuliani a copy of a memo written on November 18, 2020, by this same "Trump legal team," proposing that Trump electors "cast their votes, and then send their votes to the President of the Senate in time to be opened on January 6 . . . ."[5]

---

communications for which production is sought are 'sufficiently related to' and were made 'in furtherance of the intended, or present, continuing illegality,'" after movant has established a *prima facie* case that the exception applies).

[4] Ex. A, Dec. 13, 2021 email from Kenneth Chesebro to Rudy Giuliani, at 1.

[5] Ex. B, Dec. 7, 2020 email from John Eastman to Rudy Giuliani, at 1, 2.

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

As detailed in this strategy, the Vice President would "firmly take the position that he, and he alone, is charged with the constitutional responsibility not just to open the votes, but to count them—including making judgments about *what to do if there are conflicting votes*."[6]

As the evidence makes clear, however, Dr. Eastman himself believed that these "alternate" slates of electors—the very "conflicting" votes that purportedly invoked the Vice President's authority—had no legal validity unless they were appointed by a state legislature.  On December 19, 2020, in an email exchange with an individual with whom Dr. Eastman exchanged multiple emails in the post-election period, Dr. Eastman advised that the seven Trump/Pence slates of electors "will be dead on arrival in Congress" "unless those electors get a certification from their State Legislators."[7]  Nevertheless, only four days later, and without the certification Dr. Eastman acknowledged was required, Dr. Eastman circulated a memorandum indicating that "7 states ha[d] transmitted dual slates of electors to the President of the Senate" and urging the Vice President to disregard the Biden electors from those seven States, "gavel[ing] President Trump as re-elected" or "send[ing] the matter to the House" for resolution.[8]

After acknowledging his understanding only four days earlier that these slates would be "dead on arrival," Dr. Eastman told a representative of the Trump campaign that "[t]he fact that we have multiple slates of electors demonstrates the uncertainty of

---

[6] Ex. A at 1 (emphasis added).

[7] Ex. D, Dec. 19, 2020 email from John Eastman to an individual with whom Dr. Eastman exchanged multiple emails in the post-election period (Dr. Eastman describing his correspondence with this individual as "our project" and "our report"), Chapman043035.

[8] Ex. E, Dec. 23, 2020 email to Kenneth Chesebro regarding Jan. 6 scenario; *see also* READ Trump lawyer's memo on six-step plan for Pence to overturn the election, CNN (Sept. 21, 2021), https://perma.cc/LP48-JRAF; Jan. 3. Memo on Jan. 6 Scenario, CNN, https://perma.cc/B8XQ-4T3Z (provided by Plaintiff to CNN per CNN reporting, *see* Jeremy Herb (@jeremyherb), Twitter (Sept. 21, 2021, 5:46 PM), https://perma.cc/GX4R-MK9B).

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

either.  That should be enough."[9]  In the days following January 6th, Dr. Eastman *again* indicated that he believed votes were invalid, writing to a member of the public on January 10, 2021, that "they had no authority" because "[n]o legislature certified them."[10] As this Court explained, "[t]he illegality of the plan was obvious . . . . Every American— and certainly the President of the United States—knows that in a democracy, leaders are elected, not installed."  ECF 260 at 36.

Other communications also undermine Dr. Eastman's assertions that his advice was predicated on a genuine belief that the 2020 election had been tainted by fraud.  In an exchange between Dr. Eastman, Cleta Mitchell, and several others on January 2, 2021, Ms. Mitchell asked Dr. Eastman for information on election fraud and persuasive legal arguments to pass to "Members of Congress and Senators, who are now clamoring for facts and data re illegal votes."[11]  Dr. Eastman first responded that because "serious forensic investigations have been blocked at almost every turn, I've been focusing on the clear violations of state law," offering an example from Georgia.[12]  Ms. Mitchell then replied: "What's missing is any similar information in other states, of the kind we assembled in GA.  That's what we are asking.  Does it exist elsewhere?"[13]  Dr. Eastman responded: "No idea.  I haven't even had a chance to look at that website link I sent—but was told everything is assembled there.  Is that not the case?"[14]  When Dr. Eastman later offered to see if the Trump Campaign had this information, Ms. Mitchell responded: "I can tell you now that I don't think it exists but if you can figure it out, members of Congress are desperate for it."[15]  Dr. Eastman nevertheless continued to make false

---

[9] Ex. F, Dec. 23, 2020 email from John Eastman to Boris Epshteyn, at 1.

[10] Ex. G, Jan. 10, 2021 email from John Eastman to Valerie Moon.

[11] Ex. H, Jan. 2, 2021 email from Cleta Mitchell to John Eastman, at 2.

[12] *Id.* at 1-2.

[13] *Id.* at 1.

[14] *Id.*

[15] *Id.*

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

allegations of election fraud, both publicly and privately—in fact, he opens his brief to this Court with those very same false allegations.  Br. at 1-9.

The documents recently produced to the Select Committee by Dr. Eastman provide more than a reasonable basis to establish Dr. Eastman's role throughout the period covered by the subpoena.  Only two days after the election, Dr. Eastman was asked to prepare legal research regarding the role of state legislatures in appointing Presidential electors.[16]  His resulting memorandum, titled "The Constitutional Authority of State Legislatures to Choose Electors," asserted that there was "more than enough in the way of alteration of the legislatively-approved manner of choosing electors to warrant legislatures in several states taking back their plenary power to determine the manner of choosing electors, *even to the point of adopting a slate of electors themselves*."[17]

By November 6, 2020, Dr. Eastman indicated that he had "[a]lready been in touch" with an attorney believed to be working with President Trump "about the Legislature override (for violations of existing state law) option,"[18] and by November 28, 2020, his paper had reached President Trump and the White House Chief of Staff, Mark Meadows.[19]  Dr. Eastman repeatedly pushed this expansive theory of state legislative power in states where Trump lost the popular vote, but where Republicans controlled state legislatures.[20]  But Dr. Eastman's communications with legislators demonstrate that this was not an academic discussion of a legitimate question of constitutional interpretation; this was an outcome-driven campaign to overturn the result of a

---

[16] Ex. I, Nov. 5, 2020 email from Cleta Mitchel to John Eastman.

[17] Ex. J, Nov. 28, 2020 email from Jenna Ellis to Molly Michael, at 6 (emphasis added).

[18] Ex. K, Nov. 6, 2020 email from John Eastman to Chuck DeVore, at 1.

[19] *See* Ex. J. at 2-8.

[20] *See* Ex. L, Nov. 9, 2020 email from John Eastman to Lisa Nelson et al.; Ex. M, Dec. 4, 2020 email from Mark Finchem to Meg Reilly; John C. Eastman, *The Constitutional Authority of State to Choose Electors*, The American Mind (Dec. 1, 2020), https://perma.cc/Y4TF-Y9JJ.

democratic election.[21]  "Dr. Eastman and President Trump launched a campaign to overturn a democratic election, an action unprecedented in American history.  Their campaign was not confined to the ivory tower—it was a coup in search of a legal theory."  ECF 260 at 44.

These examples only further highlight the need for this Court's *in-camera* review of the remaining documents to determine whether they contain communications in furtherance of the former President's efforts to obstruct the electoral count in violation of 18 U.S.C. § 1512(c)(2), and the conspiracy to defraud the United States in violation of 18 U.S.C. § 371.

### b.  *United States v. Miller* is an Outlier that Should Not Alter this Court's Analysis

Dr. Eastman now asks this Court to reverse its prior crime-fraud reasoning, relying exclusively on *United States v. Miller*, No. 21-cr-119, 2022 WL 823070, (D.D.C. Mar. 7, 2022): a single decision that is inconsistent with at least 11 other decisions.

For all the reasons set forth in this Court's March 28 opinion, *Miller* is an outlier.  Nor is *Miller*'s § 1512(c) analysis sturdy on its own docket.  That opinion is subject to a motion for reconsideration, *see* Mot. for Recons., *Miller*, No. 21-cr-119 (D.D.C. Apr. 1,

---

[21] *See, e.g.*, Ex. N, Dec. 4, 2020 email from John Eastman to Russ Diamond; Ex. O, Dec. 4, 2020 email from Russ Diamond to John Eastman.  In an exchange of several emails with Pennsylvania State Representative Russ Diamond, Dr. Eastman encouraged the legislator to draft a resolution "choos[ing] a slate of electors" for Trump/Pence and— after acknowledging that he "did not watch the hearings that were held" and could only "suspect they contained ample evidence of sufficient anomalies and illegal votes to have turned the election from Trump to Biden"—suggested one or more ways to "discard" votes and "discount" the vote totals to manufacture a Trump victory in the state, thus "provid[ing] some cover" and "bolster[ing] the argument for the Legislature adopting a state of Trump electors."  Ex. N at 1.  The legislator responded to Dr. Eastman's email acknowledging the failings of the Trump legal team in the hearing held in Pennsylvania and telling Dr. Eastman that it was because of those deficiencies that he "so latched on to your comments that actual fraud is irrelevant when the election itself is unlawful."  Ex. O at 1.

11

2022), ECF 75, and Judge Nichols recently stated he is "very seriously contemplating"
the Department of Justice's request to reconsider his reasoning.[22]  For good reason.

In addition to this Court's earlier holding, at least eleven other cases have rejected
the document-focused interpretation of Section 1512(c)(2) that Dr. Eastman advances.  In
*United States v. Sandlin*, Judge Friedrich held that Section 1512(c)(2)'s terms are
"expansive and seemingly encompass all sorts of actions that affect or interfere with
official proceedings" and determined that the use of the word "otherwise" in
Section 1512(c)(2) "clarifies" that it "prohibits obstruction by means *other than*
document destruction."  No. 21-cr-88, 2021 WL 5865006, at *5-6 WL 5865006 (D.D.C.
Dec. 10, 2021).  In *United States v. Caldwell*, Judge Mehta concluded that
Section 1512(c)(2) is not "limited" to conduct "affecting the integrity or availability of
evidence in a proceeding."  No. 21-cr-28, 2021 WL 6062718, at *11 (D.D.C. Dec. 20,
2021) (brackets and internal quotation marks omitted); *see id.* at *11-19 (addressing
§ 1512(c)(2)'s text and structure).  In *United States v. Mostofsky*, Judge Boasberg found
persuasive the analysis in *Sandlin* and *Caldwell*.  No. 21-cr-138, 2021 WL 6049891, at
*11 (D.D.C. Dec. 21, 2021).  In *United States v. Nordean*, Judge Kelly reasoned that an
interpretation of Section 1512(c)(2) limiting it to "impairment of evidence" could not "be
squared with" § 1512(c)(2)'s "statutory text or structure."  No. 21-cr-175, 2021 WL
6134595, at *6 (D.D.C. Dec. 28, 2021).  And in *United States v. Montgomery*, Judge
Moss reached the same conclusion.  No. 21-cr-46, 2021 WL 6134591, at *10-18 (D.D.C.
Dec. 28, 2021); *see also United States v. Bozell*, No. 21-cr-216, 2022 WL 474144, at *5
(D.D.C. Feb. 16, 2022) (Bates, J.) (reaching the same conclusion on the scope of

---

[22] *See* Jordan Fischer, *The only judge to dismiss obstruction charges in a Capitol riot
case is "seriously contemplating" reconsidering*, WUSA 9, (May 3, 2022),
https://perma.cc/RKD3-QHTM.  That same judge advanced the same reading of
§ 1512(c) in *United States v. Fischer*, No. 21-cr-00234, 2022 WL 782413, at *4 (D.D.C.
Mar. 15, 2022).  The Department of Justice has filed a motion for reconsideration in that
case as well.  Mot. for Recons., *Fischer*, No. 21-cr-00234, (D.D.C. Apr. 8, 2022), ECF
72.

§ 1512(c)(2)); *United States v. Grider*, No. 21-cr-22, 2022 WL 392307, at \*5-6 (D.D.C. Feb. 9, 2022) (Kollar-Kotelly, J.) (same).

Following *Miller*, at least four cases have expressly disagreed with the analysis in *Miller*.  In denying a defendant's post-trial motion for acquittal under Federal Rule of Criminal Procedure 29, Judge Friedrich specifically considered the reasoning in *Miller* and "d[id] not find *Miller* persuasive."  *United States v. Reffitt*, No. 21-cr-32, 2022 WL 1404247, at \*5 (D.D.C. May 4, 2022).  In *United States v. Puma*, Judge Friedman concluded that the word "otherwise" in Section 1512(c)(2) "clarifies" that a defendant violates that section "through 'obstruction by means other than document destruction.'" No. 21-cr-454, 2022 WL 823079, at \*12 (D.D.C. Mar. 19, 2022) (quoting *Mostofsky*, 2022 WL 6049891, at \*11); *id.* at \*12 n.4 (specifically rejecting *Miller*'s reasoning).  In *United States v. Bingert*, Judge Lamberth also rejected the defendant's reliance on *Miller* to advocate for a restrictive reading of Section 1512(c)(2).  Mem. Op., at 13-22, *Bingert*, No. 21-cr-91 (D.D.C. May 25, 2022), ECF 67.

And in *United States v. McHugh*, Judge Bates specifically declined to do what Dr. Eastman asks this Court to do.  No. 21-453, 2022 WL 1302880, at \*1 (D.D.C. May 2, 2022).  "Relying almost entirely on Judge Carl Nichols's recent opinion in *United States v. Miller*, Crim. A. No. 21-cr-00119 (CJN), 2022 WL 823070 (D.D.C. Mar. 7, 2022)," as Dr. Eastman does here, the defendant there "argue[d] that § 1512(c)(2) prohibits only obstruction that occurs with respect to a document, record, or other object."  *Id.* at \*1. Judge Bates was clear:  "The Court disagrees" with *Miller* and "reiterates its conclusion that 18 U.S.C. § 1512(c)(2) is a broad prohibition on all forms of obstruction."  *Id.*  In ten pages of analysis, Judge Bates rejected, point by point, the reasoning in *Miller*.  *Id.* at \*2-12.

This Court was correct in its original reading of § 1512(c) and its reasoning has only been reinforced by subsequent decisions.  It should not be the first to agree with *Miller*.  The crime-fraud analysis in this Court's March 28 order is on solid ground, and it should govern analysis of the documents at issue here.

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

### c. Dr. Eastman's Repeated Lies About Election Fraud Were—and Still Are—Dangerous

In attempting to rebut the notion that he acted "corruptly," Eastman identifies a series of allegations about election fraud—essentially arguing that these allegations can somehow justify his actions. They cannot. The allegations are unproven conspiracy theories and nonsense, already rejected by courts, the former President's campaign, subject matter experts and/or the U.S. Department of Justice.

**1.** To the extent Dr. Eastman was relying on allegations in legal complaints to establish his belief regarding election fraud, those claims were being routinely rejected by the courts,[23] with blistering criticism of the "evidence" put forward in support of the claims.[24]

**2.** Dr. Eastman begins his argument with allegations about Georgia. These allegations are false. Dr. Eastman claims that hundreds of thousands of illegal votes were cast in the 2020 presidential election in Georgia. To support this assertion, without citing

---

[23] Dr. Eastman claims in a footnote that "almost every" case was "decided on jurisdictional grounds without ever reaching the merits of the claims of illegality and fraud." Br. at 5 n.3. That is not true. In many cases, courts addressed and rejected the merits of claims brought by the former President and those aligned with him. *See* William Cummings et al., *By the Numbers: President Donald Trump's Failed Efforts to Overturn the Election*, USA Today (Jan. 6, 2021), https://perma.cc/M52G-K3GC.

[24] *See, e.g.*, Order at 6, *Constantino v. Detroit*, No. 20-014780 (Wayne Cnty. Cir. Ct. Nov. 13, 2020) (finding election fraud claims "rife with speculation and guess-work about sinister motives"); *Bowyer v. Ducey*, 506 F. Supp. 3d 699, 706, 722, 723 (D. Ariz. 2020) ("allegations are sorely wanting of relevant or reliable evidence," "void of plausible allegations that Dominion voting machines were actually hacked or compromised," and "'expert reports' reach implausible conclusions[] often because they are derived from wholly unreliable sources"); *King v. Whitmer*, 505 F. Supp. 3d 720, 738 (E.D. Mich. 2020) ("nothing but speculation and conjecture that votes for President Trump were destroyed, discarded or switched to votes for Vice President Biden."); Mem. Op. at 2, *Donald J. Trump for President, Inc. v. Boockvar*, No. 20-cv-02078 (M.D. Pa. Nov. 21, 2020), ECF 202 ("strained legal arguments without merit and speculative accusations, unpled in the operative complaint and unsupported by evidence."); *Donald J. Trump for President, Inc. v. Sec'y of Pa.*, 830 F. App'x 377, 381 (3d Cir. 2020) ("Charges require specific allegations and then proof. We have neither here.").

14
**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

any additional evidence, Dr. Eastman relies on allegations in the complaint filed in the
Georgia case of *Trump v. Raffensperger*, No. 2020-cv-343255 (Ga. Super. Ct., Fulton
Cnty. Jan. 7, 2021) (the "Georgia Complaint").  The cited allegations involving
thousands of corrupt votes were wrong when they were made and have not withstood
scrutiny in the months since the former President and other plaintiffs voluntarily
dismissed their complaint on the eve of trial in January 2021, rather than having their
claims tested in the adversarial process.

     *First*, Dr. Eastman refers to a claim raised in the Georgia Complaint that Georgia's
absentee ballot disqualification rate declined from 2.9% in 2016 and 3.46% in 2018 to
.34% in 2020.  *See* Br. at 5.  Dr. Eastman attributes this change in ballot rejection rates to
"lax rules" adopted by the Georgia Secretary of State and posits that between 38,000 and
45,000 ballots that "should have been disqualified" were counted.  *Id.*  Dr. Eastman fails
to account for the expert analysis submitted under oath in response to the Georgia
Complaint explaining that Georgia's substantial improvement with respect to absentee
ballot rejection rates is not a result of "lax rules," but rather a reflection of the success of
COVID-era voter education efforts implemented throughout the country.[25]  In fact,
almost every state in the country reduced its mail-in ballot rejection rate from the 2018
election through public voter education and related efforts.[26]  According to a survey by

---

[25] *See* Ex. P, Decl. of Charles Stewart III ¶¶ 92-104, Dec. 14, 2020 (extended discussion
regarding the efforts undertaken in Georgia and elsewhere prior to the 2020 election to
reduce ballot rejection rates).

[26] For an analysis of this issue and a discussion of the voter education efforts undertaken
with the 2020 election, *see* Nathaniel Rakich, *Why So Few Absentee Ballots Were
Rejected in 2020*, FiveThirtyEight (Feb. 17, 2021, 6:00 AM), https://perma.cc/P3RW-
ZKLM.

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

Ballotpedia, Georgia ranked 10th in terms of the largest reductions from 2018, and 13th in terms of the lowest ballot rejection rate in 2020. [27]

On the basis of these statistics alone, Dr. Eastman makes the claim that 45,000 Georgia voters should have their votes cancelled, but he has no actual evidence to justify that result. And he only makes such arguments about states President Biden won, not states won by Trump with similar error rate reductions (*e.g.*, North Carolina and Kentucky).

*Second*, Dr. Eastman's contention that more than 66,000 underage people were allowed to register to vote, and then did vote, in Georgia in 2020 has also been refuted. The office of the Georgia Secretary of State refuted this claim over a year ago during a televised press conference on January 4, 2021, stating that the actual number of people below the age of 18 who voted was *zero*.[28] The Secretary of State's office reviewed the dates of birth listed on the state's voter registration rolls and found four cases where individuals requested absentee ballots before their 18th birthday. In each case, the voter turned 18 before Election Day.[29] Neither the Georgia Complaint, nor the affidavit upon

---

[27]*Available at* https://perma.cc/WN6D-EELH.

[28] In a February 2022 presentation, Mr. Bryan Geels responded to the Secretary of State's findings by claiming that he never claimed in his report that underage people had voted in Georgia. Rather, he claimed to have identified 2,047 instances in which data he reviewed reflected a registration date and a birth date that were less than seventeen years apart. Joe Hoft, *Auditor Bryan Geels Identified Nearly 100,000 Ballots in Georgia that Were Invalid-Raffensperger Blew It Off, Misrepresented the Data, and Certified the 2020 Election Anyway*, Gateway Pundit (Feb. 11, 2022), https://perma.cc/E8PD-TBBH (relevant portion at 58:00 mark). There is no reference to the 2,047 figure in Mr. Geels' filed affidavit. Ex. Q, Aff. of Bryan Geels ¶ 46, Dec. 1, 2020.

[29]Gabriel Sterling, *Georgia Secretary of State Office Press Conference Transcript January 4: Trump Call, Senate Runoff Election*, Rev Blog (Jan. 4, 2022), https://perma.cc/3WG2-TKS9.

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

which it relied, nor Dr. Eastman, identifies a single voter in Georgia who voted before turning 18.

*Third*, Dr. Eastman's assertion that more than 40,000 voters moved to another county within Georgia and voted in their prior county in 2020 is based on the Declaration of Mark Davis.  Mr. Davis compared National Change of Address forms to voter registration records and concluded that 40,279 people moved across county lines within Georgia more than 30 days before the election but cast a ballot in their old county of residence.[30]  Mr. Davis acknowledged in his declaration that "if those were all temporary relocations, they are eligible, but I think it highly likely the vast majority are not temporary."[31]  Mr. Davis offered no evidence to support this belief.

Nowhere did Mr. Davis contend that any of these voters registered in more than one county or cast more than one ballot in the Presidential election; he merely stated that they voted in their prior (or permanent) Georgia county of residence.  He asserted that "a person who does not permanently live in a county they cast vote in [sic] has no legal or moral right to cast a vote for sheriff, district attorney, county commission, school board, or in a legislative, congressional, or other districts they no longer reside in."[32]  He failed to offer any explanation as to how any vote cast in the wrong county in Georgia impacted the 2020 Presidential election.

*Fourth*, Dr. Eastman's filing reiterated the long-ago refuted claim that more than 10,000 votes were cast in the names of deceased people.  For that claim, the Georgia Complaint referenced by Dr. Eastman relied on the declaration of Bryan Geels, a CPA from Seattle whose affidavit reflects no experience or expertise in election administration, who compared a publicly available Georgia voter list to a list of deceased individuals and claimed to have found "up to 10,315" instances in which individuals with

---

[30] Ex. R, Aff. of Mark Allen Davis ¶¶ 22-25, Nov. 20, 2020.

[31] *Id.* ¶ 26.

[32] *Id.* ¶ 30.

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

the same first name, last name and birth year appeared on both lists.[33]  Mr. Geels warned in his declaration, however, that his list was not meant to suggest that each of those matched names corresponded to a fraudulent vote:

> Because the Voter Registration file only contains the Birth Year for each registered voter, a more exact match cannot be made and there may indeed be false positives included in the population. *Only the State possesses the full birth date records for its voters and could conduct the full analysis with certainty.*[34]

Indeed, this concession by Mr. Geels raised serious questions about his entire "analysis." As noted in the declaration filed in the same Georgia case by MIT Professor Charles Stewart, more than one million registered voters in Georgia shared a first name, last name and birth year with at least one other Georgia voter in 2020, making it an *absolute certainty* that a large number of people who voted in Georgia in 2020 had the same name and birth year as someone who died that year.[35]

In addition, even the former President's own lawyers identified an additional problem with Mr. Geels's methodology: he included in his list all matched names of people who had died by November 3, 2020, failing to account for the fact that virtually all absentee ballot voters mailed in their ballots *before* Election Day.  In internal

---

[33] Ex. Q ¶ 50. Although Mr. Geels' topline number of more than 10,000 names was repeatedly cited by former President Trump, Rudy Giuliani and others, and has now been presented to this Court by Dr. Eastman, even Mr. Geels only claimed that 8,718 individuals on his matched list "are recorded to have perished prior to the date the State records as having accepted their vote."  *Id.*

[34] *Id.* (emphasis added).  More recently, Geels clarified that he did not mean to suggest by his affidavit that any number of fraudulent votes were cast—stressing that he claimed only that it might be *up to* 10,315 votes, and that the data showed 873 people who received credit for voting although they died prior to Election Day.  *See* Hoft, *supra* n. 33 (at 1:00:00 mark of video).

[35] Ex. P ¶ 32.  According to Professor Stewart, applying the most recently available data regarding the death rate in Georgia of people over the age of 20, he would expect 11,572 registered voters in Georgia to share the same first and last name of another voter in Georgia who died in 2020.  *Id.*

18
**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

correspondence in January 2021, the former President's attorneys acknowledged that Mr.

Geels' list included many voters who died *after* they sent in their absentee ballot.[36]

 *Lastly*, and most importantly, the Georgia Secretary of State performed the "full

analysis" that Mr. Geels acknowledged only the State could conduct, and determined—in

findings that were widely publicized—that there were just four instances in which

individuals voted on behalf of deceased relatives.[37]

 The fundamental flaws in the Geels analysis relied on in the January 2021 Georgia

Complaint were identified in pleadings and public pronouncements in 2020 and 2021.

Yet Dr. Eastman promotes that analysis before this Court.

 **2.** After focusing on Georgia, Eastman attempts to undermine conclusions by

Trump Administration officials that the election was not "stolen."  First, he challenges

the statement made by a consortium of election security agencies, including the

Department of Homeland Security's Cybersecurity and Infrastructure Security Agency,

that: "There is no evidence that any voting system deleted or lost votes, changed votes, or

---

[36]  In a January 4, 2021 email to Rudy Giuliani, Steve Bannon, and others, an attorney
promoting election fraud claims attached a spreadsheet of Mr. Geels' data that reflected
only 134 individuals with a date of death *before* the date that the ballot was received and
logged in by the Clerk's office. Ex. S, Jan. 4, 2021 email from K.F. to R.H. et al. at 1.
More than half of those individuals died within three days of their vote being received
and recorded by the Clerk, meaning they likely sent their ballot before they passed.  The
attorney told Mr. Giuliani: "I think this makes the case for unfortunate timing – many
sent their ballots before they passed – rather than nefarious activity. Am raising this just
so that everyone is aware of what the data actually says." *Id.*

[37]Mark Niess, *Alleged 'dead' Georgia votes found alive and well after 2020 election*,
Atlanta J.-Const., (Dec. 27, 2021), https://perma.cc/QP4L-363L.  Georgia's Secretary of
State referred the cases to the attorney general's office for investigation.  Katherine Fung,
*Trump Claimed Thousands of Dead Voted in Georgia Election, Investigation Found Only
Four*, Newsweek (Dec. 27, 2021), https://perma.cc/9UQX-V4BZ.  In one of the four
instances, a 74-year-old widow submitted an absentee ballot on behalf of her husband,
who had died in September 2020; the vote she cast on his behalf "carried out his wishes"
to "vote Republican." *Id.*

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

was in any way compromised."[38]  Dr. Eastman claims this statement was "proved . . . to be false" by a forensic audit in Antrim County, Michigan,[39] and that Michigan's own expert "acknowledged that votes were switched in the machine due to an improper software upgrade."  Br. at 8.  This ASOG "audit" was proven to be false by state officials, and President Trump was informed it was false by his own appointees at the U.S. Department of Justice.[40]  A Michigan expert (whom Dr. Eastman references, *see* Br. at 8 n.11) concluded: "The report contains an extraordinary number of false, inaccurate, or unsubstantiated statements and conclusions."[41]  Finally, a full hand recount of the votes in Antrim County confirmed that that election systems used did not generate the faulty vote counts described by the debunked report.[42]  Nowhere in the expert's report does he conclude that votes were switched through the "adjudication" process (as alleged by the Trump team) or through any "software upgrade" (as claimed by Dr. Eastman).  Nor does the ASOG report or Michigan's expert conclude that the security agency statement noted above is false or incorrect.[43]  Frankly, it is difficult to understand why Dr. Eastman would raise these allegations again here.

Dr. Eastman also claims, without support, that the Department of Justice "did very little in the way of investigations of election illegality and fraud."  Br. at 8.  In fact, the

---

[38]  CISA, *Joint Statement from Elections Infrastructure Government Coordinating Council & The Election Infrastructure Sector Coordinating Executive Committees* (Nov. 12, 2020), https://perma.cc/NQQ9-Z7GZ.

[39] The "forensic audit" referred to by Dr. Eastman was a report prepared by Allied Security Operations Group ("ASOG"), a group hired by Trump's legal team.

[40] Ex. T, Interview of Richard Peter Donoghue Trans. at 26-34, Oct. 1, 2021.

[41] Ex. U, Halderman Rep. at 40.

[42] *See* Clara Hendrickson et al., *Antrim County hand tally affirms certified election results*, (Dec. 17, 20202), https://perma.cc/3MFZ-5YFL.

[43] Indeed, Professor Halderman, along with 58 of the nation's other leading election security scientists, signed a statement in November 2020, that said: "To our collective knowledge, no credible evidence has been put forth that supports a conclusion that the 2020 election outcome in any state has been altered through technical compromise."

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

1  Justice Department changed a long-standing practice in 2020, and authorized U.S.

2  Attorneys to investigate allegations regarding the 2020 Presidential election even before

3  the results were certified.[44]  As Acting Deputy Attorney General Donoghue testified, the

4  Justice Department looked into a litany of bogus claims raised by former President

5  Trump and his supporters and reported to the President on several occasions that the

6  claims were unfounded, including the precise claim that Dr. Eastman touts related to

7  Antrim County.[45]

8      **3.**  Dr. Eastman also reiterates claims that election provisions enacted prior to the

9  2020 general election in Pennsylvania and Wisconsin were unconstitutional, *see* Br. at 6-

10  7, notwithstanding the fact (as acknowledged by Dr. Eastman) that the Supreme Courts

11  of both states rejected the claims in 2020 (and that the U.S. Supreme Court did not

12  reverse either).  *See id.* at 7.  He does not describe the particular Wisconsin measures he

13  believes were unconstitutional.

14      With respect to Pennsylvania, Dr. Eastman refers to litigation related to the

15  constitutionality of a provision passed in 2019 by the Republican-led General Assembly

16  of Pennsylvania to add no-excuse mail-in voting.  After no challenge was filed with

17  respect to the provision within the required 180 days of enactment, the provision was

18  applied in the 2020 primary election and the general election in November 2020.  After

19  the November election, petitioners sued to block certification of the election on the

20  ground that the voting law was unconstitutional.  The Pennsylvania Supreme Court

21  dismissed the claim based on petitioners' "failure to file their facial constitutional

22  challenge in a timely manner," noting the "substantial prejudice" if the court were to

23

24  Tony Adams et al., *Scientists say no credible evidence of computer fraud in the 2020
   election outcome, but policymakers must work with experts to improve confidence* (Nov.

25  16, 2020), https://perma.cc/WAK5-GE4V.

26  [44] *See* Mem. from Att'y Gen. to U.S. Att'ys (Nov. 9, 2020), https://perma.cc/7N6E-27N2;

27  *see also* Josh Gerstein, *Barr OK for Election-fraud Investigations Roils Justice
   Department*, Politico (Nov. 9, 2020, 9:04 PM), https://perma.cc/JQG2-BF2L.

28  [45] Ex. T, Interview of Richard Peter Donoghue Trans. at 26-34 (Oct. 1, 2021).

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

adopt "the extraordinary proposition that the court disenfranchise all 6.9 million Pennsylvanians who voted in the General Election."  Order at 2-3, *Kelly v. Commonwealth of Pa.*, No. 68-map-2020 (Pa. Nov. 28, 2020) (per curiam) (citation omitted).  Thus, whether or not Dr. Eastman thinks that the Pennsylvania Supreme Court ruled incorrectly in that case as a matter of Pennsylvania law, this example cannot reasonably be cited as evidence of fraud or a stolen election.  Again, it is very difficult to understand how Dr. Eastman believes this is helpful to his position in this litigation.

Further, without analysis or discussion Dr. Eastman cites to articles suggesting the "improbability" of President Biden's electoral victory and touts a recent documentary claiming a "massive and illegal ballot harvesting scheme."  Br. at 6.  In particular, the filmmaker admits that he did not identify one false or fraudulent vote cast, but instead insists that his movie should be a "spur" to investigators "to come up with the evidence of a legal offense."[46]  Again, to use the words of Judge Brann from *Donald J. Trump for President, Inc. v. Boockvar*, "One might expect that when seeking such a startling outcome, a plaintiff would come formidably armed with compelling legal arguments and factual proof of rampant corruption . . . That has not happened.  Instead, this Court has been presented with . . . speculative accusations . . . unsupported by evidence."  502 F. Supp. 3d 899, 906 (M.D. Pa. 2020).

### d.  President Trump Likely Engaged in Common Law Fraud

In addressing the January 4-7 documents, this Court "d[id] not reach whether President Trump likely engaged in common law fraud."  ECF 260 at 40.  He did, and any materials in the current population of documents reflecting this fraud must be produced.

The District of Columbia, where these frauds occurred, defines common law fraud as: (1) "a false representation"; (2) "in reference to material fact"; (3) "made with knowledge of its falsity"; (4) "with the intent to deceive"; and (5) "action is taken in

---

[46] Philip Bump, *Discussing the Gaps in '2000 Mules' with Dinesh D'Souza*, Wash. Post (May 17, 2022), https://perma.cc/3WHS-NVVL (interview with filmmaker in which he acknowledges quote from film: "I want to make very clear that we're not suggesting the ballots that were cast were illegal ballots.").

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

reliance upon the representation." *Atraqchi v. GUMC Unified Billing Servs.*, 788 A.2d 559, 563 (D.C. 2002).[47]  As Congressional Defendants explained in their brief on the January 4-7 documents, the former President made numerous false statements regarding election fraud, both personally and through his associates, to the public at large and to various state and federal officials.  *See* ECF 164-1 at 6-7.  These statements included misrepresentations about the validity of state and federal election results.  *See id.* at 7-8.  And the evidence supports a good-faith inference that the President did so with knowledge of the falsity of these statements and an intent to deceive his listeners with the hope they would take steps in reliance thereon.  Congressional Defendants incorporate by reference the portion of their prior brief discussing common law fraud.  *See* ECF 164-1 at 46-51.

> **B.** **The Select Committee Subpoena Does Not Violate the First Amendment**

For the fourth time, Dr. Eastman challenges the subpoena on First Amendment grounds.[48]  This Court rejected Dr. Eastman's First Amendment argument before, *see* ECF 43 at 13, and—if it sees any need to address this iteration of Dr. Eastman's First Amendment argument—this Court should do so again.

A First Amendment challenge to a duly authorized subpoena depends on a balancing of "the competing private and public interests at stake in the particular circumstances shown."  *Barenblatt v. United States*, 360 U.S. 109, 126 (1959); *see also* ECF 43 at 12 (applying *Barenblatt* balancing test to First Amendment claim).  Dr. Eastman now advances a theory that his First Amendment challenge triggers "exacting

---

[47] The definition of fraudulent deceit under California law largely tracks these elements. *See Small v. Fritz Cos., Inc.*, 65 P.3d 1255, 1258 (Cal. 2003) (requiring (1) a "misrepresentation"; (2) "knowledge of falsity (or scienter)"; (3) "intent to defraud, *i.e.*, to induce reliance"; (4) "justifiable reliance"; and (5) "resulting damage" (internal quotation marks omitted)).

[48] *See* Compl. ¶¶ 14, 80-88, Jan. 20, 2022, ECF 1; Pl.'s Br. Supp. Privilege Assertions at 9-10, 31-36, Feb. 25, 2022, ECF 144; Pl.'s Reply in Supp. of Privilege Assertions at 24-25, Mar. 7, 2022, ECF 185; Br. at 31-34.

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

scrutiny" instead of *Barenblatt*'s balancing test.  *See* Br. at 31-32 (arguing the plurality

opinion in *Americans for Prosperity v. Bonta*, 141 S. Ct. 2373 (2021) requires an

exacting scrutiny test).[49]  The plurality in *Bonta* requires no such thing.[50]

Dr. Eastman fails to cite any case holding that this standard applies to a

Congressional subpoena.  The one court that confronted the issue declined to resolve the

question of which standard applies and instead "assume[d] that the narrow-tailoring

requirement applie[d]."  *Repub. Nat'l Comm. v. Pelosi* ("RNC"), No. 22-cv-659, 2022

WL 1294509, at *21 (D.D.C. May 1, 2022), *appeal pending*, No. 22-5123 (D.C. Cir.).

That assumption followed the court's reasoning that the "exacting scrutiny" theory

derived from the *Bonta* plurality and *Barenblatt*'s balancing test "appear to be different

ways of saying much the same thing."  *Id.* at *20; *id.* ("the Court does not see much if

any difference" between the *Bonta* exacting scrutiny test and the *Barenblatt* balancing

test).  According to the *RNC* court, like the *Barenblatt* test, the *Bonta* test calls for

"balanc[ing] the burdens imposed on individuals and associations against the significance

of the government interest in disclosure."  *Id.* (quoting *Am. Fed'n of Lab. & Cong. of

Indus. Orgs. v. Fed. Election Comm'n*, 333 F.3d 168, 176 (D.C. Cir. 2003)).

This Court has already correctly held that the balance falls on the Select

Committee's side.  In rejecting Dr. Eastman's First Amendment arguments in the context

of Dr. Eastman's motion for preliminary injunctive relief, this Court held that "[t]he

public interest here is weighty and urgent.  Congress seeks to understand the causes of a

grave attack on our nation's democracy and a near-successful attempt to subvert the will

of the voters."  ECF 43 at 12.  And, "Congressional action to 'safeguard [a presidential]

election' is 'essential to preserve the departments and institutions of the general

government from impairment or destruction, whether threatened by force or by

---

[49] The part of the *Bonta* opinion on which Dr. Eastman relies, Part II(B)(1), was joined by
only two additional Justices.

[50] Dr. Eastman cited *Bonta* in his prior brief, *see* ECF 144 at 10, but waited until now to
offer his exacting scrutiny theory.

corruption.'"  *Id.* (quoting *Burroughs v. United States*, 290 U.S. 534, 545 (1934)).  *See
also Trump v. Thompson*, 20 F.4th 10, 35 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 1350
(2022) (describing "Congress's uniquely weighty interest in investigating the causes and
circumstances of the January 6th attack so that it can adopt measures to better protect the
Capitol Complex, prevent similar harm in the future, and ensure the peaceful transfer of
power").

Consistent with this Court's reasoning, the Supreme Court itself has recognized
that the public interest is extremely high when the focus is on ensuring "the free
functioning of our national institutions."  *Buckley v. Valeo*, 424 U.S. 1, 66 (1976)
(citation omitted); *see also Senate Permanent Subcomm. v. Ferrer*, 199 F. Supp. 3d 125,
138 (D.D.C. 2016), *aff'd*, 856 F.3d 1080 (D.C. Cir. 2017) (rejecting claims that issuance
of a Congressional subpoena violates a respondent's First Amendment rights).  The
Select Committee is doing precisely that by seeking documents related to Dr. Eastman's
efforts to justify overturning an election.

As the *RNC* court explained, even applying a narrow-tailoring inquiry, the
contours "'must be calibrated to fit the distinct issues raised' in the context of each case."
*RNC*, 2022 WL 1294509, at *21 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 333–34
(2003)).  "And the context here is not a law or regulation of general applicability, but a
legislative investigation in which Congress generally 'has broad discretion in determining
. . . the scope and extent of the inquiry[.]'"  *Id.* (quoting *United States v. Bryan*, 72 F.
Supp. 58, 61 (D.D.C 1947), *aff'd sub nom.*, *Barsky v. United States*, 167 F.2d 241 (D.C.
Cir. 1948) and citing *Eastland v. U. S. Servicemen's Fund*, 421 U.S. 491, 509 (1975)).
Just as in *RNC*, Congress here is entitled to "broad discretion."  2022 WL 1294509, at
*21.

Dr. Eastman, by contrast, hangs his theory of injury on the presumption that the
Select Committee will haphazardly release this information to the public despite the fact
that, according to Dr. Eastman himself, this information is irrelevant to the investigation.
*See* Br. at 33 (accusing the Select Committee of disclosing information); *id.* at 32

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

(claiming that "the emails contain little substance at all, consisting mostly of scheduling, agenda setting, and communicating login information" and "[t]he emails are of little use to the Select Committee's investigation").[51]  This vague theory of injury does not outweigh the Select Committee's (and the public's) interest here.[52]  *Accord Exxon Corp. v. FTC*, 589 F.2d 582, 589 (D.C. Cir. 1978) ("The courts must presume that the committees of Congress will exercise their powers responsibly and with due regard for the rights of affected parties.").

And this theory comes nowhere close to overcoming Congress's "broad discretion in determining the subject matter of the study and the scope and extent of the inquiry." *Bryan*, 72 F. Supp. at 61; *accord Bean LLC v. John Doe Bank*, 291 F. Supp. 3d 34, 44 (D.D.C. 2018) ("In determining the proper scope of [a Congressional] Subpoena, [courts] may only inquire as to whether the documents sought by the subpoena are not plainly incompetent or irrelevant to any lawful purpose [of the Committee] in the discharge of [its] duties.") (quoting *McPhaul v. United States*, 364 U.S. 372, 381 (1960)) (internal

---

[51] Dr. Eastman's judgment about relevance has no place in the inquiry.  He is in no position to dictate what the Select Committee will determine is relevant.  And, even accepting the representation that the documents "are of little use to the Select Committee's investigation," Br. at 32, the Supreme Court has been clear that "[t]he very nature of the investigative function—like any research—is that it takes the searchers up some 'blind alleys' and into nonproductive enterprises." *Eastland*, 421 U.S. at 509.  Dr. Eastman should not be allowed to undermine that process.

[52] Courts require far more specificity than Dr. Eastman alleges.  *See Buckley*, 424 U.S. at 74 (showing an associational injury requires demonstrating "a reasonable probability that the compelled disclosure . . . will subject them to threats, harassment, or reprisals from either Government officials or private parties"); *see also John Doe No. 1 v. Reed*, 561 U.S. 186, 200 (2010); *Brock v. Loc. 375, Plumbers Int'l Union of Am., AFL-CIO*, 860 F.2d 346, 350 n.1 (9th Cir. 1988) (Courts have "emphasized in each of those decisions . . . the need for objective and articulable facts, which go beyond broad allegations or subjective fears. . . . [A] merely subjective fear of future reprisals is an insufficient showing of infringement of associational rights."); *accord Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (holding that a "threatened injury must be certainly impending to constitute injury in fact, and that [a]llegations of possible future injury are not sufficient") (internal quotation marks and citation omitted).

quotation marks omitted); *RNC*, 2022 WL 1294509, at *21 (courts addressing

constitutional challenge to Congressional subpoena "must be 'loath to second-guess the

Government's judgment' about the relevance of the information demanded and the

necessity of the burdens imposed") (quoting *Bd. of Trustees of State Univ. of New York v.

Fox*, 492 U.S. 469, 478 (1989)).[53]

Dr. Eastman's fourth bite at the First Amendment apple fails.

## II.   Dr. Eastman Has Not Met His Burden to Establish an Attorney-Client or Agency Relationship

Dr. Eastman claims attorney-client privilege over 162 of the disputed documents,[54]

including 148 over which he also claims work-protect protection.  Dr. Eastman has not

met his burden to establish attorney-client privilege over these documents.

### A.   Dr. Eastman Failed to Meet His Burden of Establishing Attorney-Client Privilege as to the Documents Related to Purported Representation of Former President Trump or His Campaign

As to his representation of former President Trump, Dr. Eastman's efforts to shield

documents under the guise of an attorney-client communication fail here for the same

reason they failed previously: none of the communications are with President Trump

himself and Dr. Eastman failed to meet his burden to establish that the various third

parties with whom he communicated were attorneys or agents for President Trump.  *See*

ECF 260 at 21.  Dr. Eastman also failed to establish that the scope of his representation

of former President Trump encompassed the entire period at issue and all documents at

issue.

---

[53] That is a key difference between this case and *Perry v. Schwarzenegger*, 591 F.3d 1147, 1161 (9th Cir. 2010), which did not involve a Congressional subpoena.

[54] Dr. Eastman states he asserted attorney-client privilege "over 113 documents containing communications with agents of former President Trump or with other attorneys working on Trump's legal team," Br. at 12, and over "fifty documents where the client (or potential client) was other than former President Trump or his campaign committee," *Id.* at 16 (footnote omitted), for a total of 163 under his calculation.

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

**1.** "[V]oluntarily disclosing privileged documents to third parties will generally destroy the privilege." *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1126–27 (9th Cir. 2012); *see also Reiserer v. United States*, 479 F.3d 1160, 1165 (9th Cir. 2007) ("there is no confidentiality where a third party . . . either receives or generates the documents."). Dr. Eastman labels numerous people as co-counsel or agents of a client, but he repeatedly fails to meet his burden to establish any such co-counsel or agency relationship and does not comply with this Court's May 12, 2022, Order.

This Court previously held that Dr. Eastman failed to meet his burden of establishing attorney-client privilege as to the documents over which he previously claimed privilege because: (1) "[n]one of th[o]se documents include[d] Dr. Eastman's client, President Trump, as a sender or recipient of the email" and "[i]nstead, all emails are sent from a third party to Dr. Eastman, and two of the emails blind copy (bcc) a close advisor to President Trump;" and (2) "Dr. Eastman failed to provide retainer agreements or a sworn declaration that would prove this third party was an attorney or agent for President Trump." ECF 260 at 21.

The same is true here. None of the 113 documents for which Dr. Eastman asserts attorney-client privilege and names President Trump as his client includes President Trump as a sender or recipient of the email; instead, all 113 emails include third parties.[55] Many of these documents include the same third parties that this Court already concluded broke the privilege. *See* ECF 260 at 21; *see, e.g.*, Chapman055012-14, 055029-31, 055050-54, 055112-16, 055127-32, 055012-14, 055029-31, and 055050-54.[56]

---

[55] Dr. Eastman's declaration claims "[i]t was necessary to communicate with Mr. Trump through agents due to his responsibilities as President of the United States." Decl. of John C. Eastman ¶ 4, May 19, 2022, ECF 346. He then lists three people he labels as "Presidential staff members." *Id.* at ¶ 3(b). The first person listed appears to be the President's executive assistant and could possibly have been an agent for attorney-client purposes, the other two had no such administrative role.

[56] Dr. Eastman asserts work product privilege over these documents as well. For the reasons discussed in Section III below, those arguments also fail.

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

On May 12, this Court ordered that Dr. Eastman file "evidence of all attorney-client and agent relationships asserted in the privilege log," consisting of contemporaneous "engagement letters, retainer agreements, or other writings" that "confirm the timing and scope of each attorney relationship and each agent relationship." ECF 343 at 1. Absent such contemporaneous written documentation, Dr. Eastman was ordered to provide "a sworn statement from an attorney, client, or agent *in each relationship* attesting that written documentation does not exist and specifying the timing and scope of the relationship." *Id*. at 2 (emphasis added).

Dr. Eastman did not comply with this order and has failed to meet his burden to demonstrate that all the people he alleges served as co-counsel or agents for the former President or his campaign did in fact serve in those roles. Dr. Eastman introduced no engagement letters, retainer or agency agreements, or any other contemporaneous documents establishing these alleged relationships. Instead, he produced six recent declarations (one of which is neither signed nor dated) from a narrow subset of those people he alleges served as co-counsel or agents for the former President or his campaign to support these purported relationships. That is not enough to meet his burden.

Dr. Eastman's own declaration has many deficiencies. Nowhere does Dr. Eastman "attest[] that written documentation [of the attorney-client or agency relationships] does not exist." *Id.* at 2. The declaration alleges that certain people served as agents of President Trump or his campaign, but, contrary to this Court's order requiring "a sworn statement from an attorney, client, or agent *in each relationship*," Dr. Eastman has not provided any statement or other evidence from President Trump, his campaign, or these alleged agents demonstrating the purported relationship. *Id.* at 2 (emphasis added); *cf. In re Bonanno*, 344 F.2d 830, 833 (2d Cir. 1965) ("[T]he burden of establishing the existence of the relationship rests on the claimant of the privilege against disclosure. That burden is not, of course, discharged by mere conclusory or ipse

dixit assertions, for any such rule would foreclose meaningful inquiry into the existence of the relationship, and any spurious claims could never be exposed.").

Dr. Eastman's declaration similarly includes a conclusory allegation that various people served as "attorneys on the Trump legal team," but the required attestation or other evidence from President Trump or these individuals verifying the alleged relationships is absent.  Decl. of John C. Eastman ¶ 4, May 19, 2022, ECF 346.  Similar ipse dixit assertions are made that others assisted with various legal cases on behalf of President Trump, but no statement or other evidence from President Trump or these individuals evidencing a co-counsel or agency relationship is provided.

The declaration from an attorney licensed to practice law in Indiana and the five-page declaration from an attorney licensed to practice law in Georgia contain similar inadequacies.  Neither "attest[s] that written documentation [of the attorney-client or agency relationships] does not exist."  ECF 343 at 2.  Both declarations allege that certain individuals were attorneys for President Trump or his campaign, yet no statement or other evidence from President Trump or these individuals verifying the alleged relationship is provided.

Moreover, the declaration from the Indiana attorney qualifies this allegation as being "[t]o the best of [the declarant's] knowledge and recollection," while the declaration from the Georgia attorney qualifies the allegation as being made "[o]n information and belief."  Decl. of K.A.K. at 2, May 19, 2022, ECF 346; Decl. of K.H. at 2-4, May 19, 2022, ECF 346.  Both hedges suggest a lack of first-hand knowledge of the alleged relationships and uncertainty regarding their existence, and they cannot suffice as compliance with this Court's order.

The two-page declaration from another attorney similarly names other attorneys with whom the declarant allegedly worked on a litigation matter in which the declarant claims to have represented President Trump, but this declaration does not even allege that these other attorneys served as counsel or agents for President Trump.  Moreover, no statement or other evidence from President Trump or these individuals claiming that

30

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

they had an attorney-client or agency relationship is provided.  As with the other declarations, nowhere does this declaration "attest[] that written documentation [of the attorney-client or agency relationships] does not exist."  ECF 343 at 2.

Finally, because the declaration assertedly by an attorney licensed to practice law in Pennsylvania is not dated or signed and thus not executed, it is inadequate and should not be relied upon by this Court.  *Cf. In re W/B Assocs.*, 307 B.R. 476, 483 (Bankr. W.D. Pa. 2004), *aff'd sub nom. Est. Partners, Ltd. v. Leckey*, No. 04-cv-1404, 2005 WL 4659380 (W.D. Pa. Aug. 31, 2005), *aff'd sub nom. In re W/B Assocs.*, 196 F. App'x 105 (3d Cir. 2006) ("An unsigned agreement, in and of itself, raises material questions as to its validity and applicability."); *Solis v. Taco Maker, Inc.*, No. 1:09-cv-3293, 2013 WL 4541912, at *5 (N.D. Ga. Aug. 27, 2013) (unsigned engagement letter insufficient to establish attorney-client relationship).[57]

Yet again, Dr. Eastman "has not met his burden to show that these communications were with [counsel to, or] an agent of President Trump or the Trump campaign, and as such, these documents do not warrant the protection of the attorney-client privilege."  ECF 260 at 21.

**2.**  Dr. Eastman also falls short of meeting his burden to establish the sweeping attorney-client relationship with former President Trump that he asserts.  Dr. Eastman continues to rely on the same unsigned, undated retainer letter—which he now describes as a "draft"—to assert a sweeping attorney-client relationship with former President Trump.  Br. at 10.  An unsigned, undated engagement letter that by its own language

---

[57] Any belated effort by the Dr. Eastman to cure this defect in his reply by appending a signed declaration or engagement letter should not be permitted.  *See U.S. ex rel. Giles v. Sardie*, 191 F. Supp. 2d 1117, 1127 (C.D. Cal. 2000) ("It is improper for a moving party to introduce new facts or different legal arguments in the reply brief than those presented in the moving papers.").

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

becomes operative when signed[58] does not by itself trigger an indefinite attorney-client relationship.

Even if all of the above were not true, former President Trump waived any privilege by expressly requesting disclosure to third parties. *See* ECF 164-1 at 28-30. This Court did not address the wavier issue in its March 28 Order, but Congressional Defendants incorporate by reference their waiver argument in connection with their prior brief.[59]

This Court concluded that for the January 4-7 timeframe, enough evidence supported an "attorney-client relationship with President Trump and his campaign between January 4 and 6, 2021." ECF 260 at 14. But Dr. Eastman's court appearance on January 5 and his attendance in meetings "[i]n the days leading up to January 6" are not enough for Dr. Eastman to meet his burden of establishing (1) an attorney client-relationship from November 3, 2020 to January 20, 2021, and (2) that the specific documents over which he claims attorney-client privilege fall within the scope of the representation. Indeed, Dr. Eastman has yet to introduce any evidence describing the scope of his representation.

Dr. Eastman did enter some court appearances on behalf of President Trump during this timeframe, but he has fallen short of meeting his burden to establish the overall scope of his representation and how each document over which he asserts attorney-client privilege fell within that scope. For the first time, Dr. Eastman attempts to link particular documents to particular cases. Because Congressional Defendants have not seen these documents, they cannot evaluate whether they establish the attorney-client relationship Dr. Eastman describes. In any event, even if Dr. Eastman has demonstrated

---

[58] *See* Ex. 2 at 1, Engagement Letter (Dec. 5, 2020), ECF 132-2 (retention letter stating it becomes operative "[u]pon the proper signatures by all parties hereto").

[59] *See* ECF 343 at 2 (permitting parties to "cross reference or restate arguments made in their previous briefings for the January 4-7, 2021 documents").

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

an attorney-client relationship, many of the communications were in furtherance of a crime or fraud and are thus not protected.  *See* Section I.A, *supra*.

## B. Dr. Eastman Has Not Met His Burden to Establish the Attorney-Client Relationship as to Documents Related to Other Purported Clients

Beyond his claims of privilege related to representation of President Trump or his campaign, Dr. Eastman asserts that he has claimed attorney-client privilege over communications with "9 different clients or potential clients who were seeking Dr. Eastman's legal advice," including seven state legislators, a party committeewoman, and a citizen coordinating information sessions for state legislators.  Br. at 16.

Here, too, Dr. Eastman has not met his burden to establish that his communications with purported clients, or potential clients, are privileged and has failed to comply with this Court's May 12 order.  Dr. Eastman has not introduced any engagement letter, retainer agreement, or other contemporaneous writing reflecting these purported potential or actual representations.  And Dr. Eastman's own declaration is insufficient to satisfy the Court's order.  Its perfunctory assertions merely claim that he had privileged communications with various parties, and it does not "attest[] that written documentation does not exist" nor does it "specify[] *the timing and scope* of the relationship."  ECF 343 at 2 (emphasis added).

Dr. Eastman's declaration not only fails to satisfy the Court's order, but it also appears misleading.  For instance, of the first three people with whom Dr. Eastman claims to have spoken "about potential representation," Pl. Decl. ¶15, ECF 346, the third has been in contact with the Select Committee through separate counsel.  This separate counsel has informed the Select Committee that this third person "never retained nor considered retaining Dr[.] John Eastman."[60]  Rather, the person "contacted Dr[.] Eastman merely to correct Eastman's incorrect publicly stated position on the [Pennsylvania] Constitution," and "never had any attorney-client privileged communications" with Dr.

---

[60] Ex. V, Mar. 10, 2022 email from M.R. to C.L. at 1.

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

Eastman.[61]  In fact, this third person has produced to the Select Committee documents that appear to match those described in Dr. Eastman's consolidated privilege log as "Comm with agent and potential clients re follow-up from conference call on possible legal consultation."  Chapman023582.

As this Court has noted, the privilege relies in part on "'whether the client believed an attorney-client relationship existed.'"  ECF 260 at 14 (quoting *Boskoff v. Yano*, 57 F. Supp. 2d 994, 998 (D. Haw. 1998)).  In short, Dr. Eastman has not come close to meeting his burden to demonstrate that documents he alleges are related to purported actual or prospective clients other than President Trump are protected by attorney-client privilege.

The vague statement in Dr. Eastman's declaration that he spoke with three people "about potential representation" and that they "had privileged communications," Pl. Decl. ¶15, is problematic for other reasons as well.  The declaration does not clarify whether Dr. Eastman spoke with some or all of the three people together or separately, nor what or whose potential representation was orally discussed.  Moreover, its ipse dixit assertion of a legal conclusion that is the subject of this litigation and for the Court to determine ("[w]e had privileged communications"), which appears repeatedly in the Dr. Eastman's declaration, is inadequate.  *Id.*; *see In re Bonanno*, 344 F.2d at 833; Pl. Decl. ¶¶16, 17, 19.

The similar imprecise statement in Dr. Eastman's declaration that he had allegedly privileged communications with an individual and that individual's alleged agent about a potential representation, Pl. Decl. ¶17, likewise fails to meet his burden.  Moreover, with regard to this alleged agency relationship, the lack of a sworn statement from the individual or the individual's agent results, as explained above, in Dr. Eastman failing both to comply with this Court's May 12 order and to meet his burden to establish any communications were privileged given the presence of a third party.  *See In re Pac. Pictures Corp.*, 679 F.3d at 1126–27.

---

[61] *Id.*

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

The statements in Dr. Eastman's declaration that he offered pro bono legal advice
to two people fail to comply with this Court's order and to meet his burden to establish
that any related documents are privileged.  *See* Pl. Decl. ¶¶18, 20.  Dr. Eastman has not
produced "a sworn statement from an attorney, client, or agent in each relationship
attesting that written documentation does not exist and specifying the timing and scope of
the relationship."  ECF 343 at 2.  The declaration does not address whether any written
documentation exists, and although the months in which the legal advice was offered are
listed, the scopes of the relationships are not adequately specified.  *See id.*  Again, Dr.
Eastman has failed to establish that his communications with his purported actual or
potential clients are privileged; the associated documents do not warrant protection.

## C.   At the Very Least, Dr. Eastman Must Produce Redacted Versions of Email Threads

Dr. Eastman asserts that he withheld entire email threads (even though he asserted
privilege over only a portion of the thread) because Dr. Eastman deemed the non-
privileged portions to be "innocuous."  Br. at 12 n.16.  That is not how privilege
productions work.

"It is not proper to withhold an entire document from discovery on grounds that a
portion of it may be privileged.  Where a document purportedly contains some privileged
information, the unprivileged portions of the document must be produced during
discovery."  *Breon v. Coca-Cola Bottling Co. of New England*, 232 F.R.D. 49, 55 (D.
Conn. 2005).  "The proper procedure in such instances is to redact the allegedly
privileged communication, and produce the redacted document.  The allegedly privileged
information then should be described in a properly executed privilege log."  *Id.*; *see also
Anderson v. Trustees of Dartmouth Coll.*, No. 19-cv-109, 2020 WL 5031910, at *2
(D.N.H. Aug. 25, 2020) ("The applicable law is straight-forward: 'If the nonprivileged
portions of a communication are distinct and severable, and their disclosure would not
effectively reveal the substance of the privileged legal portions, the court must designate
which portions of the communication are protected and therefore may be excised or

redacted (blocked out) prior to disclosure.") (quoting Paul Rice, *Attorney-Client Privilege in the United States* § 11:21 (2014)).[62]

Dr. Eastman must produce the withheld documents with material over which he was asserting privilege redacted, rather than withholding those email threads in their entirety.

## III.    Dr. Eastman Has Not Met His Burden to Establish Protection of the Work Product Doctrine

"The work-product doctrine is a qualified privilege that protects from discovery documents and tangible things prepared by a party or his representative in anticipation of litigation." *United States v. Sanmina Corp.*, 968 F.3d 1107, 1119 (9th Cir. 2020) (internal quotation marks and citation omitted).  To qualify for work-product protection, documents must: "(1) be prepared in anticipation of litigation or for trial and (2) be prepared by or for another party or by or for that other party's representative." *United States v. Richey*, 632 F.3d 559, 567 (9th Cir. 2011) (internal quotation marks and citation omitted).  Dr. Eastman claims protection of the work product doctrine over 557 documents.  As with many in the prior batch of documents, Dr. Eastman has failed to meet his burden to prove applicability of the work-product doctrine.

Dr. Eastman's expansive assertions of work-product privilege appear to hinge on two flawed presumptions.  *First*, anything that might eventually result in litigation meets the "prepared in anticipation of litigation" requirement.  *Second*, that "conduit to an

---

[62] *Durling v. Papa John's Int'l, Inc.*, No. 16-cv-3592, 2018 WL 557915, at *9 (S.D.N.Y. Jan. 24, 2018) (where party had not "adequately demonstrated that, under the circumstances, reviewing and redacting the [email] strings at issue would be unduly burdensome," it was not permitted to "withhold the entirety of a conversation merely because one portion of such communication is subject to privilege"; rather, the defendant was under an obligation to "selectively redact the document in question and produce any non-privileged portions") (internal quotation marks and citation omitted); *accord* Fed. R. Civ. P. 34(b)(2)(C) ("An objection to part of a [discovery] request must specify the part and permit inspection of the rest."); *id.* 1993 Amendment (the rule "make[s] clear that, if a request for production is objectionable only in part, production should be afforded with respect to the unobjectionable portions").

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

adversary" must be read so narrowly that it will not apply so long as a party shares the document with someone he thinks may be likeminded. Even if Dr. Eastman properly invoked the work product doctrine, however, the Select Committee's substantial need overcomes that protection.

## A. Dr. Eastman Failed to Meet His Initial Burden to Invoke the Work Product Doctrine

Dr. Eastman fails in his initial burden to invoke work product protection for two reasons. *First*, many of the documents were prepared for political purposes, not in anticipation of litigation. *Second*, Dr. Eastman leaves gaping holes in his analysis attempting to link particular documents to co-counsel or agents in the various lawsuits he cites.

**1.** Dr. Eastman falls far short of meeting his burden to show that the documents at issue were prepared in anticipation of litigation. As this Court already explained, "Dr. Eastman used evidence of alleged election fraud for two purposes: to support state litigation and to persuade legislators and Vice President Pence to act. Despite those possible dual purposes, these emails do not suggest that Dr. Eastman used them for litigation, make no mention of litigation, and would have had the same form without the prospect of litigation." ECF 260 at 26. This appears to be true of the documents over which Dr. Eastman now attempts to invoke work product protection.

Many of the documents appear to relate to Dr. Eastman's Electoral Count Act plan and his efforts to persuade elected officials to simply discard the results of the 2020 election. These documents were animated by political strategy, and not created in anticipation of litigation. *See* ECF 260 at 23-25. Because Dr. Eastman has not established that the documents were created in anticipation of litigation, they must be produced. *See* ECF 260 at 25.

Dr. Eastman insists that this Court should revisit and reverse its prior holding that Dr. Eastman's efforts to secure alternate slates of electors from various states were not in anticipation of litigation. *See* Br. at 24-27. Dr. Eastman claims that "the Electoral Count

Act and the 12th Amendment place Congress in an adjudicative capacity with respect to the validity of the states' electors."  Br. at 26.  This argument is flawed in three respects.

*First*, Dr. Eastman cites no authority for his "legislative equivalent of litigation" theory that Congress transforms into an adjudicative body when it weighs alternate slates of electors.  Br. at 25.

*Second* (and most fatal to his argument), Dr. Eastman's theory depends on events that never occurred:  states actually submitting alternate slates of electors.  ***Not a single state submitted certificates or papers purporting to be certificates of the electoral votes in connection with the 2020 Presidential election, so Congress's power to weigh alternate slates of electors—whether or not that is an adjudicative process—was never triggered.***

*Third*, Dr. Eastman's actions were not an effort to participate in an adjudicative process (such that they might be eligible for work product privilege protection); they were instead criminal acts subject to the crime-fraud exception and, thus, not protected by a privilege.  *See* Section I(A), *supra*.  The evidence establishes that Dr. Eastman did not merely serve as a lawyer providing legal advice about what happens when states submit alternate slates of electors.  Instead, Dr. Eastman played an active role in trying to materialize alternate slates of electors.  Dr. Eastman affirmatively urged state legislators from states won by President Biden to "decertify" electors.  *See* ECF 260 at 4.  And when that effort failed, Dr. Eastman and former President Trump attempted to persuade the then-Vice President to disrupt the electoral count.  *See id.* at 6-8.  Even if Congress acts in some adjudicative capacity when it weighs alternate slates of electors, a lawyer's efforts to corrupt that process do not become attorney work product entitled to protection.

**2.**  For the first time in this litigation, Dr. Eastman now attempts to link certain documents to particular lawsuits.  *See* Br. at 29-34.  Because Congressional Defendants have no access to those documents, they cannot confirm Dr. Eastman's representations, nor can they fully examine whether the numerous people included on these communications were adversaries or conduits to adversaries.  Some deficiencies,

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

1  however, are obvious even from the limited information available to Congressional

2  Defendants.

3       For example, in his effort to link documents to *Donald J. Trump for President, Inc.*

4  *v. Boockvar*, Dr. Eastman claims that 14 documents involve communications among an

5  unidentified list of attorneys (who Dr. Eastman claims "made formal appearances or

6  otherwise assisted with the litigation") and a team of experts and attorneys conducting

7  statistical and other technical analyses in support of the litigation.  Br. at 19.  To support

8  that proposition, he cites Paragraph 11 of his own declaration which states, "*[o]n

9  information and belief*, everyone included on those group emails was volunteering their

10 expertise in support of the Trump legal efforts."  Pl. Decl. ¶ 11, ECF 346 (emphasis

11 added).

12      Nowhere does Dr. Eastman introduce common interest agreements, retention

13 letters, agency agreements, or any other contemporaneous evidence supporting this

14 representation.  Dr. Eastman does not identify the specific attorneys, where they

15 practiced, the dates of their involvement, or (for many) whether they even appeared in the

16 litigation.  His representation on "information and belief" alone is insufficient.  *See also*

17 Br. at 19-20 (citing K.H. Decl. ¶¶ 4-6 for the proposition that certain emails were

18 "communications among the team of statistical and other experts providing assistance to

19 the legal team on the litigation," but those paragraphs of the declaration are made only

20 "on information and belief").  Elsewhere too, Dr. Eastman summarily asserts that his

21 communications were with "the Trump legal team who entered appearances in or

22 otherwise assisted with the case," Br. at 19, but nowhere does he identify when these

23 people entered appearances in the case or (for those who did not enter appearances)

24 explain their role and how they were connected to the case.

25      Dr. Eastman also identifies communications where a "a non-lawyer officer of the

26 non-profit with which they are affiliated, and who cannot be viewed as a conduit to an

27

28

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

adversary, was copied." *Id.*[63]  Dr. Eastman does not identify the non-profit nor does he
explain the affiliation with the non-profit or what the non-lawyer officer's interest was in
the litigation.  Without knowing this information, it is impossible to determine whether
this person could be an adversary or conduit to an adversary.

Dr. Eastman also asserts that the email exchanges "included several non-attorney
individuals who were either employed by the Trump campaign or working under
agreement with the Trump legal team to assist in gathering information for the
anticipated litigation."  Br. at 19-20 (citing bates numbers 21854, 62657).  Nowhere,
however, does he describe these people's affiliation with the Trump campaign—and he
includes no agreements with the Trump legal team reflecting these relationships.  Of the
nine people included on these emails (as evident from the privilege log), only one has a
"@donaldtrump.com" email address.  Some have "@gmail.com" addresses, two have
"@teapartypatriots.org" email addresses, and one has a "@gagop.org" email address.[64]
Dr. Eastman, moreover, states that he engaged in communications with "another attorney
with whom he was collaboratively discussing legal issues in the litigation," but their
communications were "transmitted via intermediaries (a family member of the lawyer
and a mutual friend)," Br. at 21; *id.* at 22 (noting one of the "intermediaries" used for the
communications was "a family member of the lawyer").

These representations are insufficient to meet Dr. Eastman's burden of establishing
application of the work product doctrine.

---

[63] It is unclear from Dr. Eastman's representation whom "they" refers to.

[64] Dr. Eastman states, "[s]ome are specially marked 'Attorney Work Product privilege' in
the subject line."  Br. at 24.  Because Dr. Eastman did not provide subject lines of the
documents on his privilege logs, Dr. Eastman made it difficult for Congressional
Defendants to determine the validity of his privilege claims.

40

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

### B.     Dr. Eastman Waived His Claims to Protection of the Work Product Doctrine

For any documents that were indeed prepared in anticipation of litigation, work-product protection is unavailable if that privilege was waived.  Dr. Eastman shared these materials broadly, circulating them to scores of people he perceived to be likeminded.  *See* Section III(A), *supra*.  Implicit in Dr. Eastman's argument is the assumption that because the numerous people with whom he shared this "work product" were likeminded, sharing this material widely would not break work product protection.

Importantly for this case, voluntary disclosure waives protection of the work product doctrine "when such disclosure is made to an adversary or is otherwise inconsistent with the purpose of work-product doctrine—to protect the adversarial process."  *Sanmina Corp.*, 968 F.3d at 1120.  "[D]isclosing work product to a third party may waive the protection where 'such disclosure, under the circumstances, is inconsistent with the maintenance of secrecy from the disclosing party's adversary.'"  *Id.* at 1121 (quoting *Rockwell Int'l Corp. v. U.S. Dep't of Just.*, 235 F.3d 598, 605 (D.C. Cir. 2001)).  "Under this standard, the voluntary disclosure of attorney work product to an adversary or a conduit to an adversary waives work-product protection for that material."  *Id.*

The "maintenance of secrecy" standard involves "two discrete inquiries in assessing whether disclosure constitutes waiver."  *Sanmina Corp.*, 968 F.3d at 1121 (quoting *United States v. Deloitte LLP*, 610 F.3d 129, 141 (D.C. Cir. 2010)).  First, "whether the disclosing party has engaged in self-interested selective disclosure by revealing its work product to some adversaries but not to others.  If so, [s]uch conduct militates in favor of waiver" as a matter of basic fairness.  *Id.* (internal quotation marks and citation omitted).  Second, "whether the disclosing party had a reasonable basis for believing that the recipient would keep the disclosed material confidential."  *Id.*

A party waives work product privilege if he or she discloses work product to a third party such that disclosure "has substantially increased the opportunities for potential adversaries to obtain the information."  *Sanmina Corp.*, 968 F.3d at 1121 (quoting 8

Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2024 (3d ed. 2020)).  Waiver involves a "fact-intensive analysis" which "requires a consideration of the totality of the circumstances and is ultimately guided by the same principle of fundamental fairness that underlies much of our common law doctrine on waiver by implication."  *Id.* at 1122.

Dr. Eastman shared these materials so widely that it substantially increased the opportunities for potential adversaries to obtain the information.  He also engaged in selective disclosures that shared these documents so widely that he did not have a reasonable basis for believing the material would be kept confidential.

**1.**  Dr. Eastman shared these materials widely among state legislators.  Doing so "substantially increased the opportunities for potential adversaries to obtain the information."  *Sanmina*, 968 F.3d at 1121.

To the extent Dr. Eastman assumed he could broadly share these materials with likeminded individuals (who preferred a second Trump term to a Biden victory), that assumption does not overcome waiver.  Elected officials swear an oath to preserve the Constitution (*see* U.S. Const., Art. VI, cl. 3), and Dr. Eastman's presumption that anyone who preferred a second Trump term would be likeminded enough to attempt to change their state's electors is obviously not well-founded.  Georgia's Secretary of State Brad Raffensperger provides a perfect example.  He stated publicly that he would have preferred that Trump win the 2020 election, but he was unwilling to go along with a scheme to undermine the results of the election in his State.[65]  Elected officials in states

---

[65]  *See* Letter from Sec'y of State Brad Raffensperger to Congress at 2 (Jan. 6, 2021), https://perma.cc/C2HS-VRU7; *see also* Mark Niess, *Georgia Elections Chief Counters False Claims in Letter to Congress*, Atlanta J.-Const. (Jan. 7, 2021), https://perma.cc/5G4M-C757.

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

won by President Biden are thus potential adversaries on the issue of alternative slates of electors.

2.      Dr. Eastman also used this material to pressure the Vice President.  Sharing work product with the Vice President and his team also "substantially increased the opportunities for potential adversaries to obtain the information."  *Sanmina*, 968 F.3d at 1121.  The Vice President and his staff were in fact adversaries on whether the Vice President had unilateral power to simply declare the election in favor of the former President or, at the very least, postpone the vote.  Neither former President Trump nor Dr. Eastman had "a reasonable basis for believing that [the Vice President or his team] would keep the [materials about the alternate elector plan] confidential."  *Id.* at 1121.  In fact, evidence shows that the Vice President's team did not keep this material confidential.[66]

Dr. Eastman's narrow reading of adversary or conduit to an adversary makes little sense in the context of the electoral count process.  Dr. Eastman's "plan [was] to proceed without judicial involvement."  ECF 260 at 23.  So, to say Dr. Eastman is entitled to share materials broadly under work product protection because material has not been disclosed to an adversary in litigation means little—when there is no litigation, there is no adversary to litigation.  In invoking a *litigation* doctrine (work product protection) in the context of a *legislative* subpoena, Dr. Eastman cannot now insist that the definition of adversary be confined to a *litigation* adversary.  In the context of a legislative subpoena, therefore, any definition of adversary must be read broadly.

3.      Finally, the facts of this particular case and basic fairness support waiver.  "[U]nder the totality of the circumstances, [Dr. Eastman] acted in such a way that is inconsistent with the maintenance of secrecy" against the Select Committee regarding the

---

[66] *See, e.g.*, *The never-before-told backstory of Pence's Jan. 6 argument*, Politico (Feb. 18, 2022, 5:00 AM), https://perma.cc/AQY7-KAXZ (explaining that Vice President's outside counsel called a former judge and revealed Dr. Eastman's plan to disrupt the electoral count).

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

contested documents.  *Sanmina*, 968 F.3d at 1124.  By sharing with so many people, any

work product immunity was waived because Dr. Eastman's conduct "reached a 'certain

point of disclosure' towards [likely] adversary[ies] such that 'fairness requires that his

privilege shall cease, whether he intended that result or not.'"  *Id.* at 1122 (quoting *Weil*,

647 F.2d at 24).

At the very least, sharing this "work product" so widely constitutes an implied

waiver because it is inconsistent with the maintenance of secrecy against an adversary.

*Sanmina*, 968 F.3d at 1123 ("an express waiver generally occurs by disclosure to an

adversary, while an implied waiver occurs by disclosure or conduct that is inconsistent

with the maintenance of secrecy against an adversary.").  Permitting Dr. Eastman to share

his information so widely and then claim work-product privilege enables him to "us[e]

the privilege as both a shield and a sword."  *Bittaker v. Woodford*, 331 F.3d 715, 719 (9th

Cir. 2003).

### C.    The Select Committee Has a Substantial Need for the Documents and Cannot Obtain the Substantial Equivalent of the Documents Without Undue Hardship

In any event, the Select Committee has a substantial need for the documents and

cannot, without undue hardship, obtain their substantial equivalent by other means.  *See*

*Admiral Ins. Co. v. U.S. Dist. Ct. for Dist. of Ariz.*, 881 F.2d 1486, 1494 (9th Cir. 1989)

("work-product materials nonetheless may be ordered produced upon an adverse party's

demonstration of substantial need or inability to obtain the equivalent without undue

hardship.").  As the Select Committee's investigation has progressed, the importance of

Dr. Eastman's role has only become more evident.

Dr. Eastman played an active role in attempting to convince state legislators in

states won by President Biden to reject the election results and "decertify" those electors.

When that effort failed, Dr. Eastman played a key role trying to encourage Vice President

Pence to either reject the electors from several states or to postpone certification (so that

Dr. Eastman, President Trump, and their co-conspirators would have more time to recruit

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

state legislators who would concoct slates of Trump electors).  Dr. Eastman's "strategy, mental impressions and opinion" concerning these efforts "are directly at issue" in the Select Committee's investigation.  *Reavis v. Metro. Prop. & Liab. Ins. Co.*, 117 F.R.D. 160, 164 (S.D. Cal. 1987).  How his and his associates' conduct intersected with or evaded our current laws—both civil and criminal—is of great importance to the Select Committee as it develops recommendations.

## CONCLUSION

For the reasons set forth above, Dr. Eastman's claims of privilege should be rejected, leaving Chapman University free to comply with the House subpoena at issue here as it has stated it wishes to do.

Respectfully submitted,

*/s/  Douglas N. Letter*
DOUGLAS N. LETTER
  *General Counsel*
TODD B. TATELMAN
  *Principal Deputy General Counsel*
ERIC R. COLUMBUS
  *Special Litigation Counsel*
MICHELLE S. KALLEN
  *Special Litigation Counsel*
STACIE M. FAHSEL
  *Associate General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF
REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C.  20515
(202) 225-9700
Douglas.Letter@mail.house.gov

-and-

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

SHER TREMONTE LLP
Justin M. Sher
Michael Tremonte
Noam Biale
Maya Brodziak
Kathryn E. Ghotbi
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600
JSher@shertremonte.com
MTremonte@shertremonte.com
NBiale@shertremonte.com
MBrodziak@shertremonte.com
KGhotbi@shertremonte.com

-and-

ARNOLD & PORTER
John A. Freedman
Paul Fishman
Amy Jeffress
601 Massachusetts Ave, NW
Washington, D.C. 20001
(202) 942-5000
John.Freedman@arnoldporter.com
Paul.Fishman@arnoldporter.com
Amy.Jeffress@arnoldporter.com

Dated:  May 26, 2022

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**

## CERTIFICATE OF SERVICE

### WASHINGTON, DISTRICT OF COLUMBIA

I am employed in the aforesaid county, District of Columbia; I am over the age of 18 years and not a party to the within action; my business address is:

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515

On May 26, 2022, I served the **CONGRESSIONAL DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S PRIVILEGE ASSERTIONS** on the interested parties in this action:

Anthony T. Caso
Constitutional Counsel Group
174 W Lincoln Ave #620
Anaheim, CA 92805-2901
atcaso@ccg1776.com

Charles Burnham
Burnham & Gorokhov PLLC
1424 K Street NW, Suite 500
Washington, DC 20005
charles@burnhamgorokhov.com

*Attorneys for Plaintiff John C. Eastman*

☒    **(BY E-MAIL OR ELECTRONIC TRANSMISSION)**

The document was served on the following via The United States District Court – Central District's CM/ECF electronic transfer system which generates a Notice of Electronic Filing upon the parties, the assigned judge, and any registered user in the case:

☒    **(FEDERAL)**    I declare under penalty of perjury that the foregoing is true and correct, and that I am employed at the office of a member of the bar of this Court at whose direction the service was made.

Executed on May 26, 2022 here, at Bethesda, Maryland.

*/s/* Douglas N. Letter

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CERTIFICATE OF SERVICE