OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515

SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004

ARNOLD & PORTER
601 Massachusetts Ave, NW
Washington, D.C. 20001

Counsel for the Congressional Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| JOHN C. EASTMAN<br><br>Plaintiff,<br><br>vs.<br><br>BENNIE G. THOMPSON, *et al.*,<br><br>Defendants. | Case No. 8:22-cv-00099-DOC-DFM |

# Exhibit A

**From:** Kenneth Chesebro <PIISC @msn.com>
**Sent:** Monday, January 04, 2021 8:51 PM MST
**To:** Eastman, John <jeastman@chapman.edu>
**Subject:** Fwd: Draft 2, with edits
**Attachment(s):** "2020-11-18 Chesebro memo on real deadline.pdf"

Here's the dec 13 email with 12A at end


Get Outlook for iOS

---

**From:** Kenneth Chesebro <PIISC @msn.com>
**Sent:** Saturday, January 2, 2021 7:43:30 PM
**To:** Eastman, John <jeastman@chapman.edu>
**Subject:** Fw: Draft 2, with edits

Oh, I did do a very rough e-mail on Dec. 13, which PIISC requested on behalf of the Mayor.

A lot of it is irrelevant at this point. The end discusses the originalist view of the 12th Amendment.

Ken


xxxxxxxxxxxxxxxxxxxxxx


**From:** Kenneth Chesebro
**Sent:** Sunday, December 13, 2020 9:48 PM
**To:** Rudy Giuliani <PIISC @gmail.com>
**Subject:** PRIVILEGED AND CONFIDENTIAL -- Brief notes on "President of the Senate" strategy

**PRIVILEGED AND CONFIDENTIAL**

Dear Mayor,

Unfortunately, as mentioned in my text, I lost the several-page memo I had nearly finished due to a reboot on the hotel computer.

Rather than rewrite it now, and further delay, here are some quick notes on strategy.

I have not delved into the historical record (Vice President Pence's counsel has, and seems totally up on this, and I'm sure there are many other lawyers who can add a great deal, PIISC in particular), and am writing this with reference 3 law review articles I happen to have taken with me, which I attach as references: Kesavan, 80 N.C. L. Rev. 1653 (2002); Nagle, 104 N.C. L. Rev. 1732 (2004); and Foley, 51 Loyola U. Chi. L.J. 309 (2019).

The bottom line is I think having the President of the Senate firmly take the position that he, and he alone, is charged with the constitutional responsibility not just to **open** the votes, but to **count** them -- including making judgments about what to do if there are conflicting votes -- represents the best way to ensure:

(1) that the mass media and social media platforms, and therefore the public, will focus intently on the evidence of abuses in the election and canvassing; and

(2) that there will be additional scrutiny in the courts and/or state legislatures, with an eye toward determining which electoral slates are the valid ones.

And it think this strategy can be carried out with surrogates of the President and Vice President, with them standing mostly above the fray, urging only that there be real scrutiny of what happened in this election, and that they're willing to live with the result as long as there is a serious look, especially by the state legislatures, at what happened there, to ensure it will never happen again.

I think having the President of the Senate use the defensible claim that he is in charge of counting the votes as leverage to obtain that needed scrutiny would be worthwhile even if it couldn't ultimately prevent the election of Biden and Harris. The Republicans used this argument in 1877 as leverage, and with it managed to get an election commission created which elected Hayes. Republicans should use it again.

Here is a chronology of how things could play out, if there is a serious effort to employ the argument that the President of the Senate counts the votes.

**Jan 3-5, and perhaps before then**

Committees of the Senate hold hearings detailing widespread violations of law, and fraud, in the election in the states at issue. (Apparently Ron Johnson already has one planned for this week.) Idea would be to buttress the substantive basis for the President of the Senate later refusing to count votes from those States, absent more needed scrutiny.

Also, there is a hearing in the Senate Judiciary Committee exploring the constitutional question of how the votes must be counted, with at least two highly qualified legal scholars concluding that the President of the Senate is solely responsible for counting the votes, and that the Electoral Count Act is unconstitutional in dictating limits on debate and dictating who wins electoral votes when there are 2 competing slates and the House and Senate disagree.

**Jan. 6**. The House and Senate assemble for the opening and counting of the votes.

The theme that the counting of the votes will proceed on **a strict textual, originalist basis** proceeds when Vice President Pence steps up to the podium, to cause the first break with the procedures set out in the Electoral Count Act.

The Electoral Count Act states that House and Senate shall meet in the House on Jan. 6 at 1 p.m., "and the President of the Senate **shall** be their presiding officer."

The Vice President announces that he will **not** serve as presiding officer, for two reasons. First, Congress cannot, by statute, impose duties on either the President or Vice President beyond those set out in the Constitution. For example, Congress could not by statute require the President to throw out the first ball on opening day of the baseball season. Likewise, the Vice President's duties are precisely set out in the Constitution, and Congress may not add to them. See Kesavan at 1700-01, note 213.

Two, even if Congress can mandate that a Vice President, in general, must preside over the electoral count, Pence takes the position that he should not, and cannot, in this instance, preside, because he has a conflict of interest, as one of the candidates for election. See id. at 1698-99. Thus, one of the Senators or Representatives should be selected to serve as the presiding officer Id. at 1700.

Note that Pence so far has **only** indicated that **he will not serve as presiding officer**, based on a constitutional objection to Congress imposing extra duties on the Vice President.

It is a **separate** matter whether he will have a role in the joint session itself. Because the Vice President clearly serves as the President of the Senate, and the Twelfth Amendment states that in the joint session, "[t]he President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted."

So by the constitutional test, he **should** perform that role, unless he has a constitutionally valid reason not to.

After a presiding officer is selected, he or she will then ask Vice President Pence to open the envelopes, starting with Alabama.

At this point, the Vice President will **recuse** himself, on the basis that as a candidate for election himself, and given that there is dispute about the electoral votes of some of the States, and especially given that it might well be the responsibility of the President of the Senate to actually **count** the votes, he has a conflict of interest, and he feels he cannot participate in the proceeding -- just as Vice President Humphrey recused himself in the January, 1969, electoral vote count. See Kesavan at 1702 n.219. And just as the Vice President, who presides during impeachment trials, does not preside during an impeachment trial of the President.

At this point, the Vice President will have emphasized the need for focus on plain language and adherence to the Constitution, by rejecting the role of presiding officer imposed by the Electoral Count Act. He will also have made clear that he and the President are not going to be involved in counting the votes concerning their own election, which is why he feels bound to recuse himself on conflict-of-interest grounds, just as a Democrat did previously.

Of course, politically this will insulate him and the President from what will happen next. For it is much easier for someone acting as President of the Senate to defend the prerogatives of the office if he has no conflict of interest (other than, of course, a patisan interest, which is unavoidable).

In the absence of the Vice President, the president pro tempore acts as the President of the Senate, and thus is the one with the sole power and responsibility to play that role in the joint session. So regardless of whether it is Chuck Grassley or another senior Republican who agrees to take on the role of defending the constitutional prerogatives of the President of the Senate, whoever it is then proceeds to open and count first Alabama, and then Alaska, at which point Trump and Pence are leading 12-0.

He then opens the two envelopes from Arizona, and announces that he cannot and will not, at least as of that date, count any electoral votes from Arizona because there are two slates of votes, and it is clear that the Arizona courts did not give a full and fair opportunity for review of election irregularities, in violation of due process.

PIISC has filed an excellent cert. petition to that effect, pointing out that the Arizona courts simply rubber stamped

the election results in their rush to meet the Dec. 8 "safe harbor" date which, in this context, is irrelevant, and which is contained in an unconstitutional statute. So we are lucky that Arizona will be the first contested state in the electoral count.

Unless by then the Supreme Court has taken that case and rejected it on the merits, the President of the Senate can make his own judgment that the Arizona proceedings violated due process, so he won't count the votes in Biden's column.

But, reprising the theme of modesty, and making clear that he is not using the power of his position to throw the election to Trump and Pence, he refuses to count Arizona in the Trump-Pence column. He says that if Arizona wants to be represented in the electoral count, either it has to rerun the election, or engage in adequate judicial review, or have its legislature appoint electors.

**After Jan. 6**

Lots of lawyers and political strategists connected to the campaign can wargame much better than me what would then happen, but if the President of the Senate stuck to his guns, absent him being impeached and removed from office, the fact that he is the only one permitted to even OPEN the votes could give him enormous leverage. He would of course make clear that if the Supreme Court rules that he is not the one with the power to count the votes (whether or not the Electoral Count Act is constitutional) he would of course comply with whatever the Court orders.

What the Supreme Court would do is anyone's guess, but I would not bet on a majority of the Court siding with the President of the Senate, even though a majority might well agree with that the Constitution is correctly construed, from an originalist perspective, in exactly that manner. More likely, to bring an end to a huge political crisis, the Court would find some way to rule in Biden's favor or, at minimum, find the controversy nonjusticiable (as with the Texas case) on some basis, such as the "political question" doctrine, thus insulating its legitimacy from partisan conflict.

If Biden were to win in the Court, much will still have been accomplished, in riveting public attention on election abuses, and building momentum to prevent similar abuses in the future.

If the Court were to dodge, then we would have a situation similar to 1877, in which the parties would realize that if they remained at loggerheads, with the President of the Senate perhaps refusing to open the votes of the contested states as long as his authority to count the votes was being challenged, and Pelosi refusing to hold an election for president in the House, and with January 20 looming, political leaders would face a choice. Either Pelosi would become acting president on January 20 (after resigning as Speaker) or the Senate would reelect Pence as Vice President, who would then become acting president on Jan. 20.

In this situation, which would seem messy and unpalatable to many, with renewed attention on the election abuses, and with several states controlled by Republican legislators faced with perhaps not being counted in the Electoral College, it doesn't seem fanciful to think that Trump and Pence would end up winning the vote after some legislatures appoint electors, or else that there might be a negotiated solution in which the Senate elects Pence Vice President, and Trump agrees to drop his bid to be elected in the House, so that Biden and Harris are defeated, even though Trump isn't reelected.

Any of the outcomes sketched above seems preferable to allowing the Electoral Count Act to operate by its terms, with Vice President Pence being forced to preside over a charade in which Biden and Harris are declared the winner of an election in which none of the serious abuses that occurred were ever examined with due deliberation.

Again, it's very difficult to predict how things work out, but it does seem clear that a forceful assertion by the President of the Senate that he is in charge of counting the votes would at minimum focus attention on election abuses and help in the efforts to prevent such abuses in the future. It's difficult to think of anything else that could supply anything like that sort of leverage in the situation, although obviously for the President of the Senate to take these steps would be hugely controversial.

**The originalist argument re the 12th Amendment**

Finally, as to the constitutional argument that the President of the Senate would rely on, some brief notes.

**Historical era**

In analyzing the original meaning of the 12th Amendment, we have to forget about our current political climate, and remember the world in which the Framers wrote and ratified this language.

Today, it would be unimaginable that we would write a Constitution that would give either the Vice President, or the most senior member of the majority in the Senate, sole power to decide contested results for the presidential election. However, Art. II, Sect. 1, cl. 3 was enacted in 1787, before political parties, when the Framers didn't imagine that disputes over the electoral count would arise, as Justice Story noted in the 1830s. See Foley at 325 & n.34.

Recall that the Framers thought that the Electoral College would operate with the state legislatures selecting wise men in their state, who would know the most reputable figures nationally; that they'd deliberate and send in electoral votes to

Congress; and that usually there would be no one with a majority, and then the House would elect a president from the top names. The Framers did not anticipate political parties putting up uniform slates of electors. They didn't even bother to have electors vote separately for president and vice president, leading to the crises of the 1800 election, and the need for the Twelfth Amendment.

Further, during this era there was an emphasis on honorable behavior and circumspection. Leaders were greatly concerned about their reputation, about whether they were perceived as honorable, both during their lives and afterwards. So there was much less concern that someone in a national legislature entrusted with power to count votes would abuse it.

**Text**

Consider next the text. The Twelfth Amendment, identical to Art. II, Sect. 1, cl. 3, except for punctuation, states that "[t]he President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted."

Of course, as many have noted, the passive language is ambiguous; the text doesn't specify who counts the votes. Nagle at 1737 & n.22.

But notice that the only person or entity <u>doing</u> anything here is the President of the Senate. All that is required of the Senate and House is their "presence." As Prof. Foley notes, at 325, it seems that their job is to watch the votes being opened and counted -- this ensures transparency.

And, as Foley asks, how, exactly <u>could</u> they do anything? The Senators and Representatives are sitting there. They are not part of a body that can vote on anything, because the House and Senate can only act separately, as distinct legislative chambers.

And how would they even have time to do anything? The Twelfth Amendment was written to minimize the chances for conspiracy and cabal. After the votes are counted, if no presidential candidate has a majority, the House is to "immediately" choose from the top three. There is nothing in the Twelfth Amendment that suggests the joint meeting is to be suspended if there is a dispute over a state's votes, with the House and Senate separately deliberating.

As Foley also observes, the power to make an ultimate decision on the electoral votes of a state "must be lodged ultimately in some singular authority of the federal government." Because if it were lodged in two authorities -- such as the House and Congress -- then one could have a stalemate, with one authority disgreeing with the other. That's exactly what happened in 1877.

So it seems entirely sensible to read this language as granting sole power to count the votes to the President of the Senate, with the Members of Congress having no power to influence the result. At the time this language was enacted, this scheme made sense. Maybe it makes less sense now, but if that's the case, then the Constitution can be amended to make more sense. But as long as this language can be reasonably read to grant the President of the Senate sole power to count the votes, whoever holds that post at a particular time should assert that prerogative, just as our Presidents assert executive privilege not only for their own sake (sometimes they personally would prefer, for partisan reasons, to release privileged material), but to defend the prerogatives of the office.

**Historical indications that this is what was intended**

Examples of how a constitutional provision was understood and carried out during the Framers' generation can help buttress one's conclusion about the plain meaning of an enactment, and here there seems like some very helpful material.

"The Framers clearly thought that the counting function was vested in the President of the Senate alone," as evidenced by the action of the First Congress of electing John Langdon as President of the Senate "for the pose purpose of opening and counting the votes for President of the United States." Kesavan at 1706.

The President of the Senate was permitted to count the votes even though in two early instances, that power was arguably abused.

In 1797, Vice President John Adams, overseeing his own election for President, purportedly counted improper votes from Vermont, and in 1801, Vice President Thomas Jefferson purportedly did the same for votes from Georgia. Id. at 1706-07 & n.230.

Notwithstanding such early claimed abuses, the substantively identical language was reenacted in the Twelfth Amendment, in 1804. The Framers were concerned enough about a repeat of the tied election of 1800 that they felt the process for electing the president had to be changed to require separate ballots -- but they were not concerned about the practice of the President of the Senate counting the votes, and in so doing resolving disputes about the votes (as Adams and Jefferson did), and thus they left the counting language undisturbed.

**Bottom line**

Many more points would need to be analyzed in making a complete argument that the President of the Senate possesses the sole power to count electoral votes, and anything to the contrary in the Electoral Count Act is unconstitutional. But at minimum this seems a defensible interpretation of the Twelfth Amendment, and one that ought to be asserted, vigorously, by whoever has the role of President of the Senate.

And, in terms of Republicans having leverage on Jan. 6 to force closer reexamination of what happened in this election, a defensible interpretation may be all that's needed, because the Supreme Court might decline to reverse, based on the "political question" doctrine, and even if it did reverse, that would come only after a number of additional days of delay, which itself would ensure closer attention to the voluminous evidence of electoral abuses.

I hope this very rough, incomplete sketch is of some use Thank you for seeking my further input on this possible strategy. It's an honor and privilege to be involved with you in this fight!

Sincerely,

Ken Chesebro


Kenneth Chesebro

**PIISC**

PIISC @msn.com
(Admitted in CA, FL, IL, MA, NJ, NY, and TX)

https://www.linkedin.com/in/ PIISC


---

**From:** Kenneth Chesebro < PIISC @msn.com>
**Sent:** Saturday, January 2, 2021 3:11 PM
**To:** Eastman, John <jeastman@chapman.edu>
**Subject:** Re: Draft 2, with edits

Was going to do one on VP powers, but then we did WI cert pet. But footnote 4 here might be of some use.

Get Outlook for iOS

---

**From:** Eastman, John <jeastman@chapman.edu>
**Sent:** Saturday, January 2, 2021 12:19:09 PM
**To:** Kenneth Chesebro < PIISC @msn.com>
**Subject:** RE: Draft 2, with edits

Ken,

Did you do a memo on the Jan 6 authority that includes the competing scholarship on the topics? If so, can you send it to me? I might have it in my inbox, but can't find it at the moment.

John

**From:** Kenneth Chesebro < PIISC @msn.com>
**Sent:** Wednesday, December 23, 2020 9:36 AM
**To:** Eastman, John <jeastman@chapman.edu>
**Subject:** Draft 2, with edits

**External Message**

Really awesome.


NOTE: This email originated from outside Chapman's network. Do not click links or open attachments unless you recognize the sender and know content is safe.