OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515

SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004

ARNOLD & PORTER
601 Massachusetts Ave, NW
Washington, D.C. 20001

Counsel for the Congressional Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| JOHN C. EASTMAN,<br><br>     Plaintiff,<br><br>vs.<br><br>BENNIE G. THOMPSON, *et al.*,<br><br>     Defendants. | Case No. 8:22-cv-00099-DOC-DFM |

# Exhibit B

**From:** Eastman, John
**Sent:** Monday, December 07, 2020 12:44 PM MST
**To:** [PIISC]@gmail.com <[PIISC]@gmail.com>
**Subject:** Dec 14 analysis
**Attachment(s):** "2020-11-20 Chesebro memo on real deadline2.pdf"

Here's the memo we discussed.

John Eastman

Chapman025124

**Privileged and Confidential**

# M E M O R A N D U M

TO: Judge James R. Troupis
FROM: Kenneth Chesebro
DATE: November 18, 2020
RE: **The Real Deadline for Settling a State's Electoral Votes**

You asked for a written summary of the legal analysis underlying my suggestion during our conference call that, in any judicial review of the canvassing/recounting in Wisconsin, we should emphasize that the presidential election timetable affords ample time for judicial proceedings, even if initial errors in the recount require a remand for further recounting.

## Summary

There is a very strong argument, supported by historical precedent (in particular, the 1960 Kennedy-Nixon contest), that the real deadline for a finding by the Wisconsin courts (or, possibly, by its Legislature) in favor of the President and Vice President is not **December 8** (the "safe harbor" deadline under the Electoral Count Act), nor even **December 14** (the date on which electors must vote in their respective States), but **January 6** (the date the Senate and House meet for the counting of electoral votes).

Assuming the electors pledged to Trump and Pence end up meeting at the Wisconsin Capitol on December 14 to cast their votes, and then send their votes to the President of the Senate in time to be opened on January 6, a court decision (or, perhaps, a state legislative determination) rendered <u>after</u> December 14 in favor of the Trump-Pence slate of electors should be considered timely. On this view, the only real deadline during the next month is the December 14 deadline to cast electoral votes – so that any state judicial proceedings which extend past that date, working toward resolution of who has won Wisconsin's electoral votes, are entirely compatible with federal law provided that they are completed by January 6.

1.  **The January 6 Hard Deadline**

The date which has "ultimate significance" under federal law, as Justice Ginsburg aptly noted, is "the sixth day of January," the date set by 3 U.S.C. § 15 on which the Senate and House determine "the validity of electoral votes." <u>Bush v. Gore</u>, 531 U.S. 98, 144 (2000) (Ginsburg, J., dissenting). That is the <u>first</u> date on which any electoral votes are actually counted. On that date, the Twelfth Amendment directs, "[t]he President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted."

**Privileged and Confidential**                                                                 2
**The Real Deadline for Settling a State's Electoral Votes**

2.  **What Must Happen on December 14**

The other date of particular federal significance is the date that the ten Wisconsin electors pledged, respectively, to Trump-Pence and Biden-Harris, must meet in Madison to actually cast their electoral votes, if those votes are later to be eligible to be counted in Congress on January 6. Art. II, § 1, cl. 4, gives Congress the power to specify the date "on which [the electors] shall give their Votes, which Day shall be the same throughout the United States." Exercising that power, Congress has mandated that the electors "shall meet and give their votes on the first Monday after the second Wednesday in December" – this year, December 14 – "at such place in each State as the legislature of such State shall direct." 3 U.S.C. § 7.

In accord with § 7, the Wisconsin Legislature has directed that "[t]he electors for president and vice president shall meet at the state capitol" at noon on December 14. Wis. Stat. § 7.75(1).

Prudence dictates that the ten electors pledged to Trump and Pence meet and cast their votes on December 14 (unless by then the race has been conceded). It is highly uncertain, given the language in Art. II requiring that all electors throughout the United States vote on the same day, whether Congress could validly count electoral votes cast on a later date.[1]

It may seem odd that the electors pledged to Trump and Pence might meet and cast their votes on December 14 even if, at that juncture, the Trump-Pence ticket is behind in the vote count, and no certificate of election has been issued in favor of Trump and Pence. However, a fair reading of the federal statutes suggests that this is a reasonable course of action.

The basic responsibility of the electors is to "make and sign six certificates of the votes given by them" for President and Vice President, 3 U.S.C. § 9; "seal up the certificates so made by them," id., § 10; and forward them by registered mail to the President of the Senate and to other officials. Id., § 11. These actions are carried out without any involvement by state officials.

---

[1] In 1857, Congress spent two days debating whether it would count electoral votes from Wisconsin which were cast one day late due to a blizzard in Madison. The result of the presidential election did not turn on the question, and it was left unresolved. Cong. Globe, 34th Cong., 3rd Sess., 644-60, 662-68 (1857).

<u>**Privileged and Confidential**</u>  3
**The Real Deadline for Settling a State's Electoral Votes**

It also seems clear that <u>if</u>, before the electors cast their votes, the candidates for whom they are voting have been issued certificates of election, it is the duty of the governor to deliver the certificates to the electors "on or before the day" they are required to meet, <u>id</u>. at § 6, and the electors are then to attach the certificates to the electoral votes they transmit to the President of the Senate. <u>Id</u>., § 9.

But nothing in federal law requires States to resolve controversies over electoral votes prior to the meeting of the electors. Indeed, there is no set deadline for a State to transmit to Congress a certification of <u>which</u> slate of electors has been determined to be the valid one. The duty of a state governor is merely to transmit the certification "as soon as practicable after the conclusion of the appointment of the electors in such State by the final ascertainment, under and in pursuance of the laws of such State providing for such ascertainment . . . ." <u>Id</u>., § 6.

3.   **Hawaii's Electoral Votes in the 1960 Kennedy-Nixon Contest**

The reasonableness of the above statutory analysis, and the prudence of the Trump-Pence electors meeting in Madison on December 14 to cast their votes and transmit them to Congress, regardless of the status of the electoral contest in Wisconsin at that juncture, is illustrated by how the Democratic Party handled the uncertainty over Hawaii's electoral votes in the 1960 presidential election between John F. Kennedy and Richard M. Nixon.[2]

Remarkably, Hawaii's electoral votes were counted in favor of Kennedy and Johnson when the votes were opened in Congress on January 6 even though:

(1) they did not arrive in Congress until <u>that very morning</u>;

(2) on the date the Electoral College met, December 19, 1960, Nixon's electors had in hand a certificate from the Hawaii governor certifying that Nixon had won the state (by 141 votes);

(3) the Kennedy electors nonetheless also met and voted on that day, to preserve the possibility that their votes would eventually be certified as the valid ones;

(4) on the same day, a Hawaii court ordered a recount of the entire state;

---

[2] The following summary is adapted from Michael L. Rosin & Jason Harrow, "How to Decide a Very Close Election for Presidential Electors: Part 2," <u>Take Care Blog</u>, Oct. 23, 2020 (https://takecareblog.com/blog/how-to-decide-a-very-close-election-for- presidential-electors-part-2) (visited Nov. 17, 2020).

**Privileged and Confidential**                                                                 4
**The Real Deadline for Settling a State's Electoral Votes**

(5) only on December 28 did the Hawaii courts issue a final decision finding that Kennedy had, in fact, won the state (by 105 votes); and

(6) because the Kennedy electors had taken care to vote on the proper day, and the governor signed an amended certificate of election which was then rushed to Washington, in time to be counted in Congress, the electoral votes were awarded to Kennedy (although, it should be noted, the votes were counted only after Vice President Nixon, in his capacity as President of the Senate, suggested without objection that the votes be counted in favor of Kennedy "[i]n order not to delay the further count of the electoral vote," and "without the intent of establishing a precedent").

The last-minute counting of the Hawaii electoral votes in favor of Kennedy in 1960 buttresses the conclusion of constitutional law scholar Laurence Tribe that, absent some indication by a State to the contrary, the only <u>real</u> deadline for a state to complete its recount of a presidential election is "before Congress starts to count the votes on January 6."[3]

4. **Nothing in Wisconsin Law Is Inconsistent With the Trump-Pence Electors Casting Their Votes on December 14, as the Kennedy-Johnson Electors Did in 1960**

The Biden camp might well seek to create a sense of urgency, and try to artificially truncate the post-election process of recounting and adjudication, by claiming that Wisconsin has an important interest in having all controversies regarding the election resolved by December 8, in order to gain the benefit of the "safe harbor" provision of the Electoral Count Act, which purportedly mandates that a final result reached in a State by the safe-harbor date "shall be conclusive" when votes are counted in Congress. 3 U.S.C. § 5.[4] The U.S. Supreme Court's view that

---

[3] Laurence H. Tribe, "Comment: <u>eroG .v hsuB</u> and Its Disguises: Freeing <u>Bush v. Gore</u> From Its Hall of Mirrors," 115 Harv. L. Rev. 170, 265-66 (2001).

[4] One must use the caveat "purportedly," because there are substantial reasons to doubt that the Electoral Count Act, enacted by the <u>50th Congress</u> in 1877, can have any binding effect on the <u>117th Congress</u> which will convene on January 3, regarding its authority and obligation to count electoral votes as it sees fit. In particular, there is a very strong argument that the Senate which convenes in January has the inherent power to set whatever rules it wishes for deciding challenges to the electoral votes cast in this election. To view the Electoral Count Act as tying the Senate's hands, unless amended, would mean that the Senate would need the permission of both the House and the President (absent a veto-proof

**Privileged and Confidential**                                                                 5
**The Real Deadline for Settling a State's Electoral Votes**

Florida had a strong interest in qualifying under this safe-harbor provision was a key factor in its decision to halt the ongoing Florida recount in the 2000 presidential election. <u>Bush v. Gore</u>, 531 U.S. 98, 110-11 (2000) (per curiam).

However, nowhere has the Wisconsin Legislature placed any priority on ensuring that post-election procedures in presidential contests are completed by the safe-harbor date. Far from mandating that certificates of election must be issued by this date, the Legislature has, with regard to <u>all</u> elections, affirmatively <u>banned</u> certificates of election from being issued unless and until all timely brought recounts, and subsequent judicial proceedings, have been exhausted:

> When a valid petition for recount is filed . . . the governor or commission may not issue a certificate of election until the recount has been completed and the time allowed for filing an appeal has passed, or if appeal until the appeal is decided.

Wis. Stat. § 7.70(5)(a).[5]

---

voting margin) to change the rules governing its deliberations, a result which cannot be squared with Art. I, § 5, providing that "[e]ach House may determine the Rules of its Proceedings . . . ." As Professor Tribe has noted, "[t]here is no constitutionally prescribed method by which one Congress may require a future Congress to interpret or discharge a constitutional responsibility in any particular way." Tribe, <u>supra</u> note 3, at 267 n.388 (citing Laurence H. Tribe, 1 <u>American Constitutional Law</u>, § 2-3, at 125-26 n.1 (3d ed. 2000)). <u>See also</u> Chris Land & David Schultz, <u>On the Unenforceability of the Electoral Count Act</u>, 13 Rutgers J. of Law & Pub. Pol'y 340, 368-77, 385-87 (2016); Vasan Kesavan, <u>Is the Electoral Count Act Unconstitutional?</u>, 80 N. Car. L. Rev. 1654, 1729-59, 1779-93 (2002).

[5] To be sure, in accord with ordinary practice, under which the winner of the electoral votes in Wisconsin will typically be known well in advance of the date when electors cast their votes, the Legislature has provided that in presidential elections, the govenor "shall prepare a certificate showing the determination of the results of the canvass and the names of the persons elected," and send six duplicate originals to one of the electors on or before the date electoral votes are cast. Wis. Stat. § 7.70(b). Obviously this ministerial duty exists only when a certificate of election has already issued under § 7.70(a), after all post-election recounts and related legal proceedings have reached finality. There is nothing in § 7.70(b) that purports to affect the timetable for resolving post-election proceedings.

**Privileged and Confidential**   6
**The Real Deadline for Settling a State's Electoral Votes**

## Conclusion

The position taken by the Trump-Pence campaign regarding the outside deadline for resolving post-election challenges could conceivably end up proving critical to the result of this election. If so, it would not be the first time: the failure of the Gore team in 2000 to focus on the real deadline early enough was a clear mistake. Thus, the issue of the real deadline should be examined carefully in the near future, so that the campaign presents a clear and united front concerning it.

Reflecting on the failure of the Gore challenge to Bush's victory in Florida, Ron Klain observed in a 2002 essay that "time was our enemy" – to an extent that "cannot be underestimated."[6] Klain's early mistake was to overlook the possibility that January 6 might be the real deadline for resolving the matter of who had won Florida's electoral votes. As Klain recounted, when he went on CNN shortly after the election (on November 10), he "rather offhandedly noted that there was plenty of time for a full and fair counting of the people's votes, given that the electoral votes were not scheduled to be counted until December 18 . . . ."[7]

The timetable for Gore to win the recount was further truncated by Gore attorney David Boies who, "during the first argument to the Florida Supreme Court," on November 20, "had said that the election would be over on December 12, because of an obscure provision of federal law."[8] Journalist and lawyer David Kaplan vividly describes Boies's fateful decision in answering the justices' question regarding the outside deadline for resolving the controversy over the recount:[9]

> The deadline [Boies] repeatedly cited was December 12, six days before the Electoral College met and twenty-two days hence – a veritable eternity in the day-to-day, minute-to-minute struggle. This was the date mandated by the Electoral Count Act by which states had to get their acts together, in order to prevent Congress from possibly rejecting a slate of presidential electors. December 12 was a so-called

---

[6] Ronald A. Klain & Jeremy B. Bash, "The Labor of Sisyphus: The Gore Recount Perspective," in Overtime!: The Election 2000 Thriller (2002) (Larry B. Sabato, ed.), at 161.

[7] Id.

[8] Jeffrey Toobin, Too Close to Call: The Third-Six-Day Battle to Decide the 2000 Election 195 (2001).

[9] David A. Kaplan, The Accidental President: How 413 Lawyers, 9 Supreme Court Justices, and 5,963,110 (Give or Take a Few) Floridians Landed George W. Bush in the White House 142-43 (2001).

**Privileged and Confidential**                                                                                                7
**The Real Deadline for Settling a State's Electoral Votes**

safe harbor, but it was <u>not</u> a requirement ordained by either the U.S. Constitution, the Florida constitution, or even Congress itself. It was only in the nature of a benefit offered, with no penalty other than the absence of the benefit – sort of a no-risk offer. Any electoral slate determined thereafter simply would not be immune from congressional examination in a close election. That might seem like a big deal in theory, but did anyone really believe that in practice the electoral votes of one of the most populous states in the Union might go uncounted altogether? The distinction between a safe harbor as a freebie or absolute requirement was vital, but Boies didn't make it. Boies figured: Why should he? If his client got the time to count, Gore would overtake Bush and hand <u>him</u> the witch's hourglass

Wells pressed Boies on whether he agreed that December 12 represented the outer bounds.

"I do, Your Honor." He said this despite there being no state law or executive pronouncement to that effect.

Boies's concession of the date as a constitutional line over which no recount could cross would come back to haunt him in two weeks at the U.S. Supreme Court. It walled him in from ever offering such dates as December 18 (when the Electoral College convened), January 6 (when Congress met in joint session to count the electoral votes), or even January 20 (Inauguration Day). Indeed, January 20 was the only date mandated by the federal Constitution (in the Twentieth Amendment) – the other dates were mere statutory creations, which could be changed.

But to the extent the justices were going to come up with a new timetable, thinking about December 12 was critical. Any certification of the election – whether it included all, some, or none of the results from manual recounts – had to happen in time for the contest phase of Florida law to play out. A contest lawsuit needed time for trial and appeals. That had to be completed by December 12, according to Boies's answer.

If Boies had instead taken the position that January 6 was the real deadline for resolving the contest over Florida's electoral vote, citing the Hawaii 1960 example, Gore might ultimately have prevailed. So the issue of what is the real deadline is an issue that warrants close examination.

K.C.