Anthony T. Caso (Cal. Bar #88561)
Email: atcaso@ccg1776.com
CONSTITUTIONAL COUNSEL GROUP
174 W Lincoln Ave # 620
Anaheim, CA 92805-2901
Phone: 916-601-1916
Fax: 916-307-5164

Charles Burnham (D.C. Bar# 1003464)*
Email: charles@burnhamgorokhov.com
BURNHAM & GOROKHOV PLLC
1424 K Street NW, Suite 500
Washington, D.C. 20005
Telephone: (202) 386-6920
* admitted pro hac vice

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| JOHN C. EASTMAN,<br><br>                    *Plaintiff*,<br>vs.<br><br>BENNIE G. THOMPSON, *et al.*<br>                    *Defendants* | Case No.: 8:22-cv-00099-DOC-DFM<br><br>**PLAINTIFF'S REPLY BRIEF IN SUP-PORT OF PRIVILEGE ASSERTIONS**<br><br>Judge: Hon. David O. Carter<br>Magistrate Judge: Hon. Douglas F. McCormick<br>Crtrm.: 9D<br>Trial Date: not set |

1

# **TABLE OF CONTENTS**

2

3    TABLE OF AUTHORITIES ........................................................................ iii

4    INTRODUCTION.................................................................................... 1

5    ARGUMENT ........................................................................................10

6    I.   There Is No Basis to Further Crime Fraud Review.....................................10

7         a.   There is No Basis for Crime Fraud Review Beyond January 4-7. ..........10

8         b.   *United States v. Miller* Has Been Reaffirmed.........................................11

9         c.   The Select Committee Has Not Made a *Prima Facie* Case for *In Camera* Review for Common Law Fraud ........................................................12

10             i.   No *Prima Facie* Case that Attorney Advice was Used "In Furtherance" of Fraud .............................................................12

11             ii.  No Detrimental Reliance on Alleged Misrepresentations .................13

12   II.  The First Amendment Concerns Warrant Protection ...................................14

13   III. The Contentions about Attorney-Client Privilege Are Meritless. ................16

14   IV.  Work Product Protects Matter Made In Anticipation of Litigation .............18

15   V.   Work Product for Adjudicative Role of Legislatures...................................19

16   CONCLUSION .....................................................................................20

17   CERTIFICATE OF SERVICE ...................................................................22

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## Cases

*Adams v. Ameritech Servs., Inc.*,
231 F.3d 414 (7th Cir. 2000) .................................................................... 4

*Admiral Ins. Co. v. U.S. Dist. Ct.*,
881 F.2d 1486 (9th Cir. 1989) ................................................................17

*Atraqchi v. GMUC Unified Billing Servs.*,
788 A.2d 559 (D.C. 2002) ......................................................................13

*Curling v. Raffensperger*,
397 F. Supp. 3d 1334 (N.D. Ga. 2019) ................................................... 5

*Duplan Corp. v. Moulinage et Retorderie de Chavanoz*,
487 F.2d 480 (4th Cir. 1973) ..................................................................18

*Frank LLP v. Consumer Fin. Prot. Bureau*,
288 F. Supp. 3d 46 (D.D.C. 2017) ..........................................................20

*FTC v. Grolier Inc.*,
462 U.S. 19 (1983) ..................................................................................20

*Hickman v. Taylor*,
329 U.S. 495 (1947) ................................................................................18

*In re Grand Jury Investigation*,
810 F.3d 1110 (9th Cir. 2016) ...................................................... 11, 12

*In re Grand Jury Proceedings*,
473 F.2d 840 (8th Cir. 1973) ..................................................................20

*In re Grand Jury Subpoena*,
357 F.3d 900 (9th Cir. 2003) ..................................................................19

*In re Murphy*,
560 F.2d 326 (8th Cir. 1977) ..................................................................18

*McPhearson v. Blacker*,
146 U.S. 1 (1892) ..................................................................................... 1

*Natta v. Zletz*,
418 F.2d 633 (7th Cir.1969) ...................................................................20

*Nixon v. United States*,
506 U.S. 224 (1993) ................................................................................19

*Northrop Grumman Corp. v. Factory Mut. Ins. Co.*,
No. CV058444DDPPLAX, 2011 WL 13123635 (C.D. Cal. Aug. 8, 2011) ........19

*Pyles v. HSBC Bank USA, N.A.*,
172 A.3d 903 (D.C. 2017) ......................................................................14

*Repub. Nat'l Comm. V. Pelosi*,
   22-cv-659 (D.D.C. May 1, 2022) .......................................................15

*Schiller v. Nat'l Labor Relations Bd.*,
   964 F.2d 1205 (D.C.Cir.1992)...........................................................18

*Sibley v. St. Albans School*,
   134 A.3d 789 (D.C. 2016)...................................................................14

*Trump v. Thompson*,
   20 F.4th 10 (D.C. 2021) ......................................................................16

*United States v. Bauer*,
   132 F.3d 504 (9th Cir. 1997) ..............................................................12

*United States v. Capitol Serv., Inc.*,
   89 F.R.D. 578 (E.D. Wis. 1981) .........................................................18

*United States v. Miller*,
   No. 21-cr-119 (D.C. March 7, 2022) ..................................................11


### Statutes and Constitutional Provisions

3 U.S.C. § 2 .............................................................................................. 1

18 U.S.C. § 371 .......................................................................................11

18 U.S.C. § 1512(c) ................................................................................11

Ga. Code Ann. § 21-2-216(c).................................................................. 6

Ga. Code Ann. § 21-2-224(d).................................................................. 6

U.S. Const. Art. II, § I, cl. 4 ..............................................................1, 10


### Other Authorities

Claes G. Ryn, *Memorandum: How the 2020 Election Could Have Been Stolen*, The
   American Conservative (Jan. 5, 2021).................................................. 7

Cong. Globe, 34th Cong., 3rd Sess. (1857) ...........................................10

Dan Ahlmark, *It Speaks of Election Fraud in the United States*, Nya Dagbladet
   (Dec. 2020) ........................................................................................... 8

Garland Favorito and Bob Coovert, *Refutation of Georgia Secretary of State's
   False Election Claims* (Feb. 8, 2022) .................................................. 5

Greg Marx, *What the Fact-Checkers Get Wrong*, Columbia Journalism Review
   (Jan. 5, 2012) ....................................................................................... 3

Jack Phillips, *Lawyer Who Represented Trump in Pennsylvania Placed Under Protection After 'Threats of Harm'* Epoch Times (Nov. 19, 2020)....................15

Jacob Siegel, *Invasion of the Fact-Checkers*, Tablet Magazine (Mar. 21, 2022) .... 3

Jemima Kelly, *How "fact-checking" can be used as censorship,* Financial Times (Feb. 18, 2021)........................................................................................................ 3

Michael L. Rosin & Jason Harrow, "How to Decide a Very Close Election for Presidential Electors: Part 2," Take Care Blog (Oct. 23, 2020) ..........................10

Michigan Election Security Advisory Commission. Report and Recommendations (Oct. 2020)........................................................................................................ 7

Nick Givas, *Rep. Kinzinger: Adam Schiff's 'selective leaking' has turned impeachment push into a 'clown show'*, Fox News (Oct. 8, 2019) .....................15

Plaintiffs' Motion for Leave to File Second Amended Complaint ¶¶ 14, 15, *Donald J. Trump for President, Inc. v. Boockvar*, No. 4:20-CV-02078 (M.D. PA, Dkt. 168)........................................................................................................16

Restat. 3d of the Law Governing Lawyers, § 87 ...................................................20

Restatement (Third) ¶ 70 Comment f ...................................................................16

Senate Rep. 1st Sess. 43d Cong. No. 395 ............................................................. 1

Sounding Off with Kim Monson, *Episode 65: What Really Happened During the 2020 Presidential Election* (Feb. 21, 2021) ........................................................ 8

**INTRODUCTION**

George Orwell was prescient, if about 36 years ahead of schedule. His dystopian novel, 1984, describes the government's "thought police" and its slogans designed to compel submission by the populace – "War is Peace," and "2 plus 2 equals 5" are the most memorable.

The Select Committee seems to have taken on the role of the thought police. Calling out the illegality of the election is where the crime really is, it contends. "War is Peace. 2+2=5." Unwilling even to acknowledge that Dr. Eastman's claims of illegality and fraud were far from baseless, it has doubled down, asserting in its most recent filing not only that Dr. Eastman's claims were false, but that he is "dangerous," Opp. at 14, for even raising the prospect of illegality in the election.

Moreover, instead of avoiding the distortions that Dr. Eastman has highlighted previously, the Select Committee has doubled down on that tactic, too. Although Dr. Eastman's ethical duties constrain what he can offer as rebuttal, enough is in the public realm to demonstrate the Select Committee's tactic of distortion.

A recently released email exchange that Dr. Eastman had with a Pennsylvania legislator provides a perfect example. In that exchange, Dr. Eastman made two points, one legal and the other factual. The legislator had drafted a resolution outlining the numerous violations of state election law that had been perpetrated by state executive and even judicial officials. As a matter of law, that would mean the election was not conducted according to the "the manner" that the *Legislature* had adopted. The consequence of that unconstitutional conduct would trigger a resumption by the legislature of its plenary power under Article II to choose electors as it saw fit, bolstered by the statutory recognition of that power contained in 3 U.S.C. § 2. *See McPhearson v. Blacker*, 146 U.S. 1, 35 (1892) ("there is no doubt of the right of the legislature to resume the power at any time, for it can neither be taken away nor abdicated" (quoting Senate Rep. 1st Sess. 43d Cong. No. 395)); 3 U.S.C. § 2 ("Whenever any State has held an election for the purpose of choosing electors,

and has failed to make a choice on the day prescribed by law, the electors may be appointed on a subsequent day in such a manner as the legislature of such State may direct.").

But the Legislature is a political body, even when (as here) performing adjudicative functions, and quite properly must consider public perception. Even though it had power to adopt its own electors because of the illegality in the election ("perfectly within your authority to do," Eastman noted), Eastman advised that it should do so only if the legislature had identified "ample evidence of sufficient anomalies and illegal votes to have turned the election from Trump to Biden." Ignoring that well-grounded constitutional analysis and significant factual caveat, the Select Committee asserts that Eastman encouraged the legislator to draft a resolution "choos[ing] a slate of electors for Trump/Pence" and "suggested one or more ways to 'discard' votes and 'discount' the vote totals to *manufacture* a Trump victory in the state." Opp. at 11 n.21 (emphasis added). The Select Committee's distortion of the exchange should not be countenanced.

The Select Committee also ignores the same caveats in Dr. Eastman's memo outlining various scenarios for the conduct of the Joint Session of Congress and in his memo outlining the authority of state legislatures confronted with an election that was unconstitutionally conducted contrary to the "manner" directed by the legislature.[1] Only by ignoring those caveats can the Select Committee contend that Dr. Eastman engaged in an "an outcome-driven campaign to overturn the result of a democratic election." Opp. at 10-11.

The Select Committee's recitation of "debunked" factual claims about the election fares no better. It asserts that Dr. Eastman's "allegations … are unproven

---

[1] 6-page memo, ¶ d.i ("If, after investigation, proven fraud and illegality is insufficient to alter the results of the election, the original slate of electors would remain valid. BIDEN WINS."), cited in Opp. at 8 n.8 and available at https://perma.cc/B8XQ-4T3Z; *Legislature Auth. Memo,* ECF 350 Ex. J, p.9 (noting that statistical anomalies, combined with hard evidence of vote fraud, "strongly support the conclusion that something is amiss here, and that Legislatures simply *must* investigate and then, *if convinced that the election was too fraught with risk of fraud to be properly certified,* exercise their prerogative to legislatively designate a slate of electors." (second emphasis added)).

conspiracy theories and nonsense, already rejected by courts, the former Presi-
dent's campaign, subject matter experts and/or the U.S. Department of Justice."
Opp. at 14. Instead of providing dispositive evidence for that claim, the Select
Committee appears to have adopted a pernicious propaganda tactic deployed by so-
called "fact-checkers:" "politici[zing] … a device meant to support objectivity"
into a "means of censorship," as Jemima Kelly of the Financial Times has correctly
observed.[2] The tactic, described as "America's new public-private 'Ministry of
Truth' [that] mainly serves the interests of the tech platforms and Democratic Party
Operatives,"[3] has two steps: find someone who will say a piece of evidence is
wrong, and then claim that the evidence has been "debunked." As Associate Editor
Greg Marx noted in the Columbia Journalism Review, "many 'fact-checking'
pieces actually contain *counterarguments*—many of which are solid, some shoddy
or tendentious, but few of which really fit in a 'fact-check' frame."[4]

    A particularly salient example of this tactic is the Select Committee's back-
handed treatment of the damning evidence of an extensive, illegal ballot harvesting
scheme contained in the documentary film, *2000 Mules*.[5] Instead of acknowledging
the significant problems highlighted by the movie, the Committee relies on a news-
paper story asserting that there were "gaps" in the film.[6] That is lay opinion, not
evidence, and this Court should not take it at face value, particularly when formal
investigations of the apparent criminal activity are underway in several jurisdic-
tions, including Arizona, Georgia, Michigan, and Wisconsin.[7]

---

[2] Jemima Kelly, *How "fact-checking" can be used as censorship,* Financial Times (Feb. 18, 2021), at https://www.ft.com/content/69e43380-dd6d-4240-b5e1-47fc1f2f0bdc.
[3] Jacob Siegel, *Invasion of the Fact-Checkers*, Tablet Magazine (Mar. 21, 2022), at https://www.tab-letmag.com/sections/news/articles/invasion-fact-checkers.
[4] Greg Marx, *What the Fact-Checkers Get Wrong*, Columbia Journalism Review (Jan. 5, 2012), at https://archives.cjr.org/campaign_desk/what_the_fact_checkers_get_wro.php.
[5] The Committee does not even bother to address the significant evidence of election illegality and fraud contained in the Special Prosecutor's report in Wisconsin, or the thorough assessment contained in Mollie Hemingway's recent book, *Rigged*, both referenced in Dr. Eastman's opening brief.
[6] Opp. at 22 and n.46 (citing Philip Bump, *Discussing the Gaps in '2000 Mules' with Dinesh D'Souza*, Wash. Post (May 17, 2022), https://perma.cc/3WHS-NVVL).
[7] *See, e.g.* Yuma County Sheriff's Office, *Press Release: Yuma County Voting Fraud* (May 11, 2022), at https://www.yumacountysheriff.org/pr-2022/PR-2022-30-Yuma-County-Voting-Fraud.pdf.

Other examples of the Select Committee's use of this tactic abound. The Committee asserts, for example, that the Georgia allegations "were wrong when they were made and have not withstood scrutiny in the months since." *Id.* at 15. But that assertion is supported only by a competing expert opinion filed in the case and a blog post. Competing claims and expert opinions are standard fare in litigation, which the adversarial process is supposed to resolve, but in this case, there never was an adjudication of the relative merits of the competing expert opinions, or assessment of the factual allegations such as those supposedly "debunked" by the blog post. The competing expert and the author of the blog post both speculated that the decline in disqualification rates in Georgia was the result of COVID-era voter education efforts (among other things) rather than "lax" signature verification rules, for example, but that claim was untested[8] and ignores that signature verification was blocked in several jurisdictions (without legislative approval);[9] it therefore hardly qualifies as dispositive proof that the original claims were wrong, or that lax (or non-existent) signature verification didn't also contribute to the decline. *Cf., e.g., Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 428 (7th Cir. 2000) (disputes between experts go to the weight of the evidence, not its admissibility). But even if it did, the issue here is not whether the evidence relied on by Dr. Eastman and his client would ultimately prove to be correct; it is, rather, whether at the time it was a "corrupt" criminal act to rely on such evidence, as it clearly was not.

The Select Committee similarly dismisses as "long-ago refuted" expert opinion regarding votes cast on behalf of the deceased. As above, the Committee relies on a countervailing expert opinion,[10] but that is likewise a dispute about the weight of the competing expert opinions, which was never resolved in court. The Committee

---

[8] The expert declaration relied on by the Select Committee was the basis for a *Daubert* motion to exclude Plaintiffs' experts in the Georgia case, but Plaintiffs opposed that motion, and it was never ruled on by the Court. Petitioners' Response and Objection to Respondents' Motion to Exclude Affidavits and Testimony of Petitioners' Experts, PD 185 (filed Jan. 7, 2021), Burnham Decl. Ex. A.

[9] *See, e.g.*, Daniel Payne, *Key Battleground States Don't Require Signature Matching on Mail-in Ballots*, The Tennessee Star (Oct. 16, 2020), at https://tinyurl.com/4293z5nf.

[10] In our opening brief, we inadvertently omitted Geels' important "as many as" caveat.

also relies on press accounts claiming that an investigation by Georgia officials had confirmed that only 4 votes had been cast by deceased individuals, Opp. at 19 n. 37, yet the results of the supposed investigation by the Secretary's office were never submitted to court, and the Secretary did not provide any details on methodology. As importantly, the Committee ignores Geels' subsequent report, issued *after* those news accounts, in which he addressed the "false positives" problem he had acknowledged in his prior Declaration. That unrebutted report reflects additional analysis where Geels had been able to add home address to his name and birth year comparison (which significantly reduces false positives) and "confirmed that at least 780 dead people 'voted'." Burnham Decl. Ex. A, p. 32. The Committee also ignores a comprehensive, 42-point rebuttal to all the inaccurate statements made by the Secretary of State's office published by the non-partisan Georgia election integrity organization, VoterGA.org, including the claim that only "2" voters who died before election day had votes counted.[11] The lack of credibility from the Secretary of State's office should not be a surprise, as a federal court has already castigated that office for making arguments that the court found to be "flatly not credible" and "far-fetched," and for engaging in conduct that "casts a disturbing shadow" on their contentions.[12] This Court should similarly not accept the Committee's reliance on such disputed matters as though they were gospel truth.

On several occasions, the Select Committee "rebuts" claims that were not made, a classic straw man tactic. For example, it asserts that the claim about underage individuals registering to vote had been "refuted" by the Georgia Secretary of State at a January 4, 2021 press conference, during which it was stated that "the actual number of people below the age of 18 who votes was *zero.*" Opp. at 16. But Geels never claimed that people below 18 voted, and Dr. Eastman did not, either. Rather,

---

[11] Garland Favorito and Bob Coovert, *Refutation of Georgia Secretary of State's False Election Claims* (Feb. 8, 2022), at https://tinyurl.com/2p8u6k2p. This report also significantly undermines the Select Committee's reliance on Secretary Raffensperger's letter to Congress, Opp. at 42 n.65.
[12] *Curling v. Raffensperger*, 397 F. Supp. 3d 1334, 1372-73 and n.52 (N.D. Ga. 2019).

PLAINTIFF'S REPLY BRIEF IN SUPPORT OF PRIVILEGE ASSERTIONS - 5

1  Geels identified 2,047 underage individuals[13] who *registered* to vote before they

2  were 17. The point is that because those registrations were made in violation of

3  Georgia law, *see* Ga. Code Ann. § 21-2-216(c), the individuals were not properly

4  registered and were therefore ineligible to vote, *see* Ga. Code Ann. § 21-2-224(d)

5  (providing that "Each elector who makes timely application for registration, …

6  shall be entitled to vote …"). Geels' expert analysis had nothing to do with

7  whether these individuals had voted before turning 18.[14]

8  The Select Committee likewise mischaracterizes Dr. Eastman's opening brief

9  on the CISA statement. That statement said, among other things, that there was "no

10  evidence that any voting system … changed votes…." Dr. Eastman noted that that

11  statement had been proved false, because both an audit conducted by ASOG and

12  the State's own rebuttal expert had acknowledged that an incorrectly implemented

13  update in scanner election definition files "shift[ed] Trump's votes into Biden's

14  column." In other words, the "voting system … changed votes," contrary to

15  CISA's claim.[15] Eastman made no assertion about any of the other disputed find-

16  ings in the Antrim County audit report, but neither did the court decide the compet-

17  ing expert claims in that case. And although the State's expert disputed many of

18  the claims in the ASOG audit, he also acknowledged that ASOG correctly identi-

19  fied a "serious security problem" with the vote tabulation system that "potentially

20  le[ft] it vulnerable to various methods of attack," and that the "Windows security

---

[13] Geels' initial report, Ex. Q, incorrectly stated 66,247 (which we mistakenly cited in our opening brief), apparently due to a transposition error between the underage voter data and the 2016 voter roll data. Geels corrected the error in his subsequent report, in which he identified 2,047 individuals who had improperly registered to vote before the law allowed. *See* Burnham Decl. Ex. A, p. 12.

[14] The same problem exists with the Committee's objection to another expert's conclusion regarding voters who moved to another county more than 30 days before the election but who voted in their prior residence county, contrary to state law. While the expert, Mark Davis, acknowledged that a temporary change of address would not disqualify the voter from voting in his county of permanent residence, he found it "highly likely that the vast majority [of the 40,279] are not temporary." ECF 350 Ex. R ¶¶ 25-26. Respondents offered no evidence – expert or otherwise – to the contrary, so Davis's expert opinion was unrebutted. (The expert Declaration they submitted with their *Daubert* motion, which was never ruled upon, only challenged his credentials and methodology, not his conclusion that most of the cross-county moves were not temporary. ECF 350 Ex. P, ¶¶ 107-08).

[15] ECF 350 Ex. U, p. 22, Table 5; see also p. 23, Table 7 ("As a result of the mismatched election definitions, … Biden received the votes intended for Trump"), https://tinyurl.com/2p8rt736.

event log," which are "important sources for forensic investigation," contained entries only back to November 4—the day *after* the election. P. 45.[16] Those admissions by the State's own expert indicate that a serious investigation was warranted, and when combined with statistical evidence that "reeks of a computer algorithm," *see* 63479 (*in camera*) certainly call into doubt the results of the election.

One has to wonder what could motivate government attorneys—former prosecutors, several of them—to advance such distortions of the evidentiary record in formal court pleadings. Renowned political scientist Claes Ryn offered a very insightful analysis shortly before the events of January 6 that is worth reflecting upon. In *Memorandum: How the 2020 Election Could Have Been Stolen*, he concluded "that in the 2020 election, there was *major* and *organized* vote fraud and that it probably stole the election."[17] He stated that he hoped he was not deceiving himself about that conclusion because of partisanship, noting that he has "never belonged to a political party" and that, if he had "a bias, … it is that of one who is largely alienated from both of the American parties and who believes that both of the presidential candidates in 2020 have major flaws." He also noted that

> very shortly after the election, *European* experts on American elections, some of whom also had advanced expertise in statistics, had published articles or given interviews in which they claimed to have seen clear evidence that the election was "rigged"! In *Sweden* of all places, an expert on American elections published a series of articles showing that Biden's win in the swing states simply could not be explained without assuming major fraud. Since Donald Trump is even more disdained by the media in Europe than he is here, I was surprised to hear a few European commentators refer to the presidential election as if its fraudulence should be obvious to all.

---

[16] He also acknowledged that "[s]ome Michigan jurisdictions use [Dominion scanners ability to be connected to external networks," which "creates significant risks," including, as the Michigan Election Security Advisory Commission has noted, "that unofficial results could be intercepted or manipulated, that the locality's election management system server could be attacked remotely over the network, or that optical scanners could themselves be remotely attacked." *Id.* (citing Michigan Election Security Advisory Commission. Report and Recommendations (Oct. 2020), https://tinyurl.com/f2jepzzy.

[17] Claes G. Ryn, *Memorandum: How the 2020 Election Could Have Been Stolen*, The American Conservative (Jan. 5, 2021) (emphasis in original), at https://tinyurl.com/2p8kahdk.

1    *Id.* (emphasis in original).[18] If experts from *Europe* could view the fraud as some-

2    thing that "should be obvious to all," why cannot the members of Congress serving

3    on the Select Committee and their attorneys even acknowledge the possibility that,

4    just perhaps, there might be something to the claims of illegality and fraud es-

5    poused by Dr. Eastman and his client that at least warranted further investigation.

6    Ryn offers an explanation: "Diehard partisans for a certain outlook will refuse to

7    have their beliefs questioned."

8        That is not to say that "diehard" supporters of President Trump are not equally

9    susceptible to the charge that they "will refuse to have their beliefs questioned."

10   But as the public record demonstrates, Dr. Eastman regularly called for further in-

11   vestigation when statistical and other evi-

12   dence indicated that something might be

13   amiss.[19] One high-profile example is the

14   set of graphs depicting vote spikes that

15   went viral on the internet, such as this

16   from Wisconsin:



17       In numerous public statements, Dr. Eastman acknowledged that the vote spikes

18   could be explained by late, all-at-once reporting from central canvassing facilities

19   in large, heavily Democrat cities, or they could be evidence of significant, ballot-

20   stuffing fraud.[20] County-level time series data could help determine which of the

21   two explanations was correct. If the central canvassing facility at the State Farm

22   arena in Atlanta (Fulton County), Georgia, for example, reported its results all at

23   once, then a large pro-Biden spike from that heavily Democrat jurisdiction would

24   be expected. If, on the other hand, that facility reported partial returns throughout

25

26   [18] The three Swedish articles, published in Swedish by Dan Ahlmark in the largest Swedish daily inde-
     pendent newspaper, Nya Dagbladet, are roughly translated as "It Speaks of Election Fraud in the United

27   States, parts 1, 2, and 3. They are available at https://tinyurl.com/3d8y72aj.
     [19] *See, e.g.*, Sounding Off with Kim Monson, *Episode 65: What Really Happened During the 2020 Presi-*

28   *dential Election* (Feb. 21, 2021), starting at 11:15 (discussing the need to assess whether video depicting
     duplicate scans of ballots was legitimate or fraudulent), https://tinyurl.com/2p8uppfx.
     [20] *See e.g., id.*, starting at 1:08.

the evening (as was the case elsewhere in the State), then a large vote spike would be strong indication of fraud. There is nothing nefarious, and certainly nothing criminal, about requesting further investigation of that observed anomaly before certifying a presidential election that may well have turned on the outcome of that (and similar) investigations.

The same is true for the other evidence relied on by the Select Committee. The *single* document that this Court ordered to be produced under the crime-fraud exception—one which was not authored by Dr. Eastman or copied to his client, we should note—belies the Select Committee's claim that Eastman was engaged in a "conspiracy to prevent the certification of President Biden's electoral victory" or a "monthslong effort corruptly to subvert the results of the 2020 election." Opp. at 7. Relying on significant legal scholarship indicating that the Vice President had the authority under the (admittedly ambiguous) text of the 12th Amendment not just to "**open** the votes, but to **count** them—including making judgments about what to do if there are conflicting votes," the analysis recommended that the Vice President exercise this authority to allow time for further investigation. ECF 350 Ex. A. But the explicit purpose for that recommendation was not to overturn the election, as the Select Committee repeatedly claims, but to "ensure":

(1) That the mass media and social media platforms, and therefore the public, will focus intently on the evidence of abuses in the election and canvassing; and

(2) That there will be additional scrutiny in the courts and/or state legislatures, with an eye toward determining which electoral slates are the valid ones.

*Id.* The email then continues by recommending that the President and Vice President should "urg[e] only that there be real scrutiny of what happened in this election, and that they're willing to live with the result as long as there is a serious look, especially by the state legislatures, at what happened there, to ensure it will never happen again." "[T]hat needed scrutiny," the email continued, "would be worthwhile even if it couldn't ultimately prevent the election of Biden and Harris."

*Id.* Far from being evidence of a "crime" or, worse, of a "coup," that is quite explicitly a call for investigation and scrutiny of the serious claims of election illegality and fraud wherever that investigation would lead.

Neither does Dr. Eastman's advice, or those of others on the Trump legal team, to have Trump electors in the contested states meet and cast their votes on the statutorily-designated date constitute evidence of "crime" or a "coup." Rather, it was a reflection of the fact that election challenges were at the time still pending in the contested states, but that there was a serious constitutional concern that unless the electors met on the designated day, their votes could not be counted by Congress even if the election challenges later determined conclusively that Trump rather than Biden had prevailed.[21] The same strategy was employed by Kennedy electors in Hawaii in 1960, who met and voted on the designated date even though Nixon's victory had been certified. As a result, they were available to be counted in the Joint Session of Congress after a court-ordered recount determined that Kennedy rather than Nixon had prevailed in Hawaii. ECF 350 Ex. B at 3-4.[22]

## ARGUMENT

### I.   There Is No Basis to Further Crime Fraud Review

####   a.   There is No Basis for Crime Fraud Review Beyond January 4-7.

Although he objects to the finding, Dr. Eastman acknowledges that this Court decided there was a basis for crime fraud review of Chapman materials from the January 4-7 timeframe. The Select Committee now attempts to convince the Court to extend that review to the entire subpoena period. Opp. at 6-11.

The Committee acknowledges that the crime fraud exception only applies where "the client was engaged in or planning a criminal or fraudulent scheme *when*

---

[21] The November 18, 2020, memo correctly notes that the Constitution expressly gives Congress the power to specify the date "on which [the electors] shall give their Votes, which Day shall be the same throughout the United States. U.S. Const. Art. II, § I, cl. 4. A blizzard in Wisconsin in 1856 that prevented electors from meeting on the designated day resulted in a two-day debate in Congress about whether those votes could be counted, a debate that was ultimately left unresolved because the election did not turn on those votes. Cong. Globe, 34th Cong., 3rd Sess., 644-60, 662-68 (1857).

[22] Citing Michael L. Rosin & Jason Harrow, "How to Decide a Very Close Election for Presidential Electors: Part 2," Take Care Blog (Oct. 23, 2020), at https://tinyurl.com/3anhpvzt.

PLAINTIFF'S REPLY BRIEF IN SUPPORT OF PRIVILEGE ASSERTIONS - 10

*it sought the advice of counsel to further the scheme.*" *In re Grand Jury Investigation*, 810 F.3d 1110, 1113 (9th Cir. 2016) (emphasis added). To establish a basis for crime fraud prior to January 4, the Committee would have to show when the criminal intent attributed by this Court to the President was first formulated. The Select Committee offers no answer to this question, nor does it cite any statements from the former President that could supply one. It cites a collection of emails between Dr. Eastman and other attorneys, but nothing from the President.[23] Because the Committee has not even attempted to make this showing, it has failed to meet its burden to trigger crime fraud review for materials outside of January 4-7.

### b. *United States v. Miller* **Has Been Reaffirmed**

As Dr. Eastman argued in his opening brief, Judge Nichol's decision in *United States v. Miller* gave a reasonable interpretation to the 18 U.S.C. § 1512(c) which would avoid exposing large areas of routine political participation to possible prosecution. Br. at 37 (21-cr-119 (D.C. March 7, 2022)). The *Miller* decision limited § 1512(c) to tampering with documents and objects, an interpretation which would remove it as a basis for crime fraud review in this case.[24]

The Select Committee urges this Court instead to follow other district court decisions which reach outcomes favorable to it. Opp. at 11-13. It also warned that *Miller* was not "sturdy on its own docket" due to a pending motion to reconsider. *Id.* at 11. However, as the Committee acknowledged in a supplemental filing, Judge Nichols denied the motion to reconsider and reaffirmed his prior holding. In doing so, he explained that contrary decisions are not consistent with one another:

> The Court notes that those decisions reach the same conclusion but for different reasons. For example, some opinions do not consider the relevance of the word "otherwise" in the statute at all and others suggest that it presents the key interpretive question. Other decisions appear to have concluded that § 1512(c)(1) acts as something of a carveout from § 1512(c)(2)'s otherwise

---

[23] It not sufficient merely to show that the President disputed the election results prior to January 4, 2021. As this Court has stated, "pursuing legal recourse itself did not advance any crimes." ECF 260 at 41.

[24] Plaintiff also offered authority in his opening brief that 18 U.S.C. § 371, the other criminal statute previously relied on by this Court, did not apply to mere advocacy of illegal conduct but required acts of dishonesty. The defendants have offered no opposition to this argument.

1  broad terms, while others interpret "otherwise" to require a link between the
2  subsections that is provided through the requirement that the illegal conduct
    be targeted at an "official proceeding."
3  *Id.* at ECF 186 at 2 n. 1 (internal citations omitted). The authority opposing *Miller*
4  is therefore not nearly so monolithic as the Committee would have this Court be-
5  lieve. Dr. Eastman continues to maintain that the *Miller* decision represents the
6  most defensible interpretation of § 1512 and should control in this case.

7      ### c.  The Select Committee Has Not Made a *Prima Facie* Case for *In Cam-*
8          *era* Review for Common Law Fraud

9      This Court did not decide in its March 28 order whether D.C. common law
10  fraud provided an additional basis for crime fraud review. ECF 260 at 40. The de-
11  fendants again urge the Court that it does. The argument is incorrect for at least
12  two reasons.[25]

13      ### i.  No *Prima Facie* Case that Attorney Advice was Used "In Further-
14          ance" of Fraud

15      Crime fraud applies where the invoking party can show that the client was en-
16  gaged in or planning to commit a crime when it sought the advice of counsel and
17  that the attorney-client communications for which production is sought are "suffi-
18  ciently related to" and were made "in furtherance of the intended, or present, con-
19  tinuing illegality." *In re Grand Jury Investigation*, 810 F.3d at 1113 (emphasis
20  added). The district court must find "reasonable cause to believe that the attorney's
21  services were *utilized in furtherance of* the ongoing unlawful scheme." *In re Grand*
22  *Jury Proceedings*, 87 F.3d 377, 381 (9th Cir. 1996) (emphasis added); *see also*,
23  *United States v. Bauer*, 132 F.3d 504 (9th Cir. 1997) (reversing case where crime
24  fraud exception did not apply because legal advice was not used in furtherance of
25  bankruptcy fraud scheme).

26      To support its argument for common law fraud review, the only specific exam-
27  ple the Select Committee offers is a series of alleged misrepresentations by Donald

28

---

[25] As Dr. Eastman has previously argued, the defendants have not submitted evidence sufficient to find fraudulent intent. ECF 185 at 22-32. He reasserts those arguments here.

Trump about election fraud and illegality in Georgia. *See, Atraqchi v. GMUC Uni-fied Billing Servs.*, 788 A.2d 559, 563 (D.C. 2002) (knowingly false misrepresenta-tion required for common law fraud). The Committee alleges that a post to the President's YouTube channel, two campaign Facebook advertisements, a January 2, 2021 phone call with Georgia Secretary of State Brad Raffensperger, a January, 2021 tweet from the President, and the President's January 6 speech contained knowingly false statements. ECF 164-1 at 63-64.

As Dr. Eastman has previously contended, the Committee's argument for why these statements were knowingly false fails. It argues that this Court should find that President Trump made knowingly false statement simply because other parties disputed those statements. ECF 164-1 at 46-49. This is insufficient.

However, the Court need not resolve whether President Trump made any know-ing misrepresentations because the Committee has not established that President Trump utilized Dr. Eastman's advice in making any of these statements. There is no allegation that Dr. Eastman was offering advice that was somehow used to pro-duce YouTube videos or Facebook ads, or on what to include in his January 6 speech, or that he participated in the President's January 2 call the with the Georgia Secretary of State. The closest the Committee comes to even attempting a tie be-tween advice from Dr. Eastman and alleged false statements by the President is the conclusory statement that "it appears" that the President's alleged false statements "were informed" by Dr. Eastman's advice. *Id.* at 50. This is insufficient. *See*, *e.g.* *Atraqchi*, 788 A.2d at 563 ("Fraud is never presumed and must be particularly pleaded").

Because the Committee has not even alleged any connection between Dr. East-man's legal advice and the alleged common law fraud by Donald Trump, it has failed to make a *prima facie* case for common law fraud *in camera* review.

### ii.  No Detrimental Reliance on Alleged Misrepresentations

The Committee has failed to make a *prima facie* case for reasonable and/or

detrimental reliance on alleged misstatements by the President.

The Select Committee's assertion that DC common law fraud requires that "action is taken in reliance upon the representation," ECF 164-1 at 47, is incorrect. DC common law fraud law requires that such reliance also be "justifiable" and "detrimental." *Pyles v. HSBC Bank USA, N.A.*, 172 A.3d 903, 907 (D.C. 2017) (*citing*, *Sibley v. St. Albans School*, 134 A.3d 789, 809 (D.C. 2016) ("to be actionable, reliance on the misrepresentation must have been justifiable")).

Thus viewed in its proper light, it is clear that the Committee has not made a *prima facie* case for the reliance element. It cites statements from various January 6 criminal defendants tying their criminal actions to statements from President Trump. Putting aside the obvious motive of these out-of-court declarants to deflect blame, it is clear that committing criminal acts cannot be "justifiable" reliance on any of the statements by President Trump. Although the Committee accuses him of making knowing false statements, it can point to no statement from the President encouraging crimes or violence. It therefore was not "justifiable" to, for example, "threaten[] Nancy Pelosi" based on any of the President's statements, or commit any other criminal act. ECF 164-1 at 50.

In addition to the statements of criminal defendants, the Committee also relies for this element on polling data purporting to show that "[m]ore than 40% of Americans still do not believe that Joe Biden legitimately won the 2020 presidential election." *Id*. at 50. The Committee makes no attempt to tie this polling data to specific statements of the President, as opposed to the many other influential persons raising election integrity concerns. It is also by no means obvious that holding such an opinion is legally "detrimental."

For all of the reasons, the Select Committee has not made a case for justifiable and/or detrimental reliance on any allegedly false statement by President Trump. DC common law fraud therefore cannot provide a basis for crime fraud review.

## II.   The First Amendment Concerns Warrant Protection

In opposing Dr. Eastman's First Amendment claims, the Select Committee first argues that the Court need not reach the issue because Dr. Eastman has raised First Amendment issues at prior points in this litigation. Opp. at 23. However, Dr. Eastman's current First Amendment claim is based on a particular set of materials which have not been previously addressed by the Court.

Next, the Committee denies that the D.C. District Court applied "exacting scrutiny" to a congressional subpoena in *Repub. Nat'l Comm. V. Pelosi*. 22-cv-659 (D.D.C. May 1, 2022). According to the Committee, Judge Kelly "declined to resolve the question of which standard applie[d]." Opp. at 24. This surprising contention contradicts not only Judge Kelly's opinion but the Committee's own stated position from the very same case. *See*, *RNC* at ECF 39 at 8 (Opposition to Injunction Pending Appeal) ("The Court employed exacting scrutiny and narrow tailoring— the very standards the RNC itself proposed.").

The Committee next alleges that Plaintiff's "vague theory" depends on "the presumption that the Select Committee will haphazardly release this information to the public." Opp. at 25-26. Meanwhile, the Select Committee offers no denial of Plaintiff's allegation that they have already leaked materials ordered sealed in this very case and no rebuttal to news reports of massive leaks from the Select Committee. ECF 345 at 20 n. 39l; 33. It offers no reason to conclude that the leak histories of certain of its members will not continue in the current circumstances.[26] Most importantly, it offers no assurances to the Court that the First Amendment materials Dr. Eastman seeks to protect will not be disclosed (perhaps out of context) to millions of viewers in the "blockbuster" committee hearings planned to start in June. *Id*. The potential chilling effect on First Amendment freedoms is clear, and is supported by numerous news accounts, court filings, and documents at issue here.[27]

---

[26] *See, e.g.*, Nick Givas, *Rep. Kinzinger: Adam Schiff's 'selective leaking' has turned impeachment push into a 'clown show'*, Fox News (Oct. 8, 2019) (Rep. Kinzinger statement that "I think Adam Schiff does a lot of selective leaking"), at https://www.foxnews.com/media/adam-schiff-impeachment-kinzinger.

[27] *See, e.g.*, Jack Phillips, *Lawyer Who Represented Trump in Pennsylvania Placed Under Protection After 'Threats of Harm'* Epoch Times (Nov. 19, 2020), https://tinyurl.com/yc4ah48z; Plaintiffs' Motion for Leave to File Second Amended Complaint ¶¶ 14, 15, *Donald J. Trump for President, Inc. v. Boockvar*,

These important First Amendment rights are not outweighed by any valid interest of the Select Committee. The Committee's response does not propose to the Court any piece of potential legislation which requires review of the materials for which Dr. Eastman has claimed First Amendment protection. *See*, *Trump v. Thompson*, 20 F.4th 10, 24 (D.C. 2021) ("Congress's power to investigate…is justified solely as an adjunct to the legislative process") (internal quotations omitted). *Cf.*, ECF 260 at 43 ("[T]he Court does not want to enable well-intentioned committees to circumvent work product protection by using broad and urgent mandates, as has occurred in our not-so-distant past.")

## III.  The Contentions about Attorney-Client Privilege Are Meritless.

The Select Committee makes several contentions as to why the Attorney-Client privilege is not applicable. Each is without merit.

First, it takes issue with Dr. Eastman's communications with his client through three "staff members." It concedes the obvious point that the President's executive assistant "could possibly have been an agent for attorney-client purposes," but then claims that the other two had no such administrative role. Yet that is not the test set out in either the Restatement or case law, as noted in our opening brief. "A person is a confidential agent for communication if the person's participation is reasonably necessary to facilitate the client's communication with a lawyer." Restatement (Third) ¶ 70 Comment f. The notion that the first of these two is not such a person defies logic, given his position. *See also, e.g.* 23419 and 23420 (Burnham Decl. Ex. D) (voice message confirming he would coordinate getting the retainer agreements). And the other person was also an attorney who played point for the President on a number of strategic decisions about pending litigation and other matters, as is evident in documents already produced (e.g., Burnham Decl. Ex. F, 31220) and as should be clear from the court's *in camera* review of others. *See* 23421 (describing that individual as "a lawyer for Trump"); 61356, 61424, 61561

---

No. 4:20-CV-02078 (M.D. PA, Dkt. 168) (describing threats to attorneys on the case); Burnham Decl. Exs. B, C, E (4494, 6315, 29464).

(coordinating between counsel and the President regarding a verified complaint).

The Select Committee's next objection is that this Court has already held that the inclusion of one of the individuals broke the attorney-client privilege. But this Court so held because Dr. Eastman had at the time only asserted the individual was co-counsel in the privilege log, not by providing a retainer agreement or a sworn declaration. ECF 260 at 21. Sworn declarations to that effect have now been provided. *See* Marks Decl. ¶ 6.f; Hilbert Decl. ¶ 3.m; 3rd Eastman Decl. ¶ 9; *see also* 23998 (*in camera*) (noting this individual "has been working on the Troupis recount and has agreed to assist us with the federal court action as well.").[28]

The Select Committee also challenges Dr. Eastman's assertion of privilege with respect to privileged communications Eastman had with other clients or potential clients. As is often the case for informal requests for legal opinion from public interest attorneys such as Dr. Eastman, the "representation" does not proceed to a formal written agreement. But as we noted in our opening brief, a communication made for the purpose of obtaining "legal advice of any kind" is privileged. Br. at 17 (citing *Admiral Ins. Co. v. U.S. Dist. Ct.*, 881 F.2d 1486, 1492 (9th Cir. 1989). The Committee's further assertion that Eastman has not indicated the timetable is incorrect. His 3rd Declaration specifically mentions "December 2020" for 6 of the 7 individuals, ¶¶ 15, 16, 18, and "late December and early January" for the 7th, ¶ 17. The consolidated privilege log also depicts the date for each of these communications. *See, e.g.*, 23532, 24727, 61764, 52958.

The Select Committee also contends that Dr. Eastman's Declaration with respect to three of these individuals "appears misleading." This is a serious charge, but it is based on hearsay[29] and belied by the actual communications Dr. Eastman

---

[28] The Select Committee also re-asserts its waiver argument (p. 32) because Dr. Eastman has spoken publicly about the oval office meeting on January 4. But as explained in our first reply brief back in March, ECF 185, that conversation was not privileged in the first place because it occurred in the presence of third parties. For that and the other reasons articulated there, the Select Committee's renewed waiver argument fails again.

[29] Ex. V is not authored by the individual, and he is also not copied on the email, which appears to have been solicited by an "Investigative Counsel" for the Select Committee.

PLAINTIFF'S REPLY BRIEF IN SUPPORT OF PRIVILEGE ASSERTIONS - 17

had with those three individuals, which are currently before this Court for *in camera* review. As this Court will see, 23582 is an email thread[30] which depicts a specific request for joint "guidance" on a "constitutional" question,[31] acknowledges the conference call held for that purpose, and has Dr. Eastman transmitting "the materials we discussed" to the three individuals involved. Of course, these individuals are free to waive attorney-client privilege if they so choose, but to date, none of them have contacted Dr. Eastman with such a request.

## IV.  Work Product Protects Matter Made In Anticipation of Litigation

The Select Committee objects that Dr. Eastman's opening brief is "the first time" that he as "link[ed] particular documents to particular cases." Opp. at 37. Yet that is not a requirement for work product protection to apply. The privilege "extends to documents prepared in anticipation of foreseeable litigation, even if no specific claim is contemplated." *Schiller v. Nat'l Labor Relations Bd.*, 964 F.2d 1205, 1208 (D.C.Cir.1992), *abrogated on other grounds*, *Milner v. Dep't of Navy*, 562 U.S. 562 (2011). And it "extends to documents prepared in anticipation of *any* litigation, not just the instant litigation. *United States v. Capitol Serv., Inc.*, 89 F.R.D. 578, 585 (E.D. Wis. 1981) (emphasis added) (citing *In re Murphy*, 560 F.2d 326 (8th Cir. 1977); *Duplan Corp. v. Moulinage et Retorderie de Chavanoz*, 487 F.2d 480 (4th Cir. 1973)).

The Select Committee also relies on the court's prior ruling regarding materials prepared with a "dual purpose." As is clear from Dr. Eastman's privilege log, that is clearly inapplicable for most of the documents at issue, which are classic work product prepared in anticipation of litigation—"mental impressions, conclusions, opinions, or legal theories," *Hickman v. Taylor,* 329 U.S. 495, 509-10 (1947);

---

[30] Several of the earlier emails in the thread (23418, 23425, 23430, 23441, 23442) have not been produced either to the Select Committee or to this Court for *in camera* review because the Committee did not object to Dr. Eastman's assertion of privilege over them. *See* Feb. 22 SC Objections.

[31] Dr. Eastman's declaration described those communications as about a "possible representation." We now realize that may be ambiguous and might incorrectly be read as a potential representation in a litigation matter. That is not the case, and as the *in camera* review of 23582 will confirm, the "representation" was merely a request for "guidance" on a "constitutional" issue, which Dr. Eastman provided.

"draft pleadings," *id.* at 510 n.9; and "expert analysis" of non-testifying experts, *Northrop Grumman Corp. v. Factory Mut. Ins. Co.*, No. CV058444DDPPLAX, 2011 WL 13123635, at *2 (C.D. Cal. Aug. 8, 2011).[32]

As for the few documents that might fall under a "dual purpose" umbrella, it will be clear from the Court's *in camera* review that they were prepared "*because of* anticipated litigation, and would not have been created in substantially similar form *but for* the prospect of that litigation." ECF 260 at 22 (quoting *In re Grand Jury Subpoena*, 357 F.3d 900, 908 (9th Cir. 2003)). 21814 and 21854, for example, include commentary on legislative testimony that articulated the legal theories and factual bases for an election challenge that was about to be filed. 24905 references an electors timetable memo with commentary about how that describes a deadline to "complete litigation." 28952 and 29007 reference a legislative hearing, but in the context of including additional information in pending litigation.

We believe that two additional documents, 62657 and 51059, also qualify under the above analysis, the first because it deals with pending litigation and the consequences of inaction in that litigation, and the second because it articulates legal issues in anticipated litigation. But if not, both should still be deemed protected work product as addressing issues related to the legislature acting in in its adjudicative function, discussed below.

## V.   Work Product for Adjudicative Role of Legislatures

The Select Committee claims that Dr. Eastman cited no authority in the opening brief for his contention that work product protection should apply to documents prepared in anticipation of challenges to electoral votes in Congress or in state legislatures. Actually, we did cite authority in the analogous context of an impeachment proceeding, *Nixon v. United States*, 506 U.S. 224 (1993). Moreover, we should note that the Select Committee has cited no authority to the contrary. In

---

[32] *See, e.g.*, Cons. Priv. Log 7101 ("Memo re potential claims in anticipation of litigation in PA"); 7320 ("Co-counsel edits to draft complaint for potential litigation"); 16181 ("Comm with experts re use of statistical analysis in pending litigation"); 23047 ("Comm with co-counsel re jurisdictional issues in anticipated election litigation").

fact, the work product privilege has never been restricted to Article 3 tribunals but has frequently been recognized in all sorts of all adversarial proceedings, including those before administrative agencies, arbitration panels, and of particular relevance, "investigative legislative hearing[s]." Restat. 3d of the Law Governing Lawyers, § 87; *see also, e.g.*, *Natta v. Zletz*, 418 F.2d 633, 637-38 (7th Cir.1969) (patent-interference proceeding before administrative agency); *In re Grand Jury Proceedings*, 473 F.2d 840 (8th Cir. 1973) (grand-jury proceedings). That there is no authority directly on point for the electoral certification process itself is not surprising, given that the kind of controversy presented by the 2020 election has only arisen once or twice in our nation's history.

The Select Committee also objects on the ground that the adjudicative role was never triggered because no state legislature certified alternate slates of electors.[33] But if the legislature's adjudicative role gives rise to work product protection, as we contend, that it never materialized is beside the point. "Attorney work product is protected even if the anticipated litigation never materialized." *Frank LLP v. Consumer Fin. Prot. Bureau*, 288 F. Supp. 3d 46, 54 (D.D.C. 2017) (citing *FTC v. Grolier Inc.*, 462 U.S. 19, 28 (1983)).

## CONCLUSION

For the reasons stated above and previously, plaintiff requests this Court order that the materials identified on plaintiff's privilege logs are protected from disclosure to the defendants by the attorney client and work product privileges.

May 31, 2022

Respectfully submitted,

/s/*Anthony T. Caso*
Anthony T. Caso (Cal. Bar #88561)
CONSTITUTIONAL COUNSEL GROUP
174 W Lincoln Ave # 620

---

[33] The Committee misleadingly suggests that Dr. Eastman's acknowledgement that uncertified electors would be "dead on arrival" indicates he knew the strategy developed in his two memos was invalid. But the Committee ignores the timing. The Dec. 23 "draft" memo (*see* Ex. E, "Subject: 1st Draft") specifically references "ongoing disputes in the 7 States," and the more complete version of the memo is specifically based on "[i]f State Legislatures have certified Trump electors." Jan. 3. Memo on Jan. 6 Scenario, ¶ c.i, CNN, https://perma.cc/B8XQ-4T3Z.

Anaheim, CA 92805-2901
Phone: 916-601-1916; Fax: 916-307-5164
Email: atcaso@ccg1776.com

*/s/ Charles Burnham*
Charles Burnham (D.C. Bar # 1003464)
BURNHAM & GOROKHOV PLLC
1424 K Street NW, Suite 500
Washington, D.C. 20005
Email: charles@burnhamgorokhov.com
Telephone: (202) 386-6920

*Counsel for Plaintiff*

1

## CERTIFICATE OF SERVICE

2
    I have served this filing on all counsel through the Court's ECF system.

3
                                  Respectfully submitted,

4

5
                                  */s/ Charles Burnham*
                                  Charles Burnham

6
                                  BURNHAM & GOROKHOV PLLC

7
                                  1424 K Street NW, Suite 500
                                  Washington, D.C. 20005

8
                                  Telephone: (202) 386-6920
                                  Email: charles@burnhamgorokhov.com

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S REPLY BRIEF IN SUPPORT OF PRIVILEGE ASSERTIONS - 22