1

2

3

4

5

6

7

8                          **UNITED STATES DISTRICT COURT**

9                          **CENTRAL DISTRICT OF CALIFORNIA**

10                              **SOUTHERN DIVISION**

11

12

13

14    **JOHN C. EASTMAN,**                    | **Case No. 8:22-cv-00099-DOC-DFM**

15          **Plaintiff,**

16

17          **vs.**

18

19    **BENNIE G. THOMPSON,**                  | **ORDER RE PRIVILEGE OF 599**

20    **SELECT COMMITTEE TO**                  | **DOCUMENTS DATED NOVEMBER 3,**

21    **INVESTIGATE THE JANUARY 6**            | **2020 - JANUARY 20, 2021**

22    **ATTACK ON THE US CAPITOL, AND**

23    **CHAPMAN UNIVERSITY,**

24          **Defendants.**

25

26

27

28

# **Table of Contents**

I.      BACKGROUND ....................................................................................................3

II.     LEGAL STANDARD ...........................................................................................4

III.    DISCUSSION .......................................................................................................4

   A.  Work Product ...................................................................................................5

     1.   Anticipation of litigation ...........................................................................5

     2.   Preparation by or for a client's representative.........................................10

     3.   Waiver of protection .................................................................................11

     4.   Substantial or compelling need exception ...............................................12

   B.  Attorney-Client Privilege ..............................................................................13

     1.   Clients seeking legal advice from attorneys ............................................13

     2.   Confidentiality ..........................................................................................17

   C.  Crime-fraud exception ...................................................................................19

     1.   Timeframe .................................................................................................20

     2.   Emails related to and in furtherance of the crimes ..................................21

   D.  First Amendment ...........................................................................................21

IV.     DISPOSITION ...................................................................................................26

Plaintiff Dr. John Eastman ("Dr. Eastman"), a former law school dean at Chapman University ("Chapman"), is a "political conservative who supported former President [Donald] Trump" and a self-described "activist law professor."[1] While he was a professor at Chapman, Dr. Eastman worked with President Trump and his campaign on legal and political strategy regarding the November 3, 2020 election.

This case concerns the House of Representatives Select Committee to Investigate the January 6 Attack on the US Capitol's ("Select Committee") attempt to obtain Dr. Eastman's emails from his Chapman email account between November 3, 2020 and January 20, 2021. The parties disagree on whether those documents are privileged, and thus protected from disclosure.

## I.   BACKGROUND

In its prior Order, the Court extensively detailed the events of January 6, 2021, and Dr. Eastman and President Trump's actions leading up to and on that day.[2] Accordingly, the Court discusses only the case's procedural history here.

Dr. Eastman filed his Complaint in this Court on January 20, 2022. On January 31, the Court ordered Dr. Eastman to begin his production with documents dated January 4-7, 2021.[3] On March 28, 2022, after briefing and a hearing, the Court ordered Dr. Eastman to disclose 101 of those 111 documents to the Select Committee.[4] Dr. Eastman produced the 101 documents in the first week of April 2022.[5]

Dr. Eastman completed his privilege review of the remaining documents on April 19, and the parties then cooperated to reduce their privilege claims and objections. On May 2, Dr. Eastman produced to the Select Committee 933 documents and a consolidated privilege log identifying 2,018 documents over which he claims privilege.[6] The Select Committee withdrew its objections to 721 documents and reserved the right to raise objections to 576 documents at a

---

[1] Complaint (Dkt. 1) ¶¶ 5–6.
[2] Order Re: Privilege of Documents Dated January 4-7, 2021 ("Order") (Dkt. 260) at 3-12.
[3] Dkt. 63.
[4] Order at 44.
[5] Dkt. 286.
[6] Dkt. 336.

later date. After receiving the final list of disputed documents, the Court immediately began reviewing the documents while the parties submitted briefing on their claims.

On May 19, 2022, Dr. Eastman filed his Brief supporting his privilege assertions over the remaining 599 documents.[7] The Select Committee filed its Opposition ("Opp'n") on March 2, 2022.[8] Dr. Eastman filed his Reply on May 31, 2022.[9]

## II.    LEGAL STANDARD

Federal common law governs the attorney-client privilege when courts adjudicate issues of federal law.[10] "As with all evidentiary privileges, the burden of proving that the attorney-client privilege applies rests not with the party contesting the privilege, but with the party asserting it."[11] The "party asserting the attorney-client privilege has the burden of establishing the relationship *and* the privileged nature of the communication."[12] The party must assert the privilege "as to each record sought to allow the court to rule with specificity."[13] "Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed."[14] The same burden applies to the party asserting work product protection.[15]

## III.    DISCUSSION

The Court will first consider work product protection, then attorney-client privilege, and finally the First Amendment. For documents where Dr. Eastman claims both work product and attorney client privilege, the Court will only address attorney-client privilege if it finds that work product protection does not apply. The Court draws substantially on its reasoning in its prior Order, which addressed many of the same legal and factual issues.

---

[7] Dkt. 345. Dr. Eastman withdrew his claims of privilege over two documents in his Brief. Brief at 21.
[8] Dkt. 350.
[9] Dkt. 353.
[10] *United States v. Ruehle*, 583 F.3d 600, 608 (9th Cir. 2009).
[11] *Weil v. Inv./Indicators, Rsch. & Mgmt., Inc.*, 647 F.2d 18, 25 (9th Cir. 1981) (citations omitted).
[12] *Ruehle*, 583 F.3d at 607 (citation omitted) (emphasis in original).
[13] *Clarke v. Am. Com. Nat. Bank*, 974 F.2d 127, 129 (9th Cir. 1992).
[14] *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002).
[15] *See Hernandez v. Tanninen*, 604 F.3d 1095, 1102 (9th Cir. 2010).

### A.    Work Product

Dr. Eastman claims 555 documents are protected work product, and he also claims attorney-client privilege over 152 of those 555 documents. For documents where Dr. Eastman asserts both privileges, the Court will first decide whether work product protection applies. If a document is not protected work product, the Court will then determine whether attorney-client privilege prevents disclosure.

Documents are protected work product if they are (1) "'prepared in anticipation of litigation or for trial,'" and (2) "prepared 'by or for another party or by or for that other party's representative.'"[16] The Court considers each requirement in turn.

### 1.    Anticipation of litigation

Documents qualify for work product protection if they were "prepared in anticipation of litigation or for trial."[17] However, some litigation documents are also prepared for a second, non-litigation purpose. Those documents are protected when they were "created *because of* anticipated litigation, and would not have been created in substantially similar form *but for* the prospect of that litigation."[18]

The Court groups its analysis of the 555 documents into six categories: ongoing suits, the Electoral Count Act plan, state elections, documents for Congress, connecting third parties, and news articles.

### a.    Draft filings related to ongoing suits

360 of the 555 documents relate to ongoing litigation in state or federal court. Eleven of those documents seek or send legal research for case filings,[19] and another fifty-seven documents make recommendations or edits to court filings or forward draft filings.[20] 292

---

[16] *In re Cal. Pub. Utils. Comm'n*, 892 F.2d 778, 780–81 (9th Cir. 1989) (quoting Fed. R. Civ. P. 26(b)(3)).
[17] Fed. R. Civ. P. 26(b)(3).
[18] *In re Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt.)* ("*Torf*"), 357 F.3d 900, 908 (9th Cir. 2003) (internal quotation omitted) (emphasis added).
[19] 7101; 18110; 23285; 23674; 23839; 31640; 55569; 60106; 60155; 60163; 60210.
[20] 21814; 22912; 23160; 23289; 23325; 23326; 23333; 23343; 23344; 23549; 23450; 24234; 24332; 24618; 24653; 25028; 25553; 26452; 28426; 28487; 28783; 29734; 30048; 46154; 47436; 48373; 49527; 49528; 51017; 52452; 53065; 57872; 59418; 59613; 60478; 60487; 60498; 60526; 60528; 60648; 60758; 60798; 60803; 60832; 60862; 60891; 60897; 61078; 61186; 61231; 61356; 61357; 61371; 61531; 62749; 62761; 62778.

documents discuss litigation strategy for ongoing cases.[21] All of these 360 documents were clearly prepared in anticipation of litigation.

### b.    Electoral Count Act plan

Eleven of the 555 documents relate to Dr. Eastman's proposal for Vice President Pence to reject or delay counting electoral votes on January 6, 2021.[22] As discussed in the Court's prior Order, the plan was intended "to proceed without judicial involvement" and thus emails pertaining to the plan were not made in anticipation of litigation.[23]

Five of those eleven emails discuss actions to support the plan to disrupt the Joint Session.[24] One forwards a now-public November memo about the plan,[25] and one discusses actions that Vice President Pence could take on January 6.[26] Three documents discuss actions for alternate state electors to take in the days leading up to January 6.[27] Because these documents only relate to the political plan for January 6, they were not made in anticipation of litigation and thus are not protected.

Three of the eleven documents discuss suits brought by third parties about the legality of

---

[21] 3268; 3269; 3270; 3271; 7100; 7106; 7177; 7254; 7320; 7402; 7403; 7414; 7416; 7419; 15960; 15965; 15966; 15968; 15980; 15982; 16022; 16194; 16285; 16334; 16350; 17197; 17257; 18270; 19889; 20826; 21094; 21760; 21854; 23042; 23047; 23048; 23049; 23052; 23056; 23060; 23061; 23101; 23107; 23110; 23113; 23156; 23233; 23240; 23242; 23244; 23248; 23324; 23349; 23383; 23408; 23421; 23426; 23431; 23434; 23554; 23555; 23556; 23673; 23740; 23774; 23777; 23819; 23826; 23833; 23845; 23852; 23858; 23862; 23866; 23870; 23875; 23880; 23885; 23894; 23898; 23899; 23906; 23910; 23918; 24133; 24212; 24218; 24310; 24697; 24698; 24703; 24714; 24725; 24727; 24732; 24739; 24746; 24752; 24776; 24777; 24780; 24803; 24866; 24895; 24899; 24931; 24947; 25031; 25033; 25108; 25111; 25220; 25900; 25908; 26385; 26757; 26789; 26836; 26869; 26874; 26884; 26885; 28064; 28074; 28075; 28078; 28148; 28154; 28168; 28399; 28530; 28853; 28952; 29007; 29233; 29273; 29322; 29352; 29397; 29417; 29420; 29444; 29457; 29560; 29783; 29791; 30012; 30013; 30015; 30039; 30040; 30052; 30111; 30175; 30176; 30666; 31213; 32015; 32021; 32079; 32106; 33360; 38210; 43503; 45886; 46183; 46474; 47297; 47433; 48793; 49452; 49668; 50327; 51290; 51291; 51303; 51311; 51316; 51759; 53537; 53565; 53826; 55012; 55029; 55039; 55050; 55127; 55141; 55152; 55271; 55453; 55457; 55486; 55518; 55522; 56070; 56115; 57889; 57908; 57961; 58684; 59210; 59222; 59253; 59448; 59452; 59485; 59498; 59500; 59504; 59506; 59510; 59651; 59685; 59691; 59729; 59799; 59802; 59813; 59825; 59834; 59844; 59855; 59867; 59874; 59895; 59902; 59924; 59931; 59946; 59962; 59970; 59978; 59987; 60033; 60070; 60097; 60113; 60114; 60117; 60118; 60120; 60123; 60126; 60131; 60142; 60145; 60149; 60153; 60183; 60185; 60188; 60193; 60201; 60230; 60353; 60362; 60453; 60456; 60465; 60475; 60578; 60587; 60748; 60812; 60889; 61035; 61068; 61134; 61176; 61259; 61296; 61309; 61359; 61373; 61397; 61424; 61437; 61449; 61452; 61517; 61543; 61555; 61560; 61561; 61562; 61563; 61565; 61580; 61763; 64995.

[22] 23998; 24716; 24905; 24906; 51059; 55112; 56980; 57425; 57790; 59916; 60565.

[23] Order at 23.

[24] 23998; 24716; 24905; 24906; 51059.

[25] 23998.

[26] 51059.

[27] 24716; 24905; 24906.

the Electoral Count Act.[28] These emails do not discuss how this litigation might affect the participants' existing lawsuits; they only consider how these suits could disrupt their plan for January 6. As the Court previously described, "[t]he true animating force behind these emails was advancing a political strategy: to persuade Vice President Pence to take unilateral action on January 6."[29] Because these documents were not created in anticipation of litigation, they are not protected.

In contrast, three of the eleven documents place the January 6 plan in the context of litigation strategy.[30] Two of those documents are separate email chains discussing strategy for a filing in an election-related case and its potential effects on the January 6 plan.[31] Similarly, one document is an email chain discussing the viability of election-related lawsuits after January 6.[32] While these emails relate to the January 6 plan, the team's ongoing and future litigation "animate[d] every document,"[33] such that they were created in anticipation of litigation.

Accordingly, the Court finds that eight of these eleven documents were not made in anticipation of litigation and thus ORDERS them to be disclosed to the Select Committee.

### c.   State election-related documents

Dr. Eastman claims work product protection over 170 documents relating to alleged fraud in state elections.

Fifty-four of those emails are Dr. Eastman advising state legislators or circulating his theories on their authority.[34] Thirty-seven of those coordinate meetings with state legislators or other third parties to discuss alleged election fraud and certifying electors.[35] Another fifteen

---

[28] 56980; 57425; 57790.
[29] Order at 24.
[30] 55112; 59916; 60565.
[31] 59916; 60565.
[32] 55112.
[33] *Torf*, 357 F.3d at 908.
[34] 16181; 16301; 16349; 16379; 16381; 16458; 20142; 21105; 21106; 21111; 21112; 21113; 21116; 21117; 21122; 21124; 21126; 23582; 23584; 23631; 23638; 24730; 24760; 24762; 24778; 24795; 24802; 24893; 24897; 25035; 26075; 31598; 32071; 32072; 51402; 51403; 51407; 51408; 61697; 61724; 61764; 61767; 61768; 61904; 61905; 62674; 62675; 62698; 62706; 62844; 62858; 62859; 62861; 62863.
[35] 16181; 16301; 16349; 16379; 16381; 16458; 20142; 21105; 21106; 21111; 21112; 21113; 21116; 21117; 21122; 21124; 21126; 23582; 23638; 24730; 24760; 24762; 24778; 24795; 24802; 24893; 24897; 25035; 31598; 32071; 32072; 62706; 62844; 62858; 62859; 62861; 62863.

documents send or discuss information for state legislators about their legislative authority.[36] Two documents include Dr. Eastman's request for updates on state legislative subpoenas.[37] All fifty-four documents do not relate to or mention anticipated litigation and are thus not protected.

Four of the 170 documents relate to President Trump's views on state elections.[38] One is a communication from President Trump about a state campaign rally.[39] Three documents discuss President Trump's potential press releases on state electors.[40] These documents do not reference litigation and Dr. Eastman fails to provide context as to how they could pertain to litigation. Accordingly, these four documents are not protected.

Forty-two of the 170 documents are reports or analyses of alleged state election irregularities.[41] Review of the emails shows that these documents served several purposes: they were distributed to state and federal legislators, discussed in public hearings, and also used to support election-related litigation. The reports are largely statistical analyses; they make no reference to litigation and have no indication of being tailored for potential suits. Because these forty-two documents would "have been created in substantially similar form" without the prospect of litigation, they are not protected work product.[42]

Seventy of the 170 documents are emails discussing the election data reports discussed above.[43] Forty-six of these are emails between various attorneys discussing statistical data in the context of state election litigation.[44] These emails would not have been made in the same

---

[36] 23584; 23631; 26075; 51402; 51403; 51407; 51408; 61697; 61767; 61768; 61904; 61905; 62674; 62675; 62698.

[37] 61724; 61764.

[38] 25905; 30038; 30118; 30119.

[39] 25905.

[40] 30038; 30118; 30119.

[41] 18814; 18822; 18956; 23291; 23591; 23905; 28479; 62958; 63054; 63058; 63081; 63084; 63091; 63095; 63103; 63114; 63119; 63125; 63131; 63139; 63146; 63154; 63194; 63407; 63416; 63425; 63438; 63448; 63449; 63450; 63451; 63479; 63503; 63512; 63515; 63518; 63519; 63520; 63717; 63920; 63974; 63977.

[42] *Torf*, 357 F.3d at 908.

[43] 7650; 7652; 7799; 8739; 8742; 11779; 15393; 15584; 15636; 15944; 16182; 16184; 16354; 16561; 16892; 16893; 16894; 16895; 16901; 17124; 17247; 17416; 18406; 18550; 18552; 18554; 18684; 18793; 18796; 18797; 18813; 18821; 18858; 18863; 18865; 18875; 18887; 18901; 18902; 18919; 18920; 19169; 19686; 19888; 20163; 22679; 23290; 23292; 23306; 23308; 23310; 28104; 30669; 31602; 31628; 31634; 31635; 61695; 61701; 62940; 62944; 62948; 62951; 62955; 62984; 62987; 62996; 63000; 63919; 63973.

[44] 7650; 7652; 7799; 8739; 8742; 11779; 15393; 15584; 15636; 15944; 16182; 16184; 16354; 16561; 16892; 16893; 16894; 16895; 16901; 17124; 17247; 17416; 18406; 18550; 18552; 18554; 18684; 18793; 18796; 18797;

form if not for litigation and are thus protected. Eighteen other emails are predominantly Dr. Eastman and statisticians discussing election analyses that they used for both litigation and political purposes.[45] Like the contents of the reports themselves, these discussions would have had the same form without the prospect of litigation and thus are not protected. Dr. Eastman admits that an additional six emails discussing election reports[46] were created for "adjudicatory proceedings in Congress and/or the state legislatures," not litigation.[47] Although he argues that adjudication of electors is analogous to litigation, his only support for this novel claim is a district court case that did not address the issue.[48] Accordingly, these twenty-four documents are not protected.

Of these 170 state election-related documents, 124 were not made in anticipation of litigation and thus are not protected work product. Because Dr. Eastman also claims attorney-client privilege over thirty-seven of those 124 documents,[49] the Court discusses those attorney-client claims below. The remaining eighty-seven documents[50] were not created in anticipation of litigation and have no attorney-client privilege claim, so the Court ORDERS them to be disclosed.

### d.   Documents for Congress

Three documents are email chains gathering information for members of Congress.[51] Two of those documents do not mention litigation and solely collect materials for Congress.[52]

---

[45] 18858; 18863; 18865; 18875; 18887; 18901; 18902; 18919; 19169; 23290; 23292; 23306; 23308; 23310; 28104; 30669.

[45] 18813; 18821; 18920; 19686; 19888; 20163; 22679; 62940; 62944; 62948; 62951; 62955; 62984; 62987; 62996; 63000; 63919; 63973.

[46] 31602; 31628; 31634; 31635; 61695; 61701.

[47] Brief at 26-27.

[48] *Id.* at 25.

[49] 23291; 23582; 23584; 23591; 23631; 23638; 24730; 24760; 24762; 24778; 24795; 24893; 24897; 25035; 25905; 30038; 30118; 51402; 51403; 51407; 51408; 61695; 61697; 61701; 61767; 61768; 61904; 61905; 62674; 62675; 62698; 62706; 62844; 62858; 62859; 62861; 62863.

[50] 16181; 16301; 16349; 16379; 16381; 16458; 18813; 18814; 18821; 18822; 18920; 18956; 19686; 19888; 20142; 20163; 21105; 21106; 21111; 21112; 21113; 21116; 21117; 21122; 21124; 21126; 22679; 23905; 24802; 26075; 28479; 30119; 31598; 31602; 31628; 31634; 31635; 32071; 32072; 61724; 61764; 61764; 62940; 62944; 62948; 62951; 62955; 62958; 62984; 62987; 62996; 63000; 63054; 63058; 63081; 63084; 63091; 63095; 63103; 63114; 63119; 63125; 63131; 63139; 63146; 63154; 63194; 63407; 63416; 63425; 63438; 63448; 63449; 63450; 63451; 63479; 63503; 63512; 63515; 63518; 63519; 63520; 63717; 63919; 63920; 63973; 63974; 63977.

[51] 52958; 61666; 62657.

[52] 52958; 62657.

The third email chain discusses litigation plans, but also includes a paragraph recommending talking points for members of Congress on their alleged authority to delay the electoral count.[53] This paragraph is not in anticipation of litigation and must be disclosed, with the remainder of the document redacted.

Dr. Eastman also claims attorney-client privilege over one of the three documents discussed in this section,[54] so the Court discusses that document below. Accordingly, the Court ORDERS that the other two documents[55] must be disclosed.

### e.    Connecting third parties

Four documents connect third parties to Dr. Eastman.[56] Two of those connect Dr. Eastman to state legislators and their attorneys.[57] The other two emails are people reaching out to Dr. Eastman to offer suggestions or praise.[58] As was the case for similar documents discussed in the prior Order, none of these documents relate to or implicate litigation. Accordingly, these four documents are not protected and the Court ORDERS them to be disclosed.

### f.    News articles

Seven documents share news articles or Twitter posts.[59] These public articles and posts were not created for litigation, and the minimal commentary contained in the emails is unrelated to litigation. As such, these seven documents are not protected work product.

Dr. Eastman also claims attorney-client privilege over two of the seven documents,[60] so the Court discusses those below. Accordingly, the Court ORDERS the other five documents[61] to be disclosed.

### 2.    Preparation by or for a client's representative

The Court now examines whether the 409 documents that were created in anticipation of

---

[53] List item 4 in 61666.
[54] 52958.
[55] 61666; 62657.
[56] 23893; 31209; 61862; 61868.
[57] 61862; 61868.
[58] 23893; 31209.
[59] 6854; 6855; 18592; 18593; 18897; 25167; 25170.
[60] 25167; 25170.
[61] 6854; 6855; 18592; 18593; 18897.

litigation were created by or for a party or "party's representative (including the other party's attorney, consultant, . . . or agent)," which is the second requirement for work product protection.[62] Accordingly, documents are protected if they were prepared by or for President Trump or another client, or by or for Dr. Eastman or another representative of those clients.[63]

404 of these 409 documents relate to representing President Trump or his campaign. All 404 documents were prepared and/or sent by or for members of the White House and campaign staff, attorneys of record in court cases (including Dr. Eastman), and those attorneys' staff. Because these documents were created by or for agents of President Trump or his campaign, they are protected work product.

The other five documents relate to Dr. Eastman advising Georgia legislators on potential lawsuits.[64] All of those emails were prepared by the clients' agents, Dr. Eastman or the legislators' other counsel, so they are protected work product.

### 3.    Waiver of protection

The Court now considers whether Dr. Eastman waived his privilege over any of the 409 documents that the Court concluded above were protected work product. Unlike attorney-client privilege, which is waived if not kept completely confidential, work product protection is only waived when attorneys disclose their work to "an adversary or a conduit to an adversary in litigation."[65]

As the Court previously ruled, Dr. Eastman's use of his Chapman University email address did not destroy Dr. Eastman's privilege over his communications.[66]

Dr. Eastman did not disclose any of the 409 documents to a conduit to an adversary in litigation. The documents were all exchanged between members of President Trump and his campaign's litigation teams; President Trump's staff; and likeminded experts, consultants, and volunteers. Moreover, many of the documents were labeled confidential or "attorney work

---

[62] Fed. R. Civ. P. 26(b)(3); *see United States v. Nobles*, 422 U.S. 225, 238 (1975).
[63] Below, the Court expands upon its reasoning in the prior Order and finds that Dr. Eastman and President Trump and his campaign had an established attorney-client relationship during entire the period of the subpoena. Thus, Dr. Eastman is a representative of President Trump and his campaign for purposes of the work product doctrine.
[64] 24727; 24797; 59448; 60185; 60188.
[65] *Sanmina*, 968 F.3d 1107, 1121 (9th Cir. 2020)ren; *Nobles*, 422 U.S. at 239.
[66] Order at 17-20, 29-30.

product," reinforcing Dr. Eastman's assertion that his team did not intend for these documents to be disclosed to adversaries.

### 4.      Substantial or compelling need exception

As was the case in the Court's prior decision, all of the 409 protected documents are 'opinion' work product because they include attorneys' thoughts and legal theories. Opinion work product "is virtually undiscoverable."[67] A court may compel disclosure of opinion work product only in the rare situation "when mental impressions are *the pivotal issue* in the current litigation and the need for the material is compelling."[68]

As the Court previously found, review of the 409 protected documents shows that none are "pivotal" to the Select Committee's investigation. The majority of the documents include opinions and discussions about trial strategy in ongoing or anticipated lawsuits. As discussed above, this litigation was a "legitimate form of recourse, and is not tied to the investigation's core purpose, which is to 'investigate and report upon the facts, circumstances, and causes relating to the January 6, 2021, domestic terrorist attack upon the United States Capitol.'"[69] Accordingly, none of these 409 non-"pivotal" litigation-related documents shall be disclosed based on compelling need.

* * *

Having evaluated each element of work product protection, the Court finds that 409 documents are protected work product and 146 documents are not protected work product. Dr. Eastman also claims attorney client privilege over 40 of the 146 documents that are not protected work product,[70] so the Court will determine disclosure for these 40 documents under attorney-client privilege below. Thus, the Court ORDERS the other 106 documents to be

---

[67] *Republic of Ecuador v. Mackay*, 742 F.3d 860, 869 n.3 (9th Cir. 2014) (quoting *United States v. Deloitte LLP*, 610 F.3d 129, 136 (D.C. Cir. 2010)); Fed. R. Civ. P. 26(b)(3)(B).

[68] *Holmgren v. State Farm Mutual Auto. Ins. Co.*, 976 F.2d 573, 577 (9th Cir. 1992) (emphasis added); *see also Upjohn Co. v. United States*, 449 U.S. 383, 401–02 (1981) (noting that opinion work product is discoverable only upon "a far stronger showing of necessity and unavailability by other means").

[69] Order at 43 (quoting H.R. Res. 503 § 3).

[70] 23291; 23582; 23584; 23591; 23631; 23638; 24730; 24760; 24762; 24778; 24795; 24893; 24897; 25035; 25167; 25170; 25905; 30038; 30118; 51402; 51403; 51407; 51408; 52958; 61695; 61697; 61701; 61767; 61768; 61904; 61905; 62674; 62675; 62698; 62706; 62844; 62858; 62859; 62861; 62863.

disclosed.[71]

### B.    Attorney-Client Privilege

The Court now moves from work product protection to Dr. Eastman's claims of attorney-client privilege. The attorney-client privilege protects confidential communications between attorneys and clients for the purpose of legal advice.[72] However, "advice on political, strategic, or policy issues" is not protected.[73] The privilege extends to communications with agents of the clients and third parties assisting the attorney.[74]

Dr. Eastman claims attorney-client privilege over 166 documents. Because the Court found above that 112 of those documents were protected work product, the Court here considers the remaining fifty-four documents.[75]

### 1.    Clients seeking legal advice from attorneys

Below, the Court considers whether an attorney-client relationship existed and whether the client was seeking legal advice when communicating with their attorney.

### a.  President Trump as client

The Court previously found that Dr. Eastman had an attorney-client relationship with President Trump between January 4-7, 2021.[76] Dr. Eastman was counsel of record on several cases representing President Trump and his campaign in post-election litigation beginning in

---

[71] 6854; 6855; 16181; 16301; 16349; 16379; 16381; 16458; 18592; 18593; 18813; 18814; 18821; 18822; 18897; 18920; 18956; 19686; 19888; 20142; 20163; 21105; 21106; 21111; 21112; 21113; 21116; 21117; 21122; 21124; 21126; 22679; 23893; 23905; 23998; 24716; 24802; 24905; 24906; 26075; 28479; 30119; 31209; 31598; 31602; 31628; 31634; 31635; 32071; 32072; 51059; 56980; 57425; 57790; 61666; 61724; 61764; 61862; 61868; 62657; 62940; 62944; 62948; 62951; 62955; 62958; 62984; 62987; 62996; 63000; 63054; 63058; 63081; 63084; 63091; 63095; 63103; 63114; 63119; 63125; 63131; 63139; 63146; 63154; 63194; 63407; 63416; 63425; 63438; 63448; 63449; 63450; 63451; 63479; 63503; 63512; 63515; 63518; 63519; 63520; 63717; 63919; 63920; 63973; 63974; 63977.

[72] *Upjohn*, 449 U.S. at 389; *see also United States v. Graf*, 610 F.3d 1148, 1156 (9th Cir. 2010).

[73] *In re Lindsey*, 148 F.3d 1100, 1106 (D.C. Cir. 1998).

[74] *See Sanmina*, 968 F.3d at 1116 (internal citations omitted). In some instances, the Ninth Circuit has found communications between an attorney and their associates privileged. *See United States v. Rowe*, 96 F.3d 1294, 1296 (9th Cir. 1996).

[75] 23291; 23532; 23539; 23542; 23551; 23552; 23582; 23584; 23591; 23631; 23638; 24730; 24760; 24762; 24778; 24795; 24893; 24897; 25035; 25167; 25170; 25905; 30038; 30118; 51402; 51403; 51407; 51408; 52958; 53452; 61695; 61697; 61701; 61767; 61768; 61904; 61905; 62674; 62675; 62698; 62706; 62776; 62841; 62842; 62844; 62858; 62859; 62861; 62863; 62865; 62868; 64305; 64331; 64715.

[76] Order at 14-15.

November 2020.[77] In that capacity he communicated with members of the campaign and White House staff, and their emails confirm that they viewed him as President Trump's attorney. An attorney-client relationship between Dr. Eastman and President Trump thus existed throughout the subpoena's time period.

For five of the fifty-four documents, Dr. Eastman claims attorney-client privilege involving his representation of President Trump.[78] Three of the five documents are news articles or photos from President Trump sent by his Executive Assistant to Dr. Eastman.[79] Dr. Eastman does not explain how these seek legal advice. Although Dr. Eastman's privilege log claims that the photo is President Trump's "handwritten note re issues for anticipated litigation," the note simply celebrates the size of President Trump's campaign rallies.[80] The other two documents discuss how to frame President Trump's potential press statement on certifying alternate electors in swing states.[81] These documents do not discuss any legal questions about the statement, but rather focus on framing. Because these five documents were not created for legal advice, they are not protected and the Court ORDERS them to be disclosed.

### b.   Legislators as potential clients

Forty of the fifty-four documents involve state legislators as potential clients.[82] The attorney-client privilege extends to potential clients who seek legal advice from an attorney.[83] Dr. Eastman submits his sworn declaration attesting that these legislators were potential clients,[84] and the contents of the emails support his assertion.

Fifteen of the forty documents are email communications between Dr. Eastman, two

---

[77] *Donald J. Trump for President, Inc., v. Boockvar,* No. 4:20-cv-02078 (M.D. Pa., filed Nov. 9, 2020); *see also* Declaration of John Eastman ("Eastman Decl.") (Dkt. 346-2) ¶ 5.
[78] 25167; 25170; 25905; 30038; 30118.
[79] 25167; 25170; 25905.
[80] Privilege log, 25905; 25905.
[81] 30038; 30118.
[82] 23532; 23539; 23542; 23551; 23552; 23582; 23584; 23591; 23631; 23638; 24730; 24760; 24762; 24778; 24795; 24893; 24897; 25035; 51402; 51403; 51407; 51408; 52958; 53452; 61767; 61768; 62674; 62675; 62698; 62706; 62776; 62841; 62842; 62844; 62858; 62859; 62861; 62863; 62865; 62868.
[83] *United States v. Layton*, 855 F.2d 1388, 1406 (9th Cir. 1988).
[84] Eastman Decl. ¶¶ 15-20.

Pennsylvania state legislators, and an agent of those legislators.[85] The first email is the legislators' agent asking Dr. Eastman for legal advice, which Dr. Eastman describes as "regarding the constitutional authority of state legislatures to deal with election illegality and fraud."[86] Two documents are an email chain containing this inquiry and Dr. Eastman's initial response, which are protected; the remainder of the chain is not for legal advice, so Dr. Eastman must disclose redacted versions of the two documents.[87] Two more documents are Dr. Eastman's attachments to his response, which are protected attorney-client communications.[88] The eleven documents constituting the remainder of the chain schedule Zoom meetings or discuss state politics.[89] Those emails were not for the purpose of legal advice and so must be disclosed.

Nine of the forty documents involve Georgia legislators.[90] Six documents include Georgia state legislators making explicit legal inquiries to Dr. Eastman and are therefore for the purpose of legal advice.[91] One additional document merely seeks a Zoom link and is thus not protected.[92] Two documents share a draft petition by Georgia state legislators but do not seek legal advice and are therefore not protected.[93]

Nine of the forty documents involve Arizona state legislators.[94] Four of those include a state legislator asking for Dr. Eastman's advice on a draft resolution and are therefore for the purpose of legal advice.[95] One document includes an email asking about the intersection of state and federal election law and thus seeks legal advice; the rest of the document is not for

---

[85] 23532; 23539; 23542; 23551; 23552; 23582; 23584; 23591; 23631; 23638; 24760; 24762; 24893; 24897; 25035.
[86] Brief at 16.
[87] 23582 (the Court refers here to the email on page 23582, sent on December 5, 2020, at 5:50 pm MST); 25035 (the Court refers here to the email on page 25036, sent on December 5, 2020, at 9:17 am). Dr. Eastman should redact these four fully or partially protected documents wherever they appear in other documents.
[88] 23584; 23631.
[89] 23532; 23539; 23542; 23551; 23552; 23591; 23638; 24760; 24762; 24893; 24897.
[90] 24730; 24778; 24795; 61767; 61768; 62674; 62675; 62698; 62706.
[91] 24730; 24778; 24795; 62674; 62675; 62698.
[92] 62706. Dr. Eastman should redact the other protected emails in this thread.
[93] 61767; 61768.
[94] 51402; 51403; 51407; 51408; 62776; 62841; 62842; 62865; 62868.
[95] 51402; 51403; 51407; 51408.

legal advice, so Dr. Eastman must disclose the unprotected portions.[96] Four documents coordinate scheduling calls and are therefore not for the purpose of legal advice,[97] so they must be disclosed.

Five of the forty documents circulate a Zoom invitation and discuss strategy pertaining to election investigations and strategy in several states.[98] One of the documents is protected because it contains two emails seeking legal advice from Dr. Eastman about legislative authority.[99] Four of the documents do not seek legal advice,[100] so they are not protected.

Two of the forty documents seek and provide information to encourage Members of Congress to object to certain electoral slates.[101] While these emails refer to alleged violations of state law, the purpose of the exchange is to encourage Members to object, not to seek legal advice. Accordingly, these two documents are not protected.

The Court finds that twenty-seven of these forty state legislator-related documents are not protected and ORDERS them to be disclosed.

### c.    Dr. Eastman as client

For three of the fifty-four documents, Dr. Eastman is the potential client.[102] In these emails, Dr. Eastman discusses with another attorney whether to bring a suit for "breach of contract and violation of constitutional rights."[103] Dr. Eastman's sworn declaration confirms the same.[104] These documents explicitly seek legal advice and representation.

### d.    No client relationship

Six of the fifty-four documents include no client or involve third parties without supported client relationships.[105]

---

[96] 62776. The Court refers here to the email sent on January 31, 2021 at 8:45 am MST. The other email in this document is not protected and must be disclosed.
[97] 62841; 62842; 62865; 62868.
[98] 62844; 62858; 62859; 62861; 62863.
[99] 62863. The Court refers here to the emails sent on January 3, 2021 at 4:03 pm MST and January 3, 2021 at 3:06 pm MST.
[100] 62844; 62858; 62859; 62861.
[101] 52958; 53452.
[102] 64305; 64331; 64715.
[103] Brief at 17.
[104] Eastman Decl. ¶ 21.
[105] 23291; 61904; 61905; 61695; 61697; 61701.

One of the six documents is a report on alleged state election irregularities,[106] which does not contain or seek legal advice. Thus, this document is not protected.

Another two of the six documents are between Dr. Eastman and a third party asking for information on Michigan election law violations.[107] Dr. Eastman provides no information about this third party to link him to any existing or potential client. Accordingly, Dr. Eastman has not met his burden to demonstrate that these two documents are protected.

Three of the six documents include an email planning a call for state legislators about decertifying electors and attaching two related memos.[108] While these documents contain some brief legal references, no client appears to have sought this legal information. The majority of the documents do not offer legal advice but aim to persuade legislators to take political action. Accordingly, these three documents are not protected.

Since these six documents are not protected, the Court ORDERS them to be disclosed.

## 2.    Confidentiality

The Court found above that nineteen full or partial documents were communications between an attorney and client for the purpose of seeking legal advice.[109] In order for these communications to be privileged, they must also have been kept confidential.[110] The presence of a third party does not necessarily destroy confidentiality if that third party is an agent of the client or attorney.[111] But the third party's "shared desire to see the same outcome in a legal matter is insufficient" to maintain confidentiality.[112]

Nine of the nineteen documents are solely between the client, the client's agent, and confirmed counsel.[113] Accordingly, these nine documents are protected.

---

[106] 23291.

[107] 61904; 61905.

[108] 61695; 61697; 61701.

[109] 23582; 23584; 23631; 24730; 24778; 24795; 25035; 51402; 51403; 51407; 51408; 62674; 62675; 62698; 62776; 62863; 64305; 64331; 64715.

[110] *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1126–27 (9th Cir. 2012); *see also Reiserer v. United States*, 479 F.3d 1160, 1165 (9th Cir. 2007) ("there is no confidentiality where a third party . . . either receives or generates the documents").

[111] *United States v. Landof*, 591 F.2d 36, 39 (9th Cir. 1978); *Richey*, 632 F.3d at 566.

[112] *In re Pac. Pictures Corp.*, 679 F.3d at 1129.

[113] 23582; 23584; 23631; 24730; 25035; 62776; 64305; 64331; 64715.

Four of the nineteen documents are between Dr. Eastman and a third party who is in communication with an Arizona state senator.[114] Dr. Eastman submits a sworn declaration that this third party is an agent of the state senator, and the contents of the emails confirm the agent relationship. Accordingly, these four documents are confidential and thus protected.

Two of the nineteen documents involve a potential representation of two Georgia state senators.[115] Those emails are between the two potential clients, their counsel, Dr. Eastman, and a third party. The attorney for the legislators submitted a sworn declaration that the third party was an attorney working as his agent in this matter.[116] Accordingly, those emails are confidential and therefore privileged.

Three of the nineteen emails involve a potential representation of a different Georgia state senator.[117] While Dr. Eastman provided a sworn declaration that he offered pro bono legal advice to this senator, there are four other people on the emails whom Dr. Eastman identifies as "attorneys working with the Trump legal team."[118] However, the client in this case was not President Trump or his campaign. Without further evidence specifying the relationship between these Trump attorneys and this state legislator, the Court cannot find these communications to be confidential. Accordingly, these three emails are not privileged and must be disclosed.

Similarly, the final of the nineteen documents is an email between a third party and Dr. Eastman relating to a potential representation of a state legislator.[119] Dr. Eastman's declaration, briefing, and privilege log all fail to provide any support for this third party's relationship to the potential client. Because the email is not confidential, it is not privileged and must be disclosed.

Accordingly, the Court ORDERS Dr. Eastman to disclose the four of the nineteen documents that are not confidential.[120]

\* \* \*

Having evaluated each element of attorney-client privilege, the Court finds that 12

---

[114] 51402; 51403; 51407; 51408.
[115] 24778; 24795.
[116] Declaration of Robert D. Cheeley (Dkt. 346-1) ¶ 5.
[117] 62674; 62675; 62698.
[118] Privilege log, 62674.
[119] 62863.
[120] 62674; 62675; 62698; 62863.

documents are privileged and 42 documents are not privileged. Thus, the Court ORDERS the 42 documents to be disclosed.[121]

### C.    Crime-fraud exception

Based on the Court's previous analysis, the Court has required disclosure of 148 unprotected communications. 421 documents are protected either by work product or attorney-client privilege, so the Court now considers whether those documents should be disclosed under the crime-fraud exception.

The crime-fraud exception applies when (1) a "client consults an attorney for advice that will serve [them] in the commission of a fraud or crime,"[122] and (2) the communications are "sufficiently related to" and were made "in furtherance of" the crime.[123] It is irrelevant whether the scheme was ultimately successful.[124] An attorney's wrongdoing alone may pierce the privilege, regardless of the client's awareness or innocence.[125] The exception extinguishes both the attorney-client privilege and the work product doctrine.[126]

The majority of the remaining protected documents are clearly legitimate legal or litigation communications. However, five documents reference the plan to delay or stop the electoral count on January 6, 2021, and therefore present a close call as to whether they fall

---

[121] 23291; 23532; 23539; 23542; 23551; 23552; 23582; 23591; 23638; 24760; 24762; 24893; 24897; 25035; 25167; 25170; 25905; 30038; 30118; 52958; 53452; 61695; 61697; 61701; 61767; 61768; 61904; 61905; 62674; 62675; 62698; 62706; 62776; 62841; 62842; 62844; 62858; 62859; 62861; 62863; 62865; 62868. As described above, Dr. Eastman should redact the privileged parts of documents 23582, 25035, and 62776.

[122] *In re Grand Jury Investigation*, 810 F.3d 1110, 1113 (9th Cir. 2016).

[123] *In re Grand Jury Proc. (Corp.)*, 87 F.3d 377, 381–83 (9th Cir. 1996).

[124] *Id.* at 382.

[125] *See In re Sealed Case*, 107 F.3d 46, 49 n.2 (D.C. Cir. 1997) ("[T]here may be rare cases . . . in which the attorney's fraudulent or criminal intent defeats a claim of privilege even if the client is innocent."); *In re Impounded Case (Law Firm)*, 879 F.2d 1211, 1213 (3d Cir. 1989) ("We cannot agree" that "the crime-fraud exception does not apply to defeat the client's privilege where the pertinent alleged criminality is solely that of the law firm").

[126] *In re Int'l Sys. & Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1242 (5th Cir. 1982) ("Every court of appeals that has addressed the crime-fraud exception's application to work product has concluded that it does apply."); *In re John Doe Corp.*, 675 F.2d 482, 492 (2d Cir. 1982) ("where so-called work-product is in aid of a criminal scheme, fear of disclosure may serve a useful deterrent purpose and be the kind of rare occasion on which an attorney's mental processes are not immune."). Indeed, "conduct by an attorney that is merely unethical, as opposed to illegal, may be enough to vitiate the work product doctrine." *United States v. Christensen*, 828 F.3d 763, 805 (9th Cir. 2015).

within the crime-fraud exception.[127]

### 1. Timeframe

The Court previously held that from January 4-7, 2021, President Trump and Dr. Eastman likely committed obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2), and conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, when they attempted to disrupt the Joint Session of Congress on January 6, 2021.[128] Because the remaining protected documents pre-date that time period, the Court now determines whether those attempted crimes began earlier.

The previously disclosed documents indicate that Dr. Eastman and President Trump's plan to disrupt the Joint Session was fully formed and actionable as early as December 7, 2020. On that day, Dr. Eastman forwarded a memo explaining why January 6 was the "Hard Deadline" that was "critical to the result of this election" for the Trump Campaign.[129] A week later, on December 13, President Trump's personal attorney received a more robust analysis of January 6's significance, which was potentially "the first time members of President Trump's team transformed a legal interpretation of the Electoral Count Act into a day-by-day plan of action."[130]

The current set of documents also confirm that the plan was established well before January 6, 2021. In an email on December 22, 2020, an attorney with the Trump legal team referred to the "the January 6 strategy" as a known plan to eight other people.[131] Two days later, Dr. Eastman explained that the worst case for the plan was receiving a court decision that constrained Vice President Pence's authority to reject electors.[132] Dr. Eastman and President Trump's plan to stop the count was not only established by early December, it was the ultimate goal that the legal team was working to protect from that point forward.

---

[127] 51291; 51759; 55112; 59916; 60565.
[128] Order at 36, 45.
[129] Opp'n Ex. B (Dkt. 350-3).
[130] Opp'n Ex. A (Dkt. 350-2); Order at 41.
[131] 51291; *see also* 51759.
[132] 55112, 55114.

### 2. Emails related to and in furtherance of the crimes

Four of these five documents consider how filing certain election lawsuits might affect the January 6 plan.[133] In these emails, Dr. Eastman and his colleagues discuss how to frame their legal filings in light of what they considered a near-zero chance of success in the D.C. courts.[134] Attorneys reference January 6 not as the day to enact the plan, but as a deadline to bring timely and effective lawsuits. As the Court noted in its prior Order, "pursuing legal recourse itself did not advance any crimes."[135] Accordingly, these four emails did not further the January 6 plan and therefore are not subject to the crime-fraud exception.

In the fifth email, dated December 22, 2020, an attorney goes beyond strategizing litigation outcomes. This email considers whether to bring a case that would decide the interpretation of the Electoral Count Act and potentially risk a court finding that the Act binds Vice President Pence.[136] Because the attorney concluded that a negative court ruling would "tank the January 6 strategy," he encouraged the legal team to avoid the courts.[137] This email cemented the direction of the January 6 plan. The Trump legal team chose not to seek recourse in court—instead, they forged ahead with a political campaign to disrupt the electoral count. Lawyers are free not to bring cases; they are not free to evade judicial review to overturn a democratic election. Accordingly, this portion of the email[138] is subject to the crime-fraud exception and must be disclosed.

### D. First Amendment

Dr. Eastman claims that the First Amendment protects thirty documents involving a group of "civic minded citizens of a conservative viewpoint who meet semi-regularly to

---

[133] 51759; 55112; 59916; 60565.
[134] 51759.
[135] Order at 41.
[136] 51291.
[137] The Court here refers to the first paragraph of the email. Dr. Eastman should redact the remainder of the email before disclosing it to the Select Committee.
[138] The Court refers to the first paragraph of the email on 51291. Dr. Eastman should redact the remainder of this document.

socialize and discuss issues of public concern."[139] Dr. Eastman contends that disclosure would deter people from participating in potentially controversial groups.

Disclosing information related to political associations can "have a profound chilling effect on the exercise of political rights."[140] The Supreme Court has therefore held that disclosure is only appropriate when there is "a sufficiently important governmental interest."[141] Courts must then balance the government's interest and the group members' privacy interests.[142] Ultimately, disclosure requirements must be "narrowly tailored to the government's asserted interest."[143]

The thirty documents at issue here are emails that include invitations for Dr. Eastman to speak about election litigation, meeting agendas, or Zoom information.[144] Dr. Eastman argues that the Select Committee does not have a strong interest in these documents because they "consist[] mostly of scheduling, agenda setting, and communicating login information."[145] The Court's *in camera* review shows that twenty of the thirty documents match Dr. Eastman's description: they are entirely logistical or plan updates on state post-election litigation, which the Court has already found to be a legitimate form of recourse.[146] The potential chilling effect on the participants outweighs the Select Committee's interest because the documents are at most minimally relevant to its investigation. Accordingly, those twenty documents are protected from disclosure.

---

[139] Brief at 31.
[140] *Perry v. Schwarzenegger*, 591 F.3d 1147, 1156 (9th Cir. 2010) (citing *Gibson v. Fla. Legislative Investigation Comm.*, 372 U.S. 539, 557 (1963)).
[141] *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021) (plurality opinion) (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010) (internal quotation marks omitted)).
[142] *Barenblatt v. United States*, 360 U.S. 109, 126 (1959).
[143] *Bonta*, 141 S. Ct. at 2383 (majority opinion). While the Select Committee proposes using only *Barenblatt*'s balancing test, Opp'n at 24, the Court finds that *Barenblatt* and *Bonta* articulate effectively the same test. *See Republican Nat'l Comm. v. Pelosi*, No. 22-cv-00659-TJK, __ F. Supp. 3d __, 2022 WL 1294509, at *20 (D.D.C. May 1, 2022) (finding minimal or no differences between the tests).
[144] 21115; 21119; 21120; 21242; 21243; 21245; 21253; 21429; 21430; 22779; 22780; 23038; 23956; 24948; 24950; 25165; 25438; 25558; 25877; 26072; 26091; 26790; 26791; 26793; 26903; 26910; 28376; 30032; 31471; 31537.
[145] Brief at 32.
[146] 21115; 21119; 21120; 21242; 21243; 21245; 21253; 21429; 21430; 23956; 25165; 25438; 25877; 26790; 26793; 26903; 26910; 28376; 31471; 31537.

However, the Court's review reveals that the other ten of the thirty documents are more closely tied to the Select Committee's investigation and present a closer question.[147] All of these documents relate to three meetings in the first two weeks of December 2020, which all included presentations on topics related to the election and the group's broader interests.

Four documents pertain to a meeting on December 8, 2020: two emails are the group's high-profile leader inviting Dr. Eastman to speak at the meeting, and two contain the meeting's agenda.[148] Based on the agenda, Dr. Eastman discussed "State legislative actions that can reverse the media-called election for Joe Biden."[149] Another speaker gave an "update on [state] legislature actions regarding electoral votes."[150]

Five documents include the agenda for a meeting on December 9, 2020.[151] The agenda included a section entitled "GROUND GAME following Nov 4 Election Results," during which a sitting Member of Congress discussed a "[p]lan to challenge the electors in the House of Representatives."[152]

One document contains the agenda for a meeting on December 16, 2020.[153] This meeting similarly had a section on the "GROUND GAME following Nov 4 Election Results." In this segment, an elector for President Trump analyzed "The Constitutional implications of the Electoral College Meeting and What Comes Next."[154]

The Select Committee has a substantial interest in these three meetings because the presentations furthered a critical objective of the January 6 plan: to have contested states certify alternate slates of electors for President Trump.[155] The week before these meetings, Dr. Eastman sent memos to high-level White House staff explaining that the January 6 plan required legislators "to determine the manner of choosing electors, even to the point of

---

[147] 22779; 22780; 23038; 24948; 24950; 25558; 26072; 26091; 26791; 30032.
[148] 22779; 22780; 25558; 26091.
[149] 25558.
[150] *Id.*
[151] 23038; 24948; 24950; 26072; 26791.
[152] 26791.
[153] 30032.
[154] *Id.*
[155] *See* Order at 4-5, 41.

adopting a slate of electors themselves."[156] In the same two week period, Dr. Eastman reached out to sympathetic state legislators in Pennsylvania, Georgia, and Arizona, urging them to decertify Biden electors and certify alternate Trump electors. Just three days after the third meeting, Dr. Eastman admitted that his January 6 plan hinged on "electors get[ting] a certification from their State Legislators"—without it, the dueling slates would be "dead on arrival in Congress."[157] Dr. Eastman's actions in these few weeks indicate that his and President Trump's pressure campaign to stop the electoral count did not end with Vice President Pence— it targeted every tier of federal and state elected officials. Convincing state legislatures to certify competing electors was essential to stop the count and ensure President Trump's reelection.

Dr. Eastman argues that the Select Committee's interests are weak, but his claims are unconvincing with respect to these ten documents. He contends that the documents do not further the Committee's investigation as they "predate January 6 and do not discuss demonstrations at the Capitol on that or any other day."[158] But Dr. Eastman incorrectly limits the Select Committee's mandate, which extends to the "facts, circumstances, and causes relating to the January 6, 2021, domestic terrorist attack . . . [and] the interference with the peaceful transfer of power."[159]

The Court now considers whether the Select Committee's interests outweigh the associational interests of the participants. Several courts have suggested that the First Amendment bars disclosure when it results in "extensive interference with political groups' internal operations and with their effectiveness."[160] For example, the Supreme Court found that NAACP members facing "economic reprisal, loss of employment, [and] threat of physical coercion" outweighed the government's need for disclosure of membership lists.[161] On the other hand, another district court recently found that the Select Committee's interest

---

[156] Opp'n Ex. J (Dkt. 350-11) at 6.
[157] Opp'n Ex. D (Dkt. 350-5).
[158] Brief at 32.
[159] H.R. Res. 503 § 3(2), 117th Cong. (2021).
[160] *AFL-CIO v. Fed. Election Comm'n*, 333 F.3d 168, 177 (D.C. Cir. 2003) (citing several Supreme Court cases); *see also Pelosi*, __ F. Supp. 3d __, 2022 WL 1294509, at *19.
[161] *NAACP v. Alabama*, 357 U.S. 449, 462 (1958).

outweighed "the subpoena's interference with the [Republican National Committee's] ability to pursue political goals such as winning elections and advocating for its policies."[162]

Here, Dr. Eastman argues that the risks of disclosure outweigh the Select Committee's interest. Dr. Eastman warns that group members risk being "subject to congressional subpoena," "forced to suffer unwanted public exposure," and "chill[ed]" from engaging in further discussion with other members.[163] Dr. Eastman contends that his concerns are compounded when "a politically misaligned congressional committee"[164] has engaged in leaks and publication of private documents.

While Dr. Eastman has legitimate concerns, they are not as weighty as either the RNC's fears or those of NAACP members. First, the risk of third parties receiving future subpoenas cannot be sufficient to justify noncompliance with an existing subpoena. Second, disclosing the documents would not reveal a full membership list of the group; the emails blind copied all recipients, so their information is not accessible. Eight of the ten documents are meeting agendas, so group members' names only appear if they were scheduled to speak. To mitigate any chilling effect, the Court can order redaction of the names of presenters on topics unrelated to the January 6 plan. Third, although the Court "must presume that the committees of Congress will exercise their powers responsibly and with due regard for the rights of affected parties,"[165] there have been leaks and public disclosures from the Select Committee in this case already.[166] But as the *RNC* court found, the balancing still tips in the Select Committee's favor, even when the Court considers the likelihood of disclosure to the public.[167]

Having considered the parties' arguments, the Court finds that disclosure of these ten key documents is "narrowly tailored to the government's asserted interest."[168] Accordingly, the

---

[162] *RNC*, __ F. Supp. 3d __, 2022 WL 1294509, at *23 (internal quotation marks omitted).
[163] Brief at 32-33.
[164] *Id.*
[165] *Exxon Corp. v. Fed. Trade Comm'n*, 589 F.2d 582, 589 (D.C. Cir. 1978).
[166] Brief at 33.
[167] *RNC*, __ F. Supp. 3d __, 2022 WL 1294509, at *20.
[168] *Bonta*, 141 S. Ct. at 2383.

Court ORDERS Dr. Eastman to disclose those ten documents.[169] Dr. Eastman should redact the names of all participants listed as speakers besides those mentioned by the Court.[170]

## IV.    DISPOSITION

For the reasons explained above, the Court finds that 440 documents are privileged. The Court **ORDERS** Dr. Eastman to disclose the other 159 documents to the House Select Committee by 2:00 p.m. Pacific Time on Wednesday, June 8, 2022.[171]

DATED:  June 7, 2022

_David O. Carter_
_____
DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

---

[169] 22779; 22780; 23038; 24948; 24950; 25558; 26072; 26091; 26791; 30032.
[170] The Court here refers to unmentioned participants listed on the agendas in 23038, 24948, 24950, 25558, 26072, 26091, 26791, and 30032.
[171] It is Dr. Eastman's responsibility to redact protected emails when they appear in otherwise-disclosed documents.